## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.,
*Formerly known as*
HELLER HEALTHCARE FINANCE, INC.,
Plaintiff

And

MICHAEL INGOLDSBY,
Intervenor/Plaintiff

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE GROUP, LTD,
Defendants.

Civil Action No.: 05-CV-11128-NG

## FIRST AMENDED COMPLAINT IN INTERVENTION

This is an action for declaratory judgment, pursuant to 28 U.S.C. § 2201, breach

of contract and violation of M.G.L. chapter 93A, arising from a dispute concerning

defense obligations under a liability insurance policy issued by National Union Fire

Insurance Company of Pittsburgh, PA to Michael Ingoldsby as Chairman of the Board of

Managed Health Care Systems, Inc.

## PARTIES

1.     The Plaintiff, Michael Ingoldsby, is an individual who resides at 1863 San

       Silvestro Drive, Venice, Florida.  At all times relevant hereto, Mr. Ingoldsby was

       the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"),

1

which was a corporation duly organized and existing under the laws of the
Commonwealth of Massachusetts and had its principal place of business at 175
Derby Street, Hingham, Massachusetts.  In this capacity, Mr. Ingoldsby is a
person engaged in trade or commerce as that term is defined in G.L.c. 93A.

2.     The Defendant, National Union Fire Insurance Company of Pittsburgh, PA
       ("National Union"), is a duly constituted corporation and an insurance company
       duly licensed to issue insurance policies in Massachusetts.  The Defendant
       National Union Fire Insurance Company of Pittsburgh, PA, has a home office at
       175 Water Street, New York, New York.  The Defendant is a person engaged in
       trade or commerce as that term is defined in M.G.L. c. 93A.

3.     The Defendant, International Insurance Group ("International"), is a corporation
       duly organized and existing under the laws of the Commonwealth of
       Massachusetts and has its principal place of business at 125 Broad Street, 4th
       Floor, Boston, Massachusetts.  The Defendant is a person engaged in trade or
       commerce as that term is defined in M.G.L. c. 93A.

### JURISDICTION AND VENUE

4.     Jurisdiction is properly placed in this Court pursuant to 28 U.S.C. § 1332
       because the amount in controversy exceeds $75,000, exclusive of interests and
       costs, and there is diversity of citizenship between Ingoldsby and National Union.

5.     Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of
       the events and/or omissions giving rise to the claims asserted herein occurred in
       this judicial district and National Union, a corporation, is subject to personal

2

jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS

### I.     Terms of the Insurance Policy.

6.     At all times material hereto, the Plaintiff was insured for liability under a policy of insurance issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number 873-57-52, effective August 4, 2001, through August 4, 2002, which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as the "Policy").

7.     Included in the specifications of who is covered by the Policy are the following: Directors and Officers Insurance:

> [P]olicy shall pay the Loss of each and every Director or Officer of the Company arising from any claim or claims first made against the Directors or Officers reported to the Insurer during the Policy Period or the Discovery Period ... for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company..."

8.     Under Section 2(g), a "Wrongful Act" is described as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

### II.     International Insurance Group, LTD.

9.     International served as the brokerage firm for MHCS in obtaining Directors and Officers Insurance.

10.     As such, International advised MHCS as to the most appropriate coverage and policy.

11.  On or about August 4, 2000, MHCS purchased the Policy issued by National Union, using International as its insurance broker.

12.  The Policy came up for renewal on August 4, 2001.

13.  On or about July 31, 2001, International provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, Endorsements to be added to the base policy.

14.  Upon information and belief, the Renewal Proposal provided by International did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability.

15.  Exclusion 4(h), as purportedly amended, stated as follows:

> (h)  alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon termination of any insured)...

A true and correct copy of Endorsement No. 8 of the Policy is attached hereto as Exhibit "A."

16.  On or about July 31, 2001, International also provided MHCS with a letter, dated July 27, 2001, from National Union to International that outlined changes that would be reflected in the Policy upon renewal.

17.  The July 27, 2001 letter also did not reference the purported amendment to Exclusion 4(h).

18.  Upon information and belief, International failed to fully advise MCHS regarding the language of the alleged Exclusion and the effect of said Exclusion on MCHS'

liability coverage under the Policy.

19.    The language of Exclusion 4(h), as amended, significantly decreased, if not

altogether eliminated, the value of the Policy to MHCS by excluding any claims

arising from contractual liability.

III.    Denial of Coverage under the Policy.

20.    On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller")

commenced a civil action in United States District Court for the District of

Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against the

Plaintiff Michael Ingoldsby and served the "Complaint and Jury Demand," a true

and correct copy of which is attached hereto as Exhibit "B."

21.    On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the

Defendant, National Union.

22.    All conditions precedent to the Plaintiff's rights under the Policy and to this action

have been performed or have occurred.

23.    On or about October 11, 2002, the insurer, through counsel, "declined coverage

for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby,

and Indy Edwards."  A true and correct copy of the October 11, 2003 denial letter

is attached hereto as Exhibit "C."

24.    Thereafter, by letter dated March 6, 2003, counsel for National Union again

declined coverage by stating that "there [was] no coverage available under the

policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby."

A true and correct copy of the March 6, 2003 denial letter is attached hereto as

Exhibit "D."

25.    Specifically, the insurer stated that under Exclusion 4(h), as amended by
        Endorsement No. 8, it is "not liable to make any payment for loss in connection
        with any claim or claims made against the Directors of Officers" because the
        claims allege, arise out of and are based upon the contractual liability of MHCS
        under the [Debtor-in-Possession Loan and Security Agreement] ("DIP")
        Agreement.

26.    The Heller Complaint alleged a claim for Negligent Misrepresentation (Count I)
        against Pamela Jones, Indy Edwards and Michael Ingoldsby and claim for
        Breach of Guaranty (Count II) against Michael Ingoldsby and Mary Lee
        Ingoldsby.   See Exhibit B.

27.    The allegation of negligent misrepresentation qualifies as a "Wrongful Act" under
        the terms of the policy.  Specifically, the policy defines a "Wrongful Act" as:

> any breach of duty, neglect, error, misstatement, misleading statement,
> omission or act by the Directors or Officers of the Company in their
> respective capacities as such, or any matter claimed against them solely
> by reason of their status as Directors or Officers of the Company.

