UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC., f/k/a HELLER HEALTHCARE FINANCE, INC., <br><br> Plaintiff, <br><br> And <br><br> MICHAEL INGOLDSBY, <br><br> Intervenor/Plaintiff, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and INTERNATIONAL INSURANCE GROUP, LTD., <br><br> Defendants. | Civil Action No. 05-CV-11128-NG |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S MOTION FOR SUMMARY JUDGMENT AGAINST INTERVENOR-PLAINTIFF MICHAEL INGOLDSBY**

Defendant National Union Fire Insurance Company of Pittsburgh, PA. ("NUFIC") submits this Memorandum of Law in support of its Motion for Summary Judgment with respect to claims asserted by Intervenor-Plaintiff Michael Ingoldsby ("Ingoldsby") in his First Amended Complaint in Intervention (the "Intervenor Complaint"). Ingoldsby brought suit against NUFIC for the alleged wrongful denial of insurance coverage under a Directors and Officers Insurance and Company Reimbursement Policy.

Ingoldsby is judicially estopped from asserting his claims against NUFIC due to his failure to schedule his claim for coverage under NUFIC's insurance policy as an asset of his bankruptcy estate when he filed for bankruptcy on December 13, 2002. Furthermore,

Ingoldsby's claims against NUFIC fail as a matter of law because the claims asserted against Ingoldsby by Heller Healthcare Finance, Inc. ("Heller") in the litigation underlying this dispute were excluded by the Policy's contractual liability exclusion.

For the reasons set forth herein, this Court should grant NUFIC's Motion for Summary Judgment.

## FACTUAL BACKGROUND

The following facts are undisputed.

**A.     The D&O Insurance Policy**

Managed Health Care Systems, Inc. ("MHCS") was, at all times relevant hereto, a Massachusetts corporation providing health care services to Medicare beneficiaries with its principal place of business in Hingham, Massachusetts. (Defendant's Statement of Undisputed Material Facts ("Defendant's Statement") at ¶¶ 3-4). Ingoldsby was, at all times relevant hereto, the Chairman of the Board of MHCS. (Id. at ¶ 5). On or about February 23, 2001, MHCS filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Massachusetts. (Id. at ¶ 6).

NUFIC issued to MHCS a Directors & Officers Insurance Policy bearing a policy number 873-87-52, effective August 4, 2001 to August 4, 2002 (the "Policy"). (Id. at ¶ 7). According to Exclusion 4(h) of the Policy, coverage was excluded for any claim:

> (h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement . . .

(Id. at ¶ 8).

MHCS was informed of the Policy's Exclusion 4(h) by means of a fax communication to MHCS Vice President of Finance and Chief Financial Officer Pamela

Jones ("Jones") from Nicholas Sciotto of International Insurance Group, Ltd. ("IIG"), MHCS' insurance broker, dated July 31, 2001. (Id. at ¶ 9). In that fax communication, IIG forwarded to MHCS NUFIC's proposed terms for the Policy, including the explicit language of the contractual liability exclusion under Exclusion 4(h). (Id. at ¶ 10). The Policy, under which Ingoldsby was insured, was subsequently issued to MHCS by NUFIC. (Id. at ¶ 11).

**B.    MHCS Borrows from Heller**

Heller was a pre-petition lender to MHCS on a number of loans, including one pursuant to a Loan and Security Agreement dated August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000. (Id. at ¶ 12). Post-petition, on February 28, 2001, Heller, as lender, and MHCS entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which refinanced the pre-petition Revolving Credit Note. (Id. at ¶ 13). The DIP Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"). (Id.). The Bankruptcy Court approved the DIP Loan at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001. (Id.). Ingoldsby personally guaranteed the obligations of MHCS under the DIP Loan Agreement. (Id. at ¶ 14).

According to the terms of the DIP Loan Agreement, MHCS was obligated to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report …" (Id. at ¶ 15). The DIP Loan Agreement further required MHCS, Ingoldsby, Jones, and MHCS President and Chief Operating Officer Indy Edwards ("Edwards") to prepare Borrowing Base Certificates that accurately represented the eligible Medicaid, Medicare, and other receivables of MHCS. (Id. at ¶ 16). Heller claims to have loaned money to MHCS under the DIP Loan based

upon the level of receivables MHCS reported to Heller on the periodic Borrowing Base Certificates, which were signed by Jones and Edwards.  (<u>Id.</u> at ¶ 17).

