UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GE HFS HOLDINGS, INC., f/k/a HELLER HEALTHCARE FINANCE, INC., Plaintiff, And MICHAEL INGOLDSBY, Intervenor/Plaintiff, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and INTERNATIONAL INSURANCE GROUP, LTD., Defendants. | ) | Civil Action No. 05-CV-11128-NG |

**STATEMENT OF UNDISPUTED MATERIAL FACTS SUBMITTED BY DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST INTERVENOR-PLAINTIFF MICHAEL INGOLDSBY**

Pursuant to Local Rule 56.1 of the United States District Court for the District of Massachusetts, Defendant National Union Fire Insurance Company of Pittsburgh, PA. ("NUFIC") submits the following Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment Against Intervenor-Plaintiff Michael Ingoldsby ("Ingoldsby").

## A. The Parties

1. Intervenor-Plaintiff Ingoldsby is an individual who resides at 1863 San Silvestro Drive, Venice, Florida. (Ingoldsby's First Amended Complaint in Intervention ("Compl.") at ¶ 1).

2. Defendant NUFIC is an insurance company with its principal place of business at 175 Water Street, New York, New York. (Id. at ¶ 2). NUFIC is licensed to provide insurance in Massachusetts. (Id.).

**B. Undisputed Material Facts**

**1. The D&O Insurance Policy**

3. Managed Health Care Systems, Inc. ("MHCS") was, at all times relevant hereto, a Massachusetts corporation with its principal place of business in Hingham, Massachusetts. (Id. at ¶ 1).

4. MHCS was a provider of health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas. (Complaint in Heller Healthcare Finance, Inc. v. Michael Lee Ingoldsby, Pamela Jones and Indy Edwards, Civil Action No. 02-11553-NG (the "Heller Lit. Compl."), attached hereto as Exhibit 1, at ¶ 9,).

5. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of MHCS. (Compl. at ¶ 1).

6. On or about February 23, 2001, MHCS filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Massachusetts. (Affidavit of Counsel in Support of NUFIC's Motion for Summary Judgment ("Aff.") at ¶ 6 and Ex. E).

7. NUFIC issued to MHCS a Directors & Officers Insurance Policy bearing a policy number 873-87-52, effective August 4, 2001 to August 4, 2002 (the "Policy"). (Compl. at ¶ 6; Ingoldsby's Response to NUFIC's Request for Admissions ("Ingoldsby's Response"), attached hereto as Exhibit 2, at No. 1). At the time NUFIC issued the Policy, MHCS was in Chapter 11 bankruptcy reorganization. (Ingoldsby's Response at No. 14, Exhibit 2).

8. According to Exclusion 4(h) of the Policy, coverage was excluded for any claim:

> (h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement . . .

(Aff. at ¶ 2 and Ex. A (under "For-Profit Health Care Organization Amendatory Endorsement," § II)).

9. MHCS was informed of the Policy's Exclusion 4(h) by means of a fax communication to MHCS Vice President of Finance and Chief Financial Officer Pamela Jones ("Jones") from Nicholas Sciotto of International Insurance Group, Ltd. ("IIG"), MHCS' insurance broker, dated July 31, 2001. (Aff. at ¶ 2 and Ex. A).

10. In that fax communication, IIG forwarded to MHCS NUFIC's proposed terms for the Policy, including the explicit language of the contractual liability exclusion under Exclusion 4(h). (Id.).

11. The Policy, under which Ingoldsby was insured, was subsequently issued to MHCS by NUFIC. (Compl. at ¶ 6; Ingoldsby's Response at No. 1, Exhibit 2).

**2. MHCS Borrows from Heller**

12. Heller Healthcare Finance, Inc. ("Heller") was a pre-petition lender to MHCS on a number of loans, including one pursuant to a Loan and Security Agreement dated August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000. (Heller Lit. Compl. at ¶ 17, Exhibit 1).

13. Post-petition, on February 28, 2001, Heller, as lender, and MHCS entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which refinanced the pre-petition Revolving Credit Note. (Id. at ¶ 18). The DIP Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"). (Id.). The Bankruptcy Court



BOS_542087_3/JLEE

approved the DIP Loan at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001. (Id.).

14. Ingoldsby personally guaranteed the obligations of MHCS under the DIP Loan Agreement. (Id. at ¶ 19).

15. According to the terms of the DIP Loan Agreement, MHCS was obligated to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report . . . ." (Id. at ¶ 22).

16. Under the terms of the DIP Loan, MHCS, Ingoldsby, Jones, and MHCS President and Chief Operating Officer Indy Edwards ("Edwards") were obligated to prepare Borrowing Base Certificates that represented the eligible Medicaid, Medicare and other receivables of MHCS. (Id. at ¶ 23).

17. Heller loaned money to MHCS under the DIP Loan based upon the level of receivables MHCS reported to Heller on the periodic Borrowing Base Certificates, which were signed by Jones and Edwards. (Id. at ¶ 25).

18. The Borrowing Base Certificates specified that they were "given to the Lender [Heller] in order to induce the Lender … to make an advance to the Borrower in the principle [sic] amount of … pursuant to the terms and conditions of the Loan Agreement." (Aff. at ¶ 8 and Ex. G).

