UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC., f/k/a HELLER HEALTHCARE FINANCE, INC., <br><br> Plaintiff, <br><br> And <br><br> MICHAEL INGOLDSBY, <br><br> Intervenor/Plaintiff, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and INTERNATIONAL INSURANCE GROUP, LTD., <br><br> Defendants. | Civil Action No. 05-CV-11128-NG |

**DEFENDANT NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.'S OPPOSITION TO PLAINTIFF
GE HFS HOLDINGS, INC.'S MOTION TO DISQUALIFY COUNSEL**

Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("NUFIC"), by its

undersigned counsel, Edwards Angell Palmer & Dodge LLP ("EAP&D"), hereby opposes the

motion of Plaintiff GE HFS Holdings, Inc., f/k/a Heller Healthcare Finance, Inc. ("Heller") to

disqualify EAP&D as counsel to NUFIC.

## BACKGROUND

This matter arises out of Heller's decision, over a year after this action was initiated and

EAP&D first entered its appearance in the case, to move to disqualify EAP&D as counsel to

NUFIC.   Heller claims that there is an impermissible conflict as a result of Madeleine

Estabrook's ("Estabrook") alleged representation of Indy Edwards, the President and Chief Operating Officer of Managed Health Care Systems, Inc. ("MHCS").

Edwards is not a party to this litigation. She assigned her rights under the Policy to Heller in order to settle the underlying litigation between Heller and Edwards entitled <u>Heller Healthcare Finance, Inc. v. Michael Ingoldsby, Mary Lee Ingoldsby, Pamela Jones and Indy Edwards</u>, Civil Action No. 02-CV-11553-NG (D. Mass.) (the "Heller Litigation"). Estabrook did <u>not</u> represent Edwards with respect to any coverage issues arising out of the Policy that are at issue in this litigation. Instead, Greg Aceto of Johnson & Aceto, LLP, counsel for Michael Ingoldsby in this case, represented Edwards in connection with insurance coverage matters. <u>See</u> Notice Letter from Aceto on behalf of Edwards, dated August 2, 2002 (a true copy of which is attached hereto as Exhibit A).

Neither Heller nor Edwards make any claim to the contrary. Instead, Heller asserts only that Estabrook participated in the negotiation of a proposed management buyout of MHCS by Edwards, which Heller argues created the purported conflict. Heller also complains that Estabrook was allegedly present at certain bankruptcy hearings in connection with the proposed management buyout. Heller has abandoned its previous assertion that Estabrook's former representation of MHCS creates a conflict.

In its Motion to Disqualify EAP&D, Heller cites several emails from March 2002 between Estabrook and David Tatge of Epstein Becker & Green, P.C. The emails, which are over four years old, involve negotiations between MHCS, its creditors, Edwards and *Heller*. What Heller neglects to reveal is that David Tatge, the person with whom Estabrook was corresponding, was counsel for Heller. Therefore, Heller was well aware of these negotiations back in March of 2002. Edwards also testified in her Affidavit, as quoted in the Motion to

Disqualify, that EAP&D represented her in negotiations *directly with Heller* in the last quarter of 2001 and the first quarter of 2002.

On June 26, 2006, NUFIC served on Heller its First Request for Production of Documents and Second Set of Interrogatories (collectively "Discovery Requests"). The Discovery Requests were served after NUFIC received documents from Heller under Rule 26(a) of the Federal Rules of Civil Procedure suggesting that Heller had known about the alleged negligent misrepresentations far earlier than Heller claimed and that Heller had nevertheless continued to loan MHCS money despite this knowledge. Specifically, Heller produced Answers to Interrogatories from the Heller Litigation from Pamela Jones (referred to herein as "Jones Answers"). See Exhibit B hereto.

In those Answers, Pamela Jones stated the following under oath. She informed Michael Gardullo, an employee of Heller about the misstatements in the Borrowing Base Certificates as soon as she discovered the errors. See Jones Answers, at 7 (Answer No. 6). Jones described the exact issue "in great detail directly to ... Gardullo." See Jones Answer, at 10 (Answer No. 12). Gardullo then advised Jones to continue to sign the Borrowing Base Certificates, but to include a disclaimer that the information contained did not include certain necessary adjustments, of which an amount could not be determined. See Jones Answer, at 13 (Answer No. 21). Jones, however, told Gardullo that she would no longer agree to sign the certificates. See id. The disclaimer was then included on the Borrowing Base Certificates, which were then signed by Edwards. See id.

The Jones Answers provide sworn statements that Heller knew about the problems with the Borrowing Base Certificates. Rather than demand that the Certificates be corrected, Heller agreed to accept them with just a disclaimer. These facts contrast sharply with what Heller represented in the Heller Litigation. Therein, Heller claimed that it discovered the problem with

BOS_548277_3/SMORRIS

the Borrowing Base Certificates through its own field audit, not from Jones. See Complaint filed in Heller Litigation, at ¶¶ 39-42 (a true copy of the Complaint is attached hereto as Exhibit C). Heller admitted that it continued to loan money to MHCS until early February 2002, notwithstanding the conversations Jones had with Gardullo the preceding December. See Complaint filed Heller Litigation, at ¶¶ 39 & 40.

NUFIC's Discovery Requests were prompted by the dramatic difference between Jones' story and Heller's story. They seek only information concerning what Heller knew about the inaccuracies in the Borrowing Base Certificates and when Heller knew it. NUFIC's Discovery Requests do not concern either the negotiation of the management buyout or the conversion of the bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation.

On June 27, 2006, the day after NUFIC served the Discovery Requests on Heller and more than a year after this case was initially filed, counsel for Heller sent a letter to EAP&D requesting that it withdraw as counsel for NUFIC in this action. In that letter, Heller asserted, for the first time, a conflict under Rule 1.9 and Rule 1.10 of the Massachusetts Rules of Professional Conduct based on Estabrook's former representation of MHCS and alleged representation of Edwards. Heller disingenuously claimed that Estabrook's involvement in the negotiation with Heller "only recently came to light for Heller through discovery in this matter."

On July 7, 2006, counsel for NUFIC responded pointing out that neither MHCS nor Edwards are parties to the instant litigation, that Heller had not alleged, nor could it, that Estabrook's former representation of either Edwards or MHCS had anything to do with the insurance coverage issues being litigated in this case and that Aceto separately represented Edwards in connection with the insurance coverage matters at issue here. The letter also pointed out that Heller was well aware of Estabrook's representation of MHCS as early as January 6,

2004, when Edwards herself identified Estabrook as counsel for MHCS in her initial disclosures filed in the Heller Litigation.  Notably, Edwards did not identify Estabrook as her own counsel with respect to the negotiations with Heller over the proposed management buyout.

<strong>ARGUMENT</strong>

**I.      Motions to Disqualify Are Measures of Last Resort and Allowed Only in Extreme Circumstances.**

The Massachusetts Supreme Judicial Court has emphasized that "[d]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose *except when absolutely necessary*."  Adoption of Erica, 426 Mass. 55, 58, 686 N.E.2d 967, 970 (1997) (quoting Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721 (7th Cir. 1982)) (emphasis added).  The Massachusetts Supreme Judicial Court has also expressed its concern about the misuse of such motions by parties seeking to harass their opposition.  See Adoption of Erica, 426 Mass. at 64, 686 N.E.2d at 974 ("We have noted our concern about the high cost to litigants and to the court system occasioned by motions to disqualify attorneys, especially when such motions are used as harassment and dilatory tactics.").  According to the Court, such motions undoubtedly deprive the client of their right to choose their counsel of choice and impose hardship and expense upon the client forced to arrange new counsel.  See Borman v. Borman, 378 Mass. 775, 787-8, 393 N.E.2d 847, 855 (1979).  Accordingly, motions to disqualify are only allowed when "absolutely necessary."

Heller's motion to disqualify, however, is far from "absolutely necessary."  On the contrary, Heller thought so little of the alleged conflict that it waited over a year after this case was filed to seek EAP&D's disqualification.  Heller's entire motion is premised solely on Estabrook's involvement in an unsuccessful management buyout by Edwards over four years ago.  There is clear and undisputed evidence that Heller knew about Estabrook's involvement at

the time of the negotiations, yet chose to sit on that information until right after it received

discovery in this case that it did not want to answer.

Further, Heller fails to explain how the MHCS negotiations are substantially related to

the instant action. Instead, Heller makes what amounts to two highly conclusory statements:

(1) that the negotiations relate to the course of the bankruptcy, without actually explaining what

the connection is between the negotiations and NUFIC's affirmative defenses; and (2) that the

negotiations occurred around the same time that the allegations in the underlying complaint

brought by Heller against Edwards arose. This is simply not sufficient to demonstrate that the

Motion to Disqualify is "absolutely necessary."

When the need for disqualification is not clear, courts must defer to an attorney's own

best judgment as to whether her representation of a client brings her into conflict with any

provision of the disciplinary code. See Adoption of Erica, 426 Mass. at 63 (encouraging

deference to an attorney's best judgment on the matter); Borman, 378 Mass. at 787 (the code is

self executing and lawyers should be expected to make determinations on their own).

## II.  Heller's Substantial and Unexplained Delay in Seeking Disqualification Underscores the Fact that the Disqualification is Not "Absolutely Necessary."

Dilatory motions to disqualify opposing counsel are viewed with extreme skepticism in

Massachusetts and typically denied. Massachusetts courts understand that "motions to disqualify

can be used as dilatory and harassing litigation tactics that disrupt the efficient administration of

justice." G.D. Mathews & Sons Corp. v. MSN Corp., 54 Mass.App.Ct. 18, 763 N.E.2d 93 (2002)

(motion to disqualify allowed because there was no undue delay). Massachusetts courts,

therefore, "frown upon inexplicably late motions to disqualify, often viewing such maneuvers as

evidence of dilatory behavior." Donahue v. Heritage Property Investment Trust, Inc., No. 03-P-

303, 2004 WL 1562810, at *2 (Mass. App. Ct., July 13, 2004) [appended hereto as Exhibit D];

see, also National Medical Care, Inc. v. Home Medical of America, Inc., No. 00-1225, 2002 WL 31068413, at \*8 (Mass. Super. Sept. 12, 2002) (undue delay was alternative reason to deny motion to disqualify under Rule 1.9 of the Massachusetts Rules of Professional Conduct) [appended hereto as Exhibit E].

Notably, Massachusetts Superior Court Rule 3 states that a motion for disqualification should be made within ten-days after the appearance of such attorney. Although the Superior Court can consider a motion at its own discretion after ten-days, it will typically refuse to do so if the disqualification will unfairly disrupt and delay the litigation or give the movant a substantial tactical advantage. See, e.g. Donahue, 2004 WL 1562810, at \*2 (judge did not abuse discretion by denying motion for disqualification where movant did not file motion within ten-day time frame provided under Rule 3, but instead waited eleven months); National Medical, 2002 WL 31068413, at \*8 (motion to disqualify not allowed where 19 month delay would unfairly disrupt and delay the litigation or give the movant a substantial tactical advantage.).

Heller's Motion to Disqualify, however, is devoid of any explanation as to why Heller waited over a year to file the Motion. Indeed, Heller predicates its entire Motion on the negotiations between Edwards and *Heller,* which occurred over four years ago. Heller obviously knew about those negotiations and Estabrook's involvement in them long before it filed the instant action. It cannot claim credibly now, as it tried to do in its June 27, 2006 letter to EAP&D, that those negotiations and Estabrook's involvement in them "only recently came to light for Heller through discovery in this matter." That excuse is patently false. The real reason for the Motion to Disqualify is obvious. The Motion comes on the heels of discovery requests issued by NUFIC to Heller, which go to the truth of Heller's claims in the Heller Litigation. The

timing of this disqualification effort, therefore, indisputably relates to tactical issues rather than any genuine concern regarding a conflict.

Heller does not argue that NUFIC's Discovery Requests suddenly gave rise to these issues, probably because it cannot make a colorable argument to that effect. NUFIC's Discovery Requests seek information concerning what Heller knew about the inaccuracy of the Borrowing Base Certificates and when Heller first knew that they were inaccurate. Neither of these factual issues bears any relationship to Edwards' attempt to acquire the assets of MHCS or the conversion of the bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation. They certainly are not substantially related to those issues. Accordingly, NUFIC did not obtain confidential or privileged information from Edwards concerning what Heller knew about the inaccuracies in the Borrowing Base Certificates. On the contrary, that information was set forth under oath by Jones and Edwards in sworn Answers to Interrogatories served in the Heller Litigation.[1]

### III.    Heller has Failed to Adequately Demonstrate that Any Conflict Exists Under Massachusetts Rule of Professional Conduct 1.9(a).

To establish a conflict under Rule 1.9(a), Heller must demonstrate that (1) the current representation is 'adverse' to the interests of the former client, and (2) the matter of the two representations are "substantially related." See Massachusetts Rule of Professional Conduct 1.9(a). Recognizing that MHCS is not a party to the instant action and, therefore, that there is no adverse relationship to MHCS, Heller has abandoned its assertion that Estabrook's former representation of MHCS creates an impermissible conflict. Instead, Heller argues only that the

---

[1] Jones repeated under oath the same version of events contained in her Answers to Interrogatories in an Affidavit filed in the Heller Litigation, a true copy of which is attached hereto as Exhibit F. Therein, Jones again says under oath that Heller was informed by MHCS of the problem with the Borrowing Base Certificates as early as October 2001. Affidavit of Pamela Jones, ¶¶ 27-33.

BOS_548277_3/SMORRIS

scope of Estabrook's involvement in the negotiations of the management buyout and this matter
are "substantially related."

Heller, however, does not explain *how* the two are "substantially related." Instead, Heller
concludes that because "the defenses asserted by [NUFIC purportedly] rely in whole or in part on
the conduct of MHCS' bankruptcy and conversion of MHCS' bankruptcy from a Chapter 11
reorganization to a Chapter 7 liquidation, the scope of Estabrook's representation of Edwards and
this matter are substantially related." Motion to Disqualify, at 6. Such conclusory statements
fail to meet Heller's burden of establishing a substantial relationship. ebix.com, Inc. v.
McCracken, 312 F.Supp.2d 82, 90-91 (D. Mass. 2004) (the moving party bears the burden of
establishing a substantial relationship).[2]

Heller does not explain what part of NUFIC's affirmative defenses rely on the conduct of
MHCS' bankruptcy and conversion of MHCS' bankruptcy from Chapter 11 to Chapter 7
liquidation. The answer to that question certainly does not come from looking at NUFIC's
Answer to Heller's Complaint, in which NUFIC asserts the following four affirmative defenses:
(1) that the Complaint fails to state a claim upon which relief can be granted; (2) that coverage is
barred under the terms of the Policy; (3) that all conditions precedent under the Policy have not
been met; and (4) that Heller's claims under Mass. Gen. L. ch. 93A are barred for failure to make
a demand. With no explanation from Heller, the Court cannot possibly conclude that Edwards'
negotiation of the proposed management buyout or the conversion of MHCS' bankruptcy from
Chapter 11 to Chapter 7 have anything to do with NUFIC's affirmative defenses.

