# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

      Plaintiff,

and

MICHAEL INGOLDSBY,

      Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

      Defendants.

CIVIL ACTION No: 05-CV-11128-NG

## AFFIDAVIT OF MICHAEL INGOLDSBY

I, Michael Ingoldsby, being duly sworn, depose and state as follows:

1.     I am an individual with a residence at 1863 San Silvestro Drive, Venice, Florida, 34285.

2.     At all times relevant hereto, I was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"), which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts.

3.     As Chairman of the Board, I was not involved in the day-to-day operations of

MHCS. In fact, I had not been involved in the operations of MHCS since 1999 due to a medical condition which disabled me. Since 1999, I have been collecting under a disability policy and have not been involved in the day-to-day operations of MHCS.

4.     As such, I was not involved in the preparation of the borrowing base certificates submitted to Heller in connection with the DIP Loan.

5.     In addition, I did not personally do business with Defendants IIG or National Union and was not directly involved with the procurement of insurance coverage.

6.     At all times material hereto, I was insured for liability under a Directors and Officers Policy of Insurance and Company Reimbursement Policy, issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number 873-57-52, effective August 4, 2001, through August 4, 2002, which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as the "Policy").

7.     On or about August 4, 2000, MHCS purchased the Policy issued by National Union, using International Insurance Group, Inc. ("IIG") as its insurance broker.

8.     The Policy came up for renewal on August 4, 2001.

9.     On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, endorsements to be added to the base policy.

10.    The Policy provided by IIG did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. In addition, the copy of the Policy I received was not bound.

11.     Further, as an insured, I was never advised of the inclusion of Endorsement No. 8, which amended Exclusion 4(h), or its implications on the coverage provided by the Policy.

12.     On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller") commenced a civil action in United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against me and subsequently served the "Complaint and Jury Demand," a true and correct copy of which is attached hereto as *Exhibit A*.

13.     The Heller Complaint alleged claims against me for Negligent Misrepresentation (Count I) and Breach of Guaranty (Count II).

14.     On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union.

15.     On or about October 11, 2002, the insurer, through counsel, "declined coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards." A true and correct copy of the October 11, 2002 denial letter is attached hereto as *Exhibit B*.

16.     Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), I had no knowledge of Endorsement No. 8 or Exclusion 4(h) prior to National Union's denial of my claim. More importantly, I had no knowledge of the effect of said endorsement in limiting coverage under the Policy.

17.     Thereafter, by letter dated March 6, 2003, counsel for National Union again declined coverage by stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." A true and

correct copy of the March 6, 2003 denial letter is attached hereto as *Exhibit C*.

18.    By way of letter from counsel, dated March 17, 2004, I made a formal demand to National Union under Mass. Gen. Laws Ch. 93A. National Union again declined coverage by way of letter from counsel, dated April 16, 2004, and, in doing so, again relied upon Exclusion 4(h), as amended by Endorsement No. 8.

19.    Because National Union denied my claim under the Policy, I bore the cost of my defense of the Heller Action.

20.    In litigating the claims asserted by Heller over a two-year period, I expended a substantial amount of money in attorneys' fees and costs. Specifically, I incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

21.    As a result thereof, on or about December 13, 2002, I filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").

22.    National Union was not a creditor in the Bankruptcy.

23.    On or about January 2, 2003, I filed my Schedules and Statement of Financial Affairs.

24.    In my Statement of Financial Affairs, I disclosed that I was a defendant in the Heller Action.

25.    At that time, I had not contemplated a claim for reimbursement and/or indemnification against National Union because I had not yet incurred any substantial legal fees or suffered any damages. Therefore, I did not list it on my Schedules and

Statement of Financial Affairs.

26.     On or about April 18, 2003, I filed an Amended Schedule and Statement of Affairs.

27.     At this time, I was still not aware of any potential claim against National Union.

28.     On or about July 13, 2003, Heller was granted relief from automatic stay in my bankruptcy case.  As such, the case began to proceed and I began to accumulate significant legal fees related thereto.

29.     On or about March 17, 2004, I made a formal demand upon National Union, via counsel, for reimbursement of my defense costs in the Heller Action.

30.     On or about April 16, 2004, National Union, via counsel, responded to my formal demand letter and again denied coverage.

31.     Once it became clear that National Union was not going to reimburse me for the defense costs of the Heller Action, the Bankruptcy trustee was notified that I had a potential claim against Nation Union related to the reimbursement of said defense costs.

