UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GE HFS HOLDINGS, INC., f/k/a HELLER HEALTHCARE FINANCE, INC., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MICHAEL INGOLDSBY, | ) | |
| | ) | |
| Intervenor/Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-11128-NG |
| | ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and INTERNATIONAL INSURANCE GROUP, LTD., | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.'S MOTION FOR SUMMARY JUDGMENT AGAINST INTERVENOR-PLAINTIFF MICHAEL INGOLDSBY**

Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") submits this Memorandum of Law in support of its Motion for Summary Judgment with respect to claims asserted by Intervenor-Plaintiff Michael Ingoldsby ("Mr. Ingoldsby") in his First Amended Complaint in Intervention (the "Intervenor Complaint").

Mr. Ingoldsby brought suit against National Union for the alleged wrongful denial of insurance coverage under a Directors and Officers Insurance and Company Reimbursement Policy. However, Mr. Ingoldsby is judicially estopped from asserting his claims against National Union due to his failure to schedule either his interest in the National Union policy or his claim for coverage thereunder as an asset of his bankruptcy estate when he filed for bankruptcy on

December 13, 2002. Furthermore, Mr. Ingoldsby's claims against National Union fail as a matter of law because the claims asserted against Mr. Ingoldsby by Heller Healthcare Finance, Inc. ("Heller") in the litigation underlying this dispute were excluded from coverage by the Policy's contractual liability exclusion.

Therefore, this Court should grant National Union's Motion for Summary Judgment.

## FACTUAL BACKGROUND

The following facts are undisputed.

## I.    The D&O Insurance Policy

Managed Health Care Systems, Inc. ("MHCS") was, at all times relevant hereto, a Massachusetts corporation providing health care services to Medicare beneficiaries with its principal place of business in Hingham, Massachusetts. (Defendant's Statement of Undisputed Material Facts ("Defendant's Statement") at ¶¶ 3-4). Mr. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of MHCS. (Id. at ¶ 5).

National Union issued to MHCS a Director and Officers Insurance Policy bearing a policy number 473-16-30, effective August 4, 2000 to August 4, 2001 (the "Prior Policy"). (Id. at ¶ 6). The Prior Policy excluded coverage for any claim:

> alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement . . .

(Id.). Mr. Ingoldsby received a copy of the Prior Policy, including the contractual liability exclusion. (Id. at ¶ 7).

On or about February 23, 2001, MHCS filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Massachusetts. (Id. at ¶ 8).

- 2 -

National Union thereafter issued to MHCS a Directors & Officers Insurance Policy bearing a policy number 873-87-52, effective August 4, 2001 to August 4, 2002 (the "Policy"). (Id. at ¶ 9). The Policy also excluded from coverage any claim:

> alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement . . .

(Id.). Mr. Ingoldsby received a draft copy of the Policy, including its contractual liability exclusion. (Id. at ¶ 10).

MHCS was informed of the Policy's contractual liability exclusion by means of a fax communication to MHCS Vice President of Finance and Chief Financial Officer Pamela Jones ("Ms. Jones") from Nicholas Sciotto of International Insurance Group, Ltd. ("IIG"), MHCS' insurance broker, dated July 31, 2001. (Id. at ¶ 11). In that fax communication, IIG forwarded to MHCS National Union's proposed terms for the Policy, including the explicit language of the contractual liability exclusion. (Id. at ¶ 12). The Policy, under which Mr. Ingoldsby was insured, was subsequently issued to MHCS by National Union. (Id. at ¶ 13).

## II.    **MHCS Borrows from Heller**

Heller Healthcare Finance, Inc. ("Heller") was a pre-petition lender to MHCS on a number of loans, including one pursuant to a Loan and Security Agreement dated August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000. (Id. at ¶ 14). Post-petition, on February 28, 2001, Heller, as lender, and MHCS entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which refinanced the pre-petition Revolving Credit Note. (Id. at ¶ 15). The DIP Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"). (Id.). According to Heller, Mr. Ingoldsby personally guaranteed the obligations of MHCS under the DIP Loan Agreement. (Id. at ¶ 16).

BOS_542014_3.DOC

The DIP Loan Agreement obligated MHCS to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report . . . ." (Id. at ¶ 17). The DIP Loan Agreement also obligated MHCS, Mr. Ingoldsby, Ms. Jones, and MHCS President and Chief Operating Officer Indy Edwards ("Ms. Edwards") to prepare Borrowing Base Certificates that represented the eligible Medicaid, Medicare and other receivables of MHCS. (Id. at ¶ 18). Heller loaned money to MHCS under the DIP Loan based upon the level of receivables MHCS reported to Heller on the periodic Borrowing Base Certificates. (Id. at ¶ 19).

