UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC., f/k/a )
HELLER HEALTHCARE FINANCE, INC., )
       Plaintiff )
and )
MICHAEL INGOLDSBY, )  CIVIL ACTION
     Intervenor / Plaintiff )  05-CV-11128-NG
vs. )
 )
NATIONAL UNION FIRE INSURANCE COMPANY )
OF PITTSBURGH, PA and )
INTERNATIONAL INSURANCE GROUP, LTD., )
       Defendants )

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
INTERNATIONAL INSURANCE GROUP, LTD.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

The defendant, International Insurance Group, Ltd. ("I.I.G.") submits the

foregoing Memorandum of Law in support of their Motion for Summary

Judgment directed to the claims of the Intervenor/Plaintiff, Michael Ingoldsby

(hereafter referred to as "Plaintiff" or "Ingoldsby").

## <u>FACTS</u>

I.I.G. began doing business with Managed Health Care Systems, Inc.

(M.H.C.S.") in 2000.  I.I.G. placed directors and officers liability/employment

practices liability insurance for M.H.C.S. with a policy from National Union Fire

Insurance Company of Pittsburgh, PA ("National Union").  This initial policy, as

well as the subsequent renewal, was placed through a wholesaler, Carpenter

Moore Insurance Services, Inc. The policy ran from August 4, 2000 until August 4, 2001.

The policy was renewed the following year, effective on August 4, 2001. In the time period leading up to the renewal, I.I.G. received a renewal quote from Carpenter which was faxed to M.H.C.S. along with a letter dated July 31, 2001. The contents of this fax in their entirety are attached as **Exhibit A**. The fax, which was sent by Nicholas Sciotto of I.I.G. to Pamela Jones of M.H.C.S., included a four (4) page attachment titled "For-Profit Health Care Organization Amendatory Endorsement." Section II of this attachment, titled "Amendments to Exclusions," contains the following change with regard to an exclusion for contractual liability.

1. Exclusions 4 (h) is deleted in its entirety and replaced with the following:

[The insurer shall not be liable to make any payment for Loss…]

(h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon the termination of any insured); provided however, that this exclusion shall not apply to:

> (1) Employment Practices Claims to the extent that any liability does arise from such express contact or agreement; or

> (2) Claims for Loss alleging Wrongful Acts of an insured(s) with respect to hospital practices, privileges, credentialing or peer review matters.

M.H.C.S. accepted the renewal proposal and coverage was bound as of August 4, 2001. The entire policy, including declarations, forms and

2

endorsements, was received by I.I.G. on January 2, 2002 and forwarded to M.H.C.S. on January 4, 2002. A "final version" of the policy was received by I.I.G. on January 11, 2002 and sent to M.H.C.S. on January 21, 2002. Both versions of the policy sent to M.C.H.S. contained the "Exclusion 4(h)" referenced in the July 31, 2001 letter, **Exhibit A**.

M.H.C.S. filed for bankruptcy, initially under Chapter 11 (reorganization) and then under Chapter 7 (liquidation). Heller Healthcare Finance, Inc., ("Heller") a secured creditor of M.H.C.S., filed suit against M.H.C.S. and its directors and officers, including Intervenor/Plaintiff Michael Ingoldsby ("Ingoldsby"). Heller brought suit against Ingoldsby, a shareholder of M.H.C.S., for fraudulently misrepresenting Medicaid reimbursement certifications that were presented as security for various lines of credit.

National Union denied coverage to M.H.C.S. and Ingoldsby because the Heller lawsuit arose from a funding contract, which was excluded under the "contractual liability exclusion" of the Directors & Officers policy. In November of 2005, I.I.G. produced their file in response to a subpoena from Ingoldsby in connection with the Heller litigation. In December of 2005, Ingoldsby impleaded I.I.G. into the case, claiming that "[u]pon information and belief, the Renewal Proposal provided by International did not include a copy of endorsement No. 8, which amended exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. See Ingoldsby Complaint at ¶14. This

3

allegation was reiterated by Ingoldsby in an Affidavit dated September 18, 2006,

in which he stated:

> 9.   On or about July 31, 2001, IIG provided MHCS with National Union's
>      Renewal Proposal (the "Proposal") which detailed, among other items,
>      endorsements to be added to the base policy.
>
> 10.  The policy provided by IIG did not include a copy of Endorsement No.
>      8, which amended Exclusion 4(h) and, in doing so, limited coverage
>      related to claims arising from contractual liability.  In addition, the
>      copy of the Policy which I received was not bound.

See Ingoldsby Affidavit, **Exhibit B**.  Accordingly, Ingoldsby 's position in this

lawsuit was that I.I.G. did not advise M.H.C.S. of the contractual liability

exclusion.

However, Ingoldsby was recently deposed on October 20, 2006.  During

the deposition, Ingoldsby testified concerning M.H.C.S.'s notice of the

contractual liability exclusion at issue in this case:

Q.   Do you believe that the copy that you received [of the National Union
     Renewal Proposal] was a copy that someone at the MHCS office had made
     and then sent to you?

A.   Oh, yes.

Q.   Can you tell me what the basis is for the first sentence of paragraph ten of
     your affidavit?

A.   The copy that I got didn't have that endorsement.  When I wrote this up,
     that was my belief, that wasn't there.  I think that's all that means.

Q.   It's your testimony that the copy you received did not have Endorsement
     8 [the contractual liability exclusion].  Do you know for a fact whether the
     copy that was provided by IIG to MHCS included a copy of Endorsement
     8?

A.   I later learned that it was included.

4

Deposition of Michael Ingoldsby, p. 88, l. 5-18, attached as **Exhibit C**.

## ARGUMENT

The Court should grant summary judgment to I.I.G. because Ingoldsby has not stated a prima facie claim against I.I.G. First and foremost, Ingoldsby is no longer claiming that I.I.G. did not inform M.H.C.S. of the subject exclusion, as he conceded in his deposition that he was mistaken when he made this allegation. Second, I.I.G. did not have a duty to advise M.H.C.S. as to what insurance coverage they should purchase. It is equally clear that I.I.G. did not have a duty to advise Ingoldsby himself as to what coverage to purchase, as I.I.G. had no contact whatsoever with Ingoldsby aside from a brief introductory meeting.

A party moving for summary judgment, in a case in which the opposing party will have the burden of proof at trial, is entitled to summary judgment "if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

In accordance with Rule 56, summary judgment must be granted to the moving party where there is no genuine issue of material fact and where the party is entitled to judgment as a matter of law. One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported

claims or defenses . . . it should be interpreted in a way that allows it to accomplish this purpose." <u>Kourouvacilis</u>, 410 Mass. at 716 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)).

Since Ingoldsby has admitted that M.H.C.S. was notified of the contractual liability exclusion at issue in this case, there are no material facts in dispute with regard to Ingoldsby's claim against I.I.G.  As a matter of law, I.I.G. met their duty of care as the insurance broker for M.H.C.S.  Ingoldsby will not be able to produce any evidence to support his claims against I.I.G. for violation of M.G.L. c. 93A/176D (Count III), Fraud/Deceit (Count IV) and Negligent Misrepresentation (Count V).

## A.    INGOLDSBY IS NO LONGER CLAIMING THAT HE WAS NOT AWARE OF THE CONTRACTUAL LIABILITY EXCLUSION

By his own admission, Ingoldsby has abandoned the allegation that I.I.G. did not advise M.H.C.S. of the existence of the contractual liability exclusion. Ingoldsby previously alleged in his Complaint, as well as his September 18, 2006 affidavit, that the July 31, 2001 fax from I.I.G. to M.H.C.S. did not include the page with Amended Exclusion 4(h) (the contractual liability exclusion).  This allegation formed the basis of the three Counts against I.I.G. contained in Ingoldsby's Amended Complaint.

Ingoldsby alleged that M.H.C.S. did not receive notice of the contractual liability exclusion despite several facts which proved this allegation to be

incorrect. Most notably, the fax confirmation sheet for the 7-31-01 letter from I.I.G. to M.H.C.S. (attached as the last page to **Exhibit A**) shows that eleven (11) pages were transmitted on 7-31-01. (Which is the total number of pages which were faxed to M.H.C.S. by I.I.G.) This evidence, in and of itself, showed that M.H.C.S. did in fact receive every page of this fax, including the page containing the contractual liability exclusion. Moreover, the entire policy, including the subject exclusion, was forwarded to M.H.C.S. on two subsequent occasions, on 1-04-02 and again on 1-21-02. Finally, the policy for the prior year contained an identical exclusion relative to contractual liability.

Nevertheless, Ingoldsby has now confirmed that although he previously believed this allegation to be true, he now knows that the information regarding the For-Profit Health Care Organization Amendatory Endorsements, including the Amendments to Exclusions, was in fact contained in the 7-31-01 letter from I.I.G. to M.H.C.S. It appears that his mistake was based upon the fact that said Amendments to Exclusions may have been omitted when M.H.C.S. forwarded the 7-31-01 letter to Ingoldsby. Since Ingoldsby admits that I.I.G.'s 7-31-01 letter did in fact contain all of the information about the Amendments to Exclusions, including the contractual liability exclusion, Ingoldsby will not be able to prove fraud/deceit or negligent misrepresentation against I.I.G.

## B.    I.I.G. DID NOT HAVE A DUTY TO ADVISE INGOLDSBY WITH RESPECT TO INSURANCE COVERAGE.

Insurance agents owe a duty to proceed in accordance with their customers' instructions. Rayden Engineering Corp. v. Church, 337 Mass. 652, 660 (1958).  The agent must use "reasonable skill and ordinary diligence" in carrying out these instructions.  Hartford Nat'l Bank & Trust Co. v. United Truck Leasing Corp., 24 Mass. App. Ct. 626, 630, *review denied*, 400 Mass. 1106 (1987). This duty does not require the agent to ensure that the customer understands the terms of the insurance agreement.  Baldwin Crane & Equipment Corp. v. Riley & Riley Insurance Agency, Inc., 44 Mass. App. Ct. 29, 32 (1997) (insurance agent had no duty to ensure that insured understood the meaning of "minimum premium" as set forth in the policy).

As a general rule, an insurance agent has no duty to investigate a customer's need for insurance coverage or to advise the customer about the availability of insurance products to meet his or her particular needs.  On the contrary, the customary relationship between an insurance agent and the customer is that of vendor and vendee:

> Ordinarily, of course, an insurance agent assumes only those duties normally found in any agency relationship, including the obligation to deal with his principal in good faith and to carry out instructions, and he assumes no duty to advise merely by such a relationship.

16 A.J. APPLEMAN, INSURANCE LAW AND PRACTICE § 8836, at 64 (1981).

8

This is the rule of law adopted by the Appeals Court of Massachusetts.
Robinson v. Charles A. Flynn Insurance Agency, Inc., 39 Mass. App. Ct. 902-903
(1995).  In Robinson, plaintiffs alleged that their insurance agent owed a general
duty "to inform and advise them as to the availability of uninsured and
underinsured motor vehicle coverage up to the limits of the bodily injury liability
coverage the clients carried."  In affirming the trial court's award of a directed
verdict in favor of the agent, the Appeals Court held that "[s]uch a sweeping
duty finds no support" in Massachusetts law, absent "special circumstances of
reliance."  Id. at 902-903.  Further confirming its position on agent liability, the
Appeals Court expressly stated that the relationship between an insurance
broker and the insured is not fiduciary in nature.  Baldwin Crane & Equipment
Corp. v. Riley & Riley Insurance Agency, Inc., 44 Mass. App. Ct. 29, 31-32 (1997).

As a matter of law, I.I.G. did not have the broad duty to advise M.H.C.S.
as to the appropriate coverage to carry simply because I.I.G. acted as their
insurance broker.  Further, they had no duty to advise Ingoldsby as they had no
relationship with him at all.  Ingoldsby would have to prove that there were
"special circumstances" of "assertion, representation and reliance" between
himself and I.I.G., which created a heightened duty to advise on the part of the
broker.  Based upon the evidence presented, Ingoldsby cannot possibly sustain
that burden.

An insurance agent may be held liable for negligence in failing to properly
advise his customer if the agent specifically undertakes to render such advice, or

9

where there are "special circumstances of assertion, representation and reliance" between the agent and the customer.  See <u>Bicknell, Inc. v. Havlin</u>, 9 Mass. App. Ct. 497, 500-01 (1980); See also <u>Rapp v. Lester L. Burdick, Inc.</u>, 336 Mass. 438, 442 (1957), quoted with approval in <u>McCue v. Prudential Ins. Co. of America</u>, 371 Mass. 659, 661 (1976).  There are no such "special circumstances" presented in this case.  Ingoldsby cannot, in good faith, seriously contend that he or his company was relying on I.I.G. to give him advice as to the appropriate coverage to purchase, or that there were otherwise "special circumstances of assertion, representation and reliance."

## CONCLUSION

Since Ingoldsby has admitted that I.I.G. did in fact notify M.H.C.S. of the contractual liability exclusion, the plaintiff cannot establish that I.I.G. was negligent in failing to advise M.H.C.S. of the exclusion.  Even if Ingoldsby had not made this recent admission, the evidence overwhelmingly proves that M.H.C.S. was informed of the exclusion several times.  I.I.G. submits that they have no liability to Ingoldsby, under any of the claims in his Complaint or any other theory that he could conceivably plead.  For all of these reasons, I.I.G. respectfully requests that the Court allow their Motion for Summary Judgment.

Respectfully submitted,

INTERNATIONAL INSURANCE
GROUP, LTD., Defendant
By their Attorneys:


/s/ Syd A. Saloman
Syd A. Saloman - BBO #645267
TUCKER, HEIFETZ & SALTZMAN, LLP
100 Franklin Street, Suite 801
Boston, MA 02110
617-557-9696

# EXHIBIT A

```
HP LASERJET 3150                              ID CONFIRMATION REPORT FOR
PRINTER/FAX/COPIER/SCANNER                    INTERNATIONAL INSURANCE GROUP
                                              617-951-3940
                                              JUL-31-01  11:47AM
```

| JOB | START TIME | USAGE | PHONE NUMBER/ADDRESS | TYPE | PAGES | MODE | STATUS |
|-----|-----------|-------|---------------------|------|-------|------|--------|
| 409 | 7/31 11:44AM | 2'44" | 17817402203 | SEND............ | 11/11 | EC144 | COMPLETED.................... |

```
        TOTAL    2'44"    PAGES SENT: 11    PAGES PRINTED: 0
```

125 Broad Street, 4th Fl.
Boston, MA 02110
Tel 617-951-3939 x133
Fax 617-951-3940



# Fax

| To: | Pam Jones | From: | Nicholas F. Sciotto, AU, ARM, AIS |
|-----|-----------|-------|-----------------------------------|
|     | Managed Health Care Systems | | Director of Account Service |
|     | | Pages: | Cover + 10 |
| Fax: | 781-740-2203 | Date: | July 31, 2001 |
| Re: | D&O – EPL Renewal | CC: | |

☐ Urgent    X For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Let me know if you have any questions. Presumably, you will add this premium to the current PAC finance agreement. We will probably have to execute another Bankruptcy form as we did with the Package Policy.

125 Broad Street, 4th Fl.
Boston, MA 02110
Tel 617-951-3939 x133
Fax 617-951-3940





| To: | Pam Jones | From: | Nicholas F. Sciotto, AU, ARM, AIS |
|---|---|---|---|
| | | | Director of Account Service |
| | Managed Health Care Systems | Pages: | Cover + 10 |
| Fax: | 781-740-2203 | Date: | July 31, 2001 |
| Re: | D&O – EPL Renewal | CC: | |

□ **Urgent**    X **For Review**    □ **Please Comment**    □ **Please Reply**    □ **Please Recycle**

---

Let me know if you have any questions. Presumably, you will add this premium to the current PAC finance agreement. We will probably have to execute another Bankruptcy form as we did with the Package Policy.



