**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

      Plaintiff,

and

MICHAEL INGOLDSBY,

      Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

      Defendants.

CIVIL ACTION No: 05-CV-11128-NG

**AFFIDAVIT OF GREGORY J. ACETO, ESQ. IN OPPOSITION TO
INTERNATIONAL INSURANCE GROUP, LTD.'S
MOTION FOR SUMMARY JUDGMENT**

I, Gregory J. Aceto, Esq. being duly sworn, depose and state as follows:

1.    I am an attorney with the law firm of Johnson & Aceto, LLP, 67 Batterymarch Street, Suite 400, Boston, Massachusetts, and am duly licensed to practice law in the courts of the Commonwealth of Massachusetts.

2.    I am counsel for the Plaintiff-Intervenor Michael Ingoldsby ("Ingoldsby" or "Plaintiff-Intervenor").

3.     True and correct copies of excerpts from the Deposition of Michael Ingoldsby, taken October 20, 2006, are attached hereto as *Exhibit A*.

4.     True and correct copies of excerpts from a policy of insurance issued by National Union to Managed Health Care Systems, Inc. ("MHCS"), being policy number 873-87-52, effective August 4, 2001, through August 4, 2002 which were produced by National Union during discovery are attached hereto as *Exhibit B*.

5.     True and correct copies of excerpts from the Rule 30(b)(6) Deposition of International Insurance Group, Ltd., ("IIG") taken October 19, 2006, are attached hereto as *Exhibit C*.

6.     A true and correct copy of correspondence, dated May 20, 2002, from Nicholas Sciotto of IIG to Pam Jones of MHCS which was produced by IIG during discovery is attached hereto as *Exhibit D*.

Signed under the pains and penalties of perjury this 29th day of November, 2006.

Gregory J. Aceto, Esq.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                              Volume 1
                              Pages 1-101
                              Exhibits per index


          UNITED STATES DISTRICT COURT

          DISTRICT OF MASSACHUSETTS

          Civil Action No. 05-CV-11128-NG


    -------------------------------- -----:
GE HFS Holdings , Inc.                    :
Formerly Known As                         :
Heller Healthcare Finance , Inc.,         :
          Plaintiff                       :
                                          :
and                                       :
                                          :
Michael Ingoldsby,                        :
          Intervenor/Plaintiff            :
                                          :
      VS                                  :
                                          :
National Union Fire Insurance             :
Company of Pittsburgh, Pennsylvania       :
and International Insurance Group, LTD,   :
          Defendants                      :
    ------------------------------------- :


          DEPOSITION OF MICHAEL INGOLDSBY, a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure, before
Patricia M. Haynes, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, CSR No.: 14620F, at the Offices of
Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington
Avenue, Boston, Massachusetts, on Friday, October 20,
2006, commencing at 10:00 a.m.


              COPLEY COURT REPORTING
        58 Batterymarch Street, Suite 317
            Boston, Massachusetts 02110
                 (617) 423-5841

1     APPEARANCES:

2


3

      Edwards, Angell, Palmer & Dodge, LLP
4     (By: John Tumilty, Esquire)
      111 Huntington Avenue
5     Boston, Massachusetts 02199
      Counsel for the Defendant,
6     National Union Fire Insurance Company

7

      Johnson & Aceto, P.C.
8     (By: Gregory J. Aceto, Esquire)
      67 Batterymarch Street, Suite 400
9     Boston, Massachusetts 02110
      Counsel for the Intervenor/Plaintiff
10

11    Tucker, Heifetz & Saltzman, LLP
      (By: Syd A. Saloman, Esquire)
12    100 Franklin Street
      Boston, Massachusetts 02110
13

14

15

16

17

18

19

20

21

22

23

24

1    00003 through IIG 00015.  The first page of that Exhibit

2    8 is a fax cover sheet from International Insurance

3    Group to Gregory Aceto dated November 26, 2002.  There

4    are enclosures with that fax after that.  If you go two

5    pages in, there's another fax cover sheet dated July 31,

6    2001 to Pam Jones from Nicholas Sciotto at International

7    Insurance Group.  Have you seen Exhibit 8 before?

8              MR. ACETO:  In its entirety?  There are

9    separate documents that I'm not quite sure if they came

10   together.

