UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC.<br>*Formerly known as*<br>HELLER HEALTHCARE FINANCE, INC.,<br>    Plaintiff,<br><br>and<br><br>MICHAEL INGOLDSBY,<br>    Intervenor/Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and INTERNATIONAL INSURANCE GROUP, LTD.,<br>    Defendants. | CIVIL ACTION No: 05-CV-11128-NG |

**AFFIDAVIT OF MICHAEL INGOLDSBY IN OPPOSITION TO IIG'S MOTION FOR SUMMARY JUDGMENT**

I, Michael Ingoldsby, being duly sworn, depose and state as follows:

1. I am an individual residing at 1863 San Silvestro Drive, Venice, Florida, 34285.

2. At all times relevant hereto, I was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"), which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts.

3. At all times material hereto, I was insured for liability under a Directors and Officers Policy of Insurance and Company Reimbursement Policy, issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number 873-57-52, effective August 4, 2001, through August 4, 2002,

which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as the "Policy").

4.      On or about August 4, 2000, MHCS purchased the Policy issued by National Union and used International Insurance Group, Inc. ("IIG") as its insurance broker.

5.      Although I was not directly involved with the procurement of this particular Policy, I was present at the initial meeting with IIG.

6.      IIG and MHCS had a longstanding business relationship of over ten (10) years, during which period, MHCS purchased several insurance policies through IIG. During the course of MHCS's relationship with IIG, MHCS often obtained advice from IIG regarding coverage issues and the appropriate policies of insurance, particularly during the course of its bankruptcy. In addition, IIG had advised MHCS in the past regarding endorsements added to its insurance policies, including a contractual liability endorsement added to its general liability policy. A true and correct copy of correspondence, dated December 2, 1996, from Marianne Wronka of IIG to Peter Giacomozzi of MHCS is attached hereto as *Exhibit A* and a true and correct copy of correspondence, dated February 28, 1997, from Marianne Wronka of IIG to Michael Ingoldsby is attached hereto as *Exhibit B*.

7.      IIG had served as MHCS's insurance broker in the past with regard to several other policies of insurance. Specifically, IIG served as MHCS's broker with respect to the following policies of insurance issued by St. Paul Fire & Marine Insurance Company to Managed Health Care Systems, Inc.: policy number FKO6003905, effective from April 1, 1996 through July 19, 1996; policy number FKO6008965, effective from July 19, 1996, through July 16, 1997; and policy number FKO6003217, effective from April

1, 1995 through July April 1, 1996. MHCS also purchased its errors and omissions policy using IIG as its broker.

8. Accordingly, I relied on IIG to advise MHCS on the most appropriate insurance coverage for the company and for its officers and directors.

9. I was never advised that the Policy contained a so-called contractual liability exclusion. In fact, I would have advised the company not to purchase the Policy had I known it contained such an exclusion.

10. The Policy came up for renewal on August 4, 2001.

11. On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which outlined, among other items, endorsements to be added to the base policy. While the letter detailed other coverage changes resulting from the Health Care Amendatory Exclusion, it did not explicitly reference Exclusion 4(h) or explain any changes to coverage resulting therefrom. A true and correct copy of the Proposal is attached hereto as *Exhibit C*.

12. Although I have now learned that the Proposal and the Policy included the addition of Endorsement No. 8, I was not advised of the inclusion of the endorsement or of its potential effect on the coverage provided by the Policy.

13. On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller") commenced a civil action in the United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against me and subsequently served the "Complaint and Jury Demand".

14. The Heller Complaint alleged claims against me for Negligent Misrepresentation (Count I) and Breach of Guaranty (Count II).

15. On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union.

16. On or about October 11, 2002, National Union, through counsel, issued a preliminary determination that there was no coverage for the allegations raised against me, Mary Lee Ingoldsby and Indy Edwards in the *Heller Action.*

17. Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), I had no knowledge of either prior to National Union's denial of my claim. More importantly, I had no knowledge of the purported effect of said endorsement in limiting coverage under the Policy.

18. In response to subsequent email correspondence from my attorney regarding coverage for the claims, counsel for National Union sent another letter, dated March 6, 2003, explicitly stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby."

