## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC. *Formerly known as* HELLER HEALTHCARE FINANCE, INC., Plaintiff, and MICHAEL INGOLDSBY, Intervenor/Plaintiff, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and INTERNATIONAL INSURANCE GROUP, LTD., Defendants. | CIVIL ACTION No: 05-CV-11128-NG |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT

The Plaintiff-Intervenor Michael Ingoldsby ("Plaintiff-Intervenor" or "Mr. Ingoldsby") submits this Memorandum of Law in Opposition to Defendant National Union Fire Insurance Company of Pittsburgh, PA's ("Defendant" or "National Union") Motion for Summary Judgment. The Plaintiff-Intervenor opposes the Defendant's Motion for Summary Judgment as there are genuine issues of material fact relating to: (1) Michael Ingoldsby's omission of the National Union Policy and his potential claim against National Union from his bankruptcy filings; and (2) the applicability of the Policy's contractual liability exclusion to the negligent misrepresentation claim asserted against Mr. Ingoldsby in the underlying dispute.

The Plaintiff-Intervenor also submits this Memorandum of Law in support of his Cross-Motion for Summary Judgment.  Should the Court determine that no question of fact exists relating to the terms of the Policy, it should find that the negligent misrepresentation claim for which Mr. Ingoldsby sought coverage falls squarely within the Policy's definition of a "Wrongful Act" and, therefore, Mr. Ingoldsby's claims are covered under the Policy as a matter of law.

## RELEVANT FACTUAL BACKGROUND

On or about December 5, 2005, Mr. Ingoldsby filed a civil action against National Union for declaratory judgment, pursuant to 28 U.S.C. § 2201, breach of contract, fraud, and violations of Mass. Gen. Laws ch. 93A, arising from a dispute concerning defense obligations under a directors & officers liability insurance policy issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc. ("MHCS") and its officers and directors.

### The D & O Insurance Policy

Mr. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of MHCS. *See* Affidavit of Michael Ingoldsby ("Ingoldsby Affidavit"), ¶ 2.  As such, the Plaintiff-Intervenor was insured for liability under a Directors and Officers liability policy issued by National Union to MHCS, being policy number 873-87-52, effective August 4, 2001, through August 4, 2002 (hereinafter referred to as the "Policy").  *See* Ingoldsby Affidavit, ¶ 5.  The Policy covered any claim made against the directors or officers of MHCS for any alleged wrongful act made in their respective capacities. Specifically, under Section 2(g) of the Policy, a "Wrongful Act" is described as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as

such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

The Policy also included a so-called contractual liability exclusion, Exclusion 4(h), which excludes from coverage, all claims:

> (h)  alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement (including, but not limited to, any liquidated damages, severance agreement or payment, golden parachute agreement, or any compensation agreement payable upon termination of any insured)…

> *See* Affidavit of Gregory J. Aceto ("Aceto Affidavit"), ¶ 4 and *Exhibit B* attached thereto; Affidavit of James R. Martocci ("Martocci Affidavit"), ¶ 8.

Because National Union and IIG failed to adequately disclose the existence of the contractual liability exclusion, the Plaintiff-Intervenor had no knowledge of it until National Union denied his claim.  More importantly, the Plaintiff-Intervenor had no knowledge of the effect of said endorsement in eliminating coverage under the Policy for claims against him or MHCS that relate to a contract.  *See* Ingoldsby Affidavit, ¶¶ 12-13; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 78:13-22, p. 75:5-20.  Had he been fully informed of the existence of Exclusion 4(h) and the purported effect thereof, Mr. Ingoldsby would have advised MHCS not to purchase the Policy.  *See* Ingoldsby Affidavit, ¶10; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 78:13-22.

### *The Heller Litigation*

On or about August 1, 2002, Heller commenced a civil action in the United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the

"Heller Action") against Michael Ingoldsby, in which it alleged a claim for Negligent

Misrepresentation (Count I) and a claim for Breach of Guaranty (Count II) against

Michael Ingoldsby. *See* Ingoldsby Affidavit, ¶ 14. With regard to the claim for

negligent misrepresentation, Heller alleged that "Jones, Edwards and Ingoldsby, in the

course of their business and employment, and in the course of the business MHCS and of

Medical Temporaries, *supplied false information* to Heller regarding the borrowing base

of the eligible Accounts and accounts receivables of MHCS and Medical Temporaries."

*See* Heller Lit. Compl. at ¶ 55, submitted in connection with National Union Motion for

Summary Judgment (emphasis added). Mr. Ingoldsby, however, was not involved in

compiling or assuring the accuracy of the Borrowing Base Certificates submitted to

Heller. *See* Ingoldsby Affidavit, ¶¶ 3-4; Ingoldsby Depo. p. 60:16-19. Rather, Mr.

