## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

   Plaintiff,

and

MICHAEL INGOLDSBY,

   Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

   Defendants.

CIVIL ACTION No: 05-CV-11128-NG

### PLAINTIFF-INTERVENOR MICHAEL INGOLDSBY'S STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**NOW COMES** the Plaintiff-Intervenor Michael Ingoldsby ("Mr. Ingoldsby" or ("Plaintiff-Intervenor") in the above-entitled action and, pursuant to Local Rule 56.1 of the Federal Rules of Civil Procedure, hereby submits his Statement of Disputed Material Facts in response to the Statement of Undisputed Facts submitted by Defendant National Union Insurance Company of Pittsburgh, PA ("National Union" or the "Defendant"). The Defendant hereby responds to each of the Defendant's numbered paragraphs and also provides additional material facts in opposition thereto. The Defendant incorporates by

reference hereto the Affidavit of Michael Ingoldsby (the "Ingoldsby Affidavit") and the Affidavit of Gregory J. Aceto, Esq. (the "Aceto Affidavit"). The Plaintiff-Intervenor responds as follows to the Defendant's Statement of Facts:

## The Parties

**Statement No. 1:**

Mr. Ingoldsby is an individual who resides at 1863 San Silvestro Drive, Venice, Florida. (Ingoldsby's First Amended Complaint in Intervention ("Compl.") at ¶ 1.)

**Response No. 1:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 1.

**Statement No. 2:**

Defendant National Union is an insurance company with its principal place of business at 175 Water Street, New York, New York. (Id. at ¶ 2). National Union is licensed to provide insurance in Massachusetts. (Id.).

**Response No. 2:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 2.

## The D & O Insurance Policy

**Statement No. 3:**

Managed Health Care Systems, Inc. ("MHCS") was, at all times relevant hereto, a Massachusetts corporation with its principal place of business in Hingham, Massachusetts. (Id. at ¶ 1.)

**Response No. 3:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 3.

**Statement No. 4:**

MHCS was a provider of health care services to Medicare beneficiaries in

Massachusetts' South Shore and Cape Cod areas. (Complaint in Heller Healthcare

Finance, Inc. v. Michael Lee Ingoldsby, Pamela Jones and Indy Edwards, Civil Action

No. 02-11553-NG (the "Heller Lit. Compl."), at ¶ 9).

**Response No. 4:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 4.

**Statement No. 5:**

Mr. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of

MHCS. (Compl. at ¶ 1).

**Response No. 5:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 5.

The Plaintiff-Intervenor asserts that as the Chairman of the Board he was not

involved in the day-to-day operations of MHCS.  In fact, he had not been involved in the

operations of MHCS since 1999 due to a medical condition which disabled him.  Since

1999, he has been collecting disability insurance and has not been involved in the day-to-

day operations of MHCS.  *See* Ingoldsby Affidavit, ¶3; Aceto Affidavit, ¶ 3 and *Exhibit

A* attached thereto; Deposition of Michael Ingoldsby ("Ingoldsby Depo."), pp. 17-18.

**Statement No. 6:**

National Union issued to MHCS a Director and Officers Insurance Policy bearing

a policy number 473-16-30, effective August 4, 2000 to August 4, 2001 (the "Prior

Policy"). (Aff. at ¶ 11 and Ex. J).  The Prior Policy excluded from coverage for any

claim:

Alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement...

(Id.).

**Response No. 6:**

The Plaintiff-Intervenor does not contest that National Union issued to MHCS a Director and Officers Insurance Policy bearing a policy number 473-16-30, effective August 4, 2000 to August 4, 2001 and that said policy included the above language.

**Statement No. 7:**

Mr. Ingoldsby received a copy of the Prior Policy, including the contractual liability exclusion. (Id.).

**Response No. 7:**

The Plaintiff-Intervenor does not contest that he received a copy of the Prior Policy.

However, Mr. Ingoldsby asserts that he was not aware that the Prior Policy contained the contractual liability exclusion. Had he been advised of the existence of the contractual liability exclusion and the purported effect thereof based on National Union's interpretation, Mr. Ingoldsby would have advised MHCS not to purchase the Prior Policy. *See* Ingoldsby Affidavit, ¶10; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 78:13-22.

