# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

      Plaintiff,

and

MICHAEL INGOLDSBY,

      Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

      Defendants.

CIVIL ACTION No: 05-CV-11128-NG

## AFFIDAVIT OF GREGORY J. ACETO, ESQ. IN OPPOSITION TO NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA'S MOTION FOR SUMMARY JUDGMENT

I, Gregory J. Aceto, Esq. being duly sworn, depose and state as follows:

1.    I am an attorney with the law firm of Johnson & Aceto, LLP, 67 Batterymarch Street, Suite 400, Boston, Massachusetts, and am duly licensed to practice law in the courts of the Commonwealth of Massachusetts.

2.    I am counsel for the Plaintiff-Intervenor Michael Ingoldsby ("Ingoldsby" or "Plaintiff-Intervenor").

3.      True and correct copies of excerpts from the Deposition of Michael Ingoldsby, taken October 20, 2006, are attached hereto as *Exhibit A*.

4.      True and correct copies of excerpts from a policy of insurance issued by National Union to Managed Health Care Systems, Inc., being policy number 873-87-52, effective August 4, 2001, through August 4, 2002 are attached hereto as *Exhibit B*.

Signed under the pains and penalties of perjury this 29th day of November, 2006.

Gregory J. Aceto, Esq.

Volume 1
Pages 1-101
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11128-NG

------------------------------------ -----:
GE HFS Holdings, Inc.                    :
Formerly Known As                        :
Heller Healthcare Finance, Inc.,         :
        Plaintiff                        :
                                         :
and                                      :
                                         :
Michael Ingoldsby,                       :
        Intervenor/Plaintiff             :
                                         :
    VS                                   :
                                         :
National Union Fire Insurance            :
Company of Pittsburgh, Pennsylvania      :
and International Insurance Group, LTD,  :
        Defendants                       :
-----------------------------------------:

        DEPOSITION OF MICHAEL INGOLDSBY, a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure, before
Patricia M. Haynes, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, CSR No.: 14620F, at the Offices of
Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington
Avenue, Boston, Massachusetts, on Friday, October 20,
2006, commencing at 10:00 a.m.

        COPLEY COURT REPORTING
      58 Batterymarch Street, Suite 317
        Boston, Massachusetts 02110
             (617) 423-5841

1    APPEARANCES:

2


3

      Edwards, Angell, Palmer & Dodge, LLP
4     (By: John Tumilty, Esquire)
      111 Huntington Avenue
5     Boston, Massachusetts 02199
      Counsel for the Defendant,
6     National Union Fire Insurance Company

7

      Johnson & Aceto, P.C.
8     (By: Gregory J. Aceto, Esquire)
      67 Batterymarch Street, Suite 400
9     Boston, Massachusetts 02110
      Counsel for the Intervenor/Plaintiff

10

11    Tucker, Heifetz & Saltzman, LLP
      (By: Syd A. Saloman, Esquire)
12    100 Franklin Street
      Boston, Massachusetts 02110

13

14

15

16

17

18

19

20

21

22

23

24

1     Q.   Can you tell me if you can remember and if you

2    can go in chronological order what positions you held

3    with MHCS?

4     A.   Well, I was really just a board member and

5    stockholder for -- we started it around 1980, and I

6    remained in that role until probably '92, somewhere

7    around that period.  And only around '92, '93 did I play

8    an active role.

9        But even that was not full time.  I was not

10   involved with the managing of the company at all in the

11   period of '94 to the late '90s.  I may be off on that.

12   And I wasn't involved with any aspect of day-to-day

13   activities from mid '98 forward.

14    Q.   Any aspect at all from mid '98 forward?

15    A.   I had no responsibilities.

16    Q.   Leaving aside the issue of whether you

17   actually had responsibilities, did you have any input

18   into day-to-day operations of the company at any time

19   from '98 forward?

20    A.   Not in terms of operations, no.

21    Q.   What input did you have with respect to MHCS

22   from '98 forward?

