UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC., f/k/a )
HELLER HEALTHCARE FINANCE, )
INC., )
       )
           Plaintiff, )
       )
And )
       )
MICHAEL INGOLDSBY, )
       )
           Intervenor/Plaintiff, )
       )
         v. )           Civil Action No. 05-CV-11128-NG
       )
NATIONAL UNION FIRE )
INSURANCE COMPANY OF )
PITTSBURGH, PA., and )
INTERNATIONAL INSURANCE )
GROUP, LTD., )
       )
           Defendants. )

## REPLY MEMORANDUM IN SUPPORT OF NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF INGOLDSBY AND IN OPPOSITION TO PLAINTIFF INGOLDSBY'S CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union")

submits this Reply Memorandum in support of its Motion for Summary Judgment with respect to

claims asserted by Intervenor-Plaintiff Michael Ingoldsby ("Mr. Ingoldsby") in his First

Amended Complaint in Intervention (the "Intervenor Complaint"). Should the Court deny

National Union's Motion to Strike ("Motion to Strike") Plaintiff Ingoldsby's Cross-Motion for

Summary Judgment ("Cross-Motion"), National Union further submits this Memorandum in

opposition to the Cross-Motion.

Mr. Ingoldsby opposes National Union's Motion for Summary Judgment on the basis that

genuine issues of material fact exist as to: (1) Mr. Ingoldsby's omission of the National Union

insurance policy and his potential claims against National Union as assets in his bankruptcy schedules; and (2) the applicability of the contractual liability exclusion in National Union's policy to Mr. Ingoldsby's underlying claims for coverage. As explained below, however, the additional facts which Mr. Ingoldsby alleges concerning these issues are legally irrelevant. Indeed, Mr. Ingoldsby admits facts in his Statement of Disputed Facts which, as a matter of law: (1) require judicial estoppel of his claims against National Union; and (2) establish that the underlying claims asserted against him by Heller Healthcare Finance, Inc. ("Heller") were excluded from coverage by the Policy's contractual liability exclusion.

In an attempt to avoid the clear implications of these admitted facts, Mr. Ingoldsby's Opposition completely ignores the relevant case law cited in National Union's Memorandum in Support of its Motion for Summary Judgment ("Opening Memo"). Rather than rebut or distinguish the authorities cited by National Union, Mr. Ingoldsby simply misapplies case law concerning general principles and clearly distinguishable circumstances. As established in the Opening Memo, and further discussed below, Mr. Ingoldsby's arguments are without merit.

Therefore, this Court should grant National Union's Motion for Summary Judgment. Should this Court deny National Union's Motion to Strike, it should also deny the Cross-Motion for the reasons stated herein.

BOS_562484_1.doc

## ADMITTED FACTS

All of the following facts are admitted by Mr. Ingoldsby in his Statement of Disputed

Material Facts in Opposition to Motion for Summary Judgment filed on December 1, 2006

("Admitted Facts"):

### I.    The D&O Insurance Policy

Mr. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of Managed

Health Care Systems, Inc. ("MHCS"), a Massachusetts corporation providing health care

services to Medicare beneficiaries with its principal place of business in Hingham,

Massachusetts. (Statement of Undisputed Material Facts Submitted By Defendant National

Union Fire Insurance Company of Pittsburgh, PA in Support of Its Motion for Summary

Judgment Against Intervenor-Plaintiff Michael Ingoldsby ("Undisputed Facts"), ¶¶ 3-5;

Admitted Facts, pp. 2-3).

National Union issued to MHCS a Director and Officers Insurance Policy bearing policy

number 473-16-30, effective August 4, 2000 to August 4, 2001 (the "Prior Policy").

(Undisputed Facts, ¶ 6; Admitted Facts, p. 3).  The Prior Policy excluded coverage for any claim:

> alleging, arising out of, based upon or attributable to any actual or alleged
> contractual liability of the Company or any other Insured under any express
> contract or agreement . . .

(Undisputed Facts, ¶ 6; Admitted Facts, pp. 3-4).  Mr. Ingoldsby received a copy of the Prior

Policy, including the contractual liability exclusion.  (Undisputed Facts, ¶ 7; Admitted Facts,

p. 4).

On or about February 23, 2001, MHCS filed a voluntary petition for relief under Chapter

11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of

Massachusetts.  (Undisputed Facts, ¶ 8; Admitted Facts, pp. 4-5).

BOS_562484_1.doc

National Union thereafter issued to MHCS a Directors & Officers Insurance Policy bearing policy number 873-87-52, effective August 4, 2001 to August 4, 2002 (the "Policy"). (Undisputed Facts, ¶ 9; Admitted Facts, pp. 5-6). The Policy, like the Prior Policy, excluded from coverage any claim:

> alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or an Insured under any express (written or oral) contract or agreement . . .

(Id.).

MHCS was informed of the Policy's contractual liability exclusion by means of a fax communication dated July 31, 2001 to MHCS Vice President of Finance and Chief Financial Officer Pamela Jones ("Ms. Jones") from Nicholas Sciotto of International Insurance Group, Ltd. ("IIG"), MHCS' insurance broker. (Undisputed Facts, ¶ 11; Admitted Facts, pp. 6-7). In that fax communication, IIG forwarded to MHCS National Union's proposed terms for the Policy, including the explicit language of the contractual liability exclusion. (Undisputed Facts, ¶ 12; Admitted Facts, pp. 7-8). The Policy, under which Mr. Ingoldsby was insured, was subsequently issued to MHCS by National Union. (Undisputed Facts, ¶ 13; Admitted Facts, p. 8).

## II.    **MHCS Borrows from Heller**

After MHCS filed for bankruptcy, Heller Healthcare Finance, Inc. ("Heller"), as lender, and MHCS, as borrower, entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"). (Undisputed Facts, ¶ 15; Admitted Facts, p. 9). The DIP Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"). (Id.). According to

Heller, Mr. Ingoldsby personally guaranteed the obligations of MHCS under the DIP Loan

Agreement. (Undisputed Facts, ¶ 16; Admitted Facts, pp. 9-10).[1]

The DIP Loan Agreement obligated MHCS to "keep accurate and complete records of its

accounts and all payments and collections thereon, and [to] submit to Lender on such periodic

basis as Lender will request a sales and collections report . . . ." (Undisputed Facts, ¶ 17;

Admitted Facts, p. 10). Heller alleged that the DIP Loan Agreement also obligated MHCS and

Mr. Ingoldsby to prepare Borrowing Base Certificates that represented the eligible Medicaid,

Medicare and other receivables of MHCS. (Undisputed Facts, ¶ 18; Admitted Facts, pp. 10-11).

