UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GE HFS HOLDINGS, INC. f/k/a HELLER HEALTHCARE FINANCE, INC., | ) ) ) | |
| Plaintiff, | ) | |
| and | ) | CIVIL ACTION |
| MICHAEL INGOLDSBY, | ) | NO. 05-11128-NG |
| | ) | |
| Intervenor/Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| NATIONAL UNION FIRE INS. CO. of PITTSBURGH, PA, and INTERNATIONAL INS. GROUP, LTD., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION ON
MOTION OF NATIONAL UNION FIRE INSURANCE CO.
OF PITTSBURGH, PA FOR SUMMARY JUDGMENT**

June 14, 2007

DEIN, U.S.M.J.

## I.  INTRODUCTION

The intervenor/plaintiff, Michael Ingoldsby ("Ingoldsby"), was the Chairman of

the Board of Managed Health Care Systems, Inc. ("MHCS") and, as such, was covered

under a Directors and Officers ("D&O") insurance policy issued by National Union Fire

Insurance Co. of Pittsburgh, PA ("National Union").  International Insurance Group, Ltd.

("IIG"), an insurance broker, obtained the policy.  Ingoldsby filed a claim under the

policy which National Union denied, relying on an exclusion in the policy for claims

"alleging, arising out of, based upon or attributable to any actual or alleged contractual

liability of the Company or an Insured. . . ." Ingoldsby has brought suit against National Union challenging the denial, and against IIG alleging that IIG failed to obtain the proper insurance coverage and failed to disclose and/or explain the exclusion. (See Docket No. 20 (First Amended Complaint in Intervention)).

The matter is presently before the court on National Union's Motion for Summary Judgment (Docket No. 66), and Ingoldsby's Cross-Motion for Summary Judgment (Docket No. 78).[1] National Union contends that Ingoldsby is judicially estopped from maintaining his claims against National Union because he failed to list them in his bankruptcy schedules. In addition, National Union contends that the policy exclusion is unambiguous, and that the company properly denied coverage. Ingoldsby, on the other hand, contends that as a matter of law the denial of coverage was wrongful.

For the reasons detailed herein, this court concludes that while Ingoldsby is not judicially estopped from maintaining his claim, the contract exclusion is clear and unambiguous and that National Union properly denied coverage. Therefore, this court recommends to the District Judge to whom this case is assigned that National Union's motion for summary judgment (Docket No. 66) be ALLOWED and that Ingoldsby's cross-motion for summary judgment (Docket No. 78) be DENIED.

---

[1] National Union has moved to strike Ingoldsby's cross-motion on the grounds that it is not timely. Since Ingoldsby's motion raises the same issues as National Union's, the motion to strike (Docket No. 86) is DENIED. IIG has also moved for summary judgment on Ingoldsby's claims against it. This court has issued a separate Report and Recommendation on that motion.

## II. <u>STATEMENT OF FACTS</u>[2]

In ruling on a motion for summary judgment, the court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir. 1995). Applying this principle, the facts are as follows.

### <u>The D&O Policy</u>

MHCS was a private home health care agency which provided home health care services to Medicare beneficiaries in Massachusetts. (DF ¶ 4). At all relevant times, Ingoldsby was the Chairman of the Board of MHCS. (DF ¶ 5). He was not, however, involved in the day-to-day operations of the company. (PF ¶ 5). Rather, Ingoldsby has been disabled since 1999 due to a medical condition, and he has been collecting disability insurance since then. (PF ¶ 5).

National Union first issued a D&O Policy to MHCS effective August 4, 2000 through August 4, 2001. (DF ¶ 6). That policy contained an exclusion for claims:

> Alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement....

---

[2] The facts are derived from National Union's Statement of Undisputed Material Facts (Docket No. 68) ("DF"); the exhibits attached to the affidavit of National Union's counsel (Docket No. 69) ("Def. Ex.__"); Ingoldsby's Statement of Disputed Material Facts (Docket No. 80) ("PF"); the exhibits attached to the affidavit of Gregory J. Aceto, Ingoldby's counsel (Docket No. 82) ("Pl. Ex. __") and to his second affidavit (Docket No. 91) ("Pl. Supp. Ex. ___"); the affidavit of Michael Brundage, Ingoldsby's bankruptcy counsel (Docket No. 83) ("Brundage Aff."); the affidavit of James R. Martocci, an expert retained by Ingoldsby (Docket No. 84) ("Martocci Aff."); and the Affidavit of Michael Ingoldsby in Opposition to National Union's Motion for Summary Judgment (Docket No. 85) ("Ingoldsby Aff.").

(DF ¶ 6).  While Ingoldsby admits to receiving a copy of the policy, he contends that this contractual liability exclusion was never explained or described to him.  (PF ¶ 7). Moreover, had he been advised about the exclusion, and National Union's interpretation thereof, Ingoldsby contends that he would have advised the company not to purchase the policy.  (PF ¶ 7).

MHCS filed for bankruptcy on February 23, 2001.  (DF ¶ 8).  Thereafter, National Union issued a renewal D&O policy to MHCS, which was in effect from August 4, 2001 to August 4, 2002.  (DF ¶ 9).  The policy was issued with knowledge that MHCS was in bankruptcy.  (See Def. Ex. A).  That policy included a new "For Profit Healthcare Organization Amendatory Endorsement."  (See DF ¶ 9).  That endorsement included a new Exclusion 4(h) which provided that the policy excluded coverage for claims:

> (h) alleging, arising out of, based upon or attributable to any actual
> or alleged contractual liability of the Company or an Insured under
> any express (written or oral ) contract or agreement (including, but
> not limited to, any liquidated damages, severance agreement or
> payment, golden parachute agreement, or any compensation
> agreement payable upon termination of any Insured); provided,
> however, that the exclusion shall not apply to:
>
>> (1) Employment Practices Claims to the extent
>> that any liability does not arise from such
>> express contract or agreement; or
>>
>> (2) Claims for Loss alleging Wrongful Acts of
>> an Insured(s) with respect to hospital practice,
>> privileges, credentialing or peer review matters.

