UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GE HFS HOLDINGS, INC., f/k/a HELLER HEALTHCARE FINANCE, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| And | ) ) | |
| MICHAEL INGOLDSBY, | ) ) | |
| Intervenor/Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-CV-11128-NG |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and INTERNATIONAL INSURANCE GROUP, LTD., | ) ) ) ) ) | |
| Defendants. | ) ) | |

### NATIONAL UNION'S RESPONSE TO PLAINTIFF-INTERVENOR'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON MOTION OF NATIONAL UNION FOR SUMMARY JUDGMENT

Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union")

submits this Response to Plaintiff-Intervenor Michael Ingoldsby's ("Plaintiff" or Ingoldsby")

Objections to Magistrate Judge's Report and Recommendation on Motion of National Union Fire

Insurance Co. of Pittsburgh, PA for Summary Judgment ("Objections").

In a well-reasoned 31-page Report and Recommendation ("Report and

Recommendation" or "R&R"), Magistrate Judge Dein ("Judge Dein") examined the undisputed

facts; applied the proper summary judgment standard, rules of contract interpretation and

applicable caselaw. Judge Dein then determined that, as a matter of law, National Union

properly denied the Plaintiff's claims for insurance coverage.  Judge Dein therefore recommended summary judgment in favor of National Union.

Plaintiff objects to the R&R on the ground that Judge Dein purportedly erred in reaching the following three conclusions: (1) Exclusion 4(h) of the insurance policy in question (the "Policy") is clear and unambiguous; (2) the underlying negligent misrepresentation claim against Plaintiff "arose out of" the DIP Loan Agreement in question (the "DIP Loan Agreement"); and (3) Exclusion 4(h) of the Policy applied to Plaintiff, individually.  Objections, p. 2.  Each of the arguments that underlie these purported errors, however, was fully considered by Judge Dein and appropriately rejected, not on the basis of disputed facts, but as a matter of law based upon undisputed facts.

No genuine issue of material fact exists sufficient to preclude the entry of summary judgment in this case.  Indeed, Judge Dein's Report and Recommendation on summary judgment is correct as a matter of law.  Therefore, National Union respectfully requests that the Court adopt Judge Dein's Report and Recommendation and enter summary judgment in favor of National Union on all claims brought against it by the Plaintiff.

## UNDISPUTED FACTS[1]

As noted by Judge Dein (and not challenged in Plaintiff's Objections), the following dispositive facts are undisputed in this matter (see R&R, pp. 3-10):

### The D&O Policy

MHCS was a private home health care agency which provided home health care services to Medicare beneficiaries in Massachusetts.  (DF ¶ 4).  At all relevant times, Ingoldsby was the Chairman of the Board of MHCS.  (DF ¶ 5).

---

[1] These undisputed facts, and citations in this section, are taken from Judge Dein's Report and Recommendation at pages 3-10.

BOS_590715_2

National Union first issued a D&O Policy to MHCS effective August 4, 2000 through

August 4, 2001. (DF ¶ 6). That policy contained an exclusion for claims:

> Alleging, arising out of, based upon or attributable to any actual or alleged contractual
> liability of the Company or any other Insured under any express contract or agreement...

(DF ¶ 6). Ingoldsby admits receiving a copy of the policy (PF ¶ 7).

MHCS filed for bankruptcy on February 23, 2001. (DF ¶ 8). Thereafter, National Union

issued a renewal D&O Policy to MHCS, which was in effect from August 4, 2001 to August 4,

2002. (DF ¶ 9). This Policy included a new "for Profit Healthcare Organization Amendatory

Endorsement." (See DF ¶ 9). This endorsement included a new Exclusion 4(h) which provided

that the policy excluded coverage for claims:

> (h) alleging, arising out of, based upon or attributable to any actual or alleged
> contractual liability of the Company or an Insured under any express (written or
> oral) contract or agreement (including, but not limited to, any liquidated damages,
> severance agreement or payment, golden parachute agreement, or any
> compensation agreement payable upon termination of any Insured); provided,
> however, that the exclusion shall not apply to:
>
>> (1) Employment Practices Claims to the extent that any liability
>> does not arise from such express contract or agreement; or
>>
>> (2) Claims for Loss alleging Wrongful Acts of an Insured(s) with
>> respect to hospital practice, privileges, credentialing or peer
>> review matters.

(PF ¶ 9; Def. Ex. A).

Under Section 2(g) of this policy, a Wrongful Act was defined as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission
> or act by the Directors or Officers of the Company in their respective capacities as
> such, or any matter claimed against them solely by reason of their status as
> Directors or Officers of the Company.

BOS_590715_2

(PF ¶ 9). While Ingoldsby denies having knowledge or an understanding of Exclusion 4(h), it is undisputed that it was sent to MHCS for review before the policy issued. (See PF ¶¶ 11-12; DF ¶ 11; Def. Ex. A).

According to Ingoldsby's expert, James Martocci, not all D&O policies issued in August 2001 had such contractual liability exclusions. (Martocci Aff. ¶ 7). Some policies contained provisions which limited contractual liability exclusions only to claims brought against the company. (Id. ¶ 10). Ingoldsby's expert concedes, however, that National Union's policy excluded coverage for claims brought both against the company and the individual directors and officers. (Id. ¶ 9).

### The Heller Loans

Heller Healthcare Finance, Inc. ("Heller") made a number of pre-petition loans to MHCS. (DF ¶ 14). On February 28, 2001, post-petition, Heller, as lender, and MHCS and Medical Temporaries (a related entity), as borrowers (collectively "MHCS"), entered into a $3,000,000.00 Revolving Credit Loan which refinanced the pre-petition loans. (Compl. ¶ 18). The Revolving Credit Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (hereinafter the "DIP Loan" and "DIP Loan Agreement"). (Compl. ¶ 18).

The DIP Loan Agreement required MHCS to "keep accurate and complete records of its accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report . . . . " (DF ¶ 17. In addition, MHCS was obligated to prepare "Borrowing Base Certificates" that represented the eligible Medicaid, Medicare and other receivables of MHCS. (PF ¶ 18). As stated in the Borrowing Base Certificates, they were "given to the Lender [Heller] in order to induce the Lender" to make advances under the DIP Loan Agreement. (PF ¶ 20).

BOS_590715_2

Heller contended that, in January 2002, it discovered during an audit that MHCS had failed to accurately track and report its Medicare receivables to Heller. (PF ¶ 24). As a result, Heller had loaned MHCS approximately $400,000.00 more under the DIP Loan than it would have advanced if the accounts receivable in the Borrowing Base Certificates had been accurate. (PF ¶ 24). Heller calculated that the amount due from MHCS under the DIP Loan was in excess of $1.3 million. (PF ¶ 24).

