UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GE HFS HOLDINGS, INC.<br>*Formerly known as*<br>HELLER HEALTHCARE FINANCE, INC.,<br><br>     Plaintiff,<br><br>and<br><br>MICHAEL INGOLDSBY,<br><br>     Intervenor/Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and INTERNATIONAL INSURANCE GROUP, LTD.,<br><br>     Defendants. | CIVIL ACTION No: 05-CV-11128-NG |

**PLAINTIFF-INTERVENOR MICHAEL INGOLDSBY'S
MEMORANDUM OF LAW PURSUANT TO ORDER OF THE COURT**
_____

The Plaintiff-Intervenor Michael Ingoldsby ("Plaintiff-Intervenor" or "Mr. Ingoldsby") submits this Memorandum of Law pursuant to the Court's Order, dated September 5, 2007 (Gertner, J.). In accordance therewith, this Memorandum of Law addresses Mr. Ingoldsby's standing to pursue his claim against International Insurance Group, Ltd. ("IIG") notwithstanding the fact that Mr. Ingoldsby did not schedule this potential claim as part of his bankruptcy proceeding.[1]

---

[1] Most importantly, this Court has already ruled that judicial estoppel is not applicable in this matter as it applies to Mr. Ingoldsby's claims against National Union Fire Insurance Company of Pittsburgh, PA.

As more fully set forth herein, Mr. Ingoldsby's claim against IIG should not be barred under the doctrine of judicial estoppel because: 1) Mr. Ingoldsby's claim arose post-petition and, therefore, his claim need not have been disclosed to the bankruptcy court; 2) Mr. Ingoldsby did not mislead the bankruptcy court or secure an unfair advantage by not scheduling his claim against IIG; 3) Mr. Ingoldsby did not attempt to manipulate the legal system, but rather had no knowledge of the claim at the time of his bankruptcy; and 4) IIG will avoid all liability and receive a windfall if Mr. Ingoldsby's claim is barred.

More importantly, even assuming, *arguendo*, that the doctrine of judicial estoppel is applicable here, Mr. Ingoldsby still has standing to pursue his claims against IIG because Mr. Ingoldsby and the trustee of his bankruptcy estate have agreed to share in any litigation proceeds. Moreover, this agreement with the trustee has been approved by the Bankruptcy Court for the Middle District of Florida.

In support hereof, Plaintiff-Intervenor submits the Affivait of Michael Ingoldsby in Support of Memorandum of Law Pursuant to Order of the Court ("Second Ingoldsby Affidavit") and further states as follows:

**RELEVANT FACTUAL BACKGROUND**

On or about December 5, 2005, Mr. Ingoldsby filed a civil action against IIG for fraud, negligent misrepresentation and violations of Mass. Gen. Laws ch. 93A, arising from a dispute concerning defense obligations under a directors & officers liability insurance policy issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Services, Inc. ("MHCS") and its directors and officers.

---

Since the facts are virtually identical, if not identical, in terms of Ingoldsby's bankruptcy and the potential harm to the Defendants, judicial estoppel should not be applied to the claims against IIG. This is set forth in further detail *infra*.

2

*Mr. Ingoldsby's Reliance on IIG*

Mr. Ingoldsby was, at all times relevant hereto, the Chairman of the Board of MHCS. *See* Affidavit of Michael Ingoldsby in Opposition to IIG's Motion for Summary Judgment (Previously Filed as Docket Entry No. 76) (referred to herein as "Ingoldsby IIG SJ Affidavit"), ¶ 2. Prior to obtaining the directors and officers liability insurance at issue, IIG had served as MHCS's broker and procured several other policies of insurance for MHCS. During the course of MHCS's relationship with IIG, MHCS often obtained advice from IIG regarding its policies of insurance, particularly with respect to the effect of the MHCS bankruptcy on coverage afforded by its policies. *See* Ingoldsby IIG SJ Affidavit, ¶ 6. In addition, IIG had advised MHCS in the past regarding endorsements added to its policies and the effect thereof, specifically with respect to contractual liability endorsement added to its general liability policy. *See* Ingoldsby IIG SJ Affidavit, ¶ 6 and *Exhibits A* and *B* attached thereto.

