UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GE HFS HOLDINGS, INC., f/k/a | ) | |
| HELLER HEALTHCARE FINANCE, INC., | ) | |
| Plaintiff | ) | |
| and | ) | |
| MICHAEL INGOLDSBY, | ) | **CIVIL ACTION** |
| Intervenor / Plaintiff | ) | **05-CV-11128-NG** |
| vs. | ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY | ) | |
| OF PITTSBURGH, PA and | ) | |
| INTERNATIONAL INSURANCE GROUP, LTD., | ) | |
| Defendants | ) | |

**DEFENDANT INTERNATIONAL INSURANCE GROUP, LTD.'S
MEMORANDUM OF LAW REGARDING INTERVENOR/PLAINTIFF
MICHAEL INGOLDSBY'S STANDING TO BRING CLAIM**

The defendant, International Insurance Group, Ltd. ("I.I.G.") submits the foregoing Memorandum of Law pursuant to the Court's Order dated September 5, 2007. ("One additional issue not addressed in the pleadings thus far, namely Ingoldsby's standing to bring the claims against International Insurance Group, the only claim going forward, in the light of the fact that Ingoldsby did not schedule these potential claims during his bankruptcy proceedings.") For the reasons stated below, Intervenor/Plaintiff Michael Ingoldsby ("Ingoldsby") does not have standing to pursue a claim against I.I.G.

## FACTS

I.I.G. acted as the insurance broker for Managed Health Care Systems, Inc. (M.H.C.S.") beginning in 2000. Although he had no involvement with the management of the company, Ingoldsby was at all times relevant to this action the Chairman of the Board of M.H.C.S. Ingoldsby September 16, 2006 Affidavit, **Exhibit A**. I.I.G. placed directors and officers liability/employment practices liability insurance for M.H.C.S. with National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). This case involves an exclusion in the National Union policy relative to contractual liability claims. Specifically, Ingoldsby claims that I.I.G. failed to inform M.H.C.S. that the policy contained the subject exclusion during the renewal in 2001.

In the time period leading up to the renewal, I.I.G. faxed a renewal quote to M.H.C.S. along with a letter dated July 31, 2001. The fax, which was sent by I.I.G. agent Nicholas Sciotto to M.H.C.S. Vice-President/C.F.O. Pamela Jones, included a four (4) page attachment titled "For-Profit Health Care Organization Amendatory Endorsement." Section II of this attachment, titled "Amendments to Exclusions," provided notice to Pamela Jones and M.H.C.S. of the inclusion of the subject contractual liability exclusion. M.H.C.S. accepted the renewal proposal and coverage was bound as of August 4, 2001. The entire policy, including declarations, forms and endorsements, was sent to M.H.C.S. on January 4, 2002. I.I.G. sent a "final version" of the policy to M.H.C.S. on January

2

21, 2002. All versions of the policy sent to M.C.H.S. contained the "Exclusion 4(h)" referenced in the July 31, 2001 letter.

Ingoldsby's claim against I.I.G., as it was initially plead, was that I.I.G. did not inform M.H.C.S. of the presence of the contractual liability exclusion in the National Union policy. Specifically, Ingoldsby claimed that the July 31, 2001 letter from Nicholas Sciotto did not include the attachment which notified M.H.C.S. of the exclusion. In December of 2005, Ingoldsby sued I.I.G., claiming that "[u]pon information and belief, the Renewal Proposal provided by International did not include a copy of endorsement No. 8, which amended exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. See Ingoldsby Complaint at ¶14. This allegation was reiterated by Ingoldsby in an Affidavit dated September 18, 2006, in which he stated:

9.    On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, endorsements to be added to the base policy.

10.    The policy provided by IIG did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. In addition, the copy of the Policy which I received was not bound.

**Exhibit A**. Accordingly, Ingoldsby 's position at the outset of this case was that I.I.G. did not inform M.H.C.S. of the contractual liability exclusion.

