UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC., f/k/a )
HELLER HEALTHCARE FINANCE, INC., )
         Plaintiff )
and )
MICHAEL INGOLDSBY, )   CIVIL ACTION
      Intervenor / Plaintiff )   05-CV-11128-NG
vs. )
               )
NATIONAL UNION FIRE INSURANCE COMPANY )
OF PITTSBURGH, PA and )
INTERNATIONAL INSURANCE GROUP, LTD., )
         Defendants )

**DEFENDANT INTERNATIONAL INSURANCE GROUP, LTD.'S MOTION
FOR LEAVE OF COURT TO TAKE DEPOSITION OF PAMELA JONES AND
COMPLETE DEPOSITION OF PLAINTIFF MICHAEL INGOLDSBY**

   The Defendant, International Insurance Group, Ltd. ("I.I.G.") submits the

foregoing Motion for Leave of Court to take a deposition of a non-party witness,

Pamela Jones, beyond the discovery deadline and to complete the deposition of

the Intervenor/Plaintiff, Michael Ingoldsby ("Ingoldsby"). As grounds for this

Motion, I.I.G. states the following.


**FACTS AND ARGUMENT**

1.  This case was initially filed by GE HFS Holdings , Inc. against National

Union Fire Insurance Company of Pittsburgh, PA ("National Union") on May 31,

2005. On October 7, 2005, Ingoldsby filed a motion to intervene as plaintiff, with

an Intervener Complaint which added I.I.G. as a defendant. Ingoldsby served

I.I.G. with his Intervenor Complaint on December 15, 2005.

2.      On September 21, 2006, the Court entered an Order setting certain

tracking order deadlines including a discovery deadline of October 31, 2006.

3.      On October 20, 2006, the defendants began the deposition of Michael

Ingoldsby. The deposition was suspended and has not been completed. See

Conclusion of Deposition Transcript of Michael Ingoldsby, **Exhibit A**.

4.      Briefly, the basis of Ingoldsby's Intervener Complaint against I.I.G. is as

follows: Ingoldsby was a shareholder in a company known as Managed Health

Care Systems. ("M.H.C.S."). I.I.G. was the insurance agent for M.H.C.S. and in

this capacity procured directors and officers "(D&O") insurance coverage. Heller

Healthcare, a secured lender, sued M.H.C.S. and Ingoldsby for fraudulently

misrepresenting Medicaid reimbursement certifications that were presented as

security for various lines of credit. National Union denied coverage to M.H.C.S.

pursuant to a contractual liability exclusion in the subject policy, citing the fact

that the suit arose from a funding contract. Ingoldsby claimed that I.I.G. failed to

inform M.H.C.S. of the inclusion of said contractual liability exclusion within the

policy. I.I.G., on the other hand, has always maintained that a copy of the subject

contractual liability exclusion was contained in a July 31, 2001 renewal proposal

letter sent by Nicholas Sciotto of I.I.G. to Pamela Jones, Vice President of

M.H.C.S. Furthermore, I.I.G. has maintained that the same exclusion had been

present in the prior D&O policies, albeit in a different section of the policy.

5.      Specifically, Ingoldsby alleged the following with respect to I.I.G. in his Complaint: "[u]pon information and belief, the Renewal Proposal provided by International did not include a copy of endorsement No. 8, which amended exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability.  See Ingoldsby Complaint at ¶14. **Exhibit B**.

6.      Ingoldsby reiterated the specific allegation that I.I.G. failed to inform M.H.C.S. of the presence of the contractual liability exclusion in an Affidavit dated September 18, 2006, in which he stated:

> ¶9.      On or about July 31, 2001, IIG provided MHCS with National Union's Renewal Proposal (the "Proposal") which detailed, among other items, endorsements to be added to the base policy.

> ¶10.     The policy provided by IIG did not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from contractual liability.  In addition, the copy of the Policy which I received was not bound.

See Ingoldsby Affidavit, **Exhibit C**.  Accordingly, Ingoldsby 's position in this lawsuit, prior to summary judgment, was that I.I.G. did not include a copy of the contractual liability exclusion with a July 31, 2001 renewal proposal and therefore did not advise M.H.C.S. of the existence of the contractual liability exclusion.

7.      During his deposition, Ingoldsby recanted his allegation against I.I.G. and admitted that I.I.G. did provide M.H.C.S. with a copy of the subject exclusion with the July 31, 2001 renewal proposal.

Q.   Do you believe that the copy that you received [of the National Union Renewal Proposal] was a copy that someone at the MHCS office had made and then sent to you?

A.   Oh, yes.

Q.   Can you tell me what the basis is for the first sentence of paragraph ten of your affidavit?

A.   The copy that I got didn't have that endorsement.  When I wrote this up, that was my belief, that wasn't there.  I think that's all that means.

Q.   It's your testimony that the copy you received did not have Endorsement 8 [the contractual liability exclusion].  Do you know for a fact whether the copy that was provided by IIG to MHCS included a copy of Endorsement 8?

A.   I later learned that it was included.

Deposition of Michael Ingoldsby, p. 88, l. 5-18, attached as **Exhibit A**.

8.     On December 19, 2006, the Court heard argument on the summary judgment motions of National Union and I.I.G.  On June 14, 2007, Judge Dien issued a Report and Recommendation allowing National Union's Motion and denying I.I.G.'s Motion.

9.     On September 5, 2007, the Court entered an Order adopting Judge Dien's Report and Recommendations on the summary judgment motions.  At the same time, the Court ordered Ingoldsby and I.I.G. to file briefs concerning the issue of whether Ingoldsby had standing to bring the foregoing claim against I.I.G., in light of the fact that the claim was not scheduled as a potential asset during Ingoldsby's bankruptcy proceeding.  The parties filed briefs as requested.

10.    On May 30, 2008, the Court entered an Order holding that Ingoldsby did in fact have standing to maintain this claim against I.I.G.

11.    After the Court found in favor of Ingoldsby on both the summary judgment motion and the standing issue, I.I.G. sought to complete Ingoldsby's deposition (which was suspended) and to take the deposition of Pamela Jones, the former Vice President of M.H.C.S. Pamela Jones communicated with I.I.G. with respect to her company's insurance coverage and she will be a witness at trial. I.I.G. did not previously depose Ms. Jones because Ingoldsby effectively withdrew his allegation that I.I.G. did not inform Ms. Jones and M.H.C.S. of the presence of the subject exclusion.

12.    Now, upon information and belief, Ingoldsby will seek to prove that I.I.G. was negligent in not properly advising M.H.C.S. of the scope and potential implications of the subject contractual liability exclusion. In order to adequately defend itself against this new allegation, I.I.G. wishes to depose Ms. Jones prior to trial.

13.    I.I.G. did not seek to depose Ms. Jones while their summary judgment motion and standing motion were under advisement because the deposition would have been unnecessary if either of these motions was allowed. As it turned out, the Court has allowed Ingoldsby's claim to proceed against I.I.G. and counsel for I.I.G. needs the deposition of Pamela Jones in order to prepare for trial. Likewise, I.I.G. needs to conclude the deposition of Mr. Ingoldsby.

14.     There will be no prejudice by allowing I.I.G. to depose Ms. Jones and complete Mr. Ingoldsby's deposition.  The completion of these depositions will not delay any other aspect of this case.  As the case is presently situated, the next logical step after these depositions will be a status conference to set deadlines for expert discovery and to schedule a pre-trial conference.

## CONCLUSION

For the reasons stated above, Defendant International Insurance Group respectfully requests that this Court allow them to take the Deposition of Pamela Jones and to complete Mr. Ingoldsby's deposition.

## Certification Pursuant to Local Rule 37.1

I, Syd A. Saloman, attorney for the Defendant/moving party International Insurance Group, Ltd., hereby certify that a conference was held between Plaintiff's Attorney Greg Aceto and I, via telephone, on August 21, 2008. During this conference, counsel attempted, but was unable, to resolve the discovery dispute presented within this motion. Specifically, we were unable to reach an agreement as to whether the Defendant may take the deposition of Pamela Jones, a non-party witness, and whether the Defendant may complete the deposition of the Plaintiff, Michael Ingoldsby. Accordingly, I am filing the present motion seeking Court intervention to resolve this dispute and I certify that I have complied with Local Rule 37.1.

/s/ Syd A. Saloman
Syd A. Saloman – BBO #645267

Respectfully submitted,

INTERNATIONAL INSURANCE
GROUP, LTD., Defendant
By their Attorneys:

/s/ Syd A. Saloman
Syd A. Saloman - BBO #645267
TUCKER, HEIFETZ & SALTZMAN, LLP
100 Franklin Street
Boston, MA 02110
617-557-9696

# EXHIBIT A

Volume 1
Pages 1-101
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11128-NG

---------------------------------
GE HFS Holdings, Inc.                     :
Formerly Known As                         :
Heller Healthcare Finance, Inc.,          :
            Plaintiff                     :
                                          :
and                                       :
                                          :
Michael Ingoldsby,                        :
            Intervenor/Plaintiff          :
                                          :
    vs                                    :
                                          :
National Union Fire Insurance             :
Company of Pittsburgh, Pennsylvania       :
and International Insurance Group, LTD,    :
            Defendants                     :
---------------------------------

DEPOSITION OF MICHAEL INGOLDSBY, a
witness called on behalf of the Defendant, taken
pursuant to the Federal Rules of Civil Procedure, before
Patricia M. Haynes, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, CSR No. 14620F, at the Offices of
Edwards, Angell, Palmer & Dodge, LLP, 111 Huntington
Avenue, Boston, Massachusetts, on Friday, October 20,
2006, commencing at 10:00 a.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

---

APPEARANCES:

Edwards, Angell, Palmer & Dodge, LLP
(By: John Tumilty, Esquire)
111 Huntington Avenue
Boston, Massachusetts 02199
Counsel for the Defendant,
National Union Fire Insurance Company

Johnson & Aceto, P.C.
(By: Gregory J. Aceto, Esquire)
67 Batterymarch Street, Suite 400
Boston, Massachusetts 02110
Counsel for the Intervenor/Plaintiff

Tucker, Heifetz & Saltzman, LLP
(By: Syd A. Saloman, Esquire)
100 Franklin Street
Boston, Massachusetts 02110

---

Witness        Direct  Cross  Redirect  Recross
MICHAEL INGOLDSBY

(By Mr. Tumilty)  4


E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 1 | Amended and Restated Unconditional Guaranty of Payment and Performance | 23 |
| 2 | Debtor-In-Possession Loan and Security Agreement | 24 |
| 3 | Affidavit of Pamela Jones | 39 |
| 4 | Summary of Schedules | 43 |
| 5 | Letter of 8/2/02 from Attorney Aceto | 45 |
| 6 | Letter of 10/11/02 from Mr. O'Neil | 58 |
| 7 | E-Mail, 11/7/02 | 59 |
| 8 | Fax with enclosures | 61 |
| 9 | Letter of 3/6/03 from Mr. O'Neil | 65 |
| 10 | Letter of 11/5/02 from Mr. Aceto | 65 |
| 11 | A/R Transaction Listing | 67 |
| 12 | Settlement Agreement | 69 |
| 13 | First Amended Complaint in Intervention | 72 |
| 14 | National Union Policy | 76 |
| 15 | National Union Policy | 80 |
| 16 | Affidavit of Mr. Ingoldsby | 85 |

---

P R O C E E D I N G S

MICHAEL INBGOLDSBY,

having been previously sworn, was examined and testified
as follows:

DIRECT EXAMINATION BY MR. TUMILTY:

Q.    My name is John Tumilty. I'm one of the
attorneys here that's representing National Union in the
case in which we are here for your deposition today.
I'm going to be asking you a series of questions today.

I need you to give audible responses because
the court reporter can't take down nods of the head or
shrugs of the shoulders. Do you understand that?

A.    Yes.

Q.    If you don't understand a question, I don't
want you to guess or speculate. If you don't understand
a question, just tell me and I'll try to rephrase it and
do whatever I can to help you understand it or ask a
different question.

A.    Yes.

Q.    Are you on any medications that would affect
your ability to answer questions here today?

A.    I don't believe so. I'm on a lot of
medications. I take medication for memory related
disorders. I guess to that extent there would be some

1  things I'm just not going to be able to remember.
2     Q.    What medication is that that you take for the
3  memory related disorder.
         A.    There's two of them, Namenda and Exelon.
5     Q.    Have you been diagnosed as having a memory
6  disorder?
7     A.    Yes.
8     Q.    Does that disorder have a name?
9     A.    Well, they call it frontal lobe dementia.
10 They really don't know whether it's Alzheimer's yet, but
11 they are monitoring it at Brigham and Women's.
12    Q.    You're not a doctor, correct?
13    A.    No.
14    Q.    I understand you're not a doctor, but do you
15 know if the memory related disorder that you have, does
16 it affect your short-term memory or long-term memory or
17 both?
18    A.    I mean, I can't answer technically.
19    Q.    I understand.
20    A.    I most definitely have short-term and some
21 long-term.
22    Q.    What is the name of the doctor at Brigham and
23 Women's that is treating you for this?
24    A.    Christopher Wright.  He's in the memories

---

1     Q.    But it was specifically for the year from
2  August of '01 to August of '02.
3     A.    I don't know if that's the case.  I mean, I
4  understand that's what you're referring to.
5     Q.    That's all I mean, that that defined term is
6  something for purposes of the deposition.
7           MR. ACETO:  Yes.
8  BY MR. TUMILTY:
9     Q.    Have you ever been deposed before?
10    A.    Yes.
11    Q.    How many times?
12    A.    Four or five.
13    Q.    What type of cases were you deposed in?
14    A.    There was a case that was an unfair
15 termination of an employee of that company.
16    Q.    That company being MHCS?
17    A.    Yes.
18    Q.    Go ahead.
19    A.    I was in business for years, so I've been
20 deposed a number of times.
21    Q.    Were you personally named as a party in any of
22 those cases?
23    A.    Yes.
24    Q.    What type of case were you personally named as

---

**6**

1  disorders unit.
2     Q.    In order to speed things up a little today, I
3  would like to use some shorthand terms.  I want to agree
4  on them so we are clear as to what we are talking about.
5           If I'm talking about National Union, can we
6  agree I'm talking about the National Union Insurance
7  Company that provided insurance to you and MHCS?
8     A.    Okay.
9     Q.    And if I talk about MHCS, can we agree that
10 I'm referring to Managed Healthcare Systems?
11    A.    Yes.
12    Q.    And if I talk about IIG, do you understand
13 that to mean International Insurance Group?
14    A.    Okay.
15    Q.    If I talk about Heller, can we understand that
16 that means Heller Healthcare Finance, Inc.?
17    A.    Okay.
18    Q.    If I talk about the policy, can we agree that
19 I'm referring to policy No. 8738752 which was effective
20 August 4, '01 to August 4, '02?
21    A.    Is that the one that was the directors and
22 officers policy?
23    Q.    Yes.
24    A.    Yes.