28.    Thus, any breach of *neglect, misstatement,* or *misleading statement* claimed
        against the Officers or Directors in their respective capacity are acts covered
        under the Policy as should be Count I of the Complaint.

29.    National Union disregarded the fact that Michael Ingoldsby was the Chairman of
        the Board at the relevant times and not involved in the day-to-day operations of
        MHCS.

30.    In fact, the Complaint alleged in ¶ 25 that the borrowing base certificates were

signed by Jones and Edwards, not Mr. Ingoldsby.  As such, Michael Ingoldsby was sued under Count 1 of the Complaint solely by reason of his status as a member of the Board of Directors and not due to any sort of active role in MHCS. See Exhibit B.

31.   Therefore, under the terms of Section 1, Coverage A (Directors and Officers Insurance) of the Policy, Mr. Ingoldsby qualifies as an insured.

32.   Based on the allegations of the Complaint and Jury Demand, facts were known or readily knowable to National Union articulating circumstances which were reasonably susceptible of an interpretation of a covered claim.

33.   The Defendant National Union owed a defense obligation under the policy for all defense costs associated with the defense of the Heller Action because the allegations of the Complaint and Jury Demand as a whole were reasonably susceptible of an interpretation that they state or adumbrate a claim for negligent misrepresentation, -- a "Wrongful Act" under the Policy-- which claims were not, under the terms of the Complaint, necessarily within any exclusion.

34.   The failure and refusal of the Defendant National Union to fulfill its obligations under the policy represents a breach of contract and an unfair claims practice in violation of M.G.L. c. 93A, § 2 and M.G.L. c. 176D.

35.   As a result of the failure of Defendant National Union to fulfill its obligations as set forth above, the Plaintiff has suffered substantial damages.

36.   In litigating the claims asserted by Heller over a two-year period, the Plaintiff also expended a substantial amount of money in attorneys' fees and costs.

7

37.    In addition, the Plaintiff was forced to file a petition for relief pursuant to Chapter

7 of the United States Bankruptcy Code in the United States Bankruptcy Court,

Middle District of Florida, Tampa Division, case number 02-24824-8C7.

38.    On or about February 7, 2004, the Plaintiff entered into a Settlement Agreement

with Heller under which Heller received approximately One Hundred Thousand

Dollars ($100,000.00) from the Plaintiff.

## CLAIMS FOR RELIEF

### COUNT I
### (DECLARATORY JUDGMENT)
### (MICHAEL INGOLDSBY v. NATIONAL UNION)

39.    The Plaintiff incorporates by reference herein the allegations contained within

paragraphs 1-38, as though fully set forth herein.

40.    As more fully described above, a real and justiciable controversy has arisen

between the Plaintiff and National Union regarding National Union's obligation to

defend Michael Ingoldsby in the Heller Action.

41.    The parties cannot settle the existing controversy without the aid of this Court's

judgment.

**WHEREFORE**, the Plaintiff requests this Court to:

a.    Enter a declaratory judgment that the Plaintiff Michael Ingoldsby

was entitled to a defense from National Union against Heller's

claims.

b.    Enter a declaratory judgment that the terms of Endorsement No. 8,

which amended Exclusion 4(h), are unconscionable and should not

8

be enforced.

c.      Enter a declaratory judgment that the terms of Endorsement No. 8,
which amended Exclusion 4(h) created an adhesion contract and
the terms of such should not be enforced.

d.      Enter a declaratory judgment that National Union is now required to
reimburse Plaintiff for the costs of his defense and settlement of the
Heller Action.

e.      Enter a declaratory judgment that National Union must reimburse
the Plaintiff for all attorneys' fees and court costs associated with
this action.

f.      And grant such further relief as the Court may deem equitable and
just under the circumstances.

<u>COUNT II</u>
**(BREACH OF CONTRACT)**
**(MICHAEL INGOLDSBY v. NATIONAL UNION)**

42.     The Plaintiff incorporates by reference herein the allegations contained within
paragraphs 1-41, as though fully set forth herein.

43.     At all times material hereto, the Plaintiff Michael Ingoldsby was insured for liability
under a policy of insurance issued by National Union Fire Insurance Company of
Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number
FKO6003905, effective August 4, 2001, through August 4, 2002, which was a
renewal of policy number 473-16-30.

44.     All conditions precedent to the Plaintiff's rights under the Policy and to this action

have been performed or have occurred.

45.    On or about August 1, 2002, Heller commenced a civil action against the Plaintiff
       Michael Ingoldsby and served the "Complaint and Jury Demand". <u>See</u> Exhibit D.

46.    On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the
       Defendant National Union.

47.    On or about October 11, 2002, the insurer, through counsel, "declined coverage
       for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby,
       and Indy Edwards." <u>See</u> Exhibit C.

48.    Thereafter, by letter dated March 6, 2003, counsel for National Union again
       declined coverage by stating that "there [was] no coverage available under the
       policy for the claims asserted in the *Heller Action* against Michael O. Ingoldsby."
       <u>See</u> Exhibit D.

49.    The Defendant National Union owed a defense obligation under the Policy for all
       defense costs associated with the defense of the Heller Action because the
       allegations of the Complaint and Jury Demand as a whole are reasonably
       susceptible of an interpretation that they state or adumbrate a claim for negligent
       misrepresentation, -- a "Wrongful Act" under the Policy-- which claims were not,
       on the terms of the Complaint, necessarily within any exclusion such as
       Exclusion 4(h) (as amended Endorsement No. 8).

50.    The failure and refusal of the Defendant, National Union, to fulfill its obligations
       under the policy represents a material breach of the Policy.

51.    As a result of the failure of Defendant National Union to fulfill its obligations as

set forth above, the Plaintiff Michael Ingoldsby has suffered damages, a loss of

money and has been damaged in his business.

**WHEREFORE,** the Plaintiff demands judgment against the Defendant in an

amount to be proven at trial, plus interest from the date this action was filed

and court costs.

**COUNT III**
**(VIOLATION OF MASS. GEN. L. 93A and 176D)**
**(MICHAEL INGOLDSBY v. NATIONAL UNION and INTERNATIONAL)**

52.    The Plaintiff incorporates by reference herein the allegations contained within

paragraphs 1-51, as though fully set forth herein.

53.    Both National Union and International are engaged in trade or commerce as

defined by M.G.L. ch. 93A.

54.    National Union's conduct, including willful breach of the Policy, constitutes an

unfair and deceptive act or practice in violation of G.L. c. 93A and an unfair

claims practice in violation of G.L. c. 176D.