The Borrowing Base Certificates specified that they were "given to the Lender [Heller] in order to induce the Lender … to make an advance to the Borrower [MHCS] in the principle [sic] amount of … pursuant to the terms and conditions of the Loan Agreement."  (<u>Id.</u> at ¶ 18).  According to Heller, the Borrowing Base Certificates were "supplied to Heller with the intent, knowledge, and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance the collections it received back to MHCS[.]"  (<u>Id.</u> at ¶ 19).

Heller has also stated that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]"  (<u>Id.</u> at ¶ 20).  Further, Heller asserted that MHCS owed duties to prepare any Borrowing Base Certificates submitted by MHCS in a manner that currently reported its Medicare receivables, since such receivables formed the basis of funding provided under the DIP Loan.  (<u>Id.</u> at ¶ 21).

**C.    <u>Heller Sues Ingoldsby</u>**

Heller claimed that in January of 2002, it discovered through an audit of MHCS' financial statements and bankruptcy filings that MHCS had failed to accurately track and report to Heller MHCS' Medicare receivables.  (<u>Id.</u> at ¶ 22).  Heller alleged that these errors resulted in an overstatement of MHCS' eligible receivables against which Heller loaned monies to MHCS under the DIP Loan Agreement.  (<u>Id.</u>).  Heller further alleged that, on account of the overstatements, it loaned MHCS approximately $400,000 more under the DIP Loan than it would have advanced had the accounts receivable in the Borrowing Base Certificates been properly stated.  (<u>Id.</u>).  Moreover, Heller alleged that MHCS was indebted to it under the DIP

Loan in the amount of $1,330,243.07. (Id.). After Heller claimed to have realized the full extent of MHCS' overstatements and misstatements with respect to its accounts receivable, MHCS converted its bankruptcy reorganization to a Chapter 7 liquidation proceeding on March 20, 2002. (Id. at ¶ 23).

Heller subsequently brought suit against Ingoldsby, Jones, and Edwards on August 1, 2002 (the "Heller Litigation"). (Id. at ¶ 24). Heller asserted two counts against Ingoldsby: the first for negligent misrepresentation, alleging that Ingoldsby supplied false information to Heller regarding the borrowing base of the eligible accounts and receivables of MHCS, and the second for Ingoldsby's alleged breach of his guaranty. (Id. at ¶ 25).

Ingoldsby provided NUFIC with notice of the suit and through letters dated October 11, 2002 and March 6, 2003, NUFIC denied coverage for the litigation and the associated defense costs on account of the Policy's contractual liability exclusion. (Id. at ¶ 26-27). After NUFIC denied coverage for Heller's claims against Ingoldsby, he provided his own defense in the Heller litigation. (Id. at ¶ 28).

On March 25, 2002, Heller and MHCS entered into a settlement agreement, which was approved by the bankruptcy court on March 27, 2002 (the "Settlement Agreement"). (Id. at ¶ 29). The Settlement Agreement contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order approving the Settlement Agreement] hereby releases any claims it may have arising on or before the date hereof against the Debtors' [Managed Health Care Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and employees provided, however, that this release from Heller does not include and *Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable claims Heller may have or from any damages suffered by Heller arising from the default under the DIP Loan Agreement* which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default.

(Id.).

### C. Ingoldsby Declares Bankruptcy

Ingoldsby filed for bankruptcy under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida on December 13, 2002. (Id. at ¶ 30). On January 2, 2003, Ingoldsby filed his Schedules and his Statement of Financial Affairs as required by 11 U.S.C. § 521. (Id. at ¶ 31).

Ingoldsby stated in his Statement of Financial Affairs that he was a defendant in the Heller Litigation. (Id. at ¶ 32). However, where Ingoldsby was required to disclose in his Schedule B any "[o]ther contingent and unliquidated claims of every nature," which would have included any claims against NUFIC, Ingoldsby stated "None." (Id.).

On April 18, 2003, Ingoldsby gave notice of filing the original signatures of his Schedules and Statement of Financial Affairs, and again failed to disclose any claim against NUFIC. (Id. at ¶ 33). On May 5, 2004, Ingoldsby was issued a discharge in bankruptcy. (Id. at ¶ 34).