19. According to Heller, the Borrowing Base Certificates were "supplied to Heller with the intent, knowledge, and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance the collections it received back to MHCS[.]" (Heller Lit. Compl. at ¶ 25, Exhibit 1) .

20. Heller also stated that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]" (Id. at ¶ 28).

21. Heller also has asserted that MHCS owed duties to prepare any Borrowing Base Certificates submitted by MHCS in a manner that currently reported its Medicare receivables, since such receivables formed the basis of funding provided under the DIP Loan. (Id. at ¶ 23).

**3. Heller Sues Ingoldsby**

22. Heller claimed that in January of 2002, it discovered through an audit of MHCS' financial statements and bankruptcy filings that MHCS had failed to accurately track and report to Heller MHCS' Medicare receivables. (Id. at ¶ 42). Heller alleged that these errors resulted in an overstatement of MHCS' eligible receivables against which Heller loaned monies to MHCS under the DIP Loan Agreement. (Id. at ¶¶ 37, 42). Heller further alleged that, on account of the overstatements, it loaned MHCS approximately $400,000 more under the DIP Loan than it would have advanced had the accounts receivable in the Borrowing Base Certificates been properly stated. (Id. at ¶ 37). Moreover, Heller alleged that MHCS was indebted to it under the DIP Loan in the amount of $1,330,243.07. (Id. at ¶ 50).

23. After Heller claimed to have realized the full extent of MHCS' overstatements and misstatements with respect to its accounts receivable, MHCS converted its bankruptcy reorganization to a Chapter 7 liquidation proceeding on March 20, 2002. (Id. at ¶¶ 48, 53).

24. Heller then brought suit against Ingoldsby, Jones, and Edwards on August 1, 2002. (Compl. at ¶ 20).

25. Heller asserted two claims against Ingoldsby: the first for negligent misrepresentation, alleging that Ingoldsby supplied false information to Heller regarding the borrowing base of the eligible accounts and receivables of MHCS; the second breach for

guaranty, alleging that Ingoldsby personally guaranteed the DIP Loan and was therefore directly liable for all moneys due to Heller pursuant to the DIP Loan Agreement. (Heller Lit. Compl. at ¶¶ 54-59, Exhibit 1).

26. Ingoldsby provided NUFIC notice of the suit. (Compl. at ¶ 21).

27. Through letters dated October 11, 2002 and March 6, 2003, NUFIC denied coverage for the litigation and the associated defense costs on account of the Policy's contractual liability exclusion. (Id. at ¶¶ 23-25).

28. After NUFIC denied coverage for Heller's claims against Ingoldsby, he provided his own defense in the Heller Litigation (Id. at ¶¶ 35-36).

29. On March 25, 2002, Heller and MHCS entered into a settlement agreement, which was approved by the bankruptcy court on March 27, 2002 (the "Settlement Agreement"). (Aff. at ¶ 7 and Ex. F; Aff. at ¶ 6 and Ex. E). The Settlement Agreement contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order approving the Settlement Agreement] hereby releases any claims it may have arising on or before the date hereof against the Debtors' [Managed Health Care Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and employees provided, however, that this release from Heller does not include and *Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable claims Heller may have or from any damages suffered by Heller arising from the default under the DIP Loan Agreement* which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default.

(Aff. at ¶ 7 and Ex. F) (emphasis added).

**4. Ingoldsby Declares Bankruptcy**

30. Ingoldsby filed for bankruptcy under Chapter 7 in the United States Bankruptcy Court for the Middle District of Florida on December 13, 2002. (Ingoldsby's Response at No. 34, Exhibit 2).

31. On January 2, 2003, Ingoldsby filed his Schedules and his Statement of Financial Affairs as required by 11 U.S.C. § 521. (Id. at No. 35; Aff. at ¶ 3 and Ex. B).

32. Ingoldsby stated in his Statement of Financial Affairs that he was a defendant in the Heller Litigation. (Ingoldsby's Response at No. 36, Exhibit 2; Aff. at ¶ 3 and Ex. B). However, where Ingoldsby was required to disclose in his Schedule B any "[o]ther contingent and unliquidated claims of every nature," which would have included any claims against NUFIC, Ingoldsby stated "None." (Ingoldsby's Response at No. 38, Exhibit 2; Aff. at ¶ 3 and Ex. B).

33. On April 18, 2003, Ingoldsby gave notice of filing the original signatures of his Schedules and Statement of Financial Affairs, and again failed to disclose any claim against NUFIC. (Aff. at ¶ 4 and Ex. C).