---

[2] While it is true that Heller need not show that confidential information has actually been utilized by NUFIC, it
must still establish that the information in question is substantially related to the matter at hand. Courts using the
"substantially related test" have taken differing approaches in its application, with some courts focusing on whether
the issues involved are similar and other courts focusing on whether there is a factual overlap between the two
matters. See Adoption of Erica, 426 Mass. At 58. Massachusetts has not yet determined which approach it will
take. Id. Whichever test Massachusetts adopts, Heller's conclusory statements fail to satisfy the test.

BOS_548277_3/SMORRIS

There can be no "substantial relationship" between Estabrook's alleged representation of Edwards and this case because only Aceto's representation of Edwards with respect to the insurance coverage issues would be "substantially related" to this case. Consequently, Heller has failed to satisfy its burden of establishing a "substantial relationship," and its Motion to Disqualify should be denied.

## CONCLUSION

For the reasons set forth herein, NUFIC requests that the Court deny Heller's Motion to Disqualify.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.

By its attorneys,

Dated: August 16, 2006

/s/ Joey H. Lee
John D. Hughes (BBO# 243660)
Stephen M. Prignano (BBO# 645581)
Mary Patricia Cormier (BBO# 635756)
Joey H. Lee (BBO# 663803)
EDWARDS ANGELL PALMER
   & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 239-0100
Fax: (617) 227-4420

BOS_548277_3/SMORRIS

## CERTIFICATE OF SERVICE

I, Joey H. Lee, hereby certify that on this 16th day of August, 2006, that Defendant National Union Fire Insurance Company of Pittsburgh, Pa.'s Opposition to Plaintiff GE HFS Holdings, Inc.'s Motion to Disqualify Counsel, which was electronically filed through the ECF system, will be sent electronically to all attorneys of record for Plaintiffs GE HFS Holdings, Inc., f/k/a Heller Healthcare Finance, Inc. and Michael Ingoldsby.


/s/ Joey H. Lee
Joey H. Lee

BOS_548277_3/SMORRIS

**EXHIBIT A**



JOHNSON & ACETO, P.C.

COUNSELORS AT LAW

67 BATTERYMARCH STREET, SUITE 400
BOSTON, MASSACHUSETTS 02110
TEL (617) 728-0888
FAX (617) 338-1923
EMAIL: office@fjalaw.com

August 2, 2002

**Via Facsimile No. (212) 943-1125**
**and First-Class Mail**
National Union Fire Insurance Co.
Financial Services Claims Department
175 Water Street
New York, NY 10038

Re:   *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, Mary Lee*
      *Ingoldsby, Pamela Jones and Indy Edwards*
      **United States District Court Docket No.: 02 CV 11553 NG**
      **Insured:      Managed Health Care Systems**
      **Policy No.:   873-87-52**

Dear Sir/Madam:

Enclosed please find a copy of the complaint which has been served on the above-named defendants. The defendants are presently insured by National Union Fire Insurance Company ("National Union") under Managed Health Care Systems, Inc's Directors & Officers Liability policy. The subject policy is Policy No. 873-87-52.

Please consider this letter as notice that the following three (3) officers; Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards, as National Union insureds, are making a formal claim of National Union to provide coverage for their defense (and/or indemnification) in the instant matter under Policy No. 873-87-52.

I have attached a copy of the Complaint (without *Exhibits A-F* to this facsimile transmission. A complete copy of the Complaint and attached *Exhibits A-F* will follow under separate cover via first-class mail.

Thank you for your attention to this matter. Please do not hesitate to contact me if you have any further questions.

Very truly yours,

Gregory J. Aceto

Enclosures
GJA/ejb
cc:   Michael P. Duffy, Esq. (via fax no. (617) 951-2125/complaint w/out exhibits and first-class mail)
      Catherine N. O'Donnell
      Michael O. Ingoldsby
      Indy Edwards
      F:\Aceto\Clients\Ingoldsby-Heller\National Union Ins.claim ltr1.wps.wpd

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02CV11553NG

HELLER HEALTHCARE FINANCE, INC.,    )
                Plaintiff    )
                                 )
                                 )
v.    )
                                 )
MICHAEL INGOLDSBY, MARY LEE    )
INGOLDSBY, PAMELA JONES, and    )
INDY EDWARDS,    )
                Defendants    )
                                 )

## THE DEFENDANT PAMELA JONES' ANSWERS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

The Defendant Pamela Jones (hereinafter referred to as "Jones") hereby responds
to the First Set of Interrogatories propounded by the Plaintiff as follows:

## GENERAL OBJECTIONS

In addition to the specific objections contained with Jones' response to the
interrogatories, each of these responses is made subject to the following general
objections and, to the extent applicable, each of the general objections is incorporated as
if set forth in full in each of Jones' responses, whether or not referred to herein:

A.      Jones objects generally to the Interrogatories on the grounds that they are
overly broad and because the preparation of answers thereto and the detail requested
would be unduly time-consuming, burdensome and oppressive. However, Jones will
make a good faith effort to respond, fully, fairly and comprehensibly.

HELLER 01026

B.    Jones objects to furnishing any information protected from disclosure by the operation of the attorney/client privilege, the attorney work product doctrine, or the privilege accorded in anticipation of litigation or for trial.

C.    Jones objects to producing information sought that is not reasonably calculated to lead to the discovery of admissible evidence.

D.    Jones objects to the propounded interrogatories to the extent that they seek a legal conclusion.

E.    Jones objects to each instruction to the extent it proposes to purport on her an obligation to respond beyond such obligation imposed upon her by the Federal Rules of Civil Procedure.

## INTERROGATORY NO.1:

Please state your (a) name, (b) Social Security Number, (c) residential address, (d) age, (e) occupation, (f) employer, and (g) employer's address.

## ANSWER TO INTERROGATORY NO. 1:

Pamela Jones
SSN #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
197 High Street, Duxbury, MA  02332
Employer:    Overlook VNA, Inc.
             99 Derby St., Suite 300
             Hingham, MA  02043

## INTERROGATORY NO.2:

Identify each person whom you expect to call as an expert witness at trial, and set forth for each the subject matter upon which each expert is expected to testify, the substance of the facts and opinions to which each such expert is expected to testify, and a summary of the grounds for each opinion.

2

HELLER 01027

## ANSWER TO INTERROGATORY NO. 2:

I do not at this time intend to call an expert witness in this case, but reserve the

right to supplement this answer.

## INTERROGATORY NO.3:

Identify each person whom you expect to call as a witness at trial, and set forth

for each the subject matter upon which each witness is expected to testify.

## ANSWER TO INTERROGATORY NO. 3:

Michael Ingoldsby, 5 Stagecoach Road, Hingham, MA. Mr. Ingoldsby
was the Chief Executive Officer of Managed Health Care Systems, Inc.
(hereinafter referred to as "MHCS") and has knowledge of the general
business of MHCS, the course of the contractual relationship between
Heller and MHCS, the communications between representatives of Heller
and MHCS, as well as the financial circumstances of MHCS, the financial
arrangements between Heller and MHCS, the nature of the difficulties
MHCS had with its Medicare claims, and the circumstances surrounding
the borrowing base certificates.

Indy Edwards, 345 Camp Street, #506, West Yarmouth, MA. Ms.
Edwards was the president of MHCS and has knowledge of the general
business of MHCS, the course of the contractual relationship between
Heller and MHCS, the communications between representatives of Heller
and MHCS, as well as the financial circumstances of MHCS, the financial
arrangements between Heller and MHCS, the nature of the difficulties
MHCS had with its Medicare claims, and the circumstances surrounding
the borrowing base certificates.

Pamela Jones, 197 High Street, Duxbury, MA. Ms. Jones was the vice-
president of finance for MHCS and has knowledge of the general business
of MHCS, the course of the contractual relationship between Heller and
MHCS, the communications between representatives of Heller and
MHCS, as well as the financial circumstances of MHCS, the financial
arrangements between Heller and MHCS, the nature of the difficulties
MHCS had with its Medicare claims, as well as the circumstances
surrounding the borrowing base certificates and the information provided
to Heller regarding the Medicare claims.

David B. Tatge, Epstein, Becker & Green, P.C., 1227 25th Street N.W.,
Suite 700, Washington, D.C. Mr. Tatge has knowledge of the general

3

HELLER 01028

course of the contractual relationship between Heller and MHCS, MHCS' financial circumstances, the Medicare claims of MHCS, the borrowing base certificates, as well as communications between representatives of Heller and MHCS, having been present at meetings and conferences between representatives of Heller and MHCS.

Michael Gardullo, GE HFS Holdings, Inc., Two Bethesda Metro Center, Sixth Floor, Bethesda, MD 20814. Mr. Gardullo has knowledge of the general course of the contractual relationship between Heller and MHCS, as well as knowledge of the financial circumstances of MHCS, the Medicare claims of MHCS, communications between representatives of Heller and MHCS, and audits conducted by Heller, or on behalf of Heller, of MHCS.

Peg Henline, HealthCare Analysis Corporation, 6459 W. Quaker Street, Orchard Park, NY 14127. Ms. Henline, an auditor from Heller, has information regarding MHCS' financial circumstances and of the audits conducted by Heller of MHCS, including the borrowing base certificates and Medicare claims.

Mehdi Maida, GE HFS Holdings, Inc., Two Bethesda Metro Center, Sixth Floor, Bethesda, MD 20814. Mr. Maida, a representative from Heller, has information regarding MHCS' financial circumstances and of the audits conducted by Heller of MHCS, including the borrowing base certificates and Medicare claims.

Gerald Stinnet, address unknown. Auditor from Heller conducted audits of MHCS surrounding the borrowing base certificates.

Simeone & Simeone, address unknown. Healthcare consultants/auditors specializing in home health Medicare who were sent to conduct audit of MHCS upon filing of Chapter 11 and determine if Heller was secured lender.

Verdolino Accountants, address unknown. Firm hired to assist MHCS with DIP reporting reports for court and may have information regarding MHCS' financial circumstances, including the borrowing base certificates and Medicare claims.

Alex Rodolaikis, Hanify & King, One Federal Street, Boston, MA 02110. Bankruptcy Attorney to MHCS. Will have knowledge of DIP Loan Agreement, negotiations, and financial circumstances of MHCS, including Medicare claims.

Madeline Estabrook, Esq. address unknown. Has knowledge of general business and course of events between Heller and MHCS, knowledge of

4

HELLER 01029

communications between representatives of Heller and MHCS, and
knowledge regarding negotiations.

## INTERROGATORY NO.4:

Please state the basis of your denial of paragraph 23 of the Complaint which

states that "MHCS, Medical Temporaries and the Defendants owed duties to Heller to

prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to

Heller in connection with the DIP Loan in a manner which accurately reported to

Helter[sic]'eligible' Medicaid, Medicare, Commercial and Staffing receivables of MHCS

and Medical Temporaries, as determined under the DIP Loan Agreement."

## ANSWER TO INTERROGATORY NO. 4:

The allegations contained in Paragraph 23 are inaccurate as to who owed a duty to

Heller. In addition, the allegations call for a legal conclusion.

## INTERROGATORY NO. 5:

Please state the basis of your denial of paragraph 25 of the Complaint which

states that "Heller lent money to MHCS and Medical Temporaries under the DIP Loan

based on the level of receivables the companies reported to Heller on periodic 'borrowing

base certificates', signed by Defendants Jones and Edwards in the ordinary course of

business and their employment. These certificates were supplied to Heller with the intent,

knowledge and expectation that Helter[sic] would rely on the level of eligible receivable

collateral reported therein in determining whether, and to what extent, Helter[sic] would

re-advance collections it received back to MHCS and Medical Temporaries upon various

'draw' requests by the borrowers. At all times, Helter[sic] reasonably relied on the

accuracy of the borrowing base certificates it received from MHCS and Medical

5

HELLER 01030

Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical

Temporaries under the DIP Loan."

**ANSWER TO INTERROGATORY NO. 5:**

      The allegations are inaccurate. In addition, I have no knowledge and cannot

comment on what Heller relied upon or what actions Heller took.

**INTERROGATORY NO. 6:**

      Please state the basis of your denial of paragraph 27 of the Complaint which

states that "Unknown to Helter[sic], Defendants Jones, Edwards and Ingoldsby failed to

exercise reasonable care and competence in the preparation and communication to

Helter[sic] of MHCS' and Medical Temporary's receivable collateral on the borrowing

base certificates submitted in connection with the DIP Loan. As a consequence, the

borrowing base certificates submitted to Heller by MHCS and Medical Temporaries

under the DIP Loan failed, until February 2002, to accurately track or record required

negative LUPA (downward) adjustments to receivables as reported therein. These

failures caused receivables as reported to Helter on the borrowing base certificates to be

overstated."

**ANSWER TO INTERROGATORY NO. 6:**

      I did not fail to exercise reasonable care and competence in the preparation and

communication to Heller of the receivables on the borrowing base certificates and other

reports. Due to the financial condition of MHCS and because the billing software had

failed, MHCS had no income for almost six months and had a backlog of thousands of

claims that had to be processed manually. Representatives from Heller were fully aware

of the software problem and the inability to process the claims, which was why the

6

borrowing base certificates were incomplete. Heller conducted regular audits using both internal and outside auditors and all were aware of the lack of information regarding the LUPA adjustments. Despite having full knowledge, Heller, acting through its various representatives, including attorneys and auditors, continually accepted the reports, borrowing base certificates and other records. After I was able to determine the extent of the discrepancies, I alerted Michael Ingoldsby and Indy Edwards and then informed Michael Gardullo from Heller. Once I knew what the situation was, I no longer would sign the borrowing base certificates.

**INTERROGATORY NO. 7:**

Please state the basis of your denial of paragraph 29 of the Complaint which states that "Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby[sic], prepared and served such DIP Operating Reports on Heller and other creditors with the intent and expectation that the bankruptcy court, Helter[sic] and such other creditors would reasonably re[]ly on the accuracy of the balance sheets and other financial data reported therein."

**ANSWER TO INTERROGATORY NO. 7:**

The allegations are inaccurate. In addition, I have no knowledge and cannot comment on what Heller relied upon or what actions Heller took. In addition, please refer to the answer to Interrogatory No. 6.

7

HELLER 01032

**INTERROGATORY NO. 8:**

Please state the basis of your denial of paragraph 30 of the Complaint which states that "Unknown to Helter[sic], but similar to the situation of the misstated borrowing base certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports, with the consequence that the DIP Operating Reports as filed, through January 2002, failed to show and reflect required LUPA adjustments (downwards) to the receivable collateral."

**ANSWER TO INTERROGATORY NO. 8:**

Please refer to the answer to Interrogatory No. 6.