32.     I also discussed the potential claim against National Union with my bankruptcy counsel who advised me that I did not need to amend my Statement of Financial Affairs to reflect a potential claim for post-petition expenses.

33.     As such, I did not omit my claim against National Union from my Statement of Financial Affairs with the intention of defrauding the court or my creditors.

34.     On or about February 7, 2004, I entered into a Settlement Agreement with Heller. Pursuant to the Settlement Agreement with Heller, I submitted payment to Heller in the amount of One Hundred Twelve Thousand Seven Hundred Sixty Three Dollars and 71/100 ($112,763.71).  I also incurred legal fees related to the Heller Action in the

amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

35.    I subsequently expended Two Hundred Fifty Thousand Dollars ($250,000.00) to settle the bankruptcy case and expended an additional One Hundred Thousand Seven Hundred Twenty One Dollars ($100,721.00) in legal fees.

36.    In order to cover the costs of the bankruptcy settlement, I was forced to sell my residence in Osprey, Florida, for below market price, resulting in a total loss of Five Hundred Thirty Six Thousand Six Hundred Eighty Eight Dollars ($536,688.00).  I was also forced to refinance the mortgage on my residence located in Hingham, Massachusetts, increasing my indebtedness by Two Hundred Fifty Thousand Dollars ($250,000.00).

Signed under the pains and penalties of perjury this 18th day of September, 2006.

Michael Ingoldsby

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

HELLER HEALTHCARE FINANCE, INC.,

                      Plaintiff,

   v.

MICHAEL INGOLDSBY, MARY LEE
INGOLDSBY, PAMELA JONES, and
INDY EDWARDS,

                    Defendants.



COPY

## 02ᶜᵛ11553 NG

### COMPLAINT

COMES NOW the Plaintiff, Heller Healthcare Finance, Inc. ("Heller") and for its

Complaint states as follows:

### Nature of the Case

1.     This action seeks damages suffered by Heller as a result of the negligent

misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to

collateral available to satisfy loans made by Heller to two corporate borrowers with whom they

were affiliated. Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are

also sued for breach of contract on a personal guaranty.

### Parties

2.     Plaintiff Heller is a Delaware corporation with its principal place of business at 2

Wisconsin Circle, 4th floor, Chevy Chase, Maryland 20815. Heller is a lender to the healthcare

industry.

3.     Defendant Michael Ingoldsby ("Ingoldsby") was at all relevant times the sole

shareholder and a Director of Managed Health Care Systems, Inc. ("MHCS"), a non-party. At

all relevant times, Ingoldsby served, on information and belief, as unpaid chief executive officer (CEO) of both MHCS and Medical Temporaries, Inc., another related non-party ("Medical Temporaries"). Mr. Ingoldsby was also actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones. Upon information and belief, Mr. Ingoldsby resides at 5 Stagecoach Road, Hingham, MA 02043.

4.     Defendant Mary Lee Ingoldsby is the wife of Michael Ingoldsby, residing at 5 Stagecoach Road, Hingham, MA 02043.

5.     Defendant Pam Jones was at all relevant times the Controller and, on information and belief, Vice President, Finance of MHCS and its affiliate, Medical Temporaries. At all relevant times, Ms. Jones was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Jones resides at 197 High Street, Duxbury, MA 02332.

6.     Defendant Indy Edwards was, on information and belief, at all relevant times President and a Director of MHCS and of Medical Temporaries. At all relevant times, Ms. Edwards was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Edwards resides at 345 Camp Street, #506, West Yarmouth, MA 02673.

### Jurisdiction and Venue

7.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the plaintiff and each of the defendants and the amount in controversy exceeds $75,000.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants resides in this district and all of the defendants reside in Massachusetts.

### Background

9.      At all relevant times, Defendants Jones, Edwards and Ingoldsby were either a shareholder, officer and/or director of MHCS. MHCS was a privately held, for profit, "home health agency," i.e., a provider of home health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas. Together with Medical Temporaries, MHCS provided home nursing services to over 700 persons.

10.     Medicare is a medical assistance program administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a division of the United States Department of Health and Human Services ("HHS").

11.     At all relevant times, MHCS participated in CMS' home health prospective payment system ("PPS"). The home health PPS is described in CMS' Home Health Agency Manual, HCFA Publication No. 11, Transmittals 297 and 298.