The Borrowing Base Certificates specified that they were "given to the Lender [Heller] in order to induce the Lender ... to make an advance to the Borrower in the principle [sic] amount of ... pursuant to the terms and conditions of the Loan Agreement." (Id. at ¶ 20). According to Heller, the Borrowing Base Certificates were "supplied to Heller with the intent, knowledge, and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance the collections it received back to MHCS[.]" (Id. at ¶ 21).

Heller has also stated that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]" (Id. at ¶ 22). Further, Heller has asserted that MHCS owed duties to prepare any Borrowing Base Certificates submitted by MHCS in a manner that currently reported its Medicare receivables, since such receivables formed the basis of funding provided under the DIP Loan. (Id. at ¶ 23).

## III.   Heller Sues Mr. Ingoldsby

Heller claimed that in January of 2002, it discovered through an audit of MHCS' financial statements and bankruptcy filings that MHCS had failed to accurately track and report

BOS_542014_3.DOC

to Heller MHCS' Medicare receivables. (Id. at ¶ 24). Heller alleged that these errors resulted in

an overstatement of MHCS' eligible receivables against which Heller loaned monies to MHCS

under the DIP Loan Agreement. (Id.). Heller further alleged that, on account of the

overstatements, it loaned MHCS approximately $400,000 more under the DIP Loan than it

would have advanced had the accounts receivable in the Borrowing Base Certificates been

properly stated. (Id.). Moreover, Heller alleged that MHCS was indebted to it under the DIP

Loan in the amount of $1,330,243.07. (Id.).

After Heller claimed to have realized the full extent of MHCS' overstatements and

misstatements with respect to its accounts receivable, MHCS converted its bankruptcy

reorganization to a Chapter 7 liquidation proceeding. (Id. at ¶ 25). On March 25, 2002, Heller

and MHCS entered into a settlement agreement, which was approved by the bankruptcy court on

March 27, 2002 (the "Settlement Agreement"). (Id. at ¶ 26). The Settlement Agreement

contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order
> approving the Settlement Agreement] hereby releases any claims it may have
> arising on or before the date hereof against the Debtors' [Managed Health Care
> Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and
> employees provided, however, that this release from Heller does not include and
> *Heller does not waive or release either the Debtors or any officer, director,*
> *employee or agent of either Debtor from any legal or equitable claims Heller may*
> *have or from any damages suffered by Heller arising from the default under the*
> *DIP Loan Agreement* which created the over-advance of approximately $405,000,
> which was referred to in Heller's Notice of Event of Default.

(Id.) (Emphasis added).

Heller then brought suit against Mr. Ingoldsby, Ms. Jones and Ms. Edwards (the "Heller

Litigation"). (Id. at ¶ 27). Heller asserted two claims against Mr. Ingoldsby: the first for

negligent misrepresentation, alleging that Mr. Ingoldsby supplied false information to Heller

regarding the borrowing base of the eligible accounts and receivables of MHCS; the second

breach for guaranty, alleging that Mr. Ingoldsby personally guaranteed the DIP Loan and was therefore directly liable for all monies due to Heller pursuant to the DIP Loan Agreement. (Id. at ¶ 28).

Mr. Ingoldsby provided National Union with notice of the suit. (Id. at ¶ 29). Through letters dated October 11, 2002 and March 6, 2003, National Union denied coverage for Heller's claims against Mr. Ingoldsby based upon the Policy's contractual liability exclusion. (Id. at ¶ 30). After National Union denied coverage for Heller's claims against Mr. Ingoldsby, he provided his own defense in the Heller Litigation. (Id. at ¶ 31).

## IV.    **Mr. Ingoldsby Declares Bankruptcy**

Mr. Ingoldsby filed for bankruptcy under Chapter 7 in the United States Bankruptcy Court for the Middle District of Florida on December 13, 2002. (Id. at ¶ 32). Mr. Ingoldsby claims that one of the reasons he filed for bankruptcy was his inability to pay the legal fees he was incurring and expected to incur in connection with the Heller Litigation. (Id. at ¶ 33). Mr. Ingoldsby was aware at the time he filed for bankruptcy that National Union had denied coverage for those fees under the Policy. (Id.).