July 27, 2001

Nicholas F. Sciotto
International Insurance Group, LTD
125 Broad Street
4th Floor
Boston, MA 02110

RE:   **Managed Health Care Systems**
      **Directors and Officers Liability Insurance including Employment Practices**
      **Liability (EPL)**
      **August 4, 2001**

Dear Nicolas:

On behalf of National Union, a member of the American International Group, Inc., we are pleased to provide you with a renewal quote for the above captioned account. The current marketplace for Directors and Officers Liability Insurance is becoming more restrictive in coverage, pricing and retentions are increasing at renewals as well as for new business. The healthcare marketplace in particularly is experiencing these "hard" market trends of volatile premiums and restrictive terms and conditions. It is not uncommon to see premium increases of 10% for stellar risks, to increases of 50% for risks with unenviable balance sheets. This trend follows a decade of decreasing premiums, lowered retentions, broadening terms and conditions – traits of the "soft" market. Managed Health Care Systems has filed for Chapter 11 bankruptcy since the last renewal, as well, the financial condition remains poor, albeit improving slightly. Through active negotiations with National Union, we were able to obtain a renewal proposal with a 17% increase, a remarkably reasonable increase given the dynamics since last renewal.

Additionally, for 2001 AIG has mandated that a revised Health Care Amendatory endorsement be placed ***on all Health Care risks***. We have ensured that there are no exceptions. This endorsement differs from the expiring endorsement for Managed Health Care Systems. The new revised endorsement includes an enhancement for IRS Fines and Penalties coverage. This is in addition to the expiring enhancements such as an amended Insured Person definition to include Peer Review/Credentialing, independent contractors, department heads; EMTALA coverage; and Government Funding Defense Costs. The limitations this endorsement introduces this renewal are: a sub limit on EMTALA coverage of $150,000; *failure to maintain insurance exclusion; "antitrust, price fixing, price discrimination, unfair competition, deceptive trade practices and/or monopolies, including any actions, proceedings, claims or investigations relating thereto"* exclusion; human clinical trials exclusion; and pre-authorized defense attorneys "panel counsel" for

all claims - last year panel counsel was required for Securities claims only. Finally, there are language changes with the new endorsement, however; the coverage essentially remains the same.

Lastly, at renewal AIG has added a limited private placement coverage endorsement that adds an exclusion for "public or private offering of securities by the Company..." however, the exclusion carves back coverage for private offerings of securities if less than or equal to $15,000,000.

After you have had an opportunity to review, please call with any questions.

Regards,


Thomas J. McGraw

## National Union Renewal Proposal

| | |
|---|---|
| **INSURER:** | National Union Fire Insurance Company of Pittsburgh, PA<br>Admitted Carrier / A++ A.M. Best "Superior" |
| **POLICY FORM:** | Private Edge |
| **COVERAGE:** | Corporate Liability Policy including Directors and Officers Liability Insurance and Employment Practices Liability Coverage |
| **POLICY TERM:** | August 4, 2001 to August 4, 2002 |
| **LIMITS OF LIABILITY[1]:** | $3,000,000 |
| **RETENTIONS:** | $35,000 each Claim for Employment Practices Liability;<br>$150,000 each Claim for Securities Claims (other than Private Placements);<br>$25,000 All other Claims (including Private Placements). |
| **PREMIUM:** | $24,995 |
| **DISCOVERY:** | One year optional discovery period will be available for 75% of the annual premium.   *tup = 15%* |
| **RETROACTIVE DATE:** | Date of Incorporation |

**Endorsements to be added in addition to the base policy:**
1. Outside Entity Coverage;
2. Captive Insurance Company;
3. Commissions Exclusions;
4. Nuclear Energy Liability Exclusion Endorsement (Broad Form);
5. Specific Investigation/Claim/Litigation/Event – same as expiring;
6. Final Determination Wording.

**Endorsement added at renewal:**
1. For-Profit Health Care Organization Extension –2001 Version.  This endorsement is mandatory by National Union/AIG on all health care risks.  This endorsement replaces the Health Care Extension, Endorsement No. 5 on the expiring program. Please read this endorsement carefully;

---

[1] Limit of Liability applies each Claim or related Claims and in the policy aggregate (inclusive of defense expenses).



2. Auto Private Placement Coverage threshold limited to $15M in proceeds. This endorsement limits Private Placements to $15M for automatic coverage and is included in coverage for no additional premium.

Lastly, no additional limits of liability are available from AIG.

Subjectivities:
*The quotation is subject to receipt, review and acceptance prior to binding of the following:*
1. Board of Directors;
2. Most recent audited financials;
3. Confirmation of a business plan in place to maintain operations.



## FOR-PROFIT HEALTH CARE ORGANIZATION
## AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that this policy is amended as follows:

I.    AMENDMENTS TO DEFINITIONS

A.  The Definition of Individual Insured(s) shall be amended to include the following at the end thereof:

Individual Insureds shall also include any past, present or future member of any duly constituted committee ("Committee Member"); any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialling decision concerning an individual physician ("Outside Expert"); any individual in charge of any operational department ("Department Head") or any medical director, staff physician or faculty member of the Company, regardless of whether or not such person is directly employed by the Company or is considered to be an independent contractor.

B.  The Definition of Loss shall be amended to include the following at the end thereof:

1. IRS FINES

Loss shall include Defense Costs incurred in connection with a Claim seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

Section 4911 (tax on excess expenditures to influence legislation);
Section 4940 (a);
Section 4941 (taxes on self-dealing);
Section 4942 (taxes on failure to distribute income);
Section 4943 (taxes on excess business holding);
Section 4944 (taxes on investments which jeopardize charitable purpose);
Section 4945 (taxes on taxable expenditures);
Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);
Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and
Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2. EMTALA COVERAGE

a. The definition of Claim(s) is amended to include the following: Claim shall also mean a civil lawsuit alleging a violation pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd *et seq.*, and any similar state or local statute (herein "EMTALA Claim(s)").

b. The Definition of Loss is amended to include coverage for civil fines and penalties assessed pursuant to an EMTALA Claim.

c. It is further understood that a sublimit of liability in the amount of $150,000 shall apply to all EMTALA Claims made and reported during the Policy Period or Discovery Period (if applicable) combined (hereinafter "Sublimit of Liability"). This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability.

d. Solely for the purposes of the coverage afforded herein to EMTALA Claims, exclusion (I) is modified by deleting the phrase "alleging, arising out of, based upon or attributable to" and replacing it with the word "for".

3. GOVERNMENTAL FUNDING DEFENSE COST COVERAGE

Loss shall not include the return of funds which were received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds; provided, however, that with regard to Claims for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000 ("Government Funding Defense Costs Sublimit"). This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability. With respect to any Defense Costs coverage afforded pursuant to this paragraph 3, it is understood that: the Insurer shall be liable to pay 50% of such Defense Costs, excess of a retention in the amount of $1,000,000, up to the Government Funding Defense Costs Sublimit, and subject to the Limit of Liability listed on the Declarations Page. It being a condition of this insurance that the remaining 50% of such Defense Costs shall be carried by the Insureds at their own risk and be uninsured.

It is further understood and agreed that solely with respect to the Governmental Funding Defense Cost coverage provided pursuant to the above paragraph, the No Liability retention waivers located in the section of the policy entitled RETENTION CLAUSE are deleted in their entirety.

C. The Definition of Wrongful Act is amended to include the following at the end thereof:

With respect to all Insureds, any alleged defect in peer review or credentialling.

II.    AMENDMENTS TO EXCLUSIONS

1.  Exclusions 4 (h) is deleted in its entirety and replaced with the following:

 (h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon the termination of any Insured); provided, however, that this exclusion shall not apply to:

  (1) Employment Practices Claims to the extent that any liability does not arise from such express contract or agreement; or

  (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to hospital practice, privileges, credentialling or peer review matters.

2.  The following additional exclusions are added to the end of Clause 4. EXCLUSIONS:

 (r) alleging, arising out of, based upon or attributable to any failure or omission on the part of the Insureds or the Company to effect and maintain insurance;

 (s) alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, price fixing, price discriminations, unfair competition, deceptive trade practices and/or monopolies, including any actions, proceedings, claims or investigations related thereto;

 (t) alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others; provided, however, that this exclusion shall not apply to:

  (1) Employment Practices Claims;

  (2) Claims for Loss alleging Wrongful Acts of an Insured(s) peer review or credentialling processes;

 (u) alleging, arising out of, based upon or attributable to any Human Clinical Trial. For purposes of this exclusion (u), "Human Clinical Trial" shall mean any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical.

III.    AMENDED CLAUSE 9

Clause 9 is deleted in its entirety and replaced with the following:

9.    PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

This Clause 9 applies to all Claims.

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of all Claims against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Claim is brought. In the event a Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Claim is brought to function as "local counsel" on the Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

EXCLUSION J AMENDED
(LIMITED PRIVATE PLACEMENT COVERAGE)

In consideration of the premium charged herein it is understood and agreed that Clause 4. EXCLUSIONS, is hereby amended by deleting Exclusion (j) in its entirety and replacing it with the following:

(j)     alleging, arising out of, based upon or attributable to any public or private offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such offering;

provided, however, that this exclusion will not apply to:

(1)     any purchase or sale of securities exempted pursuant to section 3(b) of the Securities Act of 1933.   Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any public offering exempted pursuant to section 3(b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

(2)     to any private offering of securities if such private offering is less than or equal to $xxxxxx in proceeds; coverage for such private offering shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any such private offering together with full particulars and as soon as practicable, but not later than 30 days after the effective date of such private offering;

(3)     to any offering of securities (other than a public offering described in paragraph (1) above or a private offering described in paragraph (2) above), as well as any purchase or sale of such securities subsequent to such offering, in the event that within 30 days prior to the effective time of such offering: (i) the Named Entity shall give the Insurer written notice of such offering together with full particulars and underwriting information required thereto; and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such

coverage is also subject to the Named Entity paying when due any such additional premium.  In the event the Named Entity gives written notice with full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC. *Formerly known as* HELLER HEALTHCARE FINANCE, INC.,     Plaintiff, <br><br> and <br><br> MICHAEL INGOLDSBY, <br><br>      Intervenor/Plaintiff, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and INTERNATIONAL INSURANCE GROUP, LTD., <br><br>    Defendants. | CIVIL ACTION No: 05-CV-11128-NG |

**AFFIDAVIT OF MICHAEL INGOLDSBY**

I, Michael Ingoldsby, being duly sworn, depose and state as follows:

1.    I am an individual with a residence at 1863 San Silvestro Drive, Venice, Florida, 34285.

2.    At all times relevant hereto, I was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"), which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts.

3.    As Chairman of the Board, I was not involved in the day-to-day operations of

MHCS. In fact, I had not been involved in the operations of MHCS since 1999 due to a medical condition which disabled me. Since 1999, I have been collecting under a disability policy and have not been involved in the day-to-day operations of MHCS.

4.     As such, I was not involved in the preparation of the borrowing base certificates submitted to Heller in connection with the DIP Loan.

5.     In addition, I did not personally do business with Defendants IIG or National Union and was not directly involved with the procurement of insurance coverage.

6.     At all times material hereto, I was insured for liability under a Directors and Officers Policy of Insurance and Company Reimbursement Policy, issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number 873-57-52, effective August 4, 2001, through August 4, 2002, which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as the "Policy").

7.     On or about August 4, 2000, MHCS purchased the Policy issued by National Union, using International Insurance Group, Inc. ("IIG") as its insurance broker.

8.     The Policy came up for renewal on August 4, 2001.

9.     On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, endorsements to be added to the base policy.

10.     The Policy provided by IIG did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. In addition, the copy of the Policy I received was not bound.

11.     Further, as an insured, I was never advised of the inclusion of Endorsement No. 8, which amended Exclusion 4(h), or its implications on the coverage provided by the Policy.

12.     On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller") commenced a civil action in United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against me and subsequently served the "Complaint and Jury Demand," a true and correct copy of which is attached hereto as *Exhibit A*.

13.     The Heller Complaint alleged claims against me for Negligent Misrepresentation (Count I) and Breach of Guaranty (Count II).

14.     On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union.

15.     On or about October 11, 2002, the insurer, through counsel, "declined coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards." A true and correct copy of the October 11, 2002 denial letter is attached hereto as *Exhibit B*.

16.     Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), I had no knowledge of Endorsement No. 8 or Exclusion 4(h) prior to National Union's denial of my claim.  More importantly, I had no knowledge of the effect of said endorsement in limiting coverage under the Policy.

17.     Thereafter, by letter dated March 6, 2003, counsel for National Union again declined coverage by stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." A true and

correct copy of the March 6, 2003 denial letter is attached hereto as *Exhibit C*.

18.    By way of letter from counsel, dated March 17, 2004, I made a formal demand to National Union under Mass. Gen. Laws Ch. 93A. National Union again declined coverage by way of letter from counsel, dated April 16, 2004, and, in doing so, again relied upon Exclusion 4(h), as amended by Endorsement No. 8.

19.    Because National Union denied my claim under the Policy, I bore the cost of my defense of the Heller Action.

20.    In litigating the claims asserted by Heller over a two-year period, I expended a substantial amount of money in attorneys' fees and costs. Specifically, I incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

21.    As a result thereof, on or about December 13, 2002, I filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").

22.    National Union was not a creditor in the Bankruptcy.

23.    On or about January 2, 2003, I filed my Schedules and Statement of Financial Affairs.

24.    In my Statement of Financial Affairs, I disclosed that I was a defendant in the Heller Action.

25.    At that time, I had not contemplated a claim for reimbursement and/or indemnification against National Union because I had not yet incurred any substantial legal fees or suffered any damages. Therefore, I did not list it on my Schedules and

Statement of Financial Affairs.

26.    On or about April 18, 2003, I filed an Amended Schedule and Statement of Affairs.

27.    At this time, I was still not aware of any potential claim against National Union.

28.    On or about July 13, 2003, Heller was granted relief from automatic stay in my bankruptcy case. As such, the case began to proceed and I began to accumulate significant legal fees related thereto.

29.    On or about March 17, 2004, I made a formal demand upon National Union, via counsel, for reimbursement of my defense costs in the Heller Action.

30.    On or about April 16, 2004, National Union, via counsel, responded to my formal demand letter and again denied coverage.

31.    Once it became clear that National Union was not going to reimburse me for the defense costs of the Heller Action, the Bankruptcy trustee was notified that I had a potential claim against Nation Union related to the reimbursement of said defense costs.

32.    I also discussed the potential claim against National Union with my bankruptcy counsel who advised me that I did not need to amend my Statement of Financial Affairs to reflect a potential claim for post-petition expenses.

33.    As such, I did not omit my claim against National Union from my Statement of Financial Affairs with the intention of defrauding the court or my creditors.

34.    On or about February 7, 2004, I entered into a Settlement Agreement with Heller. Pursuant to the Settlement Agreement with Heller, I submitted payment to Heller in the amount of One Hundred Twelve Thousand Seven Hundred Sixty Three Dollars and 71/100 ($112,763.71). I also incurred legal fees related to the Heller Action in the

amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

35.    I subsequently expended Two Hundred Fifty Thousand Dollars ($250,000.00) to settle the bankruptcy case and expended an additional One Hundred Thousand Seven Hundred Twenty One Dollars ($100,721.00) in legal fees.

36.    In order to cover the costs of the bankruptcy settlement, I was forced to sell my residence in Osprey, Florida, for below market price, resulting in a total loss of Five Hundred Thirty Six Thousand Six Hundred Eighty Eight Dollars ($536,688.00). I was also forced to refinance the mortgage on my residence located in Hingham, Massachusetts, increasing my indebtedness by Two Hundred Fifty Thousand Dollars ($250,000.00).

Signed under the pains and penalties of perjury this 18th day of September, 2006.