11   BY MR. TUMILTY:

12       A.    I've never seen the fax pages.

13             (Off the record discussion.)

14   BY MR. TUMILTY:

15       Q.    To clarify, what has been marked as Exhibit 8

16   here today consists of Bates numbers 0077 consecutively

17   numbered to 0088.  It's your testimony that you've never

18   seen the first page of Exhibit 8 or the second page of

19   Exhibit 8 before?

20       A.    I just don't know.  I can't tell you that I

21   remember it.  I mean, I could have.

22       Q.    If you go into the third page of Exhibit 8,

23   you'll see there's a letter dated July 27, 2001?

24       A.    Um-hum.

BY MR. TUMILTY:

Q.    In the same exhibit, Exhibit 13, paragraph 18, please review that paragraph to yourself.

A.    Okay.

Q.    It states, "Upon information and belief, International failed to fully advise MHCS regarding the language of the alleged exclusion and the effective said exclusion on MHCS's liability coverage under the policy."

Do you know what the basis is for that paragraph?

A.    Yes.  I mean, I had what I thought was a long-term relationship with International.  We had been buying our insurance from them probably since 1990. They obviously had, you know, an obligation to advise me of things.

I never knew anything about such an exclusion. I think International or National, someone, owed me an explanation, and they should have brought it to my attention.

Q.    You don't know for a fact that International did not bring it to the attention of either Pamela Jones or Indy Edwards, do you?

A.    No, I don't know.

1    been issued by National Union, would you read them?

2        A.    Yeah, but I wouldn't read every word.

3        Q.    Would you discuss them with anyone?

4        A.    I don't think I did.

5        Q.    You didn't discuss them with Pamela Jones or

6    Indy Edwards?

7        A.    No.

8        Q.    Did you discuss them with anyone at IIG?

9        A.    No.

10       Q.    Did you discuss them with an attorney at that

11   time?

12       A.    Not at that time.

13       Q.    I believe it's been your testimony that to

14   your knowledge none of the directors and officers

15   liability policies that National Union issued to or

16   provided to MHCS contained a contractual exclusion as we

17   saw it alleged in your Complaint?

18       A.    I don't think that's what I said.  I said I

19   never knew at the time or I wouldn't have paid the

20   $25,000 or I wouldn't have allowed our company to spend

21   $25,000.

22       Q.    This is an important point, so I want to make

23   sure it's clear.  Your testimony is you never knew that

24   a contractual liability exclusion may have been in the

1       A.     Yes.

2       Q.     Did you review this?

3       A.     I did.

4       Q.     If you would please turn to the second page.

5       A.     Yes.

6       Q.     You see there's a sentence at the top of that

7  page that says, "In fact, I have not been involved in

8  the operations of MHCS since 1999 due to a medical

9  condition which disabled me," do you see that?

10      A.     Yes.

11      Q.     Is there any other medical condition that has

12  disabled you from 1999 other than what you told me about

13  this morning?

14      A.     Well, I've had some cardiac issues and have

15  had six angioplasties from 2003, 2005.  In addition to

16  the ones I told you, I think that's it.

17      Q.     If you would look at paragraph five, that's

18  consistent with your testimony today, correct?

19      A.     Well, I didn't do personal business with

20  International or National.  I mean, initially

21  International was introduced to me by, it was either one

22  of two people.

23             I don't really remember which of the two.  I

24  think they both knew Jack Perkins.  I know that they

1    introduced me to International probably around 1990 and

2    had made the introduction because they thought that

3    International was someone who could really help a

4    growing business.

5         Quite frankly, I think that's the only time I

6    met them.  I don't even remember who it was that I met

7    at the time but -- so somewhere around 1989, '90, '91

8    is the time I met them.  But after that time, I didn't

9    have any dealings with them.