19. By way of letter from counsel, dated March 17, 2004, I made a formal written demand to National Union under Mass. Gen. Laws Ch. 93A. National Union again declined coverage by way of letter from its counsel, dated April 16, 2004, and, in doing so, relied upon Exclusion 4(h), as amended by Endorsement No. 8.

20. Because National Union denied my claim under the Policy, I bore the cost of my defense of the Heller Action.

21. In litigating the claims asserted by Heller over a two-year period, I expended a substantial amount of money in attorneys' fees and costs. Specifically, I incurred legal fees and costs in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

22.   As a result of the potential liability and costs associated with the Heller Action, on or about December 13, 2002, I filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").

23.   On or about February 7, 2004, I entered into a Settlement Agreement with Heller in the bankruptcy case. Pursuant to the Settlement Agreement, I submitted payment to the Trustee in the amount of One Hundred Five Thousand ($105,000.00).

Signed under the pains and penalties of perjury this 30th day of November, 2006.

_____
Michael Ingoldsby



70 Federal Street
Boston, MA
02110-1935
617-542-4433
Fax: 617-542-1449

**InterNational**

International
Insurance
Group Ltd.

December 2, 1996

Mr. Peter Giacomozzi
CFO
Managed Health Care Systems
175 Derby Street
Hingham, MA  02043

SUBJECT: #FK06003965        (7/19/96 - 7/19/97)
         St. Paul Fire and Marine Ins. Co.
         Package

Dear Peter,

On October 23rd I wrote you regarding the captioned policy indicating that $2,500 third party employee dishonesty coverage was left off. In fact, the appropriate form, #46163 ($2500 limit $250 deductible) was included in the policy when issued.

There is however another issue we would like to bring to your attention. Both your 4/96-7/96 policy and ours 7/96-97, include a "Massachusetts Notice of Coverage Change for Contract Liability Defense Expenses Endorsement". Essentially this applies to liability of another which Managed Care may assumes under contract (i.e. a hold harmless agreement). If the hold harmless states that Managed Health will also pay the indemnitee's (the other party) defense expenses, then this policy would not cover such defense expenses. In order to cover such expenses, the other party would need to be named as an additional insured. By the way, an additional insured could only be added with regard to General Liability (not Professional Liability).

This is one of the reasons we recommend that any contracts involving indemnification language be reviewed by legal counsel, and the insurance company. If you have any questions regarding this please call me.

We are working on obtaining D&O and Worker's Compensation quotations for you.

Regards,

Marianne E. Wronka
Vice President

Member of THE AMT NETWORK

70 Federal Street
Boston, MA
02110-1935
617-542-4433
Fax 617-542-1449

**InterNational**

International
Insurance
Group Ltd.

HAND DELIVER                    740-1100

February 28, 1997

Mr. Michael Ingoldsby
**Managed Health Care Systems, Inc.**
175 Derby Street
Hingham MA 02043

RE:   St. Paul Fire & Marine Ins. Co.
      Policy #FK06003965
      Term: 7/19/96 -- 7/19/97

Dear Mike,

Enclosed is a Register of Insurance for the captioned Package policy that is the only policy currently written by this office. Following are the general coverage sections included:

Property
Employee Dishonesty
    Including Third Party coverage and ERISA
General Liability
    Including Employee Benefits Liability
Professional Liability
Umbrella Liability

The enclosed is only an outline as we cannot interpret policy language but we will answer questions you have and refer to the company when necessary. This policy is so-called "simplified" and we suggest that you review it as well. If necessary, we can adjust coverages or limits either now, or on renewal.

To our knowledge, the other Property & Casualty insurance policies you have are:

Workers Compensation -- Wausau -- direct
Auto Non Ownership & Hired Liability -- Commerce

If you provide us with copies of these policies we can include an outline in one Register. *will do so when 7/19/97 St Paul renews*

As you know, we were not able to provide a more competitive Worker's Compensation quotation than Wausau's. The Auto policy expires April 1. For most businesses, underwriters consider Non-Owned & Hired Auto Liability an incidental exposure. However, in your business this the Non-Owned Auto liability presents a greater risk due to the fact that your employees regularly use their own vehicles on the company's business. For this reason, as we indicated to Peter in our December 2 letter, St. Paul has strict underwriting requirements before providing this coverage. Let us know if these requirements can be met; otherwise, we suggest renewing the policy with Commerce.