Ingoldsby was sued solely in his capacity as Chairman of the Board. *Id.*

### National Union's Denial of Coverage

On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the

Defendant, National Union. *See* Ingoldsby Affidavit, ¶ 16. On or about October 11,

2002, National Union, through counsel, issued a *preliminary* determination that there was

no coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee

Ingoldsby, and Indy Edwards. *See* Ingoldsby Affidavit, ¶ 17. Since National Union's

position was characterized as a preliminary determination, Mr. Ingoldsby believed that

National Union would likely revisit the coverage issue and ultimately provide coverage

once it performed the requisite investigation into Heller's claims. *Id.* Thus, Mr.

Ingoldsby, through counsel, continued to communicate with National Union and IIG

about potential coverage for the *Heller Action.* In response to subsequent email

correspondence from Mr. Ingoldsby's attorney regarding coverage for the claims, counsel for National Union sent another letter, dated March 6, 2003, explicitly stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." *See* Ingoldsby Affidavit, ¶ 19.

Because National Union denied his claim under the Policy, Mr. Ingoldsby bore the cost of his defense of the Heller Action. *See* Ingoldsby Affidavit, ¶ 21. In litigating the claims asserted by Heller over a two-year period, he expended a substantial amount of money in attorneys' fees and costs. *See* Ingoldsby Affidavit, ¶ 22. Specifically, Mr. Ingoldsby incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24). *See* Ingoldsby Affidavit, ¶ 22. In addition, pursuant to the Settlement Agreement with Heller, the Plaintiff-Intervenor submitted payment to the bankruptcy trustee in the amount of One Hundred Five Thousand Dollars ($105,000.00). *See* Ingoldsby Affidavit, ¶ 30; Brundage Affidavit, ¶ 13.

After Mr. Ingoldsby had incurred significant damages, including but not limited to those referenced above and those related to the bankruptcy, Mr. Ingoldsby, by way of letter from counsel, dated March 17, 2004, submitted a formal demand to National Union under Mass. Gen. Laws Ch. 93A for reimbursement of his defense costs. National Union declined coverage a month later and, in doing so, again relied upon Exclusion 4(h), as amended by Endorsement No. 8. *See* Ingoldsby Affidavit, ¶ 20.

### *Mr. Ingoldsby's Bankruptcy*

As a result of his growing legal fees and potential liability in the *Heller Action*, Mr. Ingoldsby filed a petition for relief pursuant to Chapter 7 of the United States

Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy"). *See* Ingoldsby Affidavit, ¶ 23; Brundage Affidavit, ¶ 3. National Union was not a creditor in the Bankruptcy. *See* Ingoldsby Affidavit, ¶ 24.

On or about January 2, 2003, Mr. Ingoldsby filed his Schedules and Statement of Financial Affairs. *See* Ingoldsby Affidavit, ¶ 21-23; Brundage Affidavit, ¶ 4. Mr. Ingoldsby also did not list the National Union Policy on his Schedule B because his bankruptcy counsel advised him not to include it since it was not a personal asset, but rather an asset of the MHCS bankruptcy. *See* Ingoldsby Affidavit, ¶ 27; Brundage Affidavit, ¶ 9; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 45:14-47:5. In his Statement of Financial Affairs, Mr. Ingoldsby disclosed that he was a defendant in the Heller Action. *See* Brundage Affidavit, ¶ 5. Mr. Ingoldsby did not schedule a potential claim against National Union because he had not yet incurred any significant legal fees or suffered any other damages and, therefore, had no reason to contemplate a claim for reimbursement and/or indemnification against National Union. Moreover, Mr. Ingoldsby believed that National Union would reconsider its preliminary denial of coverage once it looked beyond the face of the Heller Complaint and performed the requisite investigation into Heller's claims. *See* Ingoldsby Affidavit, ¶¶ 26-27; Brundage Affidavit, ¶¶ 6-7. Therefore, there was no reason for him to list any claim against National Union on his Schedules and Statement of Financial Affairs. *Id.*

Subsequently, on or about April 18, 2003, Mr. Ingoldsby filed an Amended Schedule and Statement of Affairs. At this time, however, he was still not aware of any potential claim against National Union and, therefore, did not disclose any such claim.

*See* Ingoldsby Affidavit, ¶¶ 28-29; Brundage Affidavit, ¶¶ 10-11.

### *Mr. Ingoldsby Discloses his Potential Claim*

Mr. Ingoldsby disclosed his potential claim against National Union prior to receiving a discharge.  In fact, it was during his bankruptcy settlement discussions that Mr. Ingoldsby first discussed a potential claim against National Union with his bankruptcy counsel.  *See* Ingoldsby Affidavit, ¶ 33; Brundage Affidavit, ¶ 14.  Mr. Ingoldsby's bankruptcy counsel advised him that he did not need to amend his Statement of Financial Affairs to reflect a potential claim for reimbursement of post-petition expenses.  *Id*; Brundage Affidavit, ¶ 16.   Sometime thereafter, the Bankruptcy trustee was also notified that Mr. Ingoldsby had a potential claim against National Union related to the reimbursement of said costs.  *See* Ingoldsby Affidavit, ¶ 33-34; Brundage Affidavit, ¶ 15; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 46:1-5, 47:19-49:24.  As such, Mr. Ingoldsby did not omit his claim against National Union from his Statement of Financial Affairs with the intention of defrauding the court or his creditors. *See* Ingoldsby Affidavit, ¶ 34-35.  Rather, Mr. Ingoldsby relied, in good faith, on the advice of counsel.