**Statement No. 8:**

On or about February 23, 2001, MHCS filed a voluntary petition for relief under Chapter 11 of the United States Code in the United States Bankruptcy Court for the District of Massachusetts. (Aff. at ¶ 7 and Ex. E).

**Response No. 8:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 8.

**Statement No. 9:**

National Union issued to MHCS a Directors & Officers Insurance Policy bearing

a policy number 873-87-52, effective August 4, 2001 to August 4, 2002 (the "Policy").

(Aff. at ¶ 7 and Exhibit F, at No. 1). The Policy excluded from coverage any claim:

> alleging, arising out of, based upon or attributable to any actual or alleged
> contractual liability of the Company or an Insured under any express (written or
> oral) contract or agreement...

(Aff. at ¶ 2 and Ex. A (under "For-Profit Health Care Organization Amendatory
Endorsement," § II)).

**Response No. 9:**

The Plaintiff-Intervenor does not contest that National Union issued to MHCS a

Directors & Officers Insurance Policy bearing a policy number 873-87-52, effective

August 4, 2001 to August 4, 2002. The Plaintiff-Intervenor does not contest that

Exclusion 4(h) includes the above language.

> However, Exclusion 4(h), in its entirety, states as follows:
>
> (h) alleging, arising out of, based upon or attributable to any actual or
> alleged contractual liability of the Company or an Insured under any
> express (written or oral) contract or agreement (including, but not limited
> to, any liquidated damages, severance agreement or payment, golden
> parachute agreement, or any compensation agreement payable upon
> termination of any insured); provided, however, that the exclusion shall
> not apply to:
>
>> (1) Employment Practices Claims to the extent that any liability
>> does not arise from such express contract or agreement; or
>>
>> (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with
>> respect to hospital practice, privileges, credentialling or peer
>> review matters.

5

Under Section 2(g) of the Policy, a "Wrongful Act" is described as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

*See* Affidavit of Gregory J. Aceto ("Aceto Affidavit"), ¶ 4 and *Exhibit B* attached thereto.

## Statement No. 10:

Mr. Ingoldsby received a draft copy of the Policy, including the contractual liability exclusion.

## Response No. 10:

Mr. Ingoldsby does not contest that he received a draft copy of the Policy.

However, Mr. Ingoldsby asserts that the copy of the Policy that he received did not include the contractual liability exclusion as set forth in Endorsement No. 8. Further, he was not advised of the inclusion of Endorsement No. 8, which amended Exclusion 4(h), or of its implications on the coverage provided by the Policy. *See* Ingoldsby Affidavit, ¶ 13; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 75:5-20; p. 78:13-22.

## Statement No. 11:

MHCS was informed of the Policy's Exclusion 4(h) by means of a fax communication to MHCS Vice President of Finance and Chief Financial Officer Pamela Jones ("Jones") from Nicholas Sciotto of International Insurance Group, Ltd. ("IIG"), MHCS' insurance broker, dated July 31, 2001. (Aff. at ¶ 2 and Ex. A).

**Response No. 11:**

The Plaintiff-Intervenor does not contest that Nicholas Sciotto of IIG sent a fax communication to MHCS Vice President of Finance and Chief Financial Officer Pamela Jones, dated July 31, 2001.

The Plaintiff-Intervenor, however, disputes that he ever received or in any way learned of the above-referenced communication, and that the communication "informed" MHCS of Exclusion 4(h). *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 62:12-64:10. Rather, the fax communication stated that the Policy would include a Health Care Amendatory Exclusion. *See Exhibit A* attached to Affidavit of Joey Lee. While the letter outlined other coverage changes resulting from the Health Care Amendatory Exclusion, it did not explicitly reference Exclusion 4(h) or explain any changes to coverage resulting therefrom. *Id. See* Ingoldsby Affidavit, ¶ 12; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., pp. 62:12-64:10, p. 78:13-22, p. 75:5-20.

**Statement No. 12**

In that fax communication, IIG forwarded to MHCS National Union's proposed terms for the Policy, including the explicit language of the contractual liability exclusion. (Id.).