23    A.   The only area that I had involvement in was

24   making introductions for banking relationships.  I had

```
 1      no involvement with the aspects of the business and

 2      health care providing.

 3                      MR. ACETO:  I need to talk to him about an

 4      issue.

 5                      (Witness confers with counsel.)

 6      BY MR. TUMILTY:

 7          Q.    Who would you say was responsible for the

 8      day-to-day operations at MHCS during 1998 and 1999?

 9          A.    Indy Edwards.

10          Q.    Anyone else?

11          A.    Pam Jones was the controller.

12          Q.    Is it your belief that both of those people

13      were responsible for the day-to-day operations of MHCS

14      from 1999 until MHCS ceased to exist?

15          A.    Yes.

16          Q.    Were you ever employed by MHCS?

17          A.    Yes, but it was prior to '98.

18          Q.    When were you employed by MHCS?

19          A.    I don't know the exact dates.  It would have

20      been somewhere in the 92 or '93 or '97.

21                      MR. ACETO:  I want to make sure the

22      question is not whether he was a board officer or

23      member.

24                      MR. TUMILTY:  Employed.
```

1    representing you personally in connection with the

2    debtor-in-possession loan and security agreement?

3        A.    I did.

4        Q.    Who was that?

5        A.    I don't remember his name.  Greg would know.

6        Q.    Was it an attorney located here in Boston?

7        A.    Yes.

8        Q.    Do you recall the law firm that attorney works

9    with?

10        A.    No.

11        Q.    Why would you have signed a signature page

12    document, namely page 51, without it being attached to

13    anything else?

14        A.    Well, my wife and I believe we saw drafts of

15    the agreement or our attorneys saw drafts.  I know

16    papers were being exchanged.  The signature page was

17    faxed to us wherever we were and we signed a single

18    page.  That's what we believe.

19            You have to understand that my arrangement or

20    my wife's arrangement with Heller was there would be no

21    personal guaranty, and they agreed to that.  So why

22    would I or my wife agree particularly when the company

23    is in difficult straits, agree to a personal guaranty?

24    It wouldn't have happened in a million years.

1      Q.    Do you recall an October 2001 meeting that you

2    participated in with representatives of Heller

3    concerning the overstatement of Medicare payments?

4      A.    I don't remember the date, but I do remember

5    going to that meeting.

6      Q.    Tell me what you remember about that meeting.

7      A.    I remember that Indy and Pam, Indy Edwards and

8    Pam Jones had raised an issue with Heller about the

9    borrowing base and the components that were being

10    calculated into the borrowing base.

11          It dealt with a new methodology that was

12    adopted by Medicare.  I don't remember the technical

13    name, but it had to basically estimate what the value of

14    your services would turn out to be on a certain patient.

15    You would book those revenues accordingly.

16          They felt that they were booking more than

17    what they should be booking, and they talked to Heller

18    about it.  And right before that meeting -- there wasn't

19    any big consternation.  If anything, Heller was coming

20    up to visit with them.  Heller had done the audits and

21    had been satisfied.

22          That day, because they wanted me to be there,

23    I went over.  And Heller had their attorney, two of

24    their health care guys, lenders, I think they had four

1    people in total.  And, of course, the people that run

2    Managed Healthcare were there, Indy Edwards and Pam

3    Jones and I think someone else.

4         There was a discussion that they all had about

5    the borrowing base and different ways to interpret what

6    they were basically including in it.  At the end of that

7    meeting, Heller was satisfied that although there was

8    some overstatement, there wasn't any big problem.

9         And in fact, they came up with a creative way,

10   I can't remember exactly what it was, but it was to

11   reach out to future services and pull those into the

12   present.  So there was no crisis that was a part of that

13   meeting at all.

14         It was a very pleasant meeting and it lasted

15   about an hour and a half and they served lunch in the

16   office and I left.  There wasn't ever any mention of a

17   problem by Heller.  In fact, some of the documents that

18   you should have show the correspondence where they even

19   made suggestions as to how to enhance the borrowing

20   base.

21         So that's what that meeting was all about.

22   You know, it becomes a focal point for the later

23   litigation.

24         Q.    Which later litigation?

1          A.    Correct.

2          Q.    That was a poor question on my part.  I want

3    to make sure the record is clear.  On the schedules that

4    you filed in your bankruptcy, you didn't list any

5    interest in any insurance policies issued by National

6    Union, correct?

7          A.    Correct.

8               MR. TUMILTY:  We'll mark this as the next

9    exhibit.

10               (Document marked for identification as

11    Exhibit No. 5.)

12    BY MR. TUMILTY:

13          Q.    Why didn't you list on your schedules that

14    were filed in your personal bankruptcy an interest in

15    any policy listed by National Union?

16          A.    Well, we discussed it, and my attorney didn't

17    see it as an asset.  But I'm looking at this letter and

18    I don't even know if the suit was filed -- this looks

19    like it was filed before -- can we go off the record for

20    a second?