Heller alleged that it loaned money to MHCS under the DIP Loan based upon the level of

receivables MHCS reported to Heller on the periodic Borrowing Base Certificates. (Undisputed

Facts, ¶ 19; Admitted Facts, p. 11).

The Borrowing Base Certificates specified that they were "given to the Lender [Heller] in

order to induce the Lender . . . to make an advance to the Borrower in the principle [sic] amount

of . . . pursuant to the terms and conditions of the Loan Agreement." (Undisputed Facts, ¶ 20;

Admitted Facts, p. 11). According to Heller, the Borrowing Base Certificates were "supplied to

Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible

receivable collateral reported therein in determining whether, and to what extent, Heller would

re-advance the collections it received back to MHCS[.]" (Undisputed Facts, ¶ 21; Admitted

Facts, p. 12).

---

[1] As to this and several other allegations by Heller, Mr. Ingoldsby does not contest that Heller made these allegations in the underlying litigation, but contests whether certain of the allegations have "any factual support." However, the nature of Heller's claims against Mr. Ingoldsby, and therefore whether or not the claims were covered by the Policy, are determined by Heller's allegations, not whether those allegations were true. Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 318 (1983) ("[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions . . . .").

BOS_562484_1.doc

Heller also stated that it "reasonably relied on the accuracy of the Borrowing Base Certificates submitted by MHCS in connection with the DIP Loan[.]" (Undisputed Facts, ¶ 22; Admitted Facts, pp. 12-13). Further, Heller asserted that MHCS owed duties to prepare any Borrowing Base Certificates submitted by MHCS in a manner that currently reported its Medicare receivables, since such receivables formed the basis of funding provided under the DIP Loan. (Undisputed Facts, ¶ 23; Admitted Facts, p. 13).

## III.    **Heller Sues Mr. Ingoldsby**

Heller claimed that in January of 2002, it discovered through an audit of MHCS' financial statements and bankruptcy filings that MHCS had failed to accurately track and report to Heller MHCS' Medicare receivables. (Undisputed Facts, ¶ 24; Admitted Facts, pp. 13-14). Heller alleged that these errors resulted in an overstatement of MHCS' eligible receivables against which Heller loaned monies to MHCS under the DIP Loan Agreement. (Id.). Heller further alleged that, on account of these overstatements, it loaned MHCS approximately $400,000 more under the DIP Loan than it would have advanced had the accounts receivable in the Borrowing Base Certificates been properly stated. (Id.). Moreover, Heller alleged that MHCS was indebted to it under the DIP Loan in the amount of $1,330,243.07. (Id.).

MHCS converted its bankruptcy reorganization to a Chapter 7 liquidation proceeding. (Undisputed Facts, ¶ 25; Admitted Facts, p. 14). On March 25, 2002, Heller and MHCS entered into a settlement agreement, which was approved by the bankruptcy court on March 27, 2002

BOS_562484_1.doc

(the "Settlement Agreement"). (Undisputed Facts, ¶ 26; Admitted Facts, pp. 14-15). The

Settlement Agreement contained the following provision:

> Heller further, at the Effective Time [i.e., entry of the Bankruptcy Court order
> approving the Settlement Agreement] hereby releases any claims it may have
> arising on or before the date hereof against the Debtors' [Managed Health Care
> Systems, Inc., and Medical Temporaries, Inc.] professionals, agents and
> employees provided, however, that this release from Heller does not include and
> *Heller does not waive or release either the Debtors or any officer, director,*
> *employee or agent of either Debtor from any legal or equitable claims Heller may*
> *have or from any damages suffered by Heller arising from the default under the*
> *DIP Loan Agreement* which created the over-advance of approximately $405,000,
> which was referred to in Heller's Notice of Event of Default.

(Id.) (Emphasis added).

Heller then brought suit against Mr. Ingoldsby (the "Heller Litigation"). (Undisputed

Facts, ¶ 27; Admitted Facts, p. 15). Heller asserted two claims against Mr. Ingoldsby: the first

for negligent misrepresentation, alleging that Mr. Ingoldsby supplied false information to Heller

regarding the borrowing base of the eligible accounts and receivables of MHCS;[2] the second for

breach for guaranty, alleging that Mr. Ingoldsby personally guaranteed the DIP Loan and was

therefore directly liable for all monies due to Heller pursuant to the DIP Loan Agreement.

(Undisputed Facts, ¶ 28; Admitted Facts, pp. 15-16).

Mr. Ingoldsby provided National Union with notice of the suit. (Undisputed Facts, ¶ 29;

Admitted Facts, pp. 16-17). Through letters dated October 11, 2002 and March 6, 2003,

National Union denied coverage for Heller's claims against Mr. Ingoldsby based upon the

Policy's contractual liability exclusion. (Undisputed Facts, ¶ 30; Admitted Facts, p. 17). After

National Union denied coverage for Heller's claims against Mr. Ingoldsby, he provided his own

defense in the Heller Litigation. (Undisputed Facts, ¶ 31; Admitted Facts, pp. 17-18).

---

[2] Thus, contrary to Mr. Ingoldsby's representation at page 22 of his Opposition that he was sued by Heller for
"negligently supervising MHCS's financials," Heller did not base its negligent misrepresentation claim on any
alleged misrepresentation in MHCS's financial statements generally.

BOS_562484_1.doc

## IV.    Mr. Ingoldsby Declares Bankruptcy

Mr. Ingoldsby filed for bankruptcy under Chapter 7 in the United States Bankruptcy

Court for the Middle District of Florida on December 13, 2002. (Undisputed Facts, ¶ 32;

Admitted Facts, p. 18). Mr. Ingoldsby maintains that one of the reasons he filed for bankruptcy

was his inability to pay the legal fees he was incurring and expected to incur in connection with

the Heller Litigation. (Undisputed Facts, ¶ 33; Admitted Facts, pp. 18-19). Mr. Ingoldsby was

aware at the time he filed for bankruptcy that National Union had preliminarily denied coverage

for those fees under the Policy. (Undisputed Facts, ¶ 33; Admitted Facts, pp. 19-20).

On January 2, 2003, Mr. Ingoldsby filed his bankruptcy Schedules and his Statement of

Financial Affairs as required by 11 U.S.C. § 521. (Undisputed Facts, ¶ 34; Admitted Facts,

p. 20). Mr. Ingoldsby stated under oath in his bankruptcy Statement of Financial Affairs that he

was a defendant in the Heller Litigation. (Undisputed Facts, ¶ 35; Admitted Facts, p. 20).