(PF ¶ 9; Def. Ex. A).  Under Section 2(g) of the policy, a Wrongful Act is defined as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company.

(PF ¶ 9).  While Ingoldsby denies having knowledge or an understanding of Exclusion 4(h), it is undisputed that it was sent to MHCS for review before the policy issued.  (See PF ¶¶ 11-12; DF ¶ 11; Def. Ex. A).

According to Ingoldsby's expert, James Martocci, not all D&O policies issued in August 2001 had such contractual liability exclusions.  (Martocci Aff. ¶ 7).  Some policies contained provisions which limited contractual liability exclusions only to claims brought against the company.  (Id. ¶ 10).  National Union's policy, however, purported to limit coverage for claims brought both against the company and the individual directors and officers.  (Id. ¶ 9).

### The Heller Loans

Heller Healthcare Finance, Inc. ("Heller") made a number of pre-petition loans to MHCS, including one pursuant to a Loan and Security Agreement dated August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000.00.  (DF ¶ 14).  On February 28, 2001, post-petition, Heller, as lender, and MHCS and Medical Temporaries (a related entity), as borrowers (collectively "MHCS"), entered into a $3,000,000.00 Revolving Credit Loan which refinanced the pre-petition Revolving Credit Note and was evidenced by a Debtor-in-Possession Loan and Security Agreement (hereinafter the "DIP Loan" and "DIP Loan Agreement").  (Compl. ¶ 18).  Heller

contends, but Ingoldsby denies, that Ingoldsby personally guaranteed MHCS's obligations under the DIP Loan Agreement.  (PF ¶ 16).

The DIP Loan Agreement required MHCS to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report . . . ."  (DF ¶ 17). In addition, MHCS was obligated to prepare "Borrowing Base Certificates" that represented the eligible Medicaid, Medicare and other receivables of MHCS.  (PF ¶ 18). As stated in the Borrowing Base Certificates, they were "given to the Lender [Heller] in order to induce the Lender" to make advances under the DIP Loan Agreement.  (PF ¶ 20).

Heller contends that, in January 2002, it discovered during an audit that MHCS had failed to accurately track and report its Medicare receivables to Heller, as a result of which Heller had loaned MHCS approximately $400,000.00 more under the DIP Loan than it would have advanced if the accounts receivable in the Borrowing Base Certificates had been accurate.  (PF ¶ 24).  Heller calculated that the amount due from MHCS under the DIP Loan was in excess of $1.3 million.  (PF ¶ 24).

On March 20, 2002, MHCS converted its Chapter 11 bankruptcy reorganization to a Chapter 7 liquidation proceeding.  (PF ¶ 25).  On March 25, 2002, Heller and MHCS entered into a settlement agreement which included a release of MHCS, its professionals, agents and employees, but provided that "this release from Heller does not include and Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable claims Heller may have or from any

damages suffered by Heller arising from the default under the DIP Loan Agreement which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default[.]" (DF ¶ 26; Def. Ex. H, ¶ 2(d)). The Settlement Agreement was approved by the Bankruptcy Court on March 27, 2002. (PF ¶ 26).

### **The Heller Litigation**

On August 1, 2002, Heller brought suit against Michael Ingoldsby, his wife Mary Lee Ingoldsby, and other officers of MHCS, Pamela Jones and Indy Edwards. (See Complaint attached to Ingoldsby Aff. at Ex. A). In the Complaint, Heller describes the "nature of the case" as follows:

> This action seeks damages suffered by Heller as a result of the negligent misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to collateral available to satisfy loans made by Heller to two corporate borrowers with whom they were affiliated. Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are also sued for breach of contract on a personal guaranty.

(Compl. ¶ 1). The Complaint describes Ingoldsby as "the sole shareholder and a Director" of MHCS, and alleges that Ingoldsby served as an "unpaid chief executive officer" who was "actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones." (Compl. ¶ 3).

In the Complaint, Heller describes its pre-petition loans to MHCS as well as the post-petition DIP Loan and DIP Loan Agreement. (Compl. ¶¶ 17-18). It also alleges that Ingoldsby and his wife guaranteed the borrowers' obligations under the DIP Loan

Agreement. (Compl. ¶ 19). According to the Complaint, "MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the 'eligible' Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement." (Compl. ¶ 23). Further, Heller alleges it lent money under the DIP Loan "based on the level of receivable the companies reported to Heller on periodic 'borrowing base certificates', signed by Defendants Jones and Edwards in the ordinary course of business and their employment." (Compl. ¶ 25). According to Heller, it was intended that Heller rely on the level of eligible receivable collateral reported in these certificates and Heller did so rely. (Compl. ¶ 25).

The crux of Heller's complaint is its allegation that "[u]nknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller" of the status of MHCS's receivable collateral on the borrowing base certificates, as a result of which the receivables were overstated and Heller advanced more money than it would have if they had been accurate. (Compl. ¶¶ 27-28, 37). In addition, Heller alleges that it relied on DIP Operating Reports which had been filed with the bankruptcy court, but which were similarly inaccurate. (Compl. ¶ 29). These reports supposedly were inaccurate "due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports[.]" (Compl. ¶¶ 30-31). Other status

-8-

reports filed by the debtors with the Bankruptcy Court were also inaccurate as a result of

"the actions of the Defendants Jones, Edwards, and Ingoldsby[.]"  (Compl. ¶¶ 33-34).