On March 20, 2002, MHCS converted its Chapter 11 bankruptcy reorganization to a Chapter 7 liquidation proceeding. (PF ¶ 25). On March 25, 2002, Heller and MHCS entered into a settlement agreement which included a release of MHCS, its professionals, agents and employees, but provided that "this release from Heller does not include and Heller does not waive or release either the Debtors or any officer, director, employee or agent of either Debtor from any legal or equitable claims Heller may have or from any damages suffered by Heller arising from the default under the DIP Loan Agreement which created the over-advance of approximately $405,000, which was referred to in Heller's Notice of Event of Default[.]" (DF ¶ 26; Def. Ex. H, ¶ 2(d)).

## The Heller Litigation

On August 1, 2002, Heller brought suit against Michael Ingoldsby, his wife Mary Lee Ingoldsby, and other officers of MHCS, Pamela Jones and Indy Edwards. (See Complaint attached to Ingoldsby Aff. at Ex. A). In the Complaint, Heller describes the "nature of the case" as follows:

> This action seeks damages suffered by Heller as a result of the negligent misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to collateral available to satisfy loans made by Heller to two corporate borrowers with whom they were affiliated. Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are also sued for breach of contract on a personal guaranty.

BOS_590715_2

(Compl. ¶ 1). The Complaint describes Ingoldsby as "the sole shareholder and a Director" of MHCS, and alleges that Ingoldsby served as an "unpaid chief executive officer" who was "actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones." (Compl. ¶ 3).

In the Complaint, Heller describes its pre-petition loans to MHCS as well as the post-petition DIP Loan and DIP Loan Agreement. (Compl. ¶¶ 17-18). It also alleges that Ingoldsby and his wife guaranteed the borrowers' obligations under the DIP Loan Agreement. (Compl. ¶ 19). According to the Complaint, "MHCS and Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the 'eligible' Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement." (Compl. ¶ 23). Further, Heller alleges it lent money under the DIP Loan based on the level of receivables the companies reported to Heller on periodic borrowing base certificates. (Compl. ¶ 25).

The Complaint sounds in two counts. The first is entitled "Negligent Misrepresentation." (Compl. ¶ 55). The second count of the Complaint alleges that Michael and Mary Lee Ingoldsby are liable to Heller "as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan." (Compl. ¶ 58).

### Denial of Coverage

On August 2, 2002, Ingoldsby forwarded Heller's Complaint to National Union. (PF ¶ 29). On or about October 11, 2002, National Union issued a "preliminary coverage evaluation" in which it declined coverage for the litigation and the associated defense costs, relying on the policy's contractual liability exclusion. (Ingoldsby Aff. Ex. B; PF ¶ 30). By letter dated March

- 6 -

6, 2003, National Union confirmed that there was no coverage based on Exclusion 4(h). (PF ¶

30; Ingoldsby Aff. Ex. C). As National Union wrote:

> Moreover, your e-mail addresses only the factual allegations asserted by the
> Plaintiffs against Mr. Ingoldsby in the *Heller* Complaint, disputing the accuracy
> of the allegations, and does not discuss the substance of the coverage issue. As
> you may be aware, however, National Union, in conducting its coverage analysis,
> is limited by the allegations asserted in the Complaint, and must consider what
> policy terms and conditions limit or exclude coverage if the allegations plead in
> the Complaint are proven true. National Union understands that the allegations
> asserted in the *Heller* Complaint are without substantiation at this time, and
> nothing in the letter or our previous correspondence is intended to suggest that the
> allegations have any legal or factual merit; rather, it is National Union's position
> that there is no coverage for the claims as they are asserted.

(Ingoldsby Aff. Ex. C). On March 17, 2004 Ingoldsby sent a Mass. Gen. Laws ch. 93A demand

letter to National Union. (Ingoldsby Aff. ¶ 20). By letter dated April 16, 2004, National Union

again declined coverage due to the contractual liability exclusion. (Id.) Ingoldsby then obtained

and paid for his own defense in the Heller litigation. (DF ¶ 31).

## ARGUMENT

Contrary to Plaintiff's arguments, Judge Dein appropriately found that the Policy's

contractual liability exclusion was clear and unambiguous, the underlying negligent

misrepresentation claim against Plaintiff "arose out of" a contract (namely the DIP Loan

Agreement), and the contractual liability exclusion applied to Plaintiff, individually. As Judge

Dein properly concluded, therefore, as a matter of law the undisputed facts require that summary

judgment enter in favor of National Union.[2]

Unable to avoid the clear implications of these undisputed and admitted facts and the

applicable law, Plaintiff's Objections simply ignore the relevant caselaw cited by National Union

---

[2] Conversely, Judge Dein denied the motion for summary judgment brought by International Insurance
Group, MHCS's insurance broker. Accordingly, Plaintiff's claim that International Insurance Group
negligently advised MHCS and Plaintiff regarding the coverage provided by the National Union policy
will proceed to trial.

BOS_590715_2

and applied by Judge Dein. Instead Plaintiff resorts to misapplying case law concerning general

principles and clearly distinguishable circumstances. This Court should reject those arguments,

adopt Judge Dein's Report and Recommendation and enter summary judgment in favor of

National Union.

**I.      JUDGE DEIN CORRECTLY CONCLUDED THAT INTERPRETATION AND
        APPLICATION OF THE POLICY LANGUAGE WAS A QUESTION OF LAW.**

In his Objections, Plaintiff argues that "there is insufficient evidence to support the

Magistrate Judge's conclusion that National Union properly denied coverage." Id. at 2. As

Judge Dein properly concluded, however, "[w]here, as here, the underlying facts are not in

dispute, 'the interpretation and application of the policy language is a question of law.'" R&R,

p. 22 (quoting Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co., No. 06-2465, at *2 (1st Cir.

June 7, 2007). Therefore, because Plaintiff has already admitted all facts that form the basis of

Judge Dein's decision, he may only challenge the Report and Recommendation as being

incorrect as a matter of law, which it is not.

**II.     JUDGE DEIN PROPERLY FOUND THAT THE POLICY'S CONTRACTUAL
        LIABILITY EXCLUSION IS UNAMBIGUOUS.**

Plaintiff argues that the Policy is ambiguous because the contractual liability exclusion

and the Policy's definition of "Wrongful Act" are purportedly "contradictory." Ingoldsby also

argues that the Policy is ambiguous because Judge Dein's interpretation of the contractual

liability exclusion would "swallow the policy." (Objections, pp. 3-7). These arguments,

however, were considered by Judge Dein within the appropriate principles of policy

BOS_590715_2

interpretation and properly rejected as without merit.  Therefore, Judge Dein's conclusion that

the Policy's contractual liability exclusion is unambiguous is correct as a matter of law.