Because IIG and MHCS had such a longstanding business relationship, when MHCS was seeking directors and officers insurance, MHCS and Mr. Ingoldsby relied on IIG to advise MHCS on the most appropriate coverage for the company. *See* Ingoldsby IIG SJ Affidavit, ¶¶ 8-11. Thus, at all relevant times, the Plaintiff-Intervenor was insured for liability under a directors and officers liability policy procured by IIG and issued by National Union to Managed Health Care Systems, Inc. ("MHCS"), being policy number 873-87-52, effective August 4, 2001, through August 4, 2002 (hereinafter referred to as the "Policy").[2] *See* Ingoldsby IIG SJ Affidavit, ¶ 3.

---

[2] The Policy was a renewal of policy number 473-16-30 which contained similar contractual liability exclusion language. With regard to policy number 473-16-30, MHCS was not advised by IIG of the presence or potential effect of National Union's contemplated interpretation of the exclusion.

3

*The Heller Litigation and National Union's Denial of Coverage*

On or about August 1, 2002, Heller Healthcare Finance, Inc. commenced a civil action in the United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against the Plaintiff-Intervenor Michael Ingoldsby, in which it alleged a claim for Negligent Misrepresentation (Count I) and a claim for Breach of Guaranty (Count II) against Michael Ingoldsby. *See* Ingoldsby IIG SJ Affidavit, ¶ 14. On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant National Union. *See* Ingoldsby IIG SJ Affidavit, ¶ 15. On or about October 11, 2002, National Union, through counsel, issued a *preliminary* determination that there was no coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards. *See* Ingoldsby IIG SJ Affidavit, ¶ 16. In response to subsequent email correspondence from Mr. Ingoldsby's attorney regarding coverage for the claims, counsel for National Union sent another letter, dated March 6, 2003, explicitly stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." *See* Ingoldsby IIG SJ Affidavit, ¶ 18. Mr. Ingoldsby, by way of letter from counsel, dated March 17, 2004, submitted a formal demand to National Union under Mass. Gen. Laws Ch. 93A for reimbursement of his defense costs. National Union declined coverage a month later by way of letter from counsel, dated April 16, 2004, and, in doing so, expressly relied upon Exclusion 4(h), as amended by Endorsement No. 8. *See* Ingoldsby IIG SJ Affidavit, ¶¶ 19-20. Specifically, National Union alleged that, under its interpretation of the Policy's contractual liability exclusion, even the negligent misrepresentation claim was barred from coverage.

Because National Union and IIG failed to adequately disclose the existence of the contractual liability exclusion, Mr. Ingoldsby had no knowledge of such exclusion until National Union denied his claim. More importantly, until this denial of coverage, Mr. Ingoldsby had no knowledge of the effect of said endorsement in potentially limiting coverage under the Policy for contract claims against him or MHCS. *See* Ingoldsby IIG SJ Affidavit, ¶¶ 11-12. Had he been fully informed of the existence of the contractual liability exclusion and the purported effect thereof, Mr. Ingoldsby would have advised MHCS not to purchase the Policy. *See* Ingoldsby IIG SJ Affidavit, ¶ 9.

Further, because National Union denied his claim under the Policy, Mr. Ingoldsby bore the cost of his own defense of the Heller Action. *See* Ingoldsby IIG SJ Affidavit, ¶ 21. In litigating the claims asserted by Heller over a two-year period, he expended a substantial amount of money in attorneys' fees and costs. *See* Ingoldsby IIG SJ Affidavit, ¶ 22. Specifically, Mr. Ingoldsby incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24). *See* Ingoldsby IIG SJ Affidavit, ¶ 22. In addition, pursuant to the Settlement Agreement with Heller, the Plaintiff-Intervenor submitted payment to the bankruptcy trustee in the amount of One Hundred Five Thousand Dollars ($105,000.00). *See* Ingoldsby IIG SJ Affidavit, ¶ 30.