Ingoldsby's claim against I.I.G. changed when Ingoldsby revealed that he was mistaken concerning the July 31, 2001 renewal proposal. During his

deposition, Ingoldsby conceded the renewal proposal did in fact contain the

attachment including the contractual liability exclusion.

Q.    Do you believe that the copy that you received [of the National Union
      Renewal Proposal] was a copy that someone at the MHCS office had made
      and then sent to you?

A.    Oh, yes.

Q.    Can you tell me what the basis is for the first sentence of paragraph ten of
      your [September 18, 2006] affidavit?

A.    The copy that I got didn't have that endorsement.  When I wrote this up,
      that was my belief, that wasn't there.  I think that's all that means.

Q.    It's your testimony that the copy you received did not have Endorsement
      8 [the contractual liability exclusion].  Do you know for a fact whether the
      copy that was provided by IIG to MHCS included a copy of Endorsement
      8?

A.    I later learned that it was included.

Deposition of Michael Ingoldsby, p. 88, l. 5-18, attached as **Exhibit B**.

      On August 1, 2002, Heller Health Care Finance ("Heller") sued Ingoldsby

and others to collect $1,330,243.07 that M.H.C.S. allegedly owed to Heller in

connection with a debtor-in-possession ("DIP")loan agreement.  See Heller

Complaint, ¶50.  Ingoldsby personally guaranteed the obligations of M.H.C.S.

under the DIP loan agreement.  Ingoldsby submitted the Heller claim to National

Union and on October 11, 2002, National Union denied coverage on the basis of

the contractual liability exclusion.  See **Exhibit A**, ¶15.

      On December 13, 2002, Ingoldsby filed a petition for bankruptcy under

Chapter 7.  **Exhibit A**, ¶21.  On January 2, 2003, Ingoldsby filed his Schedules

and Statement of Financial Affairs. **Exhibit A**, ¶23. Ingoldsby did not list his

claim against I.I.G. among his financial statements. On May 5, 2004, the Florida

Bankruptcy Court discharged Ingoldsby's debt.

## ARGUMENT

Ingoldsby does not have standing to sue I.I.G. for allegedly failing to

inform M.H.C.S. of the subject exclusion because this claim is property of his

bankruptcy estate. The issue of standing to bring a claim is separate and distinct

from the issue of judicial estoppel, which is the focus of Ingoldsby's

Memorandum. The exception relative to the application of judicial estoppel has

no bearing on Ingoldsby's lack of standing. However, the principles of judicial

estoppel would nevertheless preclude Ingoldsby's claim.

## A.    INGOLDSBY HAS NO STANDING TO SUE I.I.G. BECAUSE THIS CLAIM WAS NOT IDENTIFIED DURING HIS BANKRUPTCY.

Ingoldsby's claim against I.I.G. is barred because Ingoldsby abandoned

this claim by failing to list it in his Statement of Financial Affairs. As a general

rule, a debtor's cause of action which has accrued as of the commencement of the

bankruptcy case becomes property of the bankruptcy estate. 11 U.S.C. §

541(a)(1). The bankruptcy estate includes "all legal or equitable interests of the

debtor in property." In Re Rare Coin Galleries of America, 862 F.2d 896, 900-01

(1st Cir. 1988). The "trustee steps into the shoes of the debtor for the purposes of

asserting or maintaining" such claims. Id., 862 F.2d at 901.

5

The debtor is responsible for disclosing all assets to the bankruptcy court, including all contingent claims. 11 U.S.C. § 521(a)(1). Any property that is scheduled but not administered at the closing of the bankruptcy case is abandoned to the debtor. 11 U.S.C. § 554(c). However, any property that is not scheduled remains property of the bankrupt estate "and the debtor loses all rights to enforce it in his own name." Jeffrey v. Desmond, 70 F.3d 183, 186 n. 3 (1st Cir. 1995).