---

**8**

1  a party in?
2     A.    It was a termination case, employment related
3  termination case.
4     Q.    To the best of your memory, were you ever
5  named as a party to any of the other lawsuits in which
6  you were deposed?
7     A.    I think so.  I just don't remember.
8     Q.    You told me one of those suits was a
9  termination case.  Do you remember the general nature of
10 any of the other suits?
11    A.    Well, that termination case was based on a
12 sexual harassment claim.  There were other employment
13 related suits that came out of Managed Healthcare.  I
14 just can't think of any other lawsuits right now.
15    Q.    The lawsuits that you do remember and you were
16 referring to, were those here in Massachusetts?
17    A.    Yes.
18    Q.    Do you remember whether they were in state
19 court or federal court?
20    A.    State court.  I think we did have, I wasn't a
21 defendant but we did have one case that was with a
22 company that was in federal court.
23          MR. ACETO:  You personally.
24 BY MR. TUMILTY:

1   A.  **Oh, no.**
2   Q.  In any of the lawsuits that you were
3  personally named, were you named as a defendant?
    A.  **Yes.**
5   Q.  And in any of those lawsuits in which you were
6  personally named as a defendant, were you found liable?
7   A.  **Yes.**
8   Q.  In which case or cases were you found liable
9  in?
10   A.  **Donald Foster.**
11   Q.  Was that a termination case?
12   A.  **That was the termination sexual harassment**
13  **case.**
14   Q.  Is that the only case that you were personally
15  found liable of to the best of your memory?
16   A.  **I think so. I mean, there may have been**
17  **others. Things may have been settled and never, you**
18  **know, went to court fully. I just don't recall anymore.**
19   Q.  Can you tell me what, if anything, you did to
20  prepare for your deposition today?
21   A.  **Nothing.**
22   Q.  Did you review any documents?
23   A.  **No.**
24   Q.  Did you consult with anyone other than your

---

**10**

1  attorney?
2   A.  **No.**
3   Q.  Are you aware that you have produced documents
4  in this litigation?
5   A.  **That I've produced them?**
6   Q.  Yes.
7   A.  **Yes.**
8   Q.  Or that they have been produced on your behalf
9  by your attorney?
10   A.  **Yes.**
11   Q.  Were you involved in collecting those
12  documents?
13   A.  **Yes.**
14   Q.  To turn over to your attorney?
15   A.  **Yes.**
16   Q.  Was anyone else involved in that process?
17   A.  **No.**
18   Q.  Can you tell me what you did in terms of
19  collecting documents to turn over to your attorney?
20   A.  **I had a big box of items, and I took**
21  **everything out of the box except the things that I knew**
22  **he already had, which were court motions, and I just**
23  **sent everything to him.**
24   Q.  Is that a big box that you keep at your house?

---

1   A.  **It was a banker's box.**
2   Q.  But is it located at your house, the banker's
3  box, or is it somewhere else?
4   A.  **It's in a drawer right now. It's not even in**
5  **the box right now, the remaining.**
6   Q.  The documents that were in the banker's box
7  that are now in the drawer are at your house?
8   A.  **Yes.**
9   Q.  How did you know your attorney already had the
10  items you took out of the box because he already had
11  them?
12   A.  **Because all of the documents came from him.**
13      MR. ACETO:  He's referring to me. I
14  represented him in the other case that he's talking
15  about or the company and him. That's how he knows I had
16  them.
17  BY MR. TUMILTY:
18   Q.  Is MHCS still in business?
19   A.  **No.**
20   Q.  Do you know what happened to the corporate
21  records and documents of MHCS after it went out of
22  business?
23   A.  **No.**
24   Q.  If you had to locate those documents, do you

---

**12**

1  know who you would ask?
2   A.  **Well, I would go to the people that ended up**
3  **taking over the company and start there.**
4   Q.  Who is that?
5   A.  **Overlook.**
6   Q.  Where is Overlook located?
7   A.  **They are in the same building where we used to**
8  **be, but I don't know where. I think it's just a branch.**
9   Q.  Other than the documents that you say that you
10  took out of the box because you knew your attorney
11  already had them, do you recall finding any other
12  documents that you didn't forward to your attorney?
13   A.  **No.**
14   Q.  Since you forwarded those documents to your
15  attorney, have you found any additional documents or any
16  new documents that you haven't sent to him?
17   A.  **No.**
18   Q.  Can you tell me where you currently reside?
19   A.  **I reside in Florida and Massachusetts.**
20   Q.  Do you own a home in Massachusetts?
21   A.  **No.**
22   Q.  What's your current address in Massachusetts?
23   A.  **19 Blackrock Drive.**
24   Q.  Which town?

**Page 13**

1   A.   **Hingham.**

2   Q.   What is your address in Florida?

3   A.   **1863 San Sylvester Drive, Venice.**

   Q.   Do you own that property in Venice, Florida?

   A.   **No.**

6   Q.   Do you currently work?

7   A.   **No.**

8   Q.   When was the last time you were employed?

9   A.   **I don't know for sure, but it would be around**

10  **between '98 and '99.**

11   Q.   Other than bank interest or investment income,

12  have you been paid in any fashion since '98 or '99 or

13  earned income since that time?

14   A.   **Earned income?**

15   Q.   From a job or consulting or anything like

16  that?

17   A.   **No.**

18   Q.   Are you currently out on disability?

19   A.   **Yes.**

20   Q.   Have you been out on disability since

21  approximately 1999?

22   A.   **Yes.**

23   Q.   And can you tell me what the disability is

24  that has caused you to no longer be employed?

**Page 14**

1   A.   **Well, the whole subject of my memory and some**

2  **other functions that relate mostly to they call it**

3  **executive function decision process, along with severe**

4  **depression, has really caused me to be unable to do the**

5  **things I used to be able to do.**

6   Q.   I understand you're not a doctor and you're

7  not a psychologist, but can you explain if you can what

8  executive function decision process is or how would you

9  describe it?

10   A.   **All I know is that it relates to making**

11  **decisions and processing data and speech, which most**

12  **jobs require.**

13   Q.   When were you diagnosed as having these

14  things?

15   A.   **At different times, but the memory piece was**

16  **in the past three plus years.**

17   Q.   Has any physician ever told you that any of

18  the disabilities that you suffer affect your cognitive

19  abilities or your ability to process information?

         MR. ACETO:  If you understand the

    question.

22  BY MR. TUMILTY:

23   A.   **No one has ever used those words, but that's,**

24  **I think that's another way of describing the executive**

**Page 15**

1  function.

2         MR. ACETO:  We didn't discuss it at the

3  outset, but the usual stipulations, reserve all

4  objections, except as to form, and motions to strike

5  until the time of trial?

6         MR. TUMILTY:  Yes.

7         MR. ACETO:  30 days to read and sign,

8  waive the notary?

9         MR. TUMILTY:  Yes.

10  BY MR. TUMILTY:

11   Q.   Do any of your disabilities or medical

12  conditions affect your eyesight?

13   A.   **No.**

14   Q.   Do any of your disabilities or medical

15  conditions affect your ability to read?

16   A.   **No.**

17   Q.   Have you ever been arrested?

18   A.   **No.**

19   Q.   Ever been convicted of a crime?

20   A.   **Of a criminal offense?**

21   Q.   Yes.

22   A.   **No.**

23   Q.   Can you just tell me what your education has

24  been since high school, where you went to college?

**Page 16**

1   A.   **Bachelor and master's degree, Saint Francis**

2  **College in Pennsylvania.**

3   Q.   What area of study?

4   A.   **Human resource management and economics.**

5   Q.   You graduated, correct?

6   A.   **Yes.**

7   Q.   And what year was that?

8   A.   **'68.**

9   Q.   Any additional formal schooling after college?

10   A.   **Just the graduate degree.**

11   Q.   At Saint Francis also?

12   A.   **Yes, in '68.**

13   Q.   Was MHCS the last place you were employed?

14   A.   **Yes.**

15   Q.   And can you tell me when you first became

16  affiliated with MHCS?

17   A.   **I started it sometime in the early '80s, maybe**

18  **before, maybe '70s.**

19   Q.   Did you form MHCS?

20   A.   **Yes.**

21   Q.   Did anyone else form it with you, did you have

22  a partner or anything like that?

23   A.   **Initially there were a couple of people, but I**

24  **was the only one who provided the capital.**

1  Q.  Can you tell me if you can remember and if you
2  can go in chronological order what positions you held
3  with MHCS?
4      A.  Well, I was really just a board member and
5  stockholder for -- we started it around 1980, and I
6  remained in that role until probably '92, somewhere
7  around that period.  And only around '92, '93 did I play
8  an active role.
9          But even that was not full time.  I was not
10  involved with the managing of the company at all in the
11  period of '94 to the late '90s.  I may be off on that.
12  And I wasn't involved with any aspect of day-to-day
13  activities from mid '98 forward.
14     Q.  Any aspect at all from mid '98 forward?
15     A.  I had no responsibilities.
16     Q.  Leaving aside the issue of whether you
17  actually had responsibilities, did you have any input
18  into day-to-day operations of the company at any time
19  from '98 forward?
20     A.  Not in terms of operations, no.
21     Q.  What input did you have with respect to MHCS
22  from '98 forward?
23     A.  The only area that I had involvement in was
24  making introductions for banking relationships.  I had

1          MR. ACETO:  Getting a W-2?
2          MR. TUMILTY:  Right.
3  BY MR. TUMILTY:
4      Q.  In what position were you employed by MHCS?
5      A.  I guess I was the president.
6      Q.  When you say you guess you were the president,
7  are you unsure of whether you were the president?
8      A.  Well, in '95 -- I know I wasn't in '95 and '96
9  because that's when I had another person that was the
10  president.  It was probably '92 to '95 that I -- there
11  was someone else that ultimately was terminated and I
12  might have stepped in for a short period of time, but it
13  wasn't, I wasn't in that role for any long period of
14  time.
15     Q.  Do you know who the president of MHCS was in
16  2000 and 2001?
17     A.  Indy Edwards.
18     Q.  Other than being the president of MHCS for
19  some period of time, were you employed in any other
20  capacity by MHCS?
21     A.  No, not that I recall?
22     Q.  You were a member of the board of MHCS?
23     A.  Yes.
24     Q.  For what period of time were you a member of

18

1  no involvement with the aspects of the business and
2  health care providing.
3          MR. ACETO:  I need to talk to him about an
4  issue.
5          (Witness confers with counsel.)
6  BY MR. TUMILTY:
7      Q.  Who would you say was responsible for the
8  day-to-day operations at MHCS during 1998 and 1999?
9      A.  Indy Edwards.
10     Q.  Anyone else?
11     A.  Pam Jones was the controller.
12     Q.  Is it your belief that both of those people
13  were responsible for the day-to-day operations of MHCS
14  from 1999 until MHCS ceased to exist?
15     A.  Yes.
16     Q.  Were you ever employed by MHCS?
17     A.  Yes, but it was prior to '98.
18     Q.  When were you employed by MHCS?
19     A.  I don't know the exact dates.  It would have
20  been somewhere in the 92 or '93 or '97.
21          MR. ACETO:  I want to make sure the
22  question is not whether he was a board officer or
23  member.
24          MR. TUMILTY:  Employed.

20

1  the board of MHCS?
2      A.  I think the entire time of existence.
3      Q.  Were you chairman of the board the entire time
4  that MHCS existed?
5      A.  I believe so.
6      Q.  Do you remember how many people were generally
7  on the board of MHCS?
8      A.  I think it was three.
9      Q.  Can you tell me who else was on the board of
10  MHCS besides yourself?
11     A.  Myself, my wife and one other member.  The
12  other member changed from time to time.
13     Q.  And you mentioned that you were also a
14  stockholder of MHCS.  Were you a stockholder of MHCS
15  during its entire period of existence?
16     A.  Yes.
17     Q.  And were you the majority stockholder during
18  that entire period?
19     A.  I think between myself and my wife we were.
20     Q.  On a percentage basis, do you recall how much
21  your wife and you owned of the stock of MHCS?
22     A.  At what point?
23     Q.  Did it change over time?
24     A.  Yes, it did.

**23**

1    Q.   Say the 2000 to 2002 time frame?

2    A.   **I don't know for sure, but both Jones and**

3 **Edwards had stock, and I think they might have owned**

4 **between five and 10 percent each.**

5    Q.   Other than yourself, your wife, Jones and

6 Edwards, were there any other stockholders of MHCS in

7 the 2000 to 2002 time frame?

8    A.   **No.**

9    Q.   I believe you said earlier one of the things

10 you did was introductions to banking relationships for

11 MHCS?

12    A.   **Well, I did that back in the period of --**

13 **prior to '98, that was really the primary role that I**

14 **played.**

15    Q.   Did you introduce Heller to MHCS or vice

16 versa?

17    A.   **No, Heller had contacted Managed Healthcare.**

18 **Actually, I can't remember the person's name who was**

19 **trying to introduce Heller to Managed Healthcare, but**

20 **Heller was not a contact man.**

21    Q.   Did you leave MHCS before it ceased to exist?

22       MR. ACETO:  You mean turn in his shares,

23 resign from the board?

24 BY MR. TUMILTY:

**24**

1 time?

2    A.   **Because that's when my medical condition was**

3 **the most severe, and I needed a major time out.**

4       MR. TUMILTY:  We'll mark this as Exhibit

5 1.

6       (Document marked for identification as

7 Exhibit No. 1.)

8 BY MR. TUMILTY:

9    Q.   Mr. Ingoldsby, I've handed you what the court

10 reporter marked as Exhibit 1.  It's a document entitled

11 Amended and Restated Unconditional Guaranty of Payment

12 and Performance.  Do you recognize that document?

13    A.   **I'd have to read the whole thing, but it looks**

14 **familiar.**

15    Q.   If you turn to the last page, it should have a

16 Bates number in the lower right corner of Jones 1499?

17    A.   **Yes.**

18    Q.   Is that your signature on each of those lines?

19    A.   **Yes.**

20    Q.   If you turn to the page before that, 1498, is

21 that your signature on the line above the typed name?

22    A.   **Yes.**

23    Q.   Do you have any recollection as to whether you

24 read this document before you signed it?

**22**

1    Q.   Resign from the board?

2    A.   **Well, at the time that the company was**

3 **dissolved, my wife and I were still stockholders and on**

4 **the board, but there wasn't any active involvement.**

5    Q.   I'm not trying to trick you, but at some point

6 you went out on disability.  At the time you went out on

7 disability, was MHCS still in existence?

8    A.   **Yes.**

9    Q.   Was your reason for leaving MHCS because you

10 were going out on disability?

11    A.   **No.  I had some very significant medical**

12 **problems.  Managed Healthcare at that time was**

13 **functioning very well.**

14    Q.   The significant health problems you just

15 referred to, were those the ones you referred to

16 earlier?

17    A.   **Yes.**

18    Q.   In the 2000 to 2002 time frame, do you believe

19 you had any responsibilities with respect to MHCS?

20    A.   **No.**

21    Q.   When was the last time that you would say that

22 you had responsibilities with respect to MHCS?

23    A.   **It was prior to sometime in '98.**

24    Q.   Why do you pick that as kind of the cut-off

**24**

1    A.   **I'm sure I did.**

2       MR. TUMILTY:  We'll mark this as Exhibit

3 2.

4       (Document marked for identification as

5 Exhibit No. 2.)

6 BY MR. TUMILTY:

7    Q.   I'm handing you what the court reporter marked

8 Exhibit 2, Debtor-In-Possession of Loan and Security

9 Agreement By and Between Managed Healthcare Systems,

10 Inc. and Medical Temporaries, Inc., Borrowers, and

11 Heller Healthcare Finance, Inc., lender, dated February

12 28, 2001.  Do you recognize that document?

13    A.   **Yes.**

14    Q.   If you would please turn to page 51.  It's two

15 pages from the back.  Is that your signature on the

16 document above your typed name?

17    A.   **Yes.**

18    Q.   Do you know if you read this document before

19 you signed it?

20    A.   **No, I don't.**

21    Q.   Would it normally be your practice to read

22 documents before you sign them?