55.    By virtue of the above conduct, National Union engaged in unfair and deceptive

acts and practices in violation of G.L. c. 93A and an unfair claims practice in

violation of G.L. c. 176D.

56.    International's conduct, including material misrepresentations regarding the

Policy and the coverage provided therein, constitutes an unfair and deceptive act

or practice.

57.    By virtue of the above conduct, International engaged in unfair and deceptive

acts and practices in violation of G.L. c. 93A and G.L. c. 176D.

58.    The Defendants National Union and International acted in conspiracy in violation of G.L. c. 93A and G.L. c. 176D.

**WHEREFORE**, the Plaintiff suffered damages and monetary loss as a result of the Defendants' conduct in violation of Massachusetts General Laws, Chapter 93A and G.L. c. 176D, entitling the Plaintiff to treble damages, attorney's fees, plus interest and costs.

**COUNT IV**
**(FRAUD/DECEIT)**
**(MICHAEL INGOLDSBY v. INTERNATIONAL)**

59.    The Plaintiff incorporates by reference herein the allegations contained within paragraphs 1-58, as though fully set forth herein.

60.    By words or conduct, International misrepresented material facts to MHCS, thereby inducing MHCS to purchase and/or renew the Policy.

61.    Specifically, the fraud consisted of statements and representations made by International that the Policy would provide certain coverage for the Plaintiff in his capacity as a director for MHCS, in particular as it related to contractual liability.

62.    These representations, knowingly made, were intended to mislead and induce MHCS into purchasing and/or renewing the Policy.

63.    Based on these misrepresentations, MHCS's officers and directors, including Michael Ingoldsby, reasonably relied to their detriment on International's misrepresentation that the Policy would cover such claims.

64.    However, the insurer National Union failed and refused to defend the Plaintiff and, in doing so, relied on an endorsement that was not disclosed to the Plaintiff

by International upon renewal of the Policy.

   **WHEREFORE,** the Plaintiff has suffered damages and monetary loss as a result of the Defendant International's fraudulent conduct and demands judgment against it in an amount to be proven at trial, plus interest and court courts.

**COUNT V**
**(NEGLIGENT MISREPRESENTATION)**
**(MICHAEL INGOLDSBY v. INTERNATIONAL)**

65.   The Plaintiff incorporates by reference herein the allegations contained within paragraphs 1-64, as though fully set forth herein.

66.   By words or conduct, International misrepresented material facts to MHCS, thereby inducing MHCS to purchase and/or renew the Policy.

67.   Specifically, the misrepresentation consisted of statements and representations made by International that the Policy would provide certain coverage for the Plaintiff in his capacity as a director for MHCS, in particular as it related to contractual liability.

68.   These representations were negligently made as the Defendant failed to exercise reasonable care or competence in obtaining and/or communicating information regarding the Policy to the Plaintiff.

69.   Based on these misrepresentations, Mr. Ingoldsby reasonably relied to his detriment on International's misrepresentation that the Policy would cover such claims.

70.   However, the insurer, National Union, failed to defend the Plaintiff in the Heller Action and, in doing so, relied on an endorsement that was not adequately

disclosed to the Plaintiff by International upon renewal of the Policy.

**WHEREFORE,** the Plaintiff have suffered monetary damages as a result of International's negligent conduct and demand judgment against it in an amount to be proven at trial, plus interest and court courts.

**THE PLAINTIFF CLAIMS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,
MICHAEL INGOLDSBY
By his Attorney,

/s/ Gregory J. Aceto
Gregory J. Aceto
BBO# 558556
JOHNSON & ACETO, P.C.
67 Batterymarch St., Suite 400
Boston, MA 02110
(617) 728-0888
aceto@johnsonaceto.com

Dated: December 5, 2005

**ENDORSEMENT # 8**

This endorsement, effective 12:01 am    *August 4, 2001*                 forms a part of
policy number    *873-87-52*
issued to    *MANAGED HEALTH CARE SYSTEMS*

By    *National Union Fire Insurance Company of Pittsburgh, PA*


### FOR-PROFIT HEALTH CARE ORGANIZATION
### AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that this
policy is amended as follows:

I.      AMENDMENTS TO DEFINITIONS

A.  The Definition of Individual Insured(s) shall be amended to include the following at the
    end thereof:

    Individual Insureds shall also include any past, present or future member of any duly
    constituted committee ("Committee Member"); any individual person engaged by a
    duly constituted committee for purposes of providing an expert opinion with regard to
    peer review or credentialling decision concerning an individual physician ("Outside
    Expert"); any individual in charge of any operational department ("Department Head")
    or any medical director, staff physician or faculty member of the Company, regardless
    of whether or not such person is directly employed by the Company or is considered to
    be an independent contractor.

B.  The Definition of Loss shall be amended to include the following at the end thereof:

    1. <u>IRS FINES</u>

       Loss shall include Defense Costs incurred in connection with a Claim seeking an
       assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or
       penalties pursuant to the following sections of the Internal Revenue Code of 1986
       (as amended):

       Section 4911 (tax on excess expenditures to influence legislation);
       Section 4940 (a);
       Section 4941 (taxes on self-dealing);
       Section 4942 (taxes on failure to distribute income);
       Section 4943 (taxes on excess business holding);
       Section 4944 (taxes on investments which jeopardize charitable purpose);
       Section 4945 (taxes on taxable expenditures);

Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);
Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and
Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2. EMTALA COVERAGE

a. The Definition of Claim(s) is amended to include the following:  Claim shall also mean a civil lawsuit alleging a violation pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd *et seq.*, and any similar state or local statute (herein "EMTALA Claim(s)").

b. The Definition of Loss is amended to include coverage for civil fines and penalties assessed pursuant to an EMTALA Claim.

c. It is further understood that a sublimit of liability in the amount of $150,000 shall apply to all EMTALA Claims made and reported during the Policy Period or Discovery Period (if applicable) combined (hereinafter "Sublimit of Liability").  This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability.

d. Solely for the purposes of the coverage afforded herein to EMTALA Claims, exclusion (m) is modified by deleting the phrase "alleging, arising out of, based upon or attributable to" and replacing it with the word "for".