### D. Summary of Key Events

The following summarizes the key dates and events relevant to this dispute.

| | |
|---|---|
| August 4, 2001: | The Policy, issued by NUFIC to MHCS, goes into effect for the period of August 4, 2001 to August 4, 2002. (Id. at ¶ 7). |
| August 1, 2002: | Heller commences the Heller Litigation by filing suit against Ingoldsby, among others. (Id. at ¶ 24). |
| October 11, 2002: | NUFIC denies coverage to Ingoldsby under the Policy. (Id. at ¶ 27). |
| December 13, 2002: | Ingoldsby files a petition for bankruptcy under Chapter 7. (Id. at ¶ 30). In the documents submitted to the Bankruptcy Court in support of his petition, Ingoldsby fails to disclose any claim against NUFIC. (Id. at ¶¶ 31-32). |

| | |
|---|---|
| May 5, 2004: | Based on the representations made by Ingoldsby through his submissions to the Bankruptcy Court, Ingoldsby is issued a discharge in bankruptcy. (Id. at ¶ 34). |
| December 5, 2004: | Ingoldsby files his Intervenor Complaint in the present action asserting coverage claims against NUFIC concerning the Heller Litigation. |

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Construing the record in the non-movant's favor, an issue is genuine where "there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). Disputed facts, however, only preclude summary judgment when they are material. "A material issue is one that affects the outcome of the suit, that is, an issue which, perforce, needs to be resolved before the related legal issues can be decided." Id. at 681 (internal quotation marks omitted).

When the non-moving party bears the burden of proof at trial, the moving party need only "make a showing that the evidence is insufficient to support the nonmoving party's case." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993). Once the moving party makes this showing, the nonmoving party must "establish the existence of a genuine disagreement as to some material fact." Id. The non-movant's "failure to come forward with sufficient evidence to generate a trial worthy issue warrants summary judgment for the moving party." In Re Ralar Distrib., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

**ARGUMENT**

A.      **Ingoldsby's Claims Against NUFIC Are Barred Because He Failed To Declare Them As Property Of His Bankruptcy Estate.**

NUFIC is entitled to summary judgment because Ingoldsby failed declare his claim for coverage against NUFIC as an asset of his bankruptcy estate. Therefore, he is judicially estopped from pursuing this pre-petition claim against NUFIC in this Court.

Section 521(1) of the Bankruptcy Code requires a debtor to file "a schedule of assets and liabilities, a schedule of current income and current expenditures and a statement of the debtor's financial affairs." 11 U.S.C. § 521(1). It is well settled that a cause of action is an asset that must be scheduled under § 521(1). See Jeffrey v. Desmond, 70 F.3d 183, 186 (1st Cir. 1995). Moreover, "the duty of disclosure is a continuing one, and a debtor is required to disclose all *potential* causes of action." In re Coastal Plains, Inc., 179 F.3d 197, 208 (5th Cir. 1999) (emphasis added).

The First Circuit addressed this issue in Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.), Inc., 989 F.2d 570 (1st Cir. 1993). The Payless court held that where a debtor had obtained Chapter 11 relief based on its representation that it had no monetary claims other than those listed on the petition, he was judicially estopped from subsequently asserting pre-petition claims that were never disclosed during the bankruptcy claim. Id. at 571. See also Howell v. Town of Leyden, 335 F.Supp.2d 248 (D. Mass. 2004) (debtors who declared in their bankruptcy petition that they were party to no suit and had no claims among their assets were judicially estopped from later asserting a contrary position); Compton v. Depuy Orthopaedics, Inc., C.A. No. 02-10531-RWZ, 2002 WL 1046698, *1 (D. Mass. May 22, 2002) (debtor judicially estopped from asserting pre-petition claim following discharge when plaintiff knew of possible claims against defendants, but never brought them to the attention of the bankruptcy court); Welsh v.

Quabbin Timber, Inc., 199 B.R. 224, 228 (D. Mass. 1996) (debtor judicially estopped from commencing civil action seven months after bankruptcy charge); Carney v. Shawmut Bank, N.A., No. CA 954118, 1996 WL 1185157 at *1 (Mass. Super. June 12, 1996) (debtor's failure to list all claims against the defendant in the bankruptcy petition estopped the debtor from raising them in a state court lawsuit).