34. On May 5, 2004, Ingoldsby was issued a discharge in bankruptcy. (Aff. at ¶ 5 and Ex. D).

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

By its attorneys,

Dated: June 27, 2006

/s/ Joey H. Lee
John D. Hughes (BBO# 243660)
Mary Patricia Cormier (BBO# 635756)
Joey H. Lee (BBO# 663803)
EDWARDS ANGELL PALMER
& DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 239-0100
Fax: (617) 227-4420

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HELLER HEALTHCARE FINANCE, INC.,<br>Plaintiff,<br>v.<br>MICHAEL INGOLDSBY, MARY LEE INGOLDSBY, PAMELA JONES, and INDY EDWARDS,<br>Defendants. | 02 CV 11553 NG |

RECEIPT # 40869
AMOUNT $ 150.00
BY DPTY CLK 8/1/02

I hereby certify on 6/23/2006 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on 8/1/2006
☐ original filed in my office on
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
Deputy Clerk

## COMPLAINT

COMES NOW the Plaintiff, Heller Healthcare Finance, Inc. ("Heller"), and for its Complaint states as follows:

## Nature of the Case

1. This action seeks damages suffered by Heller as a result of the negligent misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to collateral available to satisfy loans made by Heller to two corporate borrowers with whom they were affiliated. Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are also sued for breach of contract on a personal guaranty.

## Parties

2. Plaintiff Heller is a Delaware corporation with its principal place of business at 2 Wisconsin Circle, 4th floor, Chevy Chase, Maryland 20815. Heller is a lender to the healthcare industry.

3. Defendant Michael Ingoldsby ("Ingoldsby") was at all relevant times the sole shareholder and a Director of Managed Health Care Systems, Inc. ("MHCS"), a non-party. At

DOCKETED

1

all relevant times, Ingoldsby served, on information and belief, as unpaid chief executive officer (CEO) of both MHCS and Medical Temporaries, Inc., another related non-party ("Medical Temporaries"). Mr. Ingoldsby was also actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones. Upon information and belief, Mr. Ingoldsby resides at 5 Stagecoach Road, Hingham, MA 02043.

4. Defendant Mary Lee Ingoldsby is the wife of Michael Ingoldsby, residing at 5 Stagecoach Road, Hingham, MA 02043.

5. Defendant Pam Jones was at all relevant times the Controller and, on information and belief, Vice President, Finance of MHCS and its affiliate, Medical Temporaries. At all relevant times, Ms. Jones was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Jones resides at 197 High Street, Duxbury, MA 02332.

6. Defendant Indy Edwards was, on information and belief, at all relevant times President and a Director of MHCS and of Medical Temporaries. At all relevant times, Ms. Edwards was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Edwards resides at 345 Camp Street, #506, West Yarmouth, MA 02673.

**Jurisdiction and Venue**

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the plaintiff and each of the defendants and the amount in controversy exceeds $75,000.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants resides in this district and all of the defendants reside in Massachusetts.

**Background**

9. At all relevant times, Defendants Jones, Edwards and Ingoldsby were either a shareholder, officer and/or director of MHCS. MHCS was a privately held, for profit, "home health agency," i.e., a provider of home health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas. Together with Medical Temporaries, MHCS provided home nursing services to over 700 persons.

10. Medicare is a medical assistance program administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a division of the United States Department of Health and Human Services ("HHS").

11. At all relevant times, MHCS participated in CMS' home health prospective payment system ("PPS"). The home health PPS is described in CMS' Home Health Agency Manual, HCFA Publication No. 11, Transmittals 297 and 298.

12. Under the PPS, MHCS obtained prospective, or advance, payments from CMS at "episode rates." An "episode rate" is a predetermined payment amount intended to cover all skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services provided to a given patient during a given sixty-day period, which generally starts the day the first Medicare billable service is delivered to a patient. With certain exceptions, including one described below, the episode rate payment is not affected by the number of visits that the home healthcare provider actually makes to the patient's home during the covered period.

13. Generally speaking, home health providers receive an up-front initial percentage payment of the episodic payment due for a patient's care by submitting a Request for Anticipated Payment (RAP). The provider claims the balance of monies due for services during the 60-day "episode" by submitting a "final claim" to Medicare, together with a physician approved Plan of Care for the episode, if not previously submitted, which final claim is due within 60-days from the end of the episode or 60-days from the issue of the RAP payment,. The up-front RAP payment is 60% of the episode payment, for an initial episode, with 40% paid on the back end; for subsequent episodes of care 50% is paid with the RAP and 50% upon the final claim.

14. As an exception to these rules, if a particular patient receives four or less visits during the 60-day episode the provider is not entitled to the full episodic payment. Rather, under the Low Utilization Payment Adjustment (LUPA) rules the provider is paid only on a per-visit basis.

15. By way of example, assume the PPS episode payment for a particular patient is $2,500. The up-front RAP payment would be 60%, or $1,500. It is determined, however, by the time that the final claim is submitted, that the LUPA rules apply and the provider is due only $300 for the limited care that was rendered during the episode. Medicare "takes back" $1,200 by recoupment, reducing monies otherwise due the provider, on other claims, by $1,200.

16. On February 23, 2001, MHCS and Medical Temporaries both filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

17. Heller was a pre-petition lender to MHCS and Medical Temporaries on a number of loans, including (i) a Loan and Security Agreement dated as of August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000; (ii) a Secured Term Note, which also served as a security agreement, in the original amount of $685,000, later amended to

$515,000; (iii) a Secured Term Note in the amount of $200,000, for an overline loan, and (iv) a further overline loan, treated as an advance under the Revolving Credit Note, in the maximum principal amount of $233,000 (the second "overline"). As of the petition date, MHCS and Medical Temporaries owed Heller $1,677,073 on these various loans ($973,184 on the Revolving Credit Note, $515,000 on the Pre-petition Term Loan; $188,889 on the first pre-petition overline, together with $13,095 of accrued and unpaid interest, together with attorneys' fees and other costs recoverable under the loan documents).