**INTERROGATORY NO. 9:**

Please state the basis of your denial of paragraph 32 of the Complaint which states that "Around this time, in the Fall of 2001, Heller was told by MHCS and Medical Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of acquiring, as 'new equity', the principal assets of MHCS and Medical Temporaries, through a sale or a reorganization plan, with Defendant Michael Ingoldsby[sic] possibly having some sort of continuing management role in any successor venture."

**ANSWER TO INTERROGATORY NO. 9:**

Ingoldsby and Edwards assumed that I would be a part of this plan, but I never agreed to do so.

**INTERROGATORY NO. 10:**

Please state the basis of your denial of paragraph 34 of the Complaint which

8

HELLER 01033

states that Wnknown[sic] to Heller, by the actions of the Defendants Jones, Edwards, and

Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of

MHCS' and Medical Temporaries Accounts and accounts receivable as reported to Heller

on the borrowing base certificates submitted to Heller and in the DIP Operating Reports

filed with the bankruptcy court and served on Helter, by failing to cause MHCS and

Medical Temporaries to make LUPA adjustments therein, which adjustments would have

reduced collectible and eligible receivables as shown thereon."

## ANSWER TO INTERROGATORY NO. 10:

Heller was aware. Please refer to the answer to Interrogatory No. 6.

## INTERROGATORY NO. 11:

Please state the basis of your denial of paragraph 38 of the Complaint which

states that "The Defendants knew, or should have known, of significant misstatements in

the borrowing base certificates submitted to Helter[sic] by MHCS and Medical

Temporaries and of related misstatements of receivables as reported in the DIP Operating

Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of

MHCS and Medical Temporaries."

## ANSWER TO INTERROGATORY NO. 11:

Please refer to the answer to Interrogatory No. 6.

## INTERROGATORY NO. 12:

Please state the basis of your denial of paragraph 39 of the Complaint which

states that "Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely,

that she believed that MHCS' and Medical Temporaries' borrowing base certificates

were no longer accurate and that she would no longer certify them. When Mr. Gardullo

HELLER 01034

probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on

information and belief, acting as unpaid Chief Executive Officer (CEO) of the two

debtors."

## ANSWER TO INTERROGATORY NO. 12:

I was not "vague" in my description of the problem to Mr. Gardullo. Mr.

Gardullo asked me questions that I was uncomfortable answering and referred him to Mr.

Ingoldsby. After speaking with Mr. Ingoldsby, Mr. Gardullo called me back. When Mr.

Gardullo told me that Mr. Ingoldsby had told him that I had been referring to an old

Medicare cost report liability that MHCS had not reserved for, I clearly stated that was

not the issue and described the LUPA issue in great detail directly to Mr. Gardullo.

## INTERROGATORY NO. 13:

Please state the basis of your Second Affirmative Defense, which states that "At

all relevant times, Heller was fully aware of the inability of MHCS to properly disclose

Medicare adjustments on its accounts receivable and, with full knowledge, accepted the

borrowing base certificates issued by MHCS without such information and knowingly

advanced monies to MHCS."

## ANSWER TO INTERROGATORY NO. 13:

Please refer to answers to Interrogatories No. 6 and 12. In addition, Heller sent

auditors out on a regular basis to audit the borrowing base certificates and to verify the

collateral. Heller hired outside home health care auditing firms as well.

## INTERROGATORY NO. 14:

Please state the basis of your Third Affirmative Defense, which states that "At all

relevant times, Helter[sic] conducted its own audits of MHCS to confirm the accuracy of

10

HELLER 01035

the borrowing base certificates, was fully aware that said certificates did not provide for Medicare adjustments on accounts receivable, and knew of the potential Medicare adjustment problems. Despite such knowledge, Heller chose to continue to advance monies to MHCS."

**ANSWER TO INTERROGATORY NO. 14:**

Please refer to answers to Interrogatories No. 6, 12, and 13.

**INTERROGATORY NO. 15:**

Please state the basis of your Fourth Affirmative Defense, which states that "Jones fully informed the representatives of Helter[sic] about the Medicare adjustment problems that relate to the Medicare accounts receivable."

**ANSWER TO INTERROGATORY NO. 15:**

Please refer to answer to Interrogatory No. 12.

**INTERROGATORY NO. 16:**

Please state the basis of your Fifth Affirmative Defense, which states that 'To the extent that Heller is able to establish that it has suffered any damage, any such damage was caused by Heller's own actions and misconduct."

**ANSWER TO INTERROGATORY NO. 16:**

Please refer to answers to Interrogatories No. 6, 12, and 13.

**INTERROGATORY NO. 17:**

Please state the basis of your Seventh Affirmative Defense, which states that "Helter[sic] has breached its obligations of good faith and fair dealing and is, therefore, entitled to recover nothing."

11

HELLER 01036

**ANSWER TO INTERROGATORY NO. 17:**

Please refer to answers to Interrogatories No. 6, 12, and 13.

**INTERROGATORY NO. 18:**

Please state the basis of any denial you asserted in Plaintiffs First Requests For

Admissions To Pamela Jones.

**ANSWER TO INTERROGATORY NO. 18:**

In Request No. 1, Exhibit A was not a borrowing base certificate. As to Request

No. 10, please refer to answer to Interrogatory No. 12.

**INTERROGATORY NO. 19:**

Please state when and how did you first become aware that low utilization

payment adjustments ("LUPA") needed to be made.

**ANSWER TO INTERROGATORY NO. 19:**

I am not able to determine exactly when, but after we were able to catch up with

the long backlog of unbilled claims created by the failure of the billing software system,

we began to sample some of the claims and discovered that they were not paid in full due

to the LUPA adjustments.

**INTERROGATORY NO. 20:**

Please state when and how you communicated to GE, or its agents, the size,

manner, and amount of LUPA adjustments that were needed.

**ANSWER TO INTERROGATORY NO. 20:**

Please refer to answer to Interrogatory No. 12. In addition, in the second

telephone conversation with Mr. Gardullo, I explained in great detail what the LUPA

adjustment problem was.

12

HELLER 01037

**INTERROGATORY NO. 21:**

Please state in complete detail the circumstances surrounding Managed Health Care Systems, Inc. and Medical Temporaries, Inc.'s failure to make low utilization payment adjustments including, but not limited to, when you first learned about the need for such adjustments, what was recorded on Managed Health Care Systems, Inc. and Medical Temporaries, Inc.'s records in lieu of accurate low utilization payments, what was recorded on Borrowing Base Certificates submitted to GE in lieu of accurate low utilization payments, and who decided to not make necessary adjustments.

**ANSWER TO INTERROGATORY NO. 21:**

Please refer to answers to Interrogatories No. 6 and 12. In addition, after I learned of the magnitude of the LUPA adjustments, I informed Mr. Ingoldsby, namely that inclusion of the LUPA adjustments on the borrowing base certificates would have a negative impact on the borrowing base to the pint where MHCS would be "overdrawn" on the collateral. Mr. Ingoldsby made light of the information at the time, particularly in his conversation with Mr. Gardullo. During my second telephone conversation with Mr. Gardullo, Mr. Gardullo advised me to continue to sign the certificates, but to include a disclaimer that the information contained did not include necessary LUPA adjustments, of which an amount could not be determined at this time. I informed Mr. Gardullo that I would not sign the certificates any longer. The disclaimer was included in the borrowing base certificates, which were then signed by Ms. Edwards.

**INTERROGATORY NO. 22:**

Please identify all communications between Health Care Systems, Inc. and Medical Temporaries, including its agents, on the one hand, and the Centers for Medicare

13

HELLER 01038

& Medicaid Services, including its agents and intermediaries, on the other hand, concerning low utilization payment adjustments.

**ANSWER TO INTERROGATORY NO. 22:**

I am not aware of, and have no knowledge of, any such communications.

**INTERROGATORY NO. 23:**

Please state in complete detail all of the reason(s) for your resignation from Managed Health Care Systems, Inc. and Medical Temporaries, Inc including, but not limited to, specific details as to whether you resigned because Michael Ingoldsby[sic] and Indy[sic] Edwards were not making low utilization payment adjustments that needed to be made, you wanted to inform GE about low utilization payment adjustments that needed to be made, or you were told by Michael Ingoldsby and Indy Edwards to conceal information about low utilization payment adjustments that needed to be made.

**ANSWER TO INTERROGATORY NO. 23:**

I resigned from MHCS in order to get on with my career. While I was no longer enamored with the people I had been working with or the direction they wanted the companies to take, my leaving was not because Mr. Ingoldsby or Ms. Edwards were not making low utilization payment adjustments that needed to be made, or because I wanted to inform Heller about the low utilization payment adjustments that needed to be made, or because I was told by Mr. Ingoldsby or Ms. Edwards to conceal such information. I was tired of working for a company that had been in Chapter 11. I was tired of working at a company involved in a number of lawsuits and did not agree with the direction the company was going in. When my present employer made me an offer, I accepted it.

14

HELLER 01039

15

HELLER 01040

Signed under the pains and penalties of perjury this 3rd day of March, 2004.

_____
PAMELA JONES

As to Objections:

Pamela Jones,
By her attorneys,

_____
Janet Kenton-Walker (BBO #269020)
KLIEMAN, LYONS, SCHINDLER
& GROSS
21 Custom House Street
Boston, MA  02110
(617) 443-1000

Dated: March 5, 2004

16

HELLER 01041

**EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HELLER HEALTHCARE FINANCE, INC., | **02 CV 1 1 5 5 3 NG** |
| Plaintiff, | |
| v. | |
| MICHAEL INGOLDSBY, MARY LEE INGOLDSBY, PAMELA JONES, and INDY EDWARDS, | |
| Defendants. | |

## COMPLAINT

COMES NOW the Plaintiff, Heller Healthcare Finance, Inc. ("Heller"), and for its

Complaint states as follows:

### Nature of the Case

1.    This action seeks damages suffered by Heller as a result of the negligent

misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to

collateral available to satisfy loans made by Heller to two corporate borrowers with whom they

were affiliated.  Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are

also sued for breach of contract on a personal guaranty.

### Parties

2.    Plaintiff Heller is a Delaware corporation with its principal place of business at 2

Wisconsin Circle, 4th floor, Chevy Chase, Maryland 20815.  Heller is a lender to the healthcare

industry.

3.    Defendant Michael Ingoldsby ("Ingoldsby") was at all relevant times the sole

shareholder and a Director of Managed Health Care Systems, Inc. ("MHCS"), a non-party.  At



all relevant times, Ingoldsby served, on information and belief, as unpaid chief executive officer

(CEO) of both MHCS and Medical Temporaries, Inc., another related non-party ("Medical

Temporaries"). Mr. Ingoldsby was also actively involved in oversight of the day-to-day

management and operation of MHCS and Medical Temporaries through his oversight of and

interaction with Defendants Edwards and Jones. Upon information and belief, Mr. Ingoldsby

resides at 5 Stagecoach Road, Hingham, MA 02043.

4.     Defendant Mary Lee Ingoldsby is the wife of Michael Ingoldsby, residing at 5

Stagecoach Road, Hingham, MA 02043.

5.     Defendant Pam Jones was at all relevant times the Controller and, on information

and belief, Vice President, Finance of MHCS and its affiliate, Medical Temporaries. At all

relevant times, Ms. Jones was actively involved in the day-to-day management and operation of

MHCS and Medical Temporaries. Upon information and belief, Ms. Jones resides at 197 High

Street, Duxbury, MA 02332.

6.     Defendant Indy Edwards was, on information and belief, at all relevant times

President and a Director of MHCS and of Medical Temporaries. At all relevant times, Ms.

Edwards was actively involved in the day-to-day management and operation of MHCS and

Medical Temporaries. Upon information and belief, Ms. Edwards resides at 345 Camp Street,

#506, West Yarmouth, MA 02673.

### Jurisdiction and Venue

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity

of citizenship between the plaintiff and each of the defendants and the amount in controversy

exceeds $75,000.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants resides in this district and all of the defendants reside in Massachusetts.

## Background

9.     At all relevant times, Defendants Jones, Edwards and Ingoldsby were either a shareholder, officer and/or director of MHCS. MHCS was a privately held, for profit, "home health agency," i.e., a provider of home health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas. Together with Medical Temporaries, MHCS provided home nursing services to over 700 persons.

10.     Medicare is a medical assistance program administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a division of the United States Department of Health and Human Services ("HHS").

11.     At all relevant times, MHCS participated in CMS' home health prospective payment system ("PPS"). The home health PPS is described in CMS' Home Health Agency Manual, HCFA Publication No. 11, Transmittals 297 and 298.

12.     Under the PPS, MHCS obtained prospective, or advance, payments from CMS at "episode rates." An "episode rate" is a predetermined payment amount intended to cover all skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services provided to a given patient during a given sixty-day period, which generally starts the day the first Medicare billable service is delivered to a patient. With certain exceptions, including one described below, the episode rate payment is not affected by the number of visits that the home healthcare provider actually makes to the patient's home during the covered period.

-3-

13.    Generally speaking, home health providers receive an up-front initial percentage payment of the episodic payment due for a patient's care by submitting a Request for Anticipated Payment (RAP). The provider claims the balance of monies due for services during the 60-day "episode" by submitting a "final claim" to Medicare, together with a physician approved Plan of Care for the episode, if not previously submitted, which final claim is due within 60-days from the end of the episode or 60-days from the issue of the RAP payment,. The up-front RAP payment is 60% of the episode payment, for an initial episode, with 40% paid on the back end; for subsequent episodes of care 50% is paid with the RAP and 50% upon the final claim.

14.    As an exception to these rules, if a particular patient receives four or less visits during the 60-day episode the provider is not entitled to the full episodic payment. Rather, under the Low Utilization Payment Adjustment (LUPA) rules the provider is paid only on a per-visit basis.

15.    By way of example, assume the PPS episode payment for a particular patient is $2,500. The up-front RAP payment would be 60%, or $1,500. It is determined, however, by the time that the final claim is submitted, that the LUPA rules apply and the provider is due only $300 for the limited care that was rendered during the episode. Medicare "takes back" $1,200 by recoupment, reducing monies otherwise due the provider, on other claims, by $1,200.

16.    On February 23, 2001, MHCS and Medical Temporaries both filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

17.    Heller was a pre-petition lender to MHCS and Medical Temporaries on a number of loans, including (i) a Loan and Security Agreement dated as of August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000; (ii) a Secured Term Note, which also served as a security agreement, in the original amount of $685,000, later amended to

$515,000; (iii) a Secured Term Note in the amount of $200,000, for an overline loan, and (iv) a

further overline loan, treated as an advance under the Revolving Credit Note, in the maximum

principal amount of $233,000 (the second "overline"). As of the petition date, MHCS and

Medical Temporaries owed Heller $1,677,073 on these various loans ($973,184 on the

Revolving Credit Note, $515,000 on the Pre-petition Term Loan; $188,889 on the first pre-

petition overline, together with $13,095 of accrued and unpaid interest, together with attorneys'

fees and other costs recoverable under the loan documents).