12.     Under the PPS, MHCS obtained prospective, or advance, payments from CMS at "episode rates." An "episode rate" is a predetermined payment amount intended to cover all skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services provided to a given patient during a given sixty-day period, which generally starts the day the first Medicare billable service is delivered to a patient. With certain exceptions, including one described below, the episode rate payment is not affected by the number of visits that the home healthcare provider actually makes to the patient's home during the covered period.

13.     Generally speaking, home health providers receive an up-front initial percentage payment of the episodic payment due for a patient's care by submitting a Request for Anticipated Payment (RAP). The provider claims the balance of monies due for services during the 60-day "episode" by submitting a "final claim" to Medicare, together with a physician approved Plan of Care for the episode, if not previously submitted, which final claim is due within 60-days from the end of the episode or 60-days from the issue of the RAP payment,. The up-front RAP payment is 60% of the episode payment, for an initial episode, with 40% paid on the back end; for subsequent episodes of care 50% is paid with the RAP and 50% upon the final claim.

14.     As an exception to these rules, if a particular patient receives four or less visits during the 60-day episode the provider is not entitled to the full episodic payment. Rather, under the Low Utilization Payment Adjustment (LUPA) rules the provider is paid only on a per-visit basis.

15.     By way of example, assume the PPS episode payment for a particular patient is $2,500. The up-front RAP payment would be 60%, or $1,500. It is determined, however, by the time that the final claim is submitted, that the LUPA rules apply and the provider is due only $300 for the limited care that was rendered during the episode. Medicare "takes back" $1,200 by recoupment, reducing monies otherwise due the provider, on other claims, by $1,200.

16.     On February 23, 2001, MHCS and Medical Temporaries both filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

17.     Heller was a pre-petition lender to MHCS and Medical Temporaries on a number of loans, including (i) a Loan and Security Agreement dated as of August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000; (ii) a Secured Term Note, which also served as a security agreement, in the original amount of $685,000, later amended to

$515,000; (iii) a Secured Term Note in the amount of $200,000, for an overline loan, and (iv) a further overline loan, treated as an advance under the Revolving Credit Note, in the maximum principal amount of $233,000 (the second "overline"). As of the petition date, MIICS and Medical Temporaries owed Heller $1,677,073 on these various loans ($973,184 on the Revolving Credit Note, $515,000 on the Pre-petition Term Loan; $188,889 on the first pre-petition overline, together with $13,095 of accrued and unpaid interest, together with attorneys' fees and other costs recoverable under the loan documents).

18.    Post-petition, on February 28, 2001, Heller, as lender, and MHCS and Medical Temporaries, jointly and severally as "borrower", entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which loan refinanced the pre-petition Revolving Credit Note. The Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), a copy of which is attached as <u>Exhibit A</u> hereto. The two debtors, at the same time, received bankruptcy court approval for use of the cash collateral (receivables) which collateralized Heller on the pre-petition term loan. The Bankruptcy Court approved the aforesaid DIP Loan and the debtors' use of cash collateral at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001.

19.    Defendant Ingoldsby and Defendant Mary Ingoldsby, his wife, guaranteed the obligations of MHCS and Medical Temporaries under the DIP Loan Agreement.

20.    Under Section 2.1(g) of the DIP Loan Agreement, the amount of $3 million revolving line of credit that MHCS and Medical Temporaries could draw upon at any given time under the DIP Loan facility was equal to "eighty five percent (85%) of Qualified Accounts due and owing from any Medicaid/Medicare, Insurer or other Account Debtor (the 'Borrowing Base')." "Qualified Account" was defined in Section 1.49 of the Loan Agreement.

21.      Under Section 3.1(a) of the DIP Loan Agreement, the DIP Loan was secured by, among other assets, MHCS' and Medical Temporaries' Accounts (defined in Section 1.1 as "any right to payment for goods sold or leased or services rendered . . . whether or not earned by performance") and accounts receivable.

22.      Under section 3.3(b) of the Loan Agreement, MHCS and Medical Temporaries were each obligated to "keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender." Section 6.1 of the Loan Agreement required MHCS and Medical Temporaries to submit a sales and collections report and an accounts receivable aging schedule to Heller by the fifteenth day of every month.

23.      MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the "eligible" Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement.