On January 2, 2003, Mr. Ingoldsby filed his bankruptcy Schedules and his Statement of Financial Affairs as required by 11 U.S.C. § 521. (Id. at ¶ 34). Mr. Ingoldsby stated under oath in his bankruptcy Statement of Financial Affairs that he was a defendant in the Heller Litigation. (Id. at ¶ 35). Where Ingoldsby was required to disclose in his Schedule B any "[i]nterests in insurance policies," however, he only listed a Unum Provident Disability Policy, not the National Union Policy. (Id.). Furthermore, where Mr. Ingoldsby was required to disclose in his Schedule B any "[o]ther contingent and unliquidated claims of every nature," which would have included any claims against National Union, Mr. Ingoldsby stated "None." (Id.).

BOS_542014_3.DOC

At the time he filed his bankruptcy Statement of Financial Affairs, however, Mr. Ingoldsby was aware that he had incurred and would likely be further incurring legal fees in connection with the Heller Litigation, and that National Union had denied coverage for those legal fees under the Policy. (Id. at ¶ 36). Indeed, Mr. Ingoldsby listed his attorney in the Heller Litigation as a creditor. (Id.). As of December 4, 2002 Ingoldsby owed his attorney in the Heller Litigation at least $5,022.91. (Id.).

On April 18, 2003, Mr. Ingoldsby gave notice of filing the original signatures of his Amended Schedules and Statement of Financial Affairs. (Id. at ¶ 37). At that time, Mr. Ingoldsby failed to amend his disclosures to disclose his interest in the National Union policy or his claims against National Union. (Id.). Therefore, despite still listing his attorney for the Heller Litigation as a creditor, Mr. Ingoldsby's representations to the bankruptcy court remained that (a) his only "[i]nterest[] in insurance policies" was in a Unum Provident Disability Policy, not the National Union Policy, (id. at ¶ 36); and (b) that he had no "[o]ther contingent and unliquidated claims of [any] nature." (Id.). By this point, Mr. Ingoldsby owed his attorney in the Heller Litigation approximately $14,000 in legal fees, as to which he knew National Union had denied coverage. (Id. at ¶ 38).

On May 5, 2004, Mr. Ingoldsby was issued a discharge in bankruptcy. (Id. at ¶ 39).

## V.    Summary of Key Events

The following summarizes the key dates and events relevant to this dispute.

| | |
|---|---|
| August 4, 2001: | The Policy, issued by National Union to MHCS, goes into effect for the period of August 4, 2001 to August 4, 2002. (Id. at ¶ 9). |
| August 1, 2002: | Heller commences the Heller Litigation by filing suit against Mr. Ingoldsby, among others. (Id. at ¶ 27). |
| October 11, 2002: | National Union denies coverage to Mr. Ingoldsby under the Policy. (Id. at ¶ 30). |

December 13, 2002:    Mr. Ingoldsby files a petition for bankruptcy under Chapter 7.  (Id. at ¶ 32).  In the documents submitted to the Bankruptcy Court in support of his petition, Mr. Ingoldsby fails to disclose either an interest in the Policy or any claim against National Union.  (Id. at ¶¶ 33-37).  Mr. Ingoldsby does, however, list his attorney in the Heller litigation as a creditor.  (Id. at ¶ 36).

May 5, 2004:    Based on the representations made by Mr. Ingoldsby through his submissions to the Bankruptcy Court, Mr. Ingoldsby is issued a discharge in bankruptcy.  (Id. at ¶ 39).

December 5, 2005:    Mr. Ingoldsby files his Intervenor Complaint in the present action asserting coverage claims against National Union concerning the Heller Litigation.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Construing the record in the non-movant's favor, an issue is genuine where "there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). Disputed facts, however, only preclude summary judgment when they are material. "A material issue is one that affects the outcome of the suit, that is, an issue which, perforce, needs to be resolved before the related legal issues can be decided." Id. at 681 (internal quotation marks omitted).

When the non-moving party bears the burden of proof at trial, the moving party need only "make a showing that the evidence is insufficient to support the nonmoving party's case." Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993). Once the moving party makes this showing, the nonmoving party must "establish the existence of a genuine disagreement as to some material fact." Id. The non-movant's "failure to come forward with sufficient evidence to

- 8 -

generate a trial worthy issue warrants summary judgment for the moving party." In Re Ralar

Distrib., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

## ARGUMENT

**I.     Mr. Ingoldsby's Claims Against National Union Are Barred Because He Failed To Disclose Either His Interest In The Policy Or His Claims Against National Union As Property Of His Bankruptcy Estate.**

National Union is entitled to summary judgment because Mr. Ingoldsby failed to disclose

either his interest in the National Union policy or his claims against National Union as assets of

his bankruptcy estate. Therefore, he is judicially estopped from pursuing these pre-petition

claims against National Union in this Court.