Michael Ingoldsby

# EXHIBIT C

---

**Page 1**

```
 1                    Volume 1
                      Pages 1-101
 2                    Exhibits per index

 3

 4          UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS
 5
            Civil Action No. 05-CV-11128-NG
 6

 7   ----------------------------------
     GE HFS Holdings, Inc.
 8   Formerly Known As
     Heller Healthcare Finance, Inc.,
 9                Plaintiff

10   and

11   Michael Ingoldsby,
                  Intervenor/Plaintiff
12
                      VS
13
     National Union Fire Insurance
14   Company of Pittsburgh, Pennsylvania
     and International Insurance Group, LTD,
15                Defendants
     ----------------------------------
16

17

18            DEPOSITION OF MICHAEL INGOLDSBY, a
     witness called on behalf of the Defendant, taken
19   pursuant to the Federal Rules of Civil Procedure, before
     Patricia M. Haynes, a Certified Shorthand Reporter and
20   Notary Public in and for the Commonwealth of
     Massachusetts, CSR No.: 14620F, at the Offices of
21   Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington
     Avenue, Boston, Massachusetts, on Friday, October 20,
22   2006, commencing at 10:00 a.m.

23            COPLEY COURT REPORTING
              58 Batterymarch Street, Suite 317
24            Boston, Massachusetts 02110
                   (617) 423-5841
```

---

**Page 3**

                    I N D E X

Witness     Direct Cross Redirect Recross
MICHAEL INGOLDSBY

(By Mr. Tumilty) 4


                  E X H I B I T S

Exhibit No.                               Page

 1  Amended and Restated Unconditional      23
    Guaranty of Payment and Performance

 2  Debtor-In-Possession Loan and Security  24
    Agreement

 3  Affidavit of Pamela Jones               39

 4  Summary of Schedules                    43

 5  Letter of 8/2/02 from Attorney Aceto    45

 6  Letter of 10/11/02 from Mr. O'Neil      58

 7  E-Mail, 11/7/02                         59

 8  Fax with enclosures                     61

 9  Letter of 3/6/03 from Mr. O'Neil        65

10  Letter of 11/5/02 from Mr. Aceto        65

11  A/R Transaction Listing                 67

12  Settlement Agreement                    69

13  First Amended Complaint in Intervention  72
14  National Union Policy                   76
15  National Union Policy                   80
16  Affidavit of Mr. Ingoldsby              85

---

**Page 2**

APPEARANCES:

Edwards, Angell, Palmer & Dodge, LLP
(By: John Tumilty, Esquire)
111 Huntington Avenue
Boston, Massachusetts 02199
Counsel for the Defendant,
National Union Fire Insurance Company


Johnson & Aceto, P.C.
(By: Gregory J. Aceto, Esquire)
67 Batterymarch Street, Suite 400
Boston, Massachusetts 02110
Counsel for the Intervenor/Plaintiff


Tucker, Heifetz & Saltzman, LLP
(By: Syd A. Saloman, Esquire)
100 Franklin Street
Boston, Massachusetts 02110

---

**Page 4**

          P R O C E E D I N G S

            MICHAEL INBGOLDSBY,

having been previously sworn, was examined and testified

as follows:

DIRECT EXAMINATION BY MR. TUMILTY:

     Q.   My name is John Tumilty. I'm one of the

attorneys here that's representing National Union in the

case in which we are here for your deposition today.

I'm going to be asking you a series of questions today.

         I need you to give audible responses because

the court reporter can't take down nods of the head or

shrugs of the shoulders. Do you understand that?

     A.   Yes.

     Q.   If you don't understand a question, I don't

want you to guess or speculate. If you don't understand

a question, just tell me and I'll try to rephrase it and

do whatever I can to help you understand it or ask a

different question.

     A.   Yes.

     Q.   Are you on any medications that would affect

your ability to answer questions here today?

     A.   I don't believe so. I'm on a lot of

medications. I take medication for memory related

disorders. I guess to that extent there would be some

5

1   things I'm just not going to be able to remember.

2   Q.   What medication is that that you take for the

3   memory related disorder?

4   A.   There's two of them, Namenda and Exelon.

5   Q.   Have you been diagnosed as having a memory

6   disorder?

7   A.   Yes.

8   Q.   Does that disorder have a name?

9   A.   Well, they call it frontal lobe dementia.

10   They really don't know whether it's Alzheimer's yet, but

11   they are monitoring it at Brigham and Women's.

12   Q.   You're not a doctor, correct?

13   A.   No.

14   Q.   I understand you're not a doctor, but do you

15   know if the memory related disorder that you have, does

16   it affect your short-term memory or long-term memory or

17   both?

18   A.   I mean, I can't answer technically.

19   Q.   I understand.

20   A.   I most definitely have short-term and some

21   long-term.

22   Q.   What is the name of the doctor at Brigham and

23   Women's that is treating you for this?

24   A.   Christopher Wright.  He's in the memories

6

1   disorders unit.

2   Q.   In order to speed things up a little today, I

3   would like to use some shorthand terms.  I want to agree

4   on them so we are clear as to what we are talking about.

5        If I'm talking about National Union, can we

6   agree I'm talking about the National Union Insurance

7   Company that provided insurance to you and MHCS?

8   A.   Okay.

9   Q.   And if I talk about MHCS, can we agree that

10   I'm referring to Managed Healthcare Systems?

11   A.   Yes.

12   Q.   And if I talk about IIG, do you understand

13   that to mean International Insurance Group?

14   A.   Okay.

15   Q.   If I talk about Heller, can we understand that

16   that means Heller Healthcare Finance, Inc.?

17   A.   Okay.

18   Q.   If I talk about the policy, can we agree that

19   I'm referring to policy No. 8738752 which was effective

20   August 4, '01 to August 4, '02?

21   A.   Is that the one that was the directors and

22   officers policy?

23   Q.   Yes.

24   A.   Yes.

7

1   Q.   But it was specifically for the year from

2   August of '01 to August of '02.

3   A.   I don't know if that's the case.  I mean, I

4   understand that's what you're referring to.

5   Q.   That's all I mean, that that defined term is

6   something for purposes of the deposition.

7        MR. ACETO:  Yes.

8   BY MR. TUMILTY:

9   Q.   Have you ever been deposed before?

10   A.   Yes.

11   Q.   How many times?

12   A.   Four or five.

13   Q.   What type of cases were you deposed in?

14   A.   There was a case that was an unfair

15   termination of an employee of that company.

16   Q.   That company being MHCS?

17   A.   Yes.

18   Q.   Go ahead.

19   A.   I was in business for years, so I've been

20   deposed a number of times.

21   Q.   Were you personally named as a party in any of

22   those cases?

23   A.   Yes.

24   Q.   What type of case were you personally named as

8

1   a party in?

2   A.   It was a termination case, employment related

3   termination case.

4   Q.   To the best of your memory, were you ever

5   named as a party to any of the other lawsuits in which

6   you were deposed?

7   A.   I think so.  I just don't remember.

8   Q.   You told me one of those suits was a

9   termination case.  Do you remember the general nature of

10   any of the other suits?

11   A.   Well, that termination case was based on a

12   sexual harassment claim.  There were other employment

13   related suits that came out of Managed Healthcare.  I

14   just can't think of any other lawsuits right now.

15   Q.   The lawsuits that you do remember and you were

16   referring to, were those here in Massachusetts?

17   A.   Yes.

18   Q.   Do you remember whether they were in state

19   court or federal court?

20   A.   State court.  I think we did have, I wasn't a

21   defendant but we did have one case that was with a

22   company that was in federal court.

23        MR. ACETO:  You personally.

24   BY MR. TUMILTY:

9

```
1    A.   Oh, no.
2    Q.   In any of the lawsuits that you were
3  personally named, were you named as a defendant?
     A.   Yes.
     Q.   And in any of those lawsuits in which you were
6  personally named as a defendant, were you found liable?
7    A.   Yes.
8    Q.   In which case or cases were you found liable
9  in?
10   A.   Donald Foster.
11   Q.   Was that a termination case?
12   A.   That was the termination sexual harassment
13 case.
14   Q.   Is that the only case that you were personally
15 found liable of to the best of your memory?
16   A.   I think so.  I mean, there may have been
17 others.  Things may have been settled and never, you
18 know, went to court fully.  I just don't recall anymore.
19   Q.   Can you tell me what, if anything, you did to
20 prepare for your deposition today?
21   A.   Nothing.
22   Q.   Did you review any documents?
23   A.   No.
24   Q.   Did you consult with anyone other than your
```

10

```
1  attorney?
2    A.   No.
3    Q.   Are you aware that you have produced documents
4  in this litigation?
5    A.   That I've produced them?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Or that they have been produced on your behalf
9  by your attorney?
10   A.   Yes.
11   Q.   Were you involved in collecting those
12 documents?
13   A.   Yes.
14   Q.   To turn over to your attorney?
15   A.   Yes.
16   Q.   Was anyone else involved in that process?
17   A.   No.
18   Q.   Can you tell me what you did in terms of
19 collecting documents to turn over to your attorney?
     A.   I had a big box of items, and I took
     everything out of the box except the things that I knew
22 he already had, which were court motions, and I just
23 sent everything to him.
24   Q.   Is that a big box that you keep at your house?
```

11

```
1    A.   It was a banker's box.
2    Q.   But is it located at your house, the banker's
3  box, or is it somewhere else?
4    A.   It's in a drawer right now.  It's not even in
5  the box right now, the remaining.
6    Q.   The documents that were in the banker's box
7  that are now in the drawer are at your house?
8    A.   Yes.
9    Q.   How did you know your attorney already had the
10 items you took out of the box because he already had
11 them?
12   A.   Because all of the documents came from him.
13        MR. ACETO:  He's referring to me.  I
14 represented him in the other case that he's talking
15 about or the company and him.  That's how he knows I had
16 them.
17 BY MR. TUMILTY:
18   Q.   Is MHCS still in business?
19   A.   No.
20   Q.   Do you know what happened to the corporate
21 records and documents of MHCS after it went out of
22 business?
23   A.   No.
24   Q.   If you had to locate those documents, do you
```

12

```
1  know who you would ask?
2    A.   Well, I would go to the people that ended up
3  taking over the company and start there.
4    Q.   Who is that?
5    A.   Overlook.
6    Q.   Where is Overlook located?
7    A.   They are in the same building where we used to
8  be, but I don't know where.  I think it's just a branch.
9    Q.   Other than the documents that you say that you
10 took out of the box because you knew your attorney
11 already had them, do you recall finding any other
12 documents that you didn't forward to your attorney?
13   A.   No.
14   Q.   Since you forwarded those documents to your
15 attorney, have you found any additional documents or any
16 new documents that you haven't sent to him?
17   A.   No.
18   Q.   Can you tell me where you currently reside?
19   A.   I reside in Florida and Massachusetts.
20   Q.   Do you own a home in Massachusetts?
21   A.   No.
22   Q.   What's your current address in Massachusetts?
23   A.   19 Blackrock Drive.
24   Q.   Which town?
```

```
                                    13
1    A.   Hingham.
2    Q.   What is your address in Florida?
3    A.   1863 San Sylvester Drive, Venice.
     Q.   Do you own that property in Venice, Florida?
     A.   No.
6    Q.   Do you currently work?
7    A.   No.
8    Q.   When was the last time you were employed?
9    A.   I don't know for sure, but it would be around
10   between '98 and '99.
11   Q.   Other than bank interest or investment income,
12   have you been paid in any fashion since '98 or '99 or
13   earned income since that time?
14   A.   Earned income?
15   Q.   From a job or consulting or anything like
16   that?
17   A.   No.
18   Q.   Are you currently out on disability?
19   A.   Yes.
20   Q.   Have you been out on disability since
21   approximately 1999?
22   A.   Yes.
23   Q.   And can you tell me what the disability is
24   that has caused you to no longer be employed?
```

```
                                    14
1    A.   Well, the whole subject of my memory and some
2    other functions that relate mostly to they call it
3    executive function decision process, along with severe
4    depression, has really caused me to be unable to do the
5    things I used to be able to do.
6    Q.   I understand you're not a doctor and you're
7    not a psychologist, but can you explain if you can what
8    executive function decision process is or how would you
9    describe it?
10   A.   All I know is that it relates to making
11   decisions and processing data and speech, which most
12   jobs require.
13   Q.   When were you diagnosed as having these
14   things?
15   A.   At different times, but the memory piece was
16   in the past three plus years.
17   Q.   Has any physician ever told you that any of
18   the disabilities that you suffer affect your cognitive
19   abilities or your ability to process information?
        MR. ACETO:  If you understand the
     question.
22   BY MR. TUMILTY:
23   A.   No one has ever used those words, but that's,
24   I think that's another way of describing the executive
```

```
                                    15
1    function.
2        MR. ACETO:  We didn't discuss it at the
3    outset, but the usual stipulations, reserve all
4    objections, except as to form, and motions to strike
5    until the time of trial?
6        MR. TUMILTY:  Yes.
7        MR. ACETO:  30 days to read and sign,
8    waive the notary?
9        MR. TUMILTY:  Yes.
10   BY MR. TUMILTY:
11   Q.   Do any of your disabilities or medical
12   conditions affect your eyesight?
13   A.   No.
14   Q.   Do any of your disabilities or medical
15   conditions affect your ability to read?
16   A.   No.
17   Q.   Have you ever been arrested?
18   A.   No.
19   Q.   Ever been convicted of a crime?
20   A.   Of a criminal offense?
21   Q.   Yes.
22   A.   No.
23   Q.   Can you just tell me what your education has
24   been since high school, where you went to college?
```

```
                                    16
1    A.   Bachelor and master's degree, Saint Francis
2    College in Pennsylvania.
3    Q.   What area of study?
4    A.   Human resource management and economics.
5    Q.   You graduated, correct?
6    A.   Yes.
7    Q.   And what year was that?
8    A.   '68.
9    Q.   Any additional formal schooling after college?
10   A.   Just the graduate degree.
11   Q.   At Saint Francis also?
12   A.   Yes, in '68.
13   Q.   Was MHCS the last place you were employed?
14   A.   Yes.
15   Q.   And can you tell me when you first became
16   affiliated with MHCS?
17   A.   I started it sometime in the early '80s, maybe
18   before, maybe '70s.
19   Q.   Did you form MHCS?
20   A.   Yes.
21   Q.   Did anyone else form it with you, did you have
22   a partner or anything like that?
23   A.   Initially there were a couple of people, but I
24   was the only one who provided the capital.
```

17

1  Q.   Can you tell me if you can remember and if you
2  can go in chronological order what positions you held
3  with MHCS?
4  A.   Well, I was really just a board member and
5  stockholder for -- we started it around 1980, and I
6  remained in that role until probably '92, somewhere
7  around that period.  And only around '92, '93 did I play
8  an active role.
9      But even that was not full time.  I was not
10 involved with the managing of the company at all in the
11 period of '94 to the late '90s.  I may be off on that.
12 And I wasn't involved with any aspect of day-to-day
13 activities from mid '98 forward.
14 Q.   Any aspect at all from mid '98 forward?
15 A.   I had no responsibilities.
16 Q.   Leaving aside the issue of whether you
17 actually had responsibilities, did you have any input
18 into day-to-day operations of the company at any time
19 from '98 forward?
20 A.   Not in terms of operations, no.
21 Q.   What input did you have with respect to MHCS
22 from '98 forward?
23 A.   The only area that I had involvement in was
24 making introductions for banking relationships.  I had

18

1  no involvement with the aspects of the business and
2  health care providing.
3      MR. ACETO:  I need to talk to him about an
4  issue.
5      (Witness confers with counsel.)
6  BY MR. TUMILTY:
7  Q.   Who would you say was responsible for the
8  day-to-day operations at MHCS during 1998 and 1999?
9  A.   Indy Edwards.
10 Q.   Anyone else?
11 A.   Pam Jones was the controller.
12 Q.   Is it your belief that both of those people
13 were responsible for the day-to-day operations of MHCS
14 from 1999 until MHCS ceased to exist?
15 A.   Yes.
16 Q.   Were you ever employed by MHCS?
17 A.   Yes, but it was prior to '98.
18 Q.   When were you employed by MHCS?
19 A.   I don't know the exact dates.  It would have
20 been somewhere in the 92 or '93 or '97.
21     MR. ACETO:  I want to make sure the
22 question is not whether he was a board officer or
23 member.
24     MR. TUMILTY:  Employed.

19

1      MR. ACETO:  Getting a W-2?
2      MR. TUMILTY:  Right.
3  BY MR. TUMILTY:
4  Q.   In what position were you employed by MHCS?
5  A.   I guess I was the president.
6  Q.   When you say you guess you were the president,
7  are you unsure of whether you were the president?
8  A.   Well, in '95 -- I know I wasn't in '95 and '96
9  because that's when I had another person that was the
10 president.  It was probably '92 to '95 that I -- there
11 was someone else that ultimately was terminated and I
12 might have stepped in for a short period of time, but it
13 wasn't, I wasn't in that role for any long period of
14 time.
15 Q.   Do you know who the president of MHCS was in
16 2000 and 2001?
17 A.   Indy Edwards.
18 Q.   Other than being the president of MHCS for
19 some period of time, were you employed in any other
20 capacity by MHCS?
21 A.   No, not that I recall?
22 Q.   You were a member of the board of MHCS?
23 A.   Yes.
24 Q.   For what period of time were you a member of

20

1  the board of MHCS?
2  A.   I think the entire time of existence.
3  Q.   Were you chairman of the board the entire time
4  that MHCS existed?
5  A.   I believe so.
6  Q.   Do you remember how many people were generally
7  on the board of MHCS?
8  A.   I think it was three.
9  Q.   Can you tell me who else was on the board of
10 MHCS besides yourself?
11 A.   Myself, my wife and one other member.  The
12 other member changed from time to time.
13 Q.   And you mentioned that you were also a
14 stockholder of MHCS.  Were you a stockholder of MHCS
15 during its entire period of existence?
16 A.   Yes.
17 Q.   And were you the majority stockholder during
18 that entire period?
19 A.   I think between myself and my wife we were.
20 Q.   On a percentage basis, do you recall how much
21 your wife and you owned of the stock of MHCS?
22 A.   At what point?
23 Q.   Did it change over time?
24 A.   Yes, it did.