10        Q.   As it says in paragraph five, you weren't

11   involved in MHCS's procurement of insurance coverage,

12   were you?

13        A.   I was not.

14        Q.   Please review paragraph ten to yourself.

15        A.   Okay.

16        Q.   Where it says in the second sentence of that

17   paragraph, "In addition, a copy of the policy I received

18   was not bound," do you remember who you received a copy

19   of the policy from?

20        A.   It would have crom from Managed Healthcare,

21   either Indy Edwards or Pam Jones.

22        Q.   For insurance policies that National Union

23   issued to MHCS, when you would receive copies of those,

24   were they usually bound?

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    PLYMOUTH, SS.

5         I, Patricia M. Haynes, a Notary Public in and

6    for the Commonwealth of Massachusetts, do hereby

7    certify:

8         That MICHAEL INGOLDSBY, the witness whose

9    testimony is hereinbefore set forth, was duly sworn by

10   me and that such testimony is a true and accurate record

11   of my stenotype notes taken in the foregoing matter, to

12   the best of my knowledge, skill and ability.

13        IN WITNESS WHEREOF, I have hereunto set my

14   hand and Notarial Seal this 26th day of October 2006.

15

16   _____

17        Patricia M. Haynes, CSR
              Notary Public

18

19   My commission expires July 30, 2010

20

21

22

23

24



# NATIONAL UNION
# FIRE INSURANCE COMPANY
# OF PITTSBURGH, PA.®

A CAPITAL STOCK COMPANY

POLICY NUMBER:
*873-87-52*

RENEWAL OF:
*473-16-30*

ADMINISTRATIVE OFFICES:
175 WATER STREET, NEW YORK, N.Y. 10038

### DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

**NOTICE:** EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.

**NOTICE:** THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

**NOTICE:** THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MAY, AND IN CERTAIN CIRCUMSTANCES MUST, ADVANCE DEFENSE COSTS PAYMENTS PRIOR TO THE FINAL DISPOSITION OF A CLAIM.

## DECLARATIONS

ITEM 1. NAMED CORPORATION: *MANAGED HEALTH CARE SYSTEMS*

MAILING ADDRESS: *175 DERBY ST STE 24*
*HINGHAM, MA 02043-3406*

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Massachusetts*

ITEM 2. SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3. POLICY PERIOD: From   *August 4, 2001*                    to   *August 4, 2002*
(12:01 A.M. Standard Time at the address stated in Item 1)

ITEM 4. LIMIT OF LIABILITY: _____ *$3,000,000* _____ aggregate for Coverages A and B combined (including Defense Costs)

ITEM 5. RETENTION:

Company Reimbursement and indemnifiable Loss: _____ *$25,000* for Loss arising from claims alleging the same Wrongful Act or related Wrongful Acts.

ITEM 6. PREMIUM: *$24,995*

_____
Authorized Representative     *Sep 27, 2001*

*CARPENTER & MOORE INSURANCE SERVICES INC.*
*530 WASHINGTON STREET*
*SAN FRANCISCO, CA 94111*

*7113299*

AIG/GE HFS 00162

| Countersignature Date | Countersigned At |
|---|---|

47352 (8/88)

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.®

DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, National Union Fire Insurance Company of Pittsburgh, Pa.® herein called the "Insurer", agrees as follows:

1.  **INSURING AGREEMENTS**

    **COVERAGE A: DIRECTORS AND OFFICERS INSURANCE**

    This policy shall pay the Loss of each and every Director or Officer of the Company arising from any claim or claims first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except for and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 9, advance to each and every Director and Officer the Defense Costs of such claim or claims prior to their final disposition.

    **COVERAGE B: COMPANY REIMBURSEMENT INSURANCE**

    This policy shall reimburse the Company for Loss arising from any claim or claims which are first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, but only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity.

2.  **DEFINITIONS**

    (a)  The "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

    (b)  "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of any claim against the Insureds, but excluding salaries of Officers or employees of the Company.