One of St. Paul's services is Loss Control. You can expect someone from St. Paul to call and find a convenient time to meet with you, or your designated representative. This is an opportunity to discuss your operations and procedures and get recommendations which can prevent and mitigate losses. *done see 5/19/9? ltr*

Member of THE AMT NETWORK

Mr. Michael Ingoldsby
February 28, 1997
Page Two

At the time of our involvement last year, premium was overdue to St. Paul and therefore we were unable to take over the St. Paul policy by broker of record letter. Instead, we were successful in having a new policy issued and financed which provided Managed Health Care with cash flow relief while maintaining coverage. A new application had to be submitted and Peter and I met in your office for several hours reviewing various coverages. We reviewed a letter from your previous broker that offered quotations for increasing General Liability and Professional Liability limits. As the applications indicate, Peter requested the same limits with higher limits to be considered on renewal.

On December 12, Peter faxed us excerpts from a proposed agreement with PHS. We discussed several issues on the phone. Let us know if this is still an open issue and we can review it again. We suggest that all contracts, agreements are reviewed with your legal counsel, and sent to us for review prior to execution.

Following is an outline of various insurance coverage issues to consider:

PACKAGE:

- Adequacy of existing contents & computer limits.
- Increased general liability, professional liability, umbrella liability limits.
- Increased employee dishonesty limit. St. Paul would not quote higher limits than existing $25,000 because checks are not countersigned. However, if you are interested in obtaining quotations for higher limits, please complete and return the enclosed Hartford application that we just received yesterday. The underwriter advises that although countersignature is important, it is not as important as having bank accounts reconciled monthly by someone other than the person making deposits.

FIDUCIARY:

The Employee Retirement Income Security Act (ERISA) requires employee benefit plan fiduciaries to carry a fidelity bond (or employee dishonesty coverage) equal to at least 10% of funds handled. Your St. Paul Employee Dishonesty limit is $25,000. The application which Peter completed last year indicates $130,000 est. assets which means you are well within compliance. However, this ERISA-mandated employee dishonesty coverage protects the fund, not the fiduciary. Therefore, Fiduciary coverage, although not required by ERISA, is recommended, even if you have a plan administrator. An application for coverage and information regarding this type of coverage is enclosed. If you are interested in quotations, please sign and return the application along with any other documents requested.

FOREIGN:

Do executives, employees have occasion to travel overseas on business? Depending on frequency, we recommend at least a Foreign Voluntary Compensation endorsement to your existing Workers Compensation policy. For more frequent travel, including regular renting of vehicles overseas, we recommend a Foreign "package" policy.



InterNational

Mr. Michael Ingoldsby
February 28, 1997
Page Three

DIRECTORS & OFFICERS LIABILITY:

One quotation with Royal has been offered. Submissions have been made to other companies and we will forward quotations upon receipt.

*quoted 5/27/97*

EMPLOYMENT PRACTICES LIABILITY:

As explained in our February 11 to Peter, we are unable to obtain quotations as part of D&O. In order to obtain quotations for this coverage specifically, please complete and return the application I sent Peter in my February 11 letter.

OTHER ISSUES:

- Third Party Dishonesty -- consider higher limits (currently $2,500) -- higher limits were quoted by Kemper (see previous correspondence to Peter)   *Declined*
- Disaster Recovery Planning -- Chubb and other companies offer this service and we can make proper arrangements if you are interested.
- Temporary Help hired by Managed Health Care -- if you use temporary help, we recommend you obtain evidence of Workers Compensation insurance from the temporary help agency and request that an "Alternate Employer" endorsement naming Managed Health Care and its subsidiaries is provided.
- Hiring of contractors, sub-contractors. If this situation applies, we can provide you with guidelines for requiring and maintaining evidence of insurance
- Sexual Misconduct -- an insurance product is available. — *see St. Paul reply (6/25/97)*
- Michael O. Ingoldsby Realty Trust etal. You currently have a policy with Commerce Ins. through the Walter J. May Insurance Agency of Hingham. Last June, Peter faxed us the renewal declarations of this policy which expires May 9. He thought the policy provided duplicate coverage. This is not the case, except possibly for the "contents" coverage. However, it is possible to add the coverage to the St. Paul policy by including the interest of the Trust. This would extend the general liability up to the Managed Health Care policy's Umbrella limits. Let's discuss at our meeting.   *added to St. Paul*

At your convenience we can meet again to discuss in more detail your operations, exposures, concerns, review existing policy language, etc..