### <u>ARGUMENT</u>

The Court should deny the Defendant National Union's Motion for Summary Judgment as there are genuine issues of material fact relating to: (1) Michael Ingoldsby's omission on his schedules of his potential claim against National Union as an alleged asset of his bankruptcy estate; and (2) the applicability of the Policy's contractual liability exclusion to the negligent misrepresentation claim asserted against Mr. Ingoldsby in the underlying dispute.

Should the Court, however, determine that no question of fact exists relating to the terms of the Policy, it should find that Mr. Ingoldsby's claims are covered under the Policy as a matter of law because the negligent misrepresentation claim for which Mr. Ingoldsby sought coverage falls squarely within the Policy's definition of a "Wrongful Act".

## I.    Standard of Review for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). At the outset, the moving party must aver that there is "an absence of evidence to support the nonmoving party's" position. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir. 1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). To avoid summary judgment, the opposing party must produce affirmative evidence demonstrating a genuine issue for trial. *Mesnick v. General* Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991). "[T]he nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir. 1989).

In deciding a motion for summary judgment, the court must view the evidence "in the light most favorable to the nonmovant, and all doubts and reasonable inferences must be resolved in the nonmovant's favor…If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant." *Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668, 684 (1st Cir. 1994) (internal quotation marks and citations omitted).

II.     **The Court should deny the Defendant National Union's Motion for Summary Judgment as there are genuine issues of material fact relating to Mr. Ingoldsby's omission of the National Union Policy and a potential claim against National Union from his bankruptcy filings.**

Mr. Ingoldsby does not dispute that he did not list the National Union Policy or a claim against National Union on his Schedules and Statement of Financial Affairs filed with the U.S. Bankruptcy Court for the Middle District of Florida. However, this omission does not bar this suit under the doctrine of judicial estoppel. Specifically, issues of material facts exist related to whether the Plaintiff-Intervenor was required to disclose the National Union Policy or a potential claim of reimbursement and indemnification against National Union. Further, should the court determine that such a duty existed, issues of material fact also exist related to the Plaintiff-Intervenor's motivation for not scheduling the Policy or a claim against National Union.

A.     **Mr. Ingoldsby's claim arose post-petition and, therefore, his claim need not have been disclosed to the bankruptcy court.**

As a general rule, a debtor's claims that have accrued as of the date that the bankruptcy case commences become part of the bankruptcy estate. *Graupner v. Brookfield*, 2006 WL 2455812, *5 (D. Mass 2006), *citing* 11 U.S.C. § 541(a)(1). A cause of action under M.G.L. ch. 93A does not accrue until the plaintiff knew or should have known of an appreciable harm resulting from the defendant's action. *Schwartz v. Travelers Indemnity Co.*, 50 Mass.App.Ct. 672, 678 (2001). Accordingly, Mr. Ingoldsby did not list a claim against National Union in his Statement of Financial Affairs because, at that time, no such claim existed. *See* Ingoldsby Affidavit, ¶¶ 24-25. Prior to filing, National Union had only issued what it characterized as a "preliminary determination" that coverage did not exist. As such, Mr. Ingoldsby reasonably believed that National

Union would likely revisit the coverage issue and ultimately provide coverage once it looked beyond the mere allegations and performed the requisite investigation into Heller's claims. *See* Ingoldsby Affidavit, ¶¶ 25-27. In addition, the Heller Action was stayed at the time he filed his Schedules and relief from stay was not granted until July 16, 2003. *See* Ingoldsby Affidavit, ¶ 29. Any fees that Mr. Ingoldsby incurred prior to the petition date were to be discharged and, therefore, did not concern Mr. Ingoldsby.

In addition, nearly all of the damages which Mr. Ingoldsby has alleged in the instant matter occurred post-petition and are, therefore, not part of the bankruptcy estate. Specifically, it was not until after Heller was granted relief from the automatic stay in the bankruptcy case and the Heller Action began to proceed that Mr. Ingoldsby began to accumulate any substantial legal fees and defense costs related thereto. *See* Ingoldsby Affidavit, ¶¶ 26-28. Further, it was not until March 17, 2004 that Ingoldsby made a formal demand upon National Union for reimbursement of his defense costs in the Heller Action. *See* Ingoldsby Affidavit, ¶ 31.