**Response No. 12:**

The Plaintiff-Intervenor does not contest that the fax communication, dated July 31, 2001, included a copy of the For-Profit Health Care Organization Amendatory Exclusion, in which the language of Exclusion 4(h) was included. Again, the Plaintiff-Intervenor contests that he ever received such communication or was advised of its

contents.  More importantly, Mr. Ingoldsby was not advised of National Union's anticipated interpretation of the language and its impact on the coverage afforded by the Policy.  *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 62:12-64:10.

Further, the Plaintiff-Intervenor asserts that neither IIG, nor National Union, advised Mr. Ingoldsby of the effect of the language of Exclusion 4(h).  Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), the Plaintiff-Intervenor had no knowledge of Endorsement No. 8 or Exclusion 4(h) prior to National Union's denial of his claim.  More importantly, the Plaintiff-Intervenor had no knowledge of the potential effect of said endorsement in limiting coverage under the Policy as National Union now argues.  *See* Ingoldsby Affidavit, ¶ 12-13; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 75:5-20, p. 78:13-22.

**Statement No. 13:**

The Policy, under which Mr. Ingoldsby was insured, was subsequently issued to MHCS by National Union. (Compl. at ¶ 6; Plaintiff-Intervenor Michael Ingoldsby's Responses to Defendant National Union's First Request for Admissions ("Mr. Ingoldsby's Admissions") at No. 1, Aff. at ¶ 7 and Ex. F).

**Response No. 13:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 13.

## MHCS Borrows from Heller

**Statement No. 14:**

Heller Healthcare Finance, Inc. ("Heller") was a pre-petition lender to MHCS on a number of loans, including one pursuant to a Loan and Security Agreement dated August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000. (Heller Lit. Compl. at ¶ 17, Aff. at ¶ 6 and Ex. E).

**Response No. 14:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 14.

**Statement No. 15:**

Post-petition, on February 28, 2001, Heller, as a lender, and MHCS entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which refinanced the pre-petition Revolving Credit Note. (Id. at ¶ 18). The DIP Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"). (Id.)

**Response No. 15:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 15.

**Statement No. 16:**

Heller alleged that Mr. Ingoldsby personally guaranteed the obligations of MHCS under the DIP Loan Agreement. (Id. at ¶ 19).

**Response No. 16:**

The Plaintiff-Intervenor does not contest that Heller made such an allegation, however, the Plaintiff-Intervenor asserts that Heller's allegation had no factual support as Mr. Ingoldsby did not personally guarantee the obligations of MHCS under the DIP Loan

Agreement. *See* Aceto Affidavit and *Exhibit A* attached thereto; Ingoldsby Depo., pp. 26:14-24, 52:16-20.

**Statement No. 17:**

According to the terms of the DIP Loan Agreement, MHCS was obligated to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report…" (Id. at ¶ 22).

**Response No. 17:**

The Plaintiff-Intervenor does not contest that the DIP Loan Agreement included the language quoted above.

**Statement No. 18:**

The DIP Loan Agreement also obligated MHCS, Mr. Ingoldsby, Ms. Jones, and MHCS President and Chief Operating Officer Indy Edwards ("Ms. Edwards") to prepare Borrowing Base Certificated that represented the eligible Medicaid, Medicare and other receivables of MHCS. (Id. at ¶ 23).

**Response No. 18:**

The Plaintiff-Intervenor disputes that he was obligated to prepare the Borrowing Base Certificates. The Plaintiff-Intervenor asserts that, to the extent the Heller Complaint alleges that Mr. Ingoldsby was involved in the preparation of the borrowing certificates, such allegations are without factual support. Mr. Ingoldsby was not involved in compiling or assuring the accuracy of the Borrowing Base Certificates submitted to Heller. *See* Ingoldsby Affidavit, ¶ 4; Ingoldsby Depo. p. 60:16-19. In fact, the Heller

Complaint states that the Borrowing Base Certificates were prepared by Jones and Edwards. *See* Heller Lit. Compl. at ¶ 25.

**Statement No. 19:**

Heller loaned money to MHCS under the DIP Loan based upon the level of receivables MHCS reported to Heller on the periodic Borrowing Base Certificates. (Id. at ¶ 25).