21          Q.    You can go off the record to talk to your

22    attorney if you want to.  I'd like to leave that letter

23    aside for a second --

24          A.    I'll answer the question.  It came up and it

1    was discussed, also discussed with the trustee.  I never

2    saw it as an asset.  They didn't see it as an asset.

3    And as I sit here now, I'm trying to remember when --

4    this was the countersuit against Heller.

5         Q.    We'll get to that.

6         A.    I'm confused.

7         Q.    We've already established that you didn't list

8    in your bankruptcy schedules any interest in any

9    policies issued by National Union, correct?

10        A.    Correct.

11        Q.    And you said that it was discussed with your

12   bankruptcy attorney whether to list an interest in the

13   policy, correct?

14        A.    Correct.

15        Q.    And can you tell me what was said in those

16   discussions?

17             MR. ACETO:  I'm going to instruct him not

18   to answer that question.

19             MR. TUMILTY:  I believe that I'm entitled

20   to an answer.  I will put on the record I'm entitled to

21   an answer since you appeared to be relying on advice of

22   counsel defense as to why you did not list them in your

23   schedules.

24   BY MR. TUMILTY:

1        Q.    Is that the reason you did not list them in

2    your schedules, because of advice of counsel?

3                MR. ACETO:  You can answer that question.

4    BY MR. TUMILTY:

5        A.    Yes.

6        Q.    Can you tell me what you and your attorney

7    discussed relating to your bankruptcy schedules?

8                MR. ACETO:  If we can agree that the

9    waiver, which it would be, is going to be a waiver only

10    of that particular discussion and not anything else?

11                MR. TUMILTY:  I'll agree it's a waiver of

12    discussions or communications regarding that issue.

13                MR. ACETO:  Just this specific issue as to

14    whether to list the National Union potential claims

15    against National Union to cover or indemnify any

16    resulting damages?

17                MR. TUMILTY:  Yes, I'll agree to that.

18    BY MR. TUMILTY:

19        Q.    With that agreement, can you tell me what you

20    and your bankruptcy attorney discussed regarding the

21    issue of whether to list any potential claim of coverage

22    with respect to the National Union policy?

23        A.    I don't remember it being a lengthy

24    discussion.  It's just he didn't see it as an asset.  It

1    wasn't any, it wasn't any big deal discussion.  But he

2    did say that he would talk to the trustee about it.

3         Q.    Did you see it as an asset of your bankruptcy?

4         A.    No, absolutely not.

5         Q.    How did the issue even come up that you and

6    your attorney were discussing the issue of whether to

7    list an interest in the policy?

8         A.    Well, because there was a question about

9    litigation.  To be honest, I don't remember how that was

10   discussed.

11        Q.    Did you and your bankruptcy attorney have any

12   written communications about the issue of whether to

13   list an interest in the National Union policy on your

14   bankruptcy schedules?

15        A.    No.

16        Q.    Did you personally ever have any discussions

17   with the bankruptcy trustee regarding the issue of where

18   to list on your schedules an interest in the National

19   Union policy?

20        A.    No, but I was present when my attorney talked

21   with him.

22        Q.    How many time did your attorney talk to the

23   bankruptcy trustee about that issue?

24        A.    I don't know how many times.  I was there once

1   when I observed it.

2       Q.   Can you tell me what was discussed on the

3   issue of whether to list an interest in the National

4   Union policy on your schedules with the trustee?

5       A.   I don't remember the details.  All I know is

6   that it was discussed, and there wasn't any suggestion

7   that it be, that the schedules be amended.

8       Q.   Do you have any memory of the trustee saying

9   that he did not think that any interest that you may or

10  may not have had in the National Union policy was an

11  interest that should be listed on your schedule?

12                  MR. ACETO:  Please read it back.

13                  MR. TUMILTY:  I'll rephrase it.

14  BY MR. TUMILTY:

15      Q.   When you said that there was never any

16  indication that anyone felt the schedules needed to be

17  amended, what I'm trying to find out is do you have any

18  memory of the trustee actually saying I don't think

19  that's an interest that needs to get put on these

20  schedules?

21      A.   I remember the outcome of the conversation.

22  That's all I remember is they discussed it.  I don't

23  remember what his words were, but it was clearly

24  discussed and the conclusion was to do nothing.

1    coverage for all of the claims that Heller brought

2    against you?

3        A.    I don't know.  I don't have the memory to know

4    what the counts were at this point.  I guess from my

5    point of view, I think in terms of when you spend

6    $20,000 for a directors and officers premium for a year

7    and you basically don't get anything for it, it just

8    seems unfair.