Where Mr. Ingoldsby was required to disclose in his Schedule B any "[i]nterests in insurance

policies," however, he only listed a Unum Provident Disability Policy, not the National Union

Policy. (Undisputed Facts, ¶ 35; Admitted Facts, pp. 20-21). Furthermore, where Mr. Ingoldsby

was required to disclose in his Schedule B any "[o]ther contingent and unliquidated claims of

every nature," which would have included any claims he had against National Union,

Mr. Ingoldsby stated "None." (Id.).

At the time he filed his bankruptcy Statement of Financial Affairs, however,

Mr. Ingoldsby was aware that he had incurred legal fees in connection with the Heller Litigation,

and that National Union had denied coverage for those legal fees under the Policy. (Undisputed

Facts, ¶ 36; Admitted Facts, pp. 21-22). Indeed, Mr. Ingoldsby listed his attorney in the Heller

BOS_562484_1.doc

Litigation as a creditor. (Id.). As of December 4, 2002, Mr. Ingoldsby owed his attorney in the
Heller Litigation at least $5,022.91. (Id.).

On April 18, 2003, Mr. Ingoldsby gave notice of filing the original signatures of his
Amended Schedules and Statement of Financial Affairs. (Undisputed Facts, ¶ 37; Admitted
Facts, pp. 22-23). At that time, Mr. Ingoldsby failed to amend his disclosures to disclose his
interest in the National Union policy or his claims against National Union. (Id.). Therefore,
despite still listing his attorney for the Heller Litigation as a creditor, Mr. Ingoldsby's
representations to the bankruptcy court remained that: (a) his only "[i]nterest[] in insurance
policies" was in a Unum Provident Disability Policy, not the National Union Policy, (Undisputed
Facts, ¶ 37; Admitted Facts, pp. 22-24); and (b) that he had no "[o]ther contingent and
unliquidated claims of [any] nature." (Id.). By this point, Mr. Ingoldsby owed his attorney in the
Heller Litigation approximately $14,000 in legal fees, as to which he knew National Union had
denied coverage. (Undisputed Facts, ¶ 38; Admitted Facts, p. 24).

On or about March 17, 2004, Mr. Ingoldsby sent National Union a formal demand letter
under M.G.L. c. 93A. (Admitted Facts, p. 23). On or about April 16, 2004, National Union
responded to the demand letter and again denied coverage, thereby making it clear to
Mr. Ingoldsby that National Union was not going to provide coverage for the Heller Action. Id.
At or about that time, Mr. Ingoldsby discussed with his bankruptcy counsel the possibility of
bringing a claim against National Union. Id.

On May 5, 2004, Mr. Ingoldsby was issued a discharge in bankruptcy. (Undisputed
Facts, ¶ 39; Admitted Facts, p. 24).

## V.    **Estoppel Chronology**

The following summarizes the key admitted dates and events relevant to judicial estoppel:

| | |
|---|---|
| August 4, 2001 | The Policy, issued by National Union to MHCS, goes into effect for the period of August 4, 2001 to August 4, 2002. |
| August 1, 2002 | Heller commences the Heller Litigation by filing suit against Mr. Ingoldsby. |
| October 11, 2002 | National Union denies coverage to Mr. Ingoldsby under the Policy. |
| December 13, 2002 | Mr. Ingoldsby files a petition for bankruptcy under Chapter 7. |
| January 2, 2003 | Mr. Ingoldsby files his debt and asset schedules with the bankruptcy court. Mr. Ingoldsby lists both the claims against him by Heller and his legal fees therein as debts, but omits his interest in the Policy and his claims against National Union as assets. |
| March 6, 2003 | National Union again denies coverage to Mr. Ingoldsby under the Policy. |
| April 18, 2003 | Mr. Ingoldsby files his amended debt and asset schedules with the bankruptcy court. Mr. Ingoldsby again lists the Heller suit and fees owed to his counsel therein as debts, but omits his interest in the Policy and his claims against National Union as assets. |
| February 7, 2004 | Mr. Ingoldsby enters into Settlement Agreement with Heller and pays Heller $105,000 to resolve its claims against him. |
| April 16, 2004 | National Union responds to Mr. Ingoldsby's 93A demand letter and again denies coverage under the Policy. |
| | At or about this time, Mr. Ingoldsby discusses with his bankruptcy attorney the possibility of bringing a claim against National Union for his legal costs in defending the Heller case. |
| May 5, 2004 | Mr. Ingoldsby is issued a discharge in bankruptcy. |
| | Mr. Ingoldsby never amends his asset schedule to reflect the existence of his interest in the Policy or his claims against National Union. |
| December 5, 2005 | Mr. Ingoldsby files his Intervenor Complaint in the present action asserting coverage claims against National Union concerning the Heller Litigation. |

BOS_562484_1.doc

## ARGUMENT

The facts of this case fall squarely within the doctrine of judicial estoppel. See Opening Memo, pp. 9-12. By failing to schedule his interest in the Policy or his actual or potential claims against National Union as assets (despite listing Heller's claims against him and his legal fees incurred in connection therewith as debts), Mr. Ingoldsby represented in his bankruptcy proceedings that he had no interest in the Policy and that he had no potential claims against National Union. Mr. Ingoldsby made these representations despite his knowledge that he was an insured under the Policy, that National Union had repeatedly denied him coverage, and that he had incurred more than $14,000 in Heller Litigation defense costs by the time of his discharge. Mr. Ingoldsby obtained his discharge on the basis of those representations.

Nonetheless, Mr. Ingoldsby now takes the position before this Court that he had an interest in the Policy and was entitled to coverage for Heller's claims against him. Mr. Ingoldsby's position before this Court is indisputably inconsistent with the position he took before the bankruptcy court. Therefore, he is judicially estopped from pursuing it. None of Mr. Ingoldsby's arguments to the contrary (arguments already conclusively rebutted in the Opening Memo[3]) have any merit.

Furthermore, even if Mr. Ingoldsby's claims were not barred by judicial estoppel, Heller's original claims against him were clearly excluded from coverage under the Policy by its contractual liability exclusion. See id. at pp. 16-20. In his Opposition, Mr. Ingoldsby again simply ignores the case law contained in the Opening Memo, and misapplies case law containing general principles and inapposite factual circumstances. Proper application of relevant case law makes clear that the contractual liability exclusion was unambiguous and effectively excluded Heller's claims from coverage.

---

[3] See id at pp. 12-16.