The Complaint sounds in two counts.  The first, entitled "Negligent Misrepresenta-

tion — against Defendants Jones, Edwards, and Michael Ingoldsby" provides as follows:

> Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary
> course of their business and employment, and in the ordinary course
> of the business of MHCS and Medical Temporaries, supplied false
> information to Heller regarding the borrowing base of the eligible
> Accounts and accounts receivable of MHCS and Medical
> Temporaries.  That false information, in the form of inaccurate
> borrowing base certificates and DIP Operating Reports, was supplied
> to Heller for Heller's guidance in its business transactions, i.e.,
> making advances to MHCS and Medical Temporaries pursuant to the
> DIP loan, with the intent and expectation that Heller rely on such
> information, as it did.  The false information, and Heller's justifiable
> reliance thereon, caused and resulted in pecuniary loss to Heller.
> Defendants Jones, Edwards and Michael Ingoldsby failed to exercise
> reasonable care or competence in obtaining or communicating the
> information regarding the borrowing base.

(Compl. ¶ 55).  The second count of the Complaint alleges that Michael and Mary Lee

Ingoldsby are liable to Heller "as guarantors of the DIP Loan, for all monies due to

Heller, other than monies due with respect to the pre-petition term loan."  (Compl. ¶ 58).

## Denial of Coverage

On August 2, 2002, Ingoldsby forwarded Heller's Complaint to National Union.

(PF ¶ 29).  On or about October 11, 2002, National Union issued a "preliminary coverage

evaluation" in which it declined coverage for the litigation and the associated defense

costs, relying on the policy's contractual liability exclusion.  (Ingoldsby Aff. Ex. B; PF

¶ 30).  By letter dated March 6, 2003, National Union confirmed that there was no cover-

age based on Exclusion 4(h).  (PF ¶ 30; Ingoldsby Aff. Ex. C).  As National Union wrote:

> Moreover, your e-mail addresses only the factual allegations asserted
> by the Plaintiffs against Mr. Ingoldsby in the *Heller* Complaint,
> disputing the accuracy of the allegations, and does not discuss the
> substance of the coverage issue.  As you may be aware, however,
> National Union, in conducting its coverage analysis, is limited by the
> allegations asserted in the Complaint, and must consider what policy
> terms and conditions limit or exclude coverage if the allegations
> plead in the Complaint are proven true.  National Union understands
> that the allegations asserted in the *Heller* Complaint are without
> substantiation at this time, and nothing in the letter or our previous
> correspondence is intended to suggest that the allegations have any
> legal or factual merit; rather, it is National Union's position that
> there is no coverage for the claims as they are asserted.

(Ingoldsby Aff. Ex. C).  On March 17, 2004 Ingoldsby sent a Mass. Gen. Laws ch. 93A

demand letter to National Union.  (Ingoldsby Aff. ¶ 20).  By letter dated April 16, 2004,

National Union again declined coverage due to the contractual liability exclusion.  (Id.).

Ingoldsby then obtained and paid for his own defense in the Heller litigation.  (DF ¶ 31).

### Ingoldsby's Bankruptcy

After National Union's preliminary determination of no coverage, and "[a]s a

result of the potential liability and costs associated with the Heller Action," Ingoldsby

filed a Chapter 7 petition for relief in the Bankruptcy Court for the Middle District of

Florida on December 13, 2002.  (Ingoldsby Aff. ¶ 23; PF ¶ 32).  National Union was not

a creditor in the bankruptcy.  (Ingoldsby Aff. ¶ 24).  Ingoldsby filed his Schedules and

Statement of Financial Affairs with the Bankruptcy Court on January 2, 2003.  (DF ¶ 34).

While Ingoldsby disclosed therein that he was a defendant in the Heller litigation, he did

-10-

not list a claim against National Union or the D&O policy. (DF ¶ 35; Ingoldsby Aff. ¶ 27). Thus, in Schedule B where Ingoldsby was to disclose his "[i]nterests in insurance policies," Ingoldsby listed a Unum Provident Disability Policy, but not the National Union Policy. (DF ¶ 35). This apparently was done on advice of bankruptcy counsel who advised Ingoldsby that the National Union policy was not a personal asset, but rather an asset of the MHCS bankruptcy. (Ingoldsby Aff. ¶ 27; see also Brundage Aff. ¶¶ 8-9). In addition, since neither Ingoldsby nor his bankruptcy counsel had contemplated a claim against National Union as of that time, Ingoldsby did not disclose the potential claim on Schedule B where he was to disclose any "contingent and unliquidated claims of every nature." (DF ¶ 35; Ingoldsby Aff. ¶ 27; Brundage Aff. ¶¶ 6-7). Ingoldsby claims that he was still hopeful that National Union would reconsider its "preliminary" denial of coverage after further investigation. (Ingoldsby Aff. ¶ 27). Moreover, the Heller litigation had been stayed, and Ingoldsby understood that monies owed Heller would be discharged in conjunction with the bankruptcy proceedings. (PF ¶ 35).

Ingoldsby filed an Amended Schedule and Statement of Financial Affairs on April 18, 2003. (Ingoldsby Aff. ¶ 28; DF ¶ 37). He did not amend the disclosures, however, and still did not list the potential claim against National Union. (PF ¶ 37). At that point in time, the Heller litigation had been stayed and Ingoldsby contends that he was not contemplating any litigation against National Union. (PF ¶ 37; Ingoldsby Aff. ¶ 29).

On July 16, 2003, Heller was granted relief from the automatic stay in the Ingoldsby bankruptcy and the Heller litigation proceeded, causing Ingoldsby to incur legal fees in connection therewith.  (PF ¶ 37; Brundage Aff. ¶ 12).

On February 7, 2004 Ingoldsby entered into a Settlement Agreement with Heller in furtherance of which he paid $105,000.00.  (Ingoldsby Aff. ¶ 30).  He then began discussing a potential claim against National Union with his bankruptcy counsel. (Brundage Aff. ¶ 14).  On March 14, 2004, Ingoldsby's counsel made a formal demand upon National Union for reimbursement of his defense costs in the Heller litigation. (Ingoldsby Aff. ¶ 31).  On April 16, 2004, National Union again denied coverage. (Ingoldsby Aff. ¶ 32).  Around this time, the bankruptcy trustee was told that Ingoldsby might be seeking reimbursement of his defense costs.  (Ingoldsby Aff. ¶ 34; Brundage Aff. ¶ 15).  It was Ingoldsby's bankruptcy counsel's opinion that such a claim did not have to be included in the schedules as it was not property of Ingoldsby's bankruptcy estate.  (Brundage Aff. ¶ 16).  Thus, Ingoldsby attested, he "was advised by [his] bankruptcy counsel that [he] did not need to amend [his] Statement of Financial Affairs to reflect a potential claim for post-petition expenses."  (Ingoldsby Aff. ¶ 33).