    A.    Judge Dein Applied The Proper Rules of Policy Interpretation

    Plaintiff made these same arguments in his Opposition to National Union's Motion for

Summary Judgment, and Judge Dein appropriately evaluated them under the proper rules of

policy interpretation:

> "If the language of an insurance policy is not ambiguous, we interpret the words
> of the policy in their usual and ordinary sense." Fuller v. First Fin. Ins. Co., 448
> Mass. 1, 5, 858 N.E.2d 288, 291-92 (2006).  The same is also true with respect to
> interpreting an exclusionary clause. Hakim v. Mass. Insurer's Insolv. Fund, 424
> Mass. 275, 281, 675 N.E.2d 1161, 1165 (1997).  "A term is ambiguous only if it
> is susceptible of more than one meaning and reasonably intelligent persons would
> differ as to which meaning is the proper one." County of Barnstable v. Am. Fin.
> Corp., 51 Mass. App. Ct. 213, 215, 744 N.E.2d 1107, 1109 (2001).  The fact that
> the parties[] disagree as to the proper interpretation does not render a provision
> ambiguous, nor does the existence of several dictionary definitions of a word.
> See id.

R&R, pp. 22-23.

    B.    Judge Dein Properly Concluded That, Under These Rules of Interpretation, The
           Policy's Contractual Liability Exclusion Was Unambiguous

    Having considered Plaintiff's arguments under the appropriate rules of interpretation and

relevant case law, Judge Dein properly concluded as follows: (1) the Policy's contractual liability

exclusion and definition of "Wrongful Act" are not "contradictory" such as to create any

ambiguity in the Policy, (R&R, p. 29); and (2) the Policy's contractual liability exclusion does

not "swallow the Policy," (Id., pp. 29-30):

> Several other arguments of Ingoldsby require some comment.  Ingoldsby argues
> that the contract is ambiguous because the negligence claim is covered by the
> definition of "wrongful act" and the exclusion therefore is in conflict with the
> coverage definition. See Ingoldsby Mem. at 15.  However, coverage for wrongful
> acts may, nevertheless, be "limited by a specific exclusion[.]" Andover Newton
> Theological Sch. V. Cont'l Cas. Co., 930 F.2d 89, 95 (1st Cir. 1991).  Thus,
> assuming that the allegations of the Heller complaint "fall[] within the scope of

BOS_590715_2

coverage under the D&O policy, [they] nevertheless also fall[] within the policy's
contract exclusion because [they] plainly arise[] out of [the company's and
Ingoldsby's] contractual obligation to [Heller]." Chapman, 171 S.W.3d at 229.
Under such circumstances, the exclusion applies."

Ingoldsby also argues that the exclusion is void as it excludes virtually all types of
coverage. Thus, the argument goes, "it should be expected that the majority of
misrepresentations made in the course of business transactions will likely involve
some sort of contract." Ingoldsby Mem. at 21. However, Ingoldsby cites no
support for this proposition, and as the cases described above make clear,
misrepresentations may occur in a business setting yet not be related to a
contractual duty. "'A provision in an insurance policy' that tends to negate the
very coverage that the policy purports to provide in the circumstances where the
person is liable is void as against public policy.' However, if the policy still
provides coverage for some acts, it is not illusory simply because of a potentially
wide exclusion." Bagley, 430 Mass. at 459, 720 N.E.2d at 817 (quoting Liberty
Mut. Ins. Co. v. Tabor, 407 Mass. 354, 358, 553 N.E.2d 909, 912 (1990)). While
the coverage provided by the National Union policy may be more limited than
other available D&O policies, see Martocci Aff. ¶¶ 9-10, this is not a situation
where the exclusion "swallow[s] the policy." County of Barnstable, 51 Mass.
App. Ct. at 218, 744 N.E.2d at 1111 (internal quotation omitted).

Id.

As Judge Dein properly concluded, the Policy's contractual liability exclusion and

definition of "Wrongful Act" are not contradictory. A policy exclusion always and necessarily

removes from coverage a claim that might otherwise constitute a covered claim. Continental

Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 377 (1st Cir. 1991) (an "exclusion

operates to relieve insurer of liability for what otherwise would be its coverage for wrongful

acts" under an insurance policy); Andover Newton Theological School, Inc. v. Continental Cas.

Co., 930 F.2d 89, 95 (1st Cir. 1991) ("The [insurer] does not deny that discriminatory acts are

"wrongful acts" within the meaning of the policy. Coverage for wrongful acts, however, is

limited by a specific exclusion . . ."). That is the very nature of an exclusion, of course: it

excludes from coverage something that might otherwise be covered. Continental Cas. Co. v.

Canadian Universal Ins. Co., 924 F.2d 370 at 377; see also Shelter Mut. Ins. Co. v. Ballew, 203

BOS_590715_2

S.W. 3d 789, 795 (Mo. App. Ct. 2006) ("An exclusion provision in an insurance policy, by definition, excludes risk.").

That Plaintiff has taken a "differing interpretation[] of the Policy," (Opposition p. 25) one that ignores the clear language of the contractual liability exclusion, cannot itself create an ambiguity where none truly exists. Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998) ("an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other . . . A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons could differ as to which meaning is the proper one.") Otherwise, any party could avoid summary judgment in an insurance coverage case simply by concocting some outlandish "differing interpretation" of a policy, whether or not supported by the language of the policy.

Indeed, as noted by Judge Dein, at least two courts have considered the interplay between the contractual liability exclusion and the definition of "Wrongful Act" contained in the Policy. Temple Univ. Health Sys. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, C.A. No. 04-061705, 2005 WL 167583 (Pa. Com. Pl. Jan. 7, 2005); Chapman v. National Union Fire Ins. Co. of Pittsburgh, PA, 171 S.W.3d 222, 228-29 (Tex. App. Ct. 2005). Neither court found the "contradiction" between the two provisions to create an ambiguity; indeed, each was able to interpret the provisions on summary disposition. Temple, 2005 WL at *3-4 (granting motion for judgment on the pleadings based upon interpretation of contractual liability exclusion); Chapman, 171 S.W.3d at 228-29 (affirming summary judgment based upon contractual liability exclusion).

Judge Dein also properly rejected Plaintiff's argument that National Union's interpretation of the contractual liability exclusion is against public policy as it would "swallow

- 11 -

the policy," that is eliminate any coverage the Policy would otherwise provide. This assertion is clearly and demonstrably false. Indeed, Plaintiff conceded below - but now conveniently ignores - that National Union's 30(b)(6) representatives testified that the exclusion would not implicate a number of different types of claims. (Opposition p. 18). Furthermore, as made clear by the case law cited here and below by both Plaintiff and National Union, a number of types of claims might not be excluded by the contractual liability exclusion depending upon the facts involved, including: securities fraud, Admiral Ins. Co. v. Briggs, 264 F. Supp.2d 460, 461-62 (N.D. Tex. 2003); conversion, American Chemical Society v. Leadscope, 2005 WL 1220746, *10 (Ohio App. May 24, 2005); fraudulent inducement of contract, Church Mutual Ins. Co. v. U.S. Liability Ins. Co., 347 F. Supp. 2d 880, 889 (N.D. Tex. 2003); and breach of fiduciary duty, Temple, at *6.[3] Therefore, Plaintiff's argument in this regard is without merit.