### *Mr. Ingoldsby's Bankruptcy*

As a result of his growing legal fees and potential liability in the *Heller Action*, Mr. Ingoldsby filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida,

Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").  *See* Second Ingoldsby Affidavit, ¶ 1.

On or about January 2, 2003, Mr. Ingoldsby filed his Schedules and Statement of Financial Affairs.  *See* Second Ingoldsby Affidavit, ¶ 3.  In his Statement of Financial Affairs, Mr. Ingoldsby disclosed that he was a defendant in the Heller Action. *See* Second Ingoldsby Affidavit, ¶ 4.  Mr. Ingoldsby did not schedule a potential claim against IIG because he had not yet incurred any significant legal fees or suffered any other damages and, therefore, had no reason to contemplate a claim against IIG.  Moreover, Mr. Ingoldsby believed that National Union would reconsider its preliminary denial of coverage once it looked beyond the face of the Heller Complaint and performed the requisite investigation into Heller's claims.  *See* Second Ingoldsby Affidavit, ¶ 5.  As such, Mr. Ingoldsby did not contemplate any claim against IIG, nor was he aware of any such claim.  *Id.*  Thus, Mr. Ingoldsby did not list any claim against IIG on his Schedules and Statement of Financial Affairs.  *Id.*  Subsequently, on or about April 18, 2003, Mr. Ingoldsby filed an Amended Schedule and Statement of Affairs.  At this time, however, he was still not aware of any potential claim against IIG and, therefore, did not disclose any such claim.  *See* Second Ingoldsby Affidavit, ¶¶ 6-7.

Prior to receiving a discharge, Mr. Ingoldsby discussed a potential claim against National Union with his bankruptcy counsel, who advised him that he did not need to amend his Statement of Financial Affairs to reflect a potential claim for reimbursement of post-petition expenses.  *See* Second Ingoldsby Affidavit, ¶ 12.  Sometime thereafter, the Bankruptcy trustee was also notified that Mr. Ingoldsby had a potential claim against National Union related to the reimbursement of said costs. *See* Second Ingoldsby

Affidavit, ¶ 14. If Mr. Ingoldsby had been aware of his potential claim against IIG at that time, he would have also disclosed this to the Bankruptcy trustee as well. *Id.*

Mr. Ingoldsby did not disclose a potential claim against IIG because, at that time, Mr. Ingoldsby did not realize that IIG had not properly advised him about the contractual liability exclusion upon which National Union relied to deny coverage. More specifically, it was not until Mr. Ingoldsby began reviewing documents and investigating his claim against National Union with his attorney in Massachusetts that he became aware of a potential claim against IIG. This occurred within weeks of filing his Complaint in Intervention, dated December 5, 2005. As such, Mr. Ingoldsby did not omit his claim against IIG from his Statement of Financial Affairs with the intention of defrauding the court or his creditors, but rather did not begin to contemplate any such claim until after the Bankruptcy matter was settled. *See* Second Ingoldsby Affidavit, ¶ 15-16.

### *Mr. Ingoldsby's Agreement with Bankruptcy Trustee*

On or about May 30, 2007, Mr. Ingoldsby and R. Jay Harpley, the Trustee of the Ingoldsby Bankruptcy Estate, entered into an Agreement whereby the parties agreed to share in any litigation proceeds that may result from this action. *See* Second Ingoldsby Affidavit, ¶ 17 and *Exhibit 1* attached thereto. Therein, the Trustee agreed that this case may proceed in solely in Mr. Ingoldsby's name. *See* Second Ingoldsby Affidavit, ¶ 19. The Agreement was entered on the record in this matter on May 30, 2007. *See* Second Ingoldsby Affidavit, ¶ 19. On or about July 19, 2007, the Agreement was also approved by the Bankruptcy Court for the Middle District of Florida. *See* Second Ingoldsby Affidavit, ¶ 20.