It is undisputed that Ingoldsby did not list his claim against I.I.G. in his Schedule of Financial Affairs. Ingoldsby's excuses for failing to list the claim are that (1) he believed that National Union would revisit their coverage position, such that a claim against I.I.G. would not be necessary; (2) he did not make a formal demand for reimbursement upon National Union until after his bankruptcy was discharged; and (3) he didn't realize that he had a claim against I.I.G. until after his bankruptcy was discharged. See Ingoldsby Memorandum, p. 10. While a factual inquiry concerning the listing of a potential claim may be relevant in analyzing judicial estoppel, such an inquiry plays no role in determining one's standing to assert a claim. Accordingly, the reasons why Ingoldsby didn't list the I.I.G. claim during his bankruptcy are of no consequence to his present standing to assert this claim.

The issues of standing and judicial estoppel are separate and distinct. In Welsh v. Quabbin Timber, Inc., 199 B.R. 224 (D.Mass., 1996), the court considered a summary judgment motion brought in a claim similar to the case at hand. In

Welsh, a bankruptcy debtor sued a bank for tortuous interference with a business relationship. The lawsuit was brought seven months after the plaintiff received his discharge in bankruptcy. The bank moved for summary judgment on the grounds that the debtor's claim was barred by judicial estoppel. The bank alternatively argued that the debtor lacked standing to assert a claim which was not scheduled during his bankruptcy.

The Welsh court considered both of the bank's summary judgment arguments. The court held that the application of judicial estoppel was appropriate. However, the court held that dismissal of the debtor's claim was also warranted due to lack of standing. Id., 199 B.R. at 229. The court applied the general principle that an unscheduled claim remains property of the bankruptcy estate and that the debtor, having obtained a discharge in bankruptcy, lack standing to pursue any such claims. Id. (citations omitted). The court reasoned that summary judgment was appropriate based upon both judicial estoppel and lack of standing.

Finally, there is no merit to the argument that the Court should allow Ingoldsby to proceed with this claim because he agreed to split the proceeds of any award with the Bankruptcy Trustee. There is no authority for the proposition that the requirements of standing may be avoided if the debtor and the trustee make a side agreement after the bankruptcy is closed. It courts were to honor such side agreements, then the well-established requirements concerning disclosure of one's assets in bankruptcy, as defined in statutes and

7

case law, would be nullified. Debtors would be free to delay a potential claim until the conclusion of their bankruptcy and to then bring the claim following discharge of their debts. Such a tactic could allow the debtor to profit by omitting a potential claim from their financial statements.

**B.    INGOLDSBY'S PRESENT CLAIM AGAINST I.I.G. IS ALSO PRECLUDED BY THE APPLICATION OF JUDICIAL ESTOPPEL.**

For the reasons stated above, the principles of judicial estoppel, and the exceptions to applying this doctrine, have no relevance on Ingoldsby's lack of standing to maintain a claim against I.I.G. However, since Ingoldsby focuses his brief upon judicial estoppel, I.I.G. submits that this doctrine serves as an alternate ground for dismissing Ingoldsby's claim. In this case, the elements of judicial estoppel are met and the exceptions argued by Ingoldsby do not apply.

Judicial estoppel precludes a party from asserting a position in a legal proceeding which is contrary to a position asserted by that party in a separate legal proceeding. Patriot Cinemas, Inc. v. General Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987). The First Circuit has held that the application of judicial estoppel is appropriate when two conditions are met. First, the legal or factual assertion advanced in the earlier judicial proceeding must be "directly inconsistent" with the assertion made in the current forum. Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). Second, the court must have accepted or adopted the assertion made at the earlier proceeding. Id.,

8

374 F.3d at 33. The purpose of the doctrine of judicial estoppel is to prevent the abuse of judicial proceedings, even if the application of the doctrine results in a windfall for the opposing party. Payless Wholesale Distrib. v. Alberto Culver, Inc., 989 F.2d 570, 571 (1st Cir. 1993).