23    A.   **Well, I was relying on my wife at the time.**

24 **In this particular document, neither one of us --**

27

1  there's a section in here that Greg just pointed out,
2  Section 10.16, that we don't think was in whatever we
3  signed. We both are of the opinion that this was a fax
4  page and this is what we signed, not attached to any
5  other document. That's our belief.
6     Q.  By that you mean page 51?
7     A.  Yes.
8     Q.  So you believe at the time you signed, it's
9  your testimony that at the time you signed page 51, it
10 was a single page and not attached to anything else?
11    A.  Correct.
12    Q.  Were you advised to sign this document by
13 anybody?
14    A.  My wife was involved at the time, but I just
15 don't recall who the lawyers were that were involved. I
16 don't remember if it was Greg or someone else. All I
17 know is that we never agreed and never had a discussion
18 about a guaranty and it ends up in the document.
19    Q.  Who did you discuss the debtor-in-possession
20 security agreement with other than your wife?
21    A.  There was a law firm that was involved,
22 Hannify & King. It might have been someone there or it
23 might have been Greg. I just don't remember.
24    Q.  Do you know if you had an attorney

---

1     Q.  And your memory is clear on that?
2     A.  It's seared in my memory. That's been a
3  subject of discussion over and over.
4     Q.  Why do you say Heller agreed you or your wife
5  would not have to give a personal guaranty?
6     A.  Because he did agree to that, and we have it
7  in writing.
8     Q.  Where is it in writing?
9     A.  It's in the documents we gave you.
10    Q.  I'm not trying to sound sarcastic, but you're
11 sure of that, it's in writing in some of the documents
12 you gave us?
13    A.  Absolutely.
14    Q.  Do you recall the name of that document or
15 what it relates to?
16    A.  You can go off the record and talk to Greg and
17 get that answer.
18    Q.  I can't. I need to get your testimony. If
19 you can't answer, you can't answer it.
20    A.  I can't give you the name, but I could go
21 through all the documents and find it for you.
22    Q.  But it's in a document that you produced?
23    A.  Yes.
24    Q.  Do you recall where you were when you signed

---

26

1  representing you personally in connection with the
2  debtor-in-possession loan and security agreement?
3     A.  I did.
4     Q.  Who was that?
5     A.  I don't remember his name. Greg would know.
6     Q.  Was it an attorney located here in Boston?
7     A.  Yes.
8     Q.  Do you recall the law firm that attorney works
9  with?
10    A.  No.
11    Q.  Why would you have signed a signature page
12 document, namely page 51, without it being attached to
13 anything else?
14    A.  Well, my wife and I believe we saw drafts of
15 the agreement or our attorneys saw drafts. I know
16 papers were being exchanged. The signature page was
17 faxed to us wherever we were and we signed a single
18 page. That's what we believe.
19       You have to understand that my arrangement or
20 my wife's arrangement with Heller was there would be no
21 personal guaranty, and they agreed to that. So why
22 would I or my wife agree particularly when the company
23 is in difficult straits, agree to a personal guaranty?
24 It wouldn't have happened in a million years.

---

28

1  page 51?
2     A.  I think that my wife and I were at Hannify &
3  King, but I really don't know. When all that was going
4  on, we spent a lot of time there at Hannify & King.
5  Maybe I'm just guessing at that.
6     Q.  Do you know if Hannify & King had the final
7  debtor-in-possession agreement in its possession while
8  you were there?
9        MR. ACETO:  Objection.
10 BY MR. TUMILTY:
11    Q.  I'll restate that. Your memory or your belief
12 is that you signed page 51 of Exhibit 2 while you were
13 at the offices of Hannify & King?
14    A.  I don't have a clear memory. All I know is
15 almost everything surrounding the bankruptcy took place
16 there. I don't have a clear memory.
17    Q.  Who was Hannify & King representing in that
18 bankruptcy?
19    A.  Managed Healthcare.
20    Q.  They didn't represent you personally?
21    A.  No.
22    Q.  Did anyone from Hannify & King discuss the
23 idea of a personal guaranty with you or your wife?
24    A.  No.

1    Q.    Do you recall an October 2001 meeting that you
2  participated in with representatives of Heller
3  concerning the overstatement of Medicare payments?
4        A.    I don't remember the date, but I do remember
5  going to that meeting.
6    Q.    Tell me what you remember about that meeting.
7        A.    I remember that Indy and Pam, Indy Edwards and
8  Pam Jones had raised an issue with Heller about the
9  borrowing base and the components that were being
10  calculated into the borrowing base.
11        It dealt with a new methodology that was
12  adopted by Medicare. I don't remember the technical
13  name, but it had to basically estimate what the value of
14  your services would turn out to be on a certain patient.
15  You would book those revenues accordingly.
16        They felt that they were booking more than
17  what they should be booking, and they talked to Heller
18  about it. And right before that meeting — there wasn't
19  any big consternation. If anything, Heller was coming
20  up to visit with them. Heller had done the audits and
21  had been satisfied.
22        That day, because they wanted me to be there,
23  I went over. And Heller had their attorney, two of
24  their health care guys, lenders, I think they had four

30

1  people in total. And, of course, the people that run
2  Managed Healthcare were there, Indy Edwards and Pam
3  Jones and I think someone else.
4        There was a discussion that they all had about
5  the borrowing base and different ways to interpret what
6  they were basically including in it. At the end of that
7  meeting, Heller was satisfied that although there was
8  some overstatement, there wasn't any big problem.
9        And in fact, they came up with a creative way,
10  I can't remember exactly what it was, but it was to
11  reach out to future services and pull those into the
12  present. So there was no crisis that was a part of that
13  meeting at all.
14        It was a very pleasant meeting and it lasted
15  about an hour and a half and they served lunch in the
16  office and I left. There wasn't ever any mention of a
17  problem by Heller. In fact, some of the documents that
18  you should have show the correspondence where they even
19  made suggestions as to how to enhance the borrowing
20  base.
21        So that's what that meeting was all about.
22  You know, it becomes a focal point for the later
23  litigation.
24    Q.    Which later litigation?

32

1        A.    Heller sued me and my wife.
2    Q.    In giving that answer, at one point you said,
3  and I think it is pretty close, I'm not trying to hold
4  you to it, you said they wanted you there at this
5  meeting?
6        A.    Right.
7    Q.    Who is the "they?"
8        A.    Indy and Pam.
9    Q.    Did they tell you why they wanted you there?
10        A.    Because I was the major stockholder and
11  chairman.
12    Q.    Did they tell you any other reason why they
13  wanted you there?
14        A.    No.
15    Q.    Do you know if Heller had requested that you
16  be at the meeting?
17        A.    I don't know that.
18    Q.    Why were you at the meeting?
19        A.    Well, at this point -- it represented a very
20  big investment of my wife and myself and this was an
21  issue that wasn't insignificant. So I went over and I
22  was satisfied when I left there that the issue was
23  resolved.
24    Q.    Other than what you just said, is there any

1  other reason why you were at the meeting?
2        A.    No. I didn't play any role.
3    Q.    At some point did Pam Jones inform you of the
4  results of an audit concerning the borrowing base
5  certificates?
6        A.    Probably. I mean, do you mean in a negative
7  sense?
8    Q.    Either negative or positive. Did she tell you
9  there had been an audit done of the borrowing base
10  certificates?
11        A.    I know Heller sent auditors in there all the
12  time, so that wouldn't be unusual.
13    Q.    How do you know that?
14        A.    I just know because Pam would tell me.
15    Q.    Why would she tell you that?
16        A.    I mean, I used to get reports faxed to my
17  house. We did own the company. I mean, I knew the
18  general health of the company, and I in general knew
19  what was going on.
20    Q.    At some point did Pam Jones tell you she would
21  no longer certify the borrowing base certificates?
22        A.    She told that to Indy Edwards.
23    Q.    Did Indy Edwards then tell you that?
24        A.    I think so.

33

1    Q.    At some point you learned that?

2    A.    **Right.**

3    Q.    Do you know or were you told why Pamela Jones
would no longer certify the borrowing base certificates?

     A.    **For the same reasons that I talked about.  She**
6  **felt they were recognizing more revenue from cases, when**
7  **the cases were finished they wouldn't produce that kind**
8  **of revenue.**

9    Q.    Do you know who Michael Gardulo is?

10   A.    **Yes.**

11   Q.    He was the vice president at Heller, correct?

12   A.    **Right.**

13   Q.    And at some point did you tell Pamela Jones to
14 contact Mr. Gardulo about the fact that she would no
15 longer sign the borrowing base certificates?

16   A.    **I don't remember doing that.**

17   Q.    You have no memory of that at all?

18   A.    **I know she talked to him and I could have, but**
19 **I just don't remember.**

20   Q.    Do you have any memory of telling her to
21 contact him?

22   A.    **No.**

23   Q.    Are you aware that Pamela Jones recommended to
24 Michael Gardulo that he talk to you for an explanation

34

1 as to how the borrowing base certificates were being
2 calculated?

3    A.    **She wouldn't do that, because she knows I**
4 **never had anything to do with that.**

5    Q.    At some point did Mr. Gardulo call or
6 communicate with you in some fashion in order to get an
7 explanation as to how the borrowing base certificates
8 were being calculated?

9    A.    **He called me but I don't remember -- they**
10 **wouldn't come to me with that kind of a question because**
11 **I had no involvement with that.**

12   Q.    When you say that he called you, what did Mr.
13 Gardulo call you to discuss?

14   A.    **The only thing that I remember was the time**
15 **when the company was in bankruptcy, and they were trying**
16 **to work a loan for Indy and Pam to buy the company.  And**
17 **he wanted, I think he wanted me to remain on personal**
18 **guarantees for one portion of the loan -- I'm not sure**
19 **exactly which part it was.**

         **But I wasn't willing to do, there was**
**something I wasn't willing to do during that period of**
22 **time.  And then it was shortly after that that they went**
23 **into court and, the bankruptcy court, and basically told**
24 **judge, you know, they were going to file a motion of**

35

1 default.

2    Q.    The they was Heller?

3    A.    **Um-hum.**

4    Q.    Do you remember having any communications with
5 Mr. Gardulo as to how the borrowing base certificates
6 were being calculated?

7    A.    **Well, I think that he was at that meeting that**
8 **they held.  I think that was really the subject.**

9    Q.    Leaving that meeting aside, because you
10 already told me about that meeting, do you recall any
11 other communications between you and Mr. Gardulo
12 concerning the calculation of the borrowing base
13 certificates?

14   A.    **No, I don't remember specifically.  But I do**
15 **know that when things were falling apart, Gardulo was**
16 **calling often.**

17   Q.    Was he calling you?

18   A.    **Yes.**

19   Q.    And do you have any recollection of the type
20 of things that you would discuss when he would call you
21 when things were, to use your phrase, "falling apart?"

22   A.    **I don't remember really at all.**

23   Q.    You're aware that National Union provided
24 insurance coverage to MHCS?

36

1    A.    **Yes.**

2    Q.    Did you have any role in obtaining that
3 coverage during any period of time?

4    A.    **Other than I told Indy and Pam Jones that we**
5 **had to have that.  That followed a period of time when**
6 **we regretted not having it for this other sexual**
7 **harassment case.**

8    Q.    Other than telling Indy and Pam -- and I
9 assume you mean directors and officers liability?

10   A.    **Right.**

11   Q.    Other than telling Indy Edwards and Pam Jones
12 that MHCS needed to obtain directors and officers
13 liability, did you play any other role in the actual
14 obtaining of the policies?

15   A.    **No.**

16   Q.    Prior to their issuance, did you ever have any
17 communication, you personally, with National Union
18 regarding any directors and officers policies that had
19 been issued to MHCS?

20   A.    **No.**

21   Q.    Prior to National Union issuing any directors
22 and officers liability policies to MHCS, did you ever
23 have any communications with IIG about that?

24   A.    **Yeah, early on.  Probably back in the early**

39

1   '90s.

2   Q.   Do you know when National Union first started

3   providing MHCS with directors and officers liability

4   coverage?

5   A.   No.

6   Q.   I just want to make sure you were clear on the

7   question I asked you two questions ago.  When you

8   responded early on in the early '90s, that was in

9   response to a question I had asked you as to whether you

10  ever had any communications with IIG about policies that

11  National Union was going to issue with respect to MHCS.

12  Did you understand the question to be that?

13  A.   I don't ever remember having a conversation

14  with anyone at International about National.

15  Q.   That's what I was trying to get to.  So when

16  you said in the early '90s, were you talking about

17  policies with some other insurer?

18  A.   Yes.

19  Q.   Thank you for telling me that, but that's not

20  what I'm focused on.  So it's your testimony to the best

21  of your memory you never had any communications with

22  anyone at IIG concerning policies that National Union

23  was going to issue?

24  A.   People with National or people with IIG?

38

1   Q.   Yes.

2   A.   No, I never did.

3   MR. ACETO:  I think what he's saying is he

4   didn't necessarily say he wanted National Union's policy

5   but he did meet with National regarding a D & O policy.

6   THE WITNESS:  No --

7   BY MR. TUMILTY:

8   Q.   Did you have any communications with IIG say

9   from 2000 on concerning the purchase of D & O coverage

10  for MHCS?

11  A.   I just don't remember it.  I mean, I gather

12  from Greg that I might have, but I don't remember it.

13  MR. ACETO:  Can we go off the record for a

14  minute?

15  (Witness confers with counsel.)

16  BY MR. TUMILTY:

17  Q.   So --

18  A.   I still don't remember.

19  Q.   Who at MHCS would deal with IIG in order to

20  obtain directors and officers liability insurance?

21  A.   It would have been Indy Edward and Pam Jones.

22  Q.   And do you know if anyone at MHCS dealt

23  directly with National Union in obtaining directors and

24  officers insurance?

40

1   A.   No, I don't know.

2   MR. TUMILTY:  We'll mark this as Exhibit

3   3.

4   (Document marked for identification as

5   Exhibit No. 3.)

6   BY MR. TUMILTY:

7   Q.   I'm handing you what the court reporter marked

8   as Exhibit 3.  It's an affidavit of Pamela Jones in

9   Civil Action 02 CV 11553 NG.  The pages are numbered at

10  the bottom and please turn to page nine.  Do you know if

11  that's Pamela Jones' signature?

12  A.   It looks like it to me.

13  Q.   If you turn to page seven.  I had asked you

14  earlier if you were aware that Pam Jones recommended to

15  Mr. Gardulo that he speak to you as to an explanation of

16  how the borrowing base certificates were being

17  calculated?

18  A.   Um-hum.

19  Q.   You said she wouldn't have done it.  If you

20  look at the paragraph 30 on that page, the second

21  sentence states, "Mr. Gardulo began to probe me for

22  details that I felt should be directed to Mr. Ingoldsby,

23  and I advised Mr. Gardulo that he should speak directly

24  to Mr. Ingoldsby."

40

1   Does that refresh your recollection at all as

2   to whether Pam Jones told Mr. Gardulo to speak to you

3   regarding the borrowing base certificates?

4   A.   No, it doesn't.  I think that, the only thing

5   I can tell you is it was probably at a time when Gardulo

6   was turning up the heat on her and she saying, "I'm not

7   going to certify.  You need to go to someone else."  I

8   would guess that's what she was doing.

9   Q.   The bankruptcy that we have been referring to,

10  that was the MHCS bankruptcy, correct?

11  A.   Correct.

12  Q.   At some point you filed personal bankruptcy,

13  correct?

14  A.   Correct.

15  Q.   And do you recall when you did that?

16  A.   I think it was December of '02.

17  Q.   Can you tell me why you initiated bankruptcy

18  proceedings, what precipitated that?

19  A.   Well, I just had -- this whole situation with

20  Heller was overwhelming.  I thought I had coverage

21  through my D & O policy at Managed Healthcare.  National

22  turned it down.  I was footing a lot of legal bills.

23  Heller claimed that I owed, I forget what the number

24  was, but I think the total was like a million four or

41

1   something like that.
2           They were claiming I had guaranteed the
3   bankruptcy, the DIP loan. I just, I was left without
4   any choice. I mean, it was just overwhelming.
5       Q.   When you say you thought you had coverage and
6   National had turned it down, you were aware of that
7   prior to filing your bankruptcy, correct?
8       A.   I think so.
9       Q.   And I believe one of the other things you
10  mentioned was that Heller was claiming that you had
11  guaranteed the DIP loan?
12      A.   Correct.
13      Q.   I think another thing you said is something
14  that developed or something precipitating you filing the
15  bankruptcy was you had a lot of legal bills?
16      A.   Relating to this matter.
17      Q.   By "this matter," what do you mean?
18      A.   The Heller lawsuit.
19      Q.   Would you agree with me that one of the
20  reasons generally for filing bankruptcy is in order for
21  the debtor to get a fresh start?
22      A.   I suppose that's true. In some cases.
23      Q.   Do you also understand that as part of a
24  bankruptcy it's not unusual for there to be payments to

42

1   creditors?
2       A.   I understand that.
3       Q.   Was a trustee appointed in your personal
4   bankruptcy?
5       A.   Yes.
6       Q.   Do you remember the name of that trustee?
7       A.   I think his name is Harpley.
8       Q.   Do you recall what his first name is or where
9   he's located?
10      A.   Tampa.
11      Q.   Tampa, Florida?
12      A.   Yes.
13      Q.   Do you happen to know whether he's an
14  attorney?
15      A.   I don't know.
16      Q.   Were you represented by an attorney in your
17  personal bankruptcy?
18      A.   Yes.
19      Q.   Who was that?
        A.   Michael Brundage.
22      Q.   You're aware that as part of your bankruptcy
22  you were required to file schedules and statements of
23  financial affairs?
24      A.   Yes.