3. GOVERNMENTAL FUNDING DEFENSE COST COVERAGE

Loss shall not include the return of funds which were received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds; provided, however, that with regard to Claims for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000 ("Government Funding Defense Costs Sublimit"). This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability.  With respect to any Defense Costs coverage afforded pursuant to this paragraph 3, it is understood that:  the Insurer shall be liable to pay 50% of such Defense Costs, excess of a retention in the amount of $1,000,000, up to the Government Funding Defense Costs Sublimit, and subject to the Limit of Liability listed on the Declarations Page.  It being a condition of this insurance that the remaining 50% of such Defense Costs shall be carried by the Insureds at their own risk and be uninsured.

It is further understood and agreed that solely with respect to the Governmental Funding Defense Cost coverage provided pursuant to the above paragraph, the No Liability retention waivers located in the section of the policy entitled RETENTION CLAUSE are deleted in their entirety.

4. <u>EXCESS BENEFIT PENALTY COVERAGE</u>

Loss shall also include any "Excess Benefits" penalty assessed in the amount of 10% by the Internal Revenue Service ("IRS") against any Insured(s) for management's involvement in the award of an "Excess Benefit" and the Defense Costs attributable thereto.  Loss shall specifically exclude: (1) any 25% penalty assessed by the IRS against an Insured deemed to have received an Excess Benefit; (2) Defense Costs incurred to defend any Insured if it has been in fact determined that such individual received an Excess Benefit; and (3) any 200% penalty assessed by the IRS for failure to correct the award of an Excess Benefit.  In all events, the assessment by the IRS of a 200% penalty against any Insured shall void ab initio all coverage afforded pursuant to this paragraph.

For purposes of this endorsement, the term "Excess Benefits" means an excess benefit as defined in the Taxpayer Bill of Rights Act, 2, 26 U.S.C. 4958.

C. The Definition of Wrongful Act is amended to include the following at the end thereof:

With respect to all Insureds, any alleged defect in peer review or credentialling.

II.    AMENDMENTS TO EXCLUSIONS

1.  Exclusions 4 (f) is deleted in its entirety and replaced with the following:

(f) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon the termination of any Insured); provided, however, that this exclusion shall not apply to:

(1) Employment Practices Claims to the extent that any liability does not arise from such express contract or agreement; or

(2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to hospital practice, privileges, credentialling or peer review matters.

2.  The following additional exclusions are added to the end of Clause 4. EXCLUSIONS:

(s) alleging, arising out of, based upon or attributable to any failure or omission on the part of the Insureds or the Company to effect and maintain insurance;

(t) alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, price fixing, price discriminations, unfair competition, deceptive trade practices and/or monopolies, including any actions, proceedings, claims or investigations related thereto;

(u) alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others; provided, however, that this exclusion shall not apply to:

    (1) Employment Practices Claims;

    (2) Claims for Loss alleging Wrongful Acts of an Insured(s) peer review or credentialling processes;

(v) alleging, arising out of, based upon or attributable to any Human Clinical Trial. For purposes of this exclusion (v), "Human Clinical Trial" shall mean any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical.

## III.   AMENDED CLAUSE 9

Clause 9 is deleted in its entirety and replaced with the following:

## 9.   PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

This Clause 9 applies to all Claims.

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of all Claims against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event

the Insureds are already defending a Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Claim is brought. In the event a Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Claim is brought to function as "local counsel" on the Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
Authorized Representative

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS



HELLER HEALTHCARE FINANCE, INC.,

                Plaintiff,

v.

MICHAEL INGOLDSBY, MARY LEE
INGOLDSBY, PAMELA JONES, and
INDY EDWARDS,

                Defendants.

## 02 CV 11553 NG

### COMPLAINT

COMES NOW the Plaintiff, Heller Healthcare Finance, Inc. ("Heller") and for its

Complaint states as follows:

### Nature of the Case

1.      This action seeks damages suffered by Heller as a result of the negligent

misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to

collateral available to satisfy loans made by Heller to two corporate borrowers with whom they

were affiliated. Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are

also sued for breach of contract on a personal guaranty.

### Parties

2.      Plaintiff Heller is a Delaware corporation with its principal place of business at 2

Wisconsin Circle, 4th floor, Chevy Chase, Maryland 20815. Heller is a lender to the healthcare

industry.

3.      Defendant Michael Ingoldsby ("Ingoldsby") was at all relevant times the sole

shareholder and a Director of Managed Health Care Systems, Inc. ("MHCS"), a non-party. At

all relevant times, Ingoldsby served, on information and belief, as unpaid chief executive officer (CEO) of both MHCS and Medical Temporaries, Inc., another related non-party ("Medical Temporaries"). Mr. Ingoldsby was also actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones. Upon information and belief, Mr. Ingoldsby resides at 5 Stagecoach Road, Hingham, MA 02043.

4.     Defendant Mary Lee Ingoldsby is the wife of Michael Ingoldsby, residing at 5 Stagecoach Road, Hingham, MA 02043.

5.     Defendant Pam Jones was at all relevant times the Controller and, on information and belief, Vice President, Finance of MHCS and its affiliate, Medical Temporaries. At all relevant times, Ms. Jones was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Jones resides at 197 High Street, Duxbury, MA 02332.

6.     Defendant Indy Edwards was, on information and belief, at all relevant times President and a Director of MHCS and of Medical Temporaries. At all relevant times, Ms. Edwards was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Edwards resides at 345 Camp Street, #506, West Yarmouth, MA 02673.

## Jurisdiction and Venue

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the plaintiff and each of the defendants and the amount in controversy exceeds $75,000.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants resides in this district and all of the defendants reside in Massachusetts.

<u>Background</u>

9.      At all relevant times, Defendants Jones, Edwards and Ingoldsby were either a shareholder, officer and/or director of MHCS.  MHCS was a privately held, for profit, "home health agency," i.e., a provider of home health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas.  Together with Medical Temporaries, MHCS provided home nursing services to over 700 persons.

10.      Medicare is a medical assistance program administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a division of the United States Department of Health and Human Services ("HHS").

11.      At all relevant times, MHCS participated in CMS' home health prospective payment system ("PPS").  The home health PPS is described in CMS' Home Health Agency Manual, HCFA Publication No. 11, Transmittals 297 and 298.

12.      Under the PPS, MHCS obtained prospective, or advance, payments from CMS at "episode rates."  An "episode rate" is a predetermined payment amount intended to cover all skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services provided to a given patient during a given sixty-day period, which generally starts the day the first Medicare billable service is delivered to a patient.  With certain exceptions, including one described below, the episode rate payment is not affected by the number of visits that the home healthcare provider actually makes to the patient's home during the covered period.