In this case, Ingoldsby filed for bankruptcy under Chapter 7 on December 13, 2002. (Defendant's Statement at ¶ 30). On January 2, 2003, Ingoldsby filed his Schedules and his sworn Statement of Financial Affairs, as required by 11 U.S.C. § 521. (Id. at ¶ 31). In his Statement of Financial Affairs, Ingoldsby declared that he was a defendant in the Heller Litigation. (Id. at ¶ 32). However, where Ingoldsby was required to disclose on his Schedule B any "[o]ther contingent and unliquidated claims of every nature," which would include his claim against NUFIC, he stated "None." (Id.). [1]

On April 18, 2003, Ingoldsby provided notice of filing the original signatures of his Schedules and Statement of Financial Affairs, but again failed to disclose any claim against NUFIC. (Id. at ¶ 33). On May 5, 2004, Ingoldsby was issued a discharge in bankruptcy. (Id. at ¶ 34).

Ingoldsby thereafter filed his Intervenor Complaint against NUFIC in which he pursues a pre-petition claim against NUFIC based upon its Policy. This is precisely the type of cat-and-mouse tactic that the courts in this circuit have held is prevented by the doctrine of judicial

---

[1] To the extent that Ingoldsby may have revealed the existence of a potential claim against NUFIC to the trustee of his bankruptcy estate, such a disclosure would have been wholly inadequate to provide proper notice to creditors and will not prevent the application of judicial estoppel now. See Autos, Inc. v. Gowin, 330 B.R. 788, 794 (D. Kan. 2005) ("[a] debtor's duty to amend her position, to list the claims on her bankruptcy schedules, to move to reopen the case, or to take other formal action so that creditors will have notice of the claims and an opportunity to negotiate them is not fulfilled by an informal agreement with the Trustee"); Reagan v. Lynch, 524 S.E.2d 510, 511 (Ga. App. 1999) (applying judicial estoppel in Chapter 7 case and finding debtor's notice to trustee inadequate without additional amendment of his petition or motion to reopen his case).

estoppel.  Since Ingoldsby failed to identify his claim for coverage under the Policy as an asset of his bankruptcy estate, he is now judicially estopped from asserting that claim against NUFIC.

**B.      NUFIC Also Is Entitled To Summary Judgment On Account Of The Policy's Contractual Liability Exclusion.**

In Massachusetts, the interpretation of an insurance contract is to be undertaken by construing the pertinent words of the policy in their usual and ordinary sense.  See Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280, 675 N.E.2d 1161 (1997); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146, 439 N.E.2d 234 (1982).  A court is to read the insurance policy as written and is "not free to revise it or change the order of the words." Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147, 461 N.E.2d 209 (1984).

Moreover, the Massachusetts Supreme Judicial Court has held that the foregoing principles apply with equal force to a policy's exclusionary clauses.  "If free from ambiguity, an exclusionary clause, like all other provisions of an insurance contract, must be given its usual and ordinary meaning."  Hakim, 424 Mass. at 281 (citing Royal-Globe Ins. Co. v. Schultz, 385 Mass. 1013, 434 N.E.2d 213 (1982)); see also Bagley v. Monticello Ins. Co., 430 Mass. 454, 720 N.E.2d 813, 816 (1999).

In this case, Exclusion 4(h) to the Policy specifically excluded any claim "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any Insured under any express (written or oral) contract or agreement . . . ." (Defendant's Statement at ¶ 8).

In the underlying claim, Heller sued Ingoldsby for breach of guaranty, specifically claiming that Ingoldsby personally guaranteed the DIP Loan under the DIP Loan Agreement and was therefore directly liable for all moneys due to Heller.  (Id. at ¶ 25).  Heller also sued Ingoldsby for negligently failing to accurately track and record downward adjustments to

MHCS' receivables in violation of the DIP Loan Agreement. (Id.). Specifically, Heller alleged in the Heller Litigation Complaint that under the explicit provisions of the DIP Loan Agreement:

> MHCS and Medical Temporaries were each obligated to keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender.

(Id. at ¶ 15).

The claims in the Heller Litigation thus were founded upon contractual obligations created by Ingoldsby's Guaranty and the DIP Loan Agreement. Therefore, because Heller's claims against Ingoldsby "arose," were "based upon," or were "attributable" to contractual liability, they were excluded from coverage under Exclusion 4(h) of the Policy. Under Massachusetts law, the phrase "arising out of" is interpreted expansively. See Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999). See also Rischitelli v. Safety Ins. Co., 423 Mass. 703 (1996) (for auto insurance policy defining "accident" as an "event that causes bodily injury . . . arising out of the ownership, maintenance, or use of an auto," the phrase "arising out of" indicated "a wider range of causation than the concept of proximate causation in tort law"); County of Barnstable v. American Fin. Corp., 51 Mass. App. Ct. 215 (2001) (for public officials' liability policy excluding "any claims . . . arising out of operational law enforcement functions and activities," the phrase "arising out of" was "read expansively" to exclude indemnification for underlying judgment against county for revoking prisoner's statutory good-time credits, even though action was characterized as a constitutional claim).