18. Post-petition, on February 28, 2001, Heller, as lender, and MHCS and Medical Temporaries, jointly and severally as "borrower", entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which loan refinanced the pre-petition Revolving Credit Note. The Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), a copy of which is attached as Exhibit A hereto. The two debtors, at the same time, received bankruptcy court approval for use of the cash collateral (receivables) which collateralized Heller on the pre-petition term loan. The Bankruptcy Court approved the aforesaid DIP Loan and the debtors' use of cash collateral at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001.

19. Defendant Ingoldsby and Defendant Mary Ingoldsby, his wife, guaranteed the obligations of MHCS and Medical Temporaries under the DIP Loan Agreement.

20. Under Section 2.1(g) of the DIP Loan Agreement, the amount of $3 million revolving line of credit that MHCS and Medical Temporaries could draw upon at any given time under the DIP Loan facility was equal to "eighty five percent (85%) of Qualified Accounts due and owing from any Medicaid/Medicare, Insurer or other Account Debtor (the 'Borrowing Base')." "Qualified Account" was defined in Section 1.49 of the Loan Agreement.

21. Under Section 3.1(a) of the DIP Loan Agreement, the DIP Loan was secured by, among other assets, MHCS' and Medical Temporaries' Accounts (defined in Section 1.1 as "any right to payment for goods sold or leased or services rendered . . . whether or not earned by performance") and accounts receivable.

22. Under section 3.3(b) of the Loan Agreement, MHCS and Medical Temporaries were each obligated to "keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender." Section 6.1 of the Loan Agreement required MHCS and Medical Temporaries to submit a sales and collections report and an accounts receivable aging schedule to Heller by the fifteenth day of every month.

23. MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the "eligible" Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement.

24. A home healthcare provider must track and record LUPAs, for among other reasons, to avoid overstating its accounts receivable and/or its right to payment for services rendered. This is relevant to the instant cause of action, for the reasons noted immediately below.

25. Heller lent money to MHCS and Medical Temporaries under the DIP Loan based on the level of receivables the companies reported to Heller on periodic "borrowing base certificates", signed by Defendants Jones and Edwards in the ordinary course of business and

their employment. These certificates were supplied to Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance collections it received back to MHCS and Medical Temporaries upon various "draw" requests by the borrowers. At all times, Heller reasonably relied on the accuracy of the borrowing base certificates it received from MHCS and Medical Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical Temporaries under the DIP Loan.

26. Officers and directors of a home healthcare provider who fail to cause the provider to track and record LUPAs cause the provider to overstate its accounts receivable and/or its right to payment for services rendered.

27. Unknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller of MHCS' and Medical Temporary's receivable collateral on the borrowing base certificates submitted in connection with the DIP Loan. As a consequence, the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries under the DIP Loan failed, until February 2002, to accurately track or record required negative LUPA (downward) adjustments to receivables as reported therein. These failures caused receivables as reported to Heller on the borrowing base certificates to be overstated.

28. Heller reasonably relied on the accuracy of borrowing base certificates submitted to it by MHCS and Medical Temporaries in connection with the DIP Loan, from time to time, such as the borrowing base certificate dated September 26, 2001, attached as <u>Exhibit B</u>.

29. Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and

Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby, prepared and served such DIP Operating Reports on Heller and other creditors with the intent and expectation that the bankruptcy court, Heller and such other creditors would reasonably reply on the accuracy of the balance sheets and other financial data reported therein.

30. Unknown to Heller, but similar to the situation of the misstated borrowing base certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports, with the consequence that the DIP Operating Reports as filed, through January 2002, failed to show and reflect required LUPA adjustments (downwards) to the receivable collateral.

31. On November 12, 2001, Medical Temporaries filed a Status Report with the bankruptcy court, attached as Exhibit C, which report was served on Heller, reflecting $1,341,389 in total collectible receivables and a $50,011 availability under the DIP Loan facility. The same report advised the Court and creditors that MHCS and Medical Temporaries were negotiating with HCFA with respect to the repayment of an alleged $480,00 pre-petition overpayment alleged by Medicare. Medical Temporaries reported that MHCS and Medical Temporaries anticipated to achieve a settlement of this disputed obligation which provided for favorable repayment terms in the near future. Medical Temporaries also reported that the two debtors anticipated filing either a plan of reorganization or achieving an asset sale within sixty (60) days time, and that a dividend to unsecured creditors was expected in the two bankruptcies.

32. Around this time, in the Fall of 2001, Heller was told by MHCS and Medical Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of acquiring, as "new equity", the principal assets of MHCS and Medical Temporaries, through a sale or a reorganization plan, with Defendant Michael Ingoldsby possibly having some sort of continuing management role in any successor venture.

33. On November 13, 2001, the United States Trustee filed a Statement Regarding Status Conference, attached as Exhibit D, to which was attached the Operating Report filed by MHCS and Medical Temporaries with the bankruptcy court for the period ending October 26, 2001.