18.    Post-petition, on February 28, 2001, Heller, as lender, and MHCS and Medical

Temporaries, jointly and severally as "borrower", entered into a $3,000,000 Revolving Credit

Loan (the "DIP Loan"), which loan refinanced the pre-petition Revolving Credit Note. The Loan

was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan

Agreement"), a copy of which is attached as Exhibit A hereto. The two debtors, at the same

time, received bankruptcy court approval for use of the cash collateral (receivables) which

collateralized Heller on the pre-petition term loan. The Bankruptcy Court approved the aforesaid

DIP Loan and the debtors' use of cash collateral at an interim hearing held March 1, 2001, with a

final order entered on March 29, 2001.

19.    Defendant Ingoldsby and Defendant Mary Ingoldsby, his wife, guaranteed the

obligations of MHCS and Medical Temporaries under the DIP Loan Agreement.

20.    Under Section 2.1(g) of the DIP Loan Agreement, the amount of $3 million

revolving line of credit that MHCS and Medical Temporaries could draw upon at any given time

under the DIP Loan facility was equal to "eighty five percent (85%) of Qualified Accounts due

and owing from any Medicaid/Medicare, Insurer or other Account Debtor (the 'Borrowing

Base')." "Qualified Account" was defined in Section 1.49 of the Loan Agreement.

21.    Under Section 3.1(a) of the DIP Loan Agreement, the DIP Loan was secured by, among other assets, MHCS' and Medical Temporaries' Accounts (defined in Section 1.1 as "any right to payment for goods sold or leased or services rendered . . . whether or not earned by performance") and accounts receivable.

22.    Under section 3.3(b) of the Loan Agreement, MHCS and Medical Temporaries were each obligated to "keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender." Section 6.1 of the Loan Agreement required MHCS and Medical Temporaries to submit a sales and collections report and an accounts receivable aging schedule to Heller by the fifteenth day of every month.

23.    MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the "eligible" Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement.

24.    A home healthcare provider must track and record LUPAs, for among other reasons, to avoid overstating its accounts receivable and/or its right to payment for services rendered. This is relevant to the instant cause of action, for the reasons noted immediately below.

25.    Heller lent money to MHCS and Medical Temporaries under the DIP Loan based on the level of receivables the companies reported to Heller on periodic "borrowing base certificates", signed by Defendants Jones and Edwards in the ordinary course of business and

-6-

their employment. These certificates were supplied to Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance collections it received back to MHCS and Medical Temporaries upon various "draw" requests by the borrowers. At all times, Heller reasonably relied on the accuracy of the borrowing base certificates it received from MHCS and Medical Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical Temporaries under the DIP Loan.

26.   Officers and directors of a home healthcare provider who fail to cause the provider to track and record LUPAs cause the provider to overstate its accounts receivable and/or its right to payment for services rendered.

27.   Unknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller of MHCS' and Medical Temporary's receivable collateral on the borrowing base certificates submitted in connection with the DIP Loan. As a consequence, the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries under the DIP Loan failed, until February 2002, to accurately track or record required negative LUPA (downward) adjustments to receivables as reported therein. These failures caused receivables as reported to Heller on the borrowing base certificates to be overstated.

28.   Heller reasonably relied on the accuracy of borrowing base certificates submitted to it by MHCS and Medical Temporaries in connection with the DIP Loan, from time to time, such as the borrowing base certificate dated September 26, 2001, attached as Exhibit B.

29.   Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and

-7-

Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS

and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby, prepared and

served such DIP Operating Reports on Heller and other creditors with the intent and expectation

that the bankruptcy court, Heller and such other creditors would reasonably reply on the

accuracy of the balance sheets and other financial data reported therein.

30.    Unknown to Heller, but similar to the situation of the misstated borrowing base

certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true

receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards

and Ingoldsby to use reasonable care in the preparation and communication of such DIP

Operating Reports, with the consequence that the DIP Operating Reports as filed, through

January 2002, failed to show and reflect required LUPA adjustments (downwards) to the

receivable collateral.

31.    On November 12, 2001, Medical Temporaries filed a Status Report with the

bankruptcy court, attached as Exhibit C, which report was served on Heller, reflecting

$1,341,389 in total collectible receivables and a $50,011 availability under the DIP Loan facility.

The same report advised the Court and creditors that MHCS and Medical Temporaries were

negotiating with HCFA with respect to the repayment of an alleged $480,00 pre-petition

overpayment alleged by Medicare. Medical Temporaries reported that MHCS and Medical

Temporaries anticipated to achieve a settlement of this disputed obligation which provided for

favorable repayment terms in the near future. Medical Temporaries also reported that the two

debtors anticipated filing either a plan of reorganization or achieving an asset sale within sixty

(60) days time, and that a dividend to unsecured creditors was expected in the two bankruptcies.

32.     Around this time, in the Fall of 2001, Heller was told by MHCS and Medical

Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of

acquiring, as "new equity", the principal assets of MHCS and Medical Temporaries, through a

sale or a reorganization plan, with Defendant Michael Ingoldsby possibly having some sort of

continuing management role in any successor venture.

33.     On November 13, 2001, the United States Trustee filed a Statement Regarding

Status Conference, attached as Exhibit D, to which was attached the Operating Report filed by

MHCS and Medical Temporaries with the bankruptcy court for the period ending October 26,

2001.

34.     Unknown to Heller, by the actions of the Defendants Jones, Edwards, and

Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of MHCS'

and Medical Temporaries Accounts and accounts receivable as reported to Heller on the

borrowing base certificates submitted to Heller and in the DIP Operating Reports filed with the

bankruptcy court and served on Heller, by failing to cause MHCS and Medical Temporaries to

make LUPA adjustments therein, which adjustments would have reduced collectible and eligible

receivables as shown thereon.

35.     MHCS' and Medical Temporaries' failure to accurately track and record LUPAs

was a breach of Section 3.3. of the Loan Agreement.

36.     MHCS' and Medical Temporaries failure to accurately track and record LUPAs

caused a misstatement of the their Qualified Accounts and, therefore, of the Borrowing Base of

eligible Accounts reported to Heller on borrowing base certificates, overstating the eligible

receivables against which Heller loaned monies to MHCS and Medical Temporaries under the

DIP Loan Agreement.

-9-

37.    In reliance on MHCS' and Medical Temporaries' misstatements of Qualified Accounts and the Borrowing Base, of which Heller had no knowledge until Heller conducted a field audit in January 2002, Heller loaned MHCS and Medical Temporaries approximately $402,000 more on the DIP Loan than Heller would have advanced had the borrowing base certificates and the DIP Operating Reports been properly stated.

38.    The Defendants knew, or should have known, of significant misstatements in the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries and of related misstatements of receivables as reported in the DIP Operating Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of MHCS and Medical Temporaries.

39.    Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely, that she believed that MHCS' and Medical Temporaries' borrowing base certificates were no longer accurate and that she would no longer certify them. When Mr. Gardullo probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on information and belief, acting as unpaid Chief Executive Officer (CEO) of the two debtors.

40.    In a contemporaneous conversation with Mr. Ingoldsby, Mr. Gardullo was led to believe by defendant Ingoldsby that Ms. Jones discomfort arose from a matter which Mr. Gardullo was familiar with, to wit, failure of the borrowing base certificates and the DIP Operating Reports to reduce Accounts and accounts receivable of MHCS and Medical Temporaries as shown therein by the $480,000 or so pre-petition overpayment liabilities alleged by Medicare, which alleged overpayment was then the subject then pending settlement negotiations between MHCS and Medicare and its fiscal intermediary, as noted above. Because MHCS and Medical Temporaries had reported to the bankruptcy court and creditors that a

-10-

favorable settlement with Medicare was close and would, once consummated, "term out" and

repay any pre-petition overpayment liability to Medicare over a multi-year period, negatively

impacting cash flow by only a few thousand dollars a month, Mr. Gardullo was comfortable that

no immediate "one time" major downward adjustment of receivables as reported on the

borrowing base certificates, to reflect an overpayment obligation to Medicare, was then

necessary. Mr. Ingoldsby made these statements to Mr. Gardullo without reasonable care, with

the intent that Heller rely on his representations and continue to advance monies under the DIP

Loan, and Heller so did.

41.    Consistent with Mr. Ingoldsby's representations, even after Defendant Jones

ceased to certify the borrowing base certificates submitted by MHCS and Medical Temporaries

to Heller the certificates submitted in connection with the DIP Loan continued to be certified by

Defendant Edwards as being accurate and Heller reasonably relied on the same, until Heller

notified MHCS and Medical Temporaries, as a result of a January 2002 field audit, of mis-

statements therein.

42.    A field audit of MHCS and Medical Temporaries was conducted for Heller in

January 2002 by Health Care Analysis Corporation, a Heller affiliate. When the audit results

were thereupon fully analyzed and completed Heller become aware of a significant

overstatement of the borrowing base by the failure of MHCS and Medical Temporaries to make

LUPA adjustments.

43.    At this point, in early February 2002, Heller ceased further advances, beyond

collections received, and notified MHCS and Medical Temporaries that they had improperly

failed to make LUPA adjustments in the approximate amount of $405,000, as of the time of the

mid-January audit.

44.    By email of February 21, 2002, attached as <u>Exhibit E</u>, after Heller had brought the failure to make LUPA adjustments to MHCS' and Medical Temporaries' attention, Defendant Jones submitted a revised 60-day forecast to Heller wherein MHCS and Medical Temporaries for the first time acknowledged an over-advance under the DIP Loan as of January 16, 2002 of $401,888, due to the failure of MHCS and Medical Temporaries to make LUPA adjustments.

45.    Had the borrowing base certificates been properly been reported to Heller by MHCS and Medical Temporaries, Heller would have advanced them $401,888 less on the DIP Loan.

46.    Heller gave formal notice of default on the DIP Loan, and of its intent to exercise default remedies, by notice filed with the bankruptcy court on March 14, 2002.

47.    On March 18, 2002, MHCS filed a Response to Heller's notice of default with the bankruptcy court, wherein MHCS acknowledged that it did not dispute the occurrence of a default under the DIP Loan, claimed that it had told Heller, in January 2002, that the value of receivables used to calculate the borrowing base would need to be adjusted and stated that in all likelihood an over-advance existed under the DIP Loan Agreement.  <u>See</u> ¶1 of MHCS's March 18, 2002 Response to Heller's notice of default, attached as <u>Exhibit F</u>.

48.    The bankruptcy cases of MHCS and Medical Temporaries were converted to Chapter 7 liquidation proceedings by order of the bankruptcy court, on motion of the two debtors, at the March 20, 2002 default hearing.

49.    Heller shortly thereafter, on March 27, 2002, received relief from the automatic stay, as part of a bankruptcy court approved settlement with the Chapter 7 trustee for MHCS and Medical Temporaries, to permit Heller to collect out its receivable collateral.

50.    As of July 12, 2002, MHCS and Medical Temporaries were indebted to Heller under the DIP Loan Agreement and the various other loans and obligations in the amount of $1,330,243.07, as follows: $570,652.89 in principal and accrued interest on the DIP Loan; $524,678 in principal and accrued interest on the pre-petition term loan; an overline advance on the revolver and interest thereon totaling $56,754.50, appraisal costs of $36,593, legal fees, audit fees (for collateral review) and other charges totaling $135,314.15, and a miscellaneous advance of $6,250.

51.    All the aforesaid indebtedness of MHCS and Medical Temporaries to Heller, under the DIP Loan, the pre-petition term loan, the overline on the revolver, etc., was secured by, among other assets, Accounts and accounts receivable pledged by the two debtors. Heller duly perfected its security interest in this receivable collateral through UCC financing statements filed pre-petition and through the bankruptcy court orders approving the DIP Loan and the debtors' related use of Heller's cash collateral (receivables) which secured the term loan.

52.    As of the date hereof, Heller believes that it has collected substantially all of the receivables of MHCS and Medical Temporaries which have commercial value and that Heller's remaining collateral has no significant worth. As noted above, after these collections more than $1.3 million still remains due and owing to Heller by MHCS and Medical Temporaries.

53.    Had the Defendants (other than Mary Lee Ingoldsby) not negligently caused a significant over-advance of $401,888 on the DIP Loan, triggering a loan default which thereafter triggered conversion of the MHCS and Medical Temporaries bankruptcies to Chapter 7, MHCS and Medical Temporaries could have been sold or reorganized as "going concerns" as MHCS and Medical Temporaries had represented to Heller, the Office of the United States Trustee and the Official Committee of Unsecured Creditors in early November 2001, was anticipated to

-13-

occur within 60 days time. In these circumstances, Heller would have avoided a further $928,355 in consequential damages now apparent from the fact that Heller's remaining loan balances of $1,330,243 are, at this point, essentially uncollectible.

## COUNT I
**(Negligent Misrepresentation -- against Defendants Jones, Edwards and Michael Ingoldsby)**

54.    Heller incorporates paragraphs 1 through 53 herein as if restated in full.

55.    Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary course of their business and employment, and in the ordinary course of the business of MHCS and Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivable of MHCS and Medical Temporaries. That false information, in the form of inaccurate borrowing base certificates and DIP Operating Reports, was supplied to Heller for Heller's guidance in its business transactions, i.e., making advances to MHCS and Medical Temporaries pursuant to the DIP loan, with the intent and expectation that Heller rely on such information, as it did. The false information, and Heller's justifiable reliance thereon, caused and resulted in pecuniary loss to Heller. Defendants Jones, Edwards and Michael Ingoldsby failed to exercise reasonable care or competence in obtaining or communicating the information regarding the borrowing base.

## COUNT II
**(Breach of Guaranty -- Against Defendants Michael and Mary Lee Ingoldsby)**

56.    Heller incorporates paragraphs 1 through 53 herein as if restated in full.

57.    Defendants Michael and Mary Lee Ingoldsby personally guaranteed MHCS' and Medical Temporaries' obligations under the DIP Loan.

58.    Defendants Michael and Mary Lee Ingoldsby are directly liable, as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan.

59.    The DIP Loan remains due and payable and Defendants Michael and Mary Lee Ingoldsby have not performed under their Guaranty by paying off the DIP Loan.

WHEREFORE, Heller respectfully requests that the Court grant the following relief:

A.    That judgment be entered in its favor on Count I against Defendants Jones, Edwards, and Michael Ingoldsby in the amount of $401,888, for other consequential damages in the amount of $928,355 or such greater amounts as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper; and

B.    That judgment be entered in its favor on Count II against Defendants Michael and Mary Lee Ingoldsby in the amount of $805,565, or such greater amount as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper.

Respectfully submitted,

OF COUNSEL:                                   HELLER HEALTHCARE FINANCE, INC.