24.      A home healthcare provider must track and record LUPAs, for among other reasons, to avoid overstating its accounts receivable and/or its right to payment for services rendered. This is relevant to the instant cause of action, for the reasons noted immediately below.

25.      Heller lent money to MHCS and Medical Temporaries under the DIP Loan based on the level of receivables the companies reported to Heller on periodic "borrowing base certificates", signed by Defendants Jones and Edwards in the ordinary course of business and

-6-

their employment. These certificates were supplied to Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance collections it received back to MHCS and Medical Temporaries upon various "draw" requests by the borrowers. At all times, Heller reasonably relied on the accuracy of the borrowing base certificates it received from MHCS and Medical Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical Temporaries under the DIP Loan.

26.     Officers and directors of a home healthcare provider who fail to cause the provider to track and record LUPAs cause the provider to overstate its accounts receivable and/or its right to payment for services rendered.

27.     Unknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller of MHCS' and Medical Temporary's receivable collateral on the borrowing base certificates submitted in connection with the DIP Loan. As a consequence, the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries under the DIP Loan failed, until February 2002, to accurately track or record required negative LUPA (downward) adjustments to receivables as reported therein. These failures caused receivables as reported to Heller on the borrowing base certificates to be overstated.

28.     Heller reasonably relied on the accuracy of borrowing base certificates submitted to it by MHCS and Medical Temporaries in connection with the DIP Loan, from time to time, such as the borrowing base certificate dated September 26, 2001, attached as Exhibit B.

29.     Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and

Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby, prepared and served such DIP Operating Reports on Heller and other creditors with the intent and expectation that the bankruptcy court, Heller and such other creditors would reasonably reply on the accuracy of the balance sheets and other financial data reported therein.

30.    Unknown to Heller, but similar to the situation of the misstated borrowing base certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports, with the consequence that the DIP Operating Reports as filed, through January 2002, failed to show and reflect required LUPA adjustments (downwards) to the receivable collateral.

31.    On November 12, 2001, Medical Temporaries filed a Status Report with the bankruptcy court, attached as <u>Exhibit C</u>, which report was served on Heller, reflecting $1,341,389 in total collectible receivables and a $50,011 availability under the DIP Loan facility. The same report advised the Court and creditors that MHCS and Medical Temporaries were negotiating with HCFA with respect to the repayment of an alleged $480,00 pre-petition overpayment alleged by Medicare. Medical Temporaries reported that MHCS and Medical Temporaries anticipated to achieve a settlement of this disputed obligation which provided for favorable repayment terms in the near future. Medical Temporaries also reported that the two debtors anticipated filing either a plan of reorganization or achieving an asset sale within sixty (60) days time, and that a dividend to unsecured creditors was expected in the two bankruptcies.

32.     Around this time, in the Fall of 2001, Heller was told by MHCS and Medical Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of acquiring, as "new equity", the principal assets of MHCS and Medical Temporaries, through a sale or a reorganization plan, with Defendant Michael Ingoldsby possibly having some sort of continuing management role in any successor venture.

33.     On November 13, 2001, the United States Trustee filed a Statement Regarding Status Conference, attached as Exhibit D, to which was attached the Operating Report filed by MHCS and Medical Temporaries with the bankruptcy court for the period ending October 26, 2001.

34.     Unknown to Heller, by the actions of the Defendants Jones, Edwards, and Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of MHCS' and Medical Temporaries Accounts and accounts receivable as reported to Heller on the borrowing base certificates submitted to Heller and in the DIP Operating Reports filed with the bankruptcy court and served on Heller, by failing to cause MHCS and Medical Temporaries to make LUPA adjustments therein, which adjustments would have reduced collectible and eligible receivables as shown thereon.

35.     MHCS' and Medical Temporaries' failure to accurately track and record LUPAs was a breach of Section 3.3. of the Loan Agreement.

36.     MHCS' and Medical Temporaries failure to accurately track and record LUPAs caused a misstatement of the their Qualified Accounts and, therefore, of the Borrowing Base of eligible Accounts reported to Heller on borrowing base certificates, overstating the eligible receivables against which Heller loaned monies to MHCS and Medical Temporaries under the DIP Loan Agreement.

37.    In reliance on MHCS' and Medical Temporaries' misstatements of Qualified Accounts and the Borrowing Base, of which Heller had no knowledge until Heller conducted a field audit in January 2002, Heller loaned MHCS and Medical Temporaries approximately $402,000 more on the DIP Loan than Heller would have advanced had the borrowing base certificates and the DIP Operating Reports been properly stated.