A.      These Circumstances Fall Squarely Within The Doctrine of Judicial Estoppel

Section 521(1) of the Bankruptcy Code requires a debtor to file "a schedule of assets and

liabilities, a schedule of current income and current expenditures and a statement of the debtor's

financial affairs." 11 U.S.C. § 521(1). It is well settled that both an interest in an insurance

policy and a cause of action are assets that must be scheduled under § 521(1). See Jeffrey v.

Desmond, 70 F.3d 183, 186 (1st Cir. 1995). Moreover, "the duty of disclosure is a continuing

one, and a debtor is required to disclose all *potential* causes of action." In re Coastal Plains, Inc.,

179 F.3d 197, 208 (5th Cir. 1999) (emphasis added).

The First Circuit addressed this issue in Payless Wholesale Distrib., Inc. v. Alberto

Culver (P.R.), Inc., 989 F.2d 570 (1st Cir. 1993). The Payless court held that where a debtor had

obtained Chapter 11 relief based on its representation that it had no monetary claims other than

those listed on the petition, he was judicially estopped from subsequently asserting pre-petition

claims that were never disclosed during the bankruptcy proceedings. Id. at 571. See also Howell

v. Town of Leyden, 335 F.Supp.2d 248 (D. Mass. 2004) (debtors who declared in their

bankruptcy petition that they were party to no suit and had no claims among their assets were judicially estopped from later asserting a contrary position); Compton v. Depuy Orthopaedics, Inc., C.A. No. 02-10531-RWZ, 2002 WL 1046698, *1 (D. Mass. May 22, 2002) (debtor judicially estopped from asserting pre-petition claim following discharge when plaintiff knew of possible claims against defendants, but never brought them to the attention of the bankruptcy court); Welsh v. Quabbin Timber, Inc., 199 B.R. 224, 228 (D. Mass. 1996) (debtor judicially estopped from commencing civil action seven months after bankruptcy discharge); Carney v. Shawmut Bank, N.A., No. CA 954118, 1996 WL 1185157 at *1 (Mass. Super. June 12, 1996) (debtor's failure to list all claims against the defendant in the bankruptcy petition estopped the debtor from raising them in a state court lawsuit).

In this case, Mr. Ingoldsby filed for bankruptcy under Chapter 7 on December 13, 2002. (Defendant's Statement at ¶ 32). Mr. Ingoldsby concedes that he was aware at the time he filed for bankruptcy that National Union had denied coverage under the Policy for Heller Litigation legal fees, (id. at ¶ 33), and even claims that one of the reasons he filed for bankruptcy was his inability to pay the legal fees he was incurring and expected to incur in connection with the Heller Litigation. Id.

Nevertheless, and despite listing his attorney in the Heller litigation as a creditor, (id. at ¶ 36), Mr. Ingoldsby failed to list either his interest in the National Union insurance policy or his claims against National Union as assets of the bankruptcy estate. (Id. at ¶ 35). Instead, where Ingoldsby was required to disclose in his Schedule B any "[i]nterests in insurance policies," he only listed a Unum Provident Disability Policy, not the National Union Policy. (Id.). Furthermore, where Mr. Ingoldsby was required to disclose in his Schedule B any "[o]ther

contingent and unliquidated claims of every nature," which would have included any claims against National Union, Mr. Ingoldsby stated "None." (Id.).

Mr. Ingoldsby also failed to amend his disclosures to disclose his interest in the National Union policy or his claims against National Union when he later gave notice of filing the original signatures of his Amended Schedules and Statement of Financial Affairs. (Id. at ¶ 37). Therefore, Mr. Ingoldsby's representations to the bankruptcy court remained that (a) his only "[i]nterest[] in insurance policies" was in a Unum Provident Disability Policy, not the National Union Policy, (id. at ¶ 36); and (b) that he had no "[o]ther contingent and unliquidated claims of [any] nature." (Id.). By this point, Mr. Ingoldsby owed his attorney in the Heller Litigation approximately $14,000 in legal fees, as to which he knew National Union had denied coverage. (Id. at ¶ 38).

On May 5, 2004, Mr. Ingoldsby was issued a discharge in bankruptcy. (Id. at ¶ 39). Mr. Ingoldsby thereafter filed his Intervenor Complaint against National Union in which he pursues a pre-petition claim against National Union based upon its Policy.