21

1    Q.    Say the 2000 to 2002 time frame?

2    A.    I don't know for sure, but both Jones and

3    Edwards had stock, and I think they might have owned

4    between five and 10 percent each.

5    Q.    Other than yourself, your wife, Jones and

6    Edwards, were there any other stockholders of MHCS in

7    the 2000 to 2002 time frame?

8    A.    No.

9    Q.    I believe you said earlier one of the things

10   you did was introductions to banking relationships for

11   MHCS?

12   A.    Well, I did that back in the period of --

13   prior to '98, that was really the primary role that I

14   played.

15   Q.    Did you introduce Heller to MHCS or vice

16   versa?

17   A.    No, Heller had contacted Managed Healthcare.

18   Actually, I can't remember the person's name who was

19   trying to introduce Heller to Managed Healthcare, but

20   Heller was not a contact man.

21   Q.    Did you leave MHCS before it ceased to exist?

22          MR. ACETO:  You mean turn in his shares,

23   resign from the board?

24   BY MR. TUMILTY:

22

1    Q.    Resign from the board?

2    A.    Well, at the time that the company was

3    dissolved, my wife and I were still stockholders and on

4    the board, but there wasn't any active involvement.

5    Q.    I'm not trying to trick you, but at some point

6    you went out on disability.  At the time you went out on

7    disability, was MHCS still in existence?

8    A.    Yes.

9    Q.    Was your reason for leaving MHCS because you

10   were going out on disability?

11   A.    No.  I had some very significant medical

12   problems.  Managed Healthcare at that time was

13   functioning very well.

14   Q.    The significant health problems you just

15   referred to, were those the ones you referred to

16   earlier?

17   A.    Yes.

18   Q.    In the 2000 to 2002 time frame, do you believe

19   you had any responsibilities with respect to MHCS?

20   A.    No.

21   Q.    When was the last time that you would say that

22   you had responsibilities with respect to MHCS?

23   A.    It was prior to sometime in '98.

24   Q.    Why do you pick that as kind of the cut-off

23

1    time?

2    A.    Because that's when my medical condition was

3    the most severe, and I needed a major time out.

4          MR. TUMILTY:  We'll mark this as Exhibit

5    1.

6          (Document marked for identification as

7    Exhibit No. 1.)

8    BY MR. TUMILTY:

9    Q.    Mr. Ingoldsby, I've handed you what the court

10   reporter marked as Exhibit 1.  It's a document entitled

11   Amended and Restated Unconditional Guaranty of Payment

12   and Performance.  Do you recognize that document?

13   A.    I'd have to read the whole thing, but it looks

14   familiar.

15   Q.    If you turn to the last page, it should have a

16   Bates number in the lower right corner of Jones 1499?

17   A.    Yes.

18   Q.    Is that your signature on each of those lines?

19   A.    Yes.

20   Q.    If you turn to the page before that, 1498, is

21   that your signature on the line above the typed name?

22   A.    Yes.

23   Q.    Do you have any recollection as to whether you

24   read this document before you signed it?

24

1    A.    I'm sure I did.

2          MR. TUMILTY:  We'll mark this as Exhibit

3    2.

4          (Document marked for identification as

5    Exhibit No. 2.)

6    BY MR. TUMILTY:

7    Q.    I'm handing you what the court reporter marked

8    Exhibit 2, Debtor-In-Possession of Loan and Security

9    Agreement By and Between Managed Healthcare Systems,

10   Inc. and Medical Temporaries, Inc., Borrowers, and

11   Heller Healthcare Finance, Inc., lender, dated February

12   28, 2001.  Do you recognize that document?

13   A.    Yes.

14   Q.    If you would please turn to page 51.  It's two

15   pages from the back.  Is that your signature on the

16   document above your typed name?

17   A.    Yes.

18   Q.    Do you know if you read this document before

19   you signed it?

20   A.    No, I don't.

21   Q.    Would it normally be your practice to read

22   documents before you sign them?

23   A.    Well, I was relying on my wife at the time.

24   In this particular document, neither one of us --

25

1   there's a section in here that Greg just pointed out,
2   Section 10.16, that we don't think was in whatever we
3   signed. We both are of the opinion that this was a fax
4   page and this is what we signed, not attached to any
5   other document. That's our belief.
6       Q.   By that you mean page 51?
7       A.   Yes.
8       Q.   So you believe at the time you signed, it's
9   your testimony that at the time you signed page 51, it
10  was a single page and not attached to anything else?
11      A.   Correct.
12      Q.   Were you advised to sign this document by
13  anybody?
14      A.   My wife was involved at the time, but I just
15  don't recall who the lawyers were that were involved. I
16  don't remember if it was Greg or someone else. All I
17  know is that we never agreed and never had a discussion
18  about a guaranty and it ends up in the document.
19      Q.   Who did you discuss the debtor-in-possession
20  security agreement with other than your wife?
21      A.   There was a law firm that was involved,
22  Hannify & King. It might have been someone there or it
23  might have been Greg. I just don't remember.
24      Q.   Do you know if you had an attorney

26

1   representing you personally in connection with the
2   debtor-in-possession loan and security agreement?
3       A.   I did.
4       Q.   Who was that?
5       A.   I don't remember his name. Greg would know.
6       Q.   Was it an attorney located here in Boston?
7       A.   Yes.
8       Q.   Do you recall the law firm that attorney works
9   with?
10      A.   No.
11      Q.   Why would you have signed a signature page
12  document, namely page 51, without it being attached to
13  anything else?
14      A.   Well, my wife and I believe we saw drafts of
15  the agreement or our attorneys saw drafts. I know
16  papers were being exchanged. The signature page was
17  faxed to us wherever we were and we signed a single
18  page. That's what we believe.
19          You have to understand that my arrangement or
20  my wife's arrangement with Heller was there would be no
21  personal guaranty, and they agreed to that. So why
22  would I or my wife agree particularly when the company
23  is in difficult straits, agree to a personal guaranty?
24  It wouldn't have happened in a million years.

27

1       Q.   And your memory is clear on that?
2       A.   It's seared in my memory. That's been a
3   subject of discussion over and over.
4       Q.   Why do you say Heller agreed you or your wife
5   would not have to give a personal guaranty?
6       A.   Because he did agree to that, and we have it
7   in writing.
8       Q.   Where is it in writing?
9       A.   It's in the documents we gave you.
10      Q.   I'm not trying to sound sarcastic, but you're
11  sure of that, it's in writing in some of the documents
12  you gave us?
13      A.   Absolutely.
14      Q.   Do you recall the name of that document or
15  what it relates to?
16      A.   You can go off the record and talk to Greg and
17  get that answer.
18      Q.   I can't. I need to get your testimony. If
19  you can't answer, you can't answer it.
20      A.   I can't give you the name, but I could go
21  through all the documents and find it for you.
22      Q.   But it's in a document that you produced?
23      A.   Yes.
24      Q.   Do you recall where you were when you signed

28

1   page 51?
2       A.   I think that my wife and I were at Hannify &
3   King, but I really don't know. When all that was going
4   on, we spent a lot of time there at Hannify & King.
5   Maybe I'm just guessing at that.
6       Q.   Do you know if Hannify & King had the final
7   debtor-in-possession agreement in its possession while
8   you were there?
9           MR. ACETO: Objection.
10  BY MR. TUMILTY:
11      Q.   I'll restate that. Your memory or your belief
12  is that you signed page 51 of Exhibit 2 while you were
13  at the offices of Hannify & King?
14      A.   I don't have a clear memory. All I know is
15  almost everything surrounding the bankruptcy took place
16  there. I don't have a clear memory.
17      Q.   Who was Hannify & King representing in that
18  bankruptcy?
19      A.   Managed Healthcare.
20      Q.   They didn't represent you personally?
21      A.   No.
22      Q.   Did anyone from Hannify & King discuss the
23  idea of a personal guaranty with you or your wife?
24      A.   No.

29

1    Q.    Do you recall an October 2001 meeting that you
2    participated in with representatives of Heller
3    concerning the overstatement of Medicare payments?
     A.    I don't remember the date, but I do remember
5    going to that meeting.
6    Q.    Tell me what you remember about that meeting.
7    A.    I remember that Indy and Pam, Indy Edwards and
8    Pam Jones had raised an issue with Heller about the
9    borrowing base and the components that were being
10   calculated into the borrowing base.
11        It dealt with a new methodology that was
12   adopted by Medicare. I don't remember the technical
13   name, but it had to basically estimate what the value of
14   your services would turn out to be on a certain patient.
15   You would book those revenues accordingly.
16        They felt that they were booking more than
17   what they should be booking, and they talked to Heller
18   about it. And right before that meeting — there wasn't
19   any big consternation. If anything, Heller was coming
20   up to visit with them. Heller had done the audits and
21   had been satisfied.
22        That day, because they wanted me to be there,
23   I went over. And Heller had their attorney, two of
24   their health care guys, lenders, I think they had four

30

1    people in total. And, of course, the people that run
2    Managed Healthcare were there, Indy Edwards and Pam
3    Jones and I think someone else.
4         There was a discussion that they all had about
5    the borrowing base and different ways to interpret what
6    they were basically including in it. At the end of that
7    meeting, Heller was satisfied that although there was
8    some overstatement, there wasn't any big problem.
9         And in fact, they came up with a creative way,
10   I can't remember exactly what it was, but it was to
11   reach out to future services and pull those into the
12   present. So there was no crisis that was a part of that
13   meeting at all.
14        It was a very pleasant meeting and it lasted
15   about an hour and a half and they served lunch in the
16   office and I left. There wasn't ever any mention of a
17   problem by Heller. In fact, some of the documents that
18   you should have show the correspondence where they even
19   made suggestions as to how to enhance the borrowing
     base.
20        So that's what that meeting was all about.
21   You know, it becomes a focal point for the later
22   litigation.
23
24   Q.    Which later litigation?

31

1    A.    Heller sued me and my wife.
2    Q.    In giving that answer, at one point you said,
3    and I think it is pretty close, I'm not trying to hold
4    you to it, you said they wanted you there at this
5    meeting?
6    A.    Right.
7    Q.    Who is the "they"?
8    A.    Indy and Pam.
9    Q.    Did they tell you why they wanted you there?
10   A.    Because I was the major stockholder and
11   chairman.
12   Q.    Did they tell you any other reason why they
13   wanted you there?
14   A.    No.
15   Q.    Do you know if Heller had requested that you
16   be at the meeting?
17   A.    I don't know that.
18   Q.    Why were you at the meeting?
19   A.    Well, at this point -- it represented a very
20   big investment of my wife and myself and this was an
21   issue that wasn't insignificant. So I went over and I
22   was satisfied when I left there that the issue was
23   resolved.
24   Q.    Other than what you just said, is there any

32

1    other reason why you were at the meeting?
2    A.    No. I didn't play any role.
3    Q.    At some point did Pam Jones inform you of the
4    results of an audit concerning the borrowing base
5    certificates?
6    A.    Probably. I mean, do you mean in a negative
7    sense?
8    Q.    Either negative or positive. Did she tell you
9    there had been an audit done of the borrowing base
10   certificates?
11   A.    I know Heller sent auditors in there all the
12   time, so that wouldn't be unusual.
13   Q.    How do you know that?
14   A.    I just know because Pam would tell me.
15   Q.    Why would she tell you that?
16   A.    I mean, I used to get reports faxed to my
17   house. We did own the company. I mean, I knew the
18   general health of the company, and I in general knew
19   what was going on.
20   Q.    At some point did Pam Jones tell you she would
21   no longer certify the borrowing base certificates?
22   A.    She told that to Indy Edwards.
23   Q.    Did Indy Edwards then tell you that?
24   A.    I think so.

33

1    Q.    At some point you learned that?

2    A.    Right.

3    Q.    Do you know or were you told why Pamela Jones

would no longer certify the borrowing base certificates?

5    A.    For the same reasons that I talked about. She

6    felt they were recognizing more revenue from cases, when

7    the cases were finished they wouldn't produce that kind

8    of revenue.

9    Q.    Do you know who Michael Gardulo is?

10   A.    Yes.

11   Q.    He was the vice president at Heller, correct?

12   A.    Right.

13   Q.    And at some point did you tell Pamela Jones to

14   contact Mr. Gardulo about the fact that she would no

15   longer sign the borrowing base certificates?

16   A.    I don't remember doing that.

17   Q.    You have no memory of that at all?

18   A.    I know she talked to him and I could have, but

19   I just don't remember.

20   Q.    Do you have any memory of telling her to

21   contact him?

22   A.    No.

23   Q.    Are you aware that Pamela Jones recommended to

24   Michael Gardulo that he talk to you for an explanation

34

1    as to how the borrowing base certificates were being

2    calculated?

3    A.    She wouldn't do that, because she knows I

4    never had anything to do with that.

5    Q.    At some point did Mr. Gardulo call or

6    communicate with you in some fashion in order to get an

7    explanation as to how the borrowing base certificates

8    were being calculated?

9    A.    He called me but I don't remember -- they

10   wouldn't come to me with that kind of a question because

11   I had no involvement with that.

12   Q.    When you say that he called you, what did Mr.

13   Gardulo call you to discuss?

14   A.    The only thing that I remember was the time

15   when the company was in bankruptcy, and they were trying

16   to work a loan for Indy and Pam to buy the company. And

17   he wanted, I think he wanted me to remain on personal

18   guarantees for one portion of the loan -- I'm not sure

19   exactly which part it was.

20       But I wasn't willing to do, there was

21   something I wasn't willing to do during that period of

22   time. And then it was shortly after that that they went

23   into court and, the bankruptcy court, and basically told

24   judge, you know, they were going to file a motion of

35

1    default.

2    Q.    The they was Heller?

3    A.    Um-hum.

4    Q.    Do you remember having any communications with

5    Mr. Gardulo as to how the borrowing base certificates

6    were being calculated?

7    A.    Well, I think that he was at that meeting that

8    they held. I think that was really the subject.

9    Q.    Leaving that meeting aside, because you

10   already told me about that meeting, do you recall any

11   other communications between you and Mr. Gardulo

12   concerning the calculation of the borrowing base

13   certificates?

14   A.    No, I don't remember specifically. But I do

15   know that when things were falling apart, Gardulo was

16   calling often.

17   Q.    Was he calling you?

18   A.    Yes.

19   Q.    And do you have any recollection of the type

20   of things that you would discuss when he would call you

21   when things were, to use your phrase, "falling apart?"

22   A.    I don't remember really at all.

23   Q.    You're aware that National Union provided

24   insurance coverage to MHCS?

36

1    A.    Yes.

2    Q.    Did you have any role in obtaining that

3    coverage during any period of time?

4    A.    Other than I told Indy and Pam Jones that we

5    had to have that. That followed a period of time when

6    we regretted not having it for this other sexual

7    harassment case.

8    Q.    Other than telling Indy and Pam -- and I

9    assume you mean directors and officers liability?

10   A.    Right.

11   Q.    Other than telling Indy Edwards and Pam Jones

12   that MHCS needed to obtain directors and officers

13   liability, did you play any other role in the actual

14   obtaining of the policies?

15   A.    No.

16   Q.    Prior to their issuance, did you ever have any

17   communication, you personally, with National Union

18   regarding any directors and officers policies that had

19   been issued to MHCS?

20   A.    No.

21   Q.    Prior to National Union issuing any directors

22   and officers liability policies to MHCS, did you ever

23   have any communications with IIG about that?

24   A.    Yeah, early on. Probably back in the early

37

1    '90s.

2    Q.    Do you know when National Union first started

3    providing MHCS with directors and officers liability

4    coverage?

5    A.    No.

6    Q.    I just want to make sure you were clear on the

7    question I asked you two questions ago.  When you

8    responded early on in the early '90s, that was in

9    response to a question I had asked you as to whether you

10   ever had any communications with IIG about policies that

11   National Union was going to issue with respect to MHCS.

12   Did you understand the question to be that?

13   A.    I don't ever remember having a conversation

14   with anyone at International about National.