    (c)  "Insured(s)", or "Director(s) or Officer(s)", means any past, present or future duly elected or appointed Directors or Officers of the Company. Coverage will automatically apply to all new Directors or Officers after the inception date of this policy.

    (d)  "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

    (e)  "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

47353 (8/88)                               -1-

AIG/GE HFS 00163

(f)    "Subsidiary" means a corporation of which the Named Corporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

"Subsidiary" also means any corporation which becomes a Subsidiary during the Policy Period but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary. A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

(g)    "Wrongful Act" means any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

3.    EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of their incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such claims are based were committed.

4.    EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers:

(a)    arising out of, based upon or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled;

(b)    arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

(c)    arising out of, based upon or attributable to the payment to the Insureds of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(d)    arising out of, based upon or attributable to profits in fact made from the purchase or sale by the Insureds of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law;

(The Wrongful Act of any Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(d) )

(e)    alleging, arising out of, based upon or attributable to any attempt, whether successful or unsuccessful, by any person or entity to acquire securities of the Company against the opposition of the Board of Directors of the Company ("Board"), or any action, whether successful or unsuccessful, by the Company or the Board to resist such attempts; however, this exclusion shall not apply if, before taking any such resistive action, the Company or the Board has obtained a written opinion (1) from independent legal counsel that such resistive action is a lawful exercise of the Board's business judgment and (2)

47353 (8/88)

AIG/GE HFS 00164

ENDORSEMENT# 8    (Continued)

This endorsement, effective *12:01 am    August 4, 2001*    forms a part of
policy number  *873-87-52*
issued to  *MANAGED HEALTH CARE SYSTEMS*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

C. The Definition of Wrongful Act is amended to include the following at the end thereof:

With respect to all Insureds, any alleged defect in peer review or credentialling.

II.    AMENDMENTS TO EXCLUSIONS

1. Exclusions 4 (h) is deleted in its entirety and replaced with the following:

(h) alleging, arising out of, based upon or attributable to any actual or alleged
contractual liability of the Company or an Insured under any express (written or
oral) contract or agreement (including, but not limited to, any liquidated
damages, severance agreement or payment, golden parachute agreement, or any
compensation agreement payable upon the termination of any Insured); provided,
however, that this exclusion shall not apply to:

(1) Employment Practices Claims to the extent that any liability does not
arise from such express contract or agreement; or

(2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to
hospital practice, privileges, credentialling or peer review matters.

2. The following additional exclusions are added to the end of Clause 4. EXCLUSIONS:

(r) alleging, arising out of, based upon or attributable to any failure or omission on
the part of the Insureds or the Company to effect and maintain insurance;

(s) alleging, arising out of, based upon or attributable to, or in any way involving,
either directly or indirectly, antitrust violations, price fixing, price
discriminations, unfair competition, deceptive trade practices and/or monopolies,
including any actions, proceedings, claims or investigations related thereto;

(t) alleging, arising out of, based upon or attributable to the Insureds performance
or rendering of or failure to perform or render medical or other professional
services or treatments for others; provided, however, that this exclusion shall
not apply to:

(1) Employment Practices Claims;

(2) Claims for Loss alleging Wrongful Acts of an Insured(s) peer review or
credentialling processes;

*END*

AIG/GE HFS 00236

ENDORSEMENT# *8*    (Co....nued)

This endorsement, effective *12:01 am*    *August 4, 2001*    forms a part of
policy number  *873-87-52*
issued to   *MANAGED HEALTH CARE SYSTEMS*

by    *National Union Fire Insurance Company of Pittsburgh, Pa.*

(u) alleging, arising out of, based upon or attributable to any Human Clinical Trial.
For purposes of this exclusion (u), "Human Clinical Trial" shall mean any study
utilizing humans to provide clinical data for the assessment of a medical
treatment, procedure or pharmaceutical.

III.    AMENDED CLAUSE 9

Clause 9 is deleted in its entirety and replaced with the following:

9.    PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

This Clause 9 applies to all Claims.