Our Claims Manager, Glen Fulton, will explain the services we provide and issues involved in reporting, managing, negotiating claims.

We encourage you to call us any time you or your staff have questions even if you are not certain that insurance may or may not be involved.

Sincerely,

*Marianne Wronka*

Marianne E. Wronka
Vice President

/encl.



July 27, 2001

Nicholas F. Sciotto
International Insurance Group, LTD
125 Broad Street
4th Floor
Boston, MA 02110

RE:   Managed Health Care Systems
      Directors and Officers Liability Insurance including Employment Practices
      Liability (EPL)
      August 4, 2001

Dear Nicolas:

On behalf of National Union, a member of the American International Group, Inc., we are pleased to provide you with a renewal quote for the above captioned account. The current marketplace for Directors and Officers Liability Insurance is becoming more restrictive in coverage, pricing and retentions are increasing at renewals as well as for new business. The healthcare marketplace in particularly is experiencing these "hard" market trends of volatile premiums and restrictive terms and conditions. It is not uncommon to see premium increases of 10% for stellar risks, to increases of 50% for risks with unenviable balance sheets. This trend follows a decade of decreasing premiums, lowered retentions, broadening terms and conditions – traits of the "soft" market. Managed Health Care Systems has filed for Chapter 11 bankruptcy since the last renewal, as well, the financial condition remains poor, albeit improving slightly. Through active negotiations with National Union, we were able to obtain a renewal proposal with a 17% increase, a remarkably reasonable increase given the dynamics since last renewal.

Additionally, for 2001 AIG has mandated that a revised Health Care Amendatory endorsement be placed *on all Health Care risks*. We have ensured that there are no exceptions. This endorsement differs from the expiring endorsement for Managed Health Care Systems. The new revised endorsement includes an enhancement for IRS Fines and Penalties coverage. This is in addition to the expiring enhancements such as an amended Insured Person definition to include Peer Review/Credentialing, independent contractors, department heads; EMTALA coverage; and Government Funding Defense Costs. The limitations this endorsement introduces this renewal are: a sub limit on EMTALA coverage of $150,000; *failure to maintain insurance exclusion;* "*antitrust, price fixing, price discrimination, unfair competition, deceptive trade practices and/or monopolies, including any actions, proceedings, claims or investigations relating thereto*" exclusion; human clinical trials exclusion; and pre-authorized defense attorneys "panel counsel" for

all claims - last year panel counsel was required for Securities claims only. Finally, there are language changes with the new endorsement, however; the coverage essentially remains the same.

Lastly, at renewal AIG has added a limited private placement coverage endorsement that adds an exclusion for "public or private offering of securities by the Company..." however, the exclusion carves back coverage for private offerings of securities if less than or equal to $15,000,000.

After you have had an opportunity to review, please call with any questions.

Regards,


Thomas J. McGraw

## National Union Renewal Proposal

| INSURER: | National Union Fire Insurance Company of Pittsburgh, PA<br>Admitted Carrier / A++ A.M. Best "Superior" |
|---|---|
| POLICY FORM: | Private Edge |
| COVERAGE: | Corporate Liability Policy including Directors and Officers Liability Insurance and Employment Practices Liability Coverage |
| POLICY TERM: | August 4, 2001 to August 4, 2002 |
| LIMITS OF LIABILITY[1]: | $3,000,000 |
| RETENTIONS: | $35,000 each Claim for Employment Practices Liability; *was 25,000*<br>$150,000 each Claim for Securities Claims (other than Private *was 50,000*<br>Placements);<br>$25,000 All other Claims (including Private Placements). *was 10,000* |
| PREMIUM: | $24,995  *was 21,300* |
| DISCOVERY: | One year optional discovery period will be available for 75% of the annual premium. *(If policy cancelled / not renewed)* |
| RETROACTIVE DATE: | Date of Incorporation |

**Endorsements to be added in addition to the base policy:**
1. Outside Entity Coverage;
2. Captive Insurance Company;
3. Commissions Exclusions;
4. Nuclear Energy Liability Exclusion Endorsement (Broad Form);
5. Specific Investigation/Claim/Litigation/Event – same as expiring;
6. Final Determination Wording.