In light of the foregoing, the Plaintiff-Intervenor did not breach any duty of disclosure to the bankruptcy court by not scheduling his potential claim of reimbursement and/or indemnification against National Union, and should not be estopped from pursuing it now.

**B.    The application of judicial estoppel is not appropriate in this case because the Mr. Ingoldsby did not mislead the bankruptcy court or secure an unfair advantage by not scheduling his claim against National Union.**

"Judicial estoppel is an equitable doctrine that precludes a party from asserting a position in one legal proceeding that is contrary to a position it had previously asserted in another proceeding." *Otis v. Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-40 (2005),

quoting *Blanchette v. School Comm. of Westwood*, 427 Mass. 176, 184 (1998). Several

factors typically inform the decision whether to apply the doctrine of judicial estoppel in

a particular case: whether the party's later position is "clearly inconsistent" with its earlier

position, whether the party has succeeded in persuading a court to accept that party's

earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that either the first or second court was misled,

and whether the party seeking to assert an inconsistent position would derive an unfair

advantage or impose an unfair detriment on the opposing party if not estopped. *New

Hampshire v. Maine*, 532 U.S. 742 (2001).

With regard to the first element, although the Plaintiff-Intervenor did not schedule

his potential claim against National Union, he did disclose that he was a defendant in the

Heller Action. As such, the fact that he is now seeking reimbursement of his post-

petition legal fees related to the Heller Action is not "clearly inconsistent" or "directly

contrary" with his earlier position. The fact that he incurred damages on a post-petition

basis for which he now seeks damages is in no way inconsistent with his filing of

schedules in the bankruptcy court. Given the deficiency in the first element, the inquiry

should end here. However, an analysis of the additional elements further illustrates that

judicial estoppel is inappropriate in this case.

With regard to the second element, the Massachusetts Supreme Judicial Court, in

*East Cambridge Sav. Bank v. Wheeler*, 664 N.E.2d 446, 448 (1996), recognized that

judicial estoppel is only applicable "where the party to be estopped had been successful

in its first assertion of its inconsistent position." The Court further reasoned that: "We

decline to identify a <u>settlement</u> [in a prior bankruptcy court proceeding] <u>as representing</u>

success for the purposes of judicial estoppel. *Id.* In this case, all of the major claims in the bankruptcy proceeding were disputed and ultimately "settled" and, therefore, the Plaintiff-Intervenor cannot be deemed to have been "successful" in asserting an inconsistent position.

Most importantly, with regard to the third element, not scheduling the indemnity claim would not allow Ingoldsby to obtain any "unfair advantage" against National Union. National Union was not even a creditor in the bankruptcy case and, thus, its position was in no way altered by the bankruptcy filings.

National Union's reliance on *Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.), Inc.*, 989 F.2d 570, 571 (1st Cir. 1993) is entirely misplaced. In *Payless,* a Chapter 11 case, the plaintiff/former-debtor had filed for bankruptcy, obtained a discharge of its debts, and then filed a lawsuit seeking damages for defendants' wrongful business practices which allegedly caused its bankruptcy. *Id.* Noting that Payless had not referenced the claims in its bankruptcy filings, the First Circuit applied the doctrine of judicial estoppel to bar Payless' claims. The present matter, however, can be distinguished from *Payless.* First, in *Payless,* the debtor's failure to disclose assets deprived creditors of their proper share of assets of the estate and would have been a windfall to the plaintiff had the court allowed the litigation to proceed. *Id.* In this case, the creditors' claims were settled. Mr. Ingoldsby will not receive a windfall if he succeeds in this litigation, but rather will essentially be reimbursed the money he was forced to spend in his defense of the *Heller Action*, the bankruptcy and his suit against National Union, most, if not all, of which was post-petition date expenses. Conversely, National Union would receive the large windfall if the case were dismissed. Finally,

*Payless* is also distinguishable because it involved undisclosed claims against one of the major creditors in the plaintiff's bankruptcy case which is not the case in the instant matter. National Union was not a debtor or creditor in the bankruptcy. More to the point, National Union did not have any claims against Mr. Ingoldsby and, thus, could not have been harmed by any alleged non-disclosure.

**C.    Judicial estoppel is not applicable because Mr. Ingoldsby did not attempt to intentionally manipulate the legal system, but rather acted in good faith and on the advice of counsel.**

Application of judicial estoppel is a matter of the court's discretion, and its purpose "is to prevent the manipulation of the judicial process by litigants." *Id.* at 640, quoting *Canavan's Case,* 432 Mass. 304, 308 (2000). The primary discretionary factor considered by the Court is the intent or motive of the litigant. *Cordeiro v. O'Connor*, 2006 WL 696560 (Mass.Super. 2006). Because the primary purpose of judicial estoppel is to protect the integrity of the court and to prevent a litigant from "playing fast and loose with the courts," courts will often look to see if the litigant is intentionally trying to manipulate the judicial system. *Otis v. Arbella Mut. Ins. Co.,* 443 Mass. 634, 642, quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F .3d 23, 33 (1st Cir. 2004); see also *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir. 1987). As such, courts have held that the doctrine should only be applied where a party has adopted one position, secured a favorable decision, and then taken a contradictory position <u>in search of legal advantage</u>. *InterGen N.V. v. Grina,* 344 F.3d 134, 144 (1st Cir. 2003) (emphasis added). The doctrine should not be applied "where the party's prior position was asserted in good faith, and where the circumstances provide a legitimate reason--other than sheer tactical gain--for the subsequent change in that party's position."