**Response No. 19:**

The Plaintiff-Intervenor disputes the allegation that Heller loaned money to MHCS under the DIP Loan based upon the level of receivables that MHCS reported to Heller on the periodic Borrowing Base Certificates. Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 29-30.

**Statement No. 20:**

The Borrowing Base Certificates specified that they were "given to the Lender [Heller] in order to induce the Lender...to make and advance to the Borrower in the principle [sic] amount of...pursuant to the terms and conditions of the Loan Agreement." (Aff. at ¶ 10 and Ex. I).

**Response No. 20:**

The Plaintiff-Intervenor does not contest that the Borrowing Base Certificates contained the language quoted above. The Plaintiff-Intervenor, however, reiterates that he was not involved in compiling or assuring the accuracy of the Borrowing Base Certificates. *See* Ingoldsby Affidavit, ¶ 4; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 60:16-19, p. 29-30, pp. 96:14-97:16.

**Statement No. 21:**

According to Heller, the Borrowing Base Certificates were "supplied to Heller with the intent, knowledge, and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance the collections it received from MHCS[.]" (Heller Lit. Compl. at ¶ 25, Aff. at ¶ 6 and Ex. E).

**Response No. 21:**

The Plaintiff-Intervenor does not contest that Heller alleged in its Complaint that the Borrowing Base Certificates were "supplied to Heller with the intent, knowledge, and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance the collections it received from MHCS[.]"

The Plaintiff-Intervenor does, however, dispute that said allegations have any factual support. *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., pp. 29-30, pp. 96:14-97:16.

**Statement No. 22:**

Heller also stated that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]" (Id. at ¶ 28).

**Response No. 22:**

The Plaintiff-Intervenor does not contest that Heller alleged in its Complaint that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]"  The Plaintiff-Intervenor does dispute that

said allegations have any factual support. *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached

thereto; Ingoldsby Depo., pp. 29-30, pp. 96:14 - 97:16.

**Statement No. 23:**

Heller also has asserted that MHCS owed duties to prepare any Borrowing Base

Certificates submitted by MHCS in a manner that currently reported its Medicare

receivables, since such receivables formed the basis of funding provided under the DIP

Loan (Id. at ¶ 23).

**Response No. 23:**

The Plaintiff-Intervenor does not contest that Heller asserted in its Complaint that

MHCS owed duties to prepare any Borrowing Base Certificates submitted by MHCS in a

manner that currently reported its Medicare receivables, since such receivables formed

the basis of funding provided under the DIP Loan.  The Plaintiff-Intervenor does dispute

that said allegations have any factual support. *See* Aceto Affidavit, ¶ 3 and *Exhibit A*

attached thereto; Ingoldsby Depo., pp. 29-30, pp. 96:14-97:16.

### Heller Sues Mr. Ingoldsby

**Statement No. 24:**

Heller claimed that in January of 2002, it discovered through an audit of MHCS'

financial statements and bankruptcy filings that MHCS had failed to accurately track and

report to Heller MHCS' Medicare receivables. (Id. at ¶ 42). Heller alleged that these

errors resulted in an overstatement of MHCS' eligible receivables against which Heller

loaned monies to MHCS under the DIP Loan Agreement. (Id. at ¶ 37, 42). Heller further

alleged that, on account of the overstatements, it loaned MHCS approximately $400,000

more under the DIP Loan than it would have advanced had the accounts receivable in the

Borrowing Base Certificates been properly stated. (<u>Id.</u> at ¶ 37). Moreover, Heller alleged

that MHCS was indebted to it under the DIP Loan in the amount of $1,330,243.07. (<u>Id.</u> at

¶ 50).

**Response No. 24:**

    The Plaintiff-Intervenor does not contest that Heller made the above-referenced

allegations in its Complaint.  However, the Plaintiff-Intervenor disputes that said

allegations have any factual support. *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached

thereto; Ingoldsby Depo., p. 29-30, pp. 96:14-97:16.

**Statement No. 25:**

    After Heller claimed to have realized the full extent of MHCS' overstatements

and misstatements with respect to its accounts receivable, MHCS converted its

bankruptcy reorganization to a Chapter 7 liquidation proceeding on March 20, 2002. (<u>Id.</u>

at ¶ 48, 53).