9        Q.    Earlier you mentioned that you recall there

10   was a negligence claim and breach of guaranty claim.  Do

11   you believe that National Union should have provided

12   coverage for the negligence claim?

13       A.    Absolutely.

14       Q.    Do you believe that National Union should have

15   provided coverage for the breach of guaranty claim?

16       A.    I think National Union should have at least

17   inquired -- for a company that paid $20,000 to say no

18   and not even listen, all they would have to do is look

19   at the documentation that I have that shows there's no

20   guaranty.

21           And they should have stepped in to help us

22   defend ourselves.  They never even tried to learn.  They

23   just basically said no.

24       Q.    You addressed the negligence claim.  I'm

1    that document before?

2         A.    I don't recall seeing it.

3         Q.    Did you know that Attorney Aceto had sent this

4    e-mail?

5         A.    I just, as I sit here, I don't recall it at

6    all.

7         Q.    You have no memory of whether you asked Mr.

8    Aceto to write this e-mail?

9         A.    No.  I didn't specifically ask him to write

10   this e-mail.  I mean, we were obviously talking about

11   the subject matter.  I just don't remember this.

12        Q.    You can take whatever time you need.  Have you

13   had a chance to review the e-mail?

14        A.    Yes.

15        Q.    Do you agree with the contents of it?

16        A.    It was 1998, and I wasn't involved with the

17   day to day and I never had any involvement ever in

18   compiling borrowing base certificates.  So that's

19   accurate.  Other than the date, I think that I basically

20   sometime in the May, June '98 period -- that's off by

21   six months.

22        Q.    But you agree with the position expressed in

23   the last paragraph of the body of that e-mail that you

24   were an insured under the National Union policy and that

1    00003 through IIG 00015.  The first page of that Exhibit

2    8 is a fax cover sheet from International Insurance

3    Group to Gregory Aceto dated November 26, 2002.  There

4    are enclosures with that fax after that.  If you go two

5    pages in, there's another fax cover sheet dated July 31,

6    2001 to Pam Jones from Nicholas Sciotto at International

7    Insurance Group.  Have you seen Exhibit 8 before?

8              MR. ACETO:  In its entirety?  There are

9    separate documents that I'm not quite sure if they came

10   together.

11   BY MR. TUMILTY:

12        A.   I've never seen the fax pages.

13              (Off the record discussion.)

14   BY MR. TUMILTY:

15        Q.   To clarify, what has been marked as Exhibit 8

16   here today consists of Bates numbers 0077 consecutively

17   numbered to 0088.  It's your testimony that you've never

18   seen the first page of Exhibit 8 or the second page of

19   Exhibit 8 before?

20        A.   I just don't know.  I can't tell you that I

21   remember it.  I mean, I could have.

22        Q.   If you go into the third page of Exhibit 8,

23   you'll see there's a letter dated July 27, 2001?

24        A.   Um-hum.

1       Q.   It's a two-page letter?

2       A.   Right.

3       Q.   Do you know if you've ever seen that letter

4  before?

5       A.   I don't know.

6       Q.   Do you know if you have ever seen any of the

7  pages before that are in Exhibit 8?

8       A.   All I can tell you is that I remember

9  requesting that Pam Jones send me a copy of the

10  directors and officers policy.  I can't say that I

11  remember any of these pages.  I wanted to make damn sure

12  we had a policy.

13       Q.   But you can't say sitting here today whether

14  you've seen any of these pages before?

15       A.   No.  But that's part of my memory problem.

16  I've gone over a lot of documents on this case and I

17  could have, I just don't remember.

18       Q.   I understand that.  I'm trying to get your --

19           MR. ACETO:  The question was more about at

20  the time period, not whether he reviewed it in

21  preparation for litigation or something, is that right?

22           MR. TUMILTY:  Right.

23           MR. ACETO:  Did you understand that?

24           THE WITNESS:  Yes.

1          MR. ACETO:  It was when this was created

2     back in July of 2001 or sometime --

3          MR. TUMILTY:  That's one question.

4     BY MR. TUMILTY:

5          Q.   Simply sitting here today, do you have any

6     memory of seeing this document before, Exhibit 8?

7          A.   I don't remember seeing, I don't today

8     remember seeing this.  I do know that I had documents

9     about the D & O policy sent to me.  I saw something.  I

10    probably saw this.  I just don't remember it today.