BOS_562484_1.doc

Therefore, and for the reasons stated in its Opening Memo, National Union's Motion for

Summary Judgment should be granted. Furthermore, should the Court deny National Union's

Motion to Strike Mr. Ingoldsby's Motion for Summary Judgment, it should be denied for the

same reasons.

**I.      No Genuine Issues of Material Fact Exist As To Judicial Estoppel: Mr. Ingoldsby Is**
**Estopped From Pursuing His Claims As A Matter of Law.**

In his Opposition, Mr. Ingoldsby maintains that he should not be judicially estopped from

pursuing his claims for the following reasons: (1) his claims arose post-petition and, therefore,

need not have been disclosed to the bankruptcy court; (2) he did not mislead the bankruptcy

court or secure an unfair advantage by not scheduling his claims; (3) he did not attempt to

intentionally manipulate the legal system, but rather acted in good faith and on the advice of

counsel; and (4) if he is estopped from pursing his claims, National Union will receive a

windfall. As discussed at length in the Opening Memo, and further addressed below, none of

these arguments has any merit.

      A.      Mr. Ingoldsby Was Required To Schedule His Interest In The Policy And His
            Claims Against National Union Because They Were, As A Matter of Law, Pre-
            Petition Assets.

          1.      Mr. Ingoldsby's Interest In The Policy Was A Pre-Petition Asset

At the time Mr. Ingoldsby received notice of the Heller suit, well before he filed for

bankruptcy, he believed he had insurance coverage under the Policy. See Statement of

Undisputed Facts, ¶ 36, Affidavit of Counsel, Exhibit M ("Q: And at the time you were served

with the lawsuit, you believed you had insurance coverage under the directors and officers

liability policy issued by National Union? A: I thought I did."). His interest in the Policy was

therefore an asset of which he was aware pre-petition, and he was required to schedule any such

asset. 11 U.S.C. § 521(1); Jeffrey v. Desmond, 70 F.3d 183, 186 (1st Cir. 1995). He did not do

BOS_562484_1.doc

so, instead representing to the bankruptcy court that his only interest in insurance was in an

unrelated Unum Provident Disability Policy.  Facts at pp. 20-21.

> 2.    Mr. Ingoldsby's Potential Claims Against National Union Were Pre-
>        Petition Assets

Mr. Ingoldsby was also aware at the inception of his bankruptcy, during the pendency of

his bankruptcy case, before he filed and then amended his schedule of assets, and before his

bankruptcy was discharged that: (1) he had incurred defense costs in connection with the claims

asserted against him by Heller, id. at pp. 21-22, 24; and (2) National Union had taken the

position that he was not entitled to coverage under the Policy for the claims asserted by Heller.

Mr. Ingoldsby was therefore aware that he at least potentially had claims against National Union

for defense costs incurred in the Heller case filed prior to his bankruptcy, and was required to

schedule those claims, whether actual or potential.    In re Coastal Plains, Inc., 179 F.3d 197, 208

(5th Cir. 1999) ("the duty of disclosure is a continuing one, and a debtor is required to disclose

all potential causes of action").

Mr. Ingoldsby claims that he believed National Union might reconsider its coverage

position and provide coverage for defense costs incurred in the Heller action.  First, if it is true

that Mr. Ingoldsby believed he might have insurance coverage for claims he was scheduling as

debts, this makes even more clear that Mr. Ingoldsby should have scheduled his interest in the

Policy as a corresponding asset, which he failed to do.  Second, Mr. Ingoldsby's argument that

National Union's initial denial did not put him on notice of his potential claims because it was

"preliminary" ignores the clear holding of the very case upon which he relies.

In Schwartz v. Travelers Indemnity Co., 50 Mass. App. Ct. 672 (2001), cited at page 9 of

the opposition, the plaintiff argued that the statute of limitations on his 93A claim should not

begin running until the time the insurance company defendant formally denied coverage in

BOS_562484_1.doc

response to plaintiff's 93A demand letter. The Court rejected this argument, holding that notice of denial of coverage (and, therefore a potential 93A claim) was provided by an earlier "preliminary" oral statement of the insurance agent denying coverage. Id. at 679.[4]

Finally, National Union's position denying coverage never wavered. Even Mr. Ingoldsby concedes that he received conclusive denial of his claims before his bankruptcy was discharged on May 5, 2004. Ingoldsby Aff. at ¶¶ 17, 19, 20 (admitting that National Union, after denying coverage twice previously, "again declined coverage" on April 16, 2004 in response to Mr. Ingoldsby's "formal demand").

Mr. Ingoldsby was therefore aware both before filing for bankruptcy and during the pendency of his bankruptcy that he had at least potential claims against National Union. He was required to schedule these claims as assets and failed to do so. See, e.g, Welsh v.Quabbin Timber, Inc., 199 B.R. 224, 228 (D. Mass. 1996) (applying judicial estoppel and rejecting assertion of lack of knowledge of claim where debtor knew of all factual elements of his potential claims prior to discharge from bankruptcy); Hoffman v. First National Bank of Akron, Iowa, 99 B.R. 929, 933 (N.D. Iowa 1989) )"[The proffered excuse] is not a valid reason to fail to disclose the claim . . . The facts underlying the cause of action were known by the Debtor long before the plan was confirmed . . . Debtor had a duty to amend his schedules to reflect this claim and to disclose the existence of the potential cause of action to creditors").

---

[4] In this action, Mr. Ingoldsby also asserts a claim for breach of contract based upon the denial of coverage. For the purposes of judicial estoppel, Mr. Ingoldsby was also put on notice of his potential claim for breach of contract on the date of breach, that is the date that National Union allegedly first breached the parties' insurance contract by refusing to provide coverage to Mr. Ingoldsby (October 11, 2002). Campanella & Cardi Constr. Co. v. Commonwealth, 351 Mass. 184, 185 (1966) (A cause of action for breach of contract accrues at the time of the breach.); DiGregorio v. Commonwealth, 10 Mass. App. Ct. 861, 862 (1980) (this rule applies even though a specific amount of damages is unascertainable at the time of the breach or even if damages may not be sustained until a later time).

BOS_562484_1.doc

B.    The Admitted Facts Establish As a Matter of Law That Mr. Ingoldsby Misled The Bankruptcy Court And Secured An Unfair Advantage By Not Scheduling His Interest In The Policy And His Claims Against National Union.