Ingoldsby received a discharge in bankruptcy on May 5, 2004.  (DF ¶ 39).  On December 5, 2005 Ingoldsby brought claims against National Union and IIG.  (Docket No. 20).  He has since entered into an agreement with the Trustee of his bankruptcy estate providing for the prosecution of this action, either in his name or the Trustee's, the payment of legal fees, and the division of any proceeds of this litigation.  It apparently

resolves disagreements between the parties, including whether the claims belong to

Ingoldsby or the bankruptcy estate, and provides that after payment of fees and expenses,

75% of any proceeds are to go to Ingoldsby and 25% are to go to the Trustee for the

benefit of the creditors of the estate.[3]

Additional facts will be provided below when appropriate.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be

decided at trial because the evidence, viewed in the light most flattering to the nonmovant

. . . would permit a rational fact finder to resolve the issue in favor of either party."

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal

citations omitted).  A material fact is one which has the "potential to affect the outcome

of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996) (internal citations and quotation omitted).

---

[3]  Ingoldsby and the Trustee have been negotiating an agreement since at least January
2007.  A final agreement was executed on May 30, 2007, and is subject to Bankruptcy Court
approval.  (Docket No. 97)

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  <u>See</u> <u>id</u>. at 324, 106 S. Ct. at 2553.  In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation."  <u>Galloza v. Foy</u>, 389 F.3d 26, 28 (1st Cir. 2004) (internal citation omitted).

### B.     Judicial Estoppel

National Union contends that, as a result of Ingoldsby's failure to list the claims against National Union in his bankruptcy schedules, he is judicially estopped from pursuing the claims at this juncture.  This court concludes that application of the equitable doctrine of judicial estoppel is not warranted under the facts presented here.

### Judicial Estoppel - Generally

"The First Circuit has explained that, 'in broad outline the doctrine [of judicial estoppel] precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another.'"  <u>Welsh v. Quabbin Timber, Inc.</u>, 199 B.R. 224, 228 (D. Mass. 1996) (quoting <u>Patriot Cinemas, Inc. v. Gen. Cinema Corp.</u>, 834 F.2d 208, 212 (1st Cir. 1987)).  The specific requirements, however, are 'rather vague' and vary from state to state and from circuit to circuit."  <u>Patriot Cinemas</u>, 834 F.2d at 212 (citation omitted).  The purpose of the doctrine is to "protect the integrity

-14-

of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Graupner v. Town of Brookfield, 450 F. Supp. 2d 119, 126-27 (D. Mass. 2006) (quoting New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S. Ct. 1808, 1815, 149 L. Ed. 2d 968 (2001)). See also Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) ("The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system."). Consequently, the "guiding principle of judicial estoppel" is that it should apply "when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" Patriot Cinemas, 834 F.2d at 212 (citation omitted).

The doctrine of judicial estoppel has been applied when a debtor fails to disclose a claim in a bankruptcy proceeding and later seeks to assert the claim. In such a situation, the plan to "[c]onceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights" constitutes "an unacceptable abuse of judicial proceedings." Payless Wholesale Distrib., Inc. v. Alberto Culver (P.R.) Inc., 989 F.2d 570, 571 (1st Cir. 1993), and cases cited. Nevertheless, the mere fact that assets were not scheduled does not result in the automatic application of the judicial estoppel doctrine. Rather, it "is an equitable doctrine, calling for the exercise of discretion in its application to particular facts." Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 642, 824 N.E.2d 23, 30 (2005).

While the parameters of the doctrine of judicial estoppel are "hazy," and each case must be decided on its own facts, the First Circuit has decided that there are at least two conditions which must be satisfied before the doctrine may be applied. See Howell v. Town of Leyden, 335 F. Supp. 2d 248, 250 (D. Mass. 2004), and cases cited. "First, the legal or factual assertion advanced in the earlier judicial proceeding must be 'directly inconsistent' with the assertion made in the current forum." Id. at 250 (citations omitted). "Second, the responsible party must have succeeded in persuading a court to accept its prior position." Alternative Sys. Concepts, 374 F.3d at 33, and cases cited. Moreover, although "it is not a formal element of a claim of judicial estoppel, courts frequently consider a third factor: absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage? Relatedly, courts often inquire as to whether judicial acceptance of a party's initial position conferred a benefit on that party." Id. (internal citation omitted). Nevertheless, it is clear that "harm to an opponent is not an invariable prerequisite to judicial estoppel." Patriot Cinemas, 834 F.2d at 214.

Courts have also recognized "that a good-faith exception to the operation of judicial estoppel may operate in limited circumstances." Graupner, 450 F. Supp. 2d at 128. For example, "it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." New Hampshire, 532 U.S. at 753, 121 S. Ct. at 1816 (internal quotation omitted). Some courts have held that "[t]he failure to comply with the Bankruptcy Code's disclosure duty is 'inadvertent' only when a party either lacks knowledge of the undisclosed claim or has no motive for their

-16-

concealment." Barger v. City of Cartersville, GA, 348 F.3d 1289, 1295 (11th Cir. 2003).

Other courts stress that the doctrine is "an extraordinary remedy" which should be

applied only when a party's actions "will result in a miscarriage of justice" and that

"[c]areless or inadvertent disclosures are not the equivalent of deliberate manipulation."

Stallings v. Hussmann Corp., 447 F.3d 1041, 1049 (8th Cir. 2006). Based on these

principles, this court recommends that the doctrine of judicial estoppel not be applied.