**III.    JUDGE DEIN PROPERLY CONCLUDED THAT THE ADMITTED FACTS ESTABLISH AS A MATTER OF LAW THAT HELLER'S CLAIM AGAINST PLAINTIFF FOR NEGLIGENT MISREPRESENTATION ARISES FROM THE CONTRACT BETWEEN HELLER AND MHCS AND, THEREFORE, IS EXCLUDED FROM COVERAGE BY THE CONTRACTUAL LIABILITY EXCLUSION.**

In his Objections, Plaintiff again argues that, when properly interpreted, the Policy's contractual liability exclusion does not apply to Heller's negligent misrepresentation claim. Judge Dein evaluated this argument in detail, reviewed the Policy and the contractual liability exclusion, reviewed the applicable case law and properly concluded that Plaintiff's argument is without merit. R&R, pp. 25-29. Indeed, upon closer examination, Plaintiff's argument is unsupported by the admitted facts in this case or by Plaintiff's cited case law. In fact, the

---

[3] As Judge Dein noted, this undisputed fact likewise distinguished this case from the circumstances in Jefferson Ins. Co. of NY v. National Union Fire Ins. Co. of Pittsburgh, PA, 42 Mass. App. Ct. 94, 677 N.E.2d 225 (1997), upon which Plaintiff also relies. In Jefferson, the Court refused to interpret a "professional services" exclusion so as to include virtually all activities that otherwise would have been insured under a CGL policy. Id. at 102. Such is not the case here, however, because, as Judge Dein concluded (R&R, p. 30), proper application of the contractual liability exclusion to exclude Heller's claims against Plaintiff leaves "numerous activities of directors and officers . . . covered by the D&O policy." Id.

BOS_590715_2

argument is directly contrary to relevant case law cited by Judge Dein and National Union, case law which Plaintiff again simply chooses to ignore.

Plaintiff admits that Heller sued him for: (1) breach of guaranty, specifically claiming that Plaintiff personally guaranteed the DIP Loan and was therefore directly liable for all moneys due to Heller (Undisputed Facts, ¶ 28; Admitted Facts, pp. 15-16); and (2) for negligently failing to accurately track and record downward adjustments to MHCS's receivables in violation of the DIP Loan Agreement. (Id.). Both claims against Plaintiff in the Heller Litigation were founded upon - and would not have existed but for - the contractual obligations created under Plaintiff's Guaranty and the DIP Loan Agreement between Heller and MHCS.[4] That is, Plaintiff would not have had the obligation to provide the allegedly misrepresented information "but for" the Guaranty and DIP Loan Agreement.[5]

The contractual liability exclusion specifically excluded any claim "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any Insured under any express (written or oral) contract or agreement." Under Massachusetts law, the exclusion must be interpreted by applying the usual and ordinary meanings of the words contained therein. Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280 (1997). Furthermore, under Massachusetts law, the phrase "arising out of" is interpreted expansively. See Fuller v. First Financial Ins. Co., 448 Mass. 1, 6-7, 858 N.E.2d 288

---

[4] This is apparent from even a brief review of Heller's Complaint against Plaintiff. See Ex. A (a highlighted copy of Heller's Complaint reflecting discussion of the DIP Loan Agreement and Plaintiff's obligations thereunder).

[5] It is likewise beyond dispute that the contractual liability exclusion, by its terms, applies to the Plaintiff individually. Indeed, as Judge Dein noted, Plaintiff's proffered expert acknowledged that the clear terms of the Policy's contractual liability exclusion excluded coverage for Heller's claims for both MHCS and Plaintiff: "Thus, by adding coverage for the entity (to more effectively market other types of insurance), National Union has reduced coverage in certain other areas, and the assured MHCS has suffered one such reduction, in the area of contractual liability . . . In August of 2001, I believe that similar D&O policies were available in which the entity exclusions such as . . . contractual liability applied only as respects claims brought against the Company, not the individual." Martocci Affidavit, ¶¶ 9-10. Notably, in this regard, Judge Dein denied the motion for summary judgment brought by the International Insurance Group, MHCS's insurance broker.

(December 14, 2006) (under Massachusetts law, "arising out of" exclusions "must be read expansively" and such exclusions bar coverage not only for claims based on the excluded conduct (*e.g.*, breach of contract), but also for any derivative negligence claim as well); Bagley v. Monticello Ins. Co., 430 Mass. 454, 457 (1999). See also Rischitelli v. Safety Ins. Co., 423 Mass. 703 (1996); County of Barnstable v. American Fin. Corp., 51 Mass. App. Ct. 213, 215 (2001).

Applying almost identical rules of interpretation to almost identical policy language and claims, two different courts have already held that tort claims based upon duties created by contract are excluded from coverage by this type of contractual liability exclusion. Temple, 2005 WL at *3-4 (granting motion for judgment on the pleadings on negligence claim); Chapman, 171 S.W.3d at 228-29 (affirming summary judgment on claims for breach of constructive trustee and fiduciary obligations).

In Temple, the plaintiff insureds, three corporations and individual officers and directors of the corporations, sought a declaration that National Union had a duty to defend and indemnify the insureds in a lawsuit. Id. at *1. The lawsuit against the insureds arose from a written loan agreement to enable the insureds to purchase a nursing home. Id. The nursing home eventually failed and closed, resulting in the insureds defaulting on their loan payments. Id. The lawsuit alleged breach of contract and negligence by the corporate insureds. Id.

As in this case, the National Union policy in Temple contained an exclusion for any claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability . . . ." Id. at *7. In addition to finding that the contract claim was barred by the clear language of the policy exclusion, the court also held that the negligence claim was similarly

excluded because the duties which the insureds negligently breached were imposed by the loan

agreement and sounded in contract. Id. at *9-10.

In Chapman, a corporate officer's wife sued him alleging that he had breached certain

fiduciary duties owed to her. Chapman, 171 S.W.3d. The officer sought coverage from National

Union. National Union denied coverage, on the ground (among others) that the fiduciary duty in

question was created by the couple's divorce agreement, and therefore, the claim was excluded

under the contractual liability exclusion. Id. at 228. The corporate officer disagreed, arguing

that the wife's complaint was riddled with allegations of malfeasance by corporate officers and

directly concerned his conduct as an officer of the company. Id. The Court agreed with National

Union and dismissed the complaint on summary judgment. That court held that any fiduciary

obligation allegedly owed by the officer to his wife arose out of their divorce agreement and was,

therefore, excluded from coverage. Id.