*Report and Recommendation as it Relates to Judicial Estoppel*

On or about September 5, 2005, the Court (Gertner, J.) adopted Magistrate Judge Dein's Report and Recommendation on Motion of National Union Fire Insurance Co. of Pittsburgh, PA for Summary Judgment (the "R&R"), filed June 14, 2007. In the R&R, the Court addressed the issue of judicial estoppel as it applied to Mr. Ingoldsby's claims against National Union and found the application of judicial estoppel was unwarranted.

In fact, the Court (Dein, J.) found that the record was not clear that the potential claim had to be listed in the bankruptcy proceeding. R&R at 17. With respect to Mr. Ingoldsby's failure to schedule the claim, the Court (Dein, J.) found that the record did not establish that Ingoldsby is seeking to derive an unfair advantage. Rather, any failure to disclose was inadvertent, as Mr. Ingoldsby had no compelling motive to conceal the potential claim under the D&O policy. R&R at 18-19. Moreover, the Court (Dein, J.) found that there is no evidence that Mr. Ingoldsby acted in bad faith, or intended to harm or deceive his creditors. *Id.*

In addition, the Court (Dein, J.) placed great weight on the fact that the Trustee was made aware of the potential claim against National Union prior to the discharge in bankruptcy and the fact that Mr. Ingoldsby's bankruptcy counsel advised him that the potential claim did not have to be scheduled. R&R at 20. Further, the Court (Dein, J.) found the application of judicial estoppel unwarranted in light of the Bankruptcy trustee's present involvement in this litigation. R&R at 21.

# ARGUMENT

I.   **Mr. Ingoldsby has standing to pursue his claims against IIG because said claims are not barred by the doctrine of judicial estoppel.**

Mr. Ingoldsby does not dispute that he did not list a claim against IIG on his Schedules and Statement of Financial Affairs filed with the U.S. Bankruptcy Court for the Middle District of Florida. However, this omission does not hinder his standing to pursue his claims against IIG, under the doctrine of judicial estoppel or otherwise.

   A.   **Mr. Ingoldsby's claim arose post-petition and, therefore, his claim need not have been disclosed to the bankruptcy court.**

As a general rule, a debtor's claims that have accrued as of the date that the bankruptcy case commences become part of the bankruptcy estate. *Graupner v. Brookfield*, 2006 WL 2455812, *5 (D. Mass 2006), *citing* 11 U.S.C. § 541(a)(1). With respect to Mr. Ingoldsby's claims against IIG, he must suffer "appreciable harm" before the limitations period on a broker negligence claim begins to run. *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass.App.Ct. 215, 218-219 (1990). In *Int'l Mobiles*, the court recognized that it would be "unsound judicial policy to encourage the initiation of litigation in anticipation that liability may materialize" as the court did not wish to encourage unhappy insureds pre-emptively to sue their broker as soon as they learned that the broker had failed to procure the necessary coverage, lest they find themselves more than three years later without coverage and with a time-barred broker negligence claim if an uncovered claim were to arise. *Id.* at 219. While the Court held that legal expenses potentially may constitute such "appreciable harm," the Court understood that legal expenses would start the limitations clock only when: (1) the legal expenses themselves were "appreciable" or likely to become "appreciable,"; and (2) the

legal action that triggered the need to incur appreciable legal expenses had been filed, not merely threatened. *See Id.* at 219.