The prerequisites of judicial estoppel are clearly met in this case. Ingoldsby took a directly inconsistent position by bringing the foregoing claim against I.I.G. after he failed to declare the claim as an asset in his bankruptcy Schedule and Statement of Financial Affairs. A debtor in a bankruptcy proceeding has the burden of disclosing all assets to the bankruptcy court, including all contingent claims. 11 U.S.C. § 521(a)(1). An asset which is not properly scheduled remains property of the bankrupt estate and the debtor loses all rights to enforce it in his own name. Jeffrey v. Desmond, 70 F.3d 183, 186 n. 3 (1st Cir, 1995). The second condition for applying judicial estoppel was satisfied when the bankruptcy court accepted Ingoldsby's position when his bankruptcy was discharged on May 5, 2004.

In determining whether judicial estoppel applies to the case at bar, it is important to remember the manner in which Ingoldsby's claim against I.I.G. was initially characterized. Ingoldsby's position, up until the time of his deposition, was that I.I.G. never informed M.H.C.S. of the inclusion of the contractual liability exclusion in their insurance policy. Following the deposition, and in opposing I.I.G.'s summary judgment motion, Ingoldsby abandoned the failure to inform claim and instead made the broad argument that I.I.G. failed to

appropriately advise Ingoldsby "about the contractual liability exclusion contained in the policies and its effect on the coverage provided." See Ingoldsby Summary Judgment Opposition, p. 7. The new theory of liability against I.I.G. is perpetuated in Ingoldsby's recent Memorandum. See Ingoldsby Memorandum, p. 14-15 ("With respect to a potential claim against I.I.G., Mr. Ingoldsby had no reason to even consider a claim against I.I.G., until after he learned that National Union was relying on the contractual liability exclusion to deny coverage *and that he had not been properly advised by I.I.G. with respect to the exclusion*.") (emphasis added).

In his brief, Ingoldsby seeks to invoke an exception to the application of judicial estoppel by arguing, among other things, that he was not aware of a potential claim against I.I.G. during his bankruptcy case. The First Circuit has held that a good faith exception to the operation of judicial estoppel may exist in limited circumstances if the debtor can show "that the new, inconsistent position is the product of information neither known nor readily available to [him] at the time the initial position was taken." Graupner v. Town of Brookfield, 450 F.Supp.2d 119 (D.Mass. 2006), quoting Alternative Sys. Concepts, 374 F.3d at 35. In Graupner, the Court declined to invoke the good faith exception to judicial estoppel despite the debtor's argument that he didn't have actual knowledge of a potential civil claim during the pendency of his bankruptcy case. The court held that actual knowledge was not required, so long as the information which would

put the debtor on notice of his potential claim was readily available to him. Id., 450 F.Supp.2d at 128.

Ingoldsby cannot reasonably argue that the information which gives rise to his claim against I.I.G. was not reasonably available to him at the time of his bankruptcy. If I.I.G. did not provide the attachment describing the contractual liability exclusion along with their July 31, 2001 letter to Pamela Jones at M.H.C.S., then this piece of information was readily available to Ingoldsby in 2002 when he presented the Heller claim to National Union. All he needed to do was speak to Pamela Jones and ask her if she received the July 31, 2001 letter in its entirety with the attachment. Ingoldsby cannot invoke the good faith exception to judicial estoppel by arguing that he had not yet sustained significant damages and therefore did not contemplate a claim against I.I.G. when he filed his Statement of Financial Affairs on January of 2003. See Ingoldsby Memorandum, p. 6. Likewise, it is irrelevant that Ingoldsby expected National Union to revisit their coverage position, or that he didn't know that he had a claim against I.I.G. His inconsistent position is not the result of information which wasn't readily available to him at the time.