43

1       Q.   One of the things that was to be listed on
2   those schedules and statement of financial affairs was a
3   listing of your assets?
4       A.   Correct.
5       Q.   Another thing was a listing of any claims that
6   you had or may have?
7       A.   Yes.
8           MR. TUMILTY:  We'll mark this as the next
9   exhibit.
10          (Document marked for identification as
11  Exhibit No. 4.)
12  BY MR. TUMILTY:
13      Q.   Mr. Ingoldsby, I've placed in front of you
14  what the court reporter marked as Exhibit 4. It's a
15  document entitled Summary of Schedules filed January 2,
16  2003 with the United States Bankruptcy Court For the
17  Middle District of Florida. That was a document that
18  was filed in your bankruptcy, correct?
19      A.   Correct.
20      Q.   If you turn to the fourth page from the end,
21  it should say verification of creditor matrix?
22      A.   Yes.
23      Q.   Is that your signature on that page?
24      A.   Yes.

44

1       Q.   The page before that says Chapter 7 Individual
2   Debtor's Statement of Intention?
3       A.   Yes.
4       Q.   Is that your signature on that page?
5       A.   Yes.
6       Q.   If you turn to the page before that, is that
7   your signature at the bottom of that page?
8       A.   Yes, it is.
9       Q.   If you go to maybe seven or eight pages before
10  that, you get to a page that says Declaration Concerning
11  Debtor's Schedules?
12      A.   Yes.
13      Q.   Is that your signature on that page?
14      A.   Yes.
15      Q.   Do you recall how it came to be how the assets
16  that were listed in your schedules, which we've marked
17  as Exhibit 4, how those assets came to be selected as
18  the assets that that would be listed?
19      A.   It was laborious. We made up a long list and
20  met with the attorney and reviewed everything. And some
21  things we had forgotten, and I know he reminded us of
22  them. And it took a week to get it organized.
23      Q.   You didn't list any interest in any insurance
24  policies issued by National Union, correct?

1    A.    **Correct.**

2    Q.    That was a poor question on my part. I want

3    to make sure the record is clear. On the schedules that

4    you filed in your bankruptcy, you didn't list any

5    interest in any insurance policies issued by National

6    Union, correct?

7    A.    **Correct.**

8            MR. TUMILTY: We'll mark this as the next

9    exhibit.

10            (Document marked for identification as

11    Exhibit No. 5.)

12    BY MR. TUMILTY:

13    Q.    Why didn't you list on your schedules that

14    were filed in your personal bankruptcy an interest in

15    any policy listed by National Union?

16    A.    **Well, we discussed it, and my attorney didn't**

17    **see it as an asset. But I'm looking at this letter and**

18    **I don't even know if the suit was filed -- this looks**

19    **like it was filed before -- can we go off the record for**

20    **a second?**

21    Q.    You can go off the record to talk to your

22    attorney if you want to. I'd like to leave that letter

23    aside for a second --

24    A.    **I'll answer the question. It came up and it**

---

1    Q.    Is that the reason you did not list them in

2    your schedules, because of advice of counsel?

3            MR. ACETO: You can answer that question.

4    BY MR. TUMILTY:

5    A.    **Yes.**

6    Q.    Can you tell me what you and your attorney

7    discussed relating to your bankruptcy schedules?

8            MR. ACETO: If we can agree that the

9    waiver, which it would be, is going to be a waiver only

10    of that particular discussion and not anything else?

11            MR. TUMILTY: I'll agree it's a waiver of

12    discussions or communications regarding that issue.

13            MR. ACETO: Just this specific issue as to

14    whether to list the National Union potential claims

15    against National Union to cover or indemnify any

16    resulting damages?

17            MR. TUMILTY: Yes, I'll agree to that.

18    BY MR. TUMILTY:

19    Q.    With that agreement, can you tell me what you

20    and your bankruptcy attorney discussed regarding the

21    issue of whether to list any potential claim of coverage

22    with respect to the National Union policy?

23    A.    **I don't remember it being a lengthy**

24    **discussion. It's just he didn't see it as an asset. It**

---

1    was discussed, also discussed with the trustee. I never

2    saw it as an asset. They didn't see it as an asset.

3    And as I sit here now, I'm trying to remember when --

4    this was the countersuit against Heller.

5    Q.    We'll get to that.

6    A.    **I'm confused.**

7    Q.    We've already established that you didn't list

8    in your bankruptcy schedules any interest in any

9    policies issued by National Union, correct?

10    A.    **Correct.**

11    Q.    And you said that it was discussed with your

12    bankruptcy attorney whether to list an interest in the

13    policy, correct?

14    A.    **Correct.**

15    Q.    And can you tell me what was said in those

16    discussions?

17            MR. ACETO: I'm going to instruct him not

18    to answer that question.

19            MR. TUMILTY: I believe that I'm entitled

20    to an answer. I will put on the record I'm entitled to

21    an answer since you appeared to be relying on advice of

22    counsel defense as to why you did not list them in your

23    schedules.

24    BY MR. TUMILTY:

---

1    wasn't any, it wasn't any big deal discussion. But he

2    did say that he would talk to the trustee about it.

3    Q.    Did you see it as an asset of your bankruptcy?

4    A.    **No, absolutely not.**

5    Q.    How did the issue even come up that you and

6    your attorney were discussing the issue of whether to

7    list an interest in the policy?

8    A.    **Well, because there was a question about**

9    **litigation. To be honest, I don't remember how that was**

10    **discussed.**

11    Q.    Did you and your bankruptcy attorney have any

12    written communications about the issue of whether to

13    list an interest in the National Union policy on your

14    bankruptcy schedules?

15    A.    **No.**

16    Q.    Did you personally ever have any discussions

17    with the bankruptcy trustee regarding the issue of where

18    to list on your schedules an interest in the National

19    Union policy?

20    A.    **No, but I was present when my attorney talked**

21    **with him.**

22    Q.    How many time did your attorney talk to the

23    bankruptcy trustee about that issue?

24    A.    **I don't know how many times. I was there once**

---

1  when I observed it.

2      Q.   Can you tell me what was discussed on the

3  issue of whether to list an interest in the National

4  Union policy on your schedules with the trustee?

5      A.   **I don't remember the details. All I know is**

6  **that it was discussed, and there wasn't any suggestion**

7  **that it be, that the schedules be amended.**

8      Q.   Do you have any memory of the trustee saying

9  that he did not think that any interest that you may or

10  may not have had in the National Union policy was an

11  interest that should be listed on your schedule?

12         MR. ACETO: Please read it back.

13         MR. TUMILTY: I'll rephrase it.

14  BY MR. TUMILTY:

15      Q.   When you said that there was never any

16  indication that anyone felt the schedules needed to be

17  amended, what I'm trying to find out is do you have any

18  memory of the trustee actually saying I don't think

19  that's an interest that needs to get put on these

20  schedules?

21      A.   **I remember the outcome of the conversation.**

22  **That's all I remember is they discussed it. I don't**

23  **remember what his words were, but it was clearly**

24  **discussed and the conclusion was to do nothing.**

---

50

1      Q.   Do you happen to know whether your attorney

2  had any written communications with the bankruptcy

3  trustee regarding the issue of whether to list an

4  interest in the National Union policy on your bankruptcy

5  schedules?

6      A.   **I don't know.**

7      Q.   I've handed you what the court reporter marked

8  as Exhibit 5. I want to ask a more general question

9  before that. Is it fair to say that you're contending

10  in this action that National Union wrongfully denied

11  coverage to you?

12      A.   **Yes.**

13      Q.   And can you tell me what you believe they

14  wrongfully denied coverage with respect to, what is it

15  they should have provided coverage for?

16         MR. ACETO: Which count in the Complaint?

17         MR. TUMILTY: I'll get to that.

18  BY MR. TUMILTY:

19      A.   **Well, I think that -- I believe a directors**

20  **and officers insurance policy should have covered**

21  **directors and officers who were falsely claimed by**

22  **Heller in this case and very egregious behavior by**

23  **Heller that we should have had our defense coverage.**

24      **That's really all we cared about at the time,**

---

1  just getting our defense. Without the defense coverage,

2  you know, my whole world fell apart.

3      Q.   I'm not trying to drag you through painful

4  memories. I need a frame of reference. Fair to say

5  that you believed you were entitled to coverage from

6  National Union with respect to the lawsuit that Heller

7  brought against you?

8      A.   **Correct.**

9      Q.   Do you recall what the claims were that Heller

10  brought against you?

11      A.   **Not all. I know that they claimed there was**

12  **negligence and breach of guaranty. And I have the**

13  **documents to show there was no guaranty. And the**

14  **subject of negligence, I know how Indy and Pam worked.**

15  **They are two very honest people, super honest. I know**

16  **this was all a game that Heller was playing, and**

17  **everything unfolded the way Heller wanted it to unfold.**

18      **And there wasn't any negligence. There**

19  **absolutely wasn't any, not even an ounce of negligence.**

20  **These two ladies were squeaky clean, and we should have**

21  **had some help in defending ourselves. And we didn't get**

22  **that. It ruined three people.**

23      Q.   I understand that you're not a lawyer, but do

24  you believe that National Union was required to provide

---

52

1  coverage for all of the claims that Heller brought

2  against you?

3      A.   **I don't know. I don't have the memory to know**

4  **what the counts were at this point. I guess from my**

5  **point of view, I think in terms of when you spend**

6  **$20,000 for a directors and officers premium for a year**

7  **and you basically don't get anything for it, it just**

8  **seems unfair.**

9      Q.   Earlier you mentioned that you recall there

10  was a negligence claim and breach of guaranty claim. Do

11  you believe that National Union should have provided

12  coverage for the negligence claim?

13      A.   **Absolutely.**

14      Q.   Do you believe that National Union should have

15  provided coverage for the breach of guaranty claim?

16      A.   **I think National Union should have at least**

17  **inquired -- for a company that paid $20,000 to say no**

18  **and not even listen, all they would have to do is look**

19  **at the documentation that I have that shows there's no**

20  **guaranty.**

21      **And they should have stepped in to help us**

22  **defend ourselves. They never even tried to learn. They**

23  **just basically said no.**

24      Q.   You addressed the negligence claim. I'm

53

1  trying to get to the issue of whether you think they
2  should have stepped in, in your words, and provided
3  coverage and done something with respect to the breach
4  of guaranty claim.
5      A.   **First of all, I don't know whether that would**
6  **be covered or not.  I don't know.  All I know is that, I**
7  **know the negligence subject they should have provided**
8  **some defense on that.  I think, I could be wrong, I**
9  **would think the breach of guaranty would fall in the**
10 **same category, but I just don't know.**
11     Q.   If you could look at Exhibit 5 in front of
12 you.  It's a letter dated August 2, 2002 from Gregory
13 Aceto to National Union.  Have you seen that document
14 before?
15     A.   **I don't remember it, but I'm sure I must have.**
16     Q.   Do you believe this document is related to the
17 lawsuit that Heller filed against you?
18     A.   **Yes.**
19     Q.   Do you recall when Heller filed the lawsuit
20 against you?
21     A.   **No, I don't.**
22     Q.   If I told you that suit was filed on August 1,
23 2002, would you have any reason to doubt that?
24     A.   **No.**

54

1      Q.   Do you know if you discussed Exhibit 5 with
2  Gregory Aceto before he sent that letter to National
3  Union?
4      A.   **I'm sure, but I just don't recall.**
5      Q.   Do you recall when you personally first became
6  aware of the lawsuit that Heller had filed against you?
7      A.   **Not really.  I would guess that I was served**
8  **at my home.**
9      Q.   But you have no memory of when that would have
10 been?
11     A.   **Not really.**
12     Q.   Do you believe it would have been prior to the
13 time that Attorney Aceto sent Exhibit 5 to National
14 Union?
15     A.   **Didn't you just say they filed it August 1?**
16     Q.   Yes.
17     A.   **I just don't remember.  I don't have any**
18 **reason to doubt that though.  I don't know what you're**
19 **getting at.**
20     Q.   I'm just trying to get at when you first
21 became aware of the lawsuit.  Is it fair to say that you
22 must have been aware of the lawsuit prior to the day
23 that Attorney Aceto sent Exhibit 5 on your behalf?
24     A.   **If the lawsuit was filed on the first and this**

55

1  was done on the second, it would seem that you would
2  **have to have some foreknowledge, but I don't remember**
3  **it.**
4      Q.   Leaving aside you don't remember specifically
5  when you first became aware of the lawsuit, whenever
6  that was, were you aware at that time that you had been
7  named as a defendant?
8      A.   **Yes.**
9      Q.   And were you aware of what the allegations
10 were against you?
11     A.   **I remember it was a misrepresentation and the**
12 **breach of guaranty.**
13     Q.   And you believed you were served with the
14 lawsuit at your home?
15     A.   **I don't know.  I just don't remember where.**
16     Q.   When you first received a copy of the
17 Complaint, did you read it?
18     A.   **I'm sure I did.**
19     Q.   And by the Complaint, I meant the Complaint of
20 Heller against you?
21     A.   **Right.**
22     Q.   After reading that Complaint, were you aware
23 Heller was seeking monetary damages against you?
24     A.   **Yes.**

56

1      Q.   And do you recall how much those alleged
2  damages were?
3      A.   **Not specifically, but I know it was in the**
4  **millions of dollars and treble damages.**
5      Q.   And after you read the Complaint the first
6  time, you were aware that Heller was seeking to have you
7  personally held liable, correct?
8      A.   **Correct.**
9      Q.   At that time did you consider that there was a
10 possibility that you might have to pay some amount of
11 money to Heller as a result of their lawsuit against
12 you?
13     A.   **I think anyone who is sued thinks you might**
14 **have to end up having to pay.  That doesn't make it**
15 **right.**
16     Q.   I understand that.  I'm simply asking if at
17 the time when you finished reading the Complaint, did
18 you think that there was a possibility that you would
19 have to at some point pay some money to Heller either by
20 way of settlement or judgment?
21     A.   **Well, no.  I mean, I knew that I didn't owe**
22 **anything.  Whether this whole thing worked against me**
23 **and I ended up being stuck with something is an entirely**
24 **different matter.  All I know is that there was nothing**

**57**

1  that was done that was wrong. And I knew I was dealing
2  with some highly unethical people, so I don't know what
3  the outcome would be.
4      Q.  And by the highly unethical people, you're
   referring to the people at Heller?
6      A.  Absolutely.
7      Q.  At the time that you were served with the
8  lawsuit, you believed you had insurance coverage under
9  the directors and officers liability policy issued by
10  National Union?
11      A.  I thought I did.
12      Q.  And at the time that you were served with the
13  lawsuit, you believed that National Union had an
14  obligation to pay your defense costs in the suit by
15  Heller?
16      A.  Yes.
17      Q.  And at the time that you were served with the
18  lawsuit, did you also believe that if in the event a
19  judgment were ever entered against you in the suit by
20  Heller that National Union would be required to provide
21  coverage for that judgment?
22      A.  Yes, I think so.
23      Q.  As you sit here today, do you understand what
24  Exhibit 5 is requesting or asking for?

**58**

1      A.  Well, it's asking, the letter is basically
2  asking National Union to provide coverage for our
3  defense.
4      Q.  And did you understand that that was the
5  intent of the letter at the time that it was sent?
6      A.  I think so, yes.
7      Q.  And again, that's because, as you just
8  testified, you believed you had insurance coverage with
9  respect to the claims brought by Heller against you?
10      A.  Right.
11      MR. TUMILTY:  I'll mark this next.
12      (Document marked for identification as
13  Exhibit No. 6.)
14  BY MR. TUMILTY:
15      Q.  I handed you what the court reporter marked as
16  Exhibit 6. It's a two-page letter dated October 11,
17  2002 from Joseph O'Neil to Gregory Aceto.  Do you know
18  if you've seen that document before?
19      A.  I believe so.
20      Q.  So you know when you first saw that document?
21      A.  I don't know the date.
22      Q.  Do you know approximately when you first saw
23  the document?
24      A.  Shortly after that I would guess.