13.     Generally speaking, home health providers receive an up-front initial percentage payment of the episodic payment due for a patient's care by submitting a Request for Anticipated Payment (RAP). The provider claims the balance of monies due for services during the 60-day "episode" by submitting a "final claim" to Medicare, together with a physician approved Plan of Care for the episode, if not previously submitted, which final claim is due within 60-days from the end of the episode or 60-days from the issue of the RAP payment,. The up-front RAP payment is 60% of the episode payment, for an initial episode, with 40% paid on the back end; for subsequent episodes of care 50% is paid with the RAP and 50% upon the final claim.

14.     As an exception to these rules, if a particular patient receives four or less visits during the 60-day episode the provider is not entitled to the full episodic payment. Rather, under the Low Utilization Payment Adjustment (LUPA) rules the provider is paid only on a per-visit basis.

15.     By way of example, assume the PPS episode payment for a particular patient is $2,500. The up-front RAP payment would be 60%, or $1,500. It is determined, however, by the time that the final claim is submitted, that the LUPA rules apply and the provider is due only $300 for the limited care that was rendered during the episode. Medicare "takes back" $1,200 by recoupment, reducing monies otherwise due the provider, on other claims, by $1,200.

16.     On February 23, 2001, MHCS and Medical Temporaries both filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

17.     Heller was a pre-petition lender to MHCS and Medical Temporaries on a number of loans, including (i) a Loan and Security Agreement dated as of August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000; (ii) a Secured Term Note, which also served as a security agreement, in the original amount of $685,000, later amended to

$515,000; (iii) a Secured Term Note in the amount of $200,000, for an overline loan, and (iv) a further overline loan, treated as an advance under the Revolving Credit Note, in the maximum principal amount of $233,000 (the second "overline"). As of the petition date, MIICS and Medical Temporaries owed Heller $1,677,073 on these various loans ($973,184 on the Revolving Credit Note, $515,000 on the Pre-petition Term Loan; $188,889 on the first pre-petition overline, together with $13,095 of accrued and unpaid interest, together with attorneys' fees and other costs recoverable under the loan documents).

18.      Post-petition, on February 28, 2001, Heller, as lender, and MHCS and Medical Temporaries, jointly and severally as "borrower", entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which loan refinanced the pre-petition Revolving Credit Note. The Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), a copy of which is attached as Exhibit A hereto. The two debtors, at the same time, received bankruptcy court approval for use of the cash collateral (receivables) which collateralized Heller on the pre-petition term loan. The Bankruptcy Court approved the aforesaid DIP Loan and the debtors' use of cash collateral at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001.

19.      Defendant Ingoldsby and Defendant Mary Ingoldsby, his wife, guaranteed the obligations of MHCS and Medical Temporaries under the DIP Loan Agreement.

20.      Under Section 2.1(g) of the DIP Loan Agreement, the amount of $3 million revolving line of credit that MHCS and Medical Temporaries could draw upon at any given time under the DIP Loan facility was equal to "eighty five percent (85%) of Qualified Accounts due and owing from any Medicaid/Medicare, Insurer or other Account Debtor (the 'Borrowing Base')." "Qualified Account" was defined in Section 1.49 of the Loan Agreement.

21.     Under Section 3.1(a) of the DIP Loan Agreement, the DIP Loan was secured by, among other assets, MHCS' and Medical Temporaries' Accounts (defined in Section 1.1 as "any right to payment for goods sold or leased or services rendered . . . whether or not earned by performance") and accounts receivable.

22.     Under section 3.3(b) of the Loan Agreement, MHCS and Medical Temporaries were each obligated to "keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender." Section 6.1 of the Loan Agreement required MHCS and Medical Temporaries to submit a sales and collections report and an accounts receivable aging schedule to Heller by the fifteenth day of every month.

23.     MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the "eligible" Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement.

24.     A home healthcare provider must track and record LUPAs, for among other reasons, to avoid overstating its accounts receivable and/or its right to payment for services rendered. This is relevant to the instant cause of action, for the reasons noted immediately below.

25.     Heller lent money to MHCS and Medical Temporaries under the DIP Loan based on the level of receivables the companies reported to Heller on periodic "borrowing base certificates", signed by Defendants Jones and Edwards in the ordinary course of business and

their employment.   These certificates were supplied to Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance collections it received back to MHCS and Medical Temporaries upon various "draw" requests by the borrowers.   At all times, Heller reasonably relied on the accuracy of the borrowing base certificates it received from MHCS and Medical Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical Temporaries under the DIP Loan.

26.     Officers and directors of a home healthcare provider who fail to cause the provider to track and record LUPAs cause the provider to overstate its accounts receivable and/or its right to payment for services rendered.

27.     Unknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller of MHCS' and Medical Temporary's receivable collateral on the borrowing base certificates submitted  in connection with the DIP Loan.  As a consequence, the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries under the DIP Loan failed, until February 2002, to accurately track or record required negative LUPA (downward) adjustments to receivables as reported therein.  These failures caused receivables as reported to Heller on the borrowing base certificates to be overstated.

28.     Heller reasonably relied on the accuracy of borrowing base certificates submitted to it by MHCS and Medical Temporaries in connection with the DIP Loan, from time to time, such as the borrowing base certificate dated September 26, 2001, attached as Exhibit B.

29.     Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and

Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby, prepared and served such DIP Operating Reports on Heller and other creditors with the intent and expectation that the bankruptcy court, Heller and such other creditors would reasonably reply on the accuracy of the balance sheets and other financial data reported therein.

30.     Unknown to Heller, but similar to the situation of the misstated borrowing base certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports, with the consequence that the DIP Operating Reports as filed, through January 2002, failed to show and reflect required LUPA adjustments (downwards) to the receivable collateral.

31.     On November 12, 2001, Medical Temporaries filed a Status Report with the bankruptcy court, attached as <u>Exhibit C</u>, which report was served on Heller, reflecting $1,341,389 in total collectible receivables and a $50,011 availability under the DIP Loan facility. The same report advised the Court and creditors that MHCS and Medical Temporaries were negotiating with HCFA with respect to the repayment of an alleged $480,00 pre-petition overpayment alleged by Medicare. Medical Temporaries reported that MHCS and Medical Temporaries anticipated to achieve a settlement of this disputed obligation which provided for favorable repayment terms in the near future. Medical Temporaries also reported that the two debtors anticipated filing either a plan of reorganization or achieving an asset sale within sixty (60) days time, and that a dividend to unsecured creditors was expected in the two bankruptcies.