That the claims in the Heller Litigation "arose," were "based upon," or were "attributable to" contractual liability under Ingoldsby's Guaranty and the DIP Loan Agreement is proven by a provision in the Settlement Agreement in which Heller released all of its claims except those arising from the DIP Loan Agreement. On March 25, 2002, Heller and MHCS entered into a

Settlement Agreement, which was approved by the bankruptcy court on March 27, 2002. (Defendant's Statement at ¶ 29). The Settlement Agreement contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order approving the Settlement Agreement] hereby releases any claims it may have arising on or before the date hereof against the Debtors' [Managed Health Care Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and employees provided, however, that this release from Heller does not include and *Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable claims Heller may have or from any damages suffered by Heller arising from the default under the DIP Loan Agreement* which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default.

(Id. at ¶ 29) (emphasis supplied).

Thus, under this Settlement Agreement, Heller released Ingoldsby, as MHCS' "agent," from all claims against him except "any legal or equitable claims Heller may have or from any damages suffered by Heller *arising from the default under the DIP Loan Agreement*." (Id.). Because Heller's subsequent suit against Ingoldsby was based on his Guaranty and the DIP Loan Agreement (all other claims having been previously released by Heller), then the Heller Litigation arose, was based upon, or was attributable to "actual or alleged contractual liability of the Company [MHCS] or an Insured [Ingoldsby] under any express (written or oral) contract or agreement . . ." (Id. at ¶ 8). Accordingly, coverage for the Heller Litigation was barred by Exclusion 4(h) of the Policy.

To the extent that Ingoldsby argues that Heller's negligent misrepresentation claim was not barred by the contractual liability exclusion because it was a tort claim, such an argument must fail. In Temple Univ. Health Sys. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, C.A. No. 04-061705, 2005 WL 167583 (Pa. Com. Pl. Jan. 7, 2005) (copy attached), the plaintiff insureds, three corporations and individual officers and directors of the corporations, sought a declaration that NUFIC had a duty to defend and indemnify the insureds in a lawsuit. Id. The lawsuit

against the insureds arose from a written loan agreement to enable the insureds to purchase a nursing home.  Id.  The nursing home eventually failed and closed, resulting in the insureds defaulting on their loan payments.  Id.  The lawsuit alleged breach of contract and negligence by the corporate insureds.  Id.  As in this case, the NUFIC policy in Temple contained an exclusion for any claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability . . . ."  Id. at *7.  In addition to finding that the contract claim was barred by the clear language of the policy exclusion, the court also held that the negligence claim was similarly excluded because the duties which the insureds negligently breached were imposed by the loan agreement and sounded in contract.  Id. at *9-10.

In this case, as in Temple, the duties that Ingoldsby breached were imposed by the express provisions of a contract – the DIP Loan Agreement.  Ingoldsby should not now be permitted to circumvent the clear terms and conditions of the Policy by ignoring that the claims against him in the Heller Litigation were predicated on his alleged failure to comply with duties imposed by the his guaranty and the DIP Loan Agreement.  See generally Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 497 (1st Cir. 2005) (holding that, in Massachusetts, the issue of coverage is to be based on the allegations of the complaint).

## CONCLUSION

For the aforementioned reasons, NUFIC is entitled to summary judgment.  Ingoldsby's claim against NUFIC is barred because he failed to schedule this claim against NUFIC as an asset of his personal bankruptcy estate.  Furthermore, the Policy's contractual liability exclusion

excluded coverage for Heller's claims against Ingoldsby.

                                              NATIONAL UNION FIRE INSURANCE
                                              COMPANY OF PITTSBURGH, PA

                                              By its attorneys,

Dated: June 27, 2006                     /s/ Joey H. Lee
                                              John D. Hughes (BBO# 243660)
                                              Mary Patricia Cormier (BBO# 635756)
                                              Joey H. Lee (BBO# 663803)
                                              EDWARDS ANGELL PALMER
                                                  & DODGE LLP
                                              111 Huntington Avenue
                                              Boston, MA 02199
                                              Tel: (617) 239-0100
                                              Fax: (617) 227-4420