34. Unknown to Heller, by the actions of the Defendants Jones, Edwards, and Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of MHCS' and Medical Temporaries Accounts and accounts receivable as reported to Heller on the borrowing base certificates submitted to Heller and in the DIP Operating Reports filed with the bankruptcy court and served on Heller, by failing to cause MHCS and Medical Temporaries to make LUPA adjustments therein, which adjustments would have reduced collectible and eligible receivables as shown thereon.

35. MHCS' and Medical Temporaries' failure to accurately track and record LUPAs was a breach of Section 3.3. of the Loan Agreement.

36. MHCS' and Medical Temporaries failure to accurately track and record LUPAs caused a misstatement of the their Qualified Accounts and, therefore, of the Borrowing Base of eligible Accounts reported to Heller on borrowing base certificates, overstating the eligible receivables against which Heller loaned monies to MHCS and Medical Temporaries under the DIP Loan Agreement.

37. In reliance on MHCS' and Medical Temporaries' misstatements of Qualified Accounts and the Borrowing Base, of which Heller had no knowledge until Heller conducted a field audit in January 2002, Heller loaned MHCS and Medical Temporaries approximately $402,000 more on the DIP Loan than Heller would have advanced had the borrowing base certificates and the DIP Operating Reports been properly stated.

38. The Defendants knew, or should have known, of significant misstatements in the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries and of related misstatements of receivables as reported in the DIP Operating Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of MHCS and Medical Temporaries.

39. Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely, that she believed that MHCS' and Medical Temporaries' borrowing base certificates were no longer accurate and that she would no longer certify them. When Mr. Gardullo probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on information and belief, acting as unpaid Chief Executive Officer (CEO) of the two debtors.

40. In a contemporaneous conversation with Mr. Ingoldsby, Mr. Gardullo was led to believe by defendant Ingoldsby that Ms. Jones discomfort arose from a matter which Mr. Gardullo was familiar with, to wit, failure of the borrowing base certificates and the DIP Operating Reports to reduce Accounts and accounts receivable of MHCS and Medical Temporaries as shown therein by the $480,000 or so pre-petition overpayment liabilities alleged by Medicare, which alleged overpayment was then the subject then pending settlement negotiations between MHCS and Medicare and its fiscal intermediary, as noted above. Because MHCS and Medical Temporaries had reported to the bankruptcy court and creditors that a

favorable settlement with Medicare was close and would, once consummated, "term out" and repay any pre-petition overpayment liability to Medicare over a multi-year period, negatively impacting cash flow by only a few thousand dollars a month, Mr. Gardullo was comfortable that no immediate "one time" major downward adjustment of receivables as reported on the borrowing base certificates, to reflect an overpayment obligation to Medicare, was then necessary. Mr. Ingoldsby made these statements to Mr. Gardullo without reasonable care, with the intent that Heller rely on his representations and continue to advance monies under the DIP Loan, and Heller so did.

41. Consistent with Mr. Ingoldsby's representations, even after Defendant Jones ceased to certify the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller the certificates submitted in connection with the DIP Loan continued to be certified by Defendant Edwards as being accurate and Heller reasonably relied on the same, until Heller notified MHCS and Medical Temporaries, as a result of a January 2002 field audit, of mis-statements therein.

42. A field audit of MHCS and Medical Temporaries was conducted for Heller in January 2002 by Health Care Analysis Corporation, a Heller affiliate. When the audit results were thereupon fully analyzed and completed Heller become aware of a significant overstatement of the borrowing base by the failure of MHCS and Medical Temporaries to make LUPA adjustments.

43. At this point, in early February 2002, Heller ceased further advances, beyond collections received, and notified MHCS and Medical Temporaries that they had improperly failed to make LUPA adjustments in the approximate amount of $405,000, as of the time of the mid-January audit.

44. By email of February 21, 2002, attached as Exhibit E, after Heller had brought the failure to make LUPA adjustments to MHCS' and Medical Temporaries' attention, Defendant Jones submitted a revised 60-day forecast to Heller wherein MHCS and Medical Temporaries for the first time acknowledged an over-advance under the DIP Loan as of January 16, 2002 of $401,888, due to the failure of MHCS and Medical Temporaries to make LUPA adjustments.

45. Had the borrowing base certificates been properly been reported to Heller by MHCS and Medical Temporaries, Heller would have advanced them $401,888 less on the DIP Loan.

46. Heller gave formal notice of default on the DIP Loan, and of its intent to exercise default remedies, by notice filed with the bankruptcy court on March 14, 2002.

47. On March 18, 2002, MHCS filed a Response to Heller's notice of default with the bankruptcy court, wherein MHCS acknowledged that it did not dispute the occurrence of a default under the DIP Loan, claimed that it had told Heller, in January 2002, that the value of receivables used to calculate the borrowing base would need to be adjusted and stated that in all likelihood an over-advance existed under the DIP Loan Agreement. See ¶1 of MHCS's March 18, 2002 Response to Heller's notice of default, attached as Exhibit F.