David B. Tatge, Esq.                          By its attorneys,
Shlomo Katz, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., 7th Floor             Russell Beck, BBO No. 561031
Washington, D.C. 20037                        Stephen D. Riden, BBO No. 644451
(202) 861-0900                                EPSTEIN BECKER & GREEN, P.C.
                                              111 Huntington Avenue, 26th Floor
                                              Boston, MA 02199-7610
Dated: August 1, 2002                         (617) 342-4000

DC:199991.1

-15-

**EXHIBIT D**

Westlaw.

811 N.E.2d 524 (Table)                                                                    Page 1
61 Mass.App.Ct. 1117, 811 N.E.2d 524 (Table), 2004 WL 1562810 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 61 Mass.App.Ct. 1117, 811 N.E.2d 524, 2004 WL 1562810 (Mass.App.Ct.))**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.
Paul J. DONAHUE & another [FN1]

FN1. Weston Associates, Inc.

v.
HERITAGE PROPERTY INVESTMENT
TRUST, INC.
**No. 03-P-303.**

July 13, 2004.

MEMORANDUM AND ORDER PURSUANT TO
RULE 1:28

***1 In these cross appeals, we consider whether a Superior Court judge erred in dismissing, pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), a complaint brought by the plaintiffs (collectively "Donahue") that asserted six causes of action against Heritage Property Investment Trust, Inc. (Heritage). [FN2] Donahue's complaint alleged that Heritage failed to compensate him for his purported role in Heritage's $1.2 billion purchase of all of the stock in Bradley Real Estate, Inc. (Bradley), a publicly traded real estate investment trust. For its part, Heritage appeals from the denial, by a second Superior Court judge, of its motion to disqualify Donahue's counsel. For the reasons that follow, we reverse the order dismissing the complaint and affirm the denial of Heritage's motion to disqualify counsel.

> FN2. Breach of contract (count I), breach of the duty of good faith and fair dealing (count II), fraud in the inducement (count III), promissory estoppel (count IV), unjust enrichment (count V), and violation of G.L. c. 93A, § 11 (count VI).

1. *Motion to dismiss.* In a one-paragraph decision, the judge dismissed Donahue's complaint in its entirety on the ground that the alleged agreement between Donahue and Heritage was unenforceable for failure to comply with G.L. c. 259, § 7, the Statute of Frauds applicable to certain commercial transactions. (A.118-119). The judge erred in doing so, if for no other reason than that G.L. c. 259, § 7, expressly excludes from its ambit the services of a "licensed real estate broker." "In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Warner-Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 47 (1998), quoting from *Nader v. Citron,* 372 Mass. 96, 98 (1977). See Mass.R.Civ.P. 12(b)(6). "It is a 'relatively light burden to be carried in maintaining a complaint." ' *Ibid.,* quoting from *Gibbs Ford, Inc. v. United Truck Leasing Corp.,* 399 Mass. 8, 13 (1987). Taking the allegations of the complaint [FN3] as true, and such inferences as may be drawn therefrom in the plaintiffs' favor, *Warner-Lambert Co. v. Execuquest Corp., supra,* we conclude that dismissal of Donahue's complaint at this stage of the proceedings was inappropriate. Fairly construed, Donahue's complaint alleged that the services provided to Heritage were in the context of Donahue's involvement with Heritage and its predecessor as "a broker, consultant, finder, and financial advisor in the purchase and/or sale of real estate." (A.7, par. 6)

> FN3. At oral argument, the parties concurred that two letters are incorporated by reference in the complaint: the July 21, 1992, letter signed by Thomas C. Prendergast on behalf of NET Properties Management, Inc., Heritage's predecessor in interest (A.8, 40); and the February 9, 2000, letter signed by Mark E. Robinson, corporate secretary of Heritage.

At a minimum, dismissal is precluded by the presence of several unresolved factual disputes raised by the pleadings as to the applicability of the Statute of Frauds to Donahue's activities on behalf of Heritage including, but not limited to, (1) the nature of the Bradley acquisition, i.e., whether it constitutes a real estate transaction subject to real estate broker's fees, or some other type of commercial transaction; (2) the nature of the services, if any, that Donahue provided to Heritage at various junctures in connection with the Bradley acquisition; and (3) whether any, or all, of the services fall outside the scope of G.L. c. 259, § 7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

811 N.E.2d 524 (Table)                                                                                    Page 2
61 Mass.App.Ct. 1117, 811 N.E.2d 524 (Table), 2004 WL 1562810 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 61 Mass.App.Ct. 1117, 811 N.E.2d 524, 2004 WL 1562810 (Mass.App.Ct.))**

***2 Additionally, the well-pleaded allegations of the complaint fairly assert the existence of writings, particularly certain letters between the parties that, individually or collectively, could satisfy the requirement of a writing for purposes of the statute. Still further, the allegations of the complaint fairly entitle Donahue to pursue through discovery whether the doctrine of equitable estoppel bars Heritage from asserting the Statute of Frauds defense. Because it does not appear that Donahue can prove no set of facts entitling him to relief under each of his factually interconnected causes of action, Donahue's complaint is entitled to survive in its entirety at this early stage. [FN4]

> FN4. We express no opinion whether upon completion of discovery the defendant can provide sufficient material to warrant the allowance of a motion for summary judgment in its favor. See Mass.R.Civ.P. 56(b), 365 Mass. 824 (1974).

2. *Motion to disqualify.* Upon review of the record and the parties' briefs, we see no reason to disturb the judge's order denying Heritage's motion to disqualify Donahue's counsel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. (Mintz Levin), from the present litigation. The conflict asserted is that during the same period that Mintz Levin represented Donahue in this matter, it also represented Heritage in a number of different corporate transactions. The judge found that Mintz Levin had violated Mass.Prof.C. 1.7(a), 426 Mass. 1330 (1998) (prohibiting undisclosed concurrent adverse representation). We need not resolve the correctness of that determination, because the judge did not abuse her discretion in denying Heritage's motion, if for no other reason than that Heritage failed to file its disqualification motion within the ten-day time frame provided under **rule 3 of the Superior Court (1974)**. Instead, Heritage waited at least nine months to serve Donahue with its disqualification motion and eleven months to file its motion with the court. [FN5] Contrast *G.D. Mathews & Sons Corp. v. MSN Corp.,* 54 Mass.App.Ct. 18, 24 (2002), cert. denied *King v. Massachusetts,* 449 U.S. 880 (1980) (no abuse of discretion in allowing motion to disqualify, filed eleven months after complaint, where "record evidences no unreasonable delay on the part of [the movant], and the motion judge properly could have found that [the movant] communicated the potential conflict promptly" and also where the opposing party withheld information "relevant to [the movant's] fair

determination of whether to press the disqualification issue").

> FN5. **Rule 3 of the Superior Court** provides, in pertinent part, that objections to the appearance of opposing counsel "be taken in writing within ten days after the appearance of such attorney." Heritage appears to have served its motion on Mintz Levin, in hand, on July 30, 2002 (A.122); the docket indicates the motion was not filed in court until September 3, 2002 (A.3).

We know of no Massachusetts case, and Heritage cites to none, in which an abuse of discretion is found in circumstances such as these. Rather, the courts frown upon inexplicably late motions to disqualify, often viewing such maneuvers as evidence of dilatory behavior. See *Masiello v. Perini Corp.,* 394 Mass. 842, 850 (1985); *Adoption of Erica,* 426 Mass. 55, 65-66 (1997). Although the judge had the discretion under the rule to permit a later objection, we cannot say that she abused her discretion in these circumstances. [FN6]

> FN6. The judge also properly concluded, with ample support from the record, that Mass.R.Prof.C. 1.9(a), 426 Mass. 1342 (1998), is not violated where the present dispute over Donahue's proper compensation is not substantially related to the subject matter of Mintz Levin's prior representation of Heritage (Addendum to defendant's brief at 6-8).

In sum, Heritage has failed to demonstrate any abuse of discretion that would overcome the governing principle that "disqualification, as a prophylactic device for protecting the attorney-client relations, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Adoption of Erica,* 426 Mass. at 58, quoting from *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982).

***3 The judgment dismissing the complaint and assessing costs is reversed. The order denying the defendant's motion to disqualify plaintiffs' counsel is affirmed.
    *So ordered.*

61 Mass.App.Ct. 1117, 811 N.E.2d 524 (Table), 2004 WL 1562810 (Mass.App.Ct.) Unpublished Disposition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

811 N.E.2d 524 (Table)                                                        Page 3
61 Mass.App.Ct. 1117, 811 N.E.2d 524 (Table), 2004 WL 1562810 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 61 Mass.App.Ct. 1117, 811 N.E.2d 524, 2004 WL 1562810 (Mass.App.Ct.))**

**Briefs and Other Related Documents (Back to top)**

• 2003 WL 23940681  (Appellate Brief) Reply Brief
of Appellee Herritage Property Investment Trust, Inc.
(Jun. 19, 2003)Original Image of this Document
(PDF)

• 2003 WL 23940682  (Appellate Brief) Reply Brief
on Behalf of Appellants Paul J. Donahue and Weston
Associates, Inc. (Jun. 02, 2003)Original Image of this
Document (PDF)

• 2003 WL 23940683  (Appellate Brief) Brief of
Appellee Heritage Property Investment Trust, Inc.
(Mar. 15, 2003)Original Image of this Document
(PDF)

• 2003 WL 23940684  (Appellate Brief) Original
Brief On Behalf Of Appellants Paul J. Donahue and
Weston Associates, Inc. (Jan. 01, 2003)Original
Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT E**

Westlaw.

Not Reported in N.E.2d                                                                                             Page 1
Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)
**(Cite as: 2002 WL 31068413 (Mass.Super.))**

**H**

Superior Court of Massachusetts.
NATIONAL MEDICAL CARE, INC. d/b/a
Fresenius Medical Care North America, NMC
Homecare, Inc., and Fresenius Medical Care
Pharmacy Services, Inc., Plaintiffs,
v.
HOME MEDICAL OF AMERICA, INC., Homecare
Concepts of America, Inc., National
Century Financial Enterprises, Thor Capital
Holdings, LLC, Chartwell Care
Givers of New York, Inc., f/k/a Home Medical of
New York, Inc., and Craig
Porter, Defendants.
**No. 00-1225.**

Sept. 12, 2002.

**FINDINGS OF FACT AND CONCLUSIONS OF
LAW REGARDING HOME MEDICAL OF
AMERICA,
INC.'S AND HOMECARE CONCEPTS OF
AMERICA, INC.'S MOTION TO DISQUALIFY
MCDERMOTT,
WILL & EMORY AS PLAINTIFFS' COUNSEL**

RALPH D. GANTS, Justice.

*1 The defendants Home Medical of America, Inc. ("HMA") and HomeCare Concepts of America, Inc. ("HCCA", collectively, "the HMA parties") have moved to disqualify the law firm of McDermott, Will & Emory ("McDermott") as counsel to the plaintiffs in this action--National Medical Care, Inc. and Fresenius Medical Care Pharmacy Services, Inc. (collectively, "NMC"). After hearing, based on the affidavits submitted regarding this motion and the exhibits attached to those affidavits, viewed in light of the governing law, this Court hereby denies the motion to disqualify McDermott and makes the following findings of fact and conclusions of law. [FN1]

> FN1. Neither party requested an evidentiary hearing and, after review of the affidavits submitted, this Court saw no need for such a hearing.

**BACKGROUND**

In late May or early June 1996, Thera-Kinetics, Inc. ("TK"), a wholly-owned subsidiary of the defendant HCCA, retained McDermott to represent TK in litigation challenging the Use Tax assessments issued by the Illinois Department of Revenue ("the Illinois tax matter"). As an important part of its business, TK leased "continuous passive motion devices" that promoted the rehabilitation of injured joints by gradually moving an injured joint through a range of motion. [FN2] Under Illinois law, TK had to pay a Use Tax on leased property, but Illinois imposed a lower Use Tax on leased medical appliances. TK contended that the "continuous passive motion devices" were medical appliances that qualified for the lower rate, and paid Use Taxes based on the lower rate. The Illinois Department of Revenue took a different view and issued TK an assessment essentially ordering it to pay Use Taxes at the higher, traditional rate for tax years 1990 through 1992. Through its accountant, Ernst & Young, TK filed an administrative protest of this higher assessment with the Illinois Department of Revenue. TK continued to pay Use Taxes on its "continuous passive motion devices" at the lower rate intended for medical appliances so, at some time in or around May 1996, the Illinois Department of Revenue again issued TK an assessment ordering it to pay Use Taxes at the higher rate for the tax years 1993 and 1994. TK decided to obtain a judicial determination as to the applicable Use Tax, so it paid the assessment for tax years 1993 and 1994 under protest and retained McDermott to sue the Department of Revenue in Illinois state court for a refund of this assessment. [FN3]

> FN2. Although not precisely clear from the record, it appears that HCCA was the corporate parent of at least two companies-- JACE Systems and TK, with JACE manufacturing the "continuous passive motion devices" and TK leasing them.

> FN3. TK and the Illinois Department of Revenue agreed to place the administrative protest for tax years 1990 through 1992 on hold pending the judicial resolution of this issue.

On June 20, 1996, the McDermott attorney responsible for this Illinois tax matter, Thomas Donohoe ("Donohoe"), sent TK's Comptroller, Bernard Rock, an engagement letter thanking him for retaining McDermott in the matter and outlined

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                              Page 2
Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)
**(Cite as: 2002 WL 31068413 (Mass.Super.))**

certain "financial and other terms of [McDermott's] legal representation." The letter set forth the parameters of the representation: "We will provide you with legal advice in connection with the litigation of the application of the lower sales tax rate for medical appliances to your continuous passive motion devices."

Enclosed with the engagement letter was a form document that, according to the letter, "sets forth additional terms of [McDermott's] business arrangement with you." The enclosed document, according to its first paragraph, "sets forth [McDermott's] standard terms of engagement for providing legal services." The document asks the client to review it carefully and retain it in the client's files. The document reiterates that the engagement letter specifies the matter in which McDermott will be representing the client. The document expressly declares that its representation extends only to the entity identified in the engagement letter and, unless specifically stated in that letter, does not extend to any affiliates of the client, including any corporate parent. The document also specifies when McDermott deems its attorney-client relationship to have ended:

> **\*2** When we complete the services you have retained us to perform, we will consider the attorney-client relationship for that matter to have been terminated. If you later retain us to perform further or additional services, our attorney-client relationship will be revived subject to these terms of engagement, or as supplemented at that time.

Rock received this engagement letter and the enclosed document, but neither he nor anyone at TK signed the line at the end of the engagement letter indicating that the terms were agreed to and accepted. Nor did Rock or anyone at TK communicate any objection to any of these terms. Consequently, regardless of whether this engagement letter, with its enclosure, should be viewed as a formal contract setting forth the terms of McDermott's legal representation, it is plain that TK was on notice of the terms that McDermott understood to be in place, that TK chose to retain McDermott knowing of these terms, that TK said and did nothing to indicate to McDermott that the terms were unacceptable, and that McDermott reasonably could rely on its understanding that the engagement letter established the terms of its representation.