38.    The Defendants knew, or should have known, of significant misstatements in the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries and of related misstatements of receivables as reported in the DIP Operating Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of MHCS and Medical Temporaries.

39.    Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely, that she believed that MHCS' and Medical Temporaries' borrowing base certificates were no longer accurate and that she would no longer certify them. When Mr. Gardullo probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on information and belief, acting as unpaid Chief Executive Officer (CEO) of the two debtors.

40.    In a contemporaneous conversation with Mr. Ingoldsby, Mr. Gardullo was led to believe by defendant Ingoldsby that Ms. Jones discomfort arose from a matter which Mr. Gardullo was familiar with, to wit, failure of the borrowing base certificates and the DIP Operating Reports to reduce Accounts and accounts receivable of MHCS and Medical Temporaries as shown therein by the $480,000 or so pre-petition overpayment liabilities alleged by Medicare, which alleged overpayment was then the subject then pending settlement negotiations between MHCS and Medicare and its fiscal intermediary, as noted above. Because MHCS and Medical Temporaries had reported to the bankruptcy court and creditors that a

favorable settlement with Medicare was close and would, once consummated, "term out" and repay any pre-petition overpayment liability to Medicare over a multi-year period, negatively impacting cash flow by only a few thousand dollars a month, Mr. Gardullo was comfortable that no immediate "one time" major downward adjustment of receivables as reported on the borrowing base certificates, to reflect an overpayment obligation to Medicare, was then necessary. Mr. Ingoldsby made these statements to Mr. Gardullo without reasonable care, with the intent that Heller rely on his representations and continue to advance monies under the DIP Loan, and Heller so did.

41.    Consistent with Mr. Ingoldsby's representations, even after Defendant Jones ceased to certify the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller the certificates submitted in connection with the DIP Loan continued to be certified by Defendant Edwards as being accurate and Heller reasonably relied on the same, until Heller notified MHCS and Medical Temporaries, as a result of a January 2002 field audit, of mis-statements therein.

42.    A field audit of MHCS and Medical Temporaries was conducted for Heller in January 2002 by Health Care Analysis Corporation, a Heller affiliate. When the audit results were thereupon fully analyzed and completed Heller become aware of a significant overstatement of the borrowing base by the failure of MHCS and Medical Temporaries to make LUPA adjustments.

43.    At this point, in early February 2002, Heller ceased further advances, beyond collections received, and notified MHCS and Medical Temporaries that they had improperly failed to make LUPA adjustments in the approximate amount of $405,000, as of the time of the mid-January audit.

44.    By email of February 21, 2002, attached as <u>Exhibit E</u>, after Heller had brought the failure to make LUPA adjustments to MHCS' and Medical Temporaries' attention, Defendant Jones submitted a revised 60-day forecast to Heller wherein MHCS and Medical Temporaries for the first time acknowledged an over-advance under the DIP Loan as of January 16, 2002 of $401,888, due to the failure of MHCS and Medical Temporaries to make LUPA adjustments.

45.    Had the borrowing base certificates been properly been reported to Heller by MHCS and Medical Temporaries, Heller would have advanced them $401,888 less on the DIP Loan.

46.    Heller gave formal notice of default on the DIP Loan, and of its intent to exercise default remedies, by notice filed with the bankruptcy court on March 14, 2002.

47.    On March 18, 2002, MHCS filed a Response to Heller's notice of default with the bankruptcy court, wherein MHCS acknowledged that it did not dispute the occurrence of a default under the DIP Loan, claimed that it had told Heller, in January 2002, that the value of receivables used to calculate the borrowing base would need to be adjusted and stated that in all likelihood an over-advance existed under the DIP Loan Agreement. <u>See</u> ¶1 of MHCS's March 18, 2002 Response to Heller's notice of default, attached as <u>Exhibit F</u>.

48.    The bankruptcy cases of MHCS and Medical Temporaries were converted to Chapter 7 liquidation proceedings by order of the bankruptcy court, on motion of the two debtors, at the March 20, 2002 default hearing.

49.    Heller shortly thereafter, on March 27, 2002, received relief from the automatic stay, as part of a bankruptcy court approved settlement with the Chapter 7 trustee for MHCS and Medical Temporaries, to permit Heller to collect out its receivable collateral.