These are precisely the type of fast and loose tactics that the courts in this circuit have held are barred by the doctrine of judicial estoppel. To paraphrase the First Circuit in Payless:

> The basic principle of bankruptcy is to obtain a discharge from one's creditors in return for all of one's assets, except those exempt, as a result of which creditors release their own claims and the bankrupt can start fresh. Assuming there is validity in [Mr. Ingoldsby's] present suit, [he] has a better plan. Conceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court will not tolerate, even passively. [Mr. Ingoldsby], having obtained judicial relief on the representation that no claims existed, can not now resurrect them and obtain relief on the opposite basis. This may not be strictly equitable estoppel . . . Indeed, defendant[] may have a windfall. However, it is an unacceptable abuse of judicial proceedings.

BOS_542014_3.DOC

989 F.2d at 571. Since Mr. Ingoldsby failed to identify his claim for coverage under the Policy as an asset of his bankruptcy estate, he is now judicially estopped from asserting that claim against National Union.

      B.     Mr. Ingoldsby's Failure To Schedule His Claims Is Not Excused By Any Of The Narrow Exceptions To The Doctrine of Judicial Estoppel.

In his Memorandum of Reasons In Opposition to National Union Fire Insurance Company's Motion for Protective Order and In Support of Motion to Compel filed September 21, 2006 ("Protective Order Opposition"), Mr. Ingoldsby asserted several purported reasons why he believed summary judgment would not enter in this case on the basis of judicial estoppel:

1.     Mr. Ingoldsby's claims against National Union did not need to be scheduled because they were post-petition rather than pre-petition.

2.     Mr. Ingoldsby did not mislead the bankruptcy court or secure an unfair advantage by not disclosing his claims. As support for this remarkable statement, Mr. Ingoldsby further asserted that:

     a.     His position before the bankruptcy court that he had no claims is not inconsistent with his assertion that he has several claims against National Union.

     b.     Even if his positions in the two cases are inconsistent, obtaining discharge of his bankruptcy was not a "successful" assertion of the prior inconsistent position.

     c.     Even if his positions are inconsistent and he was successful in his assertion of the prior inconsistent statement, he gained no unfair advantage by obtaining discharge based upon the representation to the bankruptcy court that he had no claims.

3.     Mr. Ingoldsby did not attempt to intentionally manipulate the legal system.

4.     Judicial estoppel here would provide a windfall to National Union.

Protective Order Opposition, pp. 12-18.

Unfortunately for Mr. Ingoldsby, his asserted reasons are contradicted by the undisputed facts in this case and are immaterial to the application of judicial estoppel as a matter of law.

BOS_542014_3.DOC

Therefore, judicial estoppel applies on these undisputed facts.  National Union's Motion for

Summary Judgment should be allowed.

          1.     Mr. Ingoldsby's Claims Against National Union Were Pre-Petition Assets
                That He Was Legally Required To Schedule In His Bankruptcy.

     As discussed above, the Bankruptcy Code requires a debtor to schedule his assets, 11

U.S.C. § 521(1), and a cause of action (even if potential) is an asset that must be scheduled,

Desmond, 70 F.3d at 186.  Secondly, the duty to schedule a cause of action continues throughout

a bankruptcy.  Coastal Plains, 179 F.3d at 208.  Because Mr. Ingoldsby was aware of all facts

underlying his actual and potential claims against National Union during the pendency of his

bankruptcy case, and indeed before he filed his schedule of assets, those claims were pre-petition

assets and were required to be scheduled.

     At deposition, Mr. Ingoldsby claimed that one of the reasons that he filed for bankruptcy

was the legal bills that he was incurring and expected to incur in defending against the Heller

lawsuit.  (Defendant's Statement at ¶ 33).  He further admitted that he was aware, prior to filing

bankruptcy, that his lawyer had demanded that National Union pay Mr. Ingoldsby's defense

costs in the Heller lawsuit and that National Union had declined coverage.  (Id.).  Yet Mr.

Ingoldsby still argues that he "had not contemplated a claim" against National Union until after

he was discharged from bankruptcy.  Protective Order Opposition, p. 8.

     This very argument has been considered and rejected by numerous courts.  See, e.g,

Welsh, 199 B.R. at 228 (applying judicial estoppel and rejecting assertion of lack of knowledge

of claim where debtor knew of all factual elements of his potential claims prior to discharge from

bankruptcy); Hoffman v. First National Bank of Akron, Iowa, 99 B.R. 929, 933 (N.D. Iowa

1989) (same).  In Hoffman, for example, the court rejected the debtor's claim that he was not

BOS_542014_3.DOC

aware of his claim at the date of filing for bankruptcy, stating:

> [The proffered excuse] is not a valid reason to fail to disclose the claim. The
> Debtor knew all of the facts that were pertinent to its current lawsuit when it filed
> bankruptcy. No new information was post-filing other than counsel's purported
> discovery of a legal basis for the lawsuit. The facts underlying the cause of action
> were known by the Debtor long before the plan was confirmed . . . Debtor had a
> duty to amend his schedules to reflect this claim and to disclose the existence of
> the potential cause of action to creditors . . . .