15   Q.    That's what I was trying to get to.  So when

16   you said in the early '90s, were you talking about

17   policies with some other insurer?

18   A.    Yes.

19   Q.    Thank you for telling me that, but that's not

20   what I'm focused on.  So it's your testimony to the best

21   of your memory you never had any communications with

22   anyone at IIG concerning policies that National Union

23   was going to issue?

24   A.    People with National or people with IIG?

38

1    Q.    Yes.

2    A.    No, I never did.

3         MR. ACETO:  I think what he's saying is he

4    didn't necessarily say he wanted National Union's policy

5    but he did meet with National regarding a D & O policy.

6         THE WITNESS:  No --

7    BY MR. TUMILTY:

8    Q.    Did you have any communications with IIG say

9    from 2000 on concerning the purchase of D & O coverage

10   for MHCS?

11   A.    I just don't remember it.  I mean, I gather

12   from Greg that I might have, but I don't remember it.

13        MR. ACETO:  Can we go off the record for a

14   minute?

15        (Witness confers with counsel.)

16   BY MR. TUMILTY:

17   Q.    So --

18   A.    I still don't remember.

19   Q.    Who at MHCS would deal with IIG in order to

20   obtain directors and officers liability insurance?

21   A.    It would have been Indy Edward and Pam Jones.

22   Q.    And do you know if anyone at MHCS dealt

23   directly with National Union in obtaining directors and

24   officers insurance?

39

1    A.    No, I don't know.

2         MR. TUMILTY:  We'll mark this as Exhibit

3    3.

4         (Document marked for identification as

5    Exhibit No. 3.)

6    BY MR. TUMILTY:

7    Q.    I'm handing you what the court reporter marked

8    as Exhibit 3.  It's an affidavit of Pamela Jones in

9    Civil Action 02 CV 11553 NG.  The pages are numbered at

10   the bottom and please turn to page nine.  Do you know if

11   that's Pamela Jones' signature?

12   A.    It looks like it to me.

13   Q.    If you turn to page seven.  I had asked you

14   earlier if you were aware that Pam Jones recommended to

15   Mr. Gardulo that he speak to you as to an explanation of

16   how the borrowing base certificates were being

17   calculated?

18   A.    Um-hum.

19   Q.    You said she wouldn't have done that.  If you

20   look at the paragraph 30 on that page, the second

21   sentence states, "Mr. Gardulo began to probe me for

22   details that I felt should be directed to Mr. Ingoldsby,

23   and I advised Mr. Gardulo that he should speak directly

24   to Mr. Ingoldsby."

40

1         Does that refresh your recollection at all as

2    to whether Pam Jones told Mr. Gardulo to speak to you

3    regarding the borrowing base certificates?

4    A.    No, it doesn't.  I think that, the only thing

5    I can tell you is it was probably at a time when Gardulo

6    was turning up the heat on her and she saying, "I'm not

7    going to certify.  You need to go to someone else."  I

8    would guess that's what she was doing.

9    Q.    The bankruptcy that we have been referring to,

10   that was the MHCS bankruptcy, correct?

11   A.    Correct.

12   Q.    At some point you filed personal bankruptcy,

13   correct?

14   A.    Correct.

15   Q.    And do you recall when you did that?

16   A.    I think it was December of '02.

17   Q.    Can you tell me why you initiated bankruptcy

18   proceedings, what precipitated that?

19   A.    Well, I just had -- this whole situation with

20   Heller was overwhelming.  I thought I had coverage

21   through my D & O policy at Managed Healthcare.  National

22   turned it down.  I was footing a lot of legal bills.

23   Heller claimed that I owed, I forget what the number

24   was, but I think the total was like a million four or

41

1  something like that.

2      They were claiming I had guaranteed the

3  bankruptcy, the DIP loan. I just, I was left without

4  any choice. I mean, it was just overwhelming.

5      Q.  When you say you thought you had coverage and

6  National had turned it down, you were aware of that

7  prior to filing your bankruptcy, correct?

8      A.  I think so.

9      Q.  And I believe one of the other things you

10  mentioned was that Heller was claiming that you had

11  guaranteed the DIP loan?

12      A.  Correct.

13      Q.  I think another thing you said is something

14  that developed or something precipitating you filing the

15  bankruptcy was you had a lot of legal bills?

16      A.  Relating to this matter.

17      Q.  By "this matter," what do you mean?

18      A.  The Heller lawsuit.

19      Q.  Would you agree with me that one of the

20  reasons generally for filing bankruptcy is in order for

21  the debtor to get a fresh start?

22      A.  I suppose that's true. In some cases.

23      Q.  Do you also understand that as part of a

24  bankruptcy it's not unusual for there to be payments to

42

1  creditors?

2      A.  I understand that.

3      Q.  Was a trustee appointed in your personal

4  bankruptcy?

5      A.  Yes.

6      Q.  Do you remember the name of that trustee?

7      A.  I think his name is Harpley.

8      Q.  Do you recall what his first name is or where

9  he's located?

10      A.  Tampa.

11      Q.  Tampa, Florida?

12      A.  Yes.

13      Q.  Do you happen to know whether he's an

14  attorney?

15      A.  I don't know.

16      Q.  Were you represented by an attorney in your

17  personal bankruptcy?

18      A.  Yes.

19      Q.  Who was that?

   A.  Michael Brundage.

   Q.  You're aware that as part of your bankruptcy

22  you were required to file schedules and statements of

23  financial affairs?

24      A.  Yes.

43

1      Q.  One of the things that was to be listed on

2  those schedules and statement of financial affairs was a

3  listing of your assets?

4      A.  Correct.

5      Q.  Another thing was a listing of any claims that

6  you had or may have?

7      A.  Yes.

8          MR. TUMILTY:  We'll mark this as the next

9  exhibit.

10          (Document marked for identification as

11  Exhibit No. 4.)

12  BY MR. TUMILTY:

13      Q.  Mr. Ingoldsby, I've placed in front of you

14  what the court reporter marked as Exhibit 4. It's a

15  document entitled Summary of Schedules filed January 2,

16  2003 with the United States Bankruptcy Court For the

17  Middle District of Florida. That was a document that

18  was filed in your bankruptcy, correct?

19      A.  Correct.

20      Q.  If you turn to the fourth page from the end,

21  it should say verification of creditor matrix?

22      A.  Yes.

23      Q.  Is that your signature on that page?

24      A.  Yes.

44

1      Q.  The page before that says Chapter 7 Individual

2  Debtor's Statement of Intention?

3      A.  Yes.

4      Q.  Is that your signature on that page?

5      A.  Yes.

6      Q.  If you turn to the page before that, is that

7  your signature at the bottom of that page?

8      A.  Yes, it is.

9      Q.  If you go to maybe seven or eight pages before

10  that, you get to a page that says Declaration Concerning

11  Debtor's Schedules?

12      A.  Yes.

13      Q.  Is that your signature on that page?

14      A.  Yes.

15      Q.  Do you recall how it came to be how the assets

16  that were listed in your schedules, which we've marked

17  as Exhibit 4, how those assets came to be selected as

18  the assets that that would be listed?

19      A.  It was laborious. We made up a long list and

20  met with the attorney and reviewed everything. And some

21  things we had forgotten, and I know he reminded us of

22  them. And it took a week to get it organized.

23      Q.  You didn't list any interest in any insurance

24  policies issued by National Union, correct?

45

1    A.    Correct.

2    Q.    That was a poor question on my part.  I want

3    to make sure the record is clear.  On the schedules that

4    you filed in your bankruptcy, you didn't list any

5    interest in any insurance policies issued by National

6    Union, correct?

7    A.    Correct.

8          MR. TUMILTY:  We'll mark this as the next

9    exhibit.

10         (Document marked for identification as

11   Exhibit No. 5.)

12   BY MR. TUMILTY:

13   Q.    Why didn't you list on your schedules that

14   were filed in your personal bankruptcy an interest in

15   any policy listed by National Union?

16   A.    Well, we discussed it, and my attorney didn't

17   see it as an asset.  But I'm looking at this letter and

18   I don't even know if the suit was filed -- this looks

19   like it was filed before -- can we go off the record for

20   a second?

21   Q.    You can go off the record to talk to your

22   attorney if you want to.  I'd like to leave that letter

23   aside for a second --

24   A.    I'll answer the question.  It came up and it

46

1    was discussed, also discussed with the trustee.  I never

2    saw it as an asset.  They didn't see it as an asset.

3    And as I sit here now, I'm trying to remember when --

4    this was the countersuit against Heller.

5    Q.    We'll get to that.

6    A.    I'm confused.

7    Q.    We've already established that you didn't list

8    in your bankruptcy schedules any interest in any

9    policies issued by National Union, correct?

10   A.    Correct.

11   Q.    And you said that it was discussed with your

12   bankruptcy attorney whether to list an interest in the

13   policy, correct?

14   A.    Correct.

15   Q.    And can you tell me what was said in those

16   discussions?

17         MR. ACETO:  I'm going to instruct him not

18   to answer that question.

19         MR. TUMILTY:  I believe that I'm entitled

20   to an answer.  I will put on the record I'm entitled to

21   an answer since you appeared to be relying on advice of

22   counsel defense as to why you did not list them in your

23   schedules.

24   BY MR. TUMILTY:

47

1    Q.    Is that the reason you did not list them in

2    your schedules, because of advice of counsel?

3          MR. ACETO:  You can answer that question.

4    BY MR. TUMILTY:

5    A.    Yes.

6    Q.    Can you tell me what you and your attorney

7    discussed relating to your bankruptcy schedules?

8          MR. ACETO:  If we can agree that the

9    waiver, which it would be, is going to be a waiver only

10   of that particular discussion and not anything else?

11         MR. TUMILTY:  I'll agree it's a waiver of

12   discussions or communications regarding that issue.

13         MR. ACETO:  Just this specific issue as to

14   whether to list the National Union potential claims

15   against National Union to cover or indemnify any

16   resulting damages?

17         MR. TUMILTY:  Yes, I'll agree to that.

18   BY MR. TUMILTY:

19   Q.    With that agreement, can you tell me what you

20   and your bankruptcy attorney discussed regarding the

21   issue of whether to list any potential claim of coverage

22   with respect to the National Union policy?

23   A.    I don't remember it being a lengthy

24   discussion.  It's just he didn't see it as an asset.  It

48

1    wasn't any, it wasn't any big deal discussion.  But he

2    did say that he would talk to the trustee about it.

3    Q.    Did you see it as an asset of your bankruptcy?

4    A.    No, absolutely not.

5    Q.    How did the issue even come up that you and

6    your attorney were discussing the issue of whether to

7    list an interest in the policy?

8    A.    Well, because there was a question about

9    litigation.  To be honest, I don't remember how that was

10   discussed.

11   Q.    Did you and your bankruptcy attorney have any

12   written communications about the issue of whether to

13   list an interest in the National Union policy on your

14   bankruptcy schedules?

15   A.    No.

16   Q.    Did you personally ever have any discussions

17   with the bankruptcy trustee regarding the issue of where

18   to list on your schedules an interest in the National

19   Union policy?

20   A.    No, but I was present when my attorney talked

21   with him.

22   Q.    How many time did your attorney talk to the

23   bankruptcy trustee about that issue?

24   A.    I don't know how many times.  I was there once

49

1    when I observed it.
2       Q.    Can you tell me what was discussed on the
3    issue of whether to list an interest in the National
4    Union policy on your schedules with the trustee?
5       A.    I don't remember the details. All I know is
6    that it was discussed, and there wasn't any suggestion
7    that it be, that the schedules be amended.
8       Q.    Do you have any memory of the trustee saying
9    that he did not think that any interest that you may or
10   may not have had in the National Union policy was an
11   interest that should be listed on your schedule?
12           MR. ACETO:  Please read it back.
13           MR. TUMILTY:  I'll rephrase it.
14   BY MR. TUMILTY:
15      Q.    When you said that there was never any
16   indication that anyone felt the schedules needed to be
17   amended, what I'm trying to find out is do you have any
18   memory of the trustee actually saying I don't think
19   that's an interest that needs to get put on these
20   schedules?
21      A.    I remember the outcome of the conversation.
22   That's all I remember is they discussed it. I don't
23   remember what his words were, but it was clearly
24   discussed and the conclusion was to do nothing.

50

1       Q.    Do you happen to know whether your attorney
2    had any written communications with the bankruptcy
3    trustee regarding the issue of whether to list an
4    interest in the National Union policy on your bankruptcy
5    schedules?
6       A.    I don't know.
7       Q.    I've handed you what the court reporter marked
8    as Exhibit 5. I want to ask a more general question
9    before that. Is it fair to say that you're contending
10   in this action that National Union wrongfully denied
11   coverage to you?
12      A.    Yes.
13      Q.    And can you tell me what you believe they
14   wrongfully denied coverage with respect to, what is it
15   they should have provided coverage for?
16           MR. ACETO:  Which count in the Complaint?
17           MR. TUMILTY:  I'll get to that.
18   BY MR. TUMILTY:
19      A.    Well, I think that -- I believe a directors
20   and officers insurance policy should have covered
21   directors and officers who were falsely claimed by
22   Heller in this case and very egregious behavior by
23   Heller that we should have had our defense coverage.
24           That's really all we cared about at the time,

51

1    just getting our defense. Without the defense coverage,
2    you know, my whole world fell apart.
3       Q.    I'm not trying to drag you through painful
4    memories. I need a frame of reference. Fair to say
5    that you believed you were entitled to coverage from
6    National Union with respect to the lawsuit that Heller
7    brought against you?
8       A.    Correct.
9       Q.    Do you recall what the claims were that Heller
10   brought against you?
11      A.    Not all. I know that they claimed there was
12   negligence and breach of guaranty. And I have the
13   documents to show there was no guaranty. And the
14   subject of negligence, I know how Indy and Pam worked.
15   They are two very honest people, super honest. I know
16   this was all a game that Heller was playing, and
17   everything unfolded the way Heller wanted it to unfold.
18           And there wasn't any negligence. There
19   absolutely wasn't any, not even an ounce of negligence.
20   These two ladies were squeaky clean, and we should have
21   had some help in defending ourselves. And we didn't get
22   that. It ruined three people.
23      Q.    I understand that you're not a lawyer, but do
24   you believe that National Union was required to provide

52

1    coverage for all of the claims that Heller brought
2    against you?
3       A.    I don't know. I don't have the memory to know
4    what the counts were at this point. I guess from my
5    point of view, I think in terms of when you spend
6    $20,000 for a directors and officers premium for a year
7    and you basically don't get anything for it, it just
8    seems unfair.
9       Q.    Earlier you mentioned that you recall there
10   was a negligence claim and breach of guaranty claim. Do
11   you believe that National Union should have provided
12   coverage for the negligence claim?
13      A.    Absolutely.
14      Q.    Do you believe that National Union should have
15   provided coverage for the breach of guaranty claim?
16      A.    I think National Union should have at least
17   inquired -- for a company that paid $20,000 to say no
18   and not even listen, all they would have to do is look
19   at the documentation that I have that shows there's no
20   guaranty.
21           And they should have stepped in to help us
22   defend ourselves. They never even tried to learn. They
23   just basically said no.
24      Q.    You addressed the negligence claim. I'm

53

1    trying to get to the issue of whether you think they
2    should have stepped in, in your words, and provided
3    coverage and done something with respect to the breach
4    of guaranty claim.
5        A.    First of all, I don't know whether that would
6    be covered or not. I don't know. All I know is that, I
7    know the negligence subject they should have provided
8    some defense on that. I think, I could be wrong, I
9    would think the breach of guaranty would fall in the
10   same category, but I just don't know.
11       Q.    If you could look at Exhibit 5 in front of
12   you. It's a letter dated August 2, 2002 from Gregory
13   Aceto to National Union. Have you seen that document
14   before?
15       A.    I don't remember it, but I'm sure I must have.
16       Q.    Do you believe this document is related to the
17   lawsuit that Heller filed against you?
18       A.    Yes.
19       Q.    Do you recall when Heller filed the lawsuit
20   against you?
21       A.    No, I don't.
22       Q.    If I told you that suit was filed on August 1,
23   2002, would you have any reason to doubt that?
24       A.    No.