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel
Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel
shall be made to conduct the defense of all Claims against an Insured pursuant to the
terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy,
then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event
the Insureds are already defending a Claim, then the Insureds shall select a Panel
Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds,
shall be from the list of Panel Counsel Firms designated for the type of Claim and be
from the jurisdiction in which the Claim is brought. In the event a Claim is brought in
a jurisdiction not included on the appropriate list, the selection shall be made from a
listed jurisdiction which is the nearest geographic jurisdiction to either where the
Claim is maintained or where the corporate headquarters or state of formation of the
Named Entity is located. In such instance, however, the Insurer shall, at the written
request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice
in the jurisdiction in which the Claim is brought to function as "local counsel" on the
Claim to assist the Panel Counsel Firm which will function as "lead counsel" in
conducting the defense of the Claim.

With the express prior written consent of the Insurer, an Insured may select (in the
case of the Insured defending the Claim), or cause the Insurer to select (in the case of
the Insurer defending the Claim), a Panel Counsel Firm different from that selected by

*END*

(2/90)    *INSU*

AIG/GE HFS 00237

ENDORSEMENT# 8    (Cor. .ued)

This endorsement, effective  *12:01 am*    *August 4, 2001*          forms a part of
policy number   *873-87-52*
issued to    *MANAGED HEALTH CARE SYSTEMS*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

other insured  defendants  if such  selection  is required  due  to  an actual  conflict of
interest or is otherwise reasonably justifiable.

The list of  Panel Counsel  Firms may  be amended  from time  to time  by the  Insurer.
However, no change  shall be made  to the specific  list attached to  this policy during
the Policy Period without the consent of the Named Entity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END*

(2/90)    *INSU*

_____
AUTHORIZED REPRESENTATIVE

AIG/GE HFS 00238

1

1    📜 **ORIGINAL**                    Pages: 1-105
                                        Exhibits: 1-25
2

3          U.S. DISTRICT COURT
       DISTRICT OF MASSACHUSETTS
4
              C.A.#: 05-CV-11128-NG
5

6    GE HFS HOLDINGS, INC., f/k/a

7    HELLER HEALTHCARE FINANCE, INC.,

8          Plaintiff

9       AND

10   MICHAEL INGOLDSBY,

11          Inventor/Plaintiff

12      VS.

13   NATIONAL UNION FIRE INSURANCE CO. OF

14   PITTSBURGH, PA, and INTERNATIONAL

15   INSURANCE GROUP,

16          Defendants

17

18        30(b)(6) DEPOSITION OF
     INTERNATIONAL INSURANCE GROUP, by
     JEREMY N. ALDERMAN, a witness called
19   by and on behalf of the Inventor/
     Plaintiff, Michael Ingoldsby, pursuant
20   to the provisions of the Federal Rules
     of Civil Procedure, before Joan
21   Applegate, Certified Shorthand Reporter
     and Notary Public in and for the
22   Commonwealth of Massachusetts, at
     the offices of Johnson & Aceto,
23   67 Batterymarch Street, Boston,
     Massachusetts, on Thursday, October 19,
24   2006 commencing at 10:10 a.m.

SHEA COURT REPORTING SERVICES
(617) 227-3097

```
 1    APPEARANCES:

 2

 3    Gregory Aceto, Esq.

 4    Johnson & Aceto, P.C.

 5    67 Batterymarch Street

 6    Boston MA 02110

 7    On behalf of the Inventor/Plaintiff,

 8    Michael Ingoldsby;

 9

10    Syd A. Saloman, Esq.

11    Tucker, Heifetz & Saltzman, LLP

12    100 Franklin Street

13    Boston MA 02110

14    On behalf of the Defendant,

15    International Insurance Group

16    and Jeremy Alderman;

17

18    M. Machua Millett, Esq.

19    Edwards, Angell, Palmer & Dodge, LLP

20    111 Huntington Avenue

21    Boston MA 02199

22    On behalf of the Defendant,

23    National Union Fire Insurance Company.

24
```