**Endorsement added at renewal:**
1. For-Profit Health Care Organization Extension –2001 Version. This endorsement is mandatory by National Union/AIG on all health care risks. This endorsement replaces the Health Care Extension, Endorsement No. 5 on the expiring program. Please read this endorsement carefully;

---
[1] Limit of Liability applies each Claim or related Claims and in the policy aggregate (inclusive of defense expenses).



2. Auto Private Placement Coverage threshold limited to $15M in proceeds. This endorsement limits Private Placements to $15M for automatic coverage and is included in coverage for no additional premium.

Lastly, no additional limits of liability are available from AIG.

**Subjectivities:**
*The quotation is subject to receipt, review and acceptance prior to binding of the following:*
1. Board of Directors;
2. Most recent audited financials;
3. Confirmation of a business plan in place to maintain operations.



# FOR-PROFIT HEALTH CARE ORGANIZATION
## AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that this policy is amended as follows:

I.   AMENDMENTS TO DEFINITIONS

A.  The Definition of Individual Insured(s) shall be amended to include the following at the end thereof:

*OK (Add)*

Individual Insureds shall also include any past, present or future member of any duly constituted committee ("Committee Member"); any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialling decision concerning an individual physician ("Outside Expert"); any individual in charge of any operational department ("Department Head") or any medical director, staff physician or faculty member of the Company, regardless of whether or not such person is directly employed by the Company or is considered to be an independent contractor.

B.  The Definition of Loss shall be amended to include the following at the end thereof:

*new*

1. IRS FINES

*ok (Add)*

Loss shall include Defense Costs incurred in connection with a Claim seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

Section 4911 (tax on excess expenditures to influence legislation);
Section 4940 (a);
Section 4941 (taxes on self-dealing);
Section 4942 (taxes on failure to distribute income);
Section 4943 (taxes on excess business holding);
Section 4944 (taxes on investments which jeopardize charitable purpose);
Section 4945 (taxes on taxable expenditures);
Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);
Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and
Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

*new to policy*

2. EMTALA COVERAGE

a. The definition of Claim(s) is amended to include the following:  Claim shall also mean a civil lawsuit alleging a violation pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd *et seq.*, and any similar state or local statute (herein "EMTALA Claim(s)").

b. The Definition of Loss is amended to include coverage for civil fines and penalties assessed pursuant to an EMTALA Claim.

c. It is further understood that a sublimit of liability in the amount of $150,000 shall apply to all EMTALA Claims made and reported during the Policy Period or Discovery Period (if applicable) combined (hereinafter "Sublimit of Liability"). This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability.

d. Solely for the purposes of the coverage afforded herein to EMTALA Claims, exclusion (l) is modified by deleting the phrase "alleging, arising out of, based upon or attributable to" and replacing it with the word "for".

3. **GOVERNMENTAL FUNDING DEFENSE COST COVERAGE**

[handwritten: new to policy]

Loss shall not include the return of funds which were received from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds; provided, however, that with regard to Claims for Wrongful Acts arising out of the return, or request to return such funds, this policy shall pay Defense Costs up to an amount not to exceed $1,000,000 ("Government Funding Defense Costs Sublimit"). This Sub-Limit of Liability shall be part of and not in addition to the aggregate Limit of Liability stated in the Item of the Declarations entitled Limit of Liability. With respect to any Defense Costs coverage afforded pursuant to this paragraph 3, it is understood that:  the Insurer shall be liable to pay 50% of such Defense Costs, excess of a retention in the amount of $1,000,000, up to the Government Funding Defense Costs Sublimit, and subject to the Limit of Liability listed on the Declarations Page. It being a condition of this insurance that the remaining 50% of such Defense Costs shall be carried by the Insureds at their own risk and be uninsured.

It is further understood and agreed that solely with respect to the Governmental Funding Defense Cost coverage provided pursuant to the above paragraph, the No Liability retention waivers located in the section of the policy entitled RETENTION CLAUSE are deleted in their entirety.

C. The Definition of Wrongful Act is amended to include the following at the end thereof:

With respect to all Insureds, any alleged defect in peer review or credentialling.