443 Mass. at 642. Further, judicial estoppel should not be applied when a party's prior position was based on inadvertence or mistake. *New Hampshire v. Maine*, 532 U.S. 742, 753 (2001); *see also Barger v. City of Cartersville*, 348 F 2d 1289 ((11th Cir. 2003).

In the present matter, not scheduling both the Policy and the claim against National Union was not based upon any improper motive. With respect to the Policy, Mr. Ingoldsby disclosed its existence to his bankruptcy counsel who advised him that the Policy was not a personal asset, but rather an asset of the ongoing MHCS bankruptcy and need not be scheduled. *See* Ingoldsby Affidavit, ¶ 31; Brundage Affidavit, ¶ 9.

With respect to the potential claim against National Union, Mr. Ingoldsby discussed the potential claim with his attorney who then later discussed it with the trustee. *See* Brundage Affidavit, ¶¶ 14-16. Mr. Ingoldsby was advised by his attorney that it was not necessary to amend his Schedules to include the claim. The fact that the trustee was aware of the potential claim, and that his bankruptcy counsel advised him that he did not need to include his potential claim against National Union demonstrate Mr. Ingoldsby's good faith with respect to this issue. *See* Ingoldsby Affidavit, ¶¶ 33-35; Brundage Affidavit, ¶¶ 14-16. Further, it also shows that not scheduling the claim was based on a good faith belief based on advice of counsel and not an intentional manipulation of the judicial system. *Id.* In any event, not scheduling the claim was certainly not a fraud on the court or a "cat and mouse tactic" as alleged in National Union's Motion for Summary Judgment.

**D.    Should the Court estop the Plaintiff-Intervenor from pursuing his claim, National Union will receive a windfall by avoiding all liability for its wrongful denial of coverage.**

Even where courts have found that a party did indeed mislead the court by failing to disclose a claim in bankruptcy, courts are reluctant to impose the doctrine of judicial estoppel because it is such a severe remedy. *Graupner v. Brookfield*, 2006 WL 2455812, *9 (D. Mass 2006). Moreover, courts are particularly reluctant to dismiss a claim on judicial estoppel grounds where to do so would create a potential windfall for the defendant or allow it to avoid liability for its wrongdoing altogether. *Id.* Courts have also found that dismissal of the claims, at least in theory, may be unfair to the debtor's creditors, who should have an appropriate opportunity to apply any proceeds of those claims to satisfy debts. *Id.*

Here, even if the Court determines that Mr. Ingoldsby should have scheduled the Policy and the potential claim, it should still not impose judicial estoppel because dismissal of Mr. Ingoldsby's claims will certainly lead to a windfall for National Union. Specifically, the application of judicial estoppel would allow National Union to escape all liability for its wrongful denial of insurance coverage.

**II.    The negligent misrepresentation claim against Mr. Ingoldsby falls squarely within the Policy's definition of a "Wrongful Act" to which no exclusion applies. Therefore, Mr. Ingoldsby's claims are covered under the Policy as a matter of law.**

The allegations of the Heller complaint were "reasonably susceptible" of an interpretation that they stated a claim covered by the Policy and, therefore, National Union had a duty to advance Mr. Ingoldsby his defense costs. The claim for negligent misrepresentation against Mr. Ingoldsby clearly qualifies as a "Wrongful Act" as defined under the Policy. Nonetheless, National Union is seeking to bar coverage by relying on

an overly broad interpretation of the Policy's contractual liability exclusion (Exclusion 4(h)). Specifically, National Union argues that the Heller Complaint hinges upon a written contract, namely the DIP Loan Agreement, and therefore the case should be exempt from coverage under Exclusion 4(h). This argument fails for two reasons. First, National Union's interpretation of this contract exclusion provision is overly broad in that it seeks to exclude all claims that relate in any way to a contract. Second, the claims asserted in the Heller Complaint are clearly covered under another provision of the Policy as a "Wrongful Act".