**Response No. 25:**

    The Plaintiff-Intervenor does not contest that MHCS converted its bankruptcy

reorganization to a Chapter 7 liquidation proceeding on March 20, 2002, but disputes that

this was in response to Heller realizing the full extent of MHCS' alleged overstatements

and misstatements of its accounts receivable.

**Statement No. 26:**

    On March 25, 2002, Heller and MHCS entered into a settlement agreement,

which was approved by the bankruptcy court on March 27, 2002 (the "Settlement

Agreement"). (Aff. at ¶ 8 and Ex. E). The Settlement Agreement contained the following

provision:

Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order approving the Settlement Agreement] hereby releases any claims it may have arising on or before the date hereof against the Debtors' [Managed Health Care Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and employees provided, however, that this release from Heller does not include and *Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable clams Heller may have or front any damages suffered by Heller arising form the default under the DIP Loan Agreement* which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default.

(Aff. at ¶ 9 and Ex. H) (emphasis added).

**Response No. 26:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 26.

**Statement No. 27:**

Heller then brought suit against Mr. Ingoldsby, Ms. Jones, and Ms. Edwards on August 1, 2002. (Compl. at ¶ 20).

**Response No. 27:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 27.

**Statement No. 28:**

Heller asserted two claims against Ingoldsby: the first for negligent misrepresentation, alleging that Ingoldsby supplied false information to Heller regarding the borrowing base of the eligible accounts and receivables of MHCS; the second breach for guaranty, alleging that Ingoldsby personally guaranteed the DIP Loan and was therefore directly liable for all moneys due to Heller pursuant to the DIP Loan Agreement. (Heller Lit. Compl. at ¶ 54-59, Aff. at ¶ 6 and Ex. E).

**Response No. 28:**

The Plaintiff-Intervenor does not contest that Heller asserted two claims against him: the first for negligent misrepresentation and the second for breach of guaranty. The

Plaintiff-Intervenor does not contest Heller *alleged* that Ingoldsby personally guaranteed the DIP Loan and was therefore directly liable for all moneys due to Heller pursuant to the DIP Loan Agreement.

With regard to the claim for negligent misrepresentation, the Plaintiff-Intervenor asserts that Heller *alleged* that "Jones, Edwards and Ingoldsby, in the course of their business and employment, and in the course of the business MHCS and of Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivables of MHCS and Medical Temporaries." *See* Heller Lit. Compl. at ¶ 55. The Plaintiff-Intervenor disputes that said allegations have any factual support. *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 29-30, pp. 96:14-97:16. Further, the Heller Complaint states that the Borrowing Base Certificates were prepared by Jones and Edwards, not Mr. Ingoldsby. *See* Heller Lit. Compl. at ¶ 25. Mr. Ingoldsby further asserts that he was sued under Count I solely by reason of his status as member of the Board of Directors and not due to any sort of active role in the day-to-day management of MHCS or Medical Temporaries. *Id.*

**Statement No. 29:**

Ingoldsby provided National Union with notice of the suit (Compl. at ¶ 21).

**Response No. 29:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 29. The Plaintiff-Intervenor asserts that on August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union. *See* Ingoldsby Affidavit, ¶ 16. The Plaintiff-Intervenor further asserts that, by way of letter from counsel, dated

March 17, 2004, Michael Ingoldsby made a formal demand to National Union under

Mass. Gen. Laws Ch. 93A. *See* Ingoldsby Affidavit, ¶ 20.

**Statement No. 30:**

Through letters dated October 11, 2002 and March 6, 2003, National Union

denied coverage for the litigation and the associated defense costs on account of the

Policy's contractual liability exclusion (<u>Id.</u> at ¶ 23-25).