11         Q.   If you look at the first page of Exhibit 8,

12    the fax cover sheet to Gregory Aceto from International

13    Insurance Group, the body of the message there says,

14    "Attached is a copy of the quote sent to Pam Jones on

15    July 31, 2001.  Please take note that the endorsement

16    noted 'For-Profit Health Care Amendatory Endorsement'

17    was disclosed to our client.  This endorsement contained

18    the verbiage regarding Contractual Liability Exclusion.

19    Let me know if you require additional information."  Do

20    you see that?

21         A.   I do.

22         Q.   And to your understanding, is the reference

23    there to "our client" MHCS?

24              MR. ACETO:  If you know.

BY MR. TUMILTY:

    Q.    In the same exhibit, Exhibit 13, paragraph 18,
please review that paragraph to yourself.

    A.    Okay.

    Q.    It states, "Upon information and belief,
International failed to fully advise MHCS regarding the
language of the alleged exclusion and the effective said
exclusion on MHCS's liability coverage under the
policy."

         Do you know what the basis is for that
paragraph?

    A.    Yes.    I mean, I had what I thought was a
long-term relationship with International.    We had been
buying our insurance from them probably since 1990.
They obviously had, you know, an obligation to advise me
of things.

         I never knew anything about such an exclusion.
I think International or National, someone, owed me an
explanation, and they should have brought it to my
attention.

    Q.    You don't know for a fact that International
did not bring it to the attention of either Pamela Jones
or Indy Edwards, do you?

    A.    No, I don't know.

1    been issued by National Union, would you read them?

2         A.    Yeah, but I wouldn't read every word.

3         Q.    Would you discuss them with anyone?

4         A.    I don't think I did.

5         Q.    You didn't discuss them with Pamela Jones or

6    Indy Edwards?

7         A.    No.

8         Q.    Did you discuss them with anyone at IIG?

9         A.    No.

10        Q.    Did you discuss them with an attorney at that

11   time?

12        A.    Not at that time.

13        Q.    I believe it's been your testimony that to

14   your knowledge none of the directors and officers

15   liability policies that National Union issued to or

16   provided to MHCS contained a contractual exclusion as we

17   saw it alleged in your Complaint?

18        A.    I don't think that's what I said.  I said I

19   never knew at the time or I wouldn't have paid the

20   $25,000 or I wouldn't have allowed our company to spend

21   $25,000.

22        Q.    This is an important point, so I want to make

23   sure it's clear.  Your testimony is you never knew that

24   a contractual liability exclusion may have been in the

1    transaction?

2        A.    1,399,000.

3        Q.    Resulting in a total loss of $536,688.  How

4    was that amount calculated?

5        A.    The difference between what I sold it for and

6    what it was appraised for maybe three to six months

7    before then.  It was appraised for a million 750, and I

8    put it on the market for that price and had to drop and

9    drop.  I needed the cash.  I have all those appraisals.

10       Q.    Do you recall how much you paid for the house

11   in Florida?

12       A.    A million one.

13       Q.    The last sentence of paragraph 36, was the

14   amount of the additional indebtedness that you added to

15   your home in Hingham, was that $250,000?

16       A.    Yes.

17       Q.    Why was that additional indebtedness added to

18   your home in Hingham at that time?

19       A.    Well, I needed not only the money for the

20   settlement, I had legal fees, I don't remember what the

21   balance to be paid was.  I had tapped out a home equity

22   line that I had to pay off.  I was basically robbing

23   Peter to pay Paul to get through this period.

24       Q.    As you sit here today, can you tell me what

1    because I don't think I would have lost.

2        Q.    And if you had to put an estimate on your net

3    worth right now, what would you say it is?

4        A.    Somewhere in the neighborhood of $500,000.

5        Q.    When you said there were $5.8 million worth of

6    loans that went poof, were those loans from you to MHCS?

7        A.    Yes.

8        Q.    Did you recover anything on those loans?

9        A.    No.

10        Q.    Then you said something along the lines of

11    positioning by Heller, do you recall that?

12        A.    Um-hum.

13        Q.    What were you referring to?

14        A.    It's a long story.  If you want, I'll tell you

15    the story.  To try to make it as succinct as possible,

16    this whole subject of negligence on the borrowing

17    certificates is just the opposite.  If anything, they

18    were showing the two ladies that ran the company ways to

19    create recognition of revenue streams.