Mr. Ingoldsby asserts that his representations to the bankruptcy court are not inconsistent with his claims before this Court. Opposition at pp. 10-11. He also claims that his positions were not successfully asserted before the bankruptcy court. Id. at 11-12. Finally, he claims that he did not obtain any unfair advantage vis-a-vis his representations to the bankruptcy court and this Court. Id. at 12-13. These assertions are completely contradictory to the admitted facts in this case. These assertions are also contrary to the case law cited and discussed in the Opening Memo, case law which Mr. Ingoldsby has again simply ignored without citation to a single contrary authority. See id. at pp. 14-15.

Clearly inconsistent: Mr. Ingoldsby did not schedule his claims or his interest in the Policy, thereby falsely representing that no such claims or interest existed. Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.), Inc., 989 F.2d 570, 571 (1st Cir. 1993) (failure to schedule claim is representation that debtor has no such claim, which is clearly inconsistent with subsequently bringing claims in separate suit ); Howell v. Town of Leyden, 335 F. Supp. 2d 248, 251 (D. Mass. 2004) (same); Welsh, 199 B.R. at 229 (same).

Success and Unfair Advantage: Mr. Ingoldsby's bankruptcy was discharged in reliance upon the veracity of his asset and liability schedules, thereby giving him the unfair advantage of obtaining discharge without informing his creditors of his potential claims against National Union or his interest in the Policy, which he believed would provide insurance coverage for certain of his debts. Id. ("the bankruptcy court accepted the [debtors'] representation in

resolving their bankruptcy petition and depriving their creditors of access to this substantial

potential asset").[5]

Therefore, contrary to his bold and entirely unsupported assertions to the contrary,

Mr. Ingoldsby has taken clearly inconsistent positions before the bankruptcy court and this Court

(that he did not have a claim or interest vs. that he did), successfully asserted his prior

inconsistent statement before the bankruptcy court (obtained discharge), and would obtain an

unfair advantage if permitted to assert the inconsistent positions before this Court (depriving his

creditors of access to his interest in the Policy or his claims against National Union).

C.    The Admitted Facts Establish As A Matter Of Law That Mr. Ingoldsby Cannot
Satisfy The Requirements Of The "Good Faith" Exception.

By arguing that he did not "intentionally" manipulate the judicial system, Opposition at

pp. 13-14, Mr. Ingoldsby apparently seeks to fit his actions within the "good faith" exception to

the judicial estoppel doctrine. However, the very case upon which Mr. Ingoldsby purports to

rely for the proposition that his manipulation must have been "intentional" to justify estoppel

makes clear that Mr. Ingoldsby's actions here are more than sufficient to bar him from pursuing

his claims against National Union. Furthermore, Mr. Ingoldsby's actions exclude him from the

protections of the "good faith" exception under Massachusetts and First Circuit law, which do

not require subjective "intent" to impose judicial estoppel.

Mr. Ingoldsby admits that he had knowledge during the pendency of his bankruptcy of

the factual bases for his asserted interest in the Policy and claims against National Union. It is

---

[5] East Cambridge Sav. Bank v. Wheeler, 664 N.E.2d 446, 448 (1996), miscited by Mr. Ingoldsby for the proposition that a discharge obtained by settlement cannot constitute successful assertion of a position, is inapposite. In Wheeler, the Court found that a creditor could not have a pennies on the dollar bankruptcy settlement used against it as a successful assertion of a position. Discharge, however, whether obtained by settlement or trial is the very definition of a successful result for a debtor in bankruptcy. Indeed, Mr. Ingoldsby's representation that he had no claim against National Union or interest in the Policy was accepted by the court and his creditors, and served as a basic assumption underlying the terms of his settlement with his creditors and discharge from bankruptcy. As noted by the courts in Payless and Howell, had his purported claims been known to his creditors, the terms of settlement and discharge likely would have been very different.

likewise beyond dispute that he had a motivation to misrepresent his interest and potential

claims: to conceal these purported assets from his creditors and the bankruptcy court and keeping

them for himself. Therefore, under the case law cited in his own Opposition, as well as

Massachusetts and First Circuit law, Mr. Ingoldsby may not avail himself of the "good faith"

exception to the doctrine of judicial estoppel.

In Barger v. City of Cartersville, 348 F.3d 1289 (11th Cir. 2003), cited by Mr. Ingoldsby,

the plaintiff-appellant argued that her failure to schedule should be excused because it was not

"intentional." The court rejected the argument, noting that the "good faith" exception to the

judicial estoppel doctrine may only be satisfied where the party either lacked knowledge of the

undisclosed claim or had no motive to conceal the claim. Id. at 1295. The court went on to hold

that a party's knowledge of the claim and motive to conceal it (i.e., to keep the proceeds for itself

and not have it become part of the bankruptcy estate) "are sufficient evidence from which to

infer intentional manipulation." Id. at 1296.

The Barger case cited by Mr. Ingoldsby likewise disposes of his assertion that his failure

to schedule should be forgiven on the basis of advice of counsel:

> Although it is undisputed that Barger's attorney failed to list Barger's
> discrimination suit on the schedule of assets despite the fact that Barger
> specifically told him about the suit, the attorney's omission is no panacea . . .
> [Barger] voluntarily chose this attorney as his representative in the action, and he
> cannot now avoid the consequences of the acts or omissions of this freely selected
> agent. [I]f an attorney's conduct falls substantially below what is reasonable
> under the circumstances, the client's remedy is against the attorney in a suit for
> malpractice . . . Even if Barger's failure to disclose could be blamed on her
> attorney, the nondisclosure could not in any event be considered inadvertent.

Barger, 348 F.3d at 1295. See also Lewis v. Weyerhauser Co., 141 Fed. Appx. 420, 427 (6th

Cir. 2005) ("We also find unpersuasive Lewis's assertion that she relied in good faith on the

advice of her attorney's paralegal."); Estel v. Bigelow Management, Inc., 323 B.R. 918, 923

BOS_562484_1.doc

(E.D. Tex. 2005) ("Estel's argument that it is all his lawyer's fault [for failing to schedule his claims] is not persuasive . . . [Y]ou take them as you get them. If Estel 'chose poorly' in his selection of counsel, such does not provide relief here [from judicial estoppel]."); Randleson v. Kennametal, Inc., 2006 WL 3196457, *2 (N.D. Ohio November 2, 2006) ("Randelson's assertion that she informed her bankruptcy attorney of her potential claim is unpersuasive . . . the mistake by [ ] Randelson's bankruptcy attorney will not translate into an admissible inadvertent mistake by [] Randleson and move this court to deny the application of the doctrine of judicial estoppel."). Therefore, Mr. Ingoldsby may not avoid judicial estoppel by blaming his own lawyer for his failure to schedule.