### Circumstances Presented in the Instant Case

As an initial matter, the record is not clear that the potential claim had to be listed

in the bankruptcy proceeding.[4] Not only did Ingoldsby's bankruptcy attorney advise him

that it did not have to be listed,  but the final agreement with the Trustee also gives 75%

of any proceeds to Ingoldsby, and only 25% to the bankruptcy estate. Obviously disputes

settle for many reasons, and the merits of a dispute is not always the defining factor in a

settlement. Nevertheless, the division of proceeds seems to indicate that there is at least

some merit to Ingoldsby's contention that the proceeds of the policy were not an asset of

his bankruptcy estate.

Assuming that the D&O policy, and Ingoldsby's potential claim against National

Union, should have been listed at some point before the discharge in bankruptcy, by

failing to list the D&O policy and the potential claim against National Union, Ingoldsby

was taking the position that no such claim actually existed, i.e., a position inconsistent

---

[4] The analysis is complicated by the fact that the parties do not make a clear distinction
between costs of defense and Ingoldsby's claim for indemnification.

with his present position.[5]  See Stallings v. Hussmann Corp., 447 F.3d at 1047 ("A

debtor's failure to list a claim in the mandatory bankruptcy filings is tantamount to a

representation that no such claim existed") (internal quotation and citation omitted).  It is

less clear, however, that Ingoldsby succeeded in persuading the Bankruptcy Court to

accept his prior position.  Some courts have found that where the Bankruptcy Court

discharged the debtor's debts "based on information the debtor provided in the

schedules," the discharge "is sufficient acceptance of the debtor's position to provide a

basis for judicial estoppel."  Id. at 1048.[6]  However, where, as here, the existence of a

potential claim was disclosed to the Trustee prior to the discharge, it has been held that

such disclosure "negate[s] the conclusion that the [debtor] 'convinced' the Bankruptcy

Court of a position contrary to the one in this case."  Levesque v. Ojala, No. 20034485,

2005 WL 3721859, at *12 (Mass. Super. Ct. Dec. 8, 2005).  It is not necessary to

determine which principles to apply in the instant case since, even assuming both

elements of judicial estoppel have been met, the record does not establish that Ingoldsby

is seeking to derive an unfair advantage.

---

[5]  Ingoldsby argues that since he listed the Heller litigation, his claim for legal fees is not "clearly inconsistent" with his prior position.  See Ingoldsby's Mem. (Docket No. 79) at 11.  This argument as unpersuasive.  The fact that Ingoldsby was being sued would not indicate to creditors that he was entitled to either legal fees or indemnification for any judgment.

[6]  Ingoldsby argues that since the claims in the bankruptcy were settled, he did not convince the court to accept his position.  See Ingoldsby's Mem. at 11-12.  Again, this court finds this argument unpersuasive.  Any settlement, and the Bankruptcy Court's approval thereof, would be based at least in part on the creditors' assessments of the value of the estate.  The value of the estate would not include the claims against National Union as they were not disclosed.

Any failure to disclose was inadvertent, as Ingoldsby had no compelling motive to conceal the potential claim under the D&O policy.  For instance, since all Ingoldsby could seek under the D&O policy was the reimbursement of legal fees or the payment of amounts for which he was liable to Heller, any recovery would not result in a windfall to him.  To the contrary, it would have been to his advantage to disclose the potential claim so that National Union, instead of Ingoldsby himself, could have been obligated to pay Heller.[7]  Under such circumstances, any failure to disclose should be considered inadvertent.  See In re Coastal Plains, Inc., 179 F.3d 197, 206-07 (5th Cir. 1999) (collecting cases where courts apply estoppel only where the party acted intentionally and not inadvertently).

Finally, this court would not exercise its discretion to invoke the doctrine of judicial estoppel in this case.  There is no evidence that Ingoldsby acted in bad faith, or intended in any way to harm or deceive his creditors.  The fact that there was a dispute with Heller was disclosed, as was Ingoldsby's potential liability to Heller.  The amount of Ingoldsby's obligation was not defined until he settled with Heller, and at that point he informed the Trustee of the potential claim against National Union.  The creditors were aware that Ingoldsby was incurring legal fees defending the suit, and later using his funds to pay Heller.  This is not a situation where the debtor brought an unrelated claim prior to

---

[7]  Ingoldsby contends he had to sell a residence for a below-market price and refinance a mortgage on his home to cover his bankruptcy related costs.  (Ingoldsby Aff. ¶¶ 36-38).  It would have been in Ingoldsby's interest to have had National Union pay Heller directly.

bankruptcy, and failed to disclose it hoping to reap the benefits when the dust of the bankruptcy settled. Compare Randelson v. Kennametal, Inc., No. 1:05CV1978, 2006 WL 3196457, at *2 (N. D. Ohio Nov. 2, 2006) (debtor's failure to disclose a discrimination claim which had been filed with the EEOC one year prior to bankruptcy claim precludes maintenance of the discrimination lawsuit). Nor is this a situation where the post-bankruptcy claim was being brought against creditors who had been involved in the bankruptcy and had had their debts discharged before suit was filed. Compare Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417-18 (3rd Cir. 1988) (debtor estopped from asserting post-bankruptcy claim against creditor bank). Rather, National Union was never a creditor and, at the time of Ingoldsby's discharge in bankruptcy, he had been repeatedly advised by National Union there was no coverage. Under such circumstances the application of judicial estoppel would be inappropriate. See Stallings, 447 F.3d at 1049 (District Court abused its discretion in applying judicial estoppel where debtor would not derive undue benefit if allowed to proceed with FMLA claim, defendants were not creditors in the bankruptcy, and at the time of bankruptcy the Department of Labor had ruled against the debtor).