In this case, as in Temple and Chapman, the duty of care owed to Heller that Plaintiff

allegedly breached was created by a contract – the DIP Loan Agreement – and would not have

existed but for that contract. Temple and Chapman were cited and discussed in National Union's

Opening Memo in support of its motion for summary judgment. Neither Plaintiff's Opposition

to that motion nor Plaintiff's Objections even mentions, much less seeks to distinguish them,

however, because he cannot. Instead, Plaintiff relies upon three other cases for his argument that

Heller's claim for negligent misrepresentation is not excluded from coverage. Each of these

three, however, is readily distinguishable from the case at hand.

Plaintiff cites Church for the holding that a contractual liability exclusion did not exclude

from coverage a claim where the gravamen of the underlying complaint was fraudulent

misrepresentation rather than breach of contract. Objections, pp. 7-8. In Church, however, the

BOS_590715_2

underlying complaint alleged a pattern and practice of defrauding contractors by entering into contracts without any intention of paying them and then stealing their businesses once they had crippled the contractors. Church, 347 F. Supp.2d at 889. The Court found that these allegations were "independent of breach of contract" in that the allegations were for fraudulent inducement of contract (*i.e.*, fraud preceding the entry into the contract) and stealing of business (completely unrelated to contract), rather than for breach of any duty imposed by the contract in question. Id.

Such is not the case here. Heller never alleged that Plaintiff committed fraud in inducing Heller to enter into the DIP Loan Agreement or Guaranty (*i.e.*, that he intended at the time of entering into the contracts to fail to perform thereunder). Rather, Heller alleged that Plaintiff breached the duty that was imposed upon him by the DIP Loan Agreement.

Plaintiff likewise cites Admiral and American Chemical, 2005 WL 1220746, for their holdings that a contractual liability exclusion did not exclude coverage for the underlying torts in question (securities fraud and conversion, respectively). Objections, pp. 7-8. In Admiral and Leadscope, however, each court again found that the underlying claims (securities fraud and conversion) were not excluded because they were actionable independent and regardless of the contracts in question. Admiral, 264 F. Supp. 2d at 461-62; Leadscope, at *10.

Again, this is not the case here. Unlike in the case of securities fraud or conversion, Plaintiff would not have had a duty to Heller to provide accurate Borrowing Base Certificates but for the DIP Loan Agreement and Guaranty.

Therefore, the admitted facts in this matter and relevant case law clearly establish that, as determined by Judge Dein, the underlying claims against Plaintiff were excluded from coverage by the Policy's contractual liability exclusion. Indeed, as discussed above, Plaintiff's proffered insurance expert admits as much. Martocci Affidavit, ¶¶ 9-10. Plaintiff's true claim here is that

he did not receive the type of insurance coverage he would have preferred.  That claim, however,

is against International Insurance Group, MHCS's insurance broker, and is proceeding to trial.

### CONCLUSION

For the aforementioned reasons, National Union is entitled to summary judgment and

Judge Dein's Report and Recommendation in that regard was appropriate.  The Policy's

contractual liability exclusion indisputably excluded coverage for Heller's claims against

Plaintiff.  Therefore, Judge Dein's Report and Recommendation should be adopted, and all of

Plaintiff's claims against National Union should be dismissed with prejudice.

> NATIONAL UNION FIRE INSURANCE
> COMPANY OF PITTSBURGH, PA
>
> By its attorneys,

Dated: July 27, 2007

> /s/ Joey H. Lee
> John D. Hughes (BBO# 243660)
> Joey H. Lee (BBO# 663803)
> EDWARDS ANGELL PALMER
>    & DODGE LLP
> 111 Huntington Avenue
> Boston, MA 02199
> Tel:  (617) 239-0100
> Fax: (617) 227-4420

### CERTIFICATE OF SERVICE

I, Joey H. Lee, hereby certify that on this 27th day of July, 2007, I served a copy of the foregoing document on Gregory J. Aceto, Johnson & Aceto, P.C., 67 Batterymarch Street, Suite 400, Boston, MA 02110 and Richard E. Heifetz, Tucker, Heifetz & Saltzman, LLP, Three School Street, Boston, MA 02108.

> /s/ Joey H. Lee
> Joey H. Lee

- 17 -

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

HELLER HEALTHCARE FINANCE, INC.,

Plaintiff,

v.

MICHAEL INGOLDSBY, MARY LEE
INGOLDSBY, PAMELA JONES, and
INDY EDWARDS,

Defendants.

**02 CV 11553 NG**

### COMPLAINT

COMES NOW the Plaintiff, Heller Healthcare Finance, Inc. ... copy of the
Complaint states as follows:

### Nature of the Case

1.     This action seeks damages suffered by Heller as a result of the negligent
misrepresentations of Defendants Jones, Edwards and Michael Ingoldsby with respect to
collateral available to satisfy loans made by Heller to two corporate borrowers with whom they
were affiliated.  Defendant Michael Ingoldsby and his wife, Defendant Mary Lee Ingoldsby, are
also sued for breach of contract on a personal guaranty.

### Parties

2.     Plaintiff Heller is a Delaware corporation with its principal place of business at 2
Wisconsin Circle, 4th floor, Chevy Chase, Maryland 20815.  Heller is a lender to the healthcare
industry.

3.     Defendant Michael Ingoldsby ("Ingoldsby") was at all relevant times the sole
shareholder and a Director of Managed Health Care Systems, Inc. ("MHCS"), a non-party.  At



all relevant times, Ingoldsby served, on information and belief, as unpaid chief executive officer (CEO) of both MHCS and Medical Temporaries, Inc., another related non-party ("Medical Temporaries"). Mr. Ingoldsby was also actively involved in oversight of the day-to-day management and operation of MHCS and Medical Temporaries through his oversight of and interaction with Defendants Edwards and Jones. Upon information and belief, Mr. Ingoldsby resides at 5 Stagecoach Road, Hingham, MA 02043.

4.      Defendant Mary Lee Ingoldsby is the wife of Michael Ingoldsby, residing at 5 Stagecoach Road, Hingham, MA 02043.

5.      Defendant Pam Jones was at all relevant times the Controller and, on information and belief, Vice President, Finance of MHCS and its affiliate, Medical Temporaries. At all relevant times, Ms. Jones was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Jones resides at 197 High Street, Duxbury, MA 02332.

6.      Defendant Indy Edwards was, on information and belief, at all relevant times President and a Director of MHCS and of Medical Temporaries. At all relevant times, Ms. Edwards was actively involved in the day-to-day management and operation of MHCS and Medical Temporaries. Upon information and belief, Ms. Edwards resides at 345 Camp Street, #506, West Yarmouth, MA 02673.

### Jurisdiction and Venue

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the plaintiff and each of the defendants and the amount in controversy exceeds $75,000.

-2-

8.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants resides in this district and all of the defendants reside in Massachusetts.