Accordingly, Mr. Ingoldsby did not list a claim against IIG in his Statement of Financial Affairs because, at that time, no such claim existed. *See* Ingoldsby Affidavit in Opposition to National Union's Motion for Summary Judgment (Previously Filed as Docket Entry #85) (referred to herein as "Ingoldsby NU SJ Affidavit"), ¶¶ 24-25. Prior to filing, National Union had only issued what it characterized as a "preliminary determination" that coverage did not exist. As such, Mr. Ingoldsby reasonably believed that National Union would likely revisit the coverage issue and ultimately provide coverage once it looked beyond the mere allegations and performed the requisite investigation into Heller's claims. *See* Ingoldsby NU SJ Affidavit, ¶¶ 25-27. In fact, if National Union provided coverage, there would have been no claim against IIG. Further, it was not until March 17, 2004 that Ingoldsby made a formal demand upon National Union for reimbursement of his defense costs in the Heller Action. *See* Ingoldsby NU SJ Affidavit, ¶ 31. Moreover, it was not until much later that Mr. Ingoldsby realized that IIG had not advised MHCS and him properly regarding the coverage afforded by the National Union Policy. *See* Second Ingoldsby Affidavit, ¶¶ 13-15. In fact, Mr. Ingoldsby did not consider any claim against IIG until just prior to the filing of his Complaint in Intervention, dated December 5, 2005. In fact, it was during his investigation of his claim against National Union that Mr. Ingoldsby first realized that IIG had failed to properly advise him regarding the Policies. *See* Second Ingoldsby Affidavit, ¶ 15.

At the time of his bankruptcy filing, Mr. Ingoldsby had also not yet suffered any appreciable harm. The Heller Action was stayed at the time he filed his Schedules and relief from stay was not granted until July 16, 2003. *See* Ingoldsby NU SJ Affidavit, ¶ 29. Any fees that Mr. Ingoldsby incurred prior to the petition date were to be discharged and, therefore, did not concern Mr. Ingoldsby. *See* Second Ingoldsby Affidavit, ¶ 6. In addition, nearly all of the damages which Mr. Ingoldsby has alleged in the instant matter occurred post-petition and are, therefore, not part of the bankruptcy estate. Specifically, it was not until after Heller was granted relief from the automatic stay in the bankruptcy case and the Heller Action began to proceed that Mr. Ingoldsby began to incur any substantial legal fees and defense costs related thereto. *See* Ingoldsby NU SJ Affidavit, ¶¶ 26-28.

In light of the foregoing, the Plaintiff-Intervenor did not breach any duty of disclosure to the bankruptcy court by not scheduling his potential claim against IIG[3] and, therefore, should not be estopped from pursuing it now.

      **B.**      **The application of judicial estoppel is not appropriate in this case because the Mr. Ingoldsby did not mislead the bankruptcy court or secure an unfair advantage by not scheduling his claim against IIG.**

"Judicial estoppel is an equitable doctrine that precludes a party from asserting a position in one legal proceeding that is contrary to a position it had previously asserted in another proceeding." *Otis v. Arbella Mut. Ins. Co.*, 443 Mass. 634, 639-40 (2005), quoting *Blanchette v. School Comm. of Westwood*, 427 Mass. 176, 184 (1998). Several factors typically inform the decision whether to apply the doctrine of judicial estoppel in a particular case: whether the party's later position is "clearly inconsistent" with its earlier

---

[3] As set forth previously herein, this Court has already found that the record was not clear that the potential National Union claim had to be listed in the bankruptcy proceeding. R&R at 17.

position, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled, and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742 (2001).

With regard to the first element, although the Plaintiff-Intervenor did not schedule his potential claim against IIG, he did disclose that he was a defendant in the Heller Action. As such, the fact that he is now seeking reimbursement of his post-petition legal fees related to the Heller Action is not "clearly inconsistent" or "directly contrary" with his earlier position. The fact that he incurred damages on a post-petition basis for which he now seeks damages is in no way inconsistent with his filing of schedules in the bankruptcy court. Given the deficiency in the first element, the inquiry should end here. However, an analysis of the additional elements further illustrates that judicial estoppel is inappropriate in this case.

With regard to the second element, the Massachusetts Supreme Judicial Court, in *East Cambridge Sav. Bank v. Wheeler*, 664 N.E.2d 446, 448 (1996), recognized that judicial estoppel is only applicable "where the party to be estopped had been successful in its first assertion of its inconsistent position." The Court further reasoned that: "We decline to identify a <u>settlement</u> [in a prior bankruptcy court proceeding] <u>as representing success</u> for the purposes of judicial estoppel." *Id.* In this case, all of the claims in the bankruptcy proceeding were disputed and ultimately "settled" and, therefore, the

Plaintiff-Intervenor cannot be deemed to have been "successful" in asserting an inconsistent position.