I.I.G. does not need not show that Ingoldsby's inconsistent position was the result of deliberate dishonesty. The Court in Howell v. Town of Leyden noted that a finding of intentional conduct on the part of the debtors is not necessary. 335 F.Supp.2d 246, 251 (2004) ("[T]he more persuasive authority appears to hold that, even where the facts do not support a finding of outright

11

intentional fraud, the existence of serious prejudice to the judicial proceedings will be sufficient to warrant the application of judicial estoppel.") Ingoldsby cannot avoid the application of judicial estoppel under these circumstances by simply claiming that he made an innocent mistake in not scheduling the claim as an asset during his bankruptcy.

## CONCLUSION

The good faith exception to applying judicial estoppel does not give Ingoldsby standing to bring a claim which was known to him during his bankruptcy proceedings and not scheduled in his Statement of Financial Affairs. However, even if the issue was limited to judicial estoppel, it is clear that the exception does not apply because the facts which form the basis of Ingoldsby's claim against I.I.G. were readily available to Ingoldsby prior to his bankruptcy case. For these reasons, I.I.G. respectfully submits that the Court should dismiss Ingdolsby's claim.

Respectfully submitted,

INTERNATIONAL INSURANCE
GROUP, LTD., Defendant
By their Attorneys:

/s/ Syd A. Saloman
Syd A. Saloman - BBO #645267
TUCKER, HEIFETZ & SALTZMAN, LLP
100 Franklin Street, Suite 801
Boston, MA 02110
617-557-9696

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

      Plaintiff,

and

MICHAEL INGOLDSBY,

      Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

      Defendants.

CIVIL ACTION No: 05-CV-11128-NG

## AFFIDAVIT OF MICHAEL INGOLDSBY

    I, Michael Ingoldsby, being duly sworn, depose and state as follows:

1.    I am an individual with a residence at 1863 San Silvestro Drive, Venice, Florida, 34285.

2.    At all times relevant hereto, I was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"), which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts.

3.    As Chairman of the Board, I was not involved in the day-to-day operations of

MHCS. In fact, I had not been involved in the operations of MHCS since 1999 due to a medical condition which disabled me. Since 1999, I have been collecting under a disability policy and have not been involved in the day-to-day operations of MHCS.

4.    As such, I was not involved in the preparation of the borrowing base certificates submitted to Heller in connection with the DIP Loan.

5.    In addition, I did not personally do business with Defendants IIG or National Union and was not directly involved with the procurement of insurance coverage.

6.    At all times material hereto, I was insured for liability under a Directors and Officers Policy of Insurance and Company Reimbursement Policy, issued by National Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number 873-57-52, effective August 4, 2001, through August 4, 2002, which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as the "Policy").

7.    On or about August 4, 2000, MHCS purchased the Policy issued by National Union, using International Insurance Group, Inc. ("IIG") as its insurance broker.

8.    The Policy came up for renewal on August 4, 2001.

9.    On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, endorsements to be added to the base policy.

10.    The Policy provided by IIG did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability. In addition, the copy of the Policy I received was not bound.

11.     Further, as an insured, I was never advised of the inclusion of Endorsement No. 8, which amended Exclusion 4(h), or its implications on the coverage provided by the Policy.

12.     On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller") commenced a civil action in United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against me and subsequently served the "Complaint and Jury Demand," a true and correct copy of which is attached hereto as *Exhibit A*.

13.     The Heller Complaint alleged claims against me for Negligent Misrepresentation (Count I) and Breach of Guaranty (Count II).

14.     On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union.

15.     On or about October 11, 2002, the insurer, through counsel, "declined coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards." A true and correct copy of the October 11, 2002 denial letter is attached hereto as *Exhibit B*.

16.     Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), I had no knowledge of Endorsement No. 8 or Exclusion 4(h) prior to National Union's denial of my claim. More importantly, I had no knowledge of the effect of said endorsement in limiting coverage under the Policy.

17.     Thereafter, by letter dated March 6, 2003, counsel for National Union again declined coverage by stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." A true and

correct copy of the March 6, 2003 denial letter is attached hereto as *Exhibit C*.