**59**

1      Q.  Shortly after October 11, 2002?
2      A.  Yes.
3      Q.  Did you read the letter at that time?
4      A.  I did.
5      Q.  And --
6      A.  Or I would have.
7      Q.  And do you believe that you understood what it
8  meant?
9      A.  Yes.
10      Q.  And was it your understanding that Mr. O'Neil
11  was saying that on behalf of National Union there was no
12  coverage with respect to the claims brought by Heller?
13      A.  Yes.
14      Q.  At that time did you believe Mr. O'Neil was
15  correct?
16      A.  No.
17      MR. TUMILTY:  We'll mark this as the next
18  exhibit.
19      (Document marked for identification as
20  Exhibit No. 7.)
21  BY MR. TUMILTY:
22      Q.  I've handed you what the court reporter marked
23  as Exhibit 7.  It's an e-mail from Gregory Aceto to
24  Joseph O'Neil dated November 7, 2002.  Have you seen

**60**

1  that document before?
2      A.  I don't recall seeing it.
3      Q.  Did you know that Attorney Aceto had sent this
4  e-mail?
5      A.  I just, as I sit here, I don't recall it at
6  all.
7      Q.  You have no memory of whether you asked Mr.
8  Aceto to write this e-mail?
9      A.  No.  I didn't specifically ask him to write
10  this e-mail.  I mean, we were obviously talking about
11  the subject matter.  I just don't remember this.
12      Q.  You can take whatever time you need.  Have you
13  had a chance to review the e-mail?
14      A.  Yes.
15      Q.  Do you agree with the contents of it?
16      A.  It was 1998, and I wasn't involved with the
17  day to day and I never had any involvement ever in
18  compiling borrowing base certificates.  So that's
19  accurate.  Other than the date, I think that I basically
20  sometime in the May, June '98 period -- that's off by
21  six months.
22      Q.  But you agree with the position expressed in
23  the last paragraph of the body of that e-mail that you
24  were an insured under the National Union policy and that

63

1  according to the position set forth here by Attorney

2  Aceto there was no applicable exclusion and that

3  National Union or AIG should be required to provide

4  coverage and a defense to you?

5      A.  **I think so.  This is cut off.**

6      Q.  I apologize.

7      A.  **He played an active role -- I assume that's no**

8  **active role.  The word no is missing.**

9      Q.  I'm focusing on the sentence that appears to

10  say, "Thus, he is an insured under the policy of

11  insurance and there are no applicable exclus should be

12  provided a defense by AIG, regardless of whether an

13  endorsement was or was not part of the policy (th still

14  remains unclear.)"

15          You agree with the sentiment that you should

16  have been provided coverage under the policy?

17      A.  **Yes.**

18          MR. TUMILTY:  Let's mark this as Exhibit

19  8.

20          (Document marked for identification as

21  Exhibit No. 8.)

22  BY MR. TUMILTY:

23      Q.  I've handed you what the court reporter marked

24  as Exhibit 8.  It's a document bearing Bates numbers IIG

62

1  00003 through IIG 00015.  The first page of that Exhibit

2  8 is a fax cover sheet from International Insurance

3  Group to Gregory Aceto dated November 26, 2002.  There

4  are enclosures with that fax after that.  If you go two

5  pages in, there's another fax cover sheet dated July 31,

6  2001 to Pam Jones from Nicholas Sciotto at International

7  Insurance Group.  Have you seen Exhibit 8 before?

8          MR. ACETO:  In its entirety?  There are

9  separate documents that I'm not quite sure if they came

10  together.

11  BY MR. TUMILTY:

12      A.  **I've never seen the fax pages.**

13          (Off the record discussion.)

14  BY MR. TUMILTY:

15      Q.  To clarify, what has been marked as Exhibit 8

16  here today consists of Bates numbers 0077 consecutively

17  numbered to 0088.  It's your testimony that you've never

18  seen the first page of Exhibit 8 or the second page of

19  Exhibit 8 before?

20      A.  **I just don't know.  I can't tell you that I**

21  **remember it.  I mean, I could have.**

22      Q.  If you go into the third page of Exhibit 8,

23  you'll see there's a letter dated July 27, 2001?

24      A.  **Um-hum.**

64

1      Q.  It's a two-page letter?

2      A.  **Right.**

3      Q.  Do you know if you've ever seen that letter

4  before?

5      A.  **I don't know.**

6      Q.  Do you know if you have ever seen any of the

7  pages before that are in Exhibit 8?

8      A.  **All I can tell you is that I remember**

9  **requesting that Pam Jones send me a copy of the**

10  **directors and officers policy.  I can't say that I**

11  **remember any of these pages.  I wanted to make damn sure**

12  **we had a policy.**

13      Q.  But you can't say sitting here today whether

14  you've seen any of these pages before?

15      A.  **No.  But that's part of my memory problem.**

16  **I've gone over a lot of documents on this case and I**

17  **could have, I just don't remember.**

18      Q.  I understand that.  I'm trying to get your --

19          MR. ACETO:  The question was more about at

20  the time period, not whether he reviewed it in

21  preparation for litigation or something, is that right?

22          MR. TUMILTY:  Right.

23          MR. ACETO:  Did you understand that?

24          THE WITNESS:  Yes.

64

1          MR. ACETO:  It was when this was created

2  back in July of 2001 or sometime --

3          MR. TUMILTY:  That's one question.

4  BY MR. TUMILTY:

5      Q.  Simply sitting here today, do you have any

6  memory of seeing this document before, Exhibit 8?

7      A.  **I don't remember seeing, I don't today**

8  **remember seeing this.  I do know that I had documents**

9  **about the D & O policy sent to me.  I saw something.  I**

10  **probably saw this.  I just don't remember it today.**

11      Q.  If you look at the first page of Exhibit 8,

12  the fax cover sheet to Gregory Aceto from International

13  Insurance Group, the body of the message there says,

14  "Attached is a copy of the quote sent to Pam Jones on

15  July 31, 2001.  Please take note that the endorsement

16  noted 'For-Profit Health Care Amendatory Endorsement'

17  was disclosed to our client.  This endorsement contained

18  the verbiage regarding Contractual Liability Exclusion.

19  Let me know if you require additional information."  Do

20  you see that?

21      A.  **I do.**

22      Q.  And to your understanding, is the reference

23  there to "our client" MHCS?

24          MR. ACETO:  If you know.

65

BY MR. TUMILTY:

1 BY MR. TUMILTY:

2   A.   **I don't know.**

3   Q.   Do you have any reason to doubt that it would
4 be MHCS given that the fax was concerning an original
5 quote to Pam Jones?

6   A.   **I don't know.  I have no way of knowing.**

7   Q.   Isn't the real reason that there was no
8 interest in the National Union policy listed on your
9 schedules in your bankruptcy because both you and your
10 attorney were aware of the contractual liability
11 exclusion and realized that you did not have coverage
12 for the Heller case?

13   A.   **No.**

14        MR. TUMILTY:  This will be next.

15        (Documents marked for identification as
16 Exhibit No. 9 and 10.)

17 BY MR. TUMILTY:

18   Q.   I've handed you what the court reporter marked
19 as Exhibit 10.  It's a one-page document dated November
20 5, 2002 bearing Bates number 0102.  Have you seen that
21 document before?

22   A.   **I think so.  I'm not clear.**

23   Q.   Do you have any understanding as to why
24 Attorney Aceto wrote that letter to International

66

1 Insurance Group when he did?

2   A.   **It looks like he was looking for a meeting to**
3 **review the file.**

4   Q.   And by "the file," what do you understand that
5 to be?

6   A.   **I suppose as to the reason why we were denied**
7 **coverage.**

8   Q.   I believe you have in front of you what the
9 court reporter marked as Exhibit 9.

10   A.   **Yes.**

11   Q.   A letter dated March 6, 2003 to Gregory Aceto
12 from Joseph O'Neil?

13   A.   **Yes.**

14   Q.   Have you seen that document before?

15   A.   **Yes.**

16   Q.   Do you recall when the first time was that you
17 saw this letter?

18   A.   **No.**

19   Q.   Do you believe it was shortly after March 6,
20 2003?

21   A.   **I would think so.**

22   Q.   Do you believe it was within a week of March
23 6, 2003?

24   A.   **I just don't know.**

67

1   Q.   I understand that you're not going to know an
2 exact date.  I'm just trying to get a frame of
3 reference.  Shortly afterwards is a bit ambiguous.  Do
4 you believe it would have been a matter of days that you
5 would have seen this letter after Attorney Aceto would
6 have received it?

7   A.   **It's all guesswork.  All I know is that I have**
8 **seen this letter, but I don't have any reference in**
9 **time.**

10   Q.   I take it that you don't have any idea when
11 you first saw this letter then?

12   A.   **I mean, I'd be guessing.**

13        MR. ACETO:  Don't guess.

14 BY MR. TUMILTY:

15   Q.   I don't want you to guess.

16   A.   **I just don't know.**

17        (Lunch recess.)

18        (Document marked for identification as
19 Exhibit No. 11.)

20 BY MR. TUMILTY:

21   Q.   Mr. Ingoldsby, I've handed you a one-page
22 document that the court reporter marked as Exhibit 11
23 with the Bates number 588 at the bottom.  Do you have
24 that in front of you?

68

1   A.   **I do.**

2   Q.   Have you seen that document before?

3   A.   **No.**

4   Q.   Do you have any reason to doubt the accuracy
5 of it?

6   A.   **No.**

7   Q.   Do you have any recollection of listing Mr.
8 Aceto or his law firm as a creditor on your bankruptcy
9 schedules?

10   A.   **Yes.**

11   Q.   And do you recall approximately how much you
12 owed him at the time that you listed his law firm?

13   A.   **I really don't.**

14   Q.   Prior to you filing bankruptcy, can you tell
15 me what other legal fees you incurred in connection with
16 the Heller matter other than fees to Mr. Aceto's law
17 firm?

18        MR. ACETO:  Relating to the Heller matter
19 only or any legal fees?

20        MR. TUMILTY:  We'll start with Heller and
21 then go broader.

22 BY MR. TUMILTY:

23   A.   **I don't remember any other law firm being**
24 **involved with the Heller matter.  As I sit here today, I**

69

1 would guess that it would be just whatever I owe to the
2 Aceto law firm.
3     Q.    I know you identified earlier that you had
4 been deposed in a different pieces of litigation and
5 weren't exactly sure of the years in which those
6 happened.  Were there other legal fees that you were
7 incurring in say the year or two years leading up to
8 when you filed bankruptcy?
9     A.    **No.  That was covered.**
10     Q.    Can you tell me what the ultimate outcome of
11 the Heller action was with respect to you?
12     A.    **We reached a settlement in the bankruptcy**
13 **court in Florida, and I had to come up with $250,000.**
14 **And it was split up between creditors, and how much**
15 **Heller got I think was something like, something in**
16 **excess of $100,000.**
17         MR. TUMILTY:  We'll mark this next.
18         (Document marked for identification as
19 Exhibit No. 12.)
20 BY MR. TUMILTY:
21     Q.    I've handed you a document that the court
22 reporter marked as Exhibit 12.  It's a multi-page
23 document, Bates numbers 0112 through 0130.  Is that the
24 settlement agreement you were just referring to?

70

1     A.    **Yes.**
2     Q.    Do you know where the funds came from to fund
3 the settlement in the bankruptcy case?
4     A.    **They all came from different sources, myself**
5 **and my wife.  We sold, we were forced to sell our house**
6 **in Florida and pulled some cash out of that.  That in**
7 **part was used.  We later refinanced a house in**
8 **Massachusetts and pulled cash out of that.  It was all**
9 **our money.**
10     Q.    Do you know if any of the monies used to fund
11 the settlement with Heller came from places other than
12 assets that were considered part of your bankruptcy
13 estate?
14         MR. ACETO:  Objection.
15 BY MR. TUMILTY:
16     A.    **You mean like borrowing from someone else?**
17     Q.    Yes.
18     A.    **No.**
19     Q.    So all the funds that were used to pay the
   Heller settlement came in some fashion or another from
   assets that were either yours or your wife's?
22     A.    **Right, or principally real estate.  And that**
23 **was disclosed.**
24     Q.    To your knowledge, did the settlement that you

71

1 entered into with Heller resolve both the negligent
2 misrepresentation claim that they had brought and the
3 breach of guaranty claim?
4     A.    **In terms of their claim against me?**
5     Q.    Yes.
6     A.    **Yes.**
7     Q.    Did the settlement with Heller include both
8 you and your wife?
9     A.    **Yes.  I'm pretty sure it was my wife.  Yes,**
10 **her name is in here.**
11     Q.    Do you know how many settlement agreements you
12 entered into with Heller with respect to the litigation
13 against you?
14     A.    **I thought it was just this.**
15     Q.    I'm not suggesting there was another one.
16     A.    **No, I think this is it.**
17     Q.    To your knowledge, there isn't another
18 settlement agreement between yourself and Heller?
19     A.    **No.**
20     Q.    I can't remember what number you said went to
21 Heller, I think you said in the range of 110, 120,000?
22     A.    **It's in the settlement agreement.**
23     Q.    I'm not trying to put words in your mouth.
24 The amount that went to Heller, that's encompassed

72

1 within the $250,000 total?
2     A.    **Yes.**
3     Q.    Do you know what other creditors were paid off
4 pursuant to the settlement agreement that's been marked
5 as Exhibit 12?
6     A.    **I don't think anyone has been yet.**
7     Q.    Do you know if Heller has been paid under that
8 settlement agreement?
9     A.    **Well, I don't know how I know this, but I**
10 **think recently I heard the monies hadn't been**
11 **distributed.  I think the case of Foster, as part of the**
12 **settlement agreement, I think he got his money up front.**
13 **But I think he's the only one.  To the best of my**
14 **knowledge, nothing has been distributed.**
15     Q.    Do you know who is responsible for
16 distributing those settlement funds?
17     A.    **I guess the trustee.**
18     Q.    The bankruptcy trustee?
19     A.    **Yeah.**
20         MR. TUMILTY:  We'll mark this as Exhibit
21 13.
22         (Document marked for identification as
23 Exhibit No. 13.)
24 BY MR. TUMILTY:

**73**

1  Q.  Mr. Ingoldsby, I hand you what the court

2  reporter has marked as Exhibit 13. It's your First

3  Amended Complaint in Intervention in this action. Have

4  you seen that document before?

5  A.  Yes.

6  Q.  Did you review that document before it was

7  filed?

8  A.  Yes.

9  Q.  Please turn to paragraph 15 on page four. You

10  see it starts with Exclusion 4H?

11  A.  Um-hum, okay.

12  Q.  Is it your understanding that the language of

13  that provision is at least one of the reasons that

14  National Union has put forth as a basis for denying

15  coverage to you in the Heller matter?

16  A.  Yes, I understand that's their position.

17  Q.  I'm not asking you to agree with it. I'm

18  asking if you have that understanding?

19  A.  Yes.

20  Q.  If I refer to that as a contractual liability

21  exclusion for purposes of this deposition, can we agree

22  that's what I'm referring to?

23  A.  Okay.

24  Q.  If you look at paragraph 19, it states, "The

**74**

1  language of exclusion 4H, as amended, significantly

2  decreased, if not altogether eliminated, the value of

3  the policy to MHCS by excluding any claims arising from

4  contractual liability," do you see that?

5  A.  I do.

6  Q.  Do you agree with that?

7  A.  Yes.

8  Q.  And can you explain to me how the language of

9  Exclusion 4H would do what is alleged in paragraph 19?

10  A.  Well, basically it reduces the policy. You

11  pay $25,000 for it and you get nothing, absolutely

12  nothing for it. I don't think it can be any clearer

13  than that.

14  Q.  To your knowledge, would MHCS have purchased a

15  directors and officers liability policy with that type

16  of exclusion in it?

17  A.  Never. I didn't know about it.

18  MR. ACETO:  I would like to talk to him

19  for a moment.

20  (Witness confers with counsel.)

21  MR. ACETO:  He would like to clarify the

22  answer he gave after talking with me about it.

23  MR. TUMILTY:  I'll just move on.

24  MR. ACETO:  Okay.

**75**

1  BY MR. TUMILTY:

2  Q.  In the same exhibit, Exhibit 13, paragraph 18,

3  please review that paragraph to yourself.