32.    Around this time, in the Fall of 2001, Heller was told by MHCS and Medical Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of acquiring, as "new equity", the principal assets of MHCS and Medical Temporaries, through a sale or a reorganization plan, with Defendant Michael Ingoldsby possibly having some sort of continuing management role in any successor venture.

33.    On November 13, 2001, the United States Trustee filed a Statement Regarding Status Conference, attached as Exhibit D, to which was attached the Operating Report filed by MHCS and Medical Temporaries with the bankruptcy court for the period ending October 26, 2001.

34.    Unknown to Heller, by the actions of the Defendants Jones, Edwards, and Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of MHCS' and Medical Temporaries Accounts and accounts receivable as reported to Heller on the borrowing base certificates submitted to Heller and in the DIP Operating Reports filed with the bankruptcy court and served on Heller, by failing to cause MHCS and Medical Temporaries to make LUPA adjustments therein, which adjustments would have reduced collectible and eligible receivables as shown thereon.

35.    MHCS' and Medical Temporaries' failure to accurately track and record LUPAs was a breach of Section 3.3. of the Loan Agreement.

36.    MHCS' and Medical Temporaries failure to accurately track and record LUPAs caused a misstatement of the their Qualified Accounts and, therefore, of the Borrowing Base of eligible Accounts reported to Heller on borrowing base certificates, overstating the eligible receivables against which Heller loaned monies to MHCS and Medical Temporaries under the DIP Loan Agreement.

37.    In reliance on MHCS' and Medical Temporaries' misstatements of Qualified Accounts and the Borrowing Base, of which Heller had no knowledge until Heller conducted a field audit in January 2002, Heller loaned MHCS and Medical Temporaries approximately $402,000 more on the DIP Loan than Heller would have advanced had the borrowing base certificates and the DIP Operating Reports been properly stated.

38.    The Defendants knew, or should have known, of significant misstatements in the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries and of related misstatements of receivables as reported in the DIP Operating Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of MHCS and Medical Temporaries.

39.    Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely, that she believed that MHCS' and Medical Temporaries' borrowing base certificates were no longer accurate and that she would no longer certify them. When Mr. Gardullo probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on information and belief, acting as unpaid Chief Executive Officer (CEO) of the two debtors.

40.    In a contemporaneous conversation with Mr. Ingoldsby, Mr. Gardullo was led to believe by defendant Ingoldsby that Ms. Jones discomfort arose from a matter which Mr. Gardullo was familiar with, to wit, failure of the borrowing base certificates and the DIP Operating Reports to reduce Accounts and accounts receivable of MHCS and Medical Temporaries as shown therein by the $480,000 or so pre-petition overpayment liabilities alleged by Medicare, which alleged overpayment was then the subject then pending settlement negotiations between MHCS and Medicare and its fiscal intermediary, as noted above. Because MHCS and Medical Temporaries had reported to the bankruptcy court and creditors that a

favorable settlement with Medicare was close and would, once consummated, "term out" and repay any pre-petition overpayment liability to Medicare over a multi-year period, negatively impacting cash flow by only a few thousand dollars a month, Mr. Gardullo was comfortable that no immediate "one time" major downward adjustment of receivables as reported on the borrowing base certificates, to reflect an overpayment obligation to Medicare, was then necessary. Mr. Ingoldsby made these statements to Mr. Gardullo without reasonable care, with the intent that Heller rely on his representations and continue to advance monies under the DIP Loan, and Heller so did.

41.     Consistent with Mr. Ingoldsby's representations, even after Defendant Jones ceased to certify the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller the certificates submitted in connection with the DIP Loan continued to be certified by Defendant Edwards as being accurate and Heller reasonably relied on the same, until Heller notified MHCS and Medical Temporaries, as a result of a January 2002 field audit, of mis-statements therein.

42.     A field audit of MHCS and Medical Temporaries was conducted for Heller in January 2002 by Health Care Analysis Corporation, a Heller affiliate. When the audit results were thereupon fully analyzed and completed Heller become aware of a significant overstatement of the borrowing base by the failure of MHCS and Medical Temporaries to make LUPA adjustments.

43.     At this point, in early February 2002, Heller ceased further advances, beyond collections received, and notified MHCS and Medical Temporaries that they had improperly failed to make LUPA adjustments in the approximate amount of $405,000, as of the time of the mid-January audit.

44.    By email of February 21, 2002, attached as <u>Exhibit E</u>, after Heller had brought the failure to make LUPA adjustments to MHCS' and Medical Temporaries' attention, Defendant Jones submitted a revised 60-day forecast to Heller wherein MHCS and Medical Temporaries for the first time acknowledged an over-advance under the DIP Loan as of January 16, 2002 of $401,888, due to the failure of MHCS and Medical Temporaries to make LUPA adjustments.

45.    Had the borrowing base certificates been properly been reported to Heller by MHCS and Medical Temporaries, Heller would have advanced them $401,888 less on the DIP Loan.

46.    Heller gave formal notice of default on the DIP Loan, and of its intent to exercise default remedies, by notice filed with the bankruptcy court on March 14, 2002.

47.    On March 18, 2002, MHCS filed a Response to Heller's notice of default with the bankruptcy court, wherein MHCS acknowledged that it did not dispute the occurrence of a default under the DIP Loan, claimed that it had told Heller, in January 2002, that the value of receivables used to calculate the borrowing base would need to be adjusted and stated that in all likelihood an over-advance existed under the DIP Loan Agreement. <u>See</u> ¶1 of MHCS's March 18, 2002 Response to Heller's notice of default, attached as <u>Exhibit F</u>.

48.    The bankruptcy cases of MHCS and Medical Temporaries were converted to Chapter 7 liquidation proceedings by order of the bankruptcy court, on motion of the two debtors, at the March 20, 2002 default hearing.

49.    Heller shortly thereafter, on March 27, 2002, received relief from the automatic stay, as part of a bankruptcy court approved settlement with the Chapter 7 trustee for MHCS and Medical Temporaries, to permit Heller to collect out its receivable collateral.