48. The bankruptcy cases of MHCS and Medical Temporaries were converted to Chapter 7 liquidation proceedings by order of the bankruptcy court, on motion of the two debtors, at the March 20, 2002 default hearing.

49. Heller shortly thereafter, on March 27, 2002, received relief from the automatic stay, as part of a bankruptcy court approved settlement with the Chapter 7 trustee for MHCS and Medical Temporaries, to permit Heller to collect out its receivable collateral.

50. As of July 12, 2002, MHCS and Medical Temporaries were indebted to Heller under the DIP Loan Agreement and the various other loans and obligations in the amount of $1,330,243.07, as follows: $570,652.89 in principal and accrued interest on the DIP Loan; $524,678 in principal and accrued interest on the pre-petition term loan; an overline advance on the revolver and interest thereon totaling $56,754.50, appraisal costs of $36,593, legal fees, audit fees (for collateral review) and other charges totaling $135,314.15, and a miscellaneous advance of $6,250.

51. All the aforesaid indebtedness of MHCS and Medical Temporaries to Heller, under the DIP Loan, the pre-petition term loan, the overline on the revolver, etc., was secured by, among other assets, Accounts and accounts receivable pledged by the two debtors. Heller duly perfected its security interest in this receivable collateral through UCC financing statements filed pre-petition and through the bankruptcy court orders approving the DIP Loan and the debtors' related use of Heller's cash collateral (receivables) which secured the term loan.

52. As of the date hereof, Heller believes that it has collected substantially all of the receivables of MHCS and Medical Temporaries which have commercial value and that Heller's remaining collateral has no significant worth. As noted above, after these collections more than $1.3 million still remains due and owing to Heller by MHCS and Medical Temporaries.

53. Had the Defendants (other than Mary Lee Ingoldsby) not negligently caused a significant over-advance of $401,888 on the DIP Loan, triggering a loan default which thereafter triggered conversion of the MHCS and Medical Temporaries bankruptcies to Chapter 7, MHCS and Medical Temporaries could have been sold or reorganized as "going concerns" as MHCS and Medical Temporaries had represented to Heller, the Office of the United States Trustee and the Official Committee of Unsecured Creditors in early November 2001, was anticipated to

occur within 60 days time. In these circumstances, Heller would have avoided a further $928,355 in consequential damages now apparent from the fact that Heller's remaining loan balances of $1,330,243 are, at this point, essentially uncollectible.

**COUNT I**
**(Negligent Misrepresentation – against Defendants Jones, Edwards and Michael Ingoldsby)**

54. Heller incorporates paragraphs 1 through 53 herein as if restated in full.

55. Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary course of their business and employment, and in the ordinary course of the business of MHCS and Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivable of MHCS and Medical Temporaries. That false information, in the form of inaccurate borrowing base certificates and DIP Operating Reports, was supplied to Heller for Heller's guidance in its business transactions, i.e., making advances to MHCS and Medical Temporaries pursuant to the DIP loan, with the intent and expectation that Heller rely on such information, as it did. The false information, and Heller's justifiable reliance thereon, caused and resulted in pecuniary loss to Heller. Defendants Jones, Edwards and Michael Ingoldsby failed to exercise reasonable care or competence in obtaining or communicating the information regarding the borrowing base.

**COUNT II**
**(Breach of Guaranty -- Against Defendants Michael and Mary Lee Ingoldsby)**

56. Heller incorporates paragraphs 1 through 53 herein as if restated in full.

57. Defendants Michael and Mary Lee Ingoldsby personally guaranteed MHCS' and Medical Temporaries' obligations under the DIP Loan.

58. Defendants Michael and Mary Lee Ingoldsby are directly liable, as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan.

59. The DIP Loan remains due and payable and Defendants Michael and Mary Lee Ingoldsby have not performed under their Guaranty by paying off the DIP Loan.

WHEREFORE, Heller respectfully requests that the Court grant the following relief:

A. That judgment be entered in its favor on Count I against Defendants Jones, Edwards, and Michael Ingoldsby in the amount of $401,888, for other consequential damages in the amount of $928,355 or such greater amounts as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper; and

B. That judgment be entered in its favor on Count II against Defendants Michael and Mary Lee Ingoldsby in the amount of $805,565, or such greater amount as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper.

Respectfully submitted,

HELLER HEALTHCARE FINANCE, INC.

By its attorneys,

Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
EPSTEIN BECKER & GREEN, P.C.
111 Huntington Avenue, 26th Floor
Boston, MA 02199-7610
(617) 342-4000

OF COUNSEL:

David B. Tatge, Esq.
Shlomo Katz, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., 7th Floor
Washington, D.C. 20037
(202) 861-0900

Dated: August 1, 2002

DC:199991.1

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC.<br>*Formerly known as*<br>HELLER HEALTHCARE FINANCE, INC.<br>Plaintiff,<br><br>and<br><br>MICHAEL INGOLDSBY<br>Intervenor/Plaintiff<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and INTERNATIONAL INSURANCE GROUP, LTD.<br>Defendants. | CIVIL ACTION No: 05-CV-11128-NG |

## PLAINTIFF-INTERVENOR MICHAEL INGOLDSBY'S RESPONSES TO DEFENDANTS NATIONAL UNION'S FIRST REQUEST FOR ADMISSIONS

NOW COMES the Plaintiff-Intervenor Michael Ingoldsby and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby responds to Defendant National Union Fire Insurance Company of Pittsburgh, PA's First Request for Admissions as follows:

## GENERAL OBJECTIONS

1. The Plaintiff-Intervenor objects to each admission request to the extent that it seeks to impose upon him any obligation beyond those imposed by

the Federal Rules of Civil Procedure.