The Illinois tax case focused on whether TK's "continuous passive motion devices" met the definition of a "medical appliance" in the Illinois Administrative Code, specifically whether the device was "an item which is intended by its manufacture for use in directly substituting for a malfunctioning part of the body." *Thera-Kinetics, Inc. v. Zehnder et al*, No. 1-98-4613 (Ill.App.Ct., First Jud. District), Order, June 9, 2000 at 2, quoting 86 Ill. Admin. Code § 130.310(c)(2) (1996). There was not extensive discovery prior to trial: Donohue obtained the Illinois Department of Revenue's audit file regarding TK, and one deposition was taken--of Barbara MA, TK's District Manager for the region that included Illinois. At the one day trial conducted in September 1998, Ma testified for TK and Dr. Michael Vender, a hand surgeon and clinical assistant professor at Northwestern University, testified for the Department of Revenue. *Id.* at 3-4. Their testimony explored their differing views as to whether the "continuous passive motion devices" substituted for various muscles within the human body (and therefore were "medical appliances") or whether they were purely for rehabilitative purposes (and therefore were not "medical appliances"). TK prevailed at trial in the Circuit Court of Cook County in November 1998, and the Trial Court's decision was affirmed on appeal by the Illinois Appellate Court in its June 9, 2000 Order. After the affirmance of the Trial Court's decision on June 9, 2000, Donohoe learned that TK had received yet another Use Tax assessment from the Department of Revenue for the tax years 1995 through 1997. On July 18, 2000, Donohoe asked that these Use Assessments be consolidated with the pending administrative case for the tax years 1990 through 1992 (which had been placed on hold pending the judicial determination of the issue), and his request was granted. In view of the appellate court order requiring a refund of the assessments for the tax years 1993 and 1994, the Department of Revenue agreed to cancel the assessments for tax years 1990-1992 and 1995-1997. On August 3, 2000, an Agreed Order was entered regarding the administrative cases for these tax years formally declaring that the Department of Revenue had withdrawn these assessments and the cases were dismissed. On August 15, 2000, Donohoe forwarded what he accurately described as "the final order disposing of the administrative matters," and added, "This concludes the case. I enjoyed working with your company." On October 2, 2000, the Department of Revenue issued its Final Assessment for Sales and Use Tax for the tax years 1990-1992 and 1995- 1997 reflecting, as had been mandated by the Agreed Order, that no Use Taxes were due for those years. Donohoe forwarded these final assessments to TK on October 9, 2000, and added, "Please call with any questions."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** TK did not call with any questions; nor did Donohue or anyone from McDermott have any further discussions with anyone affiliated with TK or HCCA regarding this matter except to obtain payment of McDermott's outstanding legal bills. Indeed, McDermott did not bill TK for any time devoted to this (or any) matter after July 31, 2000.

On September 25, 2000, NMC's Deputy General Counsel for litigation first spoke to McDermott about the possibility of McDermott representing NMC in the instant litigation, succeeding Ropes & Gray, who had handled the matter from its inception. McDermott's representation of NMC in the instant litigation commenced on that date. McDermott first filed its appearance in this case on October 5, 2000.

On June 21, 2002, the attorney for the HMA parties wrote McDermott's lead attorney in the instant litigation and, on behalf of his clients, demanded that McDermott immediately withdraw as counsel. On June 28, 2002, after it became clear that McDermott had rejected that demand, the HMA parties served its motion to disqualify McDermott as NMC's attorney in this litigation.

### DISCUSSION
### *Rule 1.7(a) of the Massachusetts Rules of Professional Conduct*

Under Rule 1.7(a) of the Massachusetts Rules of Professional Conduct, "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the client; and (2) each client consents after consultation." The HMA parties contend that McDermott remains the attorney to TK and HCCA (and through them, to HMA, their parent company), that McDermott's representation of NMC in this case plainly adversely affects its relationship with the HMA parties, and that none of the HMA parties have ever granted consent to McDermott's representation of NMC or even been consulted about obtaining such consent. To prevail in establishing that McDermott committed a violation of Rule 1.7(a) by representing NMC in this action, the HMA parties must establish that McDermott represented the HMA parties as of September 25, 2000, when McDermott's representation of NMC in this action commenced. This Court finds that McDermott no longer represented any HMA party as of September 25, 2000.

It is generally easy to determine when an attorney-client relationship has commenced. Except when a client has fired his lawyer, it is far more difficult to determine when it has ended. Yet, in view of the professional obligations that an attorney owes to a current client, including the obligation set forth in Rule 1.7(a) not to represent another client in a manner adverse to a current client without the clients' consent, it matters a great deal that, to the extent possible, a clear line be drawn marking the end of an attorney-client relationship. See generally *Artomick Int'l, Inc. v. Durstar, Inc.,* 134 F.R.D. 226, 229 (S.D.Ohio 1991). Such clarity is especially important to large law firms, with national and, indeed, international law practices, because the risk that a law firm will be retained in a matter adverse to a client grows as the law firm grows. While the need for clarity is substantial, this Court is aware of no Massachusetts precedent that declares when an attorney-client relationship has ended. Therefore, in search of an administrable standard, this Court must look to logic, reason, experience, and basic principles of law. "[I]t is important that any decision that purports to conclude when, as a matter of law, a legal relationship has either come into being or has ceased to exist draw its essence from the reasonable expectations of the parties to that relationship and from the need to have rules for the relationship that strike an accommodation between the desirability for certainty and the need to reflect present reality." *Id.*

**\*4** An attorney-client relationship is essentially a contractual relationship in which a client retains an attorney to perform work on his behalf, generally in return for payment. Especially when an attorney, as McDermott has here, is billing its client for the time spent on legal work, the parties may often agree in advance or during the course of the representation as to the parameters of the representation, generally the matter or type of matters that the attorney is expected to handle. The parameters generally fall into one of three categories: (1) the law firm may be retained as general counsel to the client, handling all legal matters that may arise for a client, (2) the law firm may be retained to represent the client in all matters that may arise regarding a specific area of practice, such as litigation, tax, or employment matters, or (3) the law firm may be retained to represent the client only as to a specific matter or matters. As to all three categories, an attorney-client relationship continues as long as the law firm remains responsible for a pending matter on behalf of the client, regardless of whether that matter is active, because the attorney, unless terminated by the client or withdrawing from the representation, has accepted responsibility to bring that matter to a successful closure. As to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)
(Cite as: 2002 WL 31068413 (Mass.Super.))

Page 4

first two categories, an attorney-client relationship continues even if the law firm has no pending matter on behalf of the client, because the reasonable expectation remains that the law firm will handle matters in the future for that client as they arise. [FN4] As to the third category, however, the attorney-client relationship ends when the matter is concluded, because the representation was limited to that matter. Indeed, if the attorney were to continue to perform work for that client after the matter has been concluded, the client would be justified in refusing to pay for that work because it fell outside the scope of their agreement. Consequently, one measure of whether the attorney-client relationship has ended is whether the attorney needs to obtain permission from the client to continue to perform work on the client's behalf.

> FN4. The reasonableness of that expectation may end if a substantial period of time has elapsed with no matters coming to the law firm. See _Artomick Int'l, Inc. v. Durstar, Inc.,_ 134 F.R.D. at 229 (attorney-client relationship can terminate with lapse over a period of time).

The HMA parties contend that its attorney-client relationship with McDermott fell into the second category--that it retained McDermott to represent it with respect to all Use Tax matters that may arise in any state regarding their "continuous passive motion devices." The record, however, supports NMC's contention that McDermott's representation of TK was limited to the Illinois tax matter. While Rock has testified at deposition that TK viewed the Illinois tax matter as a "springboard" for similar Use Tax litigation in other states, the record is plain that TK remained silent when McDermott, through Donohoe's engagement letter, made clear that it viewed the representation to be limited to the Illinois tax matter. Not only did TK fail to dispute McDermott's characterization of the parameters of their agreement, but TK also never asked McDermott to perform any work beyond the Illinois tax matter. Indeed, no HMA party ever asked McDermott to perform any legal work after August 2000, when the Agreed Order was entered in the Illinois tax matter. If the HMA parties truly had viewed McDermott as its attorney with regard to Use Tax matters in all fifty states, one would expect that McDermott would have been asked by an HMA party to "piggy-back" the success in the Illinois tax matter to other states before June 2002, when it brought this motion.

*5 The Illinois tax matter, for all practical purposes,

concluded on August 15, 2000 with McDermott's communication to TK of the August 3, 2000 Agreed Order. With that Agreed Order, TK had prevailed in the litigation, there was no possibility of appeal, and the Department of Revenue conceded that no Use Taxes were due for these tax years. Therefore, it was entirely appropriate for Donohue to tell TK in his August 15 letter that the case was "concluded" and that he had enjoyed working with TK, indicating that his work for TK was done. This letter conformed with the understanding set forth in the engagement letter that the legal representation was limited to this single matter. TK appeared to have shared this understanding; no one from TK (or any HMA party), after receiving this letter, telephoned or wrote Donohoe to tell him that he should not speak of his work with TK in the past tense because more legal work was anticipated. Therefore, with this matter having concluded and the client having been informed of its conclusion, McDermott was justified as of August 15, 2000 in believing that it no longer represented TK (or any of the HMA parties).

This conclusion is not altered by the fact that, when the Department of Revenue on October 2, 2000 sent Donohue TK's Final Assessment for Sales and Use Tax for the tax years 1990-1992 and 1995-1997, he forwarded these tax forms to TK and invited TK to call him with any questions. Forwarding these forms was purely a ministerial task, not legal work, and Donohue properly did not bill for any time devoted to this task. It cannot fairly be said that McDermott's representation of TK as to this matter continued until these forms were received, because these forms simply documented what the Agreed Order had already ordained--that no Use Taxes were due. Nor did the invitation for TK to call him with questions reflect that the attorney-client relationship still continued or that Donohoe had renewed the relationship. If someone from TK had called for legal advice and obtained it from Donohoe or another McDermott attorney, that conversation would certainly be privileged and an attorney-client relationship would have been renewed as of that date, but no one from TK ever called. Once a matter is concluded, an attorney-client relationship limited to that matter is not prolonged simply by an attorney's courteous offer to answer questions from a client, when the client does not take him up on that offer. The fact of the matter is that, once the August 15, 2000 letter was sent, McDermott was no longer authorized to do legal work for TK and could not reasonably be expected to be paid for any additional work it performed on TK's behalf unless TK said or did something to indicate that it authorized

Not Reported in N.E.2d                                                                                          Page 5
Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)
(Cite as: 2002 WL 31068413 (Mass.Super.))

McDermott to continue to provide legal work. Neither TK nor any HMA party gave any such indication after August 15, 2000.

Therefore, this Court concludes that Rule 1.7 does not apply to McDermott's representation of NMC in this action, because that representation did not commence until McDermott's representation of TK had concluded. [FN5]

> FN5. In view of this finding, this Court need not address the more difficult question of whether McDermott's representation in the Illinois tax matter was limited to TK or extended to HCCA and HMA. Even if McDermott were required to consider TK's corporate parents as its clients, its representation of all of these parties was over by August 15, 2000.
>
> Nor need this Court address the caselaw limiting the ability of a law firm to terminate its relationship with an existing client "like a hot potato" so that it may accept a representation of another client in an adverse, but more lucrative, matter, often referred to as the "hot potato doctrine." There is no evidence here that McDermott ended its relationship with TK so that it would be able to represent NMC in this litigation. Nor is there any evidence that Donohue or anyone from McDermott had any reason to believe on August 15, 2000 that NMC would replace Ropes & Gray with McDermott as its attorney in the instant litigation.

### Rule 1.9 of the Massachusetts Rules of Professional Conduct

*6 Under Rule 1.9(a) of the Massachusetts Rules of Professional Conduct:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Under Rule 1.9(c)(1) of the Massachusetts Rules of Professional Conduct:

A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter, unless the former client consents after consultation: (1) use confidential information relating to the representation to the disadvantage of

the former client, to the lawyer's advantage, or to the advantage of third party, except as Rule 1.6, Rule 3.3, or Rule 4.1 would permit or require with respect to a client. [FN6]

> FN6. McDermott does not contend that any confidential information obtained in its representation of TK could be provided to NMC pursuant to either Rule 1.6, 3.3, or 4.1.

The HMA parties argue that, even if McDermott no longer represented TK when it commenced its representation of NMC in the instant litigation, it is still barred from continuing its representation of NMC under Rule 1.9(a) because this case is "a substantially related matter" in which NMC's interests are adverse to TK and the HMA parties, and neither TK nor any HMA party has consented to McDermott's representation. This Court finds that Rule 1.9(a) does not bar McDermott's representation of NMC in this matter. This Court further finds that McDermott has not violated Rule 1.9(c), because there is no evidence that McDermott has used confidential information obtained from TK or any HMA party to the disadvantage of TK or any HMA party, or to the advantage of NMC.

As to Rule 1.9(a), this Court finds that the instant litigation is not a "substantially related matter" to the Illinois tax matter. In *Adoption of Erica,* the Supreme Judicial Court observed:

In deciding whether sequential matters are substantially related, some courts have focussed on the subject or factual contexts of the former and current matters. ... Other courts have adopted a stricter standard, requiring the showing of a relationship between the issues of the two matters. 426 Mass. 55, 62, 686 N.E.2d 967 (1997). The Court expressly declared in *Adoption of Erica* that it did not need to decide which focus was correct in that case, because it was so plain that there was no relationship at all between the matters. *Id.* While the precise interpretation of "a substantially related matter" has yet to be declared by the Supreme Judicial Court or the Appeals Court, this Court is persuaded by and will adopt Justice Martha Sosman's interpretation, articulated one year after *Adoption of Erica* when she was still a Superior Court judge:

The problem addressed by Rule 1.9(a) is that an attorney representing a party adverse to his former client would be tempted to betray confidences of that former client in order to serve the interests of the current client. "[T]he later suit, simply because of its substantial relation to the former one, exposes the attorney to an intolerably strong temptation to

Not Reported in N.E.2d                                                        Page 6
Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)
(Cite as: 2002 WL 31068413 (Mass.Super.))

breach his duty of confidence to the former client."
*Bays v. Theran,* 418 Mass. 685, 691, 639 N.E.2d
720 (1994), quoting Note, Developments in the
Law: Conflicts of Interest in the Legal Profession,
94 Harv.L.Rev. 1244, 1318 (1981). Rather than
force the former client to identify specific
confidential information that might be used against
him, "the 'substantial relationship' test operates by
assuming that confidences were transmitted in the
former attorney-client relationship." *Bays,* 418
Mass. at 691, 639 N.E.2d 720.