50.    As of July 12, 2002, MHCS and Medical Temporaries were indebted to Heller under the DIP Loan Agreement and the various other loans and obligations in the amount of $1,330,243.07, as follows: $570,652.89 in principal and accrued interest on the DIP Loan; $524,678 in principal and accrued interest on the pre-petition term loan; an overline advance on the revolver and interest thereon totaling $56,754.50, appraisal costs of $36,593, legal fees, audit fees (for collateral review) and other charges totaling $135,314.15, and a miscellaneous advance of $6,250.

51.    All the aforesaid indebtedness of MHCS and Medical Temporaries to Heller, under the DIP Loan, the pre-petition term loan, the overline on the revolver, etc., was secured by, among other assets, Accounts and accounts receivable pledged by the two debtors. Heller duly perfected its security interest in this receivable collateral through UCC financing statements filed pre-petition and through the bankruptcy court orders approving the DIP Loan and the debtors' related use of Heller's cash collateral (receivables) which secured the term loan.

52.    As of the date hereof, Heller believes that it has collected substantially all of the receivables of MHCS and Medical Temporaries which have commercial value and that Heller's remaining collateral has no significant worth. As noted above, after these collections more than $1.3 million still remains due and owing to Heller by MHCS and Medical Temporaries.

53.    Had the Defendants (other than Mary Lee Ingoldsby) not negligently caused a significant over-advance of $401,888 on the DIP Loan, triggering a loan default which thereafter triggered conversion of the MHCS and Medical Temporaries bankruptcies to Chapter 7, MHCS and Medical Temporaries could have been sold or reorganized as "going concerns" as MHCS and Medical Temporaries had represented to Heller, the Office of the United States Trustee and the Official Committee of Unsecured Creditors in early November 2001, was anticipated to

occur within 60 days time. In these circumstances, Heller would have avoided a further $928,355 in consequential damages now apparent from the fact that Heller's remaining loan balances of $1,330,243 are, at this point, essentially uncollectible.

## COUNT I
**(Negligent Misrepresentation – against Defendants Jones, Edwards and Michael Ingoldsby)**

54.    Heller incorporates paragraphs 1 through 53 herein as if restated in full.

55.    Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary course of their business and employment, and in the ordinary course of the business of MHCS and Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivable of MHCS and Medical Temporaries. That false information, in the form of inaccurate borrowing base certificates and DIP Operating Reports, was supplied to Heller for Heller's guidance in its business transactions, i.e., making advances to MHCS and Medical Temporaries pursuant to the DIP loan, with the intent and expectation that Heller rely on such information, as it did. The false information, and Heller's justifiable reliance thereon, caused and resulted in pecuniary loss to Heller. Defendants Jones, Edwards and Michael Ingoldsby failed to exercise reasonable care or competence in obtaining or communicating the information regarding the borrowing base.

## COUNT II
**(Breach of Guaranty – Against Defendants Michael and Mary Lee Ingoldsby)**

56.    Heller incorporates paragraphs 1 through 53 herein as if restated in full.

57.    Defendants Michael and Mary Lee Ingoldsby personally guaranteed MHCS' and Medical Temporaries' obligations under the DIP Loan.

58.    Defendants Michael and Mary Lee Ingoldsby are directly liable, as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan.

59.    The DIP Loan remains due and payable and Defendants Michael and Mary Lee Ingoldsby have not performed under their Guaranty by paying off the DIP Loan.

WHEREFORE, Heller respectfully requests that the Court grant the following relief:

A.    That judgment be entered in its favor on Count I against Defendants Jones, Edwards, and Michael Ingoldsby in the amount of $401,888, for other consequential damages in the amount of $928,355 or such greater amounts as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper; and

B.    That judgment be entered in its favor on Count II against Defendants Michael and Mary Lee Ingoldsby in the amount of $805,565, or such greater amount as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper.

Respectfully submitted,

OF COUNSEL:

David B. Tatge, Esq.
Shlomo Katz, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., 7th Floor
Washington, D.C. 20037
(202) 861-0900


Dated: August 1, 2002

HELLER HEALTHCARE FINANCE, INC.