Id.

> 2.    Mr. Ingoldsby Misled The Bankruptcy Court And Secured An Unfair
>        Advantage (Discharge) By Failing To Schedule His Claims.

Mr. Ingoldsby's bold assertion that he did not mislead the bankruptcy court or secure an

unfair advantage by failing to schedule his claims against National Union is disingenuous at best,

and contrary to clearly-established law. Mr. Ingoldsby did not schedule his claims, thereby

falsely representing that no such claims existed. Howell, 335 F. Supp. 2d at 251 (failure to

schedule claim is representation that debtor has no such claim, which is clearly inconsistent with

subsequently bringing claims in separate suit). His bankruptcy was discharged in reliance upon

the veracity of his asset and liability schedules, thereby giving him the unfair advantage of

obtaining discharge without informing his creditors of his potential claims against National

Union. Id. ("the bankruptcy court accepted the [debtors'] representation in resolving their

bankruptcy petition and depriving their creditors of access to this substantial potential asset").[1]

This conclusion is not affected by Mr. Ingoldsby's claim that he revealed the existence of

a potential claim against National Union to the trustee of his bankruptcy estate. Such a

disclosure is inadequate to provide proper notice to creditors and will not prevent the application

---

[1] Mr. Ingoldsby further argues that his prior inconsistent position was not asserted successfully because discharge of
his bankruptcy was obtained by settlement with creditors. Protective Order Opposition, p. 14. But Mr. Ingoldsby's
representation that he had no claim against National Union was accepted by the court and his creditors, and served
as a basic assumption underlying the terms of his settlement with his creditors and discharge from bankruptcy. As
noted by the courts in Payless and Howell, had his purported claims been known to his creditors, the terms of
settlement and discharge likely would have been very different.

BOS_542014_3.DOC

of judicial estoppel. See Autos, Inc. v. Gowin, 330 B.R. 788, 794 (D. Kan. 2005) ("[a] debtor's duty to amend her position, to list the claims on her bankruptcy schedules, to move to reopen the case, or to take other formal action so that creditors will have notice of the claims and an opportunity to negotiate them is not fulfilled by an informal agreement with the Trustee"); Reagan v. Lynch, 524 S.E.2d 510, 511 (Ga. App. 1999) (applying judicial estoppel in Chapter 7 case and finding debtor's notice to trustee inadequate without additional amendment of his petition or motion to reopen his case).

       3.    Mr. Ingoldsby Cannot Satisfy The Requirements Of The "Good Faith" Exception To The Judicial Estoppel Doctrine.

Mr. Ingoldsby further attempts to fit his actions within a "good faith" exception to the judicial estoppel doctrine by arguing that he did not "intentionally manipulate" the legal system. Protective Order Opposition, pp.16-17. As discussed above, however, Mr. Ingoldsby concedes that he was aware during the pendency of his bankruptcy of (1) his actual and potential legal fees which he now seeks to recover, and (2) National Union's denial of coverage as to those defense costs.

Nonetheless, and despite scheduling those legal fees as debts, Mr. Ingoldsby did not schedule his potential claims as assets, thereby concealing these purported assets from his creditors and the bankruptcy court. His attempt to now assert those claims in this litigation, after representing that no such claims existed, is precisely the sort of "manipulation of the judicial system" that the judicial estoppel doctrine is designed to prevent. Payless, 989 F.2d at 571 ("Payless, having obtained judicial relief on the representation that no such claims existed, can not now resurrect them and obtain relief on the opposite basis."); Welsh, 199 B.R. at 229 ("good faith" exception not applicable where debtor knew all of the factual bases for potential cause of action during pendency of bankruptcy); Howell, 335 F. Supp. 2d at 251 ("good faith" exception

applies only in "limited circumstances, such as where the new, inconsistent position is the product of information neither known nor readily available to [the party] at the time the initial position was taken") (quotations omitted).

      4.      Whether Or Not Judicial Estoppel Would Constitute A Windfall For National Union Is Irrelevant: Failing To Impose Judicial Estoppel Would Permit Mr. Ingoldsby To Profit From His Fraud On The Court.