54

1        Q.    Do you know if you discussed Exhibit 5 with
2    Gregory Aceto before he sent that letter to National
3    Union?
4        A.    I'm sure, but I just don't recall.
5        Q.    Do you recall when you personally first became
6    aware of the lawsuit that Heller had filed against you?
7        A.    Not really. I would guess that I was served
8    at my home.
9        Q.    But you have no memory of when that would have
10   been?
11       A.    Not really.
12       Q.    Do you believe it would have been prior to the
13   time that Attorney Aceto sent Exhibit 5 to National
14   Union?
15       A.    Didn't you just say they filed it August 1?
16       Q.    Yes.
17       A.    I just don't remember. I don't have any
18   reason to doubt that though. I don't know what you're
19   getting at.
20       Q.    I'm just trying to get at when you first
21   became aware of the lawsuit. Is it fair to say that you
22   must have been aware of the lawsuit prior to the day
23   that Attorney Aceto sent Exhibit 5 on your behalf?
24       A.    If the lawsuit was filed on the first and this

55

1    was done on the second, it would seem that you would
2    have to have some foreknowledge, but I don't remember
3    it.
4        Q.    Leaving aside you don't remember specifically
5    when you first became aware of the lawsuit, whenever
6    that was, were you aware at that time that you had been
7    named as a defendant?
8        A.    Yes.
9        Q.    And were you aware of what the allegations
10   were against you?
11       A.    I remember it was a misrepresentation and the
12   breach of guaranty.
13       Q.    And you believed you were served with the
14   lawsuit at your home?
15       A.    I don't know. I just don't remember where.
16       Q.    When you first received a copy of the
17   Complaint, did you read it?
18       A.    I'm sure I did.
19       Q.    And by the Complaint, I meant the Complaint of
20   Heller against you?
21       A.    Right.
22       Q.    After reading that Complaint, were you aware
23   Heller was seeking monetary damages against you?
24       A.    Yes.

56

1        Q.    And do you recall how much those alleged
2    damages were?
3        A.    Not specifically, but I know it was in the
4    millions of dollars and treble damages.
5        Q.    And after you read the Complaint the first
6    time, you were aware that Heller was seeking to have you
7    personally held liable, correct?
8        A.    Correct.
9        Q.    At that time did you consider that there was a
10   possibility that you might have to pay some amount of
11   money to Heller as a result of their lawsuit against
12   you?
13       A.    I think anyone who is sued thinks you might
14   have to end up having to pay. That doesn't make it
15   right.
16       Q.    I understand that. I'm simply asking if at
17   the time when you finished reading the Complaint, did
18   you think that there was a possibility that you would
19   have to at some point pay some money to Heller either by
20   way of settlement or judgment?
21       A.    Well, no. I mean, I knew that I didn't owe
22   anything. Whether this whole thing worked against me
23   and I ended up being stuck with something is an entirely
24   different matter. All I know is that there was nothing

57

1    that was done that was wrong. And I knew I was dealing
2    with some highly unethical people, so I don't know what
3    the outcome would be.
        Q.    And by the highly unethical people, you're
referring to the people at Heller?
6    A.    Absolutely.
7    Q.    At the time that you were served with the
8    lawsuit, you believed you had insurance coverage under
9    the directors and officers liability policy issued by
10   National Union?
11   A.    I thought I did.
12   Q.    And at the time that you were served with the
13   lawsuit, you believed that National Union had an
14   obligation to pay your defense costs in the suit by
15   Heller?
16   A.    Yes.
17   Q.    And at the time that you were served with the
18   lawsuit, did you also believe that if in the event a
19   judgment were ever entered against you in the suit by
20   Heller that National Union would be required to provide
21   coverage for that judgment?
22   A.    Yes, I think so.
23   Q.    As you sit here today, do you understand what
24   Exhibit 5 is requesting or asking for?

58

1    A.    Well, it's asking, the letter is basically
2    asking National Union to provide coverage for our
3    defense.
4    Q.    And did you understand that that was the
5    intent of the letter at the time that it was sent?
6    A.    I think so, yes.
7    Q.    And again, that's because, as you just
8    testified, you believed you had insurance coverage with
9    respect to the claims brought by Heller against you?
10   A.    Right.
11           MR. TUMILTY:  I'll mark this next.
12           (Document marked for identification as
13   Exhibit No. 6.)
14   BY MR. TUMILTY:
15   Q.    I handed you what the court reporter marked as
16   Exhibit 6. It's a two-page letter dated October 11,
17   2002 from Joseph O'Neil to Gregory Aceto. Do you know
18   if you've seen that document before?
19   A.    I believe so.
20   Q.    So you know when you first saw that document?
     A.    I don't know the date.
22   Q.    Do you know approximately when you first saw
23   the document?
24   A.    Shortly after that I would guess.

59

1    Q.    Shortly after October 11, 2002?
2    A.    Yes.
3    Q.    Did you read the letter at that time?
4    A.    I did.
5    Q.    And --
6    A.    Or I would have.
7    Q.    And do you believe that you understood what it
8    meant?
9    A.    Yes.
10   Q.    And was it your understanding that Mr. O'Neil
11   was saying that on behalf of National Union there was no
12   coverage with respect to the claims brought by Heller?
13   A.    Yes.
14   Q.    At that time did you believe Mr. O'Neil was
15   correct?
16   A.    No.
17           MR. TUMILTY:  We'll mark this as the next
18   exhibit.
19           (Document marked for identification as
20   Exhibit No. 7.)
21   BY MR. TUMILTY:
22   Q.    I've handed you what the court reporter marked
23   as Exhibit 7. It's an e-mail from Gregory Aceto to
24   Joseph O'Neil dated November 7, 2002. Have you seen

60

1    that document before?
2    A.    I don't recall seeing it.
3    Q.    Did you know that Attorney Aceto had sent this
4    e-mail?
5    A.    I just, as I sit here, I don't recall it at
6    all.
7    Q.    You have no memory of whether you asked Mr.
8    Aceto to write this e-mail?
9    A.    No. I didn't specifically ask him to write
10   this e-mail. I mean, we were obviously talking about
11   the subject matter. I just don't remember this.
12   Q.    You can take whatever time you need. Have you
13   had a chance to review the e-mail?
14   A.    Yes.
15   Q.    Do you agree with the contents of it?
16   A.    It was 1998, and I wasn't involved with the
17   day to day and I never had any involvement ever in
18   compiling borrowing base certificates. So that's
19   accurate. Other than the date, I think that I basically
20   sometime in the May, June '98 period -- that's off by
21   six months.
22   Q.    But you agree with the position expressed in
23   the last paragraph of the body of that e-mail that you
24   were an insured under the National Union policy and that

61

1 according to the position set forth here by Attorney
2 Aceto there was no applicable exclusion and that
3 National Union or AIG should be required to provide
  coverage and a defense to you?
  A.   I think so. This is cut off.
6 Q.   I apologize.
7 A.   He played an active role -- I assume that's no
8 active role. The word no is missing.
9 Q.   I'm focusing on the sentence that appears to
10 say, "Thus, he is an insured under the policy of
11 insurance and there are no applicable exclus should be
12 provided a defense by AIG, regardless of whether an
13 endorsement was or was not part of the policy (th still
14 remains unclear.)"
15     You agree with the sentiment that you should
16 have been provided coverage under the policy?
17 A.   Yes.
18     MR. TUMILTY: Let's mark this as Exhibit
19 8.
20     (Document marked for identification as
21 Exhibit No. 8.)
22 BY MR. TUMILTY:
23 Q.   I've handed you what the court reporter marked
24 as Exhibit 8. It's a document bearing Bates numbers IIG

62

1 00003 through IIG 00015. The first page of that Exhibit
2 8 is a fax cover sheet from International Insurance
3 Group to Gregory Aceto dated November 26, 2002. There
4 are enclosures with that fax after that. If you go two
5 pages in, there's another fax cover sheet dated July 31,
6 2001 to Pam Jones from Nicholas Sciotto at International
7 Insurance Group. Have you seen Exhibit 8 before?
8     MR. ACETO: In its entirety? There are
9 separate documents that I'm not quite sure if they came
10 together.
11 BY MR. TUMILTY:
12 A.   I've never seen the fax pages.
13     (Off the record discussion.)
14 BY MR. TUMILTY:
15 Q.   To clarify, what has been marked as Exhibit 8
16 here today consists of Bates numbers 0077 consecutively
17 numbered to 0088. It's your testimony that you've never
18 seen the first page of Exhibit 8 or the second page of
19 Exhibit 8 before?
20 A.   I just don't know. I can't tell you that I
   remember it. I mean, I could have.
22 Q.   If you go into the third page of Exhibit 8,
23 you'll see there's a letter dated July 27, 2001?
24 A.   Um-hum.

63

1 Q.   It's a two-page letter?
2 A.   Right.
3 Q.   Do you know if you've ever seen that letter
4 before?
5 A.   I don't know.
6 Q.   Do you know if you have ever seen any of the
7 pages before that are in Exhibit 8?
8 A.   All I can tell you is that I remember
9 requesting that Pam Jones send me a copy of the
10 directors and officers policy. I can't say that I
11 remember any of these pages. I wanted to make damn sure
12 we had a policy.
13 Q.   But you can't say sitting here today whether
14 you've seen any of these pages before?
15 A.   No. But that's part of my memory problem.
16 I've gone over a lot of documents on this case and I
17 could have, I just don't remember.
18 Q.   I understand that. I'm trying to get your --
19     MR. ACETO: The question was more about at
20 the time period, not whether he reviewed it in
21 preparation for litigation or something, is that right?
22     MR. TUMILTY: Right.
23     MR. ACETO: Did you understand that?
24     THE WITNESS: Yes.

64

1     MR. ACETO: It was when this was created
2 back in July of 2001 or sometime --
3     MR. TUMILTY: That's one question.
4 BY MR. TUMILTY:
5 Q.   Simply sitting here today, do you have any
6 memory of seeing this document before, Exhibit 8?
7 A.   I don't remember seeing, I don't today
8 remember seeing this. I do know that I had documents
9 about the D & O policy sent to me. I saw something. I
10 probably saw this. I just don't remember it today.
11 Q.   If you look at the first page of Exhibit 8,
12 the fax cover sheet to Gregory Aceto from International
13 Insurance Group, the body of the message there says,
14 "Attached is a copy of the quote sent to Pam Jones on
15 July 31, 2001. Please take note that the endorsement
16 noted 'For-Profit Health Care Amendatory Endorsement'
17 was disclosed to our client. This endorsement contained
18 the verbiage regarding Contractual Liability Exclusion.
19 Let me know if you require additional information." Do
20 you see that?
21 A.   I do.
22 Q.   And to your understanding, is the reference
23 there to "our client" MHCS?
24     MR. ACETO: If you know.

65

BY MR. TUMILTY:

1  BY MR. TUMILTY:

2      A.   I don't know.

3      Q.   Do you have any reason to doubt that it would
be MHCS given that the fax was concerning an original
quote to Pam Jones?

6      A.   I don't know.  I have no way of knowing.

7      Q.   Isn't the real reason that there was no
8  interest in the National Union policy listed on your
9  schedules in your bankruptcy because both you and your
10  attorney were aware of the contractual liability
11  exclusion and realized that you did not have coverage
12  for the Heller case?

13      A.   No.

14          MR. TUMILTY:  This will be next.

15          (Documents marked for identification as
16  Exhibit No. 9 and 10.)

17  BY MR. TUMILTY:

18      Q.   I've handed you what the court reporter marked
19  as Exhibit 10.  It's a one-page document dated November
20  5, 2002 bearing Bates number 0102.  Have you seen that
21  document before?

22      A.   I think so.  I'm not clear.

23      Q.   Do you have any understanding as to why
24  Attorney Aceto wrote that letter to International

67

1      Q.   I understand that you're not going to know an
2  exact date.  I'm just trying to get a frame of
3  reference.  Shortly afterwards is a bit ambiguous.  Do
4  you believe it would have been a matter of days that you
5  would have seen this letter after Attorney Aceto would
6  have received it?

7      A.   It's all guesswork.  All I know is that I have
8  seen this letter, but I don't have any reference in
9  time.

10      Q.   I take it that you don't have any idea when
11  you first saw this letter then?

12      A.   I mean, I'd be guessing.

13          MR. ACETO:  Don't guess.

14  BY MR. TUMILTY:

15      Q.   I don't want you to guess.

16      A.   I just don't know.

17          (Lunch recess.)

18          (Document marked for identification as
19  Exhibit No. 11.)

20  BY MR. TUMILTY:

21      Q.   Mr. Ingoldsby, I've handed you a one-page
22  document that the court reporter marked as Exhibit 11
23  with the Bates number 588 at the bottom.  Do you have
24  that in front of you?

66

1  Insurance Group when he did?

2      A.   It looks like he was looking for a meeting to
3  review the file.

4      Q.   And by "the file," what do you understand that
5  to be?

6      A.   I suppose as to the reason why we were denied
7  coverage.

8      Q.   I believe you have in front of you what the
9  court reporter marked as Exhibit 9?

10      A.   Yes.

11      Q.   A letter dated March 6, 2003 to Gregory Aceto
12  from Joseph O'Neil?

13      A.   Yes.

14      Q.   Have you seen that document before?

15      A.   Yes.

16      Q.   Do you recall when the first time was that you
17  saw this letter?

18      A.   No.

19      Q.   Do you believe it was shortly after March 6,
2003?

    A.   I would think so.

22      Q.   Do you believe it was within a week of March
23  6, 2003?

24      A.   I just don't know.

68

1      A.   I do.

2      Q.   Have you seen that document before?

3      A.   No.

4      Q.   Do you have any reason to doubt the accuracy
5  of it?

6      A.   No.

7      Q.   Do you have any recollection of listing Mr.
8  Aceto or his law firm as a creditor on your bankruptcy
9  schedules?

10      A.   Yes.

11      Q.   And do you recall approximately how much you
12  owed him at the time that you listed his law firm?

13      A.   I really don't.

14      Q.   Prior to you filing bankruptcy, can you tell
15  me what other legal fees you incurred in connection with
16  the Heller matter other than fees to Mr. Aceto's law
17  firm?

18          MR. ACETO:  Relating to the Heller matter
19  only or any legal fees?

20          MR. TUMILTY:  We'll start with Heller and
21  then go broader.

22  BY MR. TUMILTY:

23      A.   I don't remember any other law firm being
24  involved with the Heller matter.  As I sit here today, I

69

1  would guess that it would be just whatever I owe to the
2  Aceto law firm.
3      Q.   I know you identified earlier that you had
   been deposed in a different pieces of litigation and
   weren't exactly sure of the years in which those
6  happened.  Were there other legal fees that you were
7  incurring in say the year or two years leading up to
8  when you filed bankruptcy?
9      A.   No.  That was covered.
10     Q.   Can you tell me what the ultimate outcome of
11 the Heller action was with respect to you?
12     A.   We reached a settlement in the bankruptcy
13 court in Florida, and I had to come up with $250,000.
14 And it was split up between creditors, and how much
15 Heller got I think was something like, something in
16 excess of $100,000.
17          MR. TUMILTY:  We'll mark this next.
18          (Document marked for identification as
19 Exhibit No. 12.)
20 BY MR. TUMILTY:
21     Q.   I've handed you a document that the court
22 reporter marked as Exhibit 12.  It's a multi-page
23 document, Bates numbers 0112 through 0130.  Is that the
24 settlement agreement you were just referring to?