1   Q.   Are you comfortable that all those
2        answers are accurate and complete?
3   A.   To the best of my knowledge, yes.
4   Q.   Back when Managed Healthcare was a --
5        can you describe for me the
6        relationship between Managed Healthcare
7        and InterNational Insurance Group; what
8        was that relationship?
9   A.   I don't understand the question.
10  Q.   Can you tell me what the relationship
11       was between InterNational Insurance
12       Group and Managed Healthcare Systems?
13            MR. SALOMAN:  Objection, but
14       you can answer.
15  A.   I don't know how to answer the
16       question.
17  Q.   Did InterNational act as the broker for
18       Managed Healthcare Systems?
19  A.   We were the broker for certain lines of
20       business.
21  Q.   And what were those lines of business?
22  A.   I'm not sure the number of lines that
23       we did for them.
24  Q.   But what are the ones that you're

```
 1        familiar with?
 2   A.   I am familiar with the D and O.
 3   Q.   The D and O policy.  Do you think there
 4        are any other lines of business that
 5        InterNational was doing for Managed
 6        Healthcare?
 7   A.   I do not know.
 8   Q.   Do you know how Managed Healthcare
 9        ended up with InterNational?
10   A.   I do.
11   Q.   How was that?
12   A.   We were introduced to Mr. Ingoldsby.
13   Q.   By whom?
14   A.   By a common friend, Jack Perkins.
15   Q.   And how do you know that information?
16   A.   Because Jack asked me to call
17        Mr. Ingoldsby.
18   Q.   And was this back when you were head of
19        sales?
20   A.   No, head of InterNational.
21   Q.   You were managing director at the time?
22   A.   Correct.
23   Q.   When was that that Jack asked you to
24        call Mr. Ingoldsby?
```

```
1   A.   I do not recall.
2   Q.   But it was when you -- at the time when
3        you were managing director?
4   A.   Correct.
5   Q.   And Jack Perkins, what is his
6        relationship to InterNational?
7   A.   He is an independent -- independent --
8        how to best describe him.  Independent
9        producer.
10  Q.   He directs business to InterNational?
11  A.   At times, yes.
12  Q.   Does he get a fee from InterNational
13       for directing business to you?
14  A.   Yes, he does.
15  Q.   In this particular case did he get a
16       fee?
17  A.   I do not recall.
18  Q.   Do you know the reason why Managed
19       Healthcare was looking for insurance at
20       the time?
21  A.   I do not.
22  Q.   Did you call Mr. Ingoldsby yourself
23       when Mr. Perkins asked you to?
24  A.   I do not recall whether I called him
```

1       myself.
2   Q.  Have you ever had any conversations
3       directly with Mr. Ingoldsby?
4   A.  I have.
5   Q.  Any back at the time when he was
6       considering policies?
7   A.  Yes.
8   Q.  Anybody else at Managed Healthcare that
9       you dealt with back then?
10  A.  Do not recall.
11  Q.  How many conversations did you have
12      with Mr. Ingoldsby back at the time
13      that they were looking for insurance
14      for a D and O policy?
15  A.  I recall one meeting.
16  Q.  And where was that meeting?
17  A.  At their offices in Hingham.
18  Q.  Who else was at the meeting?
19  A.  Do not recall.
20  Q.  But you're sure that Mr. Ingoldsby was
21      there?
22  A.  I am.
23  Q.  Do you recall whether there were other
24      people present besides yourself and

```
 1    COMMONWEALTH OF MASSACHUSETTS)

 2    COUNTY OF ESSEX)

 3
           I, Joan Applegate, C.S.R., a
 4    notary public in and for the
      Commonwealth of Massachusetts, do
 5    hereby certify that Jeremy N. Alderman
      was by me first duly sworn, to testify
 6    to the truth, the whole truth, and
      nothing but the truth, and that the
 7    above deposition, pages 4 through 103,
      inclusive, was recorded steno-
 8    graphically by me and reduced to
      typewriting by me.
 9
           I FURTHER CERTIFY that the
10    foregoing transcript of the said
      deposition is a true and correct
11    transcript of the testimony given by
      the said witness at the time and place
12    specified hereinbefore.

13         I FURTHER CERTIFY that I am not a
      relative or employee or attorney or
14    counsel of any of the parties, nor a
      relative or employee of such attorney
15    or counsel, or financially interested
      directly or indirectly in this action.
16
           IN WITNESS WHEREOF, I have
17    hereunto set my hand and seal of office
      at Saugus, Massachusetts, this 30th day
18    of October, 2006.

19
20    _____
                  Joan Applegate
21        Certified Shorthand Reporter
                  Notary Public
22

23
      My notary commission expires:
24    March 29, 2007.
```