II. AMENDMENTS TO EXCLUSIONS

1. Exclusions 4 (h) is deleted in its entirety and replaced with the following:

    (h) alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon the termination of any Insured); provided, however, that this exclusion shall not apply to:

        (1) Employment Practices Claims to the extent that any liability does not arise from such express contract or agreement; or

        (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to hospital practice, privileges, credentialling or peer review matters.

2. The following additional exclusions are added to the end of Clause 4. EXCLUSIONS:

    (r) alleging, arising out of, based upon or attributable to any failure or omission on the part of the Insureds or the Company to effect and maintain insurance;

    (s) alleging, arising out of, based upon or attributable to, or in any way involving, either directly or indirectly, antitrust violations, price fixing, price discriminations, unfair competition, deceptive trade practices and/or monopolies, including any actions, proceedings, claims or investigations related thereto;

    (t) alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others; provided, however, that this exclusion shall not apply to:

        (1) Employment Practices Claims;

        (2) Claims for Loss alleging Wrongful Acts of an Insured(s) peer review or credentialling processes;

    (u) alleging, arising out of, based upon or attributable to any Human Clinical Trial. For purposes of this exclusion (u), "Human Clinical Trial" shall mean any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical.

III.  AMENDED CLAUSE 9

Clause 9 is deleted in its entirety and replaced with the following:

9.  PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

This Clause 9 applies to all Claims.

Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel shall be made to conduct the defense of all Claims against an Insured pursuant to the terms set forth below.

In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy, then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event the Insureds are already defending a Claim, then the Insureds shall select a Panel Counsel Firm to defend the Insureds.

The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds, shall be from the list of Panel Counsel Firms designated for the type of Claim and be from the jurisdiction in which the Claim is brought. In the event a Claim is brought in a jurisdiction not included on the appropriate list, the selection shall be made from a listed jurisdiction which is the nearest geographic jurisdiction to either where the Claim is maintained or where the corporate headquarters or state of formation of the Named Entity is located. In such instance, however, the Insurer shall, at the written request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice in the jurisdiction in which the Claim is brought to function as "local counsel" on the Claim to assist the Panel Counsel Firm which will function as "lead counsel" in conducting the defense of the Claim.

With the express prior written consent of the Insurer, an Insured may select (in the case of the Insured defending the Claim), or cause the Insurer to select (in the case of the Insurer defending the Claim), a Panel Counsel Firm different from that selected by other Insured defendants if such selection is required due to an actual conflict of interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer. However, no change shall be made to the specific list attached to this policy during the Policy Period without the consent of the Named Entity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**EXCLUSION J AMENDED
(LIMITED PRIVATE PLACEMENT COVERAGE)**

In consideration of the premium charged herein it is understood and agreed that Clause 4. EXCLUSIONS, is hereby amended by deleting Exclusion (j) in its entirety and replacing it with the following:

(j) alleging, arising out of, based upon or attributable to any public or private offering of securities by the Company, an Outside Entity or an Affiliate or alleging a purchase or sale of such securities subsequent to such offering;

provided, however, that this exclusion will not apply to:

(1) any purchase or sale of securities exempted pursuant to section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the Named Entity shall give the Insurer written notice of any public offering exempted pursuant to section 3(b), together with full particulars and as soon as practicable, but not later than 30 days after the effective date of the public offering;

(2) to any private offering of securities if such private offering is less than or equal to $15,000,000 [handwritten] in proceeds; coverage for such private offering shall not ~~be conditioned upon payment of any additional premium~~; however, the Named Entity shall give the Insurer written notice of any such private offering together with full particulars and as soon as practicable, but not later than 30 days after the effective date of such private offering;

(3) to any offering of securities (other than a public offering described in paragraph (1) above or a private offering described in paragraph (2) above), as well as any purchase or sale of such securities subsequent to such offering, in the event that within 30 days prior to the effective time of such offering: (i) the Named Entity shall give the Insurer written notice of such offering together with full particulars and underwriting information required thereto; and (ii) the Named Entity accepts such terms, conditions and additional premium required by the Insurer for such coverage. Such

coverage is also subject to the Named Entity paying when due any such additional premium. In the event the Named Entity gives written notice with full particulars and underwriting information pursuant to (i) above, then the Insurer must offer a quote for coverage under this paragraph;

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.