      **A.**      **National Union's interpretation of this contract exclusion provision is overly broad in that it seeks to exclude all claims that relate in any way to a contract.**

If language in a contract is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment. *Seaco Insurance Company v. Barbosa*, 435 Mass. 772, 779 (2002); *see Lexington Ins. Co. v. All Regions Chem. Labs, Inc., 419 Mass. 712, 713 (1995).* While the insured bears the initial burden of proving that a claim falls within the grant of coverage, once this is established the burden shifts onto the insurer to show the applicability of any exclusion. *Camp Dresser & McKee, Inc. v. Home Ins. Co.,* 30 Mass.App.Ct. 318, 321 (1991). This is a heavy burden as exclusions from and limitations to coverage are to be narrowly construed. *Commerce Inc. Co. v. Betty Caplette Builders, Inc.,* 420 Mass. 87, 93 (1995).

When determining whether an ambiguous policy provision provided coverage…the provision in question is to be construed in favor of the insured and coverage. *Jefferson Ins. Co. of New York v. National Union Fire Insurance Co. of Pittsburgh, PA,* 42 Mass. App. Ct. 94, 99-100 (1997). In *Jefferson Insurance Co. of N.Y.,*

National Union attempted to rely on the professional services exclusion of a comprehensive general liability policy to deny coverage for a negligence claim against an ambulance company. *Id.* The court held that the application of the canons of construction and "the test of common sense… cast doubt on the proposition that misreading or misstating an address or driving to the wrong location constituted a professional service, even on the part of an acknowledged professional." *Id.* In so finding, the court held that the negligent conduct did not fall within the exclusion and that National Union had improperly denied coverage. *Id.* at 101-102.

More important, the court found that National Union's proffered interpretation of the policy and the exclusion "would have the exclusion swallow the policy," and, therefore, was void as against public policy. *Id.* Moreover, the court held that under National Union's construction of the policy "there would be few actions of ambulance employees that would be covered, for virtually all of the ordinary activities of ambulance company personnel could be deemed professional in the broad, general sense." *Id.* at 103. As such, the policy was void as against public policy because National Union's interpretation would have negated the "very coverage that the policy purports to provide…" *Id.*, quoting *Liberty Mut. Ins. Co. v. Tabor*, 407 Mass. 354, 358 (1990).

Here, National Union is relying upon an interpretation of an exclusion that would indeed "swallow the policy." *See* Martocci Affidavit, ¶ 10. Specifically, National Union's overly broad interpretation of Exclusion 4(h) would greatly reduce the protection afforded by the Policy. *See* Martocci Affidavit, ¶ 9. *See Wolov v. Michaud Bus Lines, Inc.*, 21 Mass. App. Ct. 60, 63 (1985). Under National Union's construction of the

Policy, the Policy would provide little or no coverage because almost all claims against the directors and officers of MHCS would touch upon an agreement of some kind.

National Union claims that the Policy affords some protection for its insured because the Policy covers claims related to employment practices. While the Policy does state that Exclusion 4(h) shall not apply to employment practices claims, it again limits coverage by specifying that employment practices claims are only covered "to the extent that any liability *does not arise from such express contract or agreement*". (emphasis added). *See* Aceto Affidavit, ¶ 4 and *Exhibit B* attached thereto. Therefore, the employment practices claims, which are allegedly excepted from Exclusion 4(h), are nonetheless still subject to a contractual liability exclusion. Further, if National Union interprets the language of the exception to Exclusion 4(h) as broadly as it interprets the exclusion itself, the exception will not afford any coverage to the insured because almost all claims related to employment would touch upon an agreement of some kind. In light of the foregoing, National Union's interpretation would surely negate the very coverage that the Policy purports to provide its insured and, therefore, is void as against public policy.

**B.    The negligent misrepresentation claim asserted in the Heller Complaint is clearly covered under the Policy as a "Wrongful Act" and no exclusion applies.**

As to policy exclusions related to contractual liability, federal courts have specifically held that allegations of misrepresentation and fraud are not within such exclusions where the policy covered "wrongful acts", the definition of which includes misstatements and misleading statements. *Church Mutual Insurance Company v. United States Liability Insurance Co.*, 347 F.Supp.2d. 880, 884-85 (S.D. Cal. 2004); *Admiral*

*Insurance Co, Inc. v. Briggs*, 264 F.Supp.2d. 460, 462 (N.D. Tex. 2003); *The American Chemical Society v. Leadscope, Inc., et al.*, 2005 WL 1220746, *10 (Ohio App. 10 Dist.). In *Church Mutual Insurance Company v. United States Liability Insurance Co.*, the insurer argued that pursuant to the language of the contractual liability exclusion[1], no more than an incidental connection between breach of contract and fraud was required. *Id.* at 885. The court rejected this argument, finding that the exclusionary language was ambiguous when read in conjunction with the coverage provisions providing coverage for "wrongful acts," which were defined to include fraudulent statements. *Id.* at 886. As such, the court concluded that the exclusionary language should be narrowly construed against the insurer to require more than an incidental connection. *Id.* Using this approach, the court then determined that the gravamen of the underlying complaint was indeed fraud, not breach of contract, and, therefore, the contractual liability exclusion did not apply. *Id.*