**Response No. 30:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 30.

The Plaintiff-Intervenor asserts that on or about October 11, 2002, National

Union, through counsel, issued a preliminary determination that there was no coverage

for the allegations raised in the *Heller Action*. *See* Ingoldsby Affidavit, ¶ 17 and *Exhibit*

*B*. Since National Union's position was characterized as a preliminary determination,

Mr. Ingoldsby believed that National Union would revisit the coverage issue and

ultimately provide coverage once it performed the requisite investigation into Heller's

claims. *Id.*

In addition to the March 6, 2003 letter, National Union also declined coverage by

way of letter from counsel, dated April 16, 2004, and, in doing so, again relied upon

Exclusion 4(h), as amended by Endorsement No. 8. *See* Ingoldsby Affidavit, ¶ 20.

**Statement No. 31:**

After National Union denied coverage for Heller's claims against Mr. Ingoldsby,

he provided his own defense in the Heller Litigation. (<u>Id.</u> at ¶¶ 35-36).

**Response No. 31:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 31.

Indeed, the Plaintiff-Intervenor asserts that in litigating the claims asserted by Heller over a two-year period, the Plaintiff-Intervenor expended a substantial amount of money in attorneys' fees and costs. Specifically, Mr. Ingoldsby's incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24). *See* Ingoldsby Affidavit, ¶ 22. In addition, pursuant to the Settlement Agreement with Heller, the Plaintiff-Intervenor submitted payment to the bankruptcy trustee in the amount of One Hundred Five Thousand Dollars ($105,000.00). *See* Ingoldsby Affidavit, ¶ 30.

### Mr. Ingoldsby Declares Bankruptcy

**Statement No. 32:**

Ingoldsby filed for bankruptcy under Chapter 7 in the United States Bankruptcy Court for the Middle District of Florida on December 13, 2002. (Ingoldsby's Response at No. 34, Exhibit 2, Aff. ¶ 7 and Ex. F).

**Response No. 32:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 32.

**Statement No. 33:**

Mr. Ingoldsby claims that one of the reasons he filed bankruptcy was his inability to pay the legal fees he was incurring and expected to incur in connection with the Heller Litigation. (Excerpts of Deposition Testimony of Michael Ingoldsby) ("Ingoldsby Depo."), p. 40, 1.17-p. 41, 1. 18, Aff. at ¶ 14 and Ex. M). Mr. Ingoldsby was aware at the time he filed for bankruptcy that National Union has denied coverage for those fees under the Policy. (Ingoldsby Depo., p. 57, 1.7- p. 59, 1.16, Aff. at ¶ 14 and Ex. M).

**Response No. 33:**

The Plaintiff-Intervenor does not contest that one of the reasons he filed

bankruptcy was his inability to pay the legal fees he was incurring and expected to incur

in connection with the Heller Litigation.

The Plaintiff-Intervenor asserts that while the bankruptcy was pending, the

Plaintiff-Intervenor was forced to draw down his home equity line for six (6) months to

meet living expenses. *See* Ingoldsby Affidavit, ¶ 36; Aceto Affidavit, ¶ 3 and *Exhibit A*

attached thereto; Ingoldsby Depo., p. 92:13-23. The Plaintiff-Intervenor also expended

Eighty Six Thousand Nine Hundred Twenty One Dollars ($86,921.00) in legal fees

related to the bankruptcy. *See* Ingoldsby Affidavit, ¶ 37. In order to cover the costs of the

bankruptcy settlement, the Plaintiff-Intervenor was forced to sell his residence in Osprey,

Florida, for below-market price, resulting in a significant loss of Five Hundred Thirty Six

Thousand Six Hundred Eighty Eight Dollars ($536,688.00). *See* Ingoldsby Affidavit, ¶

38; Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 92:5-12.

The Plaintiff-Intervenor was also forced to refinance the mortgage on his residence

located in Hingham, Massachusetts, increasing his indebtedness by Two Hundred Fifty

Thousand Dollars ($250,000.00). *See* Ingoldsby Affidavit, ¶ 38; *See* Aceto Affidavit, ¶ 3

and *Exhibit A* attached thereto; Ingoldsby Depo., p. 92:13-23.