20          The reason that Heller changed their stripes

21    is because Pam Jones was such an honest person that she

22    just wasn't comfortable doing what they said she could

23    do.  Although we were in bankruptcy at the time, Heller

24    basically saw a company that was going to be able to

1    fund the loans, there wasn't going to be a problem with

2    that, but they seemed to become -- they became very,

3    very aggressive with the bankruptcy judge.  They did

4    things that were so out of character just to upset the

5    judge.

6            And one of the other partners from Edward and

7    Angell, she knows they are bad guys.  She despises them.

8    I don't know if she would admit that now.  They caused

9    the bankruptcy judge to put the company in bankruptcy

10   and they kept all the receivables.  There's never been

11   an accounting.

12           The overline, which was the only part I

13   guaranteed, which was about $200,000, that was supported

14   by the private receivables.  It was in excess of

15   200,000.  Pam Jones and Indy Edwards both fully expected

16   that that was all collected.  If there was anything left

17   on that guaranty of mine for that portion, we all would

18   have been surprised.

19           But they never gave us any accounting.  And

20   Heller ended up where they collected all the

21   receivables, and they saw an opportunity with this D & O

22   policy to make it a bad pay day.  And if I hadn't been

23   so beaten down with this bankruptcy, I never would have

24   signed that settlement agreement.

```
1                    C E R T I F I C A T E

2


3    COMMONWEALTH OF MASSACHUSETTS

4    PLYMOUTH, SS.

5             I, Patricia M. Haynes, a Notary Public in and

6    for the Commonwealth of Massachusetts, do hereby

7    certify:

8             That MICHAEL INGOLDSBY, the witness whose

9    testimony is hereinbefore set forth, was duly sworn by

10   me and that such testimony is a true and accurate record

11   of my stenotype notes taken in the foregoing matter, to

12   the best of my knowledge, skill and ability.

13             IN WITNESS WHEREOF, I have hereunto set my

14   hand and Notarial Seal this 26th day of October 2006.

15

16             _____
                 Patricia M. Haynes, CSR
17                    Notary Public

18

     My commission expires July 30, 2010
19

20

21

22

23

24
```



# NATIONAL UNION
# FIRE INSURANCE COMPANY
# OF PITTSBURGH, P.A.®

A CAPITAL STOCK COMPANY

POLICY NUMBER:
*873-87-52*

RENEWAL OF:
*473-16-30*

ADMINISTRATIVE OFFICES:
175 WATER STREET, NEW YORK, N.Y. 10038

## DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THE COVERAGE OF THIS POLICY IS LIMITED GENERALLY TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE THEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**NOTICE: THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.**

**NOTICE: THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND; HOWEVER, THE INSURER MAY, AND IN CERTAIN CIRCUMSTANCES MUST, ADVANCE DEFENSE COSTS PAYMENTS PRIOR TO THE FINAL DISPOSITION OF A CLAIM.**

## DECLARATIONS

ITEM 1. NAMED CORPORATION: *MANAGED HEALTH CARE SYSTEMS*

MAILING ADDRESS: *175 DERBY ST STE 24*
*HINGHAM, MA 02043-3406*

STATE OF INCORPORATION OF THE NAMED CORPORATION:
*Massachusetts*

ITEM 2. SUBSIDIARY COVERAGE: any past, present or future Subsidiary of the Named Corporation

ITEM 3. POLICY PERIOD: From *August 4, 2001* to *August 4, 2002*
(12:01 A.M. Standard Time at the address stated in Item 1)

ITEM 4. LIMIT OF LIABILITY: _____ *$3,000,000* _____ aggregate for Coverages A and B combined (including Defense Costs)

ITEM 5. RETENTION:

Company Reimbursement and indemnifiable Loss: _____ *$25,000* for Loss arising from claims alleging the same Wrongful Act or related Wrongful Acts.

ITEM 6. PREMIUM: *$24,995* _____

_____
Authorized Representative

*Sep 27, 2001*

*CARPENTER & MOORE INSURANCE SERVICES INC.*
*530 WASHINGTON STREET*
*SAN FRANCISCO, CA 94111*

*7113299*

AIG/GE HFS 00162

| _____ | _____ |
|---|---|
| Countersignature Date | Countersigned At |

47352 (8/88)

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.®

## DIRECTORS AND OFFICERS INSURANCE AND COMPANY REIMBURSEMENT POLICY

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer by application forming a part hereof and its attachments and the material incorporated therein, National Union Fire Insurance Company of Pittsburgh, Pa.® herein called the "Insurer", agrees as follows:

### 1. INSURING AGREEMENTS

#### COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from any claim or claims first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except for and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 9, advance to each and every Director and Officer the Defense Costs of such claim or claims prior to their final disposition.