Furthermore, neither Massachusetts nor First Circuit law requires the type of "intentional" manipulation that Mr. Ingoldsby seems to argue. See, e.g., Jeffrey, 70 F.3d at 187 (intent in failing to schedule potential claim is irrelevant); Welsh, 199 B.R. at 229 ("good faith" exception not applicable where debtor knew all of the factual bases for potential cause of action during pendency of bankruptcy); Howell, 335 F. Supp. 2d at 251 ("good faith" exception applies only in "limited circumstances, such as where the new, inconsistent position is the product of information neither known nor readily available to [the party] at the time the initial position was taken") (quotations omitted).

In Jeffrey, plaintiffs-appellants sought to avoid the consequences of their failure to schedule a claim in the bankruptcy court, arguing that the failure should be excused because it was not "intentional." Id. at 187. The First Circuit rejected the argument and applied judicial estoppel:

> [W]hether or not appellants' initial failure to schedule the state court asset was intentional, the glaring fact remains that, but for the investigation made by counsel for [the state court defendant], appellants' failure to list on the schedule the state court action at any time during the bankruptcy proceedings would never

BOS_562484_1.doc

have come to the attention of the state court, the bankruptcy court, or the trustee.
As we have already noted, appellants' "silence" here is thoroughly 'deafening."

Id. (quoting Payless, 989 F.2d at 571).

In Welsh and Howell, plaintiffs likewise argued that their failures to schedule their claims

were inadvertent and in "good faith." Welsh, at 251 (arguing that the plaintiffs did not

understand the schedules and that their failure to list the claims was in good faith); Howell, at

229 (arguing that plaintiff did not know of the claim at the time he failed to schedule). In both

cases, this Court rejected the argument, noting that each set of plaintiffs was aware of the facts

underlying the claims in question, represented to the bankruptcy court that they had no such

claim, obtained discharge on the basis of those representations, and then sought to commit fraud

upon the courts and profit by their misrepresentations by pursuing those very claims. Welsh, at

251, Howell, at 229. This, both courts decided, could not be allowed because it threatened the

integrity of the judicial process. Id.

Mr. Ingoldsby's claim of "good faith" here is no different. Indeed, Mr. Ingoldsby's

attempt to now assert claims in this litigation arising out of the Policy, after representing that no

such interest or claims existed, is precisely the sort of "manipulation of the judicial system" that

the judicial estoppel doctrine is designed to prevent, regardless of "intent." As stated in Payless:

> The basic principle of bankruptcy is to obtain a discharge from one's creditors in
> return for all of one's assets, except those exempt, as a result of which creditors
> release their own claims and the bankrupt can start fresh. Assuming there is
> validity in [Mr. Ingoldsby's] present suit, [he] has a better plan. Conceal your
> claims; get rid of your creditors on the cheap, and start over with a bundle of
> rights. This is a palpable fraud that the court will not tolerate, even passively.
> [Mr. Ingoldsby], having obtained judicial relief on the representation that no
> claims existed, can not now resurrect them and obtain relief on the opposite basis.

989 F.2d at 571.

- 19 -

> D.    Whether Or Not Judicial Estoppel Would Constitute A Windfall For National Union Is Irrelevant: Failing To Impose Judicial Estoppel Would Permit Mr. Ingoldsby To Profit From His Fraud On The Bankruptcy Court.

Mr. Ingoldsby's further argument that judicial estoppel should not be imposed here because it would grant National Union a windfall is likewise without merit. The purpose of the judicial estoppel doctrine is to prevent parties from playing fast and loose with the courts; therefore the First Circuit has summarily rejected the argument that it should not be imposed if it might create a windfall for the another party. Payless, 989 F.2d at 570 ("This may not be strictly equitable estoppel, as the court observed. Indeed, defendants may have a windfall. However, it is an unacceptable abuse of judicial proceedings."); see also Howell, 335 F. Supp. 2d at 251 ("The purpose of the doctrine of judicial estoppel is to prevent the abuse of judicial proceedings, even if the application of the doctrine results in a windfall for the opposing party.").

**II.    The Admitted Facts Establish That National Union Also Is Entitled To Summary Judgment Due To The Policy's Contractual Liability Exclusion.**

Mr. Ingoldsby argues in his Opposition that the contractual liability exclusion contained in the Policy does not exclude from coverage the negligent misrepresentation claim brought against him by Heller in the underlying litigation. Mr. Ingoldsby admits that the exclusion was contained in the Policy, as presented to MHCS, and that he was previously provided with a copy of the exclusion.[6] Therefore, the only question is one of interpretation: does the contractual

---

[6] At various points in his Opposition papers, Mr. Ingoldsby half-heartedly asserts that he was unaware of the exclusion, but does not make any real argument against National Union on this basis. Regardless, Mr. Ingoldsby cannot be excused from the consequences of the exclusion by his failure to personally review the final Policy. See Couch on Insurance 3d § 18:17 (2005) ("An insured cannot be relieved of the effect of an endorsement or rider attached to his or her policy by reason of having neglected to read and become familiar with its terms."); Cauman v. Amer. Credit Indemnity Co. of New York, 229 Mass. 278, 283 (1918) (If [the insured] did not see fit to read . . . the conditions of the policies . . . the rights of the parties are not to be affected thereby, as there is nothing to show that he was prevented from informing himself of their contents if he so desired."). Indeed, Mr. Ingoldsby concedes that MHCS and its insurance agent were advised that the exclusion was contained within the Policy. (Undisputed Facts, ¶¶ 11-13; Admitted Facts, pp. 6-8). Mr. Ingoldsby is therefore bound by the exclusion. Aguiar v. Generali Assicurazioni Ins. Co., 47 Mass. App. Ct. 687, 690 (1999) ("an insured is charged with his agent's knowledge of the terms and conditions of an insurance policy"); see also Century Indemnity Co. v. Jameson, 333 Mass. 503, 504 (1956) ("knowledge of the agent was the knowledge of [the insured]").

liability exclusion apply to the negligent misrepresentation claim or does it not? So long as there is no ambiguity in the language of the applicable exclusion, this interpretation is a matter of law for the Court to decide. Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002).

A.    There Is No Ambiguity Between The Policy's Definition of Wrongful Act and Its Contractual Liability Exclusion.

Mr. Ingoldsby argues that the Policy is ambiguous because the contractual liability exclusion and the Policy's definition of Wrongful Act are "contradictory." Opposition at p. 23. Therefore, Mr. Ingoldsby argues that because the parties have "wildly differing interpretations of the Policy," summary judgment should be denied. Id. at pp. 23-25.