The fact that the Trustee was made aware of the potential claim against National Union prior to the discharge in bankruptcy and the fact that Ingoldsby's counsel had advised him that the potential claim did not have to be scheduled also weigh against the application of judicial estoppel. This court recognizes that there are cases where oral notice to the Trustee is found to be insufficient, and where reliance on counsel is not

deemed to be a valid excuse. See, e.g., Estel v. Bigelow Mgmt., Inc., 323 B.R. 918, 924

(E.D. Tex. 2005) (fact that attorney knew about but failed to list claims does not

"absolve" the debtor); Autos, Inc. v. Gowin, 330 B.R. 788, 793-94 (D. Kan. 2005)

(agreement with Trustee to split proceeds does not satisfy duty to disclose since it was

not approved by court).  Nevertheless, in this case these facts, coupled with the fact that

Ingoldsby's claim sought payment of a debt to a third party, defeat any claim of ill-will or

improper motive.  See Brooks v. Beatty, 25 F.3d 1037, 1994 WL 224160, at *3 (1st Cir.

May 27, 1994) (unpub. op.) (summary judgment inappropriate where debtor's alleged

reliance on counsel "established a genuine issue of material fact concerning [the debtor's]

bona fides in failing to schedule the . . . action as an asset in her chapter 7 case.").

    Finally, the application of judicial estoppel is not warranted here in light of the

Trustee's present involvement in this litigation.  It has been held that, even assuming the

elements of judicial estoppel are found, the appropriate remedy is to allow the benefits of

any recovery to accrue to the bankruptcy estate.  See, e.g., Graupner, 450 F. Supp. 2d at

129 (instead of dismissing unscheduled pre-petition claim, the court provided "an

opportunity for the bankruptcy court to determine whether it has any interests it wishes to

assert or protect"); In re Miller, 347 B.R. 48, 53-54 (S.D. Tex. 2006) (bankruptcy estate

reopened so that Trustee could determine whether to proceed with unscheduled claim);

Estel, 323 B.R. at 924 (only Trustee has standing to pursue a pre-petition cause of

action).  Here, the Trustee has considered the claim, authorized the litigation to proceed

in his name if necessary, and determined the extent to which the estate has an interest in

the litigation. The Trustee's agreement with Ingoldsby is subject to Bankruptcy Court approval. In light of these facts, the application of the doctrine of judicial estoppel would not serve its over-all purpose which is "to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system." Alternative Sys. Concepts, 374 F.3d at 33. Instead, applying the doctrine in this case "would create a potential windfall for defendants, who (if they have engaged in wrongful conduct) may thereby avoid liability altogether." Graupner, 450 F. Supp. 2d at 129. For all these reasons, this court recommends that the doctrine of judicial estoppel not be applied.

C.    **Coverage Under the Policy**

While this court has concluded that Ingoldsby should be permitted to pursue his action against National Union, this court also finds that coverage for the Heller litigation is excluded under the clear and unambiguous provisions of the D&O policy.

**Principles of Contract Interpretation**

Where, as here, the underlying facts are not in dispute, "the interpretation and application of the policy language is a question of law." Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co., __ F.3d __, No. 06-2465, at *2 (1st Cir. June 7, 2007) (citing Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 61 (1st Cir. 2001)). "If the language of an insurance policy is not ambiguous, we interpret the words of the policy in their usual and ordinary sense." Fuller v. First Fin. Ins. Co., 448 Mass. 1, 5, 858 N.E.2d 288, 291-92 (2006). The same is also true with respect to interpreting an exclusionary clause.

Hakim v. Mass. Insurer's Insolv. Fund, 424 Mass. 275, 281, 675 N.E.2d 1161, 1165 (1997). "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." County of Barnstable v. Am. Fin. Corp., 51 Mass. App. Ct. 213, 215, 744 N.E.2d 1107, 1109 (2001). The fact that the parties' disagree as to the proper interpretation does not render a provision ambiguous, nor does the existence of several dictionary definitions of a word. See id. "An exclusionary clause may be ambiguous, however, when read in the context of the entire policy or as applied to the subject matter." Id.

In the event that an exclusion in an insurance policy is determined to be ambiguous, "the exclusion is strictly construed and doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured." Id. (internal quotation omitted). "When the terms of an exclusion are plain and free from ambiguity the court does not construe them strictly against the insurer." Id. (internal quotation omitted).

In the instant case, Ingoldsby contends that National Union did not consider all the information it should have prior to making its determination as to coverage for legal fees.[8] In particular, Ingoldsby asserts that National Union wrongfully failed to consider

---

[8] While the parties recognize that the D&O policy provides for payment of legal fees, not an obligation to provide a defense, they both cite to "duty to defend" cases in connection with defining the analysis National Union was obligated to undertake.

information beyond the complaint,[9] including the fact that Ingoldsby's counsel had

"pointed out that the Heller Complaint did not allege that Mr. Ingoldsby executed the

borrowing base certificates and further informed National Union that Mr. Ingoldsby was

not involved in the compiling of the borrowing base certificates.  As such, the allegations

against Mr. Ingoldsby more accurately set forth a claim for negligent supervision or

mismanagement, rather than misrepresentation."  Ingoldsby's Supp. Mem. (Docket No.

90) at 2-3 (record citation omitted).  It is well established that "a liability insurer owes a

broad duty to defend its insured against any claims that create a potential for indemnity"

and that "the question of the initial duty of a liability insurer to defend third-party actions

against the insured is decided by matching the third-party complaint with the policy

provisions[.]"  Transamerica Ins. Co. v. KMS Patriots, L.P., 52 Mass. App. Ct. 189, 192-

93, 752 N.E.2d 777, 781 (2001) (internal quotations omitted).  "In delineating the duty to

defend, Massachusetts courts say that 'if the allegations of the complaint are 'reasonably

susceptible' of an interpretation that they state or adumbrate a claim covered by the

policy terms, the insurer must undertake the defense.'"  Massamont, 2007 WL 1633817, at

*2 (quoting Sterilite Corp. v. Cont'l Cas. Co., 17 Mass. App. Ct. 316, 318, 458 N.E.2d

338, 340-41 (1983) (additional citations omitted)).  Nevertheless, it also is true that "the

obligation of the insurer to defend is based not only on the facts alleged in the complaint

---

[9] This contention was raised for the first time in Ingoldsby's supplemental memorandum. He had originally argued that the complaint stated a claim for negligent misrepresentation, and that this tort claim was covered under the policy.  See Ingoldsby Mem. at 18-23.

but also on the facts that are known or readily knowable by the insurer.  Transamerica

Ins. Co., 52 Mass. App. Ct. at 194, 752 N.E.2d at 781 (internal quotation omitted).