### Background

9.    At all relevant times, Defendants Jones, Edwards and Ingoldsby were either a shareholder, officer and/or director of MHCS. MHCS was a privately held, for profit, "home health agency," i.e., a provider of home health care services to Medicare beneficiaries in Massachusetts' South Shore and Cape Cod areas. Together with Medical Temporaries, MHCS provided home nursing services to over 700 persons.

10.    Medicare is a medical assistance program administered by the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), a division of the United States Department of Health and Human Services ("HHS").

11.    At all relevant times, MHCS participated in CMS' home health prospective payment system ("PPS"). The home health PPS is described in CMS' Home Health Agency Manual, HCFA Publication No. 11, Transmittals 297 and 298.

12.    Under the PPS, MHCS obtained prospective, or advance, payments from CMS at "episode rates." An "episode rate" is a predetermined payment amount intended to cover all skilled nursing services, home health aide services, physical therapy, speech-language pathology services, occupational therapy services, and medical social services provided to a given patient during a given sixty-day period, which generally starts the day the first Medicare billable service is delivered to a patient. With certain exceptions, including one described below, the episode rate payment is not affected by the number of visits that the home healthcare provider actually makes to the patient's home during the covered period.

-3-

13.    Generally speaking, home health providers receive an up-front initial percentage payment of the episodic payment due for a patient's care by submitting a Request for Anticipated Payment (RAP). The provider claims the balance of monies due for services during the 60-day "episode" by submitting a "final claim" to Medicare, together with a physician approved Plan of Care for the episode, if not previously submitted, which final claim is due within 60-days from the end of the episode or 60-days from the issue of the RAP payment,. The up-front RAP payment is 60% of the episode payment, for an initial episode, with 40% paid on the back end; for subsequent episodes of care 50% is paid with the RAP and 50% upon the final claim.

14.    As an exception to these rules, if a particular patient receives four or less visits during the 60-day episode the provider is not entitled to the full episodic payment. Rather, under the Low Utilization Payment Adjustment (LUPA) rules the provider is paid only on a per-visit basis.

15.    By way of example, assume the PPS episode payment for a particular patient is $2,500. The up-front RAP payment would be 60%, or $1,500. It is determined, however, by the time that the final claim is submitted, that the LUPA rules apply and the provider is due only $300 for the limited care that was rendered during the episode. Medicare "takes back" $1,200 by recoupment, reducing monies otherwise due the provider, on other claims, by $1,200.

16.    On February 23, 2001, MHCS and Medical Temporaries both filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code.

17.    Heller was a pre-petition lender to MHCS and Medical Temporaries on a number of loans, including (i) a Loan and Security Agreement dated as of August 4, 2000, which secured a Revolving Credit Note in the maximum amount of $3,000,000; (ii) a Secured Term Note, which also served as a security agreement, in the original amount of $685,000, later amended to

-4-

$515,000; (iii) a Secured Term Note in the amount of $200,000, for an overline loan, and (iv) a further overline loan, treated as an advance under the Revolving Credit Note, in the maximum principal amount of $233,000 (the second "overline"). As of the petition date, MHCS and Medical Temporaries owed Heller $1,677,073 on these various loans ($973,184 on the Revolving Credit Note, $515,000 on the Pre-petition Term Loan; $188,889 on the first pre-petition overline, together with $13,095 of accrued and unpaid interest, together with attorneys' fees and other costs recoverable under the loan documents).

18.    Post-petition, on February 28, 2001, Heller, as lender, and MHCS and Medical Temporaries, jointly and severally as "borrower", entered into a $3,000,000 Revolving Credit Loan (the "DIP Loan"), which loan refinanced the pre-petition Revolving Credit Note. The Loan was evidenced by a Debtor-in-Possession Loan and Security Agreement (the "DIP Loan Agreement"), a copy of which is attached as Exhibit A hereto. The two debtors, at the same time, received bankruptcy court approval for use of the cash collateral (receivables) which collateralized Heller on the pre-petition term loan. The Bankruptcy Court approved the aforesaid DIP Loan and the debtors' use of cash collateral at an interim hearing held March 1, 2001, with a final order entered on March 29, 2001.

19.    Defendant Ingoldsby and Defendant Mary Ingoldsby, his wife, guaranteed the obligations of MHCS and Medical Temporaries under the DIP Loan Agreement.

20.    Under Section 2.1(g) of the DIP Loan Agreement, the amount of $3 million revolving line of credit that MHCS and Medical Temporaries could draw upon at any given time under the DIP Loan facility was equal to "eighty five percent (85%) of Qualified Accounts due and owing from any Medicaid/Medicare, Insurer or other Account Debtor (the 'Borrowing Base')." "Qualified Account" was defined in Section 1.49 of the Loan Agreement.

-5-

21.    Under Section 3.1(a) of the DIP Loan Agreement, the DIP Loan was secured by, among other assets, MHCS' and Medical Temporaries' Accounts (defined in Section 1.1 as "any right to payment for goods sold or leased or services rendered . . . whether or not earned by performance") and accounts receivable.

22.    Under section 3.3(b) of the Loan Agreement, MHCS and Medical Temporaries were each obligated to "keep accurate and complete records of its Accounts and all payments and collections thereon, and [to] submit to Lender on such periodic basis as Lender will request a sales and collections report for the preceding period, in form satisfactory to Lender." Section 6.1 of the Loan Agreement required MHCS and Medical Temporaries to submit a sales and collections report and an accounts receivable aging schedule to Heller by the fifteenth day of every month.

23.    MHCS, Medical Temporaries and the Defendants owed duties to Heller to prepare the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller in connection with the DIP Loan in a manner which accurately reported to Heller the "eligible" Medicaid, Medicare, Commercial and Staffing receivables of MHCS and Medical Temporaries, as determined under the DIP Loan Agreement.

24.    A home healthcare provider must track and record LUPAs, for among other reasons, to avoid overstating its accounts receivable and/or its right to payment for services rendered.  This is relevant to the instant cause of action, for the reasons noted immediately below.

25.    Heller lent money to MHCS and Medical Temporaries under the DIP Loan based on the level of receivables the companies reported to Heller on periodic "borrowing base certificates", signed by Defendants Jones and Edwards in the ordinary course of business and

-6-

their employment.   These certificates were supplied to Heller with the intent, knowledge and expectation that Heller would rely on the level of eligible receivable collateral reported therein in determining whether, and to what extent, Heller would re-advance collections it received back to MHCS and Medical Temporaries upon various "draw" requests by the borrowers.   At all times, Heller reasonably relied on the accuracy of the borrowing base certificates it received from MHCS and Medical Temporaries on the DIP Loan in determining what funds to lender to MHCS and Medical Temporaries under the DIP Loan.

26.    Officers and directors of a home healthcare provider who fail to cause the provider to track and record LUPAs cause the provider to overstate its accounts receivable and/or its right to payment for services rendered.