Most importantly, with regard to the third element, not scheduling the potential claim would not allow Ingoldsby to obtain any "unfair advantage" against IIG.[4] IIG was not even a creditor in the bankruptcy case and, thus, its position was in no way altered by the bankruptcy filings.

> C. **Judicial estoppel is not applicable because Mr. Ingoldsby did not attempt to intentionally manipulate the legal system, but rather acted in good faith.**

Application of judicial estoppel is a matter of the court's discretion, and its purpose "is to prevent the manipulation of the judicial process by litigants." *Id.* at 640, quoting *Canavan's Case,* 432 Mass. 304, 308 (2000). The primary discretionary factor considered by the Court is the intent or motive of the litigant. *Cordeiro v. O'Connor*, 2006 WL 696560 (Mass.Super. 2006). Because the primary purpose of judicial estoppel is to protect the integrity of the court and to prevent a litigant from "playing fast and loose with the courts," courts will often look to see if the litigant is intentionally trying to manipulate the judicial system. *Otis v. Arbella Mut. Ins. Co.,* 443 Mass. 634, 642, quoting *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33 (1st Cir. 2004); see also *Patriot Cinemas, Inc. v. General Cinema Corp.,* 834 F.2d 208, 212 (1st Cir. 1987). As such, courts have held that the doctrine should only be applied where a party has adopted one position, secured a favorable decision, and then taken a contradictory position <u>in search of legal advantage</u>. *InterGen N.V. v. Grina,* 344 F.3d 134, 144 (1st Cir. 2003) (emphasis added).

---

[4] As set forth herein, the Court (Dein, J.) already found that the record did not establish that Ingoldsby is seeking to derive an unfair advantage.

The doctrine of judicial estoppel should not be applied "where the party's prior position was asserted in good faith, and where the circumstances provide a legitimate reason--other than sheer tactical gain--for the subsequent change in that party's position." 443 Mass. at 642. Further, judicial estoppel should not be applied when a party's prior position was based on inadvertence or mistake. *New Hampshire v. Maine*, 532 U.S. 742, 753 (2001); *see also Barger v. City of Cartersville*, 348 F 2d 1289 ((11th Cir. 2003). the courts have acknowledged that every failure to disclose may not amount to "playing fast and loose with the courts". *In re Jackson Brook Institute, Inc.*, 280 B.R. 1, 7 (D.Me. 2002); *Johnson v. Oregon Dept. of Human Resources,* 141 F.3d 1361, 1369 (9th Cir. 1998) ("If incompatible positions are based not on chicanery, but only on inadvertence or mistake, judicial estoppel does not apply")(non-bankruptcy case); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 358, 362 (3d Cir. 1996) (internal quotation marks and citation omitted) (judicial estoppel doctrine "not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts"; doctrine "does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court"; inconsistency "must be attributable to intentional wrongdoing"); *Johnson Serv. Co. v. Transamerica Ins. Co.,* 485 F.2d 164, 175 (5th Cir. 1973) (applying Texas law on judicial estoppel; "the rule looks toward cold manipulation and not an unthinking or confused blunder")(non-bankruptcy case).

In the present matter, not scheduling the claim against IIG was not based upon any improper motive.[5] With respect to the potential claim against IIG, Mr. Ingoldsby had

---

[5] The Court (Dein, J.) has already found that Mr. Ingoldsby had no compelling motive to conceal the potential claim under the D&O policy. R&R at 18-19. Moreover, the Court found that there is no

no reason to even consider a claim against IIG, until after he learned that National Union was relying on the contractual liability exclusion to deny coverage and that he had not been properly advised by IIG with respect to the exclusion. In fact, if National Union provided coverage, there would have been no claim against IIG. *See* Second Ingoldsby Affidavit, ¶ 5. Moreover, at the time he filed his Statement of Financial Affairs, Mr. Ingoldsby did not schedule a potential claim against IIG because he had not yet incurred any significant legal fees or suffered any other damages and, therefore, had no reason to contemplate a claim against IIG. *Id.* Indeed, it was not until Mr. Ingoldsby began investigating his claim against National Union with his Massachusetts attorney that he realized that he also had a claim against IIG. *See* Second Ingoldsby Affidavit, ¶ 15. As such, Mr. Ingoldby's omission of the potential claim against IIG was inadvertent and not improper in motive. In any event, not scheduling the claim was certainly not a fraud on the court or a "cat and mouse tactic".