18.    By way of letter from counsel, dated March 17, 2004, I made a formal demand to National Union under Mass. Gen. Laws Ch. 93A. National Union again declined coverage by way of letter from counsel, dated April 16, 2004, and, in doing so, again relied upon Exclusion 4(h), as amended by Endorsement No. 8.

19.    Because National Union denied my claim under the Policy, I bore the cost of my defense of the Heller Action.

20.    In litigating the claims asserted by Heller over a two-year period, I expended a substantial amount of money in attorneys' fees and costs. Specifically, I incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

21.    As a result thereof, on or about December 13, 2002, I filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").

22.    National Union was not a creditor in the Bankruptcy.

23.    On or about January 2, 2003, I filed my Schedules and Statement of Financial Affairs.

24.    In my Statement of Financial Affairs, I disclosed that I was a defendant in the Heller Action.

25.    At that time, I had not contemplated a claim for reimbursement and/or indemnification against National Union because I had not yet incurred any substantial legal fees or suffered any damages. Therefore, I did not list it on my Schedules and

Statement of Financial Affairs.

26.    On or about April 18, 2003, I filed an Amended Schedule and Statement of Affairs.

27.    At this time, I was still not aware of any potential claim against National Union.

28.    On or about July 13, 2003, Heller was granted relief from automatic stay in my bankruptcy case. As such, the case began to proceed and I began to accumulate significant legal fees related thereto.

29.    On or about March 17, 2004, I made a formal demand upon National Union, via counsel, for reimbursement of my defense costs in the Heller Action.

30.    On or about April 16, 2004, National Union, via counsel, responded to my formal demand letter and again denied coverage.

31.    Once it became clear that National Union was not going to reimburse me for the defense costs of the Heller Action, the Bankruptcy trustee was notified that I had a potential claim against Nation Union related to the reimbursement of said defense costs.

32.    I also discussed the potential claim against National Union with my bankruptcy counsel who advised me that I did not need to amend my Statement of Financial Affairs to reflect a potential claim for post-petition expenses.

33.    As such, I did not omit my claim against National Union from my Statement of Financial Affairs with the intention of defrauding the court or my creditors.

34.    On or about February 7, 2004, I entered into a Settlement Agreement with Heller. Pursuant to the Settlement Agreement with Heller, I submitted payment to Heller in the amount of One Hundred Twelve Thousand Seven Hundred Sixty Three Dollars and 71/100 ($112,763.71). I also incurred legal fees related to the Heller Action in the

amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

35.    I subsequently expended Two Hundred Fifty Thousand Dollars ($250,000.00) to settle the bankruptcy case and expended an additional One Hundred Thousand Seven Hundred Twenty One Dollars ($100,721.00) in legal fees.

36.    In order to cover the costs of the bankruptcy settlement, I was forced to sell my residence in Osprey, Florida, for below market price, resulting in a total loss of Five Hundred Thirty Six Thousand Six Hundred Eighty Eight Dollars ($536,688.00). I was also forced to refinance the mortgage on my residence located in Hingham, Massachusetts, increasing my indebtedness by Two Hundred Fifty Thousand Dollars ($250,000.00).

Signed under the pains and penalties of perjury this 18th day of September, 2006.