4  A.  Okay.

5  Q.  It states, "Upon information and belief,

6  International failed to fully advise MHCS regarding the

7  language of the alleged exclusion and the effective said

8  exclusion on MHCS's liability coverage under the

9  policy."

10  Do you know what the basis is for that

11  paragraph?

12  A.  Yes. I mean, I had what I thought was a

13  long-term relationship with International. We had been

14  buying our insurance from them probably since 1990.

15  They obviously had, you know, an obligation to advise me

16  of things.

17  I never knew anything about such an exclusion.

18  I think International or National, someone, owed me an

19  explanation, and they should have brought it to my

20  attention.

21  Q.  You don't know for a fact that International

22  did not bring it to the attention of either Pamela Jones

23  or Indy Edwards, do you?

24  A.  No, I don't know.

**76**

1  MR. TUMILTY:  We'll mark that as the next

2  exhibit.

3  (Document marked for identification as

4  Exhibit No. 14.)

5  BY MR. TUMILTY:

6  Q.  I've handed you what the court reporter has

7  marked as Exhibit 14. If you could take whatever time

8  you need and look through that document.

9  A.  I recognize it.

10  Q.  Exhibit 14 is a multi-page document bearing

11  Bates numbers 0131 through 0199. I will represent to

12  you that it is a document that was produced by your

13  counsel on your behalf in this action. You said you

14  recognized this document?

15  A.  Yes, it's an insurance policy, directors and

16  officers policy from National Union.

17  Q.  You'll see on the front page of Exhibit 14

18  that there's a policy period listed under item 3.

19  A.  Yes.

20  Q.  And it's August 4, 2000 to August 4, 2001?

21  A.  Yes.

22  Q.  Would you agree with me that this is the

23  policy immediately preceding the policy that's at issue

24  in this case?

77

1     A.    The policy that is at issue?

2     Q.    No, the one before that, the one for the prior

3  year?

       A.    I'm really not sure how to answer that.  I

5  mean, are you talking about the year prior to the time

6  that Heller sued?

7     Q.    Let me come about it a different way.  In this

8  case, you're contending that a policy from National

9  Union provided coverage to you for the Heller action?

10    A.    Correct.

11    Q.    Do you know for what year that policy was in

12  effect?

13    A.    No, I don't recall.

14    Q.    For purposes of this deposition, I'll

15  represent to you that the policy that's in front of you,

16  Exhibit 14, is the one for the prior year.

17    A.    Okay.

18    Q.    Would you have gotten a copy of this policy?

19    A.    Yes.

20    Q.    When you would get copies of the directors and

21  officers policies, you were a named insured on them,

22  correct?

23    A.    I believe so.

24    Q.    When you would get copies of policies that had

78

1  been issued by National Union, would you read them?

2     A.    Yeah, but I wouldn't read every word.

3     Q.    Would you discuss them with anyone?

4     A.    I don't think I did.

5     Q.    You didn't discuss them with Pamela Jones or

6  Indy Edwards?

7     A.    No.

8     Q.    Did you discuss them with anyone at IIG?

9     A.    No.

10    Q.    Did you discuss them with an attorney at that

11  time?

12    A.    Not at that time.

13    Q.    I believe it's been your testimony that to

14  your knowledge none of the directors and officers

15  liability policies that National Union issued to or

16  provided to MHCS contained a contractual exclusion as we

17  saw it alleged in your Complaint?

18    A.    I don't think that's what I said.  I said I

19  never knew at the time or I wouldn't have paid the

20  $25,000 or I wouldn't have allowed our company to spend

21  $25,000.

22    Q.    This is an important point, so I want to make

23  sure it's clear.  Your testimony is you never knew that

24  a contractual liability exclusion may have been in the

79

1  policies issued by National Union?

2     A.    Correct.

3     Q.    Are you also contending the policies did not

4  contain a contractual liability exclusion?

5     A.    No, I'm not.

6     Q.    If you would turn to page, they are Bates

7  numbered in the middle, and go to page 0176.  You'll see

8  that at the top of that page it says Endorsement 1?

9     A.    Okay.

10    Q.    And if you go to the second paragraph, there

11  is a subparagraph F, do you see that?

12    A.    Yes.

13    Q.    Do you know if you reviewed this paragraph at

14  the time you received a copy of Exhibit 14?

15    A.    No.

16    Q.    Please turn to page 0196.  It says Endorsement

17  5 at the top?

18    A.    Yes.

19    Q.    There's a Roman numeral two, Amendments to

20  Exclusions, do you see that?

21    A.    Yes.

22    Q.    Do you know if you read the text that's in II

23  at the time you received a copy of Exhibit 14?

24    A.    I don't remember ever seeing it.

80

1     Q.    You're free to look at the exhibit if you need

2  to, but the two exclusions that I just showed you, were

3  you aware of their existence prior to me just showing

4  them to you right now?

5     A.    Yes.

6     Q.    When did you first become aware of their

7  existence?

8     A.    Sometime after National Union declined

9  coverage.

10    Q.    Prior to the time that you filed bankruptcy?

11    A.    Yes, I'm pretty sure that's the case.

12          MR. TUMILTY:  I'll have this marked next.

13          (Document marked for identification as

14  Exhibit No. 15.)

15          (Brief recess.)

16  BY MR. TUMILTY:

17    Q.    I'm handing you a copy of what the court

18  reporter marked as Exhibit 15.  It's a multi-page

19  document Bates numbered 0200 through 0271.  Do you

20  recognize that document?

21    A.    I think so.

22    Q.    I'll represent to you that it's a document

23  that was produced to us in this case by your counsel on

24  your behalf.

81

1   A.   Okay.

2   Q.   Maybe that's why it has the Bates numbers in

3   this particular format there.  Can you tell me what it

4   is?

5   A.   It's a policy issued by National Union to

6   Managed Healthcare Systems.  It's a directors and

7   officers insurance policy.

8   Q.   On the front page, there's a section item 3,

9   policy period August 4, 2001 through August 4, 2002?

10  A.   Yes.

11  Q.   Have you seen a copy of this before?

12  A.   Yes.

13  Q.   Did you see a copy on or about the time the

14  policy was issued?

15  A.   I'm sure that I saw it sometime after it was

16  issued.  A copy would have been sent to me.

17  Q.   Would it have been your practice to read a

18  copy of the policy when you received it?

19  A.   Not thoroughly but I would peruse.

20  Q.   Please turn to page 0247.  You'll see it says

21  endorsement No. 1 at the top and there's a No. 10,

22  Clause 4, do you see that?

23  A.   Yes.

24  Q.   And under that, there's a subsection F, do you

82

1   see that?

2   A.   Yes.

3   Q.   Please review that to yourself.

4   A.   Okay.

5   Q.   Do you know if you reviewed that section when

6   you first received a copy of Exhibit 15?

7   A.   No, I don't believe I did.

8   Q.   Do you have any memory of discussing Exhibit

9   15 with either Pamela Jones or Indy Edwards?

10  A.   No.  I would like to correct that.  I did not

11  until after the suit was filed and National Union

12  responded with the denial coverage.  Then we did discuss

13  it.

14  Q.   Did you discuss Exhibit 15 with both Indy

15  Edwards and Pamela Jones?

16  A.   Probably, but I don't know.

17  Q.   Tell me what you remember about discussing

18  Exhibit 15 with either Pamela Jones or Indy Edwards.

19  A.   This, of course, was after the response from

20  National Union.

21  Q.   I understand.

22  A.   I remember talking about how National Union

23  really chose to interpret that section and that

24  basically the policy was worthless.  We had spent

83

1   $25,000 and neither one of them could tell me anything

2   that we would get for that $25,000.  Just about anything

3   that, almost, I can't think of anything that doesn't

4   somehow tie into a contract.  So it was that kind of

5   discussion.

6   Q.   Did either Pamela Jones or Indy Edwards

7   indicate to you that they were aware that that provision

8   or a provision like that was in the policy?

9   A.   I don't remember.

10  Q.   Did either Pamela Jones or Indy Edwards ever

11  indicate to you that they had discussed that type of a

12  provision, mainly a contractual exclusion provision,

13  with anyone from International?

14  A.   I don't remember.

15  Q.   Do you believe that the claims that Heller

16  asserted against you in the Heller action were somehow

17  related to a contract?

18  A.   Well, I think that the breach of guaranty was

19  not relating to the contract because there is no, there

20  was no guaranty.  So to that one I would say no.  If

21  they could produce a written guaranty, then I would be

22  proven wrong.  There isn't such a document.

23       As far as the negligence is concerned, I think

24  that, I know that there was not any negligence.  I think

84

1   it's how National Union chooses to interpret this is my

2   subject.  I think it should be covered.  You can't --

3   what good is the policy?  You are basically taking

4   25,000, and I can't come up with a single thing that

5   would be covered.  That's how I feel about it.

6        And that's what I told them after the

7   rejection from National Union came.  And they couldn't

8   think of anything that would be covered either.

9        MR. ACETO:  By them, you mean Pam and Indy

10  Edwards?

11       THE WITNESS:  Right.

12  BY MR. TUMILTY:

13  Q.   I understand that's how you feel about it and

14  that's what you believe.  You've already answered with

15  respect to the breach of guaranty count.  I know you've

16  said in your mind there was no negligence to support the

17  negligent misrepresentation count.

18       Do you believe the negligent misrepresentation

19  count was somehow related to or based on a contract?

20  I'm not asking you to agree there was negligence but

21  just what your view of that count is.  What do you think

22  that related to?

23  A.   I don't know.  I hadn't thought of it that

24  way.  I think that -- if you want to really go strictly

85

1  as National Union is choosing to go, you can say
2  everything is a contract.  You can say, yeah, it's
3  contractual.
4      I mean, if we had a liability for, I don't
5  know, for a janitor that did something wrong, you had a
6  contract to clean the offices -- nothing is covered.
7  That's my problem.  When I look at it, I just think, I
8  don't know what you're trying to get me to say -- I
9  don't know.  All I know is that the whole thing is a
10 joke, total joke.
11     Q.    All I was trying to get you to say was
12 whatever your view was on that first count.
13     A.    That's my view.
14           MR. TUMILTY:  We'll mark this next.
15           (Document marked for identification as
16 Exhibit No. 16.)
17 BY MR. TUMILTY:
18     Q.    I've handed you a copy of what was marked as
19 Exhibit 16.  It's entitled Affidavit of Michael
20 Ingoldsby.  There are certain exhibits attached to it.
21 Do you recognize that document?
22     A.    Yes.
23     Q.    Please turn to page six of Exhibit 16.  Is
24 that your signature on that page?

87

1  introduced me to International probably around 1990 and
2  had made the introduction because they thought that
3  International was someone who could really help a
4  growing business.
5      Quite frankly, I think that's the only time I
6  met them.  I don't even remember who it was that I met
7  at the time but -- so somewhere around 1989, '90, '91
8  is the time I met them.  But after that time, I didn't
9  have any dealings with them.
10     Q.    As it says in paragraph five, you weren't
11 involved in MHCS's procurement of insurance coverage,
12 were you?
13     A.    I was not.
14     Q.    Please review paragraph ten to yourself.
15     A.    Okay.
16     Q.    Where it says in the second sentence of that
17 paragraph, "In addition, a copy of the policy I received
18 was not bound," do you remember who you received a copy
19 of the policy from?
20     A.    It would have crom from Managed Healthcare,
21 either Indy Edwards or Pam Jones.
22     Q.    For insurance policies that National Union
23 issued to MHCS, when you would receive copies of those,
24 were they usually bound?

86

1      A.    Yes.
2      Q.    Did you review this?
3      A.    I did.
4      Q.    If you would please turn to the second page.
5      A.    Yes.
6      Q.    You see there's a sentence at the top of that
7  page that says, "In fact, I have not been involved in
8  the operations of MHCS since 1999 due to a medical
9  condition which disabled me," do you see that?
10     A.    Yes.
11     Q.    Is there any other medical condition that has
12 disabled you from 1999 other than what you told me about
13 this morning?
14     A.    Well, I've had some cardiac issues and have
15 had six angioplasties from 2003, 2005.  In addition to
16 the ones I told you, I think that's it.
17     Q.    If you would look at paragraph five, that's
18 consistent with your testimony today, correct?
19     A.    Well, I didn't do personal business with
20 International or National.  I mean, initially
21 International was introduced to me by, it was either one
22 of two people.
23           I don't really remember which of the two.  I
24 think they both knew Jack Perkins.  I know that they

88

1      A.    I don't remember.  I do know the former
2  insurance company, their copies were always bound.  I
3  think that this is probably just a copy that someone
4  from the office made.
5      Q.    Do you believe that the copy that you received
6  was a copy that someone at the MHCS office had made and
7  then sent to you?
8      A.    Oh, yes.
9      Q.    Can you tell me what the basis is for the
10 first sentence in paragraph ten of your affidavit?
11     A.    The copy that I got didn't have that
12 endorsement.  When I wrote this up, that was my belief,
13 that wasn't there.  I think that's all that means.
14     Q.    It's your testimony that the copy you received
15 did not have Endorsement 8.  Do you know for a fact
16 whether the copy that was provided by IIG to MHCS
17 included a copy of Endorsement 8?
18     A.    I later learned that it was included.
19     Q.    In preparing this affidavit, leaving your
20 attorney aside, did you obtain information from anyone
21 else so you could prepare this affidavit?
22     A.    I'd have to go through and see the content to
23 see.  I could have contacted the law firm in Florida
24 that represented me to get information.  I think mostly

89

1  it would have been with counsel.

2      Q.   If you look at page two in paragraph five,

3  given that you were not involved in the procurement of

4  insurance coverage by MHCS, I'm wondering how you knew

5  the information contained in paragraph seven and eight,

6  do you recall?

7      A.   I don't know specifically.  After the fiasco

8  we had with this when we didn't have the appropriate

9  insurance, as an owner of the company, I demanded they

10  get it and get it in place.  And I knew it was in place.

11      Q.   Page three, paragraph 16 on the next page, I

12  take it that at the time the first sentence of paragraph

13  16 was prepared you were not aware that Endorsement 8

14  actually was in the copy of the policy provided to MHCS?

15      A.   That's correct.  If I had known that nothing

16  was covered for 25,000, I would have insisted that the

17  company do something about it.

18      Q.   If you look at paragraph 20 on the next page,

19  page four?

20      A.   Which number?

21      Q.   20.  Do you know if the amount listed there,

22  the $19,396.24, was the total amount of legal fees you

23  incurred in the Heller action?

24      A.   No.  I think, I don't know for sure.  But I

90

1  know there are monies in addition to that that I wasn't

2  able to pay to Greg Aceto's firm that are still

3  outstanding.  I'm assuming that those are monies that

4  were paid to his firm.

5      Q.   I'm hoping you can clarify something for me on

6  paragraph 21.  Where it says "as a result thereof," do

7  you know what that's referring to?

8      A.   Because of the Heller suit and because

9  National chose not to provide coverage for this, I was

10  left with no choice.  I was facing insurmountable

11  liabilities.  It was as a result of all that litigation.

12      Q.   I just wanted to clarify that the "as a result

13  of" wasn't referring simply to the $19,000 in legal

14  fees?

15      A.   Oh, no.

16      Q.   With respect to the Heller litigation, do you

17  know approximately how much in legal fees you had

18  incurred prior to the time you filed for bankruptcy?

19      A.   You'd have to get that from Greg Aceto's

20  office.

21      Q.   If you look at paragraph 31, there's a

22  reference there to notification to the bankruptcy

23  trustee?

24      A.   Yes.

91

1      Q.   Is that the notification we were talking about

2  earlier today?

3      A.   Yes.

4      Q.   To the best of your memory, have you told me

5  everything you recall about discussions with the

6  bankruptcy trustee about any claims by you against

7  National Union?

8      A.   I think I've been clear.  That subject was

9  disclosed.  It was not something that anyone really saw

10  as an asset.  And he didn't either.  I remember it just

11  being dropped.

12      Q.   I wasn't suggesting you weren't clear.  I was

13  wondering whether during the course of today given the

14  questions you answered if there was anything else you

15  remembered discussing with the bankruptcy trustee?