-12-

50.    As of July 12, 2002, MHCS and Medical Temporaries were indebted to Heller under the DIP Loan Agreement and the various other loans and obligations in the amount of $1,330,243.07, as follows: $570,652.89 in principal and accrued interest on the DIP Loan; $524,678 in principal and accrued interest on the pre-petition term loan; an overline advance on the revolver and interest thereon totaling $56,754.50, appraisal costs of $36,593, legal fees, audit fees (for collateral review) and other charges totaling $135,314.15, and a miscellaneous advance of $6,250.

51.    All the aforesaid indebtedness of MHCS and Medical Temporaries to Heller, under the DIP Loan, the pre-petition term loan, the overline on the revolver, etc., was secured by, among other assets, Accounts and accounts receivable pledged by the two debtors. Heller duly perfected its security interest in this receivable collateral through UCC financing statements filed pre-petition and through the bankruptcy court orders approving the DIP Loan and the debtors' related use of Heller's cash collateral (receivables) which secured the term loan.

52.    As of the date hereof, Heller believes that it has collected substantially all of the receivables of MHCS and Medical Temporaries which have commercial value and that Heller's remaining collateral has no significant worth. As noted above, after these collections more than $1.3 million still remains due and owing to Heller by MHCS and Medical Temporaries.

53.    Had the Defendants (other than Mary Lee Ingoldsby) not negligently caused a significant over-advance of $401,888 on the DIP Loan, triggering a loan default which thereafter triggered conversion of the MHCS and Medical Temporaries bankruptcies to Chapter 7, MHCS and Medical Temporaries could have been sold or reorganized as "going concerns" as MHCS and Medical Temporaries had represented to Heller, the Office of the United States Trustee and the Official Committee of Unsecured Creditors in early November 2001, was anticipated to

-13-

occur within 60 days time. In these circumstances, Heller would have avoided a further $928,355 in consequential damages now apparent from the fact that Heller's remaining loan balances of $1,330,243 are, at this point, essentially uncollectible.

## COUNT I
### (Negligent Misrepresentation – against Defendants Jones, Edwards and Michael Ingoldsby)

54.     Heller incorporates paragraphs 1 through 53 herein as if restated in full.

55.     Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary course of their business and employment, and in the ordinary course of the business of MHCS and Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivable of MHCS and Medical Temporaries. That false information, in the form of inaccurate borrowing base certificates and DIP Operating Reports, was supplied to Heller for Heller's guidance in its business transactions, i.e., making advances to MHCS and Medical Temporaries pursuant to the DIP loan, with the intent and expectation that Heller rely on such information, as it did. The false information, and Heller's justifiable reliance thereon, caused and resulted in pecuniary loss to Heller. Defendants Jones, Edwards and Michael Ingoldsby failed to exercise reasonable care or competence in obtaining or communicating the information regarding the borrowing base.

## COUNT II
### (Breach of Guaranty – Against Defendants Michael and Mary Lee Ingoldsby)

56.     Heller incorporates paragraphs 1 through 53 herein as if restated in full.

57.     Defendants Michael and Mary Lee Ingoldsby personally guaranteed MHCS' and Medical Temporaries' obligations under the DIP Loan.

58.     Defendants Michael and Mary Lee Ingoldsby are directly liable, as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan.

59.     The DIP Loan remains due and payable and Defendants Michael and Mary Lee Ingoldsby have not performed under their Guaranty by paying off the DIP Loan.

WHEREFORE, Heller respectfully requests that the Court grant the following relief:

A.     That judgment be entered in its favor on Count I against Defendants Jones, Edwards, and Michael Ingoldsby in the amount of $401,888, for other consequential damages in the amount of $928,355 or such greater amounts as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper; and

B.     That judgment be entered in its favor on Count II against Defendants Michael and Mary Lee Ingoldsby in the amount of $805,565, or such greater amount as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper.

Respectfully submitted,

OF COUNSEL:

David B. Tatge, Esq.
Shlomo Katz, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., 7th Floor
Washington, D.C. 20037
(202) 861-0900


Dated: August 1, 2002

HELLER HEALTHCARE FINANCE, INC.

By its attorneys,

_____
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
EPSTEIN BECKER & GREEN, P.C.
111 Huntington Avenue, 26th Floor
Boston, MA 02199-7610
(617) 342-4000

DC:199991.1



**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

50 ROWES WHARF, BOSTON, MA 02110-3342
[617] 951.2100  FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI    PORTLAND, ME

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

October 11, 2002

Gregory Aceto, Esq.
Johnson & Aceto
67 Batterymarch Street, Suite 400
Boston, MA  02110

Re:    Insured:        *Managed Health Care Systems, Inc.*
       Claimant:       *Heller Healthcare Finance Inc.*
       AIGTS Claim No.:  434-003227
       Policy No.:      873-87-52
       Our File No.:    9500-TBD

Dear Mr. Aceto:

As you know, this office has been hired to assist National Union Fire Insurance Company of Pittsburgh, PA ("National Union") in its evaluation of the captioned matter. We have reviewed the complaint in the case of: *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al.*, United States District Court for the District of Massachusetts, Civil Action Number: 02CV11553 NG (the "*Heller Action*"). The purpose of this letter is to set forth National Union's preliminary coverage evaluation with respect to the *Heller Action* allegations.

We are forwarding this letter to you because you submitted this matter for coverage on behalf of Michael Ingoldsby, Mary Lee Ingoldsby and Indy Edwards. If you are not authorized to receive coverage correspondence on their behalf, please let us know so that we may redirect this correspondence to an authorized recipient.

At this time, for reasons discussed below, National Union declines coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby and Indy Edwards.

The *Heller Action* complaint alleges two counts. Count I is for Negligent Misrepresentation against Pamela Jones, Indy Edwards and Michael Ingoldsby. Count II is for Breach of a Guaranty against Michael Ingoldsby and Mary Lee Ingoldsby. Based on our review of the *Heller Action* complaint it appears that Heller is alleging that the Pamela Jones, Indy Edwards and Michael Ingoldsby negligently issued overstated the borrowing base certificates and other data which, in turn, caused Heller to make an over-advance of $401,888 on the DIP Loan contract. Heller is also seeking to enforce the loan guaranty on the DIP Loan which was given by Michael and Mary Lee Ingoldsby.