2. The Plaintiff-Intervenor objects to each admission request to the extent it seeks information which is subject to the work product doctrine, the attorney-client privilege, or any other privilege.

3. The Plaintiff-Intervenor objects to each admission request to the extent that it seeks information containing confidential commercial information, documents not within his possession, custody or control, or information which is otherwise immune from discovery on the grounds that such discovery is beyond the scope authorized by the Federal Rules of Civil Procedure.

**REQUESTED ADMISSIONS AND RESPONSES**

**REQUEST NO. 1:**

National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued its Directors and Officers Insurance and Company Reimbursement Policy Number 873-87-52, with an effective date of August 4, 2001 to August 4, 2002 ("Policy 873-87-52") to Managed Health Care Systems, Inc. ("MCHS").

**RESPONSE NO. 1:**

Admitted.

**REQUEST NO. 2:**

A true and complete copy of Policy 873-87-52 is attached hereto as "Exhibit A".

**RESPONSE NO. 2:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not

sufficient to enable him to admit or deny.

**REQUEST NO. 3:**

A true and complete copy of Endorsement No. 1 to Policy 873-87-52 is included in Exhibit A.

**RESPONSE NO. 3:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 4:**

Policy 873-87-52 included "Endorsement No. 1".

**RESPONSE NO. 4:**

Admitted.

**REQUEST NO. 5:**

Policy 873-87-52 included "Endorsement No. 8".

**RESPONSE NO. 5:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 6:**

A true and complete copy of Endorsement No. 8 to Policy 873-87-52 is included in Exhibit A.

**RESPONSE NO. 6:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 7:**

National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued its Directors and Officers Insurance and Company Reimbursement Policy Number 473-16-30, with an effective date of August 4, 2000 to August 4, 2001 ("Policy 473-16-30") to MCHS.

**RESPONSE NO. 7:**

Admitted.

**REQUEST NO. 8:**

A true and complete copy of Policy 473-16-30 and Endorsements 1, 4, 5, 6 and 7 thereto is attached hereto as Exhibit "B".

**RESPONSE NO. 8:**

Denied.

**REQUEST NO. 9:**

Policy 473-16-30 included "Endorsement No. 1."

**RESPONSE NO. 9:**

Admitted.

**REQUEST NO. 10:**

A true and complete copy of Endorsement No. 1 to Policy 473-16-30 is included in Exhibit B.

**RESPONSE NO. 10:**

Denied.

**REQUEST NO. 11:**

Policy 473-16-30 included "Endorsement No. 5."

**RESPONSE NO. 11:**

Admitted.

**REQUEST NO. 12:**

A true and complete copy of Endorsement No. 5 to Policy 473-16-30 is included in Exhibit B.

**RESPONSE NO. 12:**

Admitted.

**REQUEST NO. 13:**

Policy 873-87-52 was a renewal of Policy 473-16-30.

**RESPONSE NO. 13:**

Admitted.

**REQUEST NO. 14:**

At the time that National Union issued Policy 873-87-52, MHCS was in Chapter 11 bankruptcy reorganization, in Case No. 01-1136.

**RESPONSE NO. 14:**

Admitted.

**REQUEST NO. 15:**

MHCS entered into an insurance premium financing agreement ("Financing Agreement") with Premium Assignment Corporation ("PAC") in order to pay the premiums for Policy 873-87-52.

**RESPONSE NO. 15:**

Admitted.

**REQUEST NO. 16:**

MHCS ("Debtor") moved the bankruptcy court for an order authorizing the Financing Agreement between Debtor and PAC.

**RESPONSE NO. 16:**

Admitted.

**REQUEST NO. 17:**

Debtor presented to the bankruptcy court that it was important "with respect to the Debtor's business activities and assets" to maintain insurance coverage, and that the Financing Agreement was "in the best of interests of the Debtor's estate and creditors."

**RESPONSE NO. 17:**

Admitted.

**REQUEST NO. 18:**

The bankruptcy court entered an order granting Debtor's motion to enter into the Financing Agreement with PAC.

**RESPONSE NO. 18:**

Admitted.

**REQUEST NO. 19:**

Funds from the MHCS bankruptcy estate were used to pay PAC under the Financing Agreement.

**RESPONSE NO. 19:**

Admitted.

**REQUEST NO. 20:**

After the MHCS bankruptcy case was converted from a Chapter 11 reorganization to a Chapter 7 liquidation, MHCS defaulted under the Financing Agreement.

**RESPONSE NO. 20:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 21:**

Pursuant to the Financing Agreement, PAC had the right to cancel the policy upon default of payment premium.

**RESPONSE NO. 21:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 22:**

PAC cancelled the policy based on default of payment of premium.