*7 Where the primary purpose of the "substantially
related" test is to preserve client confidences by
avoiding an "intolerably strong temptation" to
betray them, the assessment of whether matters are
"substantially related" must focus on whether the
overlap or similarity between the two matters
would potentially give rise to such a "temptation."
Labeling a similarity as a similarity of "issues" as
opposed to a similarity of "facts" is not particularly
helpful in that analysis. Rather, the court should
focus on whether the relationship between the two
matters is such that it is reasonable to assume that
confidential information would have been given to
the attorney in the first matter that would be helpful
to the adverse client in the second matter. Where
there is a likelihood that the attorney possesses
useful information from that former client, the
temptation to make use of that useful information
arises. If the similarity between the matters is such
that it would potentially give rise to such a
temptation, the matters should be viewed as
"substantially related."
*Dee v. Conference Holdings, Inc.,* 1998 WL
1247926 (Sup.Ct., July 14, 1998) at *2.

This Courts finds that the instant litigation and the
Illinois tax matter are not so similar that it is likely
that McDermott possesses useful information from its
representation in the Illinois tax matter that would be
helpful to NMC in the instant litigation. As has
already been discussed, the Illinois tax matter
focused on the narrow question of whether the
"continuous passive motion devices" leased by TK
met the definition of a "medical appliance" in the
Illinois Administrative Code. The instant litigation
focuses on whether HMA and the other defendants
intended to honor their alleged contractual
commitments under the 1998 Asset Purchase
Agreement to pay NMC $85 million and assume $20
million in liabilities in return for the assets of an
NMC subsidiary. Plainly, the subject matter in the
two matters have nothing in common.

This Court recognizes that NMC has named as

defendants other HMA parties and subsidiaries
(although not TK), and Craig Porter, HMA's Chief
Executive Officer, on an alter-ego theory of liability,
and that evidence of the financial inter-relationship
among these parties may be probative as to this
theory. The HMA parties argue that financial and
other confidential information concerning TK and the
HMA parties were provided to McDermott during the
course of its representation in the Illinois tax matter
that would be useful to NMC and that pose a
temptation of misuse warranting McDermott's
disqualification. This Court rejects this argument on
two grounds. First, this Court does not find credible
Rock's testimony regarding the broad scope of
financial information supposedly transmitted to
Donohue during his representation in the Illinois tax
matter. There was absolutely no reason for Donohue
to have this information; he denies having received it;
it was not found among McDermott's files; Rock
does not specifically recall giving it to Donohoe or
sending it to him; and there is no transmittal letter or
other documentation to support Rock's belief that it
had been delivered to Donohue. This Court finds
instead that the only significant financial information
that McDermott obtained regarding TK or any HMA
party was contained in the Department of Revenue
audit file that he was furnished in discovery. Second,
even the confidential information that the HMA
parties contend was provided to Donohue would not
be so useful to NMC in the instant action as to pose a
meaningful risk that McDermott will be unable to
resist the temptation to use it.

*8 While Rule 1.9(a) focuses on the risk that
confidential information may be misused, Rule 1.9(c)
focuses on the actual misuse of such confidential
information. This Court acknowledges that
disqualification may be required under Rule 1.9(c)
even when the adverse matters are not substantially
related if the law firm is found, without consent, to
have actually used confidential information of the
former client to the disadvantage of the former client
or the advantage of a new client. There is no
persuasive evidence here that any confidential
information obtained by McDermott in the Illinois
tax matter has been actually used by McDermott to
the HMA parties' detriment in the instant litigation.

In short, the spirit of Rule 1.9 is that a law firm
retains a limited duty of loyalty to a former client--it
may not use a former client's confidential information
against that client, and should not represent a new
client in any matter where the former client
reasonably should fear that its earlier confidences
will be misused. Stated differently, the HMA parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should not be in an inferior position because McDermott, having represented TK in the Illinois tax matter, now represents NMC against them. This Court is satisfied that neither the letter nor the spirit of Rule 1.9 has been violated by McDermott in this litigation.

### The HMA Parties' Failure Timely to File Their Motion to Disqualify

As should be clear, this Court finds that the motion to disqualify would be without basis even if had been timely raised. The fact that it was not timely raised simply provides yet another basis for the denial of the motion.

The HMA parties insist that McDermott should have recognized that HCCA was one of its clients in the Illinois tax matter because, among other reasons, HCCA paid McDermott's legal fees in that matter. If McDermott should have recognized HCCA to be its client for that reason, HCCA should have recognized that McDermott was its attorney for that same reason and raised this issue of disqualification promptly after McDermott filed its appearance in this action on October 5, 2000. [FN7] Instead, the HMA parties first demanded disqualification by letter on June 21, 2002, and by motion on June 28, 2002, more than nineteen months later. Regardless of the HMA parties' explanation for the delay, the consequence of granting their motion at this time would be to disrupt and divert the prosecution of this litigation by NMC, and give the HMA parties a substantial strategic advantage. This Court concludes that the unfair prejudice that disqualification would cause to NMC as a result of the delay, and the disruption and delay it would produce to the administration of justice are independent reasons to deny the motion. See e.g., *Adoption of Erica,* 426 Mass. at 65, 686 N.E.2d 967; *Chauhan v. Dana-Farber Cancer Institute, Inc.,* 2001 WL 241493 (Mass.Super.2001).

> FN7. See **Superior Court Rule 3** (requiring any objection to the right of an attorney to appear for a party to be filed within ten days after the appearance, unless the court allows the objection to be taken later).

* * *

In *Adoption of Erica,* the Supreme Judicial Court recognized that "a court should not lightly interrupt the relationship between a lawyer and her client." 426 Mass. at 58, 686 N.E.2d 967. It added, "[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic

measure which courts should hesitate to impose except when absolutely necessary." *Id.,* quoting *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715. 721 (7th Cir.1982). In this case, not only is disqualification unnecessary, it is unwarranted.

### ORDER
*9 For the reasons detailed above, the HMA parties motion to disqualify McDermott as attorney for the plaintiffs in this action is ***DENIED.***

Not Reported in N.E.2d, 15 Mass.L.Rptr. 256, 2002 WL 31068413 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02CV11553NG

| | |
|---|---|
| HELLER HEALTHCARE FINANCE, INC.,<br>Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>) |
| MICHAEL INGOLDSBY, MARY LEE<br>INGOLDSBY, PAMELA JONES, and<br>INDY EDWARDS,<br>Defendants | )<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF PAMELA JONES

I, Pamela Jones, being duly sworn, depose and state as follows:

1.    I am one of the defendants named in the above action and am familiar with the circumstances surrounding this case.

2.    I was employed as the vice-president of finance by Managed Health Care Systems, Inc. (hereinafter referred to as "MHCS"), MHCS, Inc. and Medical Temporaries Inc. between March 1994 through February 2002.

3.    On or about August 1, 2002, I received a letter and courtesy copy of this complaint from Attorney David Tatge, counsel for Heller Healthcare Finance, Inc. (hereinafter referred to as "Heller"). A copy of said letter is attached hereto as Exhibit 1.

4.    Following through on the letter from Attorney Tatge, I contacted my family attorney Michael F. Loring on or about August 2, 2002 and sent him a copy of the complaint and letter.

5.    Upon his advice and in accordance with Attorney Tatge's cover letter, I also sent a copy of the letter and complaint to National Union Fire Insurance Company

(hereinafter referred to as "National Union"), the Directors & Officers Liability insurer on or about August 2, 2002. A copy of the letter to National Union is attached hereto as Exhibit 2.

6.    On or about August 20, 2002, I received a copy of a letter from Lawrence Fine, vice president of the Directors & Officers Complex of AIG Technical Services, Inc. acknowledging receipt of correspondence from Attorney Aceto regarding this matter. A copy of said letter is attached hereto as Exhibit 3.

7.    On or about September 7, 2002, I spoke with Attorney Joseph O'Neil from AIG Technical Services, Inc. He apologized about not AIG's failure to respond promptly. I expressed my concern about nothing being done about the complaint. He advised me to ask for an extension to respond to the complaint. Mr. O'Neil also advised me to hire an attorney. When I asked him if it should be someone from the AIG list, Mr. O'Neil told me that he'd get back to me on whether I needed to choose an attorney from that list.

7.    On or about September 7, 2002, I contacted Attorney Loring and explained my conversation with Attorney O'Neil. Attorney Loring, acting on my behalf, contacted Heller's counsel to discuss the matter. Attorney Loring then contacted me and led me to believe that the main thrust of the case was to access the directors and officers insurance.

8.    On September 23, 2002, following the advice of Attorney Loring, I sent a letter to Attorney Riden, Heller's counsel, telling him that I was not represented at that time. A copy of said letter is attached hereto as Exhibit 4.

9.    I also sent a letter to National Union on September 23, 2002 requesting information about the status of the claim. A copy of said letter is attached hereto as Exhibit 5.

10.    Sometime in October of 2002, I again spoke with the attorney from the insurance company who advised me that their firm was reviewing the coverage questions involved in the claim, that he did not expect to have an answer until later and that my attorney should request an extension for time to answer. I notified Attorney Loring, who contacted Attorney Riden and secured an extension on my behalf until November 7, 2002. A copy of the letter from Attorney Loring is attached hereto as Exhibit 6.

11.    On or about November 5, 2002, I received a letter dated in October from counsel to the insurance company denying coverage. I notified Attorney Loring and asked him to get another extension. A copy of said letter is attached hereto as Exhibit 7.

12.    On or about November 8, 2002, Attorney Loring contacted me. He told me that he had spoken with Attorney Riden about an extension and was waiting to hear back. He told me that he had another attorney in mind to take a look at the case. Attorney Loring told me to sit tight and that something might be worked out.

13.    I received a copy of the letter Attorney Loring sent to Attorney Riden regarding another extension and advising Attorney Riden that he would let him know when counsel had been found. A copy of the letter from Attorney Loring to Attorney Riden is attached hereto as Exhibit 8.

14.    Sometime around March or April 2003, Attorney Loring called to advise me that he had received a call from Heller's counsel inquiring about an answer to the Complaint. I reminded Attorney Loring that he was supposed to get back to me with a

3

referral. He acknowledged that he had agreed to do so and again told me that he would get back to me.

15.    I did not hear from Attorney Loring. In May I received a copy of the request for default. I called Attorney Loring, left a message for him to call me, and telefaxed a copy of the request for default to him. I did not hear back from Attorney Loring.

16.    Based on my discussions with Attorney Loring, as well as my reading of the cover letter and Complaint, I was led to believe that Heller was not particularly interested in pursuing me personally, but rather was interested in pursuing the insurance company. The only portion of the Complaint that seeks damages from me is based on an allegation that I am liable to Heller for negligent misrepresentation.

17.    When I did not hear back from Attorney Loring, I began searching for an attorney and was able to retain the services of Klieman, Lyons, Schindler & Gross on or about May 22, 2003.

18.    Upon information and belief, counsel from Klieman, Lyons, Schindler & Gross attempted to negotiate an assent to the removal of the default with Heller's counsel, but was unsuccessful.

19.    At the time this Complaint was filed and during the ensuing months, I was under extreme emotional distress as a result of the breakup of my marriage. I was preoccupied with trying to negotiate a separation from my husband, which included very acrimonious disputes regarding our living arrangements, financial considerations, and the custody and parenting of our two children.

4

20.     Based on my understanding of the facts surrounding this action, I have a
meritorious defense to the claim of negligent misrepresentation that Heller has asserted
against me.

21.     Upon information and belief, on or about October of 2000, Medicare
changed its reimbursement system from a fee for service system to an episodic payment
system, called the Prospective Payment System (PPS). Unfortunately, MHCS' billing
software vendor could not make the necessary changes to MHCS' billing software that
would allow MHCS to process its Medicare claims under the PPS. Because MHCS was
unable to process the Medicare claims, a severe backlog of claims was created. In March
of 2001, MHCS began the tedious task of processing the Medicare claims manually. Due
to the enormous volume of claims coupled with a lack of resources, MHCS was unable to
track and record the Low Utilization Payment Adjustments (hereinafter referred to as
"LUPA's") in a timely fashion.

22.     Upon information and belief, when a patient makes four or less visits
during an episode, a medical provider is not entitled to a full episodic payment from
Medicare, but rather would be paid on a pay per visit basis. Since Medicare would often
pay the provider the full episodic payment up front, a LUPA adjustment would be made
when the final claim was submitted. Because of the backlog, lack of software and other
resources, MHCS was unable to track and record the LUPA's so that it could not
determine what adjustments there were going to be to the Medicare claims.

23.     Heller was fully aware of the problems MHCS was having with its
software, knew that MHCS was unable to determine what adjustments to accounts

5

receivable needed to be made, and knew that MHCS had started manually processing the Medicare claims.

24.    Because it was unable to properly determine the appropriate adjustments to be made on the PPS Medicare receivables, MHCS consistently left this number blank on the Borrowing Base Certificates (hereinafter referred to as "BBC") provided to Heller. See for example Exhibit B to the Complaint.

25.    Contrary to the allegations contained in the Complaint, Heller was fully aware of the problem with the PPS Medicare receivable adjustments. Beginning in October 2000, Heller knowingly accepted all of the BBC's that purposely left this information blank because Heller was fully aware that MHCS could not determine what those adjustments should be.    With full knowledge, Heller continually made advances to MHCS under the DIP loan.

26.    Throughout this entire period, Heller sent its own representatives to perform quarterly onsite audits of MHCS. Heller's auditors were provided with all of the information utilized to prepare the recently submitted BBC's, which it accepted without question. As part of their work, Heller auditors routinely tested remittance advices issued by Medicare and provided by MHCS, which revealed LUPA and other adjustments. At one point, I was questioned personally by Mehdi Maida, a representative of Heller who was an assistant to Mr. Gardullo, regarding the lack of information on the BBC. I explained that MHCS did not have the means to obtain the information due to the software problem. On the second to last audit, another representative from Heller, Peg Henline, commented that she found it odd that Heller had not required some type of information on the undetermined Medicare PPS adjustments.

6

27.    At a meeting in October of 2001, Michael Ingoldsby, the CEO of MHCS again told representatives of Heller that the Medicare collateral as stated on the BBC's represented a gross number with no adjustment for possible ineligible accounts due to the software issues. Heller's representatives, which included Mr. Gardullo and Attorney Tatge, re-directed the discussion to the software failure and asked what MHCS was planning on doing to correct the problem. I explained that we were manually processing the claims. Heller's only response was to recommend that we replace the software package as part of the Chapter 11 reorganization plan.

28.    At my suggestion and at the direction of Indy Edwards, the President of MHCS, and myself, MHCS began an internal audit of the paid Medicare claims in November and December of 2001 in order to determine what adjustments would be necessary. After reviewing approximately half of the claims, it became clear to me that a significant over-advance had been made by Medicare, due mostly to the LUPA adjustments.

29.    I promptly informed Michael Ingoldsby. I provided the results of the audit to both Mr. Ingoldsby and Indy Edwards, and told them that I would no longer certify the BBC's going forward. Mr. Ingoldsby asked me to contact Mr. Gardullo from Heller to discuss my discomfort with certifying the BBC's.