By its attorneys,

_____
Russell Beck, BBO No. 561031
Stephen D. Riden, BBO No. 644451
EPSTEIN BECKER & GREEN, P.C.
111 Huntington Avenue, 26th Floor
Boston, MA 02199-7610
(617) 342-4000

DC:199991.1

-15-



**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

50 ROWES WHARF, BOSTON, MA 02110-3342
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI    PORTLAND, ME

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

October 11, 2002

Gregory Aceto, Esq.
Johnson & Aceto
67 Batterymarch Street, Suite 400
Boston, MA  02110

> Re:   *Insured:*        ***Managed Health Care Systems, Inc.***
>        *Claimant:*       ***Heller Healthcare Finance Inc.***
>        *AIGTS Claim No.:*  *434-003227*
>        *Policy No.:*      *873-87-52*
>        *Our File No.:*    *9500-TBD*

Dear Mr. Aceto:

As you know, this office has been hired to assist National Union Fire Insurance Company of Pittsburgh, PA ("National Union") in its evaluation of the captioned matter.  We have reviewed the complaint in the case of: *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al.*, United States District Court for the District of Massachusetts, Civil Action Number: 02CV11553 NG (the "*Heller Action*").  The purpose of this letter is to set forth National Union's preliminary coverage evaluation with respect to the *Heller Action* allegations.

We are forwarding this letter to you because you submitted this matter for coverage on behalf of Michael Ingoldsby, Mary Lee Ingoldsby and Indy Edwards.  If you are not authorized to receive coverage correspondence on their behalf, please let us know so that we may redirect this correspondence to an authorized recipient.

At this time, for reasons discussed below, National Union declines coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby and Indy Edwards.

The *Heller Action* complaint alleges two counts.  Count I is for Negligent Misrepresentation against Pamela Jones, Indy Edwards and Michael Ingoldsby.  Count II is for Breach of a Guaranty against Michael Ingoldsby and Mary Lee Ingoldsby.  Based on our review of the *Heller Action* complaint it appears that Heller is alleging that the Pamela Jones, Indy Edwards and Michael Ingoldsby negligently issued overstated the borrowing base certificates and other data which, in turn, caused Heller to make an over-advance of $401,888 on the DIP Loan contract.  Heller is also seeking to enforce the loan guaranty on the DIP Loan which was given by Michael and Mary Lee Ingoldsby.

PEABODY & ARNOLD LLP
Gregory Aceto
October 11, 2002
Page 2

Exclusion 4(h)(as amended by Endorsement No. 8) of the National Union policy excludes coverage for claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement…" The *Heller Action* claim alleges, arises out of, and is based upon the contractual liability of: (1) MHCS under the DIP Loan Agreement; and (2) Michael Ingoldsby and Mary Lee Ingoldsby under the loan guaranty. The plaintiff's alleged damages were caused by MHCS' inability to repay the DIP Loan. One of the specific elements of damages Heller is claiming for Count I is the $401,888 that was allegedly over-advanced on the DIP Loan contract and which was never repaid by MHCS. Count II seeks to recover the DIP Loan amount from Michael and Mary Lee Ingoldsby pursuant to their personal guaranty of the DIP Loan. Since the *Heller Action* claim arises out of and is based upon alleged contractual liability (of MHCS, Michael Ingoldsby and Mary Lee Ingoldsby), Exclusion 4(h) of Endorsement No. 8 operates to exclude coverage.

Even if the breach of contract exclusion did not operate to exclude coverage for the *Heller Action* allegations, National Union believes one or more of the following alternative coverage terms and conditions could operate to limit or exclude coverage: Exclusion 4(a) (as amended by Endorsement No. 7) [unlawful profit or advantage]; Exclusion 4(b) (as amended by Endorsement No. 7) [criminal or deliberate fraudulent acts]; Exclusion 4(f) (of Endorsement No. 1) [also breach of contract]; Exclusion 4(t) (of Endorsement No. 8) [professional services]; the policy's definitions of Insured, Loss and Wrongful Act; and Clause 14 [other insurance].

National Union's coverage analysis is based on our review of the complaint and its attachments, and of the policy. If you have any questions about this letter, disagree with our analysis, or have any additional information that you think we should review, please do not hesitate to contact me.

On behalf of National Union, I thank you for bringing this matter to its attention.