Mr. Ingoldsby's final argument against judicial estoppel is that, even if he is playing fast and loose with this court and previously intentionally failed to schedule as assets claims which he now seeks to assert in this lawsuit, he should be allowed to do so because, otherwise, National Union will receive a windfall. This argument, however, has been summarily rejected by the First Circuit. Payless, 989 F.2d at 570 ("This may not be strictly equitable estoppel, as the court observed. Indeed, defendants may have a windfall. However, it is an unacceptable abuse of judicial proceedings."); see also Howell, 335 F. Supp. 2d at 251 ("The purpose of the doctrine of judicial estoppel is to prevent the abuse of judicial proceedings, even if the application of the doctrine results in a windfall for the opposing party.").

**II.    National Union Also Is Entitled To Summary Judgment Due To The Policy's Contractual Liability Exclusion.**

In Massachusetts, the interpretation of an insurance contract is to be undertaken by construing the pertinent words of the policy in their usual and ordinary sense. See Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280, 675 N.E.2d 1161 (1997); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146, 439 N.E.2d 234 (1982). A court is to read the insurance policy as written and is "not free to revise it or change the order of the words." Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147, 461 N.E.2d 209 (1984).

Moreover, the Massachusetts Supreme Judicial Court has held that the foregoing principles apply with equal force to a policy's exclusionary clauses. "If free from ambiguity, an

BOS_542014_3.DOC

exclusionary clause, like all other provisions of an insurance contract, must be given its usual and ordinary meaning." Hakim, 424 Mass. at 281 (citing Royal-Globe Ins. Co. v. Schultz, 385 Mass. 1013, 434 N.E.2d 213 (1982)); see also Bagley v. Monticello Ins. Co., 430 Mass. 454, 720 N.E.2d 813, 816 (1999).

In this case, the Policy's contractual liability exclusion specifically excluded any claim "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any Insured under any express (written or oral) contract or agreement . . . ." (Defendant's Statement at ¶ 9).

Heller sued Mr. Ingoldsby for breach of guaranty, specifically claiming that Mr. Ingoldsby personally guaranteed the DIP Loan under the DIP Loan Agreement and was therefore directly liable for all moneys due to Heller. (Id. at ¶ 28). Heller also sued Mr. Ingoldsby for negligently failing to accurately track and record downward adjustments to MHCS' receivables in violation of the DIP Loan Agreement. (Id.). Specifically, Heller alleged in the Heller Litigation Complaint that under the explicit provisions of the DIP Loan Agreement:

> MHCS and Medical Temporaries were each obligated to keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender.

(Id. at ¶ 17).

The claims against Mr. Ingoldsby in the Heller Litigation thus were founded upon contractual obligations created under Mr. Ingoldsby's Guaranty and the DIP Loan Agreement. Therefore, because Heller's claims against Mr. Ingoldsby "arose," were "based upon," or were "attributable" to contractual liability, they were excluded from coverage under the contractual liability exclusion of the Policy. Under Massachusetts law, the phrase "arising out of" is interpreted expansively. See Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999). See also

BOS_542014_3.DOC

Rischitelli v. Safety Ins. Co., 423 Mass. 703 (1996) (for auto insurance policy defining

"accident" as an "event that causes bodily injury . . . arising out of the ownership, maintenance,

or use of an auto," the phrase "arising out of" indicated "a wider range of causation than the

concept of proximate causation in tort law"); County of Barnstable v. American Fin. Corp., 51

Mass. App. Ct. 213, 215 (2001) (for public officials' liability policy excluding "any claims . . .

arising out of operational law enforcement functions and activities," the phrase "arising out of"

was "read expansively" to exclude indemnification for underlying judgment against county for

revoking prisoner's statutory good-time credits, even though action was characterized as a

constitutional claim).

That the claims against Mr. Ingoldsby in the Heller Litigation "arose," were "based

upon," or were "attributable to" contractual liability under Mr. Ingoldsby's Guaranty and the DIP

Loan Agreement is proven by the provision in the Settlement Agreement in which Heller

released all of its claims except those arising from the DIP Loan Agreement.  On March 25,

2002, Heller and MHCS entered into a Settlement Agreement, which was approved by the

bankruptcy court on March 27, 2002. (Defendant's Statement at ¶ 26).  The Settlement

Agreement contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order
> approving the Settlement Agreement] hereby releases any claims it may
> have arising on or before the date hereof against the Debtors' [Managed Health Care
> Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and
> employees provided, however, that this release from Heller does not include and
> *Heller does not waive or release either the Debtors or any officer, director,*
> *employee or agent of either Debtor from any legal or equitable claims Heller may*
> *have or from any damages suffered by Heller arising from the default under the*
> *DIP Loan Agreement* which created the over-advance of approximately $405,000,
> which was referred to in Heller's Notice of Event of Default.