70

1      A.   Yes.
2      Q.   Do you know where the funds came from to fund
3  the settlement in the bankruptcy case?
4      A.   They all came from different sources, myself
5  and my wife.  We sold, we were forced to sell our house
6  in Florida and pulled some cash out of that.  That in
7  part was used.  We later refinanced a house in
8  Massachusetts and pulled cash out of that.  It was all
9  our money.
10     Q.   Do you know if any of the monies used to fund
11 the settlement with Heller came from places other than
12 assets that were considered part of your bankruptcy
13 estate?
14          MR. ACETO:  Objection.
15 BY MR. TUMILTY:
16     A.   You mean like borrowing from someone else?
17     Q.   Yes.
18     A.   No.
19     Q.   So all the funds that were used to pay the
   Heller settlement came in some fashion or another from
   assets that were either yours or your wife's?
22     A.   Right, or principally real estate.  And that
23 was disclosed.
24     Q.   To your knowledge, did the settlement that you

71

1  entered into with Heller resolve both the negligent
2  misrepresentation claim that they had brought and the
3  breach of guaranty claim?
4      A.   In terms of their claim against me?
5      Q.   Yes.
6      A.   Yes.
7      Q.   Did the settlement with Heller include both
8  you and your wife?
9      A.   Yes.  I'm pretty sure it was my wife.  Yes,
10 her name is in here.
11     Q.   Do you know how many settlement agreements you
12 entered into with Heller with respect to the litigation
13 against you?
14     A.   I thought it was just this.
15     Q.   I'm not suggesting there was another one.
16     A.   No, I think this is it.
17     Q.   To your knowledge, there isn't another
18 settlement agreement between yourself and Heller?
19     A.   No.
20     Q.   I can't remember what number you said went to
21 Heller, I think you said in the range of 110, 120,000?
22     A.   It's in the settlement agreement.
23     Q.   I'm not trying to put words in your mouth.
24 The amount that went to Heller, that's encompassed

72

1  within the $250,000 total?
2      A.   Yes.
3      Q.   Do you know what other creditors were paid off
4  pursuant to the settlement agreement that's been marked
5  as Exhibit 12?
6      A.   I don't think anyone has been yet.
7      Q.   Do you know if Heller has been paid under that
8  settlement agreement?
9      A.   Well, I don't know how I know this, but I
10 think recently I heard the monies hadn't been
11 distributed.  I think the case of Foster, as part of the
12 settlement agreement, I think he got his money up front.
13 But I think he's the only one.  To the best of my
14 knowledge, nothing has been distributed.
15     Q.   Do you know who is responsible for
16 distributing those settlement funds?
17     A.   I guess the trustee.
18     Q.   The bankruptcy trustee?
19     A.   Yeah.
20          MR. TUMILTY:  We'll mark this as Exhibit
21 13.
22          (Document marked for identification as
23 Exhibit No. 13.)
24 BY MR. TUMILTY:

73

1    Q.    Mr. Ingoldsby, I hand you what the court
2  reporter has marked as Exhibit 13. It's your First
3  Amended Complaint in Intervention in this action. Have
4  you seen that document before?
5    A.    Yes.
6    Q.    Did you review that document before it was
7  filed?
8    A.    Yes.
9    Q.    Please turn to paragraph 15 on page four. You
10  see it starts with Exclusion 4H?
11    A.    Um-hum, okay.
12    Q.    Is it your understanding that the language of
13  that provision is at least one of the reasons that
14  National Union has put forth as a basis for denying
15  coverage to you in the Heller matter?
16    A.    Yes, I understand that's their position.
17    Q.    I'm not asking you to agree with it. I'm
18  asking if you have that understanding?
19    A.    Yes.
20    Q.    If I refer to that as a contractual liability
21  exclusion for purposes of this deposition, can we agree
22  that's what I'm referring to?
23    A.    Okay.
24    Q.    If you look at paragraph 19, it states, "The

74

1  language of exclusion 4H, as amended, significantly
2  decreased, if not altogether eliminated, the value of
3  the policy to MHCS by excluding any claims arising from
4  contractual liability," do you see that?
5    A.    I do.
6    Q.    Do you agree with that?
7    A.    Yes.
8    Q.    And can you explain to me how the language of
9  Exclusion 4H would do what is alleged in paragraph 19?
10    A.    Well, basically it reduces the policy. You
11  pay $25,000 for it and you get nothing, absolutely
12  nothing for it. I don't think it can be any clearer
13  than that.
14    Q.    To your knowledge, would MHCS have purchased a
15  directors and officers liability policy with that type
16  of exclusion in it?
17    A.    Never. I didn't know about it.
18        MR. ACETO: I would like to talk to him
19  for a moment.
20        {Witness confers with counsel.}
21        MR. ACETO: He would like to clarify the
22  answer he gave after talking with me about it.
23        MR. TUMILTY: I'll just move on.
24        MR. ACETO: Okay.

75

1  BY MR. TUMILTY:
2    Q.    In the same exhibit, Exhibit 13, paragraph 18,
3  please review that paragraph to yourself.
4    A.    Okay.
5    Q.    It states, "Upon information and belief,
6  International failed to fully advise MHCS regarding the
7  language of the alleged exclusion and the effective said
8  exclusion on MHCS's liability coverage under the
9  policy."
10        Do you know what the basis is for that
11  paragraph?
12    A.    Yes. I mean, I had what I thought was a
13  long-term relationship with International. We had been
14  buying our insurance from them probably since 1990.
15  They obviously had, you know, an obligation to advise me
16  of things.
17        I never knew anything about such an exclusion.
18  I think International or National, someone, owed me an
19  explanation, and they should have brought it to my
20  attention.
21    Q.    You don't know for a fact that International
22  did not bring it to the attention of either Pamela Jones
23  or Indy Edwards, do you?
24    A.    No, I don't know.

76

1        MR. TUMILTY: We'll mark that as the next
2  exhibit.
3        (Document marked for identification as
4  Exhibit No. 14.)
5  BY MR. TUMILTY:
6    Q.    I've handed you what the court reporter has
7  marked as Exhibit 14. If you could take whatever time
8  you need and look through that document.
9    A.    I recognize it.
10    Q.    Exhibit 14 is a multi-page document bearing
11  Bates numbers 0131 through 0199. I will represent to
12  you that it is a document that was produced by your
13  counsel on your behalf in this action. You said you
14  recognized this document?
15    A.    Yes, it's an insurance policy, directors and
16  officers policy from National Union.
17    Q.    You'll see on the front page of Exhibit 14
18  that there's a policy period listed under item 3.
19    A.    Yes.
20    Q.    And it's August 4, 2000 to August 4, 2001?
21    A.    Yes.
22    Q.    Would you agree with me that this is the
23  policy immediately preceding the policy that's at issue
24  in this case?

77

1   A.   The policy that is at issue?

2   Q.   No, the one before that, the one for the prior

3  year?

4   A.   I'm really not sure how to answer that. I

5  mean, are you talking about the year prior to the time

6  that Heller sued?

7   Q.   Let me come about it a different way. In this

8  case, you're contending that a policy from National

9  Union provided coverage to you for the Heller action?

10   A.   Correct.

11   Q.   Do you know for what year that policy was in

12  effect?

13   A.   No, I don't recall.

14   Q.   For purposes of this deposition, I'll

15  represent to you that the policy that's in front of you,

16  Exhibit 14, is the one for the prior year.

17   A.   Okay.

18   Q.   Would you have gotten a copy of this policy?

19   A.   Yes.

20   Q.   When you would get copies of the directors and

21  officers policies, you were a named insured on them,

22  correct?

23   A.   I believe so.

24   Q.   When you would get copies of policies that had

78

1  been issued by National Union, would you read them?

2   A.   Yeah, but I wouldn't read every word.

3   Q.   Would you discuss them with anyone?

4   A.   I don't think I did.

5   Q.   You didn't discuss them with Pamela Jones or

6  Indy Edwards?

7   A.   No.

8   Q.   Did you discuss them with anyone at IIG?

9   A.   No.

10   Q.   Did you discuss them with an attorney at that

11  time?

12   A.   Not at that time.

13   Q.   I believe it's been your testimony that to

14  your knowledge none of the directors and officers

15  liability policies that National Union issued to or

16  provided to MHCS contained a contractual exclusion as we

17  saw it alleged in your Complaint?

18   A.   I don't think that's what I said. I said I

19  never knew at the time or I wouldn't have paid the

20  $25,000 or I wouldn't have allowed our company to spend

21  $25,000.

22   Q.   This is an important point, so I want to make

23  sure it's clear. Your testimony is you never knew that

24  a contractual liability exclusion may have been in the

79

1  policies issued by National Union?

2   A.   Correct.

3   Q.   Are you also contending the policies did not

4  contain a contractual liability exclusion?

5   A.   No, I'm not.

6   Q.   If you would turn to page, they are Bates

7  numbered in the middle, and go to page 0176. You'll see

8  that at the top of that page it says Endorsement 1?

9   A.   Okay.

10   Q.   And if you go to the second paragraph, there

11  is a subparagraph F, do you see that?

12   A.   Yes.

13   Q.   Do you know if you reviewed this paragraph at

14  the time you received a copy of Exhibit 14?

15   A.   No.

16   Q.   Please turn to page 0196. It says Endorsement

17  5 at the top?

18   A.   Yes.

19   Q.   There's a Roman numeral two, Amendments to

20  Exclusions, do you see that?

21   A.   Yes.

22   Q.   Do you know if you read the text that's in II

23  at the time you received a copy of Exhibit 14?

24   A.   I don't remember ever seeing it.

80

1   Q.   You're free to look at the exhibit if you need

2  to, but the two exclusions that I just showed you, were

3  you aware of their existence prior to me just showing

4  them to you right now?

5   A.   Yes.

6   Q.   When did you first become aware of their

7  existence?

8   A.   Sometime after National Union declined

9  coverage.

10   Q.   Prior to the time that you filed bankruptcy?

11   A.   Yes, I'm pretty sure that's the case.

12        MR. TUMILTY: I'll have this marked next.

13        (Document marked for identification as

14  Exhibit No. 15.)

15        (Brief recess.)

16  BY MR. TUMILTY:

17   Q.   I'm handing you a copy of what the court

18  reporter marked as Exhibit 15. It's a multi-page

19  document Bates numbered 0200 through 0271. Do you

20  recognize that document?

21   A.   I think so.

22   Q.   I'll represent to you that it's a document

23  that was produced to us in this case by your counsel on

24  your behalf.

81

1   A.   Okay.

2   Q.   Maybe that's why it has the Bates numbers in

3   this particular format there.  Can you tell me what it

4   is?

     A.   It's a policy issued by National Union to

6   Managed Healthcare Systems.  It's a directors and

7   officers insurance policy.

8   Q.   On the front page, there's a section item 3,

9   policy period August 4, 2001 through August 4, 2002?

10   A.   Yes.

11   Q.   Have you seen a copy of this before?

12   A.   Yes.

13   Q.   Did you see a copy on or about the time the

14   policy was issued?

15   A.   I'm sure that I saw it sometime after it was

16   issued.  A copy would have been sent to me.

17   Q.   Would it have been your practice to read a

18   copy of the policy when you received it?

19   A.   Not thoroughly but I would peruse.

20   Q.   Please turn to page 0247.  You'll see it says

21   endorsement No. 1 at the top and there's a No. 10,

22   Clause 4, do you see that?

23   A.   Yes.

24   Q.   And under that, there's a subsection F, do you

82

1   see that?

2   A.   Yes.

3   Q.   Please review that to yourself.

4   A.   Okay.

5   Q.   Do you know if you reviewed that section when

6   you first received a copy of Exhibit 15?

7   A.   No, I don't believe I did.

8   Q.   Do you have any memory of discussing Exhibit

9   15 with either Pamela Jones or Indy Edwards?

10   A.   No.  I would like to correct that.  I did not

11   until after the suit was filed and National Union

12   responded with the denial coverage.  Then we did discuss

13   it.

14   Q.   Did you discuss Exhibit 15 with both Indy

15   Edwards and Pamela Jones?

16   A.   Probably, but I don't know.

17   Q.   Tell me what you remember about discussing

18   Exhibit 15 with either Pamela Jones or Indy Edwards.

19   A.   This, of course, was after the response from

20   National Union.

     Q.   I understand.

22   A.   I remember talking about how National Union

23   really chose to interpret that section and that

24   basically the policy was worthless.  We had spent

83

1   $25,000 and neither one of them could tell me anything

2   that we would get for that $25,000.  Just about anything

3   that, almost, I can't think of anything that doesn't

4   somehow tie into a contract.  So it was that kind of

5   discussion.

6   Q.   Did either Pamela Jones or Indy Edwards

7   indicate to you that they were aware that that provision

8   or a provision like that was in the policy?

9   A.   I don't remember.

10   Q.   Did either Pamela Jones or Indy Edwards ever

11   indicate to you that they had discussed that type of a

12   provision, mainly a contractual exclusion provision,

13   with anyone from International?

14   A.   I don't remember.

15   Q.   Do you believe that the claims that Heller

16   asserted against you in the Heller action were somehow

17   related to a contract?

18   A.   Well, I think that the breach of guaranty was

19   not relating to the contract because there is no, there

20   was no guaranty.  So to that one I would say no.  If

21   they could produce a written guaranty, then I would be

22   proven wrong.  There isn't such a document.

23        As far as the negligence is concerned, I think

24   that, I know that there was not any negligence.  I think

84

1   it's how National Union chooses to interpret this is my

2   subject.  I think it should be covered.  You can't --

3   what good is the policy?  You are basically taking

4   25,000, and I can't come up with a single thing that

5   would be covered.  That's how I feel about it.

6        And that's what I told them after the

7   rejection from National Union came.  And they couldn't

8   think of anything that would be covered either.

9             MR. ACETO:  By them, you mean Pam and Indy

10   Edwards?

11             THE WITNESS:  Right.

12   BY MR. TUMILTY:

13   Q.   I understand that's how you feel about it and

14   that's what you believe.  You've already answered with

15   respect to the breach of guaranty count.  I know you've

16   said in your mind there was no negligence to support the

17   negligent misrepresentation count.

18        Do you believe the negligent misrepresentation

19   count was somehow related to or based on a contract?

20   I'm not asking you to agree there was negligence but

21   just what your view of that count is.  What do you think

22   that related to?

23   A.   I don't know.  I hadn't thought of it that

24   way.  I think that -- if you want to really go strictly

85

1 as National Union is choosing to go, you can say
2 everything is a contract. You can say, yeah, it's
3 contractual.
4       I mean, if we had a liability for, I don't
5 know, for a janitor that did something wrong, you had a
6 contract to clean the offices -- nothing is covered.
7 That's my problem. When I look at it, I just think, I
8 don't know what you're trying to get me to say -- I
9 don't know. All I know is that the whole thing is a
10 joke, total joke.
11    Q.    All I was trying to get you to say was
12 whatever your view was on that first count.
13    A.    That's my view.
14          MR. TUMILTY: We'll mark this next.
15          (Document marked for identification as
16 Exhibit No. 16.)
17 BY MR. TUMILTY:
18    Q.    I've handed you a copy of what was marked as
19 Exhibit 16. It's entitled Affidavit of Michael
20 Ingoldsby. There are certain exhibits attached to it.
21 Do you recognize that document?
22    A.    Yes.
23    Q.    Please turn to page six of Exhibit 16. Is
24 that your signature on that page?

86

1    A.    Yes.
2    Q.    Did you review this?
3    A.    I did.
4    Q.    If you would please turn to the second page.
5    A.    Yes.
6    Q.    You see there's a sentence at the top of that
7 page that says, "In fact, I have not been involved in
8 the operations of MHCS since 1999 due to a medical
9 condition which disabled me," do you see that?
10    A.    Yes.
11    Q.    Is there any other medical condition that has
12 disabled you from 1999 other than what you told me about
13 this morning?
14    A.    Well, I've had some cardiac issues and have
15 had six angioplasties from 2003, 2005. In addition to
16 the ones I told you, I think that's it.
17    Q.    If you would look at paragraph five, that's
18 consistent with your testimony today, correct?
19    A.    Well, I didn't do personal business with
20 International or National. I mean, initially
21 International was introduced to me by, it was either one
22 of two people.
23          I don't really remember which of the two. I
24 think they both knew Jack Perkins. I know that they

87

1 introduced me to International probably around 1990 and
2 had made the introduction because they thought that
3 International was someone who could really help a
4 growing business.
5          Quite frankly, I think that's the only time I
6 met them. I don't even remember who it was that I met
7 at the time but -- so somewhere around 1989, '90, '91
8 is the time I met them. But after that time, I didn't
9 have any dealings with them.
10    Q.    As it says in paragraph five, you weren't
11 involved in MHCS's procurement of insurance coverage,
12 were you?
13    A.    I was not.
14    Q.    Please review paragraph ten to yourself.
15    A.    Okay.
16    Q.    Where it says in the second sentence of that
17 paragraph, "In addition, a copy of the policy I received
18 was not bound," do you remember who you received a copy
19 of the policy from?
20    A.    It would have crom from Managed Healthcare,
21 either Indy Edwards or Pam Jones.
22    Q.    For insurance policies that National Union
23 issued to MHCS, when you would receive copies of those,
24 were they usually bound?