SHEA COURT REPORTING SERVICES
(617) 227-3097

```
HP LASERJET 3150                          ID CONFIRMATION REPORT FOR
PRINTER/FAX/COPIER/SCANNER                I..TERNATIONAL INSURANCE
                                          16179513940
                                          MAY-20-02  1:30PM
```

| JOB | START TIME | USAGE | PHONE NUMBER/ADDRESS | TYPE | PAGES | MODE | STATUS |
|-----|-----------|-------|----------------------|------|-------|------|--------|
| 593 | 5/20  1:26PM | 4'17" | 17817402203................. | SEND............. | 2/ 2 | EC144 | COMPLETED........................ |

TOTAL    4'17"    PAGES SENT: 2    PAGES PRINTED: 0

125 Broad Street
4th Floor
Boston, MA 02110
(617) 951-3939 x133
(617) 951-3940 Fax

**IIG**

# Memo

To: Pam Jones    FAX: 781-740-2202    Cover + 1

From: Nicholas F. Sciotto, AU, ARM, AIS
Director of Account Service

Date: 05/20/2002

Re: Directors & Officers Liability/Professional Liability

Hopefully this will give you the information to make a sound decision with respect to the captioned policies. Regarding the D&O policy, the policy has gone into run-off on 3/27/02 by virtue of the Chapter 7 filing. In essence clause 12 (Termination of Coverage for Subsequent Wrongful Acts after Certain Transaction) of the policy was invoked by virtue of the Chapter 7 filing. This means that the policy is in force through 8/4/02, but only with respect to discovery of events that took place prior to 3/27/02. In essence, claims can still be made until 8/4/02 as long as the occurrence date is 3/27/02 or prior. On 8/4/02, and extended reporting period can be purchased for claims made as follows:

One-year term        Annual Premium ($24,995) X 75% = $18,746
Two-Year Term        Annual Premium ($24,995) X 150% = $37,493
Three-Year Term      Annual Premium ($24,995) X TBD%

Now, having said all this, the only event that is complicating matters is the fact that the Finance Company has issued Cancellation Notice. Since the Company, National Union, has received all their premium up front from the deposit and finance company, they basically have been made whole. It is whether or not the Finance Company can legally obligate the company to cancel the policy effective 4/30/02. Unfortunately, I do not know the answer to that question. If that happens, then the discovery period through 8/4/02 is not valid and there is no option to purchase the Extended Reporting Period.

I would recommend paying the balance of the Financed Premium, $8,709.54, which would keep the policy definitively in force through 8/4/02. At that time, you can decide on whether or not to extend the policy further through the extended reporting period provision.

As discussed earlier, claimant's can make a claim against an individual D&O or the corporate entity. If you purchased the Extended Reporting Period on your own, you would be benefiting yourself, but other D's and O's as well as the corporate entity. Not having the coverage could expose your personal assets if a viable claim is made. This last statement is not meant to intimidate, but merely point out the plain truth of the matter. You know more about the internal aspects of the operations and whether or not a potential situation could arise.

Also attached is the Cancellation Notice from PAC regarding the E&O Package policy. We can talk more in depth about that when you call.

IIG00049