The court in *Admiral Insurance Co, Inc. v. Briggs* found that a contract exclusion clause of a management liability policy did not preclude coverage for claims that the insured's officers and directors made misstatements and misrepresentations regarding the future success of the insured in order to convince its landlord to accept stock instead of cash lease payments and a security deposit. In so ruling, the court again found that the insurer's interpretation of the policy's contractual liability exclusion[2] was overly broad. *Admiral Insurance Co, Inc. v. Briggs*, 264 F. Supp. 2d. 460, 462 (N.D. Tex. 2003). It

---

[1] The liability policy at issue excluded coverage for any claim " 'arising out of, directly or indirectly resulting from or in consequence of, or in any way involving ... any actual or alleged breach of contract.' "

[2] The clause states that no coverage exists for claims "based upon, arising out of, directly or indirectly resulting from or in consequence of, or *in any way involving* any oral or written contract or agreement" unless "such liability would have attached to the Insured in the absence of the oral or written contract or agreement."

further found that such a broad interpretation would cause the exclusion to directly

conflict with other provisions of the policy that clearly dealt with fraud and

misstatements. *Id.*

In *The American Chemical Society v. Leadscope, Inc., et al.*, the court found

National Union could not rely on a nearly identical contractual liability exclusion

contained in a directors and officers policy to deny coverage for a claim for conversion.

In so ruling, the court held that "a claim for conversion could have arisen from tortious

activity as well as the insured's employment contracts." 2005 WL 1220746, *10 (Ohio

App. 10 Dist.). The court also found that the mere reference to contractual liability in the

conversion claim and other parts of the complaint, without actually basing the conversion

complaint upon the contractual liability, is insufficient to trigger the exclusion". *Id.* The

court reasoned that, if this were true, pleading an alternate theory that included an

allegation of contractual liability would exclude other claims that may not be based on

contract and that "such a severe consequence cannot be upheld without specific language

indicating this is what the parties intended." *Id.*

The negligent misrepresentation claim asserted in the Heller Complaint clearly

falls under the Policy's definition of a "Wrongful Act". The plain meaning of

misrepresentation is a: "Wrong or incorrect representation of facts, statements, the

character of a person, etc.; the action of misrepresenting someone or something. Also: an

instance of this; a wrong or misleading representation." Oxford English Dictionary (June

2002), *available at* http:// www.oed.com. Therefore, the plain meaning of

"misrepresentation" clearly includes misstatements and misleading statements. As the

"Wrongful Act" coverage provision includes omissions, misstatements and misleading

statements, it plainly includes a claim of negligent misrepresentation. *See* Martocci Affidavit, ¶ 8.

Moreover, in order to recover for negligent misrepresentation, a plaintiff must prove that the defendant (1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) *in their business transactions*, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp. v. Keyes Assocs.*, 45 Mass.App.Ct. 15, 19-20 (1998) (emphasis added). Based on the foregoing, it should be expected that the majority of misrepresentations made in the course of *business transactions* will likely involve some sort of contract. In fact, courts in Massachusetts have indicated that there is a "general requirement that the tort of negligent misrepresentation arise from a relationship of contract privity," to which only narrow exceptions apply.[3] *Capitol Indem. Corp. v. Freedom House Development Corp.*, 487 F.Supp. 839 (D. Mass.1980). Therefore, National Union's definition of Wrongful Acts should have anticipated that any misrepresentations made by directors and officers of a corporation would likely take place in the context of some sort of contract. *See* Martocci Affidavit, ¶ 8. Instead, National Union's fails to acknowledge that its interpretation of the Wrongful Act clause and Exclusion 4(h) are in direct conflict with one another and with the nature of the claims for which the Policy purports to provide coverage.

As stated previously, National Union bears the burden of demonstrating the applicability of Exclusion 4(h) and the exclusion is to be narrowly construed against the insurer. As set forth above, federal courts have held that allegations of misrepresentation

---

[3] Courts have limited the exceptions to the narrow boundaries of foreseeability. *Id.*

and fraud are not within such exclusions where the policy covered wrongful acts, including misstatements and misleading statements.

In addition, National Union cannot simply rely upon the fact that the Heller Complaint makes reference to the DIP Loan Agreement to trigger Exclusion 4(h).  *The American Chemical Society,* 2005 WL 1220746, *10.  Instead, National Union must demonstrate that there was a causal connection between the DIP Loan and the claims against Mr. Ingoldsby.  Because the negligent misrepresentation claim set forth in Heller Complaint clearly sounds in tort and not in contract, National Union's reliance on the Exclusion 4(h) is clearly unjustified.