Mr. Ingoldsby contests the allegation that he was aware at the time he filed for

bankruptcy that National Union had denied coverage for the legal fees he had incurred in

the Heller Action. Mr. Ingoldsby asserts at that time he was aware that National Union

had *preliminarily* denied coverage for the Heller Action as set forth in a letter, dated

October 11, 2002. Since National Union's position was characterized as a preliminary

determination, Mr. Ingoldsby believed that National Union would revisit the coverage issue and ultimately provide coverage once it performed the requisite investigation into Heller's claims. *See* Ingoldsby Affidavit, ¶ 17 and *Exhibit B* attached thereto.

**Statement No. 34:**

On January 2, 2003, Ingoldsby filed his Schedules and his Statement of Financial Affairs as required by 11 U.S.C. § 521. (Mr. Ingoldsby's Admissions at No. 35; Aff. at ¶ 3 and Ex. B).

**Response No. 34:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 34.

**Statement No. 35:**

Ingoldsby stated in his Statement of Financial Affairs that he was a defendant in the Heller Litigation (Mr. Ingoldsby's Admissions at No. 36, Exhibit 2; Aff. at ¶ 7 and Ex. F, Aff. at ¶ 3 and Ex. B). Where Mr. Ingoldsby was required to disclose in his Schedule B any "[i]nterests in insurance policies," however, he only listed a Unum Provident Disability Policy, not the National Union Policy. (Mr. Ingoldsby's Admissions at No. 37, Exhibit 2; Aff. at ¶ 7 and Ex. F, Aff. at ¶ 3 and Ex. B). Furthermore, where Mr. Ingoldsby was required to disclose in his Schedule B any "[o]ther contingent and unliquidated claims of every nature," which would have included any claims against NUFIC, Ingoldsby stated "None." (Mr. Ingoldsby's Admissions at No. 38, Exhibit 2; Aff. at ¶ 7 and Ex. F, Aff. at ¶ 3 and Ex. B).

**Response No. 35:**

The Plaintiff-Intervenor does not contest that he stated in his Statement of Financial Affairs that he was a defendant in the Heller Litigation. The Plaintiff-

Intervenor also does not contest that he only listed the Unum Provident Disability Policy and that he stated "None" when asked to list "[o]ther contingent and unliquidated claims of every nature..."

In addition, at the time Mr. Ingoldsby filed his Statement of Financial Affairs, MHCS was also a debtor in bankruptcy. As such, the Policy was presumably an asset of the MHCS Bankruptcy and not a personal asset of Mr. Ingoldsby. The Plaintiff-Intervenor was also advised by his bankruptcy counsel that he did not have to list the National Union policy on his Schedule B because it was not a personal asset. *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 45:14-47:5.

The Plaintiff-Intervenor further asserts that at that time, he had not contemplated a claim for reimbursement and/or indemnification against National Union because the Heller Action was stayed and any monies owed would be discharged in conjunction with the bankruptcy. Therefore, he did not list it on his Schedules and Statement of Financial Affairs. He was also hopeful that National Union would reconsider its preliminary denial of coverage. *See* Ingoldsby Affidavit, ¶ 26-27.

**Statement No. 36:**

At the time he filed his bankruptcy Statement of Financial Affairs, Mr. Ingoldsby was aware that he had incurred and would likely be further incurring legal fees in connection with the Heller Litigation, and that National Union had denied coverage for those legal fees under the Policy. (Ingoldsby Depo., p. 40, 1.17-p. 41, 1.19, p. 57, 1.7- p. 59, 1.16, Aff. at ¶ 14 and Ex. M). As of December 2, 2002, Ingoldsby owed his attorney in the Heller Litigation at least $5,022.91. (Johnson & Aceto, LLP A/R Transaction Listing ("Heller Fees Listing"), Aff. at ¶ 13 and Ex. L).

**Response No. 36:**

The Plaintiff-Intervenor contests that, at the time he filed his Statement of Financial Affairs, he was aware that he would likely be further incurring legal fees in connection with the Heller Litigation because the matter was stayed.  Mr. Ingoldsby does not contest that, as of December 2, 2002, Ingoldsby owed his attorney in the Heller Litigation at least $5,022.91.

Mr. Ingoldsby further contests the allegation that he was aware at the time he filed his Statement of Financial Affairs that National Union had denied coverage for those fees under the Policy.  While Mr. Ingoldsby was aware that National Union had *preliminarily* denied coverage for the Heller Action, he believed that National Union would revisit the coverage issue after it performed the requisite investigation into Heller's claims and ultimately provide coverage.  *See* Ingoldsby Affidavit, ¶ 26-27.