#### COVERAGE B: COMPANY REIMBURSEMENT INSURANCE

This policy shall reimburse the Company for Loss arising from any claim or claims which are first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, but only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity.

### 2. DEFINITIONS

(a)  The "Company" means the Named Corporation designated in Item 1 of the Declarations and any Subsidiary thereof.

(b)  "Defense Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of any claim against the Insureds, but excluding salaries of Officers or employees of the Company.

(c)  "Insured(s)", or "Director(s) or Officer(s)", means any past, present or future duly elected or appointed Directors or Officers of the Company. Coverage will automatically apply to all new Directors or Officers after the inception date of this policy.

(d)  "Loss" means damages, judgments, settlements and Defense Costs; however, Loss shall not include civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amount for which the Insureds are not financially liable or which are without legal recourse to the Insureds, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(e)  "Policy Period" means the period of time from the inception date shown in Item 3 of the Declarations to the earlier of the expiration date shown in Item 3 of the Declarations or the effective date of cancellation of this policy; however, to the extent that coverage under this policy replaces coverage in other policies terminating at noon standard time on the inception date of such coverage hereunder, then such coverage as is provided by this policy shall not become effective until such other coverage has terminated.

47353 (8/88)

—1—

AIG/GE HFS 00163

(f) "Subsidiary" mean a corporation of which the Named orporation owns on or before the inception of the Policy Period more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

"Subsidiary" also means any corporation which becomes a Subsidiary during the Policy Period but only upon the condition that within 90 days of its becoming a Subsidiary, the Named Corporation shall have provided the Insurer with full particulars of the new Subsidiary and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new Subsidiary. Further, coverage as shall be afforded to the new Subsidiary is conditioned upon the Named Corporation paying when due any additional premium required by the Insurer relating to such new Subsidiary. A corporation becomes a Subsidiary when the Named Corporation owns more than 50% of the issued and outstanding voting stock either directly or indirectly through one or more of its Subsidiaries.

(g) "Wrongful Act" means any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

## 3. EXTENSIONS

Subject otherwise to the terms hereof, this policy shall cover Loss arising from any claims made against the estates, heirs, or legal representatives of deceased Directors or Officers, and the legal representatives of Directors or Officers in the event of their incompetency, insolvency or bankruptcy, who were Directors or Officers at the time the Wrongful Acts upon which such claims are based were committed.

## 4. EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any claim or claims made against the Directors or Officers:

(a) arising out of, based upon or attributable to the gaining in fact of any personal profit or advantage to which they were not legally entitled;

(b) arising out of, based upon or attributable to the committing in fact of any criminal or deliberate fraudulent act;

(c) arising out of, based upon or attributable to the payment to the Insureds of any remuneration without the previous approval of the stockholders of the Company, which payment without such previous approval shall be held to have been illegal;

(d) arising out of, based upon or attributable to profits in fact made from the purchase or sale by the Insureds of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law;

(The Wrongful Act of any Director or Officer shall not be imputed to any other Director or Officer for the purpose of determining the applicability of the foregoing exclusions 4(a) through 4(d) )

(e) alleging, arising out of, based upon or attributable to any attempt, whether successful or unsuccessful, by any person or entity to acquire securities of the Company against or opposition of the Board of Directors of the Company ("Board"), or any action, whether successful or unsuccessful, by the Company or the Board to resist such attempts; however, this exclusion shall not apply if, before taking any such resistive action, the Company or the Board has obtained a written opinion (1) from independent legal counsel that such resistive action is a lawful exercise of the Board's business judgment and (2)

47353 (8/88)

AIG/GE HFS 00164

ENDORSEMENT# 8      (Continued)

This endorsement, effective *12:01 am      August 4, 2001*      forms a part of
policy number  *873-87-52*
issued to  *MANAGED HEALTH CARE SYSTEMS*

by  *National Union Fire Insurance Company of Pittsburgh, Pa.*

C. The Definition of Wrongful Act is amended to include the following at the end thereof:

With respect to all Insureds, any alleged defect in peer review or credentialling.