First, these two provisions of the Policy are not contradictory. A policy exclusion always and necessarily removes from coverage a claim that might otherwise constitute a covered claim. Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 377 (1st Cir. 1991) (an "exclusion operates to relieve insurer of liability for what otherwise would be its coverage for wrongful acts" under an insurance policy); Andover Newton Theological School, Inc. v. Continental Cas. Co., 930 F.2d 89, 95 (1st Cir. 1991) ("The [insurer] does not deny that discriminatory acts are "wrongful acts" within the meaning of the policy. Coverage for wrongful acts, however, is limited by a specific exclusion . . ."). That is the very nature of an exclusion, of course: it excludes from coverage something that might otherwise be covered. Continental Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370 at 377; see also Shelter Mut. Ins. Co. v. Ballew, 203 S.W. 3d 789, 795 (Mo. App. Ct. 2006) ("An exclusion provision in an insurance policy, by definition, excludes risk.").

Second, that Mr. Ingoldsby has taken a "wildly differing interpretation[] of the Policy," one that ignores the clear language of the contractual liability exclusion, cannot itself create an ambiguity where none truly exists. Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998) ("an

ambiguity is not created simply because a controversy exists between the parties, each favoring

an interpretation contrary to the other . . . A term is ambiguous only if it is susceptible of more

than one meaning and reasonably intelligent persons could differ as to which meaning is the

proper one.")  Otherwise, any party could avoid summary judgment in a coverage case simply by

concocting some outlandish "differing interpretation" of a policy, whether or not supported by

the language of the policy.

Finally, at least two courts have considered the interplay between the contractual liability

exclusion and the definition of Wrongful Act contained in the Policy.  Temple Univ. Health Sys.

v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, C.A. No. 04-061705, 2005 WL 167583 (Pa. Com.

Pl. Jan. 7, 2005); Chapman v. National Union Fire Ins. Co. of Pittsburgh, PA, 171 S.W.3d 222,

228-29 (Tex. App. Ct. 2005).  Neither court found the "contradiction" between the two

provisions to create an ambiguity; indeed, each was able to interpret the provisions on summary

disposition.  Temple, 2005 WL at *3-4 (granting motion for judgment on the pleadings based

upon interpretation of contractual liability exclusion); Chapman, 171 S.W.3d at 228-29

(affirming summary judgment based upon contractual liability exclusion).[7]

Therefore, Mr. Ingoldsby's argument that the Policy is ambiguous is without merit, and

interpretation of the Policy is a question of law appropriate for the Court to decide on summary

judgment.  Seaco, 435 Mass. at 779.

---

[7] Mr. Ingoldsby's proffered expert likewise acknowledges the clear terms of the Policy's contractual liability
exclusion excluded coverage for Heller's claims for both MHCS and Mr. Ingoldsby : "Thus, by adding coverage for
the entity (to more effectively market other types of insurance), National Union has reduced coverage in certain
other areas, and the assured MHCS has suffered one such reduction, in the area of contractual liability . . . In August
of 2001, I believe that similar D&O policies were available in which the entity exclusions such as . . . contractual
liability applied only as respects claims brought against the Company, not the individual."  Martocci Affidavit, ¶¶ 9-
10.

BOS_562484_1.doc

B.    The Admitted Facts Establish As A Matter of Law That Heller's Claim Against Mr. Ingoldsby For Negligent Misrepresentation Arises From The Contract Between Heller And MHCS, And Therefore Is Excluded From Coverage By The Contractual Liability Exclusion.

Mr. Ingoldsby argues that National Union's interpretation of the contractual liability exclusion to exclude Heller's negligent misrepresentation claim is overly broad, and that, under an appropriate interpretation, the exclusion does not apply to Heller's negligent misrepresentation claim.  Upon closer examination, these interrelated arguments are unsupported by the admitted facts in this case or by Mr. Ingoldsby's cited case law.  Furthermore, they are directly contrary to relevant case law cited in the Opening Memo, case law which Mr. Ingoldsby again chooses to simply ignore.

1.    The Contractual Liability Exclusion Excludes Coverage

Mr. Ingoldsby admits that Heller sued him for: (1) breach of guaranty, specifically claiming that Mr. Ingoldsby personally guaranteed the DIP Loan and was therefore directly liable for all moneys due to Heller (Undisputed Facts, ¶ 28; Admitted Facts, pp. 15-16); and (2) for negligently failing to accurately track and record downward adjustments to MHCS' receivables in violation of the DIP Loan Agreement.  (Id.).  Both claims against Mr. Ingoldsby in the Heller Litigation thus were founded upon, and would not have existed but for, contractual obligations created under Mr. Ingoldsby's Guaranty and the DIP Loan Agreement between Heller and MHCS.  That is, Mr. Ingoldsby would not have had the obligation to provide the allegedly negligently misrepresented information but for the Guaranty and DIP Loan Agreement.

The contractual liability exclusion specifically excluded any claim "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any Insured under any express (written or oral) contract or agreement."  Under Massachusetts law, the exclusion must be interpreted by applying the usual and ordinary meanings of the words

BOS_562484_1.doc

contained therein. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280 (1997). Furthermore, under Massachusetts law, the phrase "arising out of" is interpreted expansively. See Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999). See also Rischitelli v. Safety Ins. Co., 423 Mass. 703 (1996); County of Barnstable v. American Fin. Corp., 51 Mass. App. Ct. 213, 215 (2001).

Applying almost identical rules of interpretation to almost identical policy language and claims, at least two courts have already held that tort claims based upon duties created by contract are excluded from coverage by this type of contractual liability exclusion. Temple, 2005 WL at *3-4 (granting motion for judgment on the pleadings on negligence claim); Chapman, 171 S.W.3d at 228-29 (affirming summary judgment on claims for breach of constructive trustee and fiduciary obligations).

In Temple, the plaintiff insureds, three corporations and individual officers and directors of the corporations, sought a declaration that National Union had a duty to defend and indemnify the insureds in a lawsuit. Id. at *1. The lawsuit against the insureds arose from a written loan agreement to enable the insureds to purchase a nursing home. Id. The nursing home eventually failed and closed, resulting in the insureds defaulting on their loan payments. Id. The lawsuit alleged breach of contract and negligence by the corporate insureds. Id.

As in this case, the National Union policy in Temple contained an exclusion for any claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability . . . ." Id. at *7. In addition to finding that the contract claim was barred by the clear language of the policy exclusion, the court also held that the negligence claim was similarly excluded because the duties which the insureds negligently breached were imposed by the loan agreement and sounded in contract. Id. at *9-10.