However, this court does not need to decide whether National Union should have and/or

failed to consider these additional facts.  As detailed below, whether the complaint is

considered to be one for negligent misrepresentation or negligent supervision does not

affect this court's conclusion that there is no coverage under the policy.

Finally, "[t]he duty to indemnify is narrower in scope than the duty to defend."  Id.

at 196, 752 N.E.2d 783.  Therefore, if there is no duty to defend, "it necessarily follows

that the insurer does not have a duty to indemnify."  Id. (internal quotation omitted).

Applying these principles to the instant case compels the conclusion that there is no

coverage for the Heller litigation.

## The Contract Exclusion

At issue here is whether the allegations of the Heller litigation fall within

Exclusion 4(h) which provides that there is no coverage for claims "alleging, arising out

of, based upon or attributable to any actual or alleged contractual liability of the

Company or an Insured under any express (written or oral) contract or agreement . . . ."

It is undisputed that Heller's claim based on the Ingoldsbys' alleged guarantees falls

within this exclusion.  At issue is whether coverage for the negligence claim is also

excluded.

This court will assume, as Ingoldsby argues, that Count One of the complaint

entitled "Negligent Misrepresentations" is really a claim of "negligent supervision."

Thus, the complaint can be read as a claim by Heller that Ingoldsby negligently failed to supervise those who provided information for the borrowing base certificates and reports which were required under the DIP Loan.  The entire complaint is based on Heller's contention that the borrowing base certificates and the DIP Operating Reports were inaccurate and misleading, and that Heller therefore advanced too much money under the DIP Loan.  (See, e.g., Heller Compl. ¶¶ 27-28, 37, 29-31, 55).  Giving the exclusionary language its usual and ordinary meaning, the wrongful conduct at issue "arose out of" and was "attributable to" the Company's contractual relationship with Heller (the DIP Loan) and the obligations of the Company and/or the Insured to provide information thereunder. The contractual exclusion clearly applies.  See King, Chapman & Broussard Consulting Group v. Nat. Union Fire Ins. Co., 171 S.W.3d 222, 228-29 (Ct. App. Tex. (1st Dist.) 2005) (contractual exclusion in D&O policy excluded suit for breach of fiduciary duty by former spouse for payments due under divorce settlement agreement, since all obligations to pay were created by, "arose out of" and were "attributable to" the contract); Temple Univ. Health Sys., Inc. v. Nat. Union Fire Ins. Co., No. 1547, 2005 WL 167583, at *3-4 (Pa. Com. Pl. Jan. 7, 2005) (unpub. dec.) (claims of breach of contract excluded from coverage based on the contractual exclusion in D&O policy, as were negligence claims based on the corporate defendants' failure to adequately perform their duties under the contract).[10]

---

[10]  The fact that the Heller claim sounds in tort as opposed to contract is not controlling. "It is well established in insurance law that it is the source from which the alleged harm in the

This conclusion is buttressed by, but not dependent upon, the fact that "[t]he phrase 'arising out of' must be read expansively[.]" Bagley v. Monticello Ins. Co., 430 Mass. 454, 457, 720 N.E.2d 813, 816 (1999), and cases cited.[11] While "a mere remote causal connection is not enough," Massamont, 2007 WL 1633817, at *4, in the instant case the allegedly wrongful conduct is dependent upon, and in furtherance of the DIP Loan. The connection is far from remote.

A brief review of the cases on which Ingoldsby relies further supports the conclusion that coverage for the Heller litigation is excluded under the National Union policy. For example, in Admiral Ins. Co. v. Briggs, 264 F. Supp. 2d 460 (N.D. Tex. 2003), a claim that officers and directors provided false information regarding the future success of the company in order to induce a landlord to accept stock instead of cash lease payments was not barred by the contractual exclusion in the D&O policy since "[t]he lease contract did not cause the stock fraud claim, it simply provided the context in which the stock fraud took place." Id. at 463. In the instant case, however, the DIP Loan provided more than context: the entire claim was based upon performance under the contract. Here the DIP Loan and the obligation to provide information thereunder did, in

---

underlying complaint originates rather than the specific theories of liability alleged in the complaint which determine the insurer's duty to defend." County of Barnstable, 51 Mass. App. Ct. at 219, 744 N.E.2d at 1111 (internal quotations omitted).

[11] Some courts have further defined "arising out of" as being "more analogous to 'but for' causation," but such an analysis is not required. See Fuller, 448 Mass. at 6-7 & n.9, 858 N.E. 2d at 292-93 & n.9, Massamont, 2007 WL 1633817 at *4, n.3. Since this court also finds that the wrong complained of would not have occurred "but for" the DIP Loan, the exclusion would be applicable even if this court were to use a "but for" analysis.

fact, form the basis of Heller's claims. Similarly, in <u>Church Mut. Ins. Co. v. U.S.</u>

<u>Liability Ins. Co.</u>, 347 F. Supp. 2d 880 (S.D. Cal. 2004), the court found that a claim that

the insured was involved in a pattern and practice to defraud contractors by entering into

contracts without intending to pay was not governed by an exclusion for claims "arising

out of breach of contract." <u>Id.</u> at 889. The crux of the complaint was the insured's

fraudulent intent, which was found to be "independent of breach of contract." <u>Id.</u> Here,

in contrast, performance under the contract is the crux of Heller's complaint. In <u>McPeek</u>

<u>v. Travelers Cas. & Sur. Co. of Am.</u>, No. 2:06-cv-114, 2006 WL 1308087, at *3 (W.D.