27.    Unknown to Heller, Defendants Jones, Edwards and Ingoldsby failed to exercise reasonable care and competence in the preparation and communication to Heller of MHCS' and Medical Temporary's receivable collateral on the borrowing base certificates submitted  in connection with the DIP Loan.  As a consequence, the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries under the DIP Loan failed, until February 2002, to accurately track or record required negative LUPA (downward) adjustments to receivables as reported therein.  These failures caused receivables as reported to Heller on the borrowing base certificates to be overstated.

28.    Heller reasonably relied on the accuracy of borrowing base certificates submitted to it by MHCS and Medical Temporaries in connection with the DIP Loan, from time to time, such as the borrowing base certificate dated September 26, 2001, attached as *Exhibit B*.

29.    Heller also reasonably relied on the accuracy of Debtor-in-possession Operating Reports ("DIP Operating Reports") as were filed with the bankruptcy court by MHCS and

Medical Temporaries and served on Heller, monthly, in the ordinary course of business. MHCS and Medical Temporaries, through Defendants Jones, Edwards and Ingoldsby, prepared and served such DIP Operating Reports on Heller and other creditors with the intent and expectation that the bankruptcy court, Heller and such other creditors would reasonably reply on the accuracy of the balance sheets and other financial data reported therein.

30.    Unknown to Heller, but similar to the situation of the misstated borrowing base certificates, the DIP Operating Reports of MHCS and Medical Temporaries overstated the true receivables of MHCS and Medical Temporaries due to the failure of Defendants Jones, Edwards and Ingoldsby to use reasonable care in the preparation and communication of such DIP Operating Reports, with the consequence that the DIP Operating Reports as filed, through January 2002, failed to show and reflect required LUPA adjustments (downwards) to the receivable collateral.

31.    On November 12, 2001, Medical Temporaries filed a Status Report with the bankruptcy court, attached as Exhibit C, which report was served on Heller, reflecting $1,341,389 in total collectible receivables and a $50,011 availability under the DIP Loan facility. The same report advised the Court and creditors that MHCS and Medical Temporaries were negotiating with HCFA with respect to the repayment of an alleged $480,00 pre-petition overpayment alleged by Medicare. Medical Temporaries reported that MHCS and Medical Temporaries anticipated to achieve a settlement of this disputed obligation which provided for favorable repayment terms in the near future. Medical Temporaries also reported that the two debtors anticipated filing either a plan of reorganization or achieving an asset sale within sixty (60) days time, and that a dividend to unsecured creditors was expected in the two bankruptcies.

32.    Around this time, in the Fall of 2001, Heller was told by MHCS and Medical Temporaries that Defendants Jones and Edwards were seriously exploring the possibility of acquiring, as "new equity", the principal assets of MHCS and Medical Temporaries, through a sale or a reorganization plan, with Defendant Michael Ingoldsby possibly having some sort of continuing management role in any successor venture.

33.    On November 13, 2001, the United States Trustee filed a Statement Regarding Status Conference, attached as Exhibit D, to which was attached the Operating Report filed by MHCS and Medical Temporaries with the bankruptcy court for the period ending October 26, 2001.

34.    Unknown to Heller, by the actions of the Defendants Jones, Edwards, and Ingoldsby, MHCS and Medical Temporaries had significantly overstated the value of MHCS' and Medical Temporaries Accounts and accounts receivable as reported to Heller on the borrowing base certificates submitted to Heller and in the DIP Operating Reports filed with the bankruptcy court and served on Heller, by failing to cause MHCS and Medical Temporaries to make LUPA adjustments therein, which adjustments would have reduced collectible and eligible receivables as shown thereon.

35.    MHCS' and Medical Temporaries' failure to accurately track and record LUPAs was a breach of Section 3.3. of the Loan Agreement.

36.    MHCS' and Medical Temporaries failure to accurately track and record LUPAs caused a misstatement of the their Qualified Accounts and, therefore, of the Borrowing Base of eligible Accounts reported to Heller on borrowing base certificates, overstating the eligible receivables against which Heller loaned monies to MHCS and Medical Temporaries under the DIP Loan Agreement.

-9-

37.    In reliance on MHCS' and Medical Temporaries' misstatements of Qualified Accounts and the Borrowing Base, of which Heller had no knowledge until Heller conducted a field audit in January 2002, Heller loaned MHCS and Medical Temporaries approximately $402,000 more on the DIP Loan than Heller would have advanced had the borrowing base certificates and the DIP Operating Reports been properly stated.

38.    The Defendants knew, or should have known, of significant misstatements in the borrowing base certificates submitted to Heller by MHCS and Medical Temporaries and of related misstatements of receivables as reported in the DIP Operating Reports submitted to the Bankruptcy Court and served on Heller as a secured creditor of MHCS and Medical Temporaries.

39.    Defendant Jones advised Mr. Gardullo of Heller in December 2001, vaguely, that she believed that MHCS' and Medical Temporaries' borrowing base certificates were no longer accurate and that she would no longer certify them. When Mr. Gardullo probed for the reason, she instructed him to speak with Mr. Ingoldsby who was, on information and belief, acting as unpaid Chief Executive Officer (CEO) of the two debtors.

40.    In a contemporaneous conversation with Mr. Ingoldsby, Mr. Gardullo was led to believe by defendant Ingoldsby that Ms. Jones discomfort arose from a matter which Mr. Gardullo was familiar with, to wit, failure of the borrowing base certificates and the DIP Operating Reports to reduce Accounts and accounts receivable of MHCS and Medical Temporaries as shown therein by the $480,000 or so pre-petition overpayment liabilities alleged by Medicare, which alleged overpayment was then the subject then pending settlement negotiations between MHCS and Medicare and its fiscal intermediary, as noted above. Because MHCS and Medical Temporaries had reported to the bankruptcy court and creditors that a

-10-

favorable settlement with Medicare was close and would, once consummated, "term out" and repay any pre-petition overpayment liability to Medicare over a multi-year period, negatively impacting cash flow by only a few thousand dollars a month, Mr. Gardullo was comfortable that no immediate "one time" major downward adjustment of receivables as reported on the borrowing base certificates, to reflect an overpayment obligation to Medicare, was then necessary. Mr. Ingoldsby made these statements to Mr. Gardullo without reasonable care, with the intent that Heller rely on his representations and continue to advance monies under the DIP Loan, and Heller so did.

41.     Consistent with Mr. Ingoldsby's representations, even after Defendant Jones ceased to certify the borrowing base certificates submitted by MHCS and Medical Temporaries to Heller the certificates submitted in connection with the DIP Loan continued to be certified by Defendant Edwards as being accurate and Heller reasonably relied on the same, until Heller notified MHCS and Medical Temporaries, as a result of a January 2002 field audit, of mis-statements therein.

42.     A field audit of MHCS and Medical Temporaries was conducted for Heller in January 2002 by Health Care Analysis Corporation, a Heller affiliate. When the audit results were thereupon fully analyzed and completed Heller become aware of a significant overstatement of the borrowing base by the failure of MHCS and Medical Temporaries to make LUPA adjustments.