> **D.    Should the Court bar the Plaintiff-Intervenor from pursuing his claim, IIG will receive a windfall by avoiding all liability for its wrongful denial of coverage.**

Even where courts have found that a party did indeed mislead the court by failing to disclose a claim in bankruptcy, courts are reluctant to impose the doctrine of judicial estoppel because it is such a severe remedy. *Graupner v. Brookfield*, 2006 WL 2455812, *9 (D. Mass 2006). Moreover, courts are particularly reluctant to dismiss a claim on judicial estoppel grounds where to do so would create a potential windfall for the defendant or allow it to avoid liability for its wrongdoing altogether. *Id.* Courts have also found that dismissal of the claims, at least in theory, may be unfair to the debtor's

---

evidence that Mr. Ingoldsby acted in bad faith, or intended to harm or deceive his creditors. *Id.*

creditors, who should have an appropriate opportunity to apply any proceeds of those claims to satisfy debts. *Id.*

Here, even if the Court determines that Mr. Ingoldsby should have scheduled the potential claim, it should still not impose judicial estoppel because dismissal of Mr. Ingoldsby's claims will certainly lead to a windfall for IIG.[6]  Specifically, the application of judicial estoppel would allow IIG to escape all liability for its failure to advise MHCS and Mr. Ingoldsby about the so-called contractual liability exclusion contained in the relevant insurance policies and its alleged effect on the coverage provided thereby.

## II. The Trustee of the Bankruptcy Estate has agreed that Mr. Ingoldsby may pursue his claims against IIG.

Even assuming, *arguendo*, that the doctrine of judicial estoppel is applicable, the Trustee of the Ingoldsby Bankruptcy Trustee and the Bankruptcy Court of the Middle District of Florida have consented to Mr. Ingoldsby's pursuit of his claims against IIG. As set forth herein, on or about May 30, 2007, Mr. Ingoldsby and the Trustee of the Ingoldsby Bankruptcy Estate entered into an Agreement whereby the parties agreed to share in any litigation proceeds that may result from this action. *See* Second Ingoldsby Affidavit, ¶ 17. In addition, the Trustee agreed that this case may proceed solely in Mr. Ingoldsby's name. *See* Second Ingoldsby Affidavit, ¶ 18. The Agreement was entered on the docket in this matter on May 30, 2007. *See* Second Ingoldsby Affidavit, ¶ 19. On or about July 19, 2007, the Agreement was also approved by the Bankruptcy Court for the Middle District of Florida. *See* Second Ingoldsby Affidavit, ¶ 20. As such, the

---

[6] The Court (Dein, J.) has already found that applying the doctrine of judicial estoppel would create a potential windfall for the Defendants who may avoid liability altogether. R&R at 22.

above-referenced Agreement and resulting Court order renders moot the issue of Mr. Ingoldsby's standing to pursue his claims against IIG.[7]

## CONCLUSION

In light of the foregoing, the Court should find that Mr. Ingoldsby has standing to pursue his claims against International Insurance Group, Ltd. despite any omission relating to potential claims.

Respectfully submitted,
MICHAEL INGOLDSBY,
By his attorney,

/s/ Gregory J. Aceto, Esq.
Gregory J. Aceto, Esq.
BBO No. 558556
JOHNSON & ACETO, LLP
67 Batterymarch Street, Suite 400
Boston, MA 02110
(617) 728-0888

---

[7] The Court (Dein, J.) has already found that the application of judicial estoppel is unwarranted given the Trustee's involvement in this matter.