Michael Ingoldsby

# EXHIBIT B

```
                                            1
 1                     Volume 1
                      Pages 1-101
 2                  Exhibits per index

 3

 4          UNITED STATES DISTRICT COURT

 5            DISTRICT OF MASSACHUSETTS

 6           Civil Action No. 05-CV-11128-NG

 7   --------------------------------------:
     GE HFS Holdings, Inc.
 8   Formerly Known As                     :
     Heller Healthcare Finance, Inc.,
 9            Plaintiff                     :

10   and                                   :

11   Michael Ingoldsby,                    :
             Intervenor/Plaintiff
12                                         :

         VS                                :
13
     National Union Fire Insurance         :
14   Company of Pittsburgh, Pennsylvania
     and International Insurance Group, LTD,:
15            Defendants
     --------------------------------------:
16

17

18              DEPOSITION OF MICHAEL INGOLDSBY, a
       witness called on behalf of the Defendant, taken
19     pursuant to the Federal Rules of Civil Procedure, before
       Patricia M. Haynes, a Certified Shorthand Reporter and
20     Notary Public in and for the Commonwealth of
       Massachusetts, CSR No.: 14620F, at the Offices of
21     Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington
       Avenue, Boston, Massachusetts, on Friday, October 20,
22     2006, commencing at 10:00 a.m.

23              COPLEY COURT REPORTING
           58 Batterymarch Street, Suite 317
24              Boston, Massachusetts 02110
                     (617) 423-5841
```

```
                                            3
 1                    I N D E X

 2

     Witness       Direct Cross Redirect Recross
 3   MICHAEL INGOLDSBY

 4   (By Mr. Tumilty) 4

 5

 6              E X H I B I T S

 7   Exhibit No.                         Page

 8   1 Amended and Restated Unconditional      23
       Guaranty of Payment and Performance
 9
     2 Debtor-In-Possession Loan and Security  24
10     Agreement

11   3 Affidavit of Pamela Jones          39

12   4 Summary of Schedules              43

13   5 Letter of 8/2/02 from Attorney Aceto   45

14   6 Letter of 10/11/02 from Mr. O'Neil   58

15   7 E-Mail, 11/7/02                   59

16   8 Fax with enclosures               61

17   9 Letter of 3/6/03 from Mr. O'Neil   65

18   10 Letter of 11/5/02 from Mr. Aceto  65

19   11 A/R Transaction Listing          67

20   12 Settlement Agreement             69

21   13 First Amended Complaint in Intervention  72
22   14 National Union Policy            76
23   15 National Union Policy            80
24   16 Affidavit of Mr. Ingoldsby       85
```

```
                                            2
     APPEARANCES:
 2

 3

     Edwards, Angell, Palmer & Dodge, LLP
 4   (By: John Tumilty, Esquire)
     111 Huntington Avenue
 5   Boston, Massachusetts 02199
     Counsel for the Defendant,
 6   National Union Fire Insurance Company

 7

     Johnson & Aceto, P.C.
 8   (By: Gregory J. Aceto, Esquire)
     67 Batterymarch Street, Suite 400
 9   Boston, Massachusetts 02110
     Counsel for the Intervenor/Plaintiff
10

11   Tucker, Heifetz & Saltzman, LLP
     (By: Syd A. Saloman, Esquire)
12   100 Franklin Street
     Boston, Massachusetts 02110
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                            4
 1            P R O C E E D I N G S

 2          MICHAEL INBGOLDSBY,

 3   having been previously sworn, was examined and testified

 4   as follows:

 5   DIRECT EXAMINATION BY MR. TUMILTY:

 6       Q.   My name is John Tumilty. I'm one of the

 7   attorneys here that's representing National Union in the

 8   case in which we are here for your deposition today.

 9   I'm going to be asking you a series of questions today.

10          I need you to give audible responses because

11   the court reporter can't take down nods of the head or

12   shrugs of the shoulders. Do you understand that?

13       A.   Yes.

14       Q.   If you don't understand a question, I don't

15   want you to guess or speculate. If you don't understand

16   a question, just tell me and I'll try to rephrase it and

17   do whatever I can to help you understand it or ask a

18   different question.

19       A.   Yes.

20       Q.   Are you on any medications that would affect

21   your ability to answer questions here today?

22       A.   I don't believe so. I'm on a lot of

23   medications. I take medication for memory related

24   disorders. I guess to that extent there would be some
```