16      A.   No.

17      Q.   If you go to paragraph 35, the $100,721 in

18  legal fees that's referenced there, were those legal

19  fees incurred in connection with your bankruptcy?

20      A.   Yes.

21      Q.   Paragraph 36 where it refers to the sale of

22  your residence in Osprey, Florida --

23      A.   Yes.

24      Q.   -- what was the sale price of that

92

1  transaction?

2      A.   1,399,000.

3      Q.   Resulting in a total loss of $536,688.  How

4  was that amount calculated?

5      A.   The difference between what I sold it for and

6  what it was appraised for maybe three to six months

7  before then.  It was appraised for a million 750, and I

8  put it on the market for that price and had to drop and

9  drop.  I needed the cash.  I have all those appraisals.

10      Q.   Do you recall how much you paid for the house

11  in Florida?

12      A.   A million one.

13      Q.   The last sentence of paragraph 36, was the

14  amount of the additional indebtedness that you added to

15  your home in Hingham, was that $250,000?

16      A.   Yes.

17      Q.   Why was that additional indebtedness added to

18  your home in Hingham at that time?

19      A.   Well, I needed not only the money for the

20  settlement, I had legal fees, I don't remember what the

21  balance to be paid was.  I had tapped out a home equity

22  line that I had to pay off.  I was basically robbing

23  Peter to pay Paul to get through this period.

24      Q.   As you sit here today, can you tell me what

93

1  damages you believe that you've suffered as a result of
2  National Union's decision not to provide coverage for
3  you in the Heller action, basically what damages you're
4  seeking in this case?
5          MR. ACETO:  Aside from what you already
6  covered or do you want him to list everything again?
7          MR. TUMILTY:  I'd like the full list.
8  BY MR. TUMILTY:
9  Q.    You don't have to go into detail on the things
10  you told me about, but I would like a full list.  I want
11  to have an understanding of what you believe your
12  damages are.
13          MR. ACETO:  Rather than dollar figures,
14  you want categories of what the damages are?
15          MR. TUMILTY:  Sure.
16  BY MR. TUMILTY:
17  Q.    You can say I believe I've been damaged
18  because I had to sell my home and go down a list or give
19  me the dollar numbers as you go, however you want to do
20  it.
21  A.    My life has changed completely.  Going back to
22  the time prior to the Heller action, we had a very
23  valuable entity in that company.  It should never have
24  been converted in the bankruptcy court.  There is a

94

1  direct link.
2          When you lose your main asset -- I lost about
3  a million eight in loans that just went poof and
4  disappeared.  It never should have happened.  It was
5  largely due to the positioning of Heller, which I happen
6  to know why they did what they did and so do the other
7  officers of the company.
8          But when that happened and I didn't have
9  someone to stand beside me when I thought I had
10  coverage, because I really needed to fight these people,
11  because I think they are bad guys, and I think the
12  people that worked with me were honest and
13  straightforward.
14          There was no game playing.  I assure you there
15  was never any negligence.  If there was, I would be
16  very, very surprised.  But not to have someone stand
17  beside me caused me, I became very severely depressed.
18  I had a lot of angina and ended up with six
19  angioplasties.  I'm on a ton of medication.
20          I'm 60 years old.  Just last week my wife and
21  I sold our house in Hingham.  We are trying to put
22  together our retirement.  We are renting until we are
23  able to get back on our feet.  Not being able to stand
24  up to the bad guys of Heller caused me to, caused me all

95

1  of these health-related issues.
2          When you're drained financially, you lose any
3  level of confidence that you have at the same time.  I
4  think that, I think it's not just what I spent, I think
5  it's a life that's ruined that just needed to have
6  someone stand beside them to fight off people that
7  needed to be fought off.  And I ran out of gas and my
8  body pretty much ran out of gas.
9          I used to be a pretty affluent guy and I'm not
10  now.
11          MR. ACETO:  Do you want him to go through
12  the damages listed in the affidavit, more of the special
13  damages?
14          MR. TUMILTY:  I'll go a piece at a time.
15  BY MR. TUMILTY:
16  Q.    I'm not trying to minimize anything.  When you
17  say it's worth a lot, what do you think that's worth?
18          MR. ACETO:  What he just described from
19  the prior answer?
20          MR. TUMILTY:  Yes.
21  BY MR. TUMILTY:
22  A.    I think that if someone had stood beside me
23  and fought these guys, you know, I would be, I would
24  probably be worth three or four or $5 million right now,

96

1  because I don't think I would have lost.
2  Q.    And if you had to put an estimate on your net
3  worth right now, what would you say it is?
4  A.    Somewhere in the neighborhood of $500,000.
5  Q.    When you said there were $5.8 million worth of
6  loans that went poof, were those loans from you to MHCS?
7  A.    Yes.
8  Q.    Did you recover anything on those loans?
9  A.    No.
10  Q.    Then you said something along the lines of
11  positioning by Heller, do you recall that?
12  A.    Um-hum.
13  Q.    What were you referring to?
14  A.    It's a long story.  If you want, I'll tell you
15  the story.  To try to make it as succinct as possible,
16  this whole subject of negligence on the borrowing
17  certificates is just the opposite.  If anything, they
18  were showing the two ladies that ran the company ways to
19  create recognition of revenue streams.
20          The reason that Heller changed their stripes
21  is because Pam Jones was such an honest person that she
22  just wasn't comfortable doing what they said she could
23  do.  Although we were in bankruptcy at the time, Heller
24  basically saw a company that was going to be able to

97

1   fund the loans, there wasn't going to be a problem with
2   that, but they seemed to become -- they became very,
3   very aggressive with the bankruptcy judge.  They did
4   things that were so out of character just to upset the
5   judge.
6           And one of the other partners from Edward and
7   Angell, she knows they are bad guys.  She despises them.
8   I don't know if she would admit that now.  They caused
9   the bankruptcy judge to put the company in bankruptcy
10  and they kept all the receivables.  There's never been
11  an accounting.
12          The overline, which was the only part I
13  guaranteed, which was about $200,000, that was supported
14  by the private receivables.  It was in excess of
15  200,000.  Pam Jones and Indy Edwards both fully expected
16  that that was all collected.  If there was anything left
17  on that guaranty of mine for that portion, we all would
18  have been surprised.
19          But they never gave us any accounting.  And
20  Heller ended up where they collected all the
21  receivables, and they saw an opportunity with this D & O
22  policy to make it a bad pay day.  And if I hadn't been
23  so beaten down with this bankruptcy, I never would have
24  signed that settlement agreement.

98

1           The two ladies who signed affidavits that they
2   were negligent, neither one of them believe it.  They
3   had such pressure on them from Heller, and they are both
4   people that are, they are both divorced and scared to
5   death.  Heller was putting big time pressure on them.
6           My wife was with me when we read the
7   settlement discussion, and they were just as mean as you
8   could imagine.  She wanted to get away from it and we
9   signed it and called it a day.  Heller is not the good
10  guy.  I've lost my right to go after them.  But that's
11  why I needed to have someone stand beside me.
12     Q.    Can you explain to me what the overline is
13  that you guaranteed?
14     A.    Heller would lend only on Medicare and
15  Medicaid and I think government -- as well as Blue
16  Cross/Blue Shield and insurances.  They had a formula.
17  We had another group of customers who were private pays.
18  They don't lend against private pay.
19          But in our case, they made an exception and
20  they made a separate loan on that particular component.
21  But they made me guaranty that overline.  And it was
22  about 200,000.
23          MR. TUMILTY:  This is a logical place to
24  break for the day.

99

1           (Whereupon the deposition was suspended at
2   2:45 p.m.)

100

1              C E R T I F I C A T E
2
3        I, MICHAEL INGOLDSBY, do hereby certify that I have
4   read the foregoing transcript of my testimony, and
5   further certify that said transcript is a true and
6   accurate record of said testimony.
7        Dated at _____ this _____
8   day of _____, 2006.
9
10
11
12          _____
13          MICHAEL INGOLDSBY
14
15  Signed under the pains and penalties of perjury.
16
17
18
19
20
21
22
23
24

EXHIBIT B

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.,
*Formerly known as*
HELLER HEALTHCARE FINANCE, INC.,
Plaintiff

And

MICHAEL INGOLDSBY,
Intervenor/Plaintiff

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE GROUP, LTD,
Defendants.

Civil Action No.: 05-CV-11128-NG

## FIRST AMENDED COMPLAINT IN INTERVENTION

This is an action for declaratory judgment, pursuant to 28 U.S.C. § 2201, breach of contract and violation of M.G.L. chapter 93A, arising from a dispute concerning defense obligations under a liability insurance policy issued by National Union Fire Insurance Company of Pittsburgh, PA to Michael Ingoldsby as Chairman of the Board of Managed Health Care Systems, Inc.

## PARTIES

1.    The Plaintiff, Michael Ingoldsby, is an individual who resides at 1863 San Silvestro Drive, Venice, Florida.  At all times relevant hereto, Mr. Ingoldsby was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"),

I

12/16/05 13:36 FAX 315 734 2933 UNICO E&O CLAIMS Case 1:05-cv-11128-NG Document 1.11-3 Filed 08/28/2008 Page 3 of 22 @012/048

FROM (TUE)DEC 13 2005 15:03/ST. 15:01/No. 6816175455 P 6

which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts. In this capacity, Mr. Ingoldsby is a person engaged in trade or commerce as that term is defined in G.L.c. 93A.

2.  The Defendant, National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), is a duly constituted corporation and an insurance company duly licensed to issue insurance policies in Massachusetts. The Defendant National Union Fire Insurance Company of Pittsburgh, PA, has a home office at 175 Water Street, New York, New York. The Defendant is a person engaged in trade or commerce as that term is defined in M.G.L. c. 93A.

3.  The Defendant, International Insurance Group ("International"), is a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and has its principal place of business at 125 Broad Street, 4th Floor, Boston, Massachusetts. The Defendant is a person engaged in trade or commerce as that term is defined in M.G.L. c. 93A.

## JURISDICTION AND VENUE

4.  Jurisdiction is properly placed in this Court pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is diversity of citizenship between Ingoldsby and National Union.

5.  Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this judicial district and National Union, a corporation, is subject to personal

2

jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS

### I.      Terms of the Insurance Policy.

6.      At all times material hereto, the Plaintiff was insured for liability under a policy of

insurance issued by National Union Fire Insurance Company of Pittsburgh, PA to

Managed Health Care Systems, Inc., being policy number 873-57-52, effective

August 4, 2001, through August 4, 2002, which was a renewal of policy number

473-16-30 (hereinafter collectively referred to as the "Policy").

7.      Included in the specifications of who is covered by the Policy are the following:

Directors and Officers Insurance:

> [P]olicy shall pay the Loss of each and every Director or Officer of the
> Company arising from any claim or claims first made against the Directors
> or Officers reported to the Insurer during the Policy Period or the
> Discovery Period ... for any alleged Wrongful Act in their respective
> capacities as Directors or Officers of the Company..."

8.      Under Section 2(g), a "Wrongful Act" is described as:

> any breach of duty, neglect, error, misstatement, misleading
> statement, omission or act by the Directors or Officers of the
> Company in their respective capacities as such, or any matter
> claimed against them solely by reason of their status as Directors
> or Officers of the Company.

### II.      International Insurance Group, LTD.

9.      International served as the brokerage firm for MHCS in obtaining Directors and

Officers Insurance.

10.      As such, International advised MHCS as to the most appropriate coverage and

policy.

3

11.    On or about August 4, 2000, MHCS purchased the Policy issued by National

Union, using International as its insurance broker.

12.    The Policy came up for renewal on August 4, 2001.

13.    On or about July 31, 2001, International provided MHCS with National Union's

Renewal Proposal (the "Proposal") which detailed, among other items,

Endorsements to be added to the base policy.

14.    Upon information and belief, the Renewal Proposal provided by International did

not include a copy of Endorsement No. 8, which amended Exclusion 4(h) and, in

doing so, limited coverage related to claims arising from contractual liability.

15.    Exclusion 4(h), as purportedly amended, stated as follows:

> (h) alleging, arising out of, based upon or attributable to any actual
> or alleged contractual liability of the Company or an Insured under
> any express (written or oral) contract or agreement (including, but
> not limited to, any liquidated damages, severance agreement or
> payment, golden parachute agreement, or any compensation
> agreement payable upon termination of any insured)...

A true and correct copy of Endorsement No. 8 of the Policy is attached hereto as

Exhibit "A."

16.    On or about July 31, 2001, International also provided MHCS with a letter, dated

July 27, 2001, from National Union to International that outlined changes that

would be reflected in the Policy upon renewal.

17.    The July 27, 2001 letter also did not reference the purported amendment to

Exclusion 4(h).

18.    Upon information and belief, International failed to fully advise MCHS regarding

the language of the alleged Exclusion and the effect of said Exclusion on MCHS'

4

liability coverage under the Policy.

19.   The language of Exclusion 4(h), as amended, significantly decreased, if not
      altogether eliminated, the value of the Policy to MHCS by excluding any claims
      arising from contractual liability.

III.   Denial of Coverage under the Policy.

20.   On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller")
      commenced a civil action in United States District Court for the District of
      Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against the
      Plaintiff Michael Ingoldsby and served the "Complaint and Jury Demand," a true
      and correct copy of which is attached hereto as Exhibit "B."

21.   On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the
      Defendant, National Union.

22.   All conditions precedent to the Plaintiff's rights under the Policy and to this action
      have been performed or have occurred.

23.   On or about October 11, 2002, the insurer, through counsel, "declined coverage
      for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby,
      and Indy Edwards." A true and correct copy of the October 11, 2003 denial letter
      is attached hereto as Exhibit "C."

24.   Thereafter, by letter dated March 6, 2003, counsel for National Union again
      declined coverage by stating that "there [was] no coverage available under the
      policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby."
      A true and correct copy of the March 6, 2003 denial letter is attached hereto as

5

12/16/05  13:36 FAX 315 734 2933    UMICO E&O CLAIMS                                ☑016/048
Case 1:05-cv-11128-NG    Document 111-3    Filed 08/28/2008    Page 7 of 22

FROM                                        (TUE)DEC 13 2005 15:04/ST. 15:01/No. 6816175455 P 10

Exhibit "D."

25.   Specifically, the insurer stated that under Exclusion 4(h), as amended by
      Endorsement No. 8, it is "not liable to make any payment for loss in connection
      with any claim or claims made against the Directors of Officers" because the
      claims allege, arise out of and are based upon the contractual liability of MHCS
      under the [Debtor-in-Possession Loan and Security Agreement] ("DIP")
      Agreement.

26.   The Heller Complaint alleged a claim for Negligent Misrepresentation (Count I)
      against Pamela Jones, Indy Edwards and Michael Ingoldsby and claim for
      Breach of Guaranty (Count II) against Michael Ingoldsby and Mary Lee
      Ingoldsby.   See Exhibit B.

27.   The allegation of negligent misrepresentation qualifies as a "Wrongful Act" under
      the terms of the policy.  Specifically, the policy defines a "Wrongful Act" as:

            any breach of duty, neglect, error, misstatement, misleading statement,
            omission or act by the Directors or Officers of the Company in their
            respective capacities as such, or any matter claimed against them solely
            by reason of their status as Directors or Officers of the Company.

28.   Thus, any breach of *neglect, misstatement,* or *misleading statement* claimed
      against the Officers or Directors in their respective capacity are acts covered
      under the Policy as should be Count I of the Complaint.

29.   National Union disregarded the fact that Michael Ingoldsby was the Chairman of
      the Board at the relevant times and not involved in the day-to-day operations of
      MHCS.

30.   In fact, the Complaint alleged in ¶ 25 that the borrowing base certificates were

12/16/05   13:38 FAX 315 724 2933   UMICO E&O CLAIMS   Case 1:05-cv-11128-NG   Document 111-3   Filed 08/28/2008   Page 8 of 22   ☑017/048

FROM                                    (TUE)DEC 13 2005 15:05/ST. 15:01/No. 6816175455 P 11

signed by Jones and Edwards, not Mr. Ingoldsby. As such, Michael Ingoldsby was sued under Count 1 of the Complaint solely by reason of his status as a member of the Board of Directors and not due to any sort of active role in MHCS. See Exhibit B.