PEABODY & ARNOLD LLP
Gregory Aceto
October 11, 2002
Page 2

        Exclusion 4(h)(as amended by Endorsement No. 8) of the National Union policy
excludes coverage for claims "alleging, arising out of, based upon or attributable to any actual or
alleged contractual liability of the Company or an Insured under any express (written or oral)
contract or agreement..." The *Heller Action* claim alleges, arises out of, and is based upon the
contractual liability of: (1) MHCS under the DIP Loan Agreement; and (2) Michael Ingoldsby
and Mary Lee Ingoldsby under the loan guaranty. The plaintiff's alleged damages were caused
by MHCS' inability to repay the DIP Loan. One of the specific elements of damages Heller is
claiming for Count I is the $401,888 that was allegedly over-advanced on the DIP Loan contract
and which was never repaid by MHCS. Count II seeks to recover the DIP Loan amount from
Michael and Mary Ingoldsby pursuant to their personal guaranty of the DIP Loan. Since the
*Heller Action* claim arises out of and is based upon alleged contractual liability (of MHCS,
Michael Ingoldsby and Mary Lee Ingoldsby), Exclusion 4(h) of Endorsement No. 8 operates to
exclude coverage.

        Even if the breach of contract exclusion did not operate to exclude coverage for the
*Heller Action* allegations, National Union believes one or more of the following alternative
coverage terms and conditions could operate to limit or exclude coverage: Exclusion 4(a) (as
amended by Endorsement No. 7) [unlawful profit or advantage]; Exclusion 4(b) (as amended by
Endorsement No. 7) [criminal or deliberate fraudulent acts]; Exclusion 4(f) (of Endorsement No.
1) [also breach of contract]; Exclusion 4(t) (of Endorsement No. 8) [professional services]; the
policy's definitions of Insured, Loss and Wrongful Act; and Clause 14 [other insurance].

        National Union's coverage analysis is based on our review of the complaint and its
attachments, and of the policy. If you have any questions about this letter, disagree with our
analysis, or have any additional information that you think we should review, please do not
hesitate to contact me.

        On behalf of National Union, I thank you for bringing this matter to its attention.

                                              Sincerely,

                                              F. Joseph O'Neil

EJO/dlm
PABOS2:EONEIL:553279_1


**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

50 ROWES WHARF, BOSTON, MA 02110-3342
[617] 951.2100  FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

March 6, 2003

Gregory Aceto, Esq.
Johnson & Aceto
67 Batterymarch Street, Suite 400
Boston, MA  02110

>       *Re:*    *Insured:*          ***Managed Health Care Systems, Inc. ("MHCS")***
>               *Claimant:*         ***Heller Healthcare Finance Inc.***
>               *AIGTS Claim No.:*  *434-003227*
>               *Policy No.:*       *873-87-52*
>               *Our File No.:*     *9500-89771*

Dear Mr. Aceto:

Thank you for your correspondence, via e-mail, the subject of which is designated as "Coverage Issue for Michael Ingoldsby." As your e-mail addresses only the question of coverage for Mr. Ingoldsby, this response is, likewise, limited to Mr. Ingoldsby.

As you know, this office has been hired to assist National Union Fire Insurance Company of Pittsburgh PA ("National Union") in its evaluation of the captioned matter. In light of your correspondence, we have again reviewed the complaint in the case of: *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al*, United States District Court for the District of Massachusetts, Civil Action Number: 02CV11553 NG (the "*Heller Action*") and the policy, and for the reasons set forth in our prior correspondence of October 11, 2002, National Union's position remains that there is no coverage available under the policy for the claims asserted in the *Heller* action against Michael Ingoldsby.

Specifically, it is National Union's position, as set forth in our October 11, 2002 correspondence, that coverage for the purported "Negligent Misrepresentation" claims asserted in the *Heller* action is excluded by Exclusion 4(h)(as amended by Endorsement No. 8) of the National Union policy, because the claims allege, arise out of, and are based upon the contractual liability of MHCS under the DIP Loan Agreement.[1] Further, although the claim is labeled as "Negligent Misrepresentation," the negligence asserted is the failure to provide accurate information on the collateral certificates as required under the loan contract. As such, the claim clearly "arises out of"

---

[1] It appears that since your correspondence addresses only Count I of the Complaint for Negligent Misrepresentation, that you are not disputing National Union's declination position on Count II of the Complaint for Breach of Guaranty. If this is not the case, please advise us accordingly.

PEABODY & ARNOLD LLP
Gregory Aceto, Esq.
March 6, 2003
Page 2

and is "based upon" the contractual liability of MHCS, and is excluded by Exclusion 4(h) (as amended by Endorsement No. 8).[2]

   Moreover, your e-mail addresses only the factual allegations asserted by the Plaintiffs against Mr. Ingoldsby in the *Heller* Complaint, disputing the accuracy of the allegations, and does not discuss the substance of the coverage issue.  As you may be aware, however, National Union, in conducting its coverage analysis, is limited by the allegations asserted in the Complaint, and must consider what policy terms and conditions limit or exclude coverage if the allegations plead in the Complaint are proven true.  National Union understands that the allegations asserted in the *Heller* Complaint are without substantiation at this time, and nothing in this letter or our previous correspondence is intended to suggest that the allegations have any legal or factual merit; rather, it is National Union's position that there is no coverage for the claims as they are asserted.

   Thus, for the reasons set forth above and in our correspondence of October 11, 2002, National Union maintains its position that no coverage is available under the policy for this matter.  As such, National Union will not be providing coverage for defense costs or any judgment or settlement.

   Further, as reiterated above, National Union's coverage analysis is based on our review of the Complaint and its attachments, and of the policy.  If you have any additional information you wish to provide which pertains to the coverage issues, we invite you to submit the same for our review.

   On behalf of National Union, I thank you for bringing this matter to its attention.

   Sincerely,

   E/ Joseph O'Neil

---

[2] Your e-mail also suggests that there is still some issue as to whether Endorsement No. 8 was or was not a part of the policy.  As I explained to you at our meeting, our copy of the policy does contain Endorsement No. 8.  Moreover, the binder letter, which we reviewed together, clearly provides for the "Not For Profit Healthcare Amendatory Endorsement," which is Endorsement No. 8.  It is, therefore, National Union's position that the policy was issued with Endorsement No. 8.  Should you continue to dispute this question, we invite you to provide us with any additional information or documentation available to you on this issue, and we will be happy to review the same.