**RESPONSE NO. 22:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 23:**

Policy 873-87-52 was cancelled for nonpayment before its expiration date of August 4, 2002.

**RESPONSE NO. 23:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 24:**

Policy 873-87-52 was cancelled before Heller filed its complaint against Ingoldsby, Mary Lee Ingoldsby, Pamela Jones ("Jones"), and Indy Edwards ("Edwards") in the United States District Court of the District of Massachusetts.

**RESPONSE NO. 24:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 25:**

Any proceeds that were, could have been, or could be paid under Policy 873-87-52 are proceeds of the MHCS bankruptcy estate.

**RESPONSE NO. 25:**

Denied.

**REQUEST NO. 26:**

Any proceeds were, could have been, or could be paid under Policy 873-87-52 are subject to the automatic stay under 11 U.S.C. § 362.

**RESPONSE NO. 26:**

Denied.

**REQUEST NO. 27:**

Jones never sought a lifting of the automatic stay prior to demanding insurance coverage under Policy 873-87-52 or at any time thereafter.

**RESPONSE NO. 27:**

Admitted.

**REQUEST NO. 28:**

Edwards never sought a lifting of the automatic stay prior to demanding insurance coverage under Policy 873-87-52 or at any time thereafter.

**RESPONSE NO. 28:**

Admitted.

**REQUEST NO. 29:**

Ingoldsby never sought a lifting of the automatic stay prior to demanding insurance coverage under Policy 873-87-52 or at any time thereafter.

**RESPONSE NO. 29:**

Admitted.

**REQUEST NO. 30:**

GE HFS never sought a lifting of the automatic stay before bringing this action as an assignee of Jones' the purported rights of Jones and Edwards under Policy 873-87-52.

**RESPONSE NO. 30:**

Admitted.

**REQUEST NO. 31:**

On or about March 25, 2002, Heller, MHCS, and MHCS's wholly-owned subsidiary, Medical Temporaries, Inc. entered unto a Settlement Agreement, pursuant

to which Heller released Ingoldsby, Jones and Edwards form all claims arising from the date thereof other than claims arising from the default under the DIP Loan Agreement.

**RESPONSE NO. 31:**

The Plaintiff-Intervenor cannot admit or deny the truthfulness of this statement because he has insufficient information or knowledge. The Plaintiff-Intervenor has made a reasonable inquiry and the information known and/or readily available to him is not sufficient to enable him to admit or deny.

**REQUEST NO. 32:**

On or about August 1, 2002, Heller filed complaint ("Heller Complaint") in the United States District Court for the District of Massachusetts against Ingoldsby, Mary Lee Ingoldsby, Jones and Edwards.

**RESPONSE NO. 32:**

Admitted.

**REQUEST NO. 33:**

The claims asserted in the Heller Complaint alleged, arose out of, were based upon or were attributable to an actual or alleged contractual liability of MHCS under the DIP Loan Agreement.

**RESPONSE NO. 33:**

Denied.

**REQUEST NO. 34:**

On or about December 13, 2002, Ingoldsby filed for bankruptcy under Chapter 7 ("Ingoldsby bankruptcy").

**RESPONSE NO. 34:**

Admitted.

**REQUEST NO. 35:**

In the Ingoldsby bankruptcy, on or about January 2, 2003, Ingoldsby filed his

Schedules and his Statement of Financial Affairs, under oath.

**RESPONSE NO. 35:**

Admitted.

**REQUEST NO. 36:**

In the Ingoldsby bankruptcy, in his Statement of Financial Affairs, Ingoldsby disclosed that he was a defendant in the Heller lawsuit.

**RESPONSE NO. 36:**

Admitted.

**REQUEST NO. 37:**

In the Ingoldsby bankruptcy, Ingoldsby stated in Schedule B that his Unum Provident disability insurance policy was his only “interests in insurance policies”.

**RESPONSE NO. 37:**

Admitted.

**REQUEST NO. 38:**

In the Ingoldsby bankruptcy, Ingoldsby stated “None” when required to list “[o]ther contingent and unliquidated claims of every nature...”

**RESPONSE NO. 38:**

Admitted.

**REQUEST NO. 39:**

In the Ingoldsby bankruptcy, on or about April 18, 2003, Ingoldsby gave notice of filing the original signatures of his Schedules and Statement of Financial Affairs, originally filed on January 2, 2003, and again failed to claim any interest in Policy 873-87-52 or disclose any claim or cause of action against National Union.

**RESPONSE NO. 39:**

The Plaintiff-Intervenor admits that on or about April 18, 2003, he gave notice of filing the original signatures of his Schedules and Statement of Affairs, originally filed January 2, 2003 and denies the remainder of the requested admission.

**REQUEST NO. 40:**

Ingoldsby is judicially estopped from now asserting a claim for coverage against National Union.

**RESPONSE NO. 40:**

Denied.

Signed under the penalties of perjury this 17 day of February, 2006.

Michael Ingoldsby

As to Objections,

Gregory J. Aceto
(BBO #558556)
JOHNSON & ACETO, P.C.
67 Batterymarch St., Suite 400
Boston, MA 02110
617-728-0888
fax 617-338-1923