30.    Pursuant to Mr. Ingoldsby's direction, I contacted Mr. Gardullo and told him that I could no longer certify the BBC's. Mr. Gardullo began to probe me for details that I felt should be directed to Mr. Ingoldsby and advised Mr. Gardullo that he should speak directly with Mr. Ingoldsby.

31.    Upon information and belief, Mr. Gardullo spoke with Mr. Ingoldsby. Mr. Ingoldsby then told me that Mr. Gardullo wanted to speak with me further.

32.    Contrary to the allegations contained in the complaint, I was not vague in what I reported to Mr. Gardullo and clarified for him my findings from the partially completed audit of the adjudicated Medicare claims. I further explained the types of adjustments we were seeing, including the LUPA's, and provided him with detailed information and data as to what the nature of the adjustments were and the significant dollar amount involved with the over-advance.

33.    At no time did I provide false information to Heller regarding the Medicare adjustment information or mislead Heller in order to induce it to make advances to MHCS. At all times, Heller was aware of the situation both having been told by MHCS representatives as well as by its own auditors. Even after I fully informed Mr. Gardullo of the significant over advances from Medicare and refused to certify the BBC's, Heller continued to make advances on the DIP loan to MHCS until February 2002.

34.    In its request for default judgment, Heller is seeking damages against me in the amount of $1,330,243 and states that the amount is a sum certain. I am unable to determine from the allegations made by Heller what evidence there is to support the claim that it sustained any consequential damages, let along consequential damages in the amount of $928,355.

35.    I presently work for Overlook Home Health, Inc. and earn approximately $97,000.00 per year. I do not have the income, nor do I have other liquid assets, to

8

satisfy any judgment against me, let alone a judgment in the amount of $1,330,243. The entry of any judgment would put my family and me into serious financial jeopardy.

36.    Based on the above statements, I believe I have an extremely meritorious defense and further believe that when all of the facts are presented in this case, I will prevail.

Signed under the pains and penalties of perjury this 24th day of June, 2003.

PAMELA JONES

# EXHIBIT 1

EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW
111 HUNTINGTON AVENUE
BOSTON, MASSACHUSETTS 02199-7610

(617) 342-4000
FAX (617) 342-4001
www.ebglow.com

250 PARK AVENUE
NEW YORK, NEW YORK 10177-1211
(212) 351-0989

1227 25TH STREET N.W.
WASHINGTON, D.C. 20037-1175
(202) 861-0900

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2506
(310) 556-8861

ONE LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2681
(203) 348-3737

TWO GATEWAY CENTER
NEWARK, NEW JERSEY 07102-5003
(973) 642-1900

TWO EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111-3994
(415) 398-3500

12750 MERIT DRIVE
DALLAS, TEXAS 75251-1219
(972) 628-2450

150 N. MICHIGAN AVENUE
CHICAGO, ILLINOIS 60601-7553
(312) 499-1400

945 EAST PACES FERRY ROAD
ATLANTA, GEORGIA 30326-1380
(404) 923-9000

August 1, 2002

**IN HAND DELIVERY**

Mr. Michael Ingoldsby
Ms. Mary Lee Ingoldsby
5 Stagecoach Road
Hingham, MA 02043

Ms. Pamela Jones
197 High Street
Duxbury, MA 02332

Ms. Indy Edwards
345 Camp Street, #506
West Yarmouth, MA 02673

Re:  Notice of Claim for Directors' and Officers' Wrongful Acts

Dear Mr. Ingoldsby, Ms. Ingoldsby, Ms. Edwards and Ms. Jones:

This firm is counsel to Heller Healthcare Finance, Inc.  Attached is a courtesy copy of a complaint against you that was filed in U.S. District Court and will be formally served on you in the near future.  You may wish to seek legal counsel to advise you in this matter, including whether you should notify Managed Health Care Systems, Inc.'s Directors & Officers' Liability carrier of this claim against you.  (The policy is Policy No. 873-87-52 issued by National Union Fire Insurance Co. of Pittsburgh, Pa., Financial Services Claims Department, 175 Water Street, New York, N.Y. 10038.  Facsimile: (212) 943-1125)  We understand that the policy may expire on August 4, 2002.

Very truly yours,

David B. Tatge (SDZ)

David B. Tatge
Counsel to Heller Healthcare Finance, Inc.

Mr. Michael Ingoldsby
Ms. Mary Lee Ingoldsby
Ms. Pamela Jones
Mr. Indy Edwards
August 1, 2002
Page 2


Enclosure

cc:    Joseph G. Butler, Chapter 7 Trustee for MHCS (w/o encl.)
       Dwight D. Meier, Esquire (w/o encl.)
       Russell Beck, Esquire (w/o encl.)

# EXHIBIT 2

Pamela Jones
197 High St.
Duxbury, MA  02332

August 2, 2002

National Union Fire Insurance Company
Of Pittsburg, PA
Financial Services Claims Department
175 Water Street
New York, NY  10038

RE:    Notice of Claim
       Policy Number 873-87-52

This letter services as written notice that Attorney David B. Tatge, counsel to Heller Healthcare
Finance, Inc. has filed a complaint with the U.S. District Court against the directors and officers
of Managed Health Care Systems, Inc.

Pamela Jones

Cc:    Joseph G. Butler, Bankruptcy Trustee
       Barron & Stadfeld, P.C.
       50 Staniford Street
       Boston, MA  02114

       Nicholas Sciotto
       International Insurance
       125 Broad Street
       Boston, MA  02110

# EXHIBIT 3

Lawrence Fine
Vice President
Directors & Officers Complex/PTL
Tel. 212.458.1065
Fax. 212.458.0947

**AIG** AIG Technical Services, Inc.

175 Water Street
New York, NY 10038
212.770.7000

August 20, 2002

Gregory J. Aceto
**Johnson & Aceto, P.C.**
67 Batterymarch Street, Suite 400
Boston, Massachusetts  02110

RE:    **Insured:**    MANAGED HEALTH CARE SYSTEMS
   **Matter:**    Heller Healthcare Finance, Inc.
   **Claim #**    434-003227

Dear Mr.Aceto:

Your correspondence dated August 2, 2002 referencing policy #873-8752 was received by our office on August 8, 2002. **Joni Mason** has been assigned responsibility for this matter. She will review the information you have provided and a preliminary coverage evaluation will be forwarded to you in the near future.

In the interim please direct any additional information or inquiries to her attention.  The direct dial number is **(212)458-1071.**

Sincerely,

Lawrence Fine
Vice President
Directors & Officers Complex/PTL

LF/vc

Cc:    Pamela Jones
   197 High Street
   Duxbury, MA  02332

# EXHIBIT 4

Pamela Jones
197 High St.
Duxbury, MA  02332

September 23, 2002

Attorney Stephen D. Riden
Epstein Becker & Green, P.C.
111 Huntington Ave.
Boston, MA 02199

RE    Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al.
      Case #:  02cv11553 NG

Please review the attached correspondence to National Union Fire Insurance Company.  I
am not represented by legal counsel and therefore cannot respond to the complaint at this
time, but will do so once represented.

Sincerely,

Pamela Jones

# EXHIBIT 5

Pamela Jones
197 High St.
Duxbury, MA  02332

September 23, 2002

National Union Fire Insurance Company
Of Pittsburg, PA
Financial Services Claims Department
175 Water St.
New York, NY  10038

RE      Notice of Claim; August 2, 2002
        Policy Number 873-87-52

On August 2, 2002 a notice of claim was mailed to the above address (attached). It has
been 52 days and there has been no response to this claim; it is unclear whether you have
accepted it.

The claim against the directors and officers is proceeding.  It is requested that the
following occur within 48 hours of receipt of this letter:

  A) Provide written notice that the claim has been accepted and appoint legal counsel
     so that the complaint can be responded to within the required time frame (October
     9, 2002)

  B) Deny the claim and set forth the criteria for which it was denied

I can be reached by telephone at the following number (781) 740-1100, fax (781) 740-
2203.

Sincerely,

Pamela Jones

# EXHIBIT 6

*Loring and Robinson*

*Attorneys at Law*

*50 Cole Parkway*

*Scituate, Massachusetts 02066*

---

*(781) 545-2600*

*Fax (781) 545-2695*

*Michael F. Loring, Esq.*

*Mark E. Robinson, Esq.*

October 7, 2002

Stephen D. Riden, Esq.
Epstein, Becker & Green, PC
111 Huntington Avenue
Boston, MA 02199

Via Telefax 1-617-342-4001
Hard Copy to Follow

## Re: Heller Healthcare Finance, Inc.
## vs.
## Pamela Jones, et al
## U.S. District Court Case No. 02CV11553NG

Dear Attorney Riden:

Pursuant to our telephone conversation this morning I am hereby requesting a thirty (30) day extension for Ms. Pamela Jones to file her Answer to this Complaint. The reason for this request is that Ms. Jones has spoken to a representative of National Union Fire Insurance Company, who is the Carrier of Managed Health Care Systems Inc., Directors and Officers Liability Insurance Policy and they have not issued a formal acceptance of the Claim as yet and will not have a definitive answer until next week. They requested that Ms. Jones request this Extension so they would have time to determine coverage and respond to the Complaint once it has been accepted by National Union.

As we agreed, this Extension for Ms. Jones will be for thirty (30) days and will expire on November 7, 2002. As far as this action is concerned, our office is not representing Ms. Jones in any capacity other than to request this Extension. However, I will contact your office relative to National Unions determination of coverage and the Defense of this Action on Ms. Jones behalf.

I thank you for your professional courtesy in granting this Extension.

Very truly yours,

Michael F. Loring

cc: Pamela Jones

# EXHIBIT 7

 **PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

50 ROWES WHARF, BOSTON, MA 02110-3342
[617] 951.2100  FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI    PORTLAND, ME

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

October 25, 2002

Pamela Jones
197 High Street
Duxbury, MA 02332

> Re:  *Insured:*        ***Managed Health Care Systems, Inc.***
> *Claimant:*       ***Heller Healthcare Finance Inc.***
> *AIGTS Claim No.:*  ***434-003227***
> *Policy No.:*      ***873-87-52***
> *Our File No.:*    ***9500-TBD***

Dear Ms. Jones:

As you know, this office has been hired to assist National Union Fire Insurance Company of Pittsburgh PA ("National Union") in its evaluation of the captioned matter. We have reviewed the complaint in the case of: *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al*, United States District Court for the District of Massachusetts, Civil Action Number: 02CV11553 NG (the "*Heller Action*"). The purpose of this letter is to set forth National Union's preliminary coverage evaluation with respect to the *Heller Action* allegations.

The *Heller Action* complaint alleges two counts. Count I is for Negligent Misrepresentation against you, Indy Edwards and Michael Ingoldsby. Count II is for Breach of a Guaranty against Michael Ingoldsby and Mary Lee Ingoldsby. Based on our review of the *Heller Action* complaint it appears that Heller is alleging that the you, Indy Edwards and Michael Ingoldsby negligently issued overstated the borrowing base certificates and other data which, in turn, caused Heller to make an over-advance of $401,888 on the DIP Loan contract. Heller is also seeking to enforce the loan guaranty on the DIP Loan which was given by Michael and Mary Lee Ingoldsby.

Exclusion 4(h)(as amended by Endorsement No. 8) of the National Union policy excludes coverage for claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement..." The *Heller Action* claim alleges, arises out of, and is based upon the contractual liability of MHCS under the DIP Loan Agreement. The plaintiff's alleged damages were caused by MHCS' inability to repay the DIP Loan. Moreover, one of the specific elements of damages Heller is claiming for Count I is the $401,888 that was allegedly over-advanced on the DIP Loan contract and which was never repaid by MHCS. Since the claim against you arises out of and is based upon MHCS' alleged contractual liability, Exclusion 4(h) of Endorsement No. 8 operates to exclude coverage.

**PEABODY & ARNOLD** LLP
Pamela Jones
October 25, 2002
Page 2

Even if the breach of contract exclusion did not operate to exclude coverage for the *Heller Action* allegations against you, National Union believes one or more of the following alternative coverage terms and conditions could operate to limit or exclude coverage: Exclusion 4(a) (as amended by Endorsement No. 7) [unlawful profit or advantage]; Exclusion 4(b) (as amended by Endorsement No. 7) [criminal or deliberate fraudulent acts]; Exclusion 4(f) (of Endorsement No. 1) [also breach of contract]; Exclusion 4(t) (of Endorsement No. 8) [professional services]; the policy's definitions of Insured, Loss and Wrongful Act; and Clause 14 [other insurance].

Since the *Heller Action* does not appear to be covered under the National Union policy, National Union must decline coverage for this matter and thus will not be providing coverage for defense costs or any judgment or settlement. National Union's coverage analysis is based on our review of the complaint and its attachments, and of the policy. If you have any questions about this letter, disagree with our analysis, or have any additional information that you think we should review, please do not hesitate to contact me.

On behalf of National Union, I thank you for bringing this matter to its attention.

Sincerely,

E. Joseph O'Neil

EJO/dlm
PABOS2:EONEIL:553279_1

# EXHIBIT 8

*Loring and Robinson*

*Attorneys at Law*

*50 Cole Parkway*

*Scituate, Massachusetts 02066*

---

(781) 545-2600

Fax (781) 545-2695

*Michael F. Loring, Esq.*
*Mark E. Robinson, Esq.*

*Robert M. Kenny, Esq.*
*of Counsel*

November 15, 2002

Stephen D. Riden, Esq.
Epstein, Becker & Green, PC
111 Huntington Avenue
Boston, MA 02199

**RE: Pamela Jones**

Dear Attorney Riden:

Thank you for your courtesy in extending the time for Ms. Jones to file her Answer to the above Complaint. Since the Insurance Carrier has declined coverage for the claim, Ms. Jones will continue to pursue her claim for Coverage against National Union Fire Insurance Company. I am in the process of securing an Attorney to represent her and to file an Answer to the Complaint. As soon as I can do so, I will advise you of his/her name.

Very truly yours,

Michael F. Loring

cc: Pamela Jones

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02CV11553NG

| | |
|---|---|
| HELLER HEALTHCARE FINANCE, INC.,<br>Plaintiff | )<br>)<br>)<br>) |
| v. | )<br>) |
| MICHAEL INGOLDSBY, MARY LEE<br>INGOLDSBY, PAMELA JONES, and<br>INDY EDWARDS,<br>Defendants | )<br>)<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I, Janet Kenton-Walker, hereby certify that on this 26th day of June, 2003, I served

a copy of the Defendant Pamela Jones' Motion to Remove Default & Opposition to

Plaintiff's Motion for Entry of Default Judgment, together with the Affidavit of Pamela

Jones, on the Plaintiff by delivering said copy in hand, to counsel for the Plaintiff,

Stephen D. Riden, of Epstein, Becker & Green, P.C., at his offices at 111 Huntington

Avenue, 26th Floor, Boston, MA 02199.

Janet Kenton-Walker, BBO #269020
KLIEMAN, LYONS, SCHINDLER
& GROSS
21 Custom House Street
Boston, MA 02110
(617) 443-1000