Sincerely,

F. Joseph O'Neil

EJO/dlm
PABOS2:EONEIL:553279_1



**PEABODY & ARNOLD** LLP
COUNSELLORS AT LAW

50 ROWES WHARF, BOSTON, MA 02110-3342
[617] 951.2100 FAX [617] 951.2125

BOSTON, MA    PROVIDENCE, RI

E. JOSEPH O'NEIL
[617] 951.4705
eoneil@peabodyarnold.com

March 6, 2003

Gregory Aceto, Esq.
Johnson & Aceto
67 Batterymarch Street, Suite 400
Boston, MA  02110

> Re:  *Insured:*          *Managed Health Care Systems, Inc. ("MHCS")*
>      *Claimant:*         *Heller Healthcare Finance Inc.*
>      *AIGTS Claim No.:*  *434-003227*
>      *Policy No.:*       *873-87-52*
>      *Our File No.:*     *9500-89771*

Dear Mr. Aceto:

Thank you for your correspondence, via e-mail, the subject of which is designated as "Coverage Issue for Michael Ingoldsby." As your e-mail addresses only the question of coverage for Mr. Ingoldsby, this response is, likewise, limited to Mr. Ingoldsby.

As you know, this office has been hired to assist National Union Fire Insurance Company of Pittsburgh PA ("National Union") in its evaluation of the captioned matter. In light of your correspondence, we have again reviewed the complaint in the case of: *Heller Healthcare Finance, Inc. v. Michael Ingoldsby, et al*, United States District Court for the District of Massachusetts, Civil Action Number: 02CV11553 NG (the "*Heller Action*") and the policy, and for the reasons set forth in our prior correspondence of October 11, 2002, National Union's position remains that there is no coverage available under the policy for the claims asserted in the *Heller* action against Michael Ingoldsby.

Specifically, it is National Union's position, as set forth in our October 11, 2002 correspondence, that coverage for the purported "Negligent Misrepresentation" claims asserted in the *Heller* action is excluded by Exclusion 4(h)(as amended by Endorsement No. 8) of the National Union policy, because the claims allege, arise out of, and are based upon the contractual liability of MHCS under the DIP Loan Agreement.[1] Further, although the claim is labeled as "Negligent Misrepresentation," the negligence asserted is the failure to provide accurate information on the collateral certificates as required under the loan contract. As such, the claim clearly "arises out of"

---

[1] It appears that since your correspondence addresses only Count I of the Complaint for Negligent Misrepresentation, that you are not disputing National Union's declination position on Count II of the Complaint for Breach of Guaranty. If this is not the case, please advise us accordingly.

PEABODY & ARNOLD LLP
Gregory Aceto, Esq.
March 6, 2003
Page 2

and is "based upon" the contractual liability of MHCS, and is excluded by Exclusion 4(h) (as amended by Endorsement No. 8).[2]

Moreover, your e-mail addresses only the factual allegations asserted by the Plaintiffs against Mr. Ingoldsby in the *Heller* Complaint, disputing the accuracy of the allegations, and does not discuss the substance of the coverage issue. As you may be aware, however, National Union, in conducting its coverage analysis, is limited by the allegations asserted in the Complaint, and must consider what policy terms and conditions limit or exclude coverage if the allegations plead in the Complaint are proven true. National Union understands that the allegations asserted in the *Heller* Complaint are without substantiation at this time, and nothing in this letter or our previous correspondence is intended to suggest that the allegations have any legal or factual merit; rather, it is National Union's position that there is no coverage for the claims as they are asserted.

Thus, for the reasons set forth above and in our correspondence of October 11, 2002, National Union maintains its position that no coverage is available under the policy for this matter. As such, National Union will not be providing coverage for defense costs or any judgment or settlement.

Further, as reiterated above, National Union's coverage analysis is based on our review of the Complaint and its attachments, and of the policy. If you have any additional information you wish to provide which pertains to the coverage issues, we invite you to submit the same for our review.

On behalf of National Union, I thank you for bringing this matter to its attention.

Sincerely,

E/ Joseph O'Neil

---

[2] Your e-mail also suggests that there is still some issue as to whether Endorsement No. 8 was or was not a part of the policy. As I explained to you at our meeting, our copy of the policy does contain Endorsement No. 8. Moreover, the binder letter, which we reviewed together, clearly provides for the "Not For Profit Healthcare Amendatory Endorsement," which is Endorsement No. 8. It is, therefore, National Union's position that the policy was issued with Endorsement No. 8. Should you continue to dispute this question, we invite you to provide us with any additional information or documentation available to you on this issue, and we will be happy to review the same.