(Id.) (emphasis added).

BOS_542014_3.DOC

Thus, under this Settlement Agreement, Heller released Mr. Ingoldsby, as MHCS' "agent," from all claims against him except "any legal or equitable claims Heller may have or from any damages suffered by Heller *arising from the default under the DIP Loan Agreement.*" (Id.). Because Heller's subsequent suit against Mr. Ingoldsby was based on his Guaranty and the DIP Loan Agreement (all other claims having been previously released by Heller), then the Heller Litigation arose, was based upon, or was attributable to "actual or alleged contractual liability of the Company [MHCS] or an Insured [Mr. Ingoldsby] under any express (written or oral) contract or agreement . . ." (Id. at ¶ 9). Accordingly, coverage for the Heller Litigation was barred by the contractual liability exclusion of the Policy.

To the extent that Mr. Ingoldsby argues that Heller's negligent misrepresentation claim was not barred by the contractual liability exclusion because it was a tort claim, such an argument must fail. In Temple Univ. Health Sys. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, C.A. No. 04-061705, 2005 WL 167583 (Pa. Com. Pl. Jan. 7, 2005) (copy attached), the plaintiff insureds, three corporations and individual officers and directors of the corporations, sought a declaration that National Union had a duty to defend and indemnify the insureds in a lawsuit. Id. The lawsuit against the insureds arose from a written loan agreement to enable the insureds to purchase a nursing home. Id. The nursing home eventually failed and closed, resulting in the insureds defaulting on their loan payments. Id. The lawsuit alleged breach of contract and negligence by the corporate insureds. Id.

As in this case, the National Union policy in Temple contained an exclusion for any claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability . . . ." Id. at *7. In addition to finding that the contract claim was barred by the clear language of the policy exclusion, the court also held that the negligence claim was similarly

excluded because the duties which the insureds negligently breached were imposed by the loan agreement and sounded in contract. Id. at *9-10; see also Chapman v. National Union Fire Ins. Co. of Pittsburgh, PA, 171 S.W.3d 222, 228-29 (Tex. App. Ct. 2005) (affirming summary judgment on basis, in part, that same contractual liability exclusion barred tort claims for breach of constructive trustee and fiduciary obligations where obligations existed only because of the contract) (copy attached).

In this case, as in Temple and Chapman, the tort duties that Mr. Ingoldsby allegedly breached were imposed by the express provisions of a contract – the DIP Loan Agreement – and would not have existed in the absence of the Agreement. Mr. Ingoldsby should not now be permitted to circumvent the clear terms and conditions of the Policy by ignoring that the claims against him in the Heller Litigation were predicated on his alleged failure to comply with duties imposed by his guaranty and the DIP Loan Agreement. See generally Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491, 497 (1st Cir. 2005) (holding that, in Massachusetts, the issue of coverage is to be based on the allegations of the complaint).

BOS_542014_3.DOC

## CONCLUSION

For the aforementioned reasons, National Union is entitled to summary judgment. Mr.

Ingoldsby's claims against National Union are barred because he failed to schedule either his

interest in the Policy or his claims thereunder as assets of his personal bankruptcy estate.

Furthermore, the Policy's contractual liability exclusion indisputably excluded coverage for

Heller's claims against Mr. Ingoldsby.

> NATIONAL UNION FIRE INSURANCE
> COMPANY OF PITTSBURGH, PA
>
> By its attorneys,

Dated: November 9, 2006

/s/ Joey H. Lee
John D. Hughes (BBO# 243660)
Joey H. Lee (BBO# 663803)
EDWARDS ANGELL PALMER
   & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 239-0100
Fax: (617) 227-4420

## CERTIFICATE OF SERVICE

I, Joey H. Lee, hereby certify that on this 9th day of November, 2006, I served a copy of
the foregoing Memorandum in Support of Motion for Summary Judgment via ECF on Gregory J.
Aceto, Johnson & Aceto, P.C., 67 Batterymarch Street, Suite 400, Boston, MA 02110 and
Richard E. Heiftez, Tucker, Heifetz & Saltzman, LLP, Three School Street, Boston, MA 02108.

> /s/ Joey H. Lee
> Joey H. Lee

BOS_542014_3.DOC