88

1    A.    I don't remember. I do know the former
2 insurance company, their copies were always bound. I
3 think that this is probably just a copy that someone
4 from the office made.
5    Q.    Do you believe that the copy that you received
6 was a copy that someone at the MHCS office had made and
7 then sent to you?
8    A.    Oh, yes.
9    Q.    Can you tell me what the basis is for the
10 first sentence in paragraph ten of your affidavit?
11    A.    The copy that I got didn't have that
12 endorsement. When I wrote this up, that was my belief,
13 that wasn't there. I think that's all that means.
14    Q.    It's your testimony that the copy you received
15 did not have Endorsement 8. Do you know for a fact
16 whether the copy that was provided by IIG to MHCS
17 included a copy of Endorsement 8?
18    A.    I later learned that it was included.
19    Q.    In preparing this affidavit, leaving your
20 attorney aside, did you obtain information from anyone
21 else so you could prepare this affidavit?
22    A.    I'd have to go through and see the content to
23 see. I could have contacted the law firm in Florida
24 that represented me to get information. I think mostly

89

1    it would have been with counsel.
2       Q.   If you look at page two in paragraph five,
3    given that you were not involved in the procurement of
4    insurance coverage by MHCS, I'm wondering how you knew
5    the information contained in paragraph seven and eight,
6    do you recall?
7       A.   I don't know specifically.  After the fiasco
8    we had with this when we didn't have the appropriate
9    insurance, as an owner of the company, I demanded they
10   get it and get it in place.  And I knew it was in place.
11      Q.   Page three, paragraph 16 on the next page, I
12   take it that at the time the first sentence of paragraph
13   16 was prepared you were not aware that Endorsement 8
14   actually was in the copy of the policy provided to MHCS?
15      A.   That's correct.  If I had known that nothing
16   was covered for 25,000, I would have insisted that the
17   company do something about it.
18      Q.   If you look at paragraph 20 on the next page,
19   page four?
20      A.   Which number?
21      Q.   20.  Do you know if the amount listed there,
22   the $19,396.24, was the total amount of legal fees you
23   incurred in the Heller action?
24      A.   No.  I think, I don't know for sure.  But I

90

1    know there are monies in addition to that that I wasn't
2    able to pay to Greg Aceto's firm that are still
3    outstanding.  I'm assuming that those are monies that
4    were paid to his firm.
5       Q.   I'm hoping you can clarify something for me on
6    paragraph 21.  Where it says "as a result thereof," do
7    you know what that's referring to?
8       A.   Because of the Heller suit and because
9    National chose not to provide coverage for this, I was
10   left with no choice.  I was facing insurmountable
11   liabilities.  It was as a result of all that litigation.
12      Q.   I just wanted to clarify that the "as a result
13   of" wasn't referring simply to the $19,000 in legal
14   fees?
15      A.   Oh, no.
16      Q.   With respect to the Heller litigation, do you
17   know approximately how much in legal fees you had
18   incurred prior to the time you filed for bankruptcy?
19      A.   You'd have to get that from Greg Aceto's
     office.
20 (21)   Q.   If you look at paragraph 31, there's a
21 (22) reference there to notification to the bankruptcy
23   trustee?
24      A.   Yes.

91

1       Q.   Is that the notification we were talking about
2    earlier today?
3       A.   Yes.
4       Q.   To the best of your memory, have you told me
5    everything you recall about discussions with the
6    bankruptcy trustee about any claims by you against
7    National Union?
8       A.   I think I've been clear.  That subject was
9    disclosed.  It was not something that anyone really saw
10   as an asset.  And he didn't either.  I remember it just
11   being dropped.
12      Q.   I wasn't suggesting you weren't clear.  I was
13   wondering whether during the course of today given the
14   questions you answered if there was anything else you
15   remembered discussing with the bankruptcy trustee?
16      A.   No.
17      Q.   If you go to paragraph 35, the $100,721 in
18   legal fees that's referenced there, were those legal
19   fees incurred in connection with your bankruptcy?
20      A.   Yes.
21      Q.   Paragraph 36 where it refers to the sale of
22   your residence in Osprey, Florida --
23      A.   Yes.
24      Q.   -- what was the sale price of that

92

1    transaction?
2       A.   1,399,000.
3       Q.   Resulting in a total loss of $536,688.  How
4    was that amount calculated?
5       A.   The difference between what I sold it for and
6    what it was appraised for maybe three to six months
7    before then.  It was appraised for a million 750, and I
8    put it on the market for that price and had to drop and
9    drop.  I needed the cash.  I have all those appraisals.
10      Q.   Do you recall how much you paid for the house
11   in Florida?
12      A.   A million one.
13      Q.   The last sentence of paragraph 36, was the
14   amount of the additional indebtedness that you added to
15   your home in Hingham, was that $250,000?
16      A.   Yes.
17      Q.   Why was that additional indebtedness added to
18   your home in Hingham at that time?
19      A.   Well, I needed not only the money for the
20   settlement, I had legal fees, I don't remember what the
21   balance to be paid was.  I had tapped out a home equity
22   line that I had to pay off.  I was basically robbing
23   Peter to pay Paul to get through this period.
24      Q.   As you sit here today, can you tell me what

93

1  damages you believe that you've suffered as a result of

2  National Union's decision not to provide coverage for

3  you in the Heller action, basically what damages you're

   seeking in this case?

          MR. ACETO:  Aside from what you already

6  covered or do you want him to list everything again?

7          MR. TUMILTY:  I'd like the full list.

8  BY MR. TUMILTY:

9      Q.    You don't have to go into detail on the things

10 you told me about, but I would like a full list.  I want

11 to have an understanding of what you believe your

12 damages are.

13         MR. ACETO:  Rather than dollar figures,

14 you want categories of what the damages are?

15         MR. TUMILTY:  Sure.

16 BY MR. TUMILTY:

17     Q.    You can say I believe I've been damaged

18 because I had to sell my home and go down a list or give

19 me the dollar numbers as you go, however you want to do

20 it.

21     A.    My life has changed completely.  Going back to

22 the time prior to the Heller action, we had a very

23 valuable entity in that company.  It should never have

24 been converted in the bankruptcy court.  There is a

94

1  direct link.

2          When you lose your main asset -- I lost about

3  a million eight in loans that just went poof and

4  disappeared.  It never should have happened.  It was

5  largely due to the positioning of Heller, which I happen

6  to know why they did what they did and so do the other

7  officers of the company.

8          But when that happened and I didn't have

9  someone to stand beside me when I thought I had

10 coverage, because I really needed to fight these people,

11 because I think they are bad guys, and I think the

12 people that worked with me were honest and

13 straightforward.

14         There was no game playing.  I assure you there

15 was never any negligence.  If there was, I would be

16 very, very surprised.  But not to have someone stand

17 beside me caused me, I became very severely depressed.

18 I had a lot of angina and ended up with six

19 angioplasties.  I'm on a ton of medication.

           I'm 60 years old.  Just last week my wife and

   I sold our house in Hingham.  We are trying to put

22 together our retirement.  We are renting until we are

23 able to get back on our feet.  Not being able to stand

24 up to the bad guys of Heller caused me to, caused me all

95

1  of these health-related issues.

2          When you're drained financially, you lose any

3  level of confidence that you have at the same time.  I

4  think that, I think it's not just what I spent, I think

5  it's a life that's ruined that just needed to have

6  someone stand beside them to fight off people that

7  needed to be fought off.  And I ran out of gas and my

8  body pretty much ran out of gas.

9          I used to be a pretty affluent guy and I'm not

10 now.

11         MR. ACETO:  Do you want him to go through

12 the damages listed in the affidavit, more of the special

13 damages?

14         MR. TUMILTY:  I'll go a piece at a time.

15 BY MR. TUMILTY:

16     Q.    I'm not trying to minimize anything.  When you

17 say it's worth a lot, what do you think that's worth?

18         MR. ACETO:  What he just described from

19 the prior answer?

20         MR. TUMILTY:  Yes.

21 BY MR. TUMILTY:

22     A.    I think that if someone had stood beside me

23 and fought these guys, you know, I would be, I would

24 probably be worth three or four or $5 million right now,

96

1  because I don't think I would have lost.

2      Q.    And if you had to put an estimate on your net

3  worth right now, what would you say it is?

4      A.    Somewhere in the neighborhood of $500,000.

5      Q.    When you said there were $5.8 million worth of

6  loans that went poof, were those loans from you to MHCS?

7      A.    Yes.

8      Q.    Did you recover anything on those loans?

9      A.    No.

10     Q.    Then you said something along the lines of

11 positioning by Heller, do you recall that?

12     A.    Um-hum.

13     Q.    What were you referring to?

14     A.    It's a long story.  If you want, I'll tell you

15 the story.  To try to make it as succinct as possible,

16 this whole subject of negligence on the borrowing

17 certificates is just the opposite.  If anything, they

18 were showing the two ladies that ran the company ways to

19 create recognition of revenue streams.

20         The reason that Heller changed their stripes

21 is because Pam Jones was such an honest person that she

22 just wasn't comfortable doing what they said she could

23 do.  Although we were in bankruptcy at the time, Heller

24 basically saw a company that was going to be able to

97

1  fund the loans, there wasn't going to be a problem with
2  that, but they seemed to become -- they became very,
3  very aggressive with the bankruptcy judge. They did
   things that were so out of character just to upset the
   judge.
6       And one of the other partners from Edward and
7  Angell, she knows they are bad guys. She despises them.
8  I don't know if she would admit that now. They caused
9  the bankruptcy judge to put the company in bankruptcy
10 and they kept all the receivables. There's never been
11 an accounting.
12      The overline, which was the only part I
13 guaranteed, which was about $200,000, that was supported
14 by the private receivables. It was in excess of
15 200,000. Pam Jones and Indy Edwards both fully expected
16 that that was all collected. If there was anything left
17 on that guaranty of mine for that portion, we all would
18 have been surprised.
19      But they never gave us any accounting. And
20 Heller ended up where they collected all the
21 receivables, and they saw an opportunity with this D & O
22 policy to make it a bad pay day. And if I hadn't been
23 so beaten down with this bankruptcy, I never would have
24 signed that settlement agreement.

98

1       The two ladies who signed affidavits that they
2  were negligent, neither one of them believe it. They
3  had such pressure on them from Heller, and they are both
4  people that are, they are both divorced and scared to
5  death. Heller was putting big time pressure on them.
6       My wife was with me when we read the
7  settlement discussion, and they were just as mean as you
8  could imagine. She wanted to get away from it and we
9  signed it and called it a day. Heller is not the good
10 guy. I've lost my right to go after them. But that's
11 why I needed to have someone stand beside me.
12 Q.    Can you explain to me what the overline is
13 that you guaranteed?
14 A.    Heller would lend only on Medicare and
15 Medicaid and I think government -- as well as Blue
16 Cross/Blue Shield and insurances. They had a formula.
17 We had another group of customers who were private pays.
18 They don't lend against private pay.
19      But in our case, they made an exception and
   they made a separate loan on that particular component.
   But they made me guaranty that overline. And it was
22 about 200,000.
23      MR. TUMILTY: This is a logical place to
24 break for the day.

99

1       (Whereupon the deposition was suspended at
2  2:45 p.m.)

100

1  C E R T I F I C A T E
2
3       I, MICHAEL INGOLDSBY, do hereby certify that I have
4  read the foregoing transcript of my testimony, and
5  further certify that said transcript is a true and
6  accurate record of said testimony.
7       Dated at _____ this _____
8  day of _____, 2006.
9
10
11
12       _____
13       MICHAEL INGOLDSBY
14
15  Signed under the pains and penalties of perjury.

101

```
 1                C E R T I F I C A T E

 2

 3   COMMONWEALTH OF MASSACHUSETTS

 4   PLYMOUTH, SS.

 5           I, Patricia M. Haynes, a Notary Public in and

 6   for the Commonwealth of Massachusetts, do hereby

 7   certify:

 8           That MICHAEL INGOLDSBY, the witness whose

 9   testimony is hereinbefore set forth, was duly sworn by

10   me and that such testimony is a true and accurate record

11   of my stenotype notes taken in the foregoing matter, to

12   the best of my knowledge, skill and ability.

13           IN WITNESS WHEREOF, I have hereunto set my

14   hand and Notarial Seal this    day of October 2006.

15

16           _____

          Patricia M. Haynes, CSR
17              Notary Public

18

     My commission expires July 30, 2010
19

20

21

22

23

24
```

102

```
     ERRATA SHEET

 2   Please indicate the page number and line number along
     with the correction.
 3
     1.
 4
     2.
 5
     3.
 6
     4.
 7
     5.
 8
     6.
 9
     7.
10
     8.
11
     9.
12
     10.
13
     11.
14
     12.
15
     13.
16
     14.
17
     15.
18
     16.
19
     17.

     18.

     19.
22
     20.
23
     _____
     MICHAEL INGOLDSBY
24
```

103

```
 1              COPLEY COURT REPORTING
 2         58 Batterymarch Street, Suite 317
            Boston, Massachusetts 02110
 3                 617-423-5841

 4   DATE:    October 23, 2006

 5   TO:     Johnson & Aceto, P.C.
              ATT: Gregory J. Aceto, Esquire
 6            67 Batterymarch Street
              Boston, Massachusetts 02110

 7   IN RE:   Ingoldsby VS National Union

 8
     Dear Mr. Aceto,
 9
             Enclosed herewith is your copy of the
10   transcript of the deposition of MICHAEL INGOLDSBY, taken
     on Friday, October 20, 2006, in the above-mentioned case
11           In compliance with applicable rules, the
     witness will read the transcript and sign the signature
12   page and errata sheet and return them as soon as
     possible to the respective attorneys involved.  Any
13   changes or corrections are to be made separately on the
     enclosed errata sheets signed by the witness.
14           If the witness has not read and signed the
     transcript and returned it to the parties involved
15   within thirty days, the transcript will go in as
     testified to under oath
16           Thank you for your anticipated cooperation.
     If you have any questions, please feel free to call on
17   me.

18              Very truly yours,

19

20              Patricia M. Haynes

21   CC: John J. Tumilty, Esquire
         Syd A. Saloman, Esquire
22
23
24
```

101

```
 1              C E R T I F I C A T E
 2
 3   COMMONWEALTH OF MASSACHUSETTS
 4   PLYMOUTH, SS.
          I, Patricia M. Haynes, a Notary Public in and
 6   for the Commonwealth of Massachusetts, do hereby
 7   certify:
 8          That MICHAEL INGOLDSBY, the witness whose
 9   testimony is hereinbefore set forth, was duly sworn by
10   me and that such testimony is a true and accurate record
11   of my stenotype notes taken in the foregoing matter, to
12   the best of my knowledge, skill and ability.
13          IN WITNESS WHEREOF, I have hereunto set my
14   hand and Notarial Seal this    day of October 2006.
15

16          _____
          Patricia M. Haynes, CSR
17             Notary Public

18
     My commission expires July 30, 2010
19
20
21
22
23
24
```

102

```
     ERRATA SHEET
 2   Please indicate the page number and line number along
     with the correction.
 3
 4   1.
 5   2.
 6   3.
 7   4.
 8   5.
 9   6.
10   7.
11   8.
12   9.
13   10.
14   11.
15   12.
16   13.
17   14.
18   15.
19   16.
     17.
     18.
22   19.
23   20.
24          _____
            MICHAEL INGOLDSBY
```

103

```
 1              COPLEY COURT REPORTING
 2            58 Batterymarch Street, Suite 317
              Boston, Massachusetts 02110
 3                 617-423-5841

     DATE:    October 23, 2006
 4
 5   TO:      Johnson & Aceto, P.C.
              ATT: Gregory J. Aceto, Esquire
 6            67 Batterymarch Street
              Boston, Massachusetts 02110
 7
     IN RE:   Ingoldsby Rosanina VS National Union
 8
 9   Dear Mr. Aceto,
          Enclosed herewith is your copy of the
10   transcript of the deposition of MICHAEL INGOLDSBY, taken
     on Friday, November 20, 2006, in the above-mentioned
11   case
          In compliance with applicable rules, the
12   witness will read the transcript and sign the signature
     page and errata sheet and return them as soon as
13   possible to the respective attorneys involved.  Any
     changes or corrections are to be made separately on the
14   enclosed errata sheets signed by the witness.
          If the witness has not read and signed the
15   transcript and returned it to the parties involved
     within thirty days, the transcript will go in as
16   testified to under oath
          Thank you for your anticipated cooperation.
17   If you have any questions, please feel free to call on
     me.
18
                 Very truly yours,
19
20               Patricia M. Haynes

21
     CC: John J. Tumilty, Esquire
22      Syd A. Saloman, Esquire
23
24
```

104