Like the lease in *Admiral*, the DIP Loan did not *cause* the negligent misrepresentation claim, it simply provided the context in which the negligent misrepresentation took place.  244 F. Supp. 2d at 463.  First, Mr. Ingoldsby was not a party to the DIP Loan between Heller and MHCS and has not been sued by Heller for any alleged breach of contract.  A duty cannot arise from a contract, where, as here, the person owing the duty is not a party to the contract.  Rather, Mr. Ingoldsby was sued in his capacity as Chairman of the Board for negligently supervising MHCS's financials.  In fact, courts have held that the duty of an officer or director not to make false statements regarding his company's financial health flows from social policy rather than contractual obligation.  *Jamestown Iron & Metal Co. v. Knofsky*, 291 Pa. 60, 63 (1927).  As such, the negligent misrepresentation claim arises from tortious activity rather than contract.

In addition, Mr. Ingoldsby's purported liability to Heller for misrepresentation arose at the time of the preparation of MHCS's financial statements, which, of course, was long before Heller declared that MHCS breached the DIP Loan Agreement.   Thus,

22

by definition, the negligent misrepresentation claim does not "arise out of" the DIP Loan. *McPeek v. Travelers Cas. and Sur. Co. of America,* Slip Copy, 2006 WL 1308087, *4 (W.D.Pa. 2006). As such, Exclusion 4(h) is not applicable to the allegations set forth in the Heller Complaint and the claim is, therefore covered as a "Wrongful Act".

**III.    The language of the Policy is ambiguous because the contractual liability exclusion and the definition of "Wrongful Act" are contradictory when read together. Should the Court determine that the terms of the Policy are so ambiguous that a question of fact exists, National Union's Motion for Summary Judgment must be denied.**

A contract is ambiguous if it "is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is a proper one." *Bercume v. Bercume*, 428 Mass. 635, 641 (1999). If a contract contains ambiguities, a question of fact for the factfinder exists. *Gillentine v. McKead,* 426 F.2d 717, 721 (1st Cir.1970); *Trafton v. Custeau,* 338 Mass. 305, 307-08 (1959). In addition, where the contract has terms that are ambiguous, uncertain or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial. *Seaco Insurance Company v. Barbosa*, 435 Mass. 772, 779 (2002); *see Robert Indus., Inc. v. Spence*, 362 Mass., 751, 753-754 (1973).

Interpretation of an insurance contract is no different from interpretation of any other contract. *Citation Insurance Company v. Gomez, 426 Mass. 379, 381, 688 N.E.2d 951, 952 (1998).* In examining an insurance contract, the Court should consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 849, 616 N.E.2d 68, 72 (1993)* (quoting *Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990)).* Ambiguities in

insurance policies are resolved against the insurer, who drafted the policy and, therefore, if "there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." *Hazen,* 407 Mass. at 700. In addition, where an insurance policy is ambiguous as to create a genuine issue of material fact as to whether an exclusion excludes a particular claim, summary judgment must be precluded. *McConnell v. Scottsdale Insurance Co.*, 206 F.Supp.2d 95, 99 (D. Mass. 2002); *Liberty Mutual Insurance Company v. Metropolitan Life Insurance Co.*, 53 F.Supp. 529, 534-36 (D. Mass. 1999).

In the present matter, the Plaintiff-Intervenor and its insurer, National Union, have set forth opposing interpretations of the Policy as they relate to the claims set forth in the Heller Complaint. In this case, a reasonable insured reading the Policy's definition of a "Wrongful Act" would believe that a claim for negligent misrepresentation would be covered because the definition itself plainly states that the Policy provides coverage for "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company." Heller's allegations against Mr. Ingoldsby fall squarely within this definition. *See* Martocci Affidavit, ¶ 8.

National Union's interpretation of the Policy, on the other hand, relies solely on the contractual liability exclusion and fails to acknowledge that the claims asserted in the Heller Complaint are clearly covered under another provision of the Policy as a "Wrongful Act". *See* Martocci Affidavit, ¶ 11. In addition, as stated above, National Union bears the burden of demonstrating the applicability of any exclusion. As such,

National Union must show that the allegation of negligent misrepresentation squarely falls under the contractual liability exclusion set forth in Endorsement No. 8, as amended by Exclusion 4(h). The parties' widely differing interpretations of the Policy illustrate that the Policy may be so ambiguous as to create a genuine issue of material fact as to the applicability of the exclusion and, therefore, summary judgment should be denied and judgment.

## CONCLUSION

Should the Court determine that no question of fact exists relating to the terms of the Policy, it should find that the negligent misrepresentation claim for which Mr. Ingoldsby sought coverage falls squarely within the Policy's definition of a "Wrongful Act" and should enter judgment for Mr. Ingoldsby.

Respectfully submitted,
MICHAEL INGOLDSBY,
By his attorney,

/s/ Gregory J. Aceto, Esq.
Gregory J. Aceto, Esq.
BBO No. 558556
JOHNSON & ACETO, LLP
67 Batterymarch Street, Suite 400
Boston, MA 02110
(617) 728-0888