**Statement No. 37:**

On April 18, 2003, Ingoldsby gave notice of filing the original signatures of his Schedules and Statement of Financial Affairs. (Aff. at ¶ 4 and Ex. C).  At that time, Mr. Ingoldsby failed to amend his disclosures to disclose his interest in the National Union policy or his claims against National Union. (Id.).  Therefore, despite still listing his attorney for the Heller Litigation as a creditor, Mr. Ingoldsby's representations to the bankruptcy court remained that (a) his only "[i]nterests in insurance policies" was in a Unum Provident Disability Policy, not the National Union Policy, (Mr. Ingoldsby's Admissions at No. 37, Exhibit 2; Aff. at ¶ 7 and Ex. F, Aff. at ¶ 3 and Ex. B); and (b) that he had no "[o]ther contingent and unliquidated claims of [any] nature." (Mr. Ingoldsby's Admissions at No. 38, Exhibit 2; Aff. at ¶ 7 and Ex. F, Aff. at ¶ 3 and Ex. B).

**Response No. 37:**

The Plaintiff-Intervenor does not contest that on April 18, 2003, Ingoldsby gave notice of filing the original signatures of his Schedules and Statement of Financial Affairs. The Plaintiff-Intervenor also does not contest that he did not amend his disclosures at that time. He disputes that he was required to amend his disclosures because at the time he filed his Schedules and Statement of Financial Affairs he was not contemplating any claim against National Union, nor did he have a present ongoing claim as the action was stayed. *See* Ingoldsby Affidavit, ¶ 29. Heller obtained relief from stay on or about July 16, 2003. *Id.*

On or about March 17, 2004, he made a formal demand upon National Union, via counsel, for reimbursement of his defense costs in the Heller Action. On or about April 16, 2004, National Union, via counsel, responded to the formal demand letter and again denied coverage. *See* Ingoldsby Affidavit, ¶ 31-33. Thereafter, it became clear that National Union was not going to reimburse Mr. Ingoldsby for the defense costs of the Heller Action. *Id.*

Sometime thereafter, the Bankruptcy trustee was notified that Mr. Ingoldsby had a potential claim against National Union related to the reimbursement of said costs. *See* Ingoldsby Affidavit, ¶ 33; *See* Aceto Affidavit, ¶ 3 and *Exhibit A* attached thereto; Ingoldsby Depo., p. 46:1-5, 47:19-49:24.

Mr. Ingoldsby also discussed the potential claim against National Union with his bankruptcy counsel who advised him that he did not need to amend his Statement of Financial Affairs to reflect a potential claim for post-petition expenses. *Id.* As such, Mr. Ingoldsby did not omit his claim against National Union from his Statement of Financial

Affairs with the intention of defrauding the court or his creditors as National Union is alleging. *See* Ingoldsby Affidavit, ¶ 34-35.

**Statement No. 38:**

By that point, Mr. Ingoldsby owed his attorney in the Heller Litigation approximately $14,000.00 in legal fees, as to which he knew National Union had denied coverage.

**Response No. 38:**

The Plaintiff-Intervenor does not contest that on or about April 18, 2003, he owed his attorney in the Heller Litigation approximately $14,000.00 in legal fees.

He asserts that he was unaware that National Union's denial was final until he received a response to his formal demand letter on or about April 16, 2004. *See* Ingoldsby Affidavit, ¶ 32.

**Statement No. 39:**

On May 5, 2004, Ingoldsby was issued a discharge in bankruptcy (Aff. at ¶ 5 and Ex. D).

**Response No. 39:**

The Plaintiff-Intervenor does not contest the assertions in Paragraph 39.

Respectfully submitted,
MICHAEL INGOLDSBY,
By his attorney,

/s/ Gregory J. Aceto, Esq.
Gregory J. Aceto, Esq.
BBO No. 558556
JOHNSON & ACETO, LLP
67 Batterymarch Street, Suite 400
Boston, MA 02110
(617) 728-0888

Dated: November 30, 2006