II.      AMENDMENTS TO EXCLUSIONS

1. Exclusions 4 (h) is deleted in its entirety and replaced with the following:

    (h) alleging, arising out of, based upon or attributable to any actual or alleged
        contractual liability of the Company or an Insured under any express (written or
        oral) contract or agreement (including, but not limited to, any liquidated
        damages, severance agreement or payment, golden parachute agreement, or any
        compensation agreement payable upon the termination of any Insured); provided,
        however, that this exclusion shall not apply to:

        (1) Employment Practices Claims to the extent that any liability does not
            arise from such express contract or agreement; or

        (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with respect to
            hospital practice, privileges, credentialling or peer review matters.

2. The following additional exclusions are added to the end of Clause 4. EXCLUSIONS:

    (r) alleging, arising out of, based upon or attributable to any failure or omission on
        the part of the Insureds or the Company to effect and maintain insurance;

    (s) alleging, arising out of, based upon or attributable to, or in any way involving,
        either directly or indirectly, antitrust violations, price fixing, price
        discriminations, unfair competition, deceptive trade practices and/or monopolies,
        including any actions, proceedings, claims or investigations related thereto;

    (t) alleging, arising out of, based upon or attributable to the Insureds performance
        or rendering of or failure to perform or render medical or other professional
        services or treatments for others; provided, however, that this exclusion shall
        not apply to:

        (1) Employment Practices Claims;

        (2) Claims for Loss alleging Wrongful Acts of an Insured(s) peer review or
            credentialling processes;

*END*

AIG/GE HFS 00236

ENDORSEMENT# 8    (Continued)

This endorsement, effective  *12:01 am*    *August 4, 2001*        forms a part of
policy number  *873-87-52*
issued to  *MANAGED HEALTH CARE SYSTEMS*


by    *National Union Fire Insurance Company of Pittsburgh, Pa.*


      (u) alleging, arising out of, based upon or attributable to any Human Clinical Trial.
      For purposes of this exclusion (u), "Human Clinical Trial" shall mean any study
      utilizing humans to provide clinical data for the assessment of a medical
      treatment, procedure or pharmaceutical.

III.    AMENDED CLAUSE 9

Clause 9 is deleted in its entirety and replaced with the following:

9.    PRE-AUTHORIZED DEFENSE ATTORNEYS FOR ALL CLAIMS

    This Clause 9 applies to all Claims.

    Affixed as Appendix A hereto and made a part of this policy is a list or lists of Panel
    Counsel law firms ("Panel Counsel Firms") from which a selection of legal counsel
    shall be made to conduct the defense of all Claims against an Insured pursuant to the
    terms set forth below.

    In the event the Insurer has assumed the defense pursuant to Clause 8 of this policy,
    then the Insurer shall select a Panel Counsel Firm to defend the Insureds. In the event
    the Insureds are already defending a Claim, then the Insureds shall select a Panel
    Counsel Firm to defend the Insureds.

    The selection of the Panel Counsel Firm, whether done by the Insurer or the Insureds,
    shall be from the list of Panel Counsel Firms designated for the type of Claim and be
    from the jurisdiction in which the Claim is brought. In the event a Claim is brought in
    a jurisdiction not included on the appropriate list, the selection shall be made from a
    listed jurisdiction which is the nearest geographic jurisdiction to either where the
    Claim is maintained or where the corporate headquarters or state of formation of the
    Named Entity is located. In such instance, however, the Insurer shall, at the written
    request of the Named Entity, assign a non-Panel Counsel Firm of the Insurer's choice
    in the jurisdiction in which the Claim is brought to function as "local counsel" on the
    Claim to assist the Panel Counsel Firm which will function as "lead counsel" in
    conducting the defense of the Claim.

    With the express prior written consent of the Insurer, an Insured may select (in the
    case of the Insured defending the Claim), or cause the Insurer to select (in the case of
    the Insurer defending the Claim), a Panel Counsel Firm different from that selected by

*END*

AIG/GE HFS 00237

ENDORSEMENT# *8*     (Cor. .ued)

This endorsement, effective *12:01 am*     *August 4, 2001*     forms a part of
policy number  *873-87-52*
issued to   *MANAGED HEALTH CARE SYSTEMS*

by     *National Union Fire Insurance Company of Pittsburgh, Pa.*

other insured defendants if such selection is required due to an actual conflict of
interest or is otherwise reasonably justifiable.

The list of Panel Counsel Firms may be amended from time to time by the Insurer.
However, no change shall be made to the specific list attached to this policy during
the Policy Period without the consent of the Named Entity.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

*END*

*INSU*

(2/90)

———————————————
AUTHORIZED REPRESENTATIVE

AIG/GE HFS 00238