In <u>Chapman v. National Union Fire Ins. Co. of Pittsburgh, PA</u>, 171 S.W.3d 222, a

corporate officer's wife sued him alleging that he had breached certain fiduciary duties owed to

her. <u>Id.</u> at 224. The officer sought coverage from National Union and National Union denied

coverage, on the ground (among others) that the fiduciary duty in question was created by the

couple's divorce agreement and, therefore, the claim was excluded under the contractual liability

exclusion. <u>Id.</u> at 228. The corporate officer disagreed, arguing that the wife's complaint was

riddled with allegations of malfeasance by corporate officers and directly concerned his conduct

as an officer of the company. <u>Id.</u> The Court agreed with National Union, and dismissed the

complaint on summary judgment on the ground that any fiduciary obligation allegedly owed by

the officer to his wife arose out of their divorce agreement and was, therefore, excluded from

coverage. <u>Id.</u>

In this case, as in <u>Temple</u> and <u>Chapman</u>, the duty of care owed to Heller that

Mr. Ingoldsby allegedly breached was imposed by a contract – the DIP Loan Agreement – and

would not have existed in the absence of that contract. <u>Temple</u> and <u>Chapman</u> were cited and

discussed in the Opening Memo. Mr. Ingoldsby's Opposition does not even mention, much less

seek to distinguish them, however, because he cannot. Instead, Mr. Ingoldsby relies upon three

other cases for his argument that Heller's claim for negligent misrepresentation is not excluded

from coverage. Each of these three, however, is readily distinguishable from the case at hand.

Mr. Ingoldsby cites <u>Church Mutual Ins. Co. v. U.S. Liability Ins. Co.</u>, 347 F. Supp. 2d

880 (N.D. Tex. 2003), for the holding that a contractual liability exclusion did not exclude from

coverage a claim where the gravamen of the underlying complaint was fraudulent

misrepresentation rather than breach of contract. Opposition at pp. 18-19. In <u>Church</u>, however,

the underlying complaint alleged a pattern and practice of defrauding contractors by entering into

BOS_562484_1.doc

contracts without any intention of paying them and then stealing their businesses once they had

crippled the contractors. Id. at 889. The Court found that these allegations were "independent of

breach of contract" in that the allegations were for fraudulent inducement of contract (i.e., fraud

preceding the entry into the contract) and stealing of business (completely unrelated to contract)

rather than for breach of any duty imposed by the contract in question. Id.

Such is not the case here. Heller never alleged that Mr. Ingoldsby committed fraud in

inducing Heller to enter into the DIP Loan Agreement or Guaranty (i.e., that he intended at the

time of entering into the contracts to fail to perform thereunder). Rather, Heller alleged that

Mr. Ingoldsby breached the duty of care that was imposed upon him by the DIP Loan Agreement

by providing Heller with misleading Borrowing Base Certificates.

Mr. Ingoldsby likewise cites Admiral Ins. Co. v. Briggs, 264 F. Supp.2d 460 (N.D. Tex.

2003), and American Chemical Society v. Leadscope, 2005 WL 1220746, *10 (Ohio App.

May 24, 2005), for their holdings that that a contractual liability exclusion did not exclude

coverage for the underlying torts in question (securities fraud and conversion, respectively).

Opposition at pp. 19-21. In Admiral and Leadscope, however, each court again found that the

underlying claims (securities fraud and conversion) were not excluded because they were

actionable independent and regardless of the contracts in question. Admiral, at 461-62;

Leadscope, at *10.

Again, this is not the case here. Unlike in the case of securities fraud or conversion,

Mr. Ingoldsby would not have had a duty to Heller to provide accurate Borrowing Base

Certificates but for the DIP Loan Agreement and Guaranty.

Therefore, the admitted facts in this matter and relevant case law clearly establish that the

underlying claims against Mr. Ingoldsby were excluded from coverage by the Policy's

BOS_562484_1.doc

contractual liability exclusion. Indeed, as discussed above, Mr. Ingoldsby's proffered insurance expert admits as much. Martocci Affidavit, ¶¶ 9-10.

        2.     This Proper Interpretation Of The Contractual Liability Exclusion Is Not Overbroad Or Against Public Policy.

    Mr. Ingoldsby asserts that National Union's interpretation of the contractual liability exclusion is against public policy as it would "swallow the policy," that is eliminate any coverage the policy would otherwise provide. Opposition at pp. 16-18. This assertion, however, is clearly and demonstrably false. Indeed, Mr. Ingoldsby concedes, but then ignores, that National Union's 30(b)(6) representatives testified that the exclusion would not implicate a number of different types of claims. Id. at 18. As made clear by the case law cited above by both Mr. Ingoldsby and National Union, a number of types of claims might not be excluded by the contractual liability exclusion depending upon the facts involved, including securities fraud, Admiral, at 461-62; conversion, Leadscope, at *10; fraudulent inducement of contract, Church, at 889; and breach of fiduciary duty, Temple, at *6. Therefore, Mr. Ingoldsby's argument in this regard is without merit.

## CONCLUSION

    For the aforementioned reasons, National Union is entitled to summary judgment. Mr. Ingoldsby's claims against National Union are barred because he failed to schedule either his interest in the Policy or his claims thereunder as assets of his personal bankruptcy estate. Furthermore, the Policy's contractual liability exclusion indisputably excluded coverage for

Heller's claims against Mr. Ingoldsby.  For the same reasons, Mr. Ingoldsby's Motion for

Summary Judgment should be denied.

<div style="margin-left: 40%">

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA

By its attorneys,

</div>

Dated: December 8, 2006

<div style="margin-left: 40%">

/s/ Joey H. Lee
John D. Hughes (BBO# 243660)
Joey H. Lee (BBO# 663803)
EDWARDS ANGELL PALMER
  & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Tel:  (617) 239-0100
Fax: (617) 227-4420

</div>

## CERTIFICATE OF SERVICE

I, Joey H. Lee, hereby certify that on this 8th day of December, 2006, I served a copy of the foregoing Reply Memorandum via ECF on Gregory J. Aceto, Johnson & Aceto, P.C., 67 Batterymarch Street, Suite 400, Boston, MA 02110 and Richard E. Heifetz, Tucker, Heifetz & Saltzman, LLP, Three School Street, Boston, MA 02108.

<div style="margin-left: 40%">

/s/ Joey H. Lee
Joey H. Lee

</div>

BOS_562484_1.doc