Pa. May 10, 2006), the underlying claim was that the officers and directors made false

representations and/or omissions in order to fraudulently induce the plaintiffs to purchase

promissory notes. The court held that the exclusion in the D&O policy for claims

"arising out of any alleged liability of any Insured under any express contract or

agreement" did not apply since the allegedly tortious conduct preceded the purchase of

the notes. <u>Id.</u> at *4. Therefore the claims were properly characterized as "'arising out of'

pre-contract misdeeds, rather than 'arising out of' the notes (contracts) themselves." <u>Id.</u>

The instant case is obviously distinguishable as the allegedly wrongful conduct was part

and parcel of performance under the contract. Finally, in <u>Am. Chem. Soc. v. Nat'l Union</u>

<u>Fire Ins. Co. of Pittsburgh, PA</u>, No. 04AP-305, 2005 WL 1220746 (Ohio App. 10 Dist.

May 24, 2005) (unpub. op.), the issue was whether coverage for a claim of conversion of

trade secrets was excluded by the D&O exclusion of claims "alleging, arising out of,

based upon or attributable to any actual or alleged contractual liability of the Company or

any other Insured under any express contract or agreement," i.e. Exclusion 4(h).  Id. at

*8.  Since, as the court held, the claim could be maintained "without regard" to any

contract and the "claim for conversion neither necessarily arises from nor is based upon

contractual liability," Exclusion 4(h) was not applicable.  Id. at 2.  In the instant case,

however, Heller's claim was dependent upon the contract and its claims were based upon

contractual liability.  Therefore, the exclusion applies.

Several other arguments of Ingoldsby require some comment.  Ingoldsby argues

that the contract is ambiguous because the negligence claim is covered by the definition

of "wrongful act" and the exclusion therefore is in conflict with the coverage definition.

See Ingoldsby Mem. at 15.  However, coverage for wrongful acts may, nevertheless, be

"limited by a specific exclusion[.]"  Andover Newton Theological Sch. v. Cont'l Cas.

Co., 930 F.2d 89, 95 (1st Cir. 1991).  Thus, assuming that the allegations of the Heller

complaint "fall[] within the scope of coverage under the D&O policy, [they] nevertheless

also fall[] within the policy's contract exclusion because [they] plainly arise[] out of [the

company's and Ingoldsby's] contractual obligation to [Heller]."  Chapman, 171 S.W.3d at

229.  Under such circumstances, the exclusion applies.[12]

Ingoldsby also argues that the exclusion is void as it excludes virtually all types of

coverage.  Thus, the argument goes, "it should be expected that the majority of

---

[12]  Ingoldsby also argues half-heartedly that the policy itself is ambiguous in that it is difficult to read all the parts of the contract as a cohesive unit.  See Ingoldsby Supp. Mem. at 6-7. While not an unsympathetic argument given the number of amendments, it does not help Ingoldsby in the instant case.  Exclusion 4(h) stands alone and replaces a prior provision "in its entirety."  The placement of the exclusion does not create an ambiguity.

misrepresentations made in the course of business transactions will likely involve some sort of contract." Ingoldsby Mem. at 21. However, Ingoldsby cites no support for this proposition, and as the cases described above make clear, misrepresentations may occur in a business setting yet not be related to a contractual duty. "'A provision in an insurance policy that negates the very coverage that the policy purports to provide in the circumstances where the person is liable is void as against public policy.' However, if the policy still provides coverage for some acts, it is not illusory simply because of a potentially wide exclusion." Bagley, 430 Mass. at 459, 720 N.E.2d at 817 (quoting Liberty Mut. Ins. Co. v. Tabor, 407 Mass. 354, 358, 553 N.E.2d 909, 912 (1990)). While the coverage provided by the National Union policy may be more limited than other available D&O policies, see Martocci Aff. ¶¶ 9-10, this is not a situation where the exclusion "swallow[s] the policy." County of Barnstable, 51 Mass. App. Ct. at 218, 744 N.E.2d at 1111 (internal quotation omitted).[13]

Since the clear and unambiguous language of the policy excludes coverage for the Heller litigation, this court recommends that National Union's motion for summary judgment be allowed, and Ingoldsby's cross-motion for summary judgment be denied.

---

[13] The instant case is readily distinguishable from Jefferson Ins. Co. of NY v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 42 Mass. App. Ct. 94, 677 N.E.2d 225 (1997) on which Ingoldsby relies. In Jefferson, the CGL policy excluded coverage for "professional services." The court rejected a definition of professional services which would include "nonspecialized, clerical or administrative activity requiring neither special learning, intellectual skill, [or] professional judgment." Id. at 102, 677 N.E.2d at 231. To hold otherwise would have excluded virtually all activities of the insured ambulance employees. Id. at 102, 677 N.E.2d at 231. In the instant case, however, numerous activities of directors and officers remain covered by the D&O policy.

## IV.  <u>CONCLUSION</u>

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that National Union's motion for summary judgment (Docket No. 66) be ALLOWED and that Ingoldsby's cross-motion for summary judgment (Docket No. 78) be DENIED.[14]


                                               <u>/ s / Judith Gail Dein</u>
                                               Judith Gail Dein
                                               United States Magistrate Judge

---

[14]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  <u>See Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-605 (1st Cir. 1980); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Scott v. Schweiker</u>, 702 F.2d 13, 14 (1st Cir. 1983); <u>see</u> also <u>Thomas v. Arn</u>, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  <u>Accord</u> <u>Phinney v. Wentworth Douglas Hosp.</u>, 199 F.3d 1, 3-4 (1st Cir. 1999); <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-51 (1st Cir. 1994); <u>Santiago v. Canon U.S.A., Inc.</u>, 138 F.3d 1, 4 (1st Cir. 1998).