43.     At this point, in early February 2002, Heller ceased further advances, beyond collections received, and notified MHCS and Medical Temporaries that they had improperly failed to make LUPA adjustments in the approximate amount of $405,000, as of the time of the mid-January audit.

44.    By email of February 21, 2002, attached *as Exhibit E*, after Heller had brought the failure to make LUPA adjustments to MHCS' and Medical Temporaries' attention, Defendant Jones submitted a revised 60-day forecast to Heller wherein MHCS and Medical Temporaries for the first time acknowledged an over-advance under the DIP Loan as of January 16, 2002 of $401,888, due to the failure of MHCS and Medical Temporaries to make LUPA adjustments.

45.    Had the borrowing base certificates been properly been reported to Heller by MHCS and Medical Temporaries, Heller would have advanced them $401,888 less on the DIP Loan.

46.    Heller gave formal notice of default on the DIP Loan, and of its intent to exercise default remedies, by notice filed with the bankruptcy court on March 14, 2002.

47.    On March 18, 2002, MHCS filed a Response to Heller's notice of default with the bankruptcy court, wherein MHCS acknowledged that it did not dispute the occurrence of a default under the DIP Loan, claimed that it had told Heller, in January 2002, that the value of receivables used to calculate the borrowing base would need to be adjusted and stated that in all likelihood an over-advance existed under the DIP Loan Agreement. *See* ¶1 of MHCS's March 18, 2002 Response to Heller's notice of default, attached as Exhibit F.

48.    The bankruptcy cases of MHCS and Medical Temporaries were converted to Chapter 7 liquidation proceedings by order of the bankruptcy court, on motion of the two debtors, at the March 20, 2002 default hearing.

49.    Heller shortly thereafter, on March 27, 2002, received relief from the automatic stay, as part of a bankruptcy court approved settlement with the Chapter 7 trustee for MHCS and Medical Temporaries, to permit Heller to collect out its receivable collateral.

50.    As of July 12, 2002, MHCS and Medical Temporaries were indebted to Heller under the DIP Loan Agreement and the various other loans and obligations in the amount of $1,330,243.07, as follows: $570,652.89 in principal and accrued interest on the DIP Loan; $524,678 in principal and accrued interest on the pre-petition term loan; an overline advance on the revolver and interest thereon totaling $56,754.50, appraisal costs of $36,593, legal fees, audit fees (for collateral review) and other charges totaling $135,314.15, and a miscellaneous advance of $6,250.

51.    All the aforesaid indebtedness of MHCS and Medical Temporaries to Heller, under the DIP Loan, the pre-petition term loan, the overline on the revolver, etc., was secured by, among other assets, Accounts and accounts receivable pledged by the two debtors. Heller duly perfected its security interest in this receivable collateral through UCC financing statements filed pre-petition and through the bankruptcy court orders approving the DIP Loan and the debtors' related use of Heller's cash collateral (receivables) which secured the term loan.

52.    As of the date hereof, Heller believes that it has collected substantially all of the receivables of MHCS and Medical Temporaries which have commercial value and that Heller's remaining collateral has no significant worth. As noted above, after these collections more than $1.3 million still remains due and owing to Heller by MHCS and Medical Temporaries.

53.    Had the Defendants (other than Mary Lee Ingoldsby) not negligently caused a significant over-advance of $401,888 on the DIP Loan, triggering a loan default which thereafter triggered conversion of the MHCS and Medical Temporaries bankruptcies to Chapter 7, MHCS and Medical Temporaries could have been sold or reorganized as "going concerns" as MHCS and Medical Temporaries had represented to Heller, the Office of the United States Trustee and the Official Committee of Unsecured Creditors in early November 2001, was anticipated to

-13-

occur within 60 days time. In these circumstances, Heller would have avoided a further $928,355 in consequential damages now apparent from the fact that Heller's remaining loan balances of $1,330,243 are, at this point, essentially uncollectible.

## COUNT I
**(Negligent Misrepresentation – against Defendants Jones, Edwards and Michael Ingoldsby)**

54.   Heller incorporates paragraphs 1 through 53 herein as if restated in full.

55.   Defendants Jones, Edwards and Michael Ingoldsby, in the ordinary course of their business and employment, and in the ordinary course of the business of MHCS and Medical Temporaries, supplied false information to Heller regarding the borrowing base of the eligible Accounts and accounts receivable of MHCS and Medical Temporaries. That false information, in the form of inaccurate borrowing base certificates and DIP Operating Reports, was supplied to Heller for Heller's guidance in its business transactions, i.e., making advances to MHCS and Medical Temporaries pursuant to the DIP loan, with the intent and expectation that Heller rely on such information, as it did. The false information, and Heller's justifiable reliance thereon, caused and resulted in pecuniary loss to Heller. Defendants Jones, Edwards and Michael Ingoldsby failed to exercise reasonable care or competence in obtaining or communicating the information regarding the borrowing base.

## COUNT II
**(Breach of Guaranty -- Against Defendants Michael and Mary Lee Ingoldsby)**

56.   Heller incorporates paragraphs 1 through 53 herein as if restated in full.

57.   Defendants Michael and Mary Lee Ingoldsby personally guaranteed MHCS' and Medical Temporaries' obligations under the DIP Loan.

58.   Defendants Michael and Mary Lee Ingoldsby are directly liable, as guarantors of the DIP Loan, for all monies due to Heller, other than monies due with respect to the pre-petition term loan.

-14-

59.    The DIP Loan remains due and payable and Defendants Michael and Mary Lee Ingoldsby have not performed under their Guaranty by paying off the DIP Loan.

WHEREFORE, Heller respectfully requests that the Court grant the following relief:

A.    That judgment be entered in its favor on Count I against Defendants Jones, Edwards, and Michael Ingoldsby in the amount of $401,888, for other consequential damages in the amount of $928,355 or such greater amounts as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper; and

B.    That judgment be entered in its favor on Count II against Defendants Michael and Mary Lee Ingoldsby in the amount of $805,565, or such greater amount as may be proved at trial, plus interest, attorneys' fees and costs, and for such other and further relief as is just and proper.

Respectfully submitted,

OF COUNSEL:                          HELLER HEALTHCARE FINANCE, INC.

David B. Tatge, Esq.                By its attorneys,
Shlomo Katz, Esq.
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, N.W., 7th Floor    Russell Beck, BBO No. 561031
Washington, D.C. 20037               Stephen D. Riden, BBO No. 644451
(202) 861-0900                       EPSTEIN BECKER & GREEN, P.C.
                                     111 Huntington Avenue, 26th Floor
                                     Boston, MA 02199-7610
Dated: August 1, 2002                (617) 342-4000

DC:199991.1

-15-