85

1   as National Union is choosing to go, you can say
2   everything is a contract. You can say, yeah, it's
3   contractual.
4           I mean, if we had a liability for, I don't
5   know, for a janitor that did something wrong, you had a
6   contract to clean the offices -- nothing is covered.
7   That's my problem. When I look at it, I just think, I
8   don't know what you're trying to get me to say -- I
9   don't know. All I know is that the whole thing is a
10  joke, total joke.
11      Q.   All I was trying to get you to say was
12  whatever your view was on that first count.
13      A.   That's my view.
14           MR. TUMILTY: We'll mark this next.
15           (Document marked for identification as
16  Exhibit No. 16.)
17  BY MR. TUMILTY:
18      Q.   I've handed you a copy of what was marked as
19  Exhibit 16. It's entitled Affidavit of Michael
20  Ingoldsby. There are certain exhibits attached to it.
21  Do you recognize that document?
22      A.   Yes.
23      Q.   Please turn to page six of Exhibit 16. Is
24  that your signature on that page?

86

1       A.   Yes.
2       Q.   Did you review this?
3       A.   I did.
4       Q.   If you would please turn to the second page.
5       A.   Yes.
6       Q.   You see there's a sentence at the top of that
7   page that says, "In fact, I have not been involved in
8   the operations of MHCS since 1999 due to a medical
9   condition which disabled me," do you see that?
10      A.   Yes.
11      Q.   Is there any other medical condition that has
12  disabled you from 1999 other than what you told me about
13  this morning?
14      A.   Well, I've had some cardiac issues and have
15  had six angioplasties from 2003, 2005. In addition to
16  the ones I told you, I think that's it.
17      Q.   If you would look at paragraph five, that's
18  consistent with your testimony today, correct?
19      A.   Well, I didn't do personal business with
20  International or National. I mean, initially
21  International was introduced to me by, it was either one
22  of two people.
23           I don't really remember which of the two. I
24  think they both knew Jack Perkins. I know that they

87

1   introduced me to International probably around 1990 and
2   had made the introduction because they thought that
3   International was someone who could really help a
4   growing business.
5           Quite frankly, I think that's the only time I
6   met them. I don't even remember who it was that I met
7   at the time but -- so somewhere around 1989, '90, '91
8   is the time I met them. But after that time, I didn't
9   have any dealings with them.
10      Q.   As it says in paragraph five, you weren't
11  involved in MHCS's procurement of insurance coverage,
12  were you?
13      A.   I was not.
14      Q.   Please review paragraph ten to yourself.
15      A.   Okay.
16      Q.   Where it says in the second sentence of that
17  paragraph, "In addition, a copy of the policy I received
18  was not bound," do you remember who you received a copy
19  of the policy from?
20      A.   It would have crom from Managed Healthcare,
21  either Indy Edwards or Pam Jones.
22      Q.   For insurance policies that National Union
23  issued to MHCS, when you would receive copies of those,
24  were they usually bound?

88

1       A.   I don't remember. I do know the former
2   insurance company, their copies were always bound. I
3   think that this is probably just a copy that someone
4   from the office made.
5       Q.   Do you believe that the copy that you received
6   was a copy that someone at the MHCS office had made and
7   then sent to you?
8       A.   Oh, yes.
9       Q.   Can you tell me what the basis is for the
10  first sentence in paragraph ten of your affidavit?
11      A.   The copy that I got didn't have that
12  endorsement. When I wrote this up, that was my belief,
13  that wasn't there. I think that's all that means.
14      Q.   It's your testimony that the copy you received
15  did not have Endorsement 8. Do you know for a fact
16  whether the copy that was provided by IIG to MHCS
17  included a copy of Endorsement 8?
18      A.   I later learned that it was included.
19      Q.   In preparing this affidavit, leaving your
20  attorney aside, did you obtain information from anyone
21  else so you could prepare this affidavit?
22      A.   I'd have to go through and see the content to
23  see. I could have contacted the law firm in Florida
24  that represented me to get information. I think mostly