31.   Therefore, under the terms of Section 1, Coverage A (Directors and Officers Insurance) of the Policy, Mr. Ingoldsby qualifies as an insured.

32.   Based on the allegations of the Complaint and Jury Demand, facts were known or readily knowable to National Union articulating circumstances which were reasonably susceptible of an interpretation of a covered claim.

33.   The Defendant National Union owed a defense obligation under the policy for all defense costs associated with the defense of the Heller Action because the allegations of the Complaint and Jury Demand as a whole were reasonably susceptible of an interpretation that they state or adumbrate a claim for negligent misrepresentation, -- a "Wrongful Act" under the Policy-- which claims were not, under the terms of the Complaint, necessarily within any exclusion.

34.   The failure and refusal of the Defendant National Union to fulfill its obligations under the policy represents a breach of contract and an unfair claims practice in violation of M.G.L. c. 93A, § 2 and M.G.L. c. 176D.

35.   As a result of the failure of Defendant National Union to fulfill its obligations as set forth above, the Plaintiff has suffered substantial damages.

36.   In litigating the claims asserted by Heller over a two-year period, the Plaintiff also expended a substantial amount of money in attorneys' fees and costs.

7

37.  In addition, the Plaintiff was forced to file a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7.

38.  On or about February 7, 2004, the Plaintiff entered into a Settlement Agreement with Heller under which Heller received approximately One Hundred Thousand Dollars ($100,000.00) from the Plaintiff.

## CLAIMS FOR RELIEF

### COUNT I
### (DECLARATORY JUDGMENT)
### (MICHAEL INGOLDSBY v. NATIONAL UNION)

39.  The Plaintiff incorporates by reference herein the allegations contained within paragraphs 1-38, as though fully set forth herein.

40.  As more fully described above, a real and justiciable controversy has arisen between the Plaintiff and National Union regarding National Union's obligation to defend Michael Ingoldsby in the Heller Action.

41.  The parties cannot settle the existing controversy without the aid of this Court's judgment.

WHEREFORE, the Plaintiff requests this Court to:

a.  Enter a declaratory judgment that the Plaintiff Michael Ingoldsby was entitled to a defense from National Union against Heller's claims.

b.  Enter a declaratory judgment that the terms of Endorsement No. 8, which amended Exclusion 4(h), are unconscionable and should not

8

be enforced.

   c.    Enter a declaratory judgment that the terms of Endorsement No. 8,
which amended Exclusion 4(h) created an adhesion contract and
the terms of such should not be enforced.

   d.    Enter a declaratory judgment that National Union is now required to
reimburse Plaintiff for the costs of his defense and settlement of the
Heller Action.

   e.    Enter a declaratory judgment that National Union must reimburse
the Plaintiff for all attorneys' fees and court costs associated with
this action.

   f.    And grant such further relief as the Court may deem equitable and
just under the circumstances.

**COUNT II**
**(BREACH OF CONTRACT)**
**(MICHAEL INGOLDSBY v. NATIONAL UNION)**

42.   The Plaintiff incorporates by reference herein the allegations contained within
paragraphs 1-41, as though fully set forth herein.

43.   At all times material hereto, the Plaintiff Michael Ingoldsby was insured for liability
under a policy of insurance issued by National Union Fire Insurance Company of
Pittsburgh, PA to Managed Health Care Systems, Inc., being policy number
FKO6003905, effective August 4, 2001, through August 4, 2002, which was a
renewal of policy number 473-16-30.

44.   All conditions precedent to the Plaintiff's rights under the Policy and to this action

9

have been performed or have occurred.

45. On or about August 1, 2002, Heller commenced a civil action against the Plaintiff Michael Ingoldsby and served the "Complaint and Jury Demand". See Exhibit D.

46. On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant National Union.

47. On or about October 11, 2002, the insurer, through counsel, "declined coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards." See Exhibit C.

48. Thereafter, by letter dated March 6, 2003, counsel for National Union again declined coverage by stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller Action* against Michael O. Ingoldsby." See Exhibit D.

49. The Defendant National Union owed a defense obligation under the Policy for all defense costs associated with the defense of the *Heller Action* because the allegations of the Complaint and Jury Demand as a whole are reasonably susceptible of an interpretation that they state or adumbrate a claim for negligent misrepresentation, -- a "Wrongful Act" under the Policy-- which claims were not, on the terms of the Complaint, necessarily within any exclusion such as Exclusion 4(h) (as amended Endorsement No. 8).

50. The failure and refusal of the Defendant, National Union, to fulfill its obligations under the policy represents a material breach of the Policy.

51. As a result of the failure of Defendant National Union to fulfill its obligations as

10

set forth above, the Plaintiff Michael Ingoldsby has suffered damages, a loss of money and has been damaged in his business.

**WHEREFORE**, the Plaintiff demands judgment against the Defendant in an amount to be proven at trial, plus interest from the date this action was filed and court costs.

## COUNT III
### (VIOLATION OF MASS. GEN. L. 93A and 176D)
### (MICHAEL INGOLDSBY v. NATIONAL UNION and INTERNATIONAL)

52. The Plaintiff incorporates by reference herein the allegations contained within paragraphs 1-51, as though fully set forth herein.

53. Both National Union and International are engaged in trade or commerce as defined by M.G.L. ch. 93A.

54. National Union's conduct, including willful breach of the Policy, constitutes an unfair and deceptive act or practice in violation of G.L. c. 93A and an unfair claims practice in violation of G.L. c. 176D.

55. By virtue of the above conduct, National Union engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A and an unfair claims practice in violation of G.L. c. 176D.

56. International's conduct, including material misrepresentations regarding the Policy and the coverage provided therein, constitutes an unfair and deceptive act or practice.

57. By virtue of the above conduct, International engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A and G.L. c. 176D.

11

58. The Defendants National Union and International acted in conspiracy in violation of G.L. c. 93A and G.L. c. 176D.

   **WHEREFORE**, the Plaintiff suffered damages and monetary loss as a result of the Defendants' conduct in violation of Massachusetts General Laws, Chapter 93A and G.L. c. 176D, entitling the Plaintiff to treble damages, attorney's fees, plus interest and costs.

**COUNT IV**
**(FRAUD/DECEIT)**
**(MICHAEL INGOLDSBY v. INTERNATIONAL)**

59. The Plaintiff incorporates by reference herein the allegations contained within paragraphs 1-58, as though fully set forth herein.

60. By words or conduct, International misrepresented material facts to MHCS, thereby inducing MHCS to purchase and/or renew the Policy.

61. Specifically, the fraud consisted of statements and representations made by International that the Policy would provide certain coverage for the Plaintiff in his capacity as a director for MHCS, in particular as it related to contractual liability.

62. These representations, knowingly made, were intended to mislead and induce MHCS into purchasing and/or renewing the Policy.

63. Based on these misrepresentations, MHCS's officers and directors, including Michael Ingoldsby, reasonably relied to their detriment on International's misrepresentation that the Policy would cover such claims.

64. However, the insurer National Union failed and refused to defend the Plaintiff and, in doing so, relied on an endorsement that was not disclosed to the Plaintiff

by International upon renewal of the Policy.

**WHEREFORE,** the Plaintiff has suffered damages and monetary loss as a result

of the Defendant International's fraudulent conduct and demands judgment against it in

an amount to be proven at trial, plus interest and court courts.

**COUNT V**
**(NEGLIGENT MISREPRESENTATION)**
**(MICHAEL INGOLDSBY v. INTERNATIONAL)**

65.     The Plaintiff incorporates by reference herein the allegations contained within

paragraphs 1-64, as though fully set forth herein.

66.     By words or conduct, International misrepresented material facts to MHCS,

thereby inducing MHCS to purchase and/or renew the Policy.

67.     Specifically, the misrepresentation consisted of statements and representations

made by International that the Policy would provide certain coverage for the

Plaintiff in his capacity as a director for MHCS, in particular as it related to

contractual liability.

68.     These representations were negligently made as the Defendant failed to exercise

reasonable care or competence in obtaining and/or communicating information

regarding the Policy to the Plaintiff.

69.     Based on these misrepresentations, Mr. Ingoldsby reasonably relied to his

detriment on International's misrepresentation that the Policy would cover such

claims.

70.     However, the insurer, National Union, failed to defend the Plaintiff in the Heller

Action and, in doing so, relied on an endorsement that was not adequately

13

disclosed to the Plaintiff by International upon renewal of the Policy.

WHEREFORE, the Plaintiff have suffered monetary damages as a result of International's negligent conduct and demand judgment against it in an amount to be proven at trial, plus interest and court courts.

THE PLAINTIFF CLAIMS A JURY TRIAL ON ALL CLAIMS SO TRIABLE.

Respectfully submitted,
MICHAEL INGOLDSBY
By his Attorney,

Gregory J. Aceto
BBO# 558556
JOHNSON & ACETO, P.C.
67 Batterymarch St., Suite 400
Boston, MA 02110
(617) 728-0888

Dated: November_____, 2005

14

EXHIBIT C

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

GE HFS HOLDINGS, INC.
*Formerly known as*
HELLER HEALTHCARE FINANCE,
INC.,

      Plaintiff,

and

MICHAEL INGOLDSBY,

      Intervenor/Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, and
INTERNATIONAL INSURANCE
GROUP, LTD.,

      Defendants.

CIVIL ACTION No: 05-CV-11128-NG

## AFFIDAVIT OF MICHAEL INGOLDSBY

      I, Michael Ingoldsby, being duly sworn, depose and state as follows:

1.     I am an individual with a residence at 1863 San Silvestro Drive, Venice, Florida, 34285.

2.     At all times relevant hereto, I was the Chairman of the Board of Managed Health Care Systems, Inc. ("MHCS"), which was a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts and had its principal place of business at 175 Derby Street, Hingham, Massachusetts.

3.     As Chairman of the Board, I was not involved in the day-to-day operations of

MHCS.  In fact, I had not been involved in the operations of MHCS since 1999 due to a

medical condition which disabled me.  Since 1999, I have been collecting under a

disability policy and have not been involved in the day-to-day operations of MHCS.

4.      As such, I was not involved in the preparation of the borrowing base certificates

submitted to Heller in connection with the DIP Loan.

5.      In addition, I did not personally do business with Defendants IIG or National

Union and was not directly involved with the procurement of insurance coverage.

6.      At all times material hereto, I was insured for liability under a Directors and

Officers Policy of Insurance and Company Reimbursement Policy, issued by National

Union Fire Insurance Company of Pittsburgh, PA to Managed Health Care Systems, Inc.,

being policy number 873-57-52, effective August 4, 2001, through August 4, 2002,

which was a renewal of policy number 473-16-30 (hereinafter collectively referred to as

the "Policy").

7.      On or about August 4, 2000, MHCS purchased the Policy issued by National

Union, using International Insurance Group, Inc. ("IIG") as its insurance broker.

8.      The Policy came up for renewal on August 4, 2001.

9.      On or about July 31, 2001, IIG provided MHCS with National Union's Renewal

Proposal (the "Proposal") which detailed, among other items, endorsements to be added

to the base policy.

10.     The Policy provided by IIG did not include a copy of Endorsement No. 8, which

amended Exclusion 4(h) and, in doing so, limited coverage related to claims arising from

contractual liability.  In addition, the copy of the Policy I received was not bound.

11.    Further, as an insured, I was never advised of the inclusion of Endorsement No. 8, which amended Exclusion 4(h), or its implications on the coverage provided by the Policy.

12.    On or about August 1, 2002, Heller Healthcare Finance, Inc. ("Heller") commenced a civil action in United States District Court for the District of Massachusetts, Civil Action No. 02CV11553 NG (the "Heller Action") against me and subsequently served the "Complaint and Jury Demand," a true and correct copy of which is attached hereto as *Exhibit A*.

13.    The Heller Complaint alleged claims against me for Negligent Misrepresentation (Count I) and Breach of Guaranty (Count II).

14.    On August 2, 2002, the "Complaint and Jury Demand" was forwarded to the Defendant, National Union.

15.    On or about October 11, 2002, the insurer, through counsel, "declined coverage for the *Heller Action* allegations against Michael Ingoldsby, Mary Lee Ingoldsby, and Indy Edwards." A true and correct copy of the October 11, 2002 denial letter is attached hereto as *Exhibit B*.

16.    Because National Union and IIG failed to adequately disclose Endorsement No. 8 and its amendment of Exclusion 4(h), I had no knowledge of Endorsement No. 8 or Exclusion 4(h) prior to National Union's denial of my claim. More importantly, I had no knowledge of the effect of said endorsement in limiting coverage under the Policy.

17.    Thereafter, by letter dated March 6, 2003, counsel for National Union again declined coverage by stating that "there [was] no coverage available under the policy for the claims asserted in the *Heller* action against Michael O. Ingoldsby." A true and

correct copy of the March 6, 2003 denial letter is attached hereto as *Exhibit C*.

18.     By way of letter from counsel, dated March 17, 2004, I made a formal demand to National Union under Mass. Gen. Laws Ch. 93A. National Union again declined coverage by way of letter from counsel, dated April 16, 2004, and, in doing so, again relied upon Exclusion 4(h), as amended by Endorsement No. 8.

19.     Because National Union denied my claim under the Policy, I bore the cost of my defense of the Heller Action.

20.     In litigating the claims asserted by Heller over a two-year period, I expended a substantial amount of money in attorneys' fees and costs. Specifically, I incurred legal fees related to the Heller Action in the amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100 ($19,396.24).

21.     As a result thereof, on or about December 13, 2002, I filed a petition for relief pursuant to Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Tampa Division, case number 02-24824-8C7 (the "Bankruptcy").

22.     National Union was not a creditor in the Bankruptcy.

23.     On or about January 2, 2003, I filed my Schedules and Statement of Financial Affairs.

24.     In my Statement of Financial Affairs, I disclosed that I was a defendant in the Heller Action.

25.     At that time, I had not contemplated a claim for reimbursement and/or indemnification against National Union because I had not yet incurred any substantial legal fees or suffered any damages. Therefore, I did not list it on my Schedules and

Statement of Financial Affairs.

26.    On or about April 18, 2003, I filed an Amended Schedule and Statement of Affairs.

27.    At this time, I was still not aware of any potential claim against National Union.

28.    On or about July 13, 2003, Heller was granted relief from automatic stay in my bankruptcy case. As such, the case began to proceed and I began to accumulate significant legal fees related thereto.

29.    On or about March 17, 2004, I made a formal demand upon National Union, via counsel, for reimbursement of my defense costs in the Heller Action.

30.    On or about April 16, 2004, National Union, via counsel, responded to my formal demand letter and again denied coverage.

31.    Once it became clear that National Union was not going to reimburse me for the defense costs of the Heller Action, the Bankruptcy trustee was notified that I had a potential claim against Nation Union related to the reimbursement of said defense costs.

32.    I also discussed the potential claim against National Union with my bankruptcy counsel who advised me that I did not need to amend my Statement of Financial Affairs to reflect a potential claim for post-petition expenses.

33.    As such, I did not omit my claim against National Union from my Statement of Financial Affairs with the intention of defrauding the court or my creditors.

34.    On or about February 7, 2004, I entered into a Settlement Agreement with Heller. Pursuant to the Settlement Agreement with Heller, I submitted payment to Heller in the amount of One Hundred Twelve Thousand Seven Hundred Sixty Three Dollars and 71/100 ($112,763.71). I also incurred legal fees related to the Heller Action in the

amount of Nineteen Thousand Three Hundred Ninety Six Dollars and 24/100

($19,396.24).

35.     I subsequently expended Two Hundred Fifty Thousand Dollars ($250,000.00) to

settle the bankruptcy case and expended an additional One Hundred Thousand Seven

Hundred Twenty One Dollars ($100,721.00) in legal fees.

36.     In order to cover the costs of the bankruptcy settlement, I was forced to sell my

residence in Osprey, Florida, for below market price, resulting in a total loss of Five

Hundred Thirty Six Thousand Six Hundred Eighty Eight Dollars ($536,688.00).  I was

also forced to refinance the mortgage on my residence located in Hingham,

Massachusetts, increasing my indebtedness by Two Hundred Fifty Thousand Dollars

($250,000.00).


Signed under the pains and penalties of perjury this _18th_ day of